## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SYNTHES, INC.,<br>1302 Wrights Lane East<br>West Chester, Pennsylvania 19380, | :<br>:<br>:   CASE NO.:<br>: |
| SYNTHES USA HQ, INC.,<br>1302 Wrights Lane East<br>West Chester, Pennsylvania 19380, | :   JURY TRIAL DEMANDED<br>:<br>:<br>: |
| SYNTHES USA, LLC,<br>1302 Wrights Lane East<br>West Chester, Pennsylvania 19380; | :<br>:<br>: |
| SYNTHES USA SALES, LLC,<br>1302 Wrights Lane East<br>West Chester, Pennsylvania 19380; and | :<br>:<br>:<br>: |
| SYNTHES USA PRODUCTS, LLC,<br>1302 Wrights Lane East<br>West Chester, Pennsylvania 19380, | :<br>:<br>:<br>: |
| Plaintiffs, | :<br>: |
| v. | :<br>: |
| JOHN P. MAROTTA,<br>464 Garfield St.<br>Denver, Colorado 80206; and | :<br>:<br>:<br>: |
| EMERGE MEDICAL, INC., f/k/a Emerge<br>Surgical, Inc.,<br>1530 Blake St., Suite 204<br>Denver, Colorado 80202, | :<br>:<br>:<br>: |
| Defendants. | :<br>: |

## VERIFIED COMPLAINT

Plaintiffs Synthes, Inc.; Synthes USA HQ, Inc.; Synthes USA, LLC; Synthes USA Sales,

LLC; and Synthes USA Products, LLC (collectively, "Synthes") file this Complaint against

1

Defendants John P. Marotta ("Marotta") and Emerge Medical, Inc., f/k/a Emerge Surgical, Inc. (collectively, "Emerge") and, in support thereof, aver as follows:

## INTRODUCTION

1.      This lawsuit presents a classic example of employee disloyalty.  Synthes, a global leader in the orthopedic medical device market, hired Marotta in 2004 to serve as one of its Trauma Sales Consultants in an expansion territory in Arizona.  Marotta had never worked in the orthopedic medical device industry, but armed with access to Synthes' customer base and goodwill, resources, extensive product and industry training, and sensitive information concerning Synthes' business practices and strategies, Marotta grew to become one of Synthes' most successful and well-compensated employees and a strong resource for Synthes' customers. Based on his exemplary performance as a Sales Consultant, Synthes promoted Marotta to serve as a Regional Manager based in Colorado.  Throughout Marotta's tenure at Synthes as both a Sales Consultant and Regional Manager, assessments of his performance were glowing.  In all, Marotta's supervisors described him as a "trusted resource" who "aggressively supports" Synthes' business and is "selflessly supportive of company objectives and interests."

2.      But recent developments have proven otherwise.  Unbeknownst to Synthes, Marotta did not have Synthes' interests foremost in his mind during his employment, and instead engaged in an archetypal form of disloyalty.  While employed and while fully aware of his post-employment contractual obligations to Synthes, Marotta conceived, developed, and founded Emerge—an entity designed to compete directly with Synthes—and actively solicited Synthes' employees to join him in his plan.

3.      Then, with an MBA paid for by Synthes freshly under his belt, Marotta resigned effective April 15, 2010, lying to Synthes by stating that he would be joining a non-competitor.

2

As Synthes has come to learn, however, Marotta immediately began operating Emerge; targeting Synthes' customers in multiple regions, including regions in which he served as a Synthes employee; and selling substitute products fully interchangeable with Synthes' Trauma product offerings directly to Synthes customers, using Synthes' part numbers. At first it was drill bits, but Emerge is now selling cannulated screws as well as plates and has its sights on Synthes' entire orthopedic portfolio, targeting products with applications in trauma, spine, sports medicine, and reconstruction.

       4.     Duplicating a competitor's products and part numbers and selling them directly to its customers may seem like an effective model to establish market presence quickly and without a significant expenditure of resources. But in this case, Marotta's and Emerge's actions have violated the most fundamental precepts of employee loyalty and fair competition as well as contractual and common law obligations to Synthes. Marotta violated fiduciary and contractual duties owed to Synthes during the term of his employment by conceiving, developing, and forming Emerge, conspiring with others to do so, and soliciting Synthes' employees and customers to participate in his illicit scheme. Additionally, Marotta violated, and continues to violate, reasonable post-employment contractual obligations he owes to Synthes by continuing to solicit Synthes' employees and customers, including customers within his former territory, and by directly competing with Synthes across the country. Marotta and Emerge have also tortiously interfered, and continue to interfere, with Synthes' relationships with its customers and employees. Marotta's and Emerge's conduct as a whole is the epitome of unfair competition. But most importantly, however, Marotta developed and is marketing products and a company, Emerge, that lawfully belong to Synthes.

5.      Synthes already has suffered a substantial, adverse business impact and irreparable harm as a direct result of Marotta's and Emerge's illicit actions, and those same actions threaten imminent additional harm.

6.      Synthes now files this Verified Complaint ("Complaint"), aiming to untangle the web of deceit and unlawful conduct that led to the creation and operation of Emerge and seeking justice and redress, including, but not limited to, equitable relief, assignment of Emerge and its assets to Synthes, and damages arising out of that conduct.

## THE PARTIES

7.      Plaintiff Synthes, Inc. is a Delaware corporation with its principal place of business at 1302 Wrights Lane East, West Chester, Pennsylvania.  Synthes, Inc. is the parent company of the other plaintiffs, all of whom are Delaware entities with principal places of business at 1302 Wrights Lane East, West Chester, Pennsylvania.

8.      Plaintiff Synthes USA, LLC—formerly Synthes (U.S.A.), a general partnership— owns certain assets and liabilities related to the intellectual property and manufacturing operations of the Synthes family of companies.  Plaintiff Synthes USA Sales, LLC owns certain assets and liabilities related to the field sales activities of the Synthes family of companies. Plaintiff Synthes USA Products, LLC owns certain assets and liabilities related to the product development, manufacturing, and distribution operations of the Synthes family of companies. Plaintiff Synthes USA HQ, Inc. owns certain assets and liabilities related to the corporate staff functions and administrative operations of the Synthes family of companies.  Plaintiffs Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC are all wholly-owned subsidiaries of Synthes USA HQ, Inc., which is, in turn, a wholly-owed subsidiary of Synthes, Inc.

4

9.     The operations of the Synthes family of companies are organized into unincorporated operating divisions, including, without limitation, Trauma, Spine, Cranio-Maxillofacial ("CMF"), and Biomaterials.

10.     Defendant John P. Marotta is, upon information and belief, an adult citizen of the State of Colorado who maintains a residence at 464 Garfield St., Denver, Colorado.   At all material times, Marotta was employed by Synthes as a Sales Consultant or Regional Manager in its Trauma division.   Marotta resigned from Synthes on March 15, 2010, effective April 15, 2010.

11.     Upon information and belief, Marotta founded Defendant Emerge Medical, Inc. and currently serves as its Chief Executive Officer and as a director.   (See Notice of Exempt Offering of Securities (Form D), attached hereto as Exhibit "A," at Section 3 ("Mr. Marotta is a founder of the Issuer and will become an executive officer and director of the Issuer upon completion of this offering."); LinkedIn Profile of "John Marotta, MBA," attached hereto as Exhibit "B.")   Emerge Medical, Inc. is a Colorado profit corporation and, upon information and belief, maintains its principal place of business at 1530 Blake St., Suite 204, Denver, Colorado. (See Certificate of Good Standing, attached hereto as Exhibit "C," and Statement of Change Changing the Principal Office Address, attached hereto as Exhibit "D.")   Emerge Surgical, Inc. filed articles of incorporation with the Colorado Secretary of State on January 13, 2010 and changed its name to Emerge Medical, Inc. on June 23, 2010.   (See Articles of Incorporation for a Profit Corporation, attached hereto as Exhibit "E," and Articles of Amendment, attached hereto as Exhibit "F.")   Emerge directly competes with Synthes in the orthopedic medical device market.   (See Compendium of Archived and Current Website Images, attached hereto as Exhibit "G.")   Upon information and belief, Zachary W. Stassen ("Stassen") is also one of the founders

5

of Emerge and, following its formation and during Marotta's final months of employment at Synthes, served as Emerge's Chief Operating Officer and as a director. (See Ex. A at Section 3 & Signature.) Upon information and belief, Charles Q. (Chaun) Powell ("Powell"), a former Sales Consultant in Synthes' Trauma division who resigned from Synthes effective March 30, 2010, currently serves as Emerge's Director of US Sales. (See Emerge Solicitation Material, attached hereto as Exhibit "H.")

12.     Defendants' unlawful conduct has adversely affected and harmed interests held by each of the Plaintiffs and threatens to cause additional harm to those interests.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this Complaint under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship. The parties are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over the Defendants under Pennsylvania's long arm statute, 42 PA. CON. STAT. ANN. § 5322(b), and the Constitution, and venue is proper under 28 U.S.C. § 1391(a). Synthes is a citizen of Pennsylvania, with its principal place of business in Pennsylvania. Marotta's employment agreements with Synthes, discussed fully infra, were formed in Pennsylvania. The Defendants' conduct specifically relates to and gives rise to Synthes' claims set forth herein and has been, and continues to be, directed at Synthes in Pennsylvania. And the harmful, and intended, effects of the Defendants' conduct have been felt, and will continue to be felt, by Synthes in Pennsylvania. Furthermore, this Court has personal jurisdiction over the Defendants and venue is proper because this action and the Defendants' conduct are the subject of a valid contractual provision that not only selects the Commonwealth

of Pennsylvania as the designated forum but also consents to this Court's exercise of personal jurisdiction.  (See Marotta's Confidentiality, Non-Solicitation and Non-Competition Agreement ("Regional Manager Non-Compete Agreement"), attached hereto as Exhibit "I," at p. 6 ("I agree that this agreement shall exclusively be enforced by any federal or state court of competent jurisdiction in the Commonwealth of Pennsylvania and hereby consent to the personal jurisdiction of these courts.").)  Emerge is bound by this forum-selection provision because its formation and conduct constitute the very contractual violations at issue in this Complaint and because it is foreseeable that its conduct would implicate the Non-Compete Agreement and bind it to the forum-selection provision.

## FACTS SUPPORTING SYNTHES' COMPLAINT

### Background

15.     Synthes is a worldwide leader in the medical device industry, marketing and selling medical implant devices, including, without limitation, plates, screws, rods, biomaterials, instrumentation, and other devices for orthopedic surgery.

16.     Synthes' customers include, but are not limited to, hospitals; hospital employees or directors who influence or may influence the use or purchase of medical devices from Synthes, including materials management, operating room, sterile processing, and related personnel; and physicians who use or may use the devices supplied by Synthes, as well as their partners, employees, and staff nurses (collectively, "Customers").

17.     The medical device industry, and the orthopedic device industry in particular, is a highly competitive business, and the protection of Synthes' sensitive, confidential, proprietary, and trade secret information is vital to prevent competitors, or would-be competitors, from obtaining an unfair competitive advantage and from tortiously interfering with Synthes' business.

7

18.     Synthes markets and sells its product offerings through a sales force comprised of regional Sales Consultants and Associate Sales Consultants (collectively, "Sales Consultants") report to Regional Managers, are assigned to specific territories within regions, and are generally paid on a commission basis. As part of their responsibilities, Sales Consultants also assist in sales and surgical coverage for Customers in nearby territories that have been assigned to other Sales Consultants.

19.     Synthes' Regional Managers are responsible for the maintenance and growth of sales in the territories within their region. Among other things, Regional Managers hire, train, and manage Sales Consultants, travel to existing and prospective customers with Sales Consultants to establish and nurture effective working relationships with those customers, and negotiate and close sales. Regional managers also identify, develop, and implement strategic territory expansion opportunities; evaluate and develop Sales Consultants' individual business plans; and lead sales strategies and activities for all new product introductions. Synthes' Regional Managers, like Sales Consultants, are often compensated based on sales within their regions and, like Marotta, may also receive base compensation in addition to commissions.

20.     Synthes invests millions of dollars in resources annually to develop its technology, systems, products, and strategies and to educate and train its employees. In order to protect its investments, Synthes requires all employees to sign an Employee Innovation and Non-Disclosure Agreement ("Non-Disclosure Agreement"), which, among other things, protects against the use or disclosure of confidential, proprietary, and trade secret information, such as information concerning projects, product technology, product development, manufacturing methods and technology, pricing, and marketing and sales strategies and opportunities.

090725.02126/21951826v.4

21.     Synthes also requires employees hired in capacities which involve sales, marketing, and product development to sign a Confidentiality, Non-Solicitation and Non-Competition Agreement ("Non-Competition Agreement"), which, among other things, protects against the disclosure of confidential information, prohibits the solicitation of Synthes' employees and Synthes' existing or prospective customers, and prohibits activities during and after employment with or on behalf of any individual or entity that competes or intends to compete with Synthes, subject to reasonable geographic and temporal limitations.

22.     In exchange for executing the Non-Disclosure and Non-Competition Agreements, Synthes promises to provide and does, in fact, provide its employees with sensitive, confidential, and proprietary information, customer relationships and related goodwill, and valuable training programs in which Synthes has invested significant time, effort, and monies.

23.     Synthes further protects these interests by requiring employees to return, and not retain copies of, all correspondence files, business card files, customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes and other material that contain any of this information and other similar information upon separation from Synthes' employment.

24.     Synthes takes additional and significant measures to protect its sensitive, confidential, proprietary, and trade secret information, including obtaining patent and trademark protection when available, setting up physical and electronic limitations to access, requiring the assignment of all inventions and innovations conceived or developed during the term of employment, and by enforcing the provisions in the Non-Disclosure and Non-Competition Agreements where, as here, they have been violated.

9

25.     Each of Plaintiffs Synthes USA HQ, Inc., Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC holds certain rights and obligations related to the Non-Disclosure and Non-Competition Agreements, and the Plaintiffs are also direct, third-party beneficiaries of those agreements.

**Marotta's Employment with Synthes in Arizona and Colorado, His Contractual Non-Solicitation, Non-Competition, Non-Disclosure Obligations to Synthes, and Synthes' Ownership of Inventions and Innovations Conceived or Developed during His Employment**

26.     Marotta applied to Synthes on April 1, 2004, without any background in the orthopedic medical device industry.

27.     Synthes offered Marotta a position as a Sales Consultant in its Trauma division, and Marotta accepted Synthes' offer on June 21, 2004 and thereafter began as a Sales Consultant in the Desert Valley region.

28.     Prior to commencing employment and as a condition of that employment, Synthes required that Marotta review and execute the Non-Competition Agreement, which he then signed on June 25, 2004.  (See Ex. Sales Consultant Non-Competition Agreement, attached hereto as Exhibit "J.")

29.     On June 25, 2004, Marotta also signed the Non-Disclosure Agreement.  (See Non-Disclosure Agreement, attached hereto as Exhibit "K.")

30.     At that same time, Marotta received and reviewed Synthes' Employee Policy Manual, and in 2009, Marotta received and reviewed the Synthes' amended Employee Policy Manual.  Among other policies, those manuals detail Synthes' Tuition Reimbursement Policy, which requires that employees who leave Synthes reimburse the company for tuition payments made during the term of their employment.

090725.02126/21951826v.4

31.     As part of its investment in Marotta and to educate him in an area in which he had no prior experience, at the commencement of his employment with Synthes, Synthes provided extensive training concerning the trauma industry, product segment, human anatomy, the treatment of traumatic fractures and the application of trauma products in the surgical environment.

32.     As a Sales Consultant in Arizona, Marotta had direct and primary contact with Synthes' customers and became intimately familiar with Synthes' customers' preferences, needs, priorities, purchasing and ordering histories, decision-making, and practices as well as additional sensitive and confidential information concerning his territory and Synthes' business practices and strategies.

33.     Marotta was highly successful and highly compensated as a Sales Consultant, receiving hundreds of thousands of dollars annually in compensation.

34.     Based on his success as a Sales Consultant and the trust Synthes had placed in him, Synthes offered Marotta a promotion to Regional Manager in 2007.

35.     Marotta accepted his offer of promotion to Regional Manager on September 23, 2007 and he began as Regional Manager on February 1, 2008.

36.     In connection with his promotion to Regional Manager, on September 17, 2007, Synthes required that Marotta review and execute a second Non-Competition Agreement, which he then signed on September 23, 2007.  (See Ex. I (Non-Competition Agreement).)

37.     As a Regional Manager in Colorado, Marotta's responsibilities increased.  He was now directly responsible for the maintenance and growth of sales in the entire region as well as for hiring, training, and managing the Sales Consultants and accounts within that region, traveling to existing and prospective customers with Sales Consultants to establish and nurture

11

effective working relationships with those customers, and negotiating and closing sales.  In this role, Marotta became intimately familiar with Synthes' customers' preferences, needs, priorities, purchasing and ordering histories, decision-making, and practices as well as additional sensitive and confidential information concerning the Rocky Mountain region and Synthes' company-wide business practices and strategies.  Indeed, Marotta was directly responsible for identifying, developing and implementing strategic territory expansion opportunities; evaluating and developing Sales Consultants' individual business plans; and leading sales strategies and activities for all of Synthes' new product introductions.

38.    Marotta himself acknowledged the significance of his responsibilities as a Regional Manager and his value to Synthes in a draft business plan apparently generated during and for purposes of the MBA program in which he was enrolled at Synthes' expense, subject to his agreement to repay Synthes for those tuition costs in the event he left the company.

39.    Marotta was well-rewarded for his services to Synthes, and his compensation increased progressively over the course of his tenure with the company.

40.    Throughout his employment with Synthes as a Sales Consultant and Regional Manager, Synthes entrusted Marotta with its most valuable customer contacts, goodwill, and business information.   Synthes also assigned and introduced Marotta to its existing and prospective customers in those regions.  Synthes provided Marotta with direct access to Synthes' valuable business relationships.   In his roles, Marotta had access to and used sensitive, confidential, proprietary, and trade secret information that he would not have obtained but for his working for Synthes in that capacity, including sensitive information about Synthes' customers and business activities and strategies generally as well as sensitive information about Synthes'

12

customers and business activities and strategies within the Desert Valley territory in Arizona and the Rocky Mountain region in Colorado.

41.     The sensitive information Synthes entrusted to Marotta included, but is not limited to, information concerning Synthes' marketing and sales strategies, product performance and development, expansion plans, technology, pricing, competitive terms, contract and sales administration, compensation and personnel, and other sensitive information related to Synthes' business.

42.     Synthes also provided Marotta with substantial specialized training on the technical aspects of Synthes' products and the medical procedures in which these products are used as well as on techniques for educating operating room personnel and surgeons so that Marotta could be an effective resource to those surgeons during medical procedures concerning the use of existing and new implants and instrumentation. During these training sessions, Marotta also received sensitive information regarding Synthes' contract and sales administration, personnel, and other departments.

43.     Marotta was obligated to use this vital information and training for Synthes' exclusive benefit and to maintain and develop Synthes' valuable customer and business relationships for Synthes' exclusive benefit.

44.     As set forth in the Non-Competition Agreements between Marotta and Synthes, Marotta agreed not to "disclose or communicate" Synthes' confidential and proprietary information "to any competitor or other third party" at any time during or after leaving Synthes' employ or to "use or refer to" such information "for any purpose…except as necessary for [him] to properly perform services for Synthes during [his] employment," including, but not limited to, information concerning:

13

A.   the identity of Synthes' existing and prospective customers, customers' specific requirements, preferences, and usage histories, and the names, addresses, and telephone numbers of individual contacts with those existing and prospective customers;

B.   Synthes' prices, renewal dates, and other detailed terms of Synthes' customer and supplier contracts and proposals;

C.   Synthes' pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology, and product development strategies;

D.   Synthes' physical security systems, access control systems, network, and other equipment designs;

E.   Synthes' employment and payroll records;

F.   Synthes' forecasts, budgets, and other non-public financial information;

G.   Synthes' product performance information, product technical information, and product know-how; and

H.   Synthes' expansion plans, management policies, and other business strategies and policies.

(See Ex. I at pp. 1-2; Ex. J at p. 2.)

45.   Under the Non-Disclosure Agreement and his Non-Competition Agreements, Marotta also agreed that any inventions, innovations, or technical or business ideas conceived or developed during his employment are the exclusive property of Synthes:

> I agree...to disclose and assign to Synthes *as its exclusive property, all inventions and technical or business innovations*, including computer software developed or conceived by me solely or jointly with others on company time or on my own time during the period of my employment, (1) that are along the lines of the business, work or investigations of SYNTHES or its affiliates to which my employment relates, or as to which I may receive information due to my employment, or (2) that result from or are suggested by any work which I may do for SYNTHES or (3) that are otherwise made through the use of SYNTHES time, facilities or materials.

14

(See Ex. K (emphasis added); see also Ex. J at p. 2 ("I understand that Synthes'
proprietary…information includes…information…that is developed or conceived by me, alone
or with others, at Synthes' instruction or otherwise."); Ex. I at pp. 2-3 (same).)

46.    To further protect Synthes' legitimate business interests and confidential and
proprietary information, the non-competition covenant in Marotta's Sales Consultant Non-
Competition Agreement specifically prohibited Marotta from competing with Synthes for a
period of one year following the termination of his employment with Synthes:

> I am employed by Synthes in sales, account management or
> maintenance, or customer service or support, with an assigned
> territory, and I agree I will not, for a period of one year after my
> employment terminates for any reason, work for (as an employee,
> consultant, contractor, agent or representative) any competitor of
> Synthes in the territories that I am now, or have been responsible
> for at any time during the last year of my employment with
> Synthes. Competitors shall be deemed any persons or entities who
> now, or in the future, sell, or intend to sell, orthopedic, bone
> fixation, maxillofacial medical, endoscopic and/or spinal implant
> device or instrumental technologies, products, or services.

(See Ex. J at p. 3.)

47.    Similarly, the non-competition covenant in Marotta's Regional Manager Non-
Competition Agreement also specifically prohibited Marotta from competing with Synthes both
during his employment and for a period of one year following the termination of his employment
with Synthes:

> I agree that, during my employment and for a period of twelve (12)
> months after my employment with Synthes terminates for any
> reason, voluntary or involuntary, I will not, directly or
> indirectly…work for or be involved in the Business of any
> Competitor of Synthes in an executive, managerial, marketing,
> sales, technical, administrative, or product development capacity,
> whether as an owner, principal, partner, employee, consultant,
> contractor, agent or representative. 'Competitor', as used in this
> Agreement, shall mean any persons or entities who now, or in the

> future, manufacture, develop, sell, or intend to sell, technologies, products, or services in the Business described above.

(See Ex. I. at p. 4.)

48.     The Sales Consultant Non-Competition Agreement also contains a non-solicitation covenant that prohibits Marotta from soliciting business from Synthes' customers within his territory in Arizona and with whom he had worked for a period of one year following the termination of his employment with Synthes:

> I will not, for a period of one year after my employment with Synthes terminates for any reason solicit or contact, directly or through others, for the purpose of competing or interfering with any part of Synthes' business, (1) any customer of Synthes that I solicited at any time during the last three years of my employment; (2) any prospective customer of Synthes that received or requested a proposal or offer from me on behalf of Synthes at any time during the last three years of his employment; or (3) any customer or prospective customer of Synthes for which I had any responsibility, directly or indirectly, at any time during the last three years of my employment.

(See Ex. J at p. 3.)

49.     Because Marotta was promoted to Regional Manager in a different territory and region, the non-solicitation covenant in his Regional Manager Non-Competition Agreement also applies.  And that covenant further prohibits Marotta from soliciting business from Synthes' customers with within his region in Colorado and with whom he had worked, as well as from soliciting Synthes' employees, during the term of his employment and for a period of one year following the termination of his employment with Synthes:

> I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not solicit, contact, or provide services to (or attempt to do any of the foregoing), directly or indirectly, for the purpose or effect of competing or interfering with any part of Synthes' Business: (1) any Customer of Synthes within my assigned territory; (2) any Customer of Synthes that I contacted, for whom I had coverage responsibility, or who

16

received or requested a proposal or offer from me on behalf of Synthes at any time during the last two years of my employment; (3) any prospective Customer of Synthes that I contacted, for whom I had coverage responsibility, or who received or requested a proposal or offer from me on behalf of Synthes at any time during the last two years of my employment; (4) any existing or prospective Customer of Synthes for which I had any direct or indirect responsibility at any time during the last three years of my employment.  For purposes of this Agreement, "Customer" shall include, without limitation, hospitals; hospital employees who influence or may influence the use or purchase of medical devices in the Business, as defined, including material management, operating room, sterile processing, and related personnel; and physicians who use or may use the devices supplied within the Business, as defined, and their partners, employees and staff nurses.

*　　*　　*

I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not, directly or indirectly, (1) solicit, induce, or encourage any employee of Synthes to leave his/her employment with Synthes, (2) offer any employee of Synthes employment elsewhere, (3) participate in the recruitment of any employee of Synthes to work elsewhere, or (4) hire any employee of Synthes to work elsewhere.

(See Ex. I at pp. 3-4.)

50.　　In both Non-Competition Agreements, Marotta acknowledged the availability and necessity of injunctive relief as well as his obligation to indemnify Synthes for any attorneys' fees and costs incurred in prosecuting violations of the Non-Competition Agreements:

I acknowledge that it would be extremely difficult to measure the damages that might result from any breach by me of this agreement, and that a breach may cause irreparable injury to Synthes…that could not be compensated by money damages. Therefore, Synthes…will be entitled to enforce this agreement by obtaining a court order prohibiting me from breaching this agreement….I agree to indemnify Synthes for its reasonable attorney[s'] fees and costs  incurred in enforcing the terms of this agreement should I violate any of its terms.

(See Ex I at p. 5; Ex. J at p. 4.)

090725.02126/21951826v.4

51.     The Non-Competition Agreements have choice of law provisions under which Pennsylvania law is to govern the agreements.  (See Ex. I at p. 6; Ex. J at p. 4.)

52.     The restrictions in Marotta's Non-Competition and Non-Disclosure Agreements are reasonable in scope and time, as they limit Marotta, during his employment and after his employment for a period of only one year, from soliciting Synthes' employees and existing or prospective customers within his two territories and from competing with Synthes.  In addition, the restrictions are designed to protect Synthes' legitimate business interests and do not impose a greater restraint than necessary to do so.[1]

53.     As expressly acknowledged in his Non-Competition Agreements, Marotta entered into the Sales Consultant Non-Competition Agreement in connection with his acceptance of employment with Synthes as a Sales Consultant and into the Regional Manager Non-Competition Agreement in connection with his promotion to Regional Manager, and he received adequate, and separate, consideration for signing each agreement. Marotta entered into the Non-Disclosure Agreement in connection with his acceptance of employment with Synthes and he received adequate consideration in the form of his employment.  Additionally, with respect to all of the agreements, Synthes promised Marotta that he would have access to, and in fact provided him with, its sensitive, confidential, and proprietary information, customer relationships and related goodwill, and valuable training programs, in all of which Synthes has invested significant time, effort, and monies to develop to and protect its business and position in the highly competitive medical device industry.  (See generally Exs. I, J, and K.)

---

[1] The Pennsylvania Superior Court and numerous courts throughout the country have upheld the enforceability of the non-competition and non-disclosure provisions of Synthes' employment agreement. *See, e.g., Synthes (U.S.A.) v. Myer*, 986 A.2d 1294 (Pa. Super. Ct. 2009) (affirming Jan. 7, 2009 Opinion and Order, Civil Action No. 2008-10358-IR (Pa. C.C.P. Chester County) (J. Streitel)).

18

54.     As Marotta's offer letters for his position as Sales Consultant and promotion to Regional Manager make plain, Synthes would not have allowed Marotta to become its employee or be promoted to Regional Manager had he not signed the Non-Competition and Non-Disclosure Agreements.

55.     Marotta was fully aware of his obligations to Synthes under these agreements at the time he signed them and at the time of his resignation.  Indeed, Marotta had been informed of Synthes' enforcement of these agreements against other former employees, and Synthes even questioned Marotta about his employment plans after termination in an exit interview, during which he denied leaving Synthes to join a competitor.  Tellingly, Marotta even forwarded an electronic copy of the Regional Manager Sales Consultant Agreement to himself by e-mail just days after Emerge's articles of incorporation were filed, acknowledging the applicability of the agreements to his formation and planned operation of Emerge.

### Marotta's Resignation from Synthes

56.     Marotta resigned from Synthes on March 15, 2010, effective April 15, 2010, providing Synthes with no indication of his future plans.  But, by that time, Emerge and Marotta's plan to destroy Synthes' business by targeting its customers were well under way.

57.     By the time he resigned, Marotta already had formed Emerge and planned to join Emerge immediately.  But leading up to his resignation, Marotta lied to Synthes, stating to his supervisor that he would be working with his uncle, a board member of Centerre Healthcare, an entity that developed and operated rehabilitation facilities, and to Human Resources, during his exit interview, that he would be joining a non-competitor.  And Synthes reasonably relied on his representations.

58.     And despite a written demand and company policies with which he was fully aware, since his resignation Marotta has refused to reimburse Synthes for $35,058.32 in tuition payments Synthes made during the term of his employment in connection with his MBA degree. (See Compendium of Applications for Tuition Refund, attached hereto as Exhibit "L," and Demand Letter, attached hereto as Exhibit "M.")

<strong>Marotta's Violations of Fiduciary, Contractual, and Common Law<br>Obligations to Synthes</strong>

59.     Notwithstanding Marotta's clandestine planning of Emerge while employed by Synthes, his lies and misrepresentations to Synthes leading up to his resignation, and his post-employment efforts to mask his involvement with Emerge, Synthes has learned that Marotta has been quietly engaged in unlawful conduct to form Emerge and wrongfully compete with Synthes since 2009, at the latest.

60.     In the summer of 2009, Marotta reached out to an accounting and consulting firm regarding possible names for an "orthopedic and medical device and healthcare consultant" company and, by that time, had researched companies that design corporate logos.

61.     Marotta's calendar entries reveal that, in the summer of 2009, he also began to collaborate with Zachary W. Stassen, who later became Emerge's Chief Operating Officer and a corporate director and to seek out potential investors as well as lawyers with Venture Law Advisors—the same law firm that eventually filed Emerge's articles of incorporation.

62.     Marotta's calendar entries reveal that Marotta's collaboration with potential investors, Mr. Stassen, and lawyers from Venture Law Advisors continued regularly into the winter of 2009.

63.     In December of 2009, Marotta began making trademark filings with the United States Patent and Trademark Office ("PTO") relating to the name and logo for Emerge.

64.     And on January 13, 2010—three months before his resignation from Synthes—Marotta met with Venture Law Advisors, and Venture Law Advisors filed Emerge's articles of incorporation with the Colorado Secretary of State.

65.     Around that same time frame, Marotta e-mailed to himself copies of a Regional Manager Non-Competition Agreement saved under his name as well as encrypted files containing his Microsoft Contacts, Calendar, Notes, and Tasks, including details concerning his meetings with potential investors, Mr. Stassen, and Venture Law Advisors as well as over 1,200 entries pertaining to his business contacts, including extensive contact information for Synthes' customers.

66.     On February 22, 2010, Mr. Stassen, purporting to be Emerge's Chief Operating Officer and a director, filed a Form D Notice of Exempt Offering of Securities with the SEC, indicating that, as of that date, Emerge intended to obtain $1.5 million in investment capital and already had obtained two investors for $200,000 just days before the filing.  In that same document, Mr. Stassen represents that Marotta, then still employed by Synthes, was "a founder of the Issuer [Emerge] and will become an executive office and director of the Issuer upon completion of this offer" of securities.  (See Ex. A.)

67.     Synthes has learned that Marotta personally solicited Synthes' employees and customers during early 2010, while Marotta was still employed by Synthes, concerning, at a minimum, their willingness to invest in Emerge.

68.     On June 23, 2010, Emerge Surgical, Inc. changed its name to Emerge Medical, Inc. in a filing with the Colorado Secretary of State.  (See Ex. F.)

69.     And less than one month later, Marotta made a new trademark filing with the PTO for the name and logo of "Emerge Medical."   Marotta has continued to update these

21

trademark filings and appears to have received tentative registration of the trademark pending objections by third parties.

70.     In November 2010, representatives of Emerge began placing labels for reordering Synthes' surgical drill bits in Synthes Inventory Management System ("SIMS") cabinets, directing Synthes' customers to reorder surgical drill bits from Emerge instead.  To make it perfectly clear to users and customers that Emerge's products are fully interchangeable with Synthes' products, Emerge uses Synthes' part numbers, differentiating it only by appending the suffix ".EM."

71.     Since that time, those Synthes customers have begun to order replacement surgical drill bits directly from Emerge rather than from Synthes, resulting in a direct loss of business to Synthes.

72.     Emerge's general intent to compete with Synthes is further evidenced by Emerge's recent 510(k) submission—only made public recently.  In that November 2010 510(k) approval, Emerge obtained clearance from the FDA for a "Cannulated Screw Fixation System" that is "substantially equivalent" to Synthes' cannulated screw system.  Emerge indicates that this cannulated screw fixation system is "intended to provide bone fixation in the management of fractures of both small and large bones and bone fragments, including those in the foot, patella, ankle, wrist, and elbow and arthrodesis of the foot, wrist, and elbow and small and long bone osteotomies."  (See 510(k) Materials, attached hereto as Exhibit "N.")

73.     Following Emerge's 510(k) approval, Emerge revised its website to indicate that it is now marketing its cannulated screw system—a market worth millions of dollars to Synthes in Marotta's former territories alone.

22

74.     Synthes also has recently learned that Marotta joined forces with Charles Q. (Chaun) Powell, a former Synthes Sales Consultant assigned to Marotta's region in Colorado during Marotta's employment, and that Mr. Powell is actively soliciting Synthes' customers as Emerge's "Director of US Sales."

75.     The competitive nature of Emerge's business model is further evidenced by marketing materials distributed by Mr. Powell, which represent that "Emerge Medical manufactures high quality orthopedic medical devices that you [Synthes' customers] are already familiar with at fair prices." (See Ex. H.)

76.     In the span of only a few months, Emerge has gone from marketing drill bits identical to and compatible with Synthes' systems to receiving 510(k) clearance for a cannulated screw system that is substantially equivalent to Synthes' system, and, as indicated above, Emerge plans to forge ahead into other product offerings and segments including general orthopedics, spine, and reconstruction—all marketed by well-trained and highly motivated sales representatives.  Synthes has recently learned that Emerge is now selling plates as well.

77.     By engaging in these and similar activities, Marotta has directly violated and continues to violate directly the confidentiality, non-solicitation, and non-competition aspects of his Non-Competition Agreements as well as the non-disclosure obligations of his Non-Disclosure Agreement.  By forming Emerge while employed by Synthes and by contacting Synthes' employees to invest in Emerge and assist his efforts, Marotta breached his fiduciary duty to Synthes.  And by operating Emerge through this conduct and offering products as Emerge's own, Marotta and Emerge are unfairly competing with Synthes in violation of Marotta's Non-Disclosure Agreement, which establishes Synthes' exclusive ownership of Emerge and its products.

78.     Marotta's tortious solicitation of Synthes' customers and employees and unlawful competition with Synthes already have caused Synthes direct harm and will only continue to harm Synthes in its business by, among other things, causing Synthes to lose market share, lose its investment in specialized training, lose its customers and goodwill as well as contributing to the disclosure or use of Synthes' sensitive business information, interference with Synthes' customer relations, and reputational harm.

## COUNT I
## BREACH OF FIDUCIARY DUTY AND/OR DUTY OF LOYALTY (against Marotta)

79.     Synthes incorporates and re-alleges the allegations set forth above, which further detail Marotta's unlawful and disloyal conduct, as though fully set forth herein.

80.     During the term of his employment with Synthes, Marotta owed Synthes a duty of the utmost good faith, undivided loyalty, diligence, and faithful service and a duty to place Synthes' interests ahead of his own and not to act for persons, entities, or purposes whose interests would conflict with those of Synthes.

81.     Disregarding those duties, Marotta purposefully diverted his efforts during his time as a Synthes employee towards the establishment and operation of Emerge, a company formed to compete directly with Synthes in the highly specialized medical device industry by targeting Synthes' customers with substitute products that are fully interchangeable with Synthes' products and that incorporate the characteristics and part numbers for Synthes' products.

82.     Marotta also breached his duty of loyalty to Synthes by using Synthes' time and resources in order to benefit Emerge.

090725.02126/21951826v.4

83.     Marotta was bound to act in good faith and with due regard to the interests of Synthes while an employee of Synthes, but instead acted for his own interests and to injure Synthes in its business.

84.     Synthes has suffered, and will continue to suffer, substantial and irreparable damage as a result of Marotta's tortious conduct.

85.     Marotta's tortious conduct is a direct and proximate cause of Synthes' damages.

WHEREFORE, Synthes demands judgment in its favor and against Marotta:

a.     For actual damages that Synthes is entitled to recover as a result of Marotta's breach of fiduciary duty;

b.     For incidental and consequential damages as permitted by law;

c.     For the establishment of a constructive trust in favor of Synthes;

d.     For damages in the amount that Marotta and Emerge have been unjustly enriched;

e.     For Synthes' attorneys fees and costs;

f.     For an equitable accounting, forfeiture, and delivery to Synthes of all assets, income, profits, and pecuniary benefits resulting from Marotta's and Emerge's conduct;

g.     For injunctive relief; and

h.     For all such other relief as this Court deems appropriate.

## COUNT II
## BREACH OF CONTRACT UNDER THE NON-COMPETITION AND NON-DISCLOSURE AGREEMENTS) (against Marotta)

86.     Synthes incorporates and re-alleges every allegation set forth above, which further detail Marotta's and Emerge's conduct,  as though fully set forth herein.

25

87.     The Non-Competition and Non-Disclosure Agreements between Marotta and Synthes are valid and enforceable agreements and are each supported by adequate consideration.

88.     The restrictive covenants within those agreements are no broader in scope than is necessary to protect Synthes' legitimate interests in its business and its sensitive, confidential, and proprietary information.

89.     Marotta developed Emerge's business model, plan, and strategy along with its name and logo and, upon information and belief, conceptualized Emerge's competitive product offerings before the termination of his employment with Synthes.

90.     By the terms of the Non-Disclosure Agreement, Synthes owns, and Marotta is required to assign to Synthes, Emerge and its product offerings, business models, plans, strategies, names, logos, and slogans and all implants, instrumentation, and intellectual property associated with them and with any other products developed or marketed by Emerge:

> *I agree...to disclose and assign to SYNTHES as its exclusive property, all inventions and technical or business innovations*, including computer software developed or conceived by me solely or jointly with others on company time or on my own time during the period of my employment, (1) that are along the lines of the businesses, work or investigations of SYNTHES or its affiliates to which my employment relates, or as to which I may receive information due to my employment, or (2) that result from or are suggested by any work which I may do for SYNTHES or (3) that are otherwise made through the use of SYNTHES time, facilities or materials.

(See Ex. K (emphasis added); see also Ex. J at p. 2 ("I understand that Synthes' proprietary...information includes...information...that is developed or conceived by me, alone or with others, at Synthes' instruction or otherwise."); Ex. I at pp. 2-3 (same).)

91.     Synthes owns Emerge and all of its product offerings, as well as all of Emerge's business models, plans, strategies, names, logos, and slogans and all implants, instrumentation

26

and intellectual property associated with them and with any other products developed or marketed by Emerge, because (1) they were conceptualized, created, and developed by Marotta before he resigned from Synthes; (2) they were conceptualized, created, and developed using Synthes' resources; and (3) they are well within Synthes' business lines and result from or are suggested by Marotta's work as a Synthes employee.

92.     Additional products marketed by Emerge, or that Emerge plans to market, that are competitive with Synthes' products and all business models, plans, strategies, names, logos, and slogans and all implants, instrumentation and intellectual property associated with such products also belong to Synthes.

93.     Marotta is contractually prohibited from competing with Synthes during his employment and for a period of one year after terminating his employment with Synthes and from soliciting employees during the term of his employment.

94.     Marotta has breached his contractual duties to Synthes by immediately commencing employment with Emerge, and also by directly or indirectly (including through Emerge and its employees), within one year after terminating his employment with Synthes, if not before, soliciting Synthes' customers on behalf of Emerge within the territories previously assigned to him and beyond and by operating Emerge, an entity that manufactures, develops, and sells, or intends to sell medical devices competitive with Synthes' product offerings, all in direct violation of the non-solicitation and non-competition obligations of his Non-Competition Agreements.

95.     Marotta has breached his contractual duties to Synthes by, directly or indirectly, soliciting Synthes' employees to, at a minimum, invest in Emerge.

090725.02126/21951826v.4

96.     Upon information and belief, Marotta has further breached his contractual duties to Synthes by, directly or indirectly, providing Synthes' sensitive, confidential, proprietary, or trade secret information to Emerge and third parties, in violation of the confidentiality obligations in the Non-Competition and Non-Disclosure Agreements.

97.     Unless the relief requested herein is granted, Marotta and Emerge will continue, among other things, to compete with Synthes in violation of Marotta's agreement, take advantage of the specialized training, investment and access that Synthes gave Marotta to Synthes' business and its valuable business relationships, as well as to Synthes' sensitive, confidential, and proprietary business information, and Marotta and Emerge will continue to solicit Synthes' customers, all in violation of Marotta's contractual obligations to Synthes.

98.     And unless otherwise restrained as requested herein, Marotta and Emerge will continue to market products and implement business plans and strategies owned by Synthes to Synthes' detriment and in violation of their contractual obligations to Synthes.

99.     Synthes has sustained, and will continue to sustain, damages as a result of Marotta's breach of the provisions of the Non-Compete and Non-Disclosure Agreements concerning Synthes' ownership of inventions and business innovations developed by him during his employment with Synthes.

100.    As a result of Marotta's conduct, Synthes has never enjoyed a one-year period of time without any competition by him and, therefore, has been deprived of its contractual rights.

101.    Marotta's deceit, illegal conduct, and misrepresentations have hindered and delayed Synthes' ability to enforce its contractual and equitable rights in the Non-Compete Agreements.  For this reason, and also as set forth in his Regional Manager Non-Competition

Agreement, Synthes is entitled to injunctive relief from the date of the Court's order and beyond the one-year period following Marotta's resignation of employment.

102.     Marotta's breach of the Non-Compete and Non-Disclosure Agreements is a direct and proximate cause of Synthes' damages.

103.     Synthes has fully complied with all of its obligations under the Non-Compete and Non-Disclosure Agreements.

104.     All conditions precedent to the relief requested herein have been performed, have occurred, or have been waived.

105.     Marotta's acts alleged herein were performed without Synthes' consent.

WHEREFORE, Synthes demands judgment in its favor and against Marotta:

    a.     For actual damages that Synthes is entitled to recover as a result of Marotta's breach of the Non-Compete and Non-Disclosure Agreements with Synthes;

    b.     For incidental and consequential damages as permitted by law;

    c.     For Synthes' attorneys fees and costs incurred in enforcing the terms of Non-Compete Agreement, as permitted by the Non-Compete Agreement;

    d.     For specific performance of the Non-Compete and Non-Disclosure Agreements, including the assignment to Synthes of Emerge; all products designed, developed, manufactured, or marketed by Emerge; all business models, plans, strategies, names, logos, and slogans and all implants, instrumentation and intellectual property associated with Emerge or products designed, developed, manufactured, or marketed by Emerge; and

29

all registered and unregistered trademarks associated with any products designed, developed, manufactured, or marketed by Emerge;

e.      For a declaration that Synthes owns Emerge, including all business models, plans, strategies, names, logos, and slogans and Emerge itself;

f.      For a declaration that Synthes owns all products designed, developed, manufactured, or marketed by Emerge; all business models, plans, strategies, names, logos, and slogans and all implants, instrumentation and intellectual property associated with products designed, developed, manufactured, or marketed by Emerge; and all registered and unregistered trademarks associated with the products;

g.      For the establishment of a constructive trust in favor of Synthes;

h.      For an equitable accounting, forfeiture, and delivery to Synthes of all assets, income, profits, and pecuniary benefits resulting from Marotta's and Emerge's conduct;

i.      For injunctive relief, including an injunction compelling Marotta to comply with the terms of the Non-Competition and Non-Disclosure Agreements and enjoining Marotta from competing with Synthes for a period of one year; and

j.      For all such other relief as this Court deems appropriate.

090725.02126/21951826v.4

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT (against Marotta and Emerge)

106.    Synthes incorporates and re-alleges every allegation set forth above, which further detail Marotta's and Emerge's conduct,  as though fully set forth herein.

107.    In addition to Synthes' breach of contract claims, or in the alternative, Marotta and Emerge have tortiously interfered with Synthes' contractual relationships.

108.    At the time that Marotta began working for Emerge, and before, Synthes had existing contractual relationships with Marotta and numerous customers, and Emerge knew or should have known about those contractual relationships.

109.    Emerge has tortiously interfered with Synthes' relationship with Marotta by causing Marotta to breach his obligations to Synthes.

110.    Emerge has tortiously interfered with Synthes relationships with customers in Marotta's former territories and beyond.

111.    Marotta and Emerge have tortiously interfered with Synthes' relationships with customers in Marotta's former territories and beyond.

112.    Marotta and Emerge have tortiously interfered with Synthes' contractual relationships with its employees, including employees Marotta and Emerge solicited regarding, at a minimum, investments in Emerge, and with Synthes' former employees, including, without limitation, Mr. Powell, who Emerge employs as a Director of US Sales soliciting Synthes' customers.

113.    Marotta and Emerge have acted without privilege or justification in interfering with Synthes' contractual relationships.

090725.02126/21951826v.4

114.    Marotta's and Emerge's interference with Synthes' contractual relationships was willful and wanton and has been carried out with a specific intent to injure Synthes in the conduct of its business.

115.    Synthes has suffered, and will continue to suffer, substantial and irreparable damage as a result of Marotta's and Emerge's tortious conduct.

WHEREFORE, Synthes demands judgment in its favor and against Marotta and Emerge:

a.    For actual damages that Synthes is entitled to recover as a result of Defendants' tortious interference;

b.    For incidental and consequential damages as permitted by law;

c.    For punitive damages to punish Defendants for their willful and malicious conduct in tortiously interfering with Synthes' contractual relationships;

d.    For Synthes' attorneys fees and costs;

e.    For an injunction preventing Defendants from further interfering with Synthes' contractual relationships;

f.    For the establishment of a constructive trust in favor of Synthes;

g.    For damages in the amount that Defendants have been unjustly enriched as a result of their tortious interference;

h.    For an equitable accounting, forfeiture, and delivery to Synthes of all assets, income, profits, and pecuniary benefits resulting from Marotta's and Emerge's conduct;

i.    For injunctive relief; and

j.    For all such other relief as this Court deems appropriate.

32

## COUNT IV
## AIDING AND ABETTING BREACH OF FIDCUCIARY DUTY (against Emerge)

116.   Synthes incorporates and re-alleges every allegation set forth above, which further detail Marotta's and Emerge's conduct, as though fully set forth herein.

117.   This count states a claim for aiding and abetting the breach of fiduciary duties under the Restatement (Second) of Torts, § 876(b), as adopted by Pennsylvania law.

118.   Marotta breached his fiduciary duty to Synthes by forming Emerge while employed by Synthes, by misappropriating Synthes' confidential and proprietary information and property so that the Defendants could benefit from the use of such information and property, and by otherwise wrongfully violating restrictive covenants, all in violation of the Pennsylvania common law.

119.   Emerge knew or should have known of the fiduciary duties Marotta owed to Synthes.

120.   Emerge knew or should have known of Marotta's breaches of the fiduciary duties owed to Synthes.

121.   Emerge offered substantial assistance and encouragement in furtherance of Marotta's breaches of his fiduciary duties to Synthes.

122.   Emerge's conduct is the direct and proximate cause of Synthes' damages.

WHEREFORE, Synthes demands judgment in its favor and against Emerge:

    a.   For actual damages that Synthes is entitled to recover as a result of Emerge's aiding and abetting Marotta in breaching his fiduciary duties to Synthes;

    b.   For incidental and consequential damages permitted by law;

c.    For punitive damages to punish Emerge for its willful and malicious conduct in aiding and abetting Marotta in breaching his fiduciary duties to Synthes;

d.    For Synthes' attorneys fees and costs;

e.    For the establishment of a constructive trust in favor of Synthes;

f.    For damages in the amount Emerge have been unjustly enriched by its conduct;

g.    For an equitable accounting, forfeiture, and delivery to Synthes of all assets, income, profits, and pecuniary benefits resulting from Marotta's and Emerge's conduct;

h.    For injunctive relief; and

i.    For all such other relief as this Court deems appropriate.

## COUNT V
## UNFAIR COMPETITION (against Marotta and Emerge)

123.    Synthes incorporates and re-alleges every allegation set forth above, which further detail Marotta's and Emerge's conduct,  as though fully set forth herein.

124.    Defendants have solicited Synthes' employees and customers, and Defendants' purpose in soliciting Synthes' customers was to destroy integral parts of Synthes' business and to compete with Synthes in the highly specialized and competitive medical device industry.

125.    Defendants' actions have been willful and wanton and were carried out with the specific intent to injure Synthes in the conduct of its business and to gain an unfair competitive advantage over Synthes.

34

126.    Defendants have, upon information and belief, made false descriptions or representations in connection with its advertising, marketing, and sales of Emerge's products that are competitive with certain of Synthes' products and that are, in fact, owned by Synthes.

127.    Because, upon information and belief, Emerge and its products were developed through the use of resources and information obtained by Marotta during the course of his employment with Synthes, Emerge and its products belong exclusively to Synthes.

128.    There is a likelihood of confusion on the part of consumers and/or purchasers as a result of Defendants' false representations and deceptive marketing as to the origin and the nature of so-called Emerge products and because Emerge is duplicating the appearance of Synthes' products as well as Synthes' part numbers.

129.    As a result of Defendants' conduct, Synthes is being deprived of the value of its name and goodwill.

130.    Upon information and belief, Defendants have also made false or misleading descriptions or representations in concerning the nature, qualities, or characteristics of certain of Emerge's goods that are competitive with Synthes' products.

131.    Any statements by Defendants concerning the reliability or quality of Emerge's products are materially false and misleading to customers, including customers of Synthes, because, upon information and belief, Emerge has not performed clinical testing on its products nor has Emerge conducted testing on the other competitive predicate devices, including those made by Synthes, sufficient for Defendants to draw a comparison between Emerge's products and Synthes' products.

132.    Synthes has been and will continue to be damaged by Defendants' misrepresentation of Synthes' products as belonging to Emerge, by Defendants' false or

deceptive marketing concerning the nature, quality, and characteristics of Emerge's products and the part numbers assigned to those products, by Defendants' improper solicitation of Synthes' employees and customers, and by Defendants' acquisition and use of Synthes' trade secret and other confidential proprietary business information.

133.    Synthes has suffered, and will continue to suffer, substantial and irreparable damage as a result of Defendants' tortious conduct.

134.    Defendants' tortious conduct is a direct and proximate cause of Synthes' damages.

WHEREFORE, Synthes demands judgment in its favor and against Marotta and Emerge:

a.    For actual damages that Synthes is entitled to recover as a result of Defendants' unfair competition with Synthes;

b.    For incidental and consequential damages as permitted by law;

c.    For the establishment of a constructive trust in favor of Synthes;

d.    For damages in the amount Defendants have been unjustly enriched;

e.    For Synthes' attorneys' fees and costs;

f.    For punitive damages to punish Defendants for unfairly competing with Synthes;

g.    For an equitable accounting, forfeiture, and delivery to Synthes of all assets, income, profits, and pecuniary benefits resulting from Marotta's and Emerge's conduct;

h.    For injunctive relief, including an injunction enjoining Defendants from any further unfair competition with Synthes; and

i.    For all such other relief as this Court deems appropriate.

## COUNT VI
## BREACH OF CONTRACT OR, IN THE ALTERNATIVE, UNJUST ENRICHMENT
### (against Marotta)

135.    Synthes incorporates and re-alleges every allegation set forth above, which further detail Marotta's conduct, as though fully set forth herein.

136.    Pursuant to Synthes' tuition reimbursement policy, which Marotta acknowledged every time he requested reimbursement, Synthes reimbursed Marotta for nearly $70,000 in expenses for Marotta's pursuit of an MBA degree from the University of Denver.

137.    Pursuant to those same reimbursement policies and in consideration for Synthes' payment, Marotta understood and agreed that "if I voluntarily leave the company within one year of completion of the courses for which I have been reimbursed, I will be responsible for reimbursing the company those funds paid within the past year.  These funds will be deducted from my last paycheck and the balance, if any, will be billed to me for payment." (See Ex. M.)

138.    To date, the unpaid balance of funds is $35,058.32.  (See Ex. N.)

139.    Marotta has breached the tuition reimbursement policies and agreement by refusing to tender the $35,058.32 to Synthes, and Synthes is entitled to recover that amount as damages caused by his breach of the agreement.

140.    In the alternative, Synthes is entitled to recover the unpaid balance of $35,058.32 because Marotta has been unjustly enriched by Synthes' payment for his MBA degree.  Synthes has conferred a benefit on Marotta in the form of its payment for his MBA degree, Marotta has appreciated the benefit of his MBA degree, and Marotta's acceptance and retention of Synthes' payment without compensating Synthes for the MBA degree is, under the circumstances, inequitable.

090725.02126/21951826v.4

141.   Not only has Marotta received the benefit of Synthes' financial expenditures, he has received a master degree that enhances his marketability and provides real value to him and to Emerge.

142.   Synthes paid more than $70,000 for Marotta to obtain an MBA—an investment in Marotta's future with Synthes and in his role as a Regional Manager.  It would be unreasonable and inequitable for Marotta to retain the benefit of Synthes' financial investment given that he resigned from Synthes just weeks after his final tuition payment and the completion of his MBA program.   Moreover, it would be inequitable for Marotta to retain the benefit of Synthes' financial investment in the MBA program given that Marotta breached his fiduciary duties to Synthes and engaged in unlawful conduct in forming and operating Emerge Medical.

WHEREFORE, Synthes demands judgment in its favor and against Marotta for damages in the amount Marotta has been unjustly enriched, and for all such other relief as this Court deems appropriate.

## COUNT VII
## FRAUD (against Marotta)

143.   Synthes incorporates and re-alleges every allegation set forth above, which further detail Marotta's and Emerge's conduct, as though fully set forth herein.

144.   Marotta defrauded Synthes during and after his employment with Synthes by materially misrepresenting his compliance with his fiduciary and contractual obligations to Synthes and by misrepresenting and omitting his intention to compete with Synthes immediately after resignation and his conception, development, and operation of Emerge.

145.   Synthes reasonably relied on Marotta's misrepresentations and omissions.

090725.02126/21951826v.4

146.    Synthes has been directly harmed as a result of Marotta's misrepresentations and omissions, including, but not limited to, economic harm and the unnecessary delay Marotta's actions have caused to Synthes' ability to enforce its contractual and equitable rights.

WHEREFORE, Synthes demands judgment in its favor and against Marotta and Emerge:

   a.    For actual damages that Synthes is entitled to recover as a result of Marotta's conduct;

   b.    For incidental and consequential damages as permitted by law;

   c.    For the establishment of a constructive trust in favor of Synthes;

   d.    For damages in the amount Defendants have been unjustly enriched;

   e.    For Synthes' attorneys' fees and costs;

   f.    For punitive damages to punish Marotta for his fraudulent conduct;

   g.    For an equitable accounting, forfeiture, and delivery to Synthes of all assets, income, profits, and pecuniary benefits resulting from Marotta's and Emerge's conduct;

   h.    For injunctive relief; and

   i.    For all such other relief as this Court deems appropriate.

## **JURY DEMAND**

Synthes hereby demands a trial by jury on any issue so triable by right.

090725.02126/21951826v.4

Dated: March 4, 2011              **BLANK ROME LLP**

_Anthony B. Haller_

Anthony B. Haller
Identification No. 37017
James T. Smith
Identification No. 39933
Michael P. Broadhurst
Identification No. 80906
One Logan Square
Philadelphia, PA  19103
(t) (215) 569-5690/5643/5438
(f) (215) 832-5690/5643/5438
haller@blankrome.com
smith-jt@blankrome.com
broadhurst@blankrome.com

*Attorneys for Plaintiffs Synthes, Inc., Synthes USA
HQ, Inc., Synthes USA, LLC, Synthes USA Sales,
LLC, and Synthes USA Products*

## VERIFICATION

I, Kenneth Carpenter, in my capacity as Vice President, U.S. Trauma Sales in Synthes'

Trauma division, an unincorporated operating division of the Synthes group of companies, which

includes the plaintiffs in the above-captioned litigation, Synthes, Inc., Synthes USA HQ, Inc.,

Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC, hereby state

that I am familiar with the facts set forth in the foregoing Verified Complaint, am authorized to

execute this Verification on behalf of Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC,

Synthes USA Sales, LLC, and Synthes USA Products, LLC, and that the facts set forth therein

are true and correct to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 for unsworn

falsification to authorities.

_____
Kenneth Carpenter

Dated: February 24, 2011