**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SYNTHES, INC., SYNTHES USA HQ, INC.,  :
SYNTHES USA, LLC, SYNTHES USA SALES,  :
LLC, and SYNTHES USA PRODUCTS, LLC,  :
                                      :  CIVIL ACTION
               Plaintiffs,            :
                                      :
      v.                              :
                                      :  NO.  11-1566
JOHN P. MAROTTA and EMERGE MEDICAL,   :
INC., f/k/a Emerge Surgical, Inc.,    :
                                      :
               Defendants.            :

**MEMORANDUM**

BUCKWALTER, S.J.                                        March 6, 2012

     Currently pending before the Court is the Motion of Plaintiffs Synthes, Inc., Synthes USA

HQ, Inc., Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC

(collectively "Synthes" or "Plaintiffs") for Leave to Amend the Complaint.  For the following

reasons, the Motion is granted.

I.      **FACTUAL BACKGROUND**[1]

    A.      <u>General Information About Synthes and Its Efforts to Protect Confidential</u>
        <u>Information</u>

    Plaintiff Synthes is a worldwide leader in the medical device industry, marketing and

selling medical implant devices, including plates, screws, rods, biomaterials, instrumentation,

and other devices for orthopedic surgery.  (Compl. ¶ 15.)  Its customers include hospitals,

---

[1]  The factual background is taken directly from Plaintiff's original Complaint, as required at this stage of the proceedings.  <u>Mergliano v. MGC Mortg., Inc.</u>, No. Civ.A.11-2223, 2011 WL 5105440, at *2 (E.D. Pa. Oct. 26, 2011).

hospital employees and directors, and physicians together with their employees and staff nurses. (Id. ¶ 16.)

Synthes markets and sells its products through a sales force comprised of Regional Sales Consultants and Associate Sales Consultants. (Id. ¶ 18.) These individuals report to Regional Managers, are assigned to specific territories within regions, and are generally paid on a commission basis. (Id.) The Regional Managers are responsible for the maintenance and growth of sales in the territories within their regions, and are also responsible for hiring, training, and management of Sales Consultants. (Id. ¶ 19.) They are often compensated based on sales within their regions and may also receive base compensation in addition to commissions. (Id.)

Because Synthes invests millions of dollars annually to develop its technology, systems, products, and strategies, and to educate and train its employees, it requires all employees to sign an Employee Innovation and Non-Disclosure Agreement ("Non-Disclosure Agreement"). (Id. ¶ 20.) In addition, employees hired in sales, marketing, and product development capacities must sign a Confidentiality, Non-Solicitation, and Non-Competition Agreement ("Non-Competition Agreement"). (Id. ¶ 21.) These Agreements, in part, protect against the disclosure of confidential information, prohibit solicitation of Synthes's employees and Synthes's existing or prospective customers, and prohibit activities during and after employment with or on behalf of any individual or entity that competes or intends to compete with Synthes, subject to geographic and temporal limitations. (Id. ¶¶ 20, 21.) In exchange for the employees' execution of these Agreements, Synthes provides its employees with proprietary information, customer relationships, and valuable training programs. (Id. ¶ 22.) Synthes takes other measures to protect these interests by requiring the return of various information upon the employees' separation

from Synthes's employment.  (Id. ¶¶ 23–24.)

**B.      Plaintiff John Marotta's Employment With Synthes**

Defendant, John P. Marotta, applied to Synthes on April 1, 2004, without any background in the orthopedic medical device industry.  (Id. ¶ 26.)  On June 21, 2004, he accepted a position as a Sales Consultant in Synthes's Trauma division, working in the Desert Valley region.  (Id. ¶ 27.)  Prior to commencing work, Marotta signed both the Non-Competition Agreement and Non-Disclosure Agreement, each dated June 25, 2004.  (Id. ¶¶ 28–29.)  At the same time, Marotta was given Synthes's Employee Policy Manual and, later, the amended Employee Policy Manual.  (Id. ¶ 30.)

At the start of Marotta's employment, Synthes provided him with training concerning the trauma industry, product segment, human anatomy, the treatment of traumatic fractures, and the application of trauma products in the surgical environment.  (Id. ¶ 31.)  As a Sales Consultant in Arizona, Marotta received access to extensive customer information as well as substantial Synthes confidential information.  (Id. ¶ 32.)  He was highly successful and highly compensated and, as a result, Synthes offered him a promotion to Regional Manager in 2007.  (Id. ¶¶ 33–34.)  On February 1, 2008, Marotta began his tenure as a Regional Manager, prior to which time he reviewed and executed a second Non-Competition Agreement.  (Id. ¶¶ 35–36.)  Upon becoming a Regional Manager in Colorado, Marotta's responsibilities substantially increased, and he was responsible for identifying, developing, and implementing strategic territory expansion opportunities; evaluating and developing Sales Consultants' individual business plans; and leading sales strategies and activities for all of Synthes's new product introductions.  (Id. ¶ 37.)  Due to his good service, Marotta's compensation increased progressively.  (Id. ¶ 38.)  In addition,

he was enrolled at an MBA program, at Synthes's expense, subject to his agreement to repay Synthes for those tuition costs in the event he left the company.  (Id. ¶ 39.)  Throughout his employment, Synthes entrusted Marotta with its most valuable customer contacts, goodwill, and business information, and introduced Marotta to existing and prospective customers in his regions.  (Id. ¶ 40.)  Further, it entrusted Marotta with information concerning, among other things, Synthes's marketing and sales strategies, product performance and development, expansion plans, pricing terms, contract information, and sales information.  (Id. ¶ 41.)  Finally, Synthes provided Marotta with specialized training on the technical aspects of Synthes's products.  (Id. ¶ 42.)

Under the Non-Competition Agreements between Marotta and Synthes, Marotta agreed not to "disclose or communicate" Synthes's confidential and proprietary information "to any competitor or other third party" at any time during or after leaving Synthes's employ or to "use or refer to" such information "for any purpose . . . except as necessary for [him] to properly perform services for Synthes during [his] employment."  (Id. ¶ 44.)  Further, under the Non-Disclosure Agreement and his Non-Competition Agreements, Marotta agreed that any inventions, innovations, or technical or business ideas conceived or developed during his employment were the exclusive property of Synthes.  (Id. ¶ 45.)  In addition, Marotta's Sales Consultant Non-Competition Agreement specifically prohibited him from competing with Synthes, for a period of one year following the termination of his employment with Synthes, in the territories for which he was responsible either at that time or one year prior.  (Id. ¶ 46.)  It also contained a non-solicitation covenant prohibiting him, for a period of one year, from soliciting business from Synthes's customers within his territory in Arizona.  (Id. ¶ 48.)  Similarly, a covenant in his

Regional Manager Non-Competition Agreement specifically prohibited him from competing with Synthes both during his employment and for a period of one year following the termination of his employment.  (Id. ¶ 47.)  It also contained a non-solicitation covenant, which applied to his region in Colorado.  (Id. ¶ 49.)  Aside from the foregoing covenants, both Non-Competition Agreements required Marotta to acknowledge both the availability and necessity of injunctive relief for a breach and his obligation to indemnify Synthes for any attorneys' fees and costs incurred in prosecuting violations of the Non-Competition Agreements.  (Id. ¶ 50.)  Further, both Agreements had choice of law provisions requiring the application of Pennsylvania law.  (Id. ¶ 51.)  According to the Complaint, Marotta was fully aware of his obligations to Synthes under these agreements both at the time he signed them and at the time of his resignation.  (Id. ¶ 55.)

**C.**      **Marotta's Resignation from Synthes and Purported Violations of His Legal Obligations**

On March 15, 2010, Marotta resigned from Synthes, effective April 15, 2010, without giving any indication of his future plans.  (Id. ¶ 56.)  By the time he resigned, however, Marotta had purportedly already formed his company, Emerge Surgical, Inc. ("Emerge") and planned to join it immediately.  (Id. ¶ 57.)  Leading up to his resignation, Marotta told his supervisor at Synthes that he would be working with his uncle, who was a board member of Center Healthcare (an entity that developed and operated rehabilitation facilities), and told Synthes Human Resources that he would be joining a non-competitor.  (Id.)  Despite a written demand and the well-known company policies, Marotta refused to reimburse Synthes for $35,058.32 in tuition payments it made during the term of his employment in connection with his MBA degree.  (Id. ¶ 58.)

Synthes later learned that, in the summer of 2009, Marotta reached out to an accounting and consulting firm regarding possible names for an "orthopedic and medical device and healthcare consultant" company and had also researched companies that design corporate logos. (Id. ¶ 60.)  In addition, he also began to collaborate—well into the winter of 2009—with Zachary W. Stassen, who later became Emerge's Chief Operating Officer and a corporate director, and to seek out potential investors and lawyers.  (Id. ¶¶ 61–62.)  By December of 2009, Marotta began making filings with the United States Patent and Trademark Office ("PTO") relating to the name and logo for Emerge.  (Id. ¶ 63.)  On January 13, 2010—three months before his resignation from Synthes—Marotta met with Venture Law Advisors, who then filed Emerge's articles of incorporation with the Colorado Secretary of State.  (Id. ¶ 64.)

Mr. Stassen, then purporting to be Emerge's Chief Operating Officer and a director, filed, on February 22, 2010, a Form Notice of Exempt Offering of Securities with the Securities Exchange Commission ("SEC"), indicating that Emerge intended to obtain $1.5 million in investment capital and already had obtained two investors for $200,000 just days before the filing.  (Id. ¶ 66.)  In that document, Mr. Stassen described Marotta, who was still employed by Synthes, as "a founder of the Issuer [Emerge] and will become an executive officer and director of [Emerge] upon completion of this offer" of securities.  (Id. ¶ 66.)  Indeed, Synthes avers that Marotta personally solicited Synthes's employees and customers during early 2010 concerning, at a minimum, their willingness to invest in Emerge.  (Id. ¶ 67.)  On June 23, 1010, Emerge Surgical, Inc. filed with the Colorado Secretary of State to change its name to Emerge Medical, Inc.  (Id. ¶ 68.)  Less than one month later, Marotta made a new trademark filing with the PTO for the name and logo of "Emerge Medical."  (Id. ¶ 69.)

6

By November 2010, Emerge representatives began placing labels for reordering Synthes's surgical drill bits in Synthes Inventory Management System ("SIMS") cabinets, directing Synthes's customers to reorder surgical drill bits from Emerge instead.  (Id. ¶ 70.)  As a result, those Synthes customers have begun to order replacement drill bits directly from Emerge rather than from Synthes.  (Id. ¶ 71.)  Moreover, in a November 2010 510(k) submission, Emerge obtained clearance from the FDA for a "Cannulated Screw Fixation System" that is "substantially equivalent" to Synthes's cannulated screw system.  (Id. ¶ 72.)  Following Emerge's 510(k) approval, Emerge revised its website to indicate that it is now marketing its cannulated screw system.  (Id. ¶ 73.)  Synthes has also recently learned that Marotta joined forced with Charles Q. (Chaun) Powell, a former Synthes Sales Consultant assigned to Marotta's region in Colorado during Marotta's employment, and that Powell is actively soliciting Synthes's customers as Emerge's "Director of US Sales."  (Id. ¶ 74.)  The marketing material distributed by Powell represents that "Emerge Medical manufactures high quality orthopedic medical devices that you [Synthes's customers] are already familiar with at fair prices."  (Id. ¶ 75.)

D.    **Commencement of Litigation**

On March 4, 2011, Synthes initiated the current federal action against both John Marotta and Emerge Medical, Inc.  Its lengthy Complaint set forth seven causes of action, as follows: (1) breach of fiduciary duty and/or duty of loyalty against Marotta (id. ¶¶ 79–85); (2) breach of contract under the Non-Competition and Non-Disclosure Agreements against Marotta (id. ¶¶ 86–105); (3) tortious interference with contract against Marotta and Emerge (id. ¶¶ 106–15); (4) aiding and abetting breach of fiduciary duty against Emerge (id. ¶¶ 116–22); (5) unfair competition against Marotta and Emerge (id. ¶¶ 123–34); (6) breach of contract or, in the

7

alternative, unjust enrichment against Marotta (id. ¶¶ 135–42); and (7) fraud against Marotta. (Id. ¶¶ 143–46.)  Five days later, Synthes moved for a preliminary injunction against the Defendants, as well as for an expedited discovery schedule.  Defendants filed their responses on May 20, 2011.

Before the close of expedited discovery, the parties discussed the issue of Synthes's amendment of its Complaint to include additional claims against Marotta and Emerge, as well as the inclusion of additional party defendants.  Nonetheless, Synthes agreed to proceed with the litigation in its current state in light of the pending preliminary injunction hearing.  The hearing, however, was postponed on several occasions, and the Court directed the parties to attend a settlement conference before Magistrate Judge Rice, to no avail.

The Court then held a scheduling conference on December 20, 2011.  At that time, Synthes advised Defendants and the Court of its intent to seek leave to amend its Complaint. After the conference, this Court issued an Order withdrawing Synthes's Motion for Preliminary Injunction and setting a schedule for discovery, pre-trial matters, and the start of the trial.

On January 11, 2012, Synthes filed the instant Motion for Leave to File an Amended Complaint.  Defendants filed a Response in Opposition to this Motion on February 2, 2012, and Plaintiff submitted a Reply Brief on February 10, 2012.  The Motion is now ripe for judicial consideration.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a) sets out the standard for granting leave to amend a complaint when, as is the case here, a responsive pleading has been served:  "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P.

15(a).  The Rule clearly states that "[t]he court should freely give leave when justice so requires."
Id.  Nonetheless, the policy favoring liberal amendments is not "unbounded."  Dole v. Arco
Chem. Co., 921 F.2d 484, 487 (3d Cir. 1990).  The decision whether to grant or to deny a motion
for leave to amend rests within the sound discretion of the district court.  Foman v. Davis, 371
U.S. 178, 182 (1962); Waterfront Renaissance Assoc. v. Phila., 701 F. Supp. 2d 633, 639 (E.D.
Pa. 2010).  A district court may deny leave to amend a complaint where "it is apparent from the
record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2)
the amendment would be futile, or (3) the amendment would prejudice the other party."  Lake v.
Arnold, 232 F.3d 360, 373 (3d Cir. 2000) (citing Foman, 371 U.S. at 182).

## III.   DISCUSSION

        By way of the present Motion, Plaintiff argues that the Amended Complaint is necessary
to (1) conform the original pleading to the more developed record in this case; (2) add claims
against the existing Defendants based on information uncovered in discovery to date; and (3)
assert claims against additional individuals with direct involvement in Marotta's alleged "covert
scheme."  Specifically, aside from current Defendants Marotta and Emerge ("Current
Defendants"), Plaintiff seeks to join as Defendants Eric W. Brown, Zachary W. Stassen, and
Charles Q. Powell ("Proposed Defendants") as additional parties to the action, as well as "John
Does 1–10".  The causes of action would then be amended as follows:

•       Count I still alleges a breach of fiduciary duty and/or breach of loyalty claim, but adds
        Eric Brown as a Defendant;

•       Count II still alleges a breach of contract under the Non-Competition and Non-Disclosure
        Agreements, but adds Brown and Charles Powell as Defendants;

•       Count III still alleges tortious interference with contract, but adds Brown, Powell,

Zachary Stassen, and the John Does as Defendants;

• Count IV still alleges aiding and abetting breach of fiduciary duty, but adds Brown and
  Stassen as Defendants;

• Count V makes a new allegation of misappropriation of trade secrets under Pennsylvania
  common law and the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5302 against
  all Current and Proposed Defendants;

• Count VI makes a new allegation of violation of the Computer Fraud and Abuse Act, 18
  U.S.C. § 1030, against all Current and Proposed Defendants;

• Count VII makes a new allegation of conversion and replevin against all Current and
  Proposed Defendants;

• Count VIII makes a new allegation of false or deceptive advertising under the Lanham
  Act, 15 U.S.C. § 1125(a), against Marotta, Stassen, Powell, and Emerge;

• Count IX makes a new allegation of trespass to chattels against Marotta, Stassen, Powell,
  and Emerge;

• Count X alleges unfair competition as in former Count V, but adds Stassen and Powell as
  Defendants;

• Count XI alleges fraud as in former Count VII, but includes all Current and Proposed
  Defendants in this claim;

• Count XII makes a new allegation of civil conspiracy against all Current and Proposed
  Defendants;

• Count XIII, alleges breach of contract or, in the alternative, unjust enrichment as in
  former Count VI, but brings it only against Defendant Powell and removes Defendant
  Marotta from this Count.

The Current Defendants put forth multiple arguments against allowing amendment, which the

Court now considers individually.

### A.   Whether Plaintiffs Have Demonstrated Undue Delay, Bad Faith, or Dilatory Motives

Defendants' first argument against a grant of leave to amend contends that Plaintiffs'

proposed amended complaint is nothing more than a delayed assertion of claims that could have been brought at the time of the original Complaint.  They go on to assert that this Motion embodies a long-established Synthes litigation technique through which Plaintiffs seek to drive up litigation costs and further harass the Current and Proposed Defendants

   In the Third Circuit, delay alone does not justify denying a motion to amend.  Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001); see also Collins v. City of Gloucester, No. Civ.A.06-2589, 2008 WL 1374213, at *6 (D.N.J. Apr. 9, 2008) ("'The mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay.'") (quoting Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984)).  Rather, it is only where delay becomes "'undue,' placing an unwarranted burden on the court, or . . . 'prejudicial,' placing an unfair burden on the opposing party" that denial of a motion to amend is appropriate. Adams, 739 F.2d at 868; Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008); Tarkett, Inc. v. Congoleum Corp., 144 F.R.D. 289, 291 (E.D. Pa. 1992).  "Implicit in the concept of 'undue delay' is the premise that Plaintiffs, in the exercise of due diligence, could have sought relief from the court earlier."  In re Pressure Sensitive Labeldstock Antitrust Litig., No. MDL.03-1556, 2006 WL 433891, at *1 (M.D. Pa. Feb. 21, 2006).  As such, the question of undue delay requires the court to focus on the movant's reasons for not amending sooner, while "bearing in mind the liberal pleading philosophy of the federal rules."  Cureton, 252 F.3d at 273; see also Lindquist v. Buckingham Twp., 106 F. App'x 768, 775 (3d Cir. 2004) (noting that the question of undue delay, as well as the question of bad faith, requires that the court focus on the plaintiff's motives for not amending their complaint to assert this claim earlier).  "Tactical decisions and dilatory motives may lead to a finding of undue delay."  Leary v. Nwosu, No. Civ.A.05-5769,

2007 WL 2892641, at *4 (E.D. Pa. Oct. 2, 2007); see also Cureton, 252 F.3d at 271–74 (finding

undue delay where plaintiffs made a tactical decision not to seek leave to amend until after they

lost first argument on summary judgment).  Nonetheless, "[t]here is no presumptive period in

which a motion for leave to amend is deemed 'timely' or in which delay becomes 'undue.'"

Arthur v. Maersk, Inc., 434 F.3d 196, 205 (3d Cir. 2006).  Rather, "[w]hether delay is undue

depends on the facts and circumstances of the case."  Nat'l Recovery Agency, Inc. v. AIG

Domestic Claims, Inc., No. Civ.A.05-0033, 2006 WL 1289545, at *4 (M.D. Pa. May 9, 2006).

Ultimately, "the obligation of the district court in its disposition of the motion is to articulate the

imposition or prejudice caused by the delay, and to balance those concerns against the movant's

reasons for delay."  Coventry v. U.S. Steel Corp., 856 F.2d 514, 520 (3d Cir. 1988).

      Defendants now contend that Plaintiff's Motion constitutes a consummate case of undue

delay.  They argue that Plaintiffs' main contention in both pleadings is that former employees

Marotta, Brown, and Powell, along with Stassen, joined forces to create a company that directly

competes with Synthes's "global business."  In both the Complaint and the proposed Amended

Complaint, Synthes specifically (1) identifies Stassen as one of the founders of Emerge; (2)

claims that Powell—a former Synthes employee—was involved in the creation of Emerge and

the alleged solicitation of customers and employees; and (3) claims that Brown, Marotta's former

supervisor, was involved in the alleged "web of lies."  Yet, despite the passage of one year and

the completion of twelve depositions, the two pleadings are substantively the same, meaning that

no logical basis exists for not amending the Complaint sooner.  According to Defendants, this

tactic stems from Plaintiffs' dilatory ulterior motive: "to continue Synthes['s] well established

litigation plan against start-up competitors . . . [by] driv[ing] up the costs of litigation and

wear[ing] down its young opponents with a call for an unnecessary preliminary injunction . . . [and then] mov[ing] to amend their complaint."  (Defs.' Resp. Opp'n Mot. Leave to Amend 5.)

In response, however, Plaintiffs deny any such legal gamesmanship and aver that they filed the Complaint against Defendants based on the limited information gained from their own investigation of Marotta's and Emerge's unlawful conduct.  (Pls.' Mem. Supp. Mot. Leave to Amend 2.)  Until discovery began, Synthes was purportedly "unaware of the nature and extent of the participation of the Proposed Defendants in concert with Marotta and his company."  (Id. ¶ 3.)  Indeed, Plaintiffs assert that Marotta concealed a great deal of information and that some of what Synthes presently understands has been gleaned from third-party deponents and subpoena recipients, meaning that Synthes could not have asserted the claims prior to discovery. Moreover, Plaintiffs argue that before the close of the expedited discovery period, counsel discussed Plaintiffs desire to amend the Complaint to add both claims and parties, but withheld the amendment until after the intended preliminary injunction hearing.  Just prior to the hearing, the Court postponed the hearing over Synthes's objection and directed the parties to engage in settlement discussions.  Those multiple rounds of unsuccessful negotiations did not conclude until December 2011, and a scheduling conference was held on December 20, 2011.  During that conference, Plaintiffs advised the Court and re-notified Defendants' counsel of its intent to seek leave to amend the Complaint to include additional claims and parties.  At the same time, given the extended lapse in time, Plaintiffs withdrew their request for a preliminary injunction. Notably, just prior to the conference, Emerge's counsel filed its own motion seeking leave to supplement Emerge's Answer to assert, for the first time, counterclaims against Synthes.  In doing so, it emphasized that there had been no undue delay or unfair prejudice in permitting

amendments given the extended time remaining before trial.

In light of this procedural background, the Court declines to find that Plaintiffs engaged in any undue delay or dilatory tactics.  The Federal Rules of Civil Procedure require that a party have a proper legal and factual foundation before initiating a lawsuit or filing a claim against a party.  Fed. R. Civ. P. 11(b).  Plaintiffs plausibly allege that although they knew of the participation of the additional defendants and the possibility of some of the additional claims, they did not have sufficient support for adding such defendants or claims until it had the opportunity to test their theories during discovery.  Aside from making cursory allegations to the contrary, Defendants provide nothing to rebut this proffer.  Moreover, Defendants do not challenges Plaintiffs' representation that Synthes repeatedly indicated its intent to amend the Complaint—both at the close of expedited discovery and during the scheduling conference—but that its efforts were hampered by various factors, including the pending preliminary injunction hearing, the extended settlement period, and the new scheduling order.  At the first plausible period after the scheduling conference, Plaintiffs moved to amend their Complaint.  Defendants' present allegation that the Motion is motivated by harassing and dilatory motives in an effort to gain strategic advantage is supported by nothing more than speculative and unsubstantiated allegations.  Accordingly, the Court does not find any undue delay or unfair tactics.[2]

---

[2]  Although length of time is not raised by either party, the Court notes that the motion for leave to amend was filed approximately ten months after initiation of the litigation.  The Third Circuit has noted that, based upon its canvassing of case law from other jurisdictions, only one has "approved of denial of leave to amend based on a delay of less than one year" and that "a period of eleven months from commencement of an action to the filing of a motion for leave to amend is not, on its face, so excessive as to be presumptively unreasonable."  Arthur, 434 F.3d at 204–05.

14

**B.**     **Whether the Proposed Amendments Will Unnecessarily Complicate this Case**

Defendants' second argument against allowing leave to amend contends that the

amendment will "frustrate and unnecessarily complicate this case rather than streamline

litigation." (Defs.' Resp. Opp'n Mot. Leave to Amend 6 (bold and capitalization omitted).)  In

making this argument, Defendants attempt to distinguish three decisions issued by this

Court—Bolden v. Pa. Bureau of Prisons, No. Civ.A.11-467, 2011 WL 4974487 (E.D. Pa. Oct.

19, 2011); Harben v. Amer Sports Co., No. Civ.A.2284, 2010 WL 4978021 (E.D. Pa. Dec. 8,

2010), and Romero v. Allstate Ins. Co., No. Civ.A.01-3894, 2010 WL 2996963 (E.D. Pa. July

2010)—and argue that, unlike in those cases, the amendments requested will not eliminate

unnecessary parties, dismiss vague or needless claims, cure pleading deficiencies, or clarify

allegations.  Rather, according to Defendants, the Amended Complaint will add three individuals

to a lawsuit, "which at its heart is a business dispute among companies" and "add seven causes of

action to an already complex suit." (Id. at 8.)  In short and quite contrary to above cases, the

Amended Complaint will simply muddle rather than streamline litigation.

This argument, however, fails to provide a cognizable legal basis for denying the present

Motion.  As noted above, a district court has three grounds on which it may deny leave to amend

a complaint: (1) where the moving party has demonstrated undue delay, bad faith or dilatory

motives; (2) where the amendment would be futile; or (3) the amendment would prejudice the

other party." Lake v. Arnold, 232 F.3d at 373 (citing Foman, 371 U.S. at 182).  In the absence of

these factors, "leave to amend should be freely given." Foman, 371 U.S. at 182.  "Complication

of the issues alone does not justify denying plaintiffs' motion for leave to amend." Biskas v.

Clyde Seaways, S.A., No. Civ.A.90-2316, 1991 WL 59950, at *1 (E.D. Pa. Apr. 10, 1991); see

also <u>Beltz v. Air-Ride, Inc.</u>, No. Civ.A.08-927, 2008 WL 4540403, at *2 (M.D. Pa. Oct. 7, 2008)

(finding that suggestion that proposed amendment would create additional costs and lead to a

more lengthy and complicated trial likely to confuse or mislead a jury was not a persuasive

reason to deny leave to amend).  Indeed, it is not necessary that amendment of the complaint

result in streamlining of the case.  Motions to amend under Rule 15(a) serve a multitude of

purposes, including "cur[ing] a defective pleading, [] correct[ing] insufficiently stated claims, []

amplify[ing] a previously alleged claim, [] chang[ing] the nature or theory of the case, [] stat[ing]

additional claims, [] increas[ing] the amount of damages sought, [] elect[ing] different remedies,

or [] add[ing], substitut[ing] or drop[ping] parties to the action."  <u>Wolfson v. Lewis</u>, 168 F.R.D.

530, 533 (E.D. Pa. 1996) (citing L. Charles Alan Wright, Arthur R. Miller, Mary Kay Kane,

<u>Federal Practice and Procedure: Civil 2d</u> § 1474 (1990)).  The touchstone of whether the

amendment should be allowed is the issue of prejudice.  Only where "the amendment

'substantially changes the theory on which the case has been proceeding and is proposed late

enough so that the opponent would be required to engage in significant new preparation,'" may

the court deem it prejudicial.  <u>Rehabilitation Inst. v. Equitable Life Assurance Soc'y of the U.S.</u>,

131 F.R.D. 99, 102 (W.D. Pa. 1992) (quoting 6 C. Wright & A. Miller, <u>Federal Practice &</u>

<u>Procedure</u> § 1487 (1990)).

　　　　"The issue of prejudice requires that we focus on the hardship to the defendants if the

amendment were permitted."  <u>Cureton</u>, 252 F.3d at 273.  "But the non-moving party must do

more than merely claim prejudice."  <u>Bechtel v. Robinson</u>, 886 F.2d 644, 652 (3d Cir. 1989).  To

state a cognizable claim of prejudice, the defendant must establish that it would be "unfairly

disadvantaged or deprived of the opportunity to present facts or evidence which it would have

offered" had the allegations in the amended complaint been timely made.  Pegasus Int'l, Inc. v. Crescent Mfg. Co., No. Civ.A.06-2943, 2007 WL 1030457, at *5 (E.D. Pa. Apr. 2, 2007) (quoting Arthur, 434 F.3d at 206) (further quotations omitted).  A defendant may also be burdened by being required to defend against new facts or legal theories that require entirely new defenses.  See Tarkett, Inc. v. Congoleum Corp., 144 F.R.D. 269, 291 (E.D. Pa. 1992).  Notably, however, the need for additional discovery due to amendment does not, without more, prejudice the non-moving party.  Dole v. Arco Chem. Co., 921 F.2d 484, 488 (3d Cir. 1990).  Even when a proposed amended complaint adds substantive allegations against a defendant or adds new defendants, where such new defendants are related to the existing ones or where "[t]he evidence required to meet these new allegations is substantially similar to that which was originally required," prejudice does not exist.  Pegasus Int'l, 2007 WL 1030457, at *5 (quoting Dole, 921 F.2d at 488).   Ultimately, the non-moving party bears the burden of demonstrating prejudice. Bechtel, 886 F.2d at 652.

In this case, Defendants spend extensive time distinguishing this Court's decisions in Bolden, Harben, and Romero, wherein leave to amend was given, yet they cite to nothing in those cases that requires that a requested amendment streamline a case.  Nor do Defendants cite to cases which support their proposition that "complication of litigation" is a proper ground for denying leave to amend.  More importantly, aside from making bald and conclusory statements about the fact that Plaintiffs seek to "add three individuals . . . [and] seven causes of action to an already complex lawsuit," Defendants fail to demonstrate how these amendments will affect the litigation of this action.  At no point do Defendants discuss what additional discovery will be required, whether depositions will have to be repeated, whether the scheduling order will have to

17

be adjusted, whether significant new trial preparation will be required, or whether the time for

trial will have to be extended.  Indeed, contrary to their claims of prejudice, Defendants expressly

admit that the proposed Amended Complaint "is nothing more than a 'rewrite' of the same facts

and allegations set forth in the original Complaint" and that the two pleadings are "substantively

the same."  (Defs.' Resp. Opp'n Mot. Leave to Amend 5, 32.)  Further, Defendants concede that

the Proposed Defendants are related individuals and were identified in the original Complaint as

relevant persons with, at minimum, important knowledge of this action.  (Id. at 5.)  In addition,

Defendants themselves have only recently added a series of counterclaims against Plaintiffs,

including trade libel, tortious interference, unfair competition, and abuse of process, making their

alleged concerns about the litigation's increasing complexity somewhat disingenuous.  Finally,

the Court observes that, under the current scheduling order, Plaintiffs have until April 4, 2012 to

complete discovery, dispositive motions are not due until July 2012, and trial is not scheduled

until October 15, 2012.  Given this extended schedule, Defendants have the opportunity to fully

investigate and defend against the new claims.  Because Defendants have offered nothing to

show that they will be deprived of the opportunity to present facts or evidence, the Court finds no

clear prejudice.  In turn, absent a showing of prejudice, the mere fact that the case will be more

complicated than before is an insufficient basis on which to deny leave to amend.[3]

---

[3]  Defendants engage in a lengthy tangential discussion about the ongoing discovery
disputes between the parties in what appears to be an effort to distinguish the Harben case from
the present one.  (Defs.' Resp. Opp'n Mot. Leave to Amend 9–12.)  Notably, however, although
Plaintiffs cite Harben for some broad principles of law, at no point do they attempt to compare
the dilatory conduct of the defendants in Harben to the conduct of the Defendants in the present
case.  Nor do they delve into any discussion of Defendants' discovery practices, other than to
indicate that they did not obtain the discovery necessary to allege viable claim against the
Proposed Defendants until well into the discovery process.  Accordingly, the Court need not
address this argument.

C.      **Whether the Proposed Amendments Are Futile**

In their third argument, Defendants contend that Plaintiffs' Motion should be denied as futile on various grounds.  "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted.  Holst v. Oxman, 290 F. App'x 508, 510 (3d Cir. 2008).  The futility analysis on a motion to amend is essentially the same as a Rule 12(b)(6) motion.  Id.  The trial court may thus deny leave to amend where the amendment would not withstand a motion to dismiss.  Massarsky v. Gen. Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983).  Given the liberal standard for the amendment of pleadings, however, "courts place a heavy burden on opponents who wish to declare a proposed amendment futile."  Aruanno v. New Jersey, No. Civ.A.06-296, 2009 WL 114556, at *2 (D.N.J. Jan. 15, 2009).  "If a proposed amendment is not *clearly* futile, then denial of leave to amend is improper."  6 Wright, Miller & Kane, Federal Practice & Procedure § 1487 (2d ed. 1990) (emphasis added).

Defendants now assert that adding Proposed Defendants Brown, Stassen, and Powell is futile for the following reasons: (1) the Court does not have personal jurisdiction over these individuals; (2) Brown had no substantive involvement in the venture at issue; (3) the proposed claims against Stassen fail because Plaintiffs have not alleged facts sufficient to pierce the corporate veil; and (4) the proposed Amended Complaint seeks to add six claims and three new defendants after the expiration of the statute of limitations and without the benefit of the relation back provisions of Federal Rule of Civil Procedure 15.  The Court takes each allegation individually.

1.      **Absence of Personal Jurisdiction**

In their first—and most lengthy—futility argument, Defendants contend that the Court

lacks personal jurisdiction over the three Proposed Defendants.  They reason that Stassen never

worked for Synthes, and that Brown and Powell worked for Synthes in regions far outside

Pennsylvania, leaving none of the them with the requisite minimum contacts with Pennsylvania.

Moreover, they contend that neither Stassen nor Powell are bound by any contractual forum-

selection clause, and that Brown's contractual forum-selection clause is not enforceable and/or is

overreaching.

Two key concerns render this issue premature for purposes of the pending Motion.

Primarily, the Court questions the soundness of Current Defendants' standing to pursue this

argument.  Defendants' Response in Opposition is submitted only on behalf of Defendants

Marotta and Emerge; counsel does not purport to represent the interests of Brown, Stassen, or

Powell.  This is crucial because, unlike subject matter jurisdiction, personal jurisdiction

represents a restriction on judicial power as a matter of individual liberty.  Ins. Corp. of Ireland,

Ltd., v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702–03 (1982).  As such, this right is

waiveable, reflecting the principle that "the individual can subject himself to powers from which

he may otherwise be protected."  Azubuko v. Eastern Bank, 160 F. App'x 143, 146 (3d Cir.

2005) (quoting Ins. Corp. of Ireland, 456 U.S. at 703 n.10)).  Given the individual nature of this

right, many courts have found that a defendant lacks standing to raise absence of personal

jurisdiction on behalf of proposed co-defendants.  See, e.g., SmithKline Beecham v. Geneva

Pharms., 287 F. Supp. 2d 576, 580 n.7 (E.D. Pa. 2002) (finding, in context of deciding motion

for leave to amend, that party defendant lacks standing to contest personal jurisdiction on

proposed defendant's behalf); Jenkins v. Smead Mfg. Co., No. Civ.A.09-261, 2009 WL

3628100, at *3 (S.D. Cal. Oct. 28, 2009) (finding that defendants could not, in opposition to a

motion for leave to amend, raise lack of personal jurisdiction or venue on behalf of the proposed

defendants); Sayles v. Pac. Eng'rs & Constructors, Ltd., No. Civ.A.08-676, 2009 WL 791332, at

*6 (W.D.N.Y. Mar. 23, 2009) (holding that the court may consider personal jurisdiction only

where the affected defendant challenges the assertion of personal jurisdiction over it).[4]  Because

Proposed Defendants Stassen, Powell, and Brown have not yet appeared and have not yet

indicated whether they wish to challenge jurisdiction, the Court is reluctant to allow Current

Defendants Marotta and Emerge to do so on their behalf.

    Moreover, even were the Court to find that Defendants have standing to raise this issue,

the Court remains cognizant of the general reluctance in the Third Circuit to rule on personal

jurisdiction questions in the context of a motion for leave to amend a complaint.  It is well-

established, under federal law, that it is inappropriate to dismiss a case or deny leave to amend

based on a *sua sponte* determination of personal jurisdiction.  Azubuko v. E. Bank, 160 F. App'x

143, 146 (3d Cir. 2005) (citing cases); Bernheim v. Estate of Bedrick, No. Civ.A.07-2195, 2007

WL 2900377, at *7 n.9 (D.N.J. Oct. 1, 2007).  Where the court could "conceivably have personal

---

    [4] The Court is aware of the existence of contrary jurisprudence, finding that "objections
to motions to add parties, which are necessarily filed only by existing parties, are routinely
addressed by courts without discussion of standing or ripeness doctrines."  Speedsportz, LLC v.
Menzel Motor Sports, Inc., No. Civ.A.07-624, 2008 WL 46632726, at *1 (N.D. Okla. Oct. 17,
2008).  In those cases, the courts allowed current defendants to object to a motion for leave to
amend on the grounds that the court does not have personal jurisdiction over the proposed new
defendants, thereby making the amendment futile.  Id.; see also Cole v. Salt Creek, Inc., No.
Civ.A.08-928, 2010 WL 3075481, at *3 (D. Utah Aug. 5, 2010).  Neither of the cases addressing
this issue, however, are binding.  Moreover, the courts in both Speedsportz and Cole allowed the
amendment in light of the fact that the evidentiary record on personal jurisdiction had not been
fully developed.  Both courts directed that the matter be conclusively decided upon a fully briefed
motion to dismiss.  Speedsportz, 2008 WL 46632726, at *2; Cole, 2010 WL 3075481, at *3.  As
described in more detail above, this Court likewise finds that the record on personal jurisdiction
in this case is not fully developed.

jurisdiction" over a defendant sought to be added via an amended complaint, the court should

not, despite objection by existing parties, deny leave to amend based on futility challenges.

Pegasus Int'l, 2007 WL 1030457, at *7; see also Metex Mfg. Corp. v. Manson Envtl. Corp., No.

Civ.A.05-2948, 2008 WL 474100, at *4 (D.N.J. Feb. 15, 2008) (finding that a decision on the

issue of personal jurisdiction, in the context of a motion to amend a complaint, was premature

because the parties had not submitted affidavits or other jurisdictional evidence; the Court should

presume that it had jurisdiction over the proposed defendant); Bernheim, 2007 WL 2900377, at

*7 n.9 (noting that "under federal law it would not be proper to deny a motion for leave to amend

based solely on an alleged lack of personal jurisdiction"); Mylan Pharms., Inc. v. Kremers Urban

Dev., No. Civ.A.02-1628, 2003 WL 22711586, at *4 (D. Del. Nov. 14, 2003) (declining to deny

leave to amend based on challenge to personal jurisdiction since "[t]here is no requirement that a

plaintiff allege the facts that support a finding of personal jurisdiction in a complaint" and "the

parties have not yet developed a record on the possible contacts [proposed defendants] may or

may not have in the [forum state]"); Wolfson v. Lewis, 168 F.R.D. 530, 534 (E.D. Pa. 1996)

(holding that the court would not rule on whether it lacked personal jurisdiction over the

additional defendants because there was insufficient evidence and the issue should be presented

in a motion to dismiss); Hershey Pasta Grp. v. Vitelli-Elvea Co., No. Civ.A.95-231, 1995 WL

862016, at *4 (M.D. Pa. June 27, 1995) ("Because the court conceivably could have personal

jurisdiction over [proposed defendants], the court cannot find that joining these two parties

would be an exercise in futility.").

      These considerations are equally present in this case.  First, as noted above, the Current

Defendants and their counsel make no indication that they represent the Proposed Defendants.

Although the Current Defendants submit two virtually identical affidavits—one from Stassen and one from Powell—denying a variety of different types of contacts with Pennsylvania, (Defs.' Resp. Opp'n Mot. Leave to Amend, Exs. J, K.),[5] neither of those affidavits suggests—either explicitly or implicitly—that these individuals would waive a personal jurisdiction objection if joined in the present action.  It is certainly conceivable that they would consent to jurisdiction so as to be tried jointly with their employing company, Emerge, rather than face separate suit—and consequently, separate expense—in their resident state of Colorado.[6]

Moreover, the Court has before it an insufficient record on which to properly determine the existence of personal jurisdiction over the Proposed Defendants.  As stated above, Defendants offer a series of arguments to rebut any assertion of personal jurisdiction, yet supply only the two cursory affidavits in support of their arguments, which, while denying numerous *types* of contacts with Pennsylvania, do not deny *all* contacts with Pennsylvania on which jurisdiction could be based.  In response, Plaintiffs provide a contrary affidavit from a Synthes official indicating that both Brown and Powell did indeed have substantial contacts with Pennsylvania leading up to their hiring and employment by Synthes, and that Brown actually consented to personal jurisdiction in Pennsylvania through his contractual forum-selection clause.[7]  (Pls.' Reply Br., Ex. A.)  Further, they allege that Powell and Stassen are closely related

---

[5]  The record contains no affidavit from Proposed Defendant Brown.

[6]  In fact, the Court takes note that even though Defendant Marotta is not a resident of Pennsylvania and stands in much the same position as Proposed Defendant Brown, he has not contested personal jurisdiction in the course of this action.  Certainly, Brown, and the others, may do the same.

[7]  Notably, the proposed Amended Complaint itself sets forth a substantial number allegations to support the exercise of personal jurisdiction over all of the Defendants.  (Pls.' Mot.

to this dispute, making it reasonably foreseeable that they would be bound by the forum selection provisions in Marotta's and Brown's Non-Competition Agreements.  The parties' conflicting arguments rest, however, on a sparse factual record, leaving the Court with little evidentiary basis on which to conclusively rule on the issue.  In view of these considerations, the Court must find that it "conceivably could have personal jurisdiction" over the Proposed Defendants, and, therefore, will not preclude their addition to this case on such grounds.  This ruling, however, does not foreclose any properly-briefed Rule 12(b) challenge by the Proposed Defendants upon their entry of appearance in this case.  Until that time, however, a ruling on personal jurisdiction is improper.

### 2.   Brown's Lack of Involvement

In a second effort to allege futility, Defendants argue that Proposed Defendant Brown had no substantive involvement in the venture at issue.  They specifically contend that when Emerge was just being formed, there was no discussion that Brown might participate, even after the expiration of his Non-Competition Agreement.  This was "not surprising" since Marotta and Brown had different visions of the business to be conducted.  (Defs.' Resp. Opp'n Mot. Leave to Amend 19.)  When Emerge "passed the threshold from an idea and became a business entity that sought to be up and running," only Marotta and Stassen were involved.  (Id. at 20.)[8]

Plaintiffs respond via only a brief footnote.  They argue that Defendants' representation

_____

Leave to Amend, Ex. A ¶¶ 22–23.)

[8] In support of this argument, Defendants cite to multiple pages from Marotta's deposition.  Upon review of both the hard-copy of the brief provided to Chambers and the sealed copy filed in the Clerk's Office, the Court was unable to locate these deposition pages.  Although the absence of these pages did not impact the present ruling, the Court simply wishes to make Defendants aware of their omission.

"is not only incorrect, as Brown was directly and intimately involved with Emerge (a fact which discovery in this case has made plain), [but] is inconsistent with their own prior judicial admissions describing in detail Brown's involvement with Emerge."  (Pls.' Reply Br. at 10 n.9.)

Given these bare arguments from both sides, and cognizant of Defendants' burden to prove futility, the Court cannot find that the case against Proposed Defendant Brown is futile. Taking the allegations of the proposed Amended Complaint as true—as required in a futility analysis—the Court deems the case against Brown to be well-pled and supportive of the causes of action against him.  Indeed, interspersed throughout the lengthy Amended Complaint are numerous and detailed allegations regarding Brown's involvement in the start-up of Emerge. (Pls.' Mot. Leave to Amend, Ex. A ¶¶ 3, 4, 8, 115, 119–27, 129, 133, 135, 138, 142, 144–46, 149, 161, 164, 165.)  Such detailed factual allegations clearly raise the right to relief against Brown above the "speculative level."  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008).  Accordingly, the Court rejects Defendants' argument on these grounds.

### 3.    Failure to Pierce the Corporate Veil

Third, Defendants contend that Plaintiffs' claims against Proposed Defendant Stassen fail because Plaintiffs have not alleged any facts sufficient to pierce the corporate veil.  More precisely, they argue that all of Plaintiffs' claims relate to the alleged conduct of Emerge in misappropriating Plaintiffs' trade secrets, and all of the acts attributed to Stassen were accomplished in his role as a director and officer of Emerge.  According to Defendants, to impose liability on Stassen, Plaintiffs must therefore pierce the corporate veil with respect to Emerge.  Because Plaintiffs have failed to allege any facts to justify such piercing, Defendants contend that Stassen legally can have no liability.

25

It is clear that an individual who is acting as a director or officer of a corporation cannot be held personally liable absent an allegation that the corporate veil should be pierced.  Solomon v. Klein, 770 F.2d 352, 354 (3rd Cir. 1985).  However, "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort."  Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978).  "The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; it does not however relieve the individual of his responsibility."  Id.; see also Coach, Inc. v. Sunfastic Tanning Resort, No. Civ.A.10-1626, 2011 WL 5447972, at *6 (E.D. Pa. Nov. 10, 2011) (citing Donsco as controlling case law).  This is also known, under Pennsylvania law, as the participation theory of liability, which states that:

> The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

3A Fletcher, Cyclopedia of the Law of Private Corporations, § 1137, p. 207 (perm. ed. rev. 1975); see also In re Jadczak, Bankr. No. 10-11804, Adv. No. 10-230, 22011 WL 13612, at *8 (Bankr. E.D. Pa. Jan. 4, 2011).  In such cases, where the corporate officer has personally or actively committed intentional torts, it is unnecessary to pierce the corporate veil to hold the officer liable.  Kare Distrib., Inc. v. Jam Labels & Cards, No. Civ.A.09-969, 2009 WL 3297555, at *8 (D.N.J. 2009) (relying on Donsco); see also Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc., No. Civ.A.96-6961, 1998 WL 767440, at *7 (E.D. Pa. Nov. 3, 1998) (noting that "the

liability of a corporate officer who actively participates in the infringing acts is 'distinct from the liability resulting from the 'piercing of the corporate veil' as that term is commonly used.'") (quoting Donsco, 587 F.2d at 606). This principle has been applied, *inter alia*, in cases of claims against a corporate officer for unfair competition and Lanham Act violations, Donsco, 587 F.2d at 606, Homenexus, Inc. v. Directweb, Inc., No. Civ.A.99–2316, 1999 WL 959823, at *3 (E.D. Pa. Oct. 14, 1999); aiding and abetting breach of a fiduciary duty, Bohler-Uddelholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 105 n.13 (3d Cir. 2001); tortious interference with business relationships, Brandywine Mushroom Co. v. Hockessin Mushroom Prods., Inc. 682 F. Supp. 1307, 1314 (D. Del. 1988); fraud, Walsh v. Alarm Sec. Grp., Inc., 95 F. App'x 399, 401 (3d Cir. 2004), Jadczak, 2011 WL 13612, at *8; conversion, In re B.S. Livingston & Co., Inc., 186 B.R. 841, 866-67 (D.N.J. 1995); and tortious interference with contract. Strategic Learning, Inc. v. Wentz, No. Civ.A.05-467, 2006 WL 3437531, at *7 (M.D. Pa. Nov. 29, 2006).

In the present case, Defendants simply assume that Stassen bears no liability absent a clear showing that the corporate veil of Emerge could and should be pierced. Such an argument, however, plainly disregards the aforementioned body of case law. Plaintiffs bring a multitude of different counts against Defendant Stassen, including tortious interference with contract, aiding and abetting breach of fiduciary duty, misappropriation of trade secrets, conversion and replevin, false or deceptive advertising under the Lanham Act, trespass to chattels, unfair competition, fraud, and civil conspiracy. Each of these causes of actions sets forth an intentional tort or statutory violation, and contains factual allegations describing Stassen's individual acts taken to perpetuate the alleged wrongdoing. (Pls.' Mot. Leave to Amend, Ex. A ¶¶ 217–25, 230–36, 242–47, 245–56, 262–67, 272–75, 278, 283–85, 288–89, 292, 295, 301, and 304–06.) Many of these

actions were taken prior to the formation of Emerge as a corporation and prior to Stassen assuming his officer status, meaning that no corporate insulation could have existed.  Of those that were taken after Emerge formed, Stassen is not shielded from individual liability for his personal actions simply because he was acting in his role as an officer of Emerge.  Because the proposed Amended Complaint, as pled, clearly states claims against Stassen upon which relief may be granted, the Court cannot deem the amendment to add him as a defendant to be futile.

### 4.      Statute of Limitations Bar

In a last-ditch effort to foreclose the filing of the proposed Amended Complaint, Defendants argue, in cursory fashion, that Plaintiffs are improperly seeking to add new claims and defendants after the expiration of the statute of limitations.  Specifically, Defendants summarily assert that, in Pennsylvania, the statute of limitations is four years for breach of contract actions and two years for negligence actions.  Without engaging in any further limitations analysis or identifying the statutes of limitations applicable to each of the various causes of action, they then conclude that Plaintiffs will be unable to invoke the "relation-back" provisions of Federal Rule of Civil Procedure 15(c), since they cannot show that the Proposed Defendants knew or should have known within 120 days from service of the original complaint that "but for a mistake" by Plaintiffs, the action would have been brought against them.

In response, Plaintiffs indicate that they need not invoke the Federal Rule of Civil Procedure 15(c)[9] since all of its claims are well within the limitations period.  They note that the

---

[9]  Federal Rule of Civil Procedure 15(c) states:

(1) . . . An amendment to a pleading relates back to the date of the original pleading when:

statutes of limitations applicable to the claims in the proposed Amended Complaint range from

two to six years.  All of these limitations periods are subject to tolling and the discovery rule.

Based on the facts set forth in the proposed Amended Complaint, Plaintiffs contend that they had

no knowledge of even the existence of Emerge until the end of September 2010 and promptly

initiated this civil action in March 2011.  The current Motion for Leave to Amend, which is

premised on facts first discovered in the first half of 2011, is therefore within the two year

limitations period—the shortest of the potentially-applicable statutes.

In absence of a more specific analysis by Defendants explaining what the applicable

statutory periods are for each cause of action and discussing when those statutory periods began

to run, the Court must give credence to Plaintiffs' contention that there is no limitations bar.

Indeed, the Court recognizes that, if the statutes of limitation began to run as early as March

---

(A) the law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1).

2010,[10] then, regardless of whether the statute of limitations for any particular cause of action is two, four, or six years, the proposed Amended Complaint is still well within the appropriate limitations period.  Accordingly, the Court declines to find futility on these grounds.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court will grant Plaintiffs' Motion for Leave to Amend.  Plaintiffs have not clearly demonstrated any undue delay, bad faith, or dilatory motives. Moreover, and more importantly, Defendants have not established that they will suffer any prejudice from the amendment of the Complaint.  Finally, nothing in Defendants' arguments reveals that the amendments will be futile.  Accordingly, leave to amend shall be granted and the proposed Amended Complaint, attached as Exhibit A to Plaintiffs' Motion, shall be deemed filed as of the date of the Order accompanying this Motion.

---

[10]  Based on the proposed Amended Complaint, Marotta first tendered his resignation to Synthes on March 15, 2010, effective April 15, 2010.  (Id. ¶¶ 144, 147.)  Certainly, it is a reasonable assumption that Plaintiffs did not know of Marotta's tortious activities and contractual breaches until at least that time.