## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SYNTHES, INC., SYNTHES USA HQ, INC., SYNTHES USA, LLC, SYNTHES USA SALES, LLC, and SYNTHES USA PRODUCTS, LLC, | : : CASE NO.:  11-1566 : : JURY TRIAL DEMANDED : |
| Plaintiffs, | : : |
| v. | : : |
| EMERGE MEDICAL, INC., JOHN P. MAROTTA, ZACHARY W. STASSEN, ERIC W. BROWN, CHARLES Q. POWELL, ET AL. | : : : : |
| Defendants. | : : |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
### DEFENDANT CHARLES Q. POWELL'S
### MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC (collectively, "Synthes"), by and through its undersigned counsel, hereby respond to and oppose Defendant Charles Q. Powell's ("Powell") Motion to Dismiss Synthes' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Powell's Motion").  Synthes respectfully requests that this Court enter an order in the form attached denying Powell's Motion in its entirety.

## **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     RELEVANT PROCEDURAL BACKGROUND..................................................2

III.    ARGUMENT ........................................................................................................3

     A.      Synthes' Tort Claims Against Powell Are Not Grounded in Contract.  Therefore, Pennsylvania's "Gist of the Action" Doctrine Does Not Bar Synthes' Tort Claims3

         1.      Dismissal Under the "Gist of the Action" Doctrine is Premature Where the Validity and Scope of the Contracts Are in Dispute. ..........................6

         2.      Synthes' Tort Claims Should Not Be Dismissed in Light of the Federal Rule's Alternative Pleading Standard. .....................................................7

         3.      Synthes' Tortious Interference with Contract Claim as to Powell Addresses Conduct Outside the Scope of Powell's Contractual Obligations to Synthes.................................................................................8

         4.      Synthes Has an Express Property Interest in its Confidential and Proprietary Business Information and Product Such That the Gist of the Action Doctrine Cannot Bar Synthes' Conversion Claim.......................12

         5.      The Gist of the Action Doctrine Cannot Serve As a Bar to Synthes' Unfair Competition and Civil Conspiracy Claims Where the Tort Claims Underlying These Claims Survive Dismissal...........................................14

     B.      Contrary to Powell's Distorted Presentation of the Amended Complaint's Allegations, Synthes Can Maintain its Claim under the Computer Fraud & Abuse Act....................................................................................................................16

     C.      The Well-Pleaded Allegations of Synthes' Remaining Claims Satisfy the Pleading Standards Set Forth in Twombly & Iqbal. ............................................................21

         1.      Standard for Dismissal Under Rules 8(a)(2) and 12(b)(6). .....................21

         2.      Powell's Employment Agreements With Synthes Are Enforceable Under Both Colorado and Pennsylvania Law. ....................................................23

         3.      Synthes Has Adequately Pled a Claim for Misappropriation of Trade Secrets Against Powell.............................................................................26

         4.      Powell's Motion to Dismiss Synthes' Conversion Claim Fails As Synthes Has Pleaded All The Necessary Elements.................................................31

         5.      Synthes' Lanham Act Claim Is Sufficiently Pled.....................................33

i

6.      Synthes Has Stated a Claim for Trespass to Chattels..............................38

7.      Synthes Has Properly Alleged a Civil Conspiracy Against All
        Defendants, Including Powell. ................................................................41

IV.    CONCLUSION..............................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alpart v. Gen. Land Partners, Inc.*,
574 F. Supp. 2d 491 (E.D. Pa. 2008) ................................................................................15

*Am. Bd. of Internal Med. v. Muller*,
No. 10-CV-2680, 2011 U.S. Dist. LEXIS 25169 (E.D. Pa. Mar. 11, 2011) ........................43

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) .......................................................................................21, 22, 31

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..........................................................................................21, 22, 31

*Berger & Montague, P.C. v. Scott & Scott, LLC*,
153 F. Supp. 750 (E.D. Pa. 2001) .....................................................................................11

*BIEC Int'l, Inc. v. Global Steel Servs., Ltd.*,
791 F. Supp. 489 (E.D. Pa. 1992) ................................................................................27, 29

*Bimbo Bakeries USA, Inc. v. Botticella*,
613 F.3d 102 (3d Cir. 2010) ..............................................................................................27

*Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*,
247 F.3d 79 (3d Cir. 2001) .........................................................................................3, 4, 6

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
627 F. Supp. 2d 384 (D.N.J. 2009) ............................................................................35, 36, 37

*Brown & Brown, Inc. v. Cola*,
745 F. Supp. 2d 588 (E.D. Pa. 2010) ...................................................................... *passim*

*Bldg. Materials Corp. of Am. v. Rotter*,
535 F. Supp. 2d 518 (E.D. Pa. 2008) ................................................................................22

*Caldon, Inc. v. Advanced Measurement & Analysis Group*,
515 F. Supp. 2d 565 (E.D. Pa. 2007) ............................................................................35, 36

*Carpenter v. United States*,
484 U.S. 19 (1987) ......................................................................................................13, 33

*Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc.*,
170 Fed. Appx. 805 (3d Cir. 2006) ...................................................................................11

iii

*Council for Educ. Travel v. Agata Czopek*,
  No. 1:11-CV-00672, 2011 U.S. Dist. LEXIS 99230 (M.D. Pa. Sept. 2, 2011) ......................29

*Deangelo Bros., Inc. v. Platte River Ins. Co.*,
  No. 3:09-CV-1198, 2010 U.S. Dist. LEXIS 64324 (M.D. Pa. June 29, 2010) ...................9, 10

*Eastman Chem. Co. v. Alphapet Inc.*,
  No. 09-971-LPS-CJB, 2011 U.S. Dist. LEXIS 127757 (D. Del. Nov. 4, 2011) ..............28, 30

*ED&F Man Biofuels, Ltd. v. MV Fase*,
  728 F. Supp. 2d 862 (S.D. Tex. 2010) ..................................................................................40

*eToll, Inc. v. Elias/Savion Adver., Inc.*,
  811 A.2d 10 (Pa. Super. 2002)..........................................................................................3, 4

*EXL Labs., LLC v. Egolf*,
  No. 10-6282, 2011 U.S. Dist. LEXIS 25295 (E.D. Pa. Mar. 11, 2011)............................ 41-44

*Farm Credit Leasing Servs. Corp. v. Ferguson Packaging Mach., Inc.*,
  No. 07-1900, 2007 U.S. Dist. LEXIS 89330 (E.D. Pa. Dec. 5, 2007)....................................32

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  314 F. 3d 48 (2d Cir. 2002)..................................................................................................35

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009)..................................................................................................22

*Gen. Refractories Co. v. Fireman's Fund Ins. Co.*,
  337 F.3d 297 (3d Cir. 2003)..................................................................................................41

*Giordano v. Claudio*,
  714 F. Supp. 2d 508 (E.D. Pa. 2010) ...................................................................................42

*Gold Messenger, Inc. v. McGuay*,
  937 P.2d 907 (Colo. Ct. App. 1997) ....................................................................................25

*Haggard v. Synthes Spine*,
  No. 09-cv-00721-CMA-KMT, 2009 U.S. Dist. LEXIS 54818 (D. Colo. June 12,
  2009) ...............................................................................................................................25, 26

*Hartford Fire Ins. Co. v. Lewis*,
  No. 08-1198, 2009 U.S. Dist. LEXIS 5178 (E.D. Pa. Jan. 26, 2009)................................32, 33

*Harvey Barnett, inc. v. Shidler*,
  338 F.3d 1125 (10th Cir. 2003) ............................................................................................25

iv

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Fraley,*
    497 F. Supp. 2d 627 (E.D. Pa. 2007) ......................................................................21

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,*
    602 F.3d 237 (3d Cir. 2010)...................................................................................5

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
    193 F.3d 781 (3d Cir. 1999)...................................................................................15

*Integrated Waste Solutions, Inc. v. Goverdhanam,*
    No. 10-2155, 2010 U.S. Dist. LEXIS 127192 (E.D. Pa. Nov. 30, 2010) ...............15

*InterMetro Indus. Corp. v. Ken*t,
    No. 3:cv-07-0075, 2007 U.S. Dist. LEXIS 10559 (E.D. Pa. Feb. 12, 2007) ..........24

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,*
    19 F.3d 125 (3d Cir. 1994).....................................................................................34

*Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.,*
    No. 11-4568, 2011 U.S. Dist. LEXIS 139980 (E.D. Pa. Dec. 6, 2011).............4, 27

*Klaxon Co. v. Stentor Electric Mfg. Co.,*
    313 U.S. 487 (1941)...............................................................................................23

*Kruzits v. Okuma Mach. Tool, Inc.,*
    40 F.3d 52 (3d Cir. 1994) .......................................................................................23

*McGregor v. Indus. Excess Landfill, Inc.,*
    856 F.2d 39 (6th Cir. 1988) ....................................................................................22

*Med. Marketing Consultants, LLC v. Cardiac Telecom Corp.,*
    No. 06-00274, 2007 U.S. Dist. LEXIS 48394 (W.D. Pa. May 31, 2007), *adopted by*
    2007 U.S. Dist. LEXIS 45019 (W.D. Pa. June 20, 2007).....................................7, 9

*Mobius Mgmt. Sys. v. Fourth Dimension Software,*
    880 F. Supp. 1005 (S.D.N.Y. 1994).......................................................................35

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,*
    290 F.3d 578 (3d Cir. 2002)....................................................................................34

*O'Brien v. Di Grazia,*
    544 F.2d 543 (1st Cir. 1976)...................................................................................22

*Orthovita, Inc. v. Erbe*,
  No. 07-2395, 2008 U.S. Dist. LEXIS 11088 (E.D. Pa. Feb. 14, 2008) ......................12, 13, 14

*P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Super Store, LLC*,
  No. 04-4554, 2007 U.S. Dist. LEXIS 15216 (D.N.J. March 2, 2007)....................................21

*Papasan v. Allain*,
  478 U.S. 265 (1986).................................................................................................................22

*Partners Coffee Co, LLC v. Oceana Servs. & Prods. Co.*,
  No. 09-236, 2009 U.S. Dist. LEXIS 113209 (W.D. Pa. Dec. 4, 2009) .......................... *passim*

*Patrick Peterson Custom Homes, Inc. v. Bach*,
  586 F. Supp 2d 1026 (N.D. Ill. 2008) ....................................................................................19

*Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*,
  602 F.3d 541 (3d Cir. 2010)......................................................................................................3

*Perma-Liner Indus. v. United States Sewer & Drain, Inc.*,
  630 F. Supp. 2d 516 (E.D. Pa. 2008) ......................................................................................24

*PNC Mortgage v. Superior Mortgage Corp.*,
  No. 09-5084, 2012 U.S. Dist. LEXIS 25276 (E.D. Pa. Feb. 27, 2012) ..................................15

*Premier Payments Online, Inc. v. Payment Sys. Worldwide*,
  Nos. 11-3429 & 11-5272, 2012 U.S. Dist. LEXIS 10701 (E.D. Pa. Jan. 27, 2012)..............5, 7

*RDK Truck Sales & Service Inc. v. Mack Trucks, Inc.*,
  No. 04-4007, 2009 U.S. Dist. LEXIS 43245 (E.D. Pa. May 19, 2009).......................42, 43, 44

*Santiago v. Warminster Twp.*,
  629 F. 3d 121 (3d Cir. 2010)....................................................................................................22

*Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc.*,
  No. 00-CV-3683, 2001 U.S. Dist. LEXIS 10709 (E.D. Pa. July 26, 2001).............................35

*Schonberger v. Oswell*,
  530 A.2d 112 (Pa. Super. 1987)...............................................................................................32

*Seven-Up Co. v. Coca-Cola Co.*,
  86 F.3d 1379 (5th Cir. 1996) ...................................................................................................36

*Smith v. Commonwealth Nat'l Bank*,
  557 A.2d 775 (Pa. Super. 1989)) .............................................................................................23

*Strickland v. Univ. of Scranton*,
    700 A.2d 979 (Pa. Super. 1997)......................................................................................41

*Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*,
    40 F. Supp. 2d 644 (W.D. Pa. 1999)..................................................................................4

*Synthes (U.S.A.) v. Globus Med., Inc.*,
    No. 04-1236, 2007 U.S. Dist. LEXIS 50812 (E.D. Pa. July 12, 2007)...................................15

*Synthes (U.S.A.) v. Myer*,
    Case No. 343 EDA 2009, Pa. Superior Ct., Memorandum Opinion dated Sept. 9, 2009........26

*The Dedalus Found. v. Banach*,
    Civil Action No. 09-2842, 2009 U.S. Dist. LEXIS 98606 (S.D.N.Y. Oct. 16, 2009).............19

*Thompson Coal Co. v. Pike Coal Co.*,
    412 A.2d 466 (Pa. 1979).................................................................................................41

*TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*,
    No. 10-1054, 2011 U.S. Dist. LEXIS 145932 (E.D. Pa. Dec. 19, 2011)................................38

*TruePosition, Inc. v. Sunon, Inc.*,
    No. 05-CV-3023, 2006 U.S. Dist. LEXIS 32918 (E.D. Pa. May 23, 2006)............................15

*Ueberroth v. Goldner, Papandon, Childs & Deluccia, LLC*,
    No. 11-3119, 2012 U.S. Dist. LEXIS 33165 (E.D. Pa. Mar. 12, 2012)............................15, 32

*United States v. Al Hedaithy*,
    392 F.3d 580 (3d Cir. 2004)........................................................................................13, 33

*Verizon Commc'ns, Inc. v. Pizzirani*,
    462 F. Supp. 2d 648 (E.D. Pa. 2006)................................................................................23

*Warminster Equities, LLC v. Warminster Commerce, LLC*,
    No. 10-520, 2010 U.S. Dist. LEXIS 107347 (E.D. Pa. Oct. 7, 2010)...............................32, 33

*Warner-Lambert Co. v. Breathasure, Inc.*,
    204 F.3d 87 (3d Cir. 2000).............................................................................................34

*Youtie v. Macy's Retail Holding, Inc.*,
    653 F. Supp. 2d 612 (E.D. Pa. 2009)...............................................................27, 28, 29, 30

*ZS Assocs. v. Synygy, Inc.*,
    No. 10-4274, 2011 U.S. Dist. LEXIS 55711 (E.D. Pa. May 23, 2011)............................34, 35

vii

**STATUTES**

15 U.S.C. § 1125(a) ..................................................................................................34

18 U.S.C. § 1030 .......................................................................................................18

18 U.S.C. § 1030(e)(8) ..............................................................................................21

18 U.S.C. § 1030(e)(11) .............................................................................................21

18 U.S.C. § 1030(g) ...................................................................................................21

COLO. REV. STAT. § 8-2-113(2) ............................................................................24, 26

**OTHER AUTHORITIES**

2-7 GILSON ON TRADEMARKS § 7.02[6][b][i][D] (Matthew Bender 2010) ...................................36

12 PA. C.S.A. § 5302 .......................................................................................26, 27, 28, 30

Federal Rule of Civil Procedure 8(a)(2) .......................................................................21, 22

Federal Rule of Civil Procedure 8(d)...........................................................................5, 7

Federal Rule of Civil Procedure 9(b)..........................................................................3

Federal Rule of Civil Procedure 12(b)(6) ....................................................................21

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) .................................................24

RESTATEMENT (SECOND) OF TORTS § 216 ..................................................................39

RESTATEMENT (SECOND) OF TORTS § 217 ..................................................................38

I.      **INTRODUCTION**

Based on a selective and erroneous reading of the Amended Complaint that distorts the bases for and nature of Synthes' claims, Defendant Powell asks this Court to dismiss the claims against him asserting that they are either (1) barred by the "gist of the action" doctrine; or (2) fail to state claims upon which relief could be granted as they are insufficiently pleaded as to him or fail as a matter of law.

Interestingly, in opposing Synthes' request for leave to amend, Emerge's counsel never argued that amendment would be futile against Powell or any other defendant because Synthes' claims were barred by Pennsylvania's "gist of the action" doctrine or that they failed to state a claim upon which relief could be granted.  Now representing Powell, that same counsel assert those arguments for the first time.

Because Synthes' tort claims against Powell are based on events distinct from its contract claim and based on duties not grounded in Synthes' contracts with Powell, the tort claims do not fall within Pennsylvania's "gist of the action" doctrine.  Further, in light of his distorted reading of the Amended Complaint's allegations, Powell is also incorrect in claiming that there are insufficient factual allegations on which to base claims against him.   Finally, Powell's inconsistent arguments that the law precludes claims against him for enforcement of Synthes' non-compete agreement and the Computer Fraud and Abuse Act are equally faulted.  Synthes' non-compete agreement with Powell is enforceable under either Pennsylvania or Colorado law and Synthes has properly pleaded a Computer Fraud and Abuse Act claim against Powell.

For all of the reasons set forth herein, this Court should reject Powell's assertions and deny Powell's Motion in its entirety.

## II.    RELEVANT PROCEDURAL BACKGROUND

On January 11, 2012, Synthes sought leave to amend the Verified Complaint to, among other things, assert claims against additional defendants, including Defendant Powell, for their unlawful and deceitful conduct and their roles in the same transactions and occurrences that form the basis for the claims set forth in the Verified Complaint against Defendants John P. Marotta ("Marotta") and Emerge Medical, Inc. ("Emerge").  (*See* Dkt. No. 38.)  Defendants Marotta and Emerge opposed Synthes' request for leave to amend based, in large part, on this Court's alleged lack of personal jurisdiction over proposed additional defendants Powell, Eric W. Brown ("Brown"), and Zachary W. Stassen ("Stassen").  (*See* Dkt. No. 41.)  Synthes filed a reply brief on February 10, 2012 in further support of its request for leave to amend.  (*See* Dkt. No. 44.)  On March 6, 2012, this Court granted Synthes' motion for leave to amend and deemed the Amended Complaint filed on that date.  (*See* Dkt. No. 47.)  Having been joined and now represented by the same counsel for Emerge, Powell filed the instant motion on April 18, 2012 seeking to dismiss the majority of Synthes' claims against him.[1]

---

[1] Synthes' Amended Complaint asserts the following causes of action against Defendant Powell:  (1) Breach of Contract (Count II); (2) Tortious Interference with Contract (Count III); (3) Misappropriation of Trade Secrets Under Pennsylvania Common Law and the Pennsylvania Uniform Trade Secrets Act (Count V); (4) Violation of the Computer Fraud and Abuse Act (Count VI); (5) Conversion and Replevin (Count VII); (6) False or Deceptive Advertising Under the Lanham Act (Count VIII); (7) Trespass to Chattels (Count IX); (8) Unfair Competition (Count X); (9) Civil Conspiracy (Count XII); and (10) Breach of Contract or, in the alternative, Unjust Enrichment (Count XIII).

III.   **ARGUMENT**[2]

    A.   **Synthes' Tort Claims Against Powell Are Not Grounded in Contract. Therefore, Pennsylvania's "Gist of the Action" Doctrine Does Not Bar Synthes' Tort Claims.**

Contrary to Defendant Powell's assertions, none of Synthes' tort claims are barred by Pennsylvania's "gist of the action" doctrine.

Under Pennsylvania law, the "gist of the action" doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] precluding plaintiffs from recasting ordinary breach of contract claims into tort claims."[3]   *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 548 (3d Cir. 2010) (quoting *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10 (Pa. Super. 2002)).   However, the simple existence of a contractual relationship between two parties does not preclude one party from bringing a tort claim against the other.   *See Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 104 (3d Cir. 2001).

To determine whether a tort claim is barred by the doctrine, Pennsylvania courts examine whether the "gist" or gravamen of the claim sounds in contract or tort.   *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619 (E.D. Pa. 2010) (citing *Sunquest Info. Sys., Inc. v. Dean Witter*

---

[2] At the outset, Defendant Powell seeks dismissal of Synthes' fraud claim against him on the grounds that: (1) the allegations supposedly fail to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b); and (2) the claim is barred by the "gist of the action" doctrine.  This argument appears to result from a misunderstanding of Synthes allegations.  To clarify, Synthes' fraud claim relates only to the conduct by Defendants Marotta, Stassen, Brown, and Emerge.  To remove any confusion, Synthes agrees to the dismissal of this claim as to Powell only.  In light of this and to avoid adding to the length of this submission, Synthes will otherwise forego addressing Powell's substantive arguments for the dismissal of this claim.

[3] Although the Pennsylvania Supreme Court has not explicitly adopted the "gist of the action" doctrine, both the Pennsylvania Superior Court and multiple district courts in the Third Circuit have predicted that it will.  *See Partners Coffee Co, LLC v. Oceana Servs. & Prods. Co.*, No. 09-236, 2009 U.S. Dist. LEXIS 113209, at *8-9 n.5 (W.D. Pa. Dec. 4, 2009) (citing cases).

*Reynolds, Inc*., 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999)).   To accomplish this, the court must ascertain the source of the duties allegedly breached.   *Id.*   The "gist of the action" doctrine bars tort claims:

> (1) "arising solely from a contract between the parties;"
>
> (2) "where the duties allegedly breached were created and grounded in the contract itself;"
>
> (3) "where the liability stems from a contract; or"
>
> (4) "where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract."

*Id.* (citing *eToll*, 811 A.2d 19).   In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort.   *See Bohler*, 279 F.3d at 103-04.   Where the obligations and duties alleged to have been violated are imposed by larger social policies, and not by contract, the tort claims are not barred by the "gist of the action" doctrine.   *See id.* at 104-05.[4]

Courts within the Third Circuit are hesitant to dismiss tort claims under the "gist of the action" doctrine at the motion to dismiss stage.   *See Partners Coffee*, 2009 U.S. Dist. LEXIS 113209, at *10; *Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.*, No. 11-4568, 2011 U.S. Dist. LEXIS 139980, at *22-23 (E.D. Pa. Dec. 6, 2011).[5]   This is due in part to

---

[4] "Whether the "gist of the action" doctrine applies in any particular setting is a question of law."   *Partners Coffee*, 2009 U.S. Dist. LEXIS 113209, at *10 (internal quotations and citations omitted).

[5] Powell cites a number of district court cases in support of his position that dismissal of Synthes' tort claims under the "gist of the action" doctrine at the motion to dismiss stage is proper.   (*See* Powell Mem. of Law in Support of Mot. to Dismiss ("Powell Mem.") at 11 (citing cases).)   The cases upon which Powell relies are inapposite because each of the cases involves claims for fraudulent or negligent misrepresentation where the misrepresentations fall within the language of the contract.

the fact that the Federal Rules of Civil Procedure allow parties to plead multiple claims as alternative theories of liability.[6]  *Partners Coffee*, 2009 U.S. Dist. LEXIS 113209, at *10; *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (acknowledging that pleading in the alternative is authorized by the federal rules).

Moreover, when the existence of a contract, or if valid, the effect and scope of its terms, are in dispute, courts should refuse to dismiss claims based on the "gist of the action" doctrine. *See, e.g.*, *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, Nos. 11-3429 & 11-5272, 2012 U.S. Dist. LEXIS 10701, at *36-37 (E.D. Pa. Jan. 27, 2012) (declining to dismiss conversion claim based on the "gist of the action" doctrine, stating that "[w]hen the validity and if valid, the effect, of a contract is uncertain, courts have found application of the "gist of the action" doctrine on a motion to dismiss to be inappropriate").

Here, Synthes' tort claim claims against Powell are not barred by the "gist of the action" doctrine because for each of these claims, there is a separate and independent duty on which the tort claim rests, which duty is not based in contract.  Powell's argument in favor of application of the "gist of the action" doctrine relies solely on the existence of a contractual relationship between him and Synthes.  This is not enough to bar Synthes' tort claims where, as here, Synthes' claims go beyond the contractual obligations set forth in Powell's employment agreements with Synthes, and thus the claims sound in tort as opposed to contract.  *See Bohler*, 247 F.3d at 104.

---

[6] Specifically, Federal Rule of Civil Procedure 8(d)(2) provides:  "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  FED. R. CIV. P. 8(d)(2). This same rule further states that a party may allege as many claims or defenses it has, "regardless of consistency." *Id.* at 8(d)(3).

5

### 1.  Dismissal Under the "Gist of the Action" Doctrine is Premature Where the Validity and Scope of the Contracts Are in Dispute.

Throughout this litigation, Emerge has consistently contended that the scope of the agreements at issue is limited and confers upon Synthes only certain narrow rights. (*See* Emerge Mem. of Law in Opp'n to Synthes Prelim. Inj. Mot., Dkt. 16 at 2, 9, 19 (describing the restrictions in the non-competition agreements as limited in geographic scope and only prohibitive of sales by Emerge in Colorado); *id*. at 11 (describing the non-disclosure agreement as giving Synthes "certain limited rights").)[7] More recently, Emerge asserted that Synthes' agreements are "contrary to public policy and/or the laws of the United States." (See Dkt. 51 at 43.)  And, in the counterclaims Emerge has asserted against Synthes–filed on Emerge's behalf by the same lawyers now representing Powell–Emerge claims that it has not tortiously interfered with Synthes' contractual relationships based on Emerge's interpretations of those agreements. (*See* Dkt. 55 at 61 ("An actual controversy exists regarding whether Emerge tortiously interfered with any contractual relationship between [Synthes] and any of its employees or former employees.").)

Because several Defendants have disputed the scope and enforceability of the contracts at issue in this litigation, this Court should not dismiss Synthes' tort claims against Defendant Powell or any other Defendant on "gist of the action" grounds.  This dispute alone precludes the dismissal of Synthes' tort claims at this stage of the litigation.  *See Premier Payments Online*, 2012 U.S. Dist. LEXIS at *36-37.

---

[7] Marotta has made similar statements, further evidencing the disputed scope of the agreements.  (*See* Marotta Mem. of Law in Opp'n to Synthes Prelim. Inj. Mot., Dkt. No. 15 at 8, 10, 12-13, 25, 29, 45-46.)

**2.      Synthes' Tort Claims Should Not Be Dismissed in Light of the Federal Rule's Alternative Pleading Standard.**

Similarly, this Court should not dismiss Synthes' tort claims against Powell at this juncture of the case because Rule 8(d) allows Synthes to plead multiple claims as alternative theories of liability.  The inconsistency of Powell's positions cannot be overlooked and actually illustrates the need to allow Synthes to plead in the alternative.  On the one hand, Powell asks this Court to relieve him of the need to answer for his conduct in tort reasoning that his contracts with Synthes are expansive and cover all of Synthes' allegations.  (Powell Mem. at 11-20.) Simultaneously and without any indication that he is arguing in the alternative, Powell also claims that the contracts are unenforceable, presumably because they are too broad.  (Powell Mem. at 29-33.)   All the while, Emerge urges that the contacts have not been violated nor interfered with because they provide only narrow rights.  (*See* Emerge Mem. of Law in Opp'n to Synthes Prelim. Inj. Mot., Dkt. 16 at 2, 9, 11, 19.)  The Defendants' contrasting and shifting positions on the scope and enforceability of Synthes' contracts emphasize how appropriate it is for Synthes to be permitted to pursue both tort and contact claims for the range of Defendants' conduct and militates against granting Powell's motion to dismiss Synthes' tort claims based on the "gist of the action" doctrine.  *See, e.g.*, *Med. Marketing Consultants, LLC v. Cardiac Telecom Corp.*, No. 06-00274, 2007 U.S. Dist. LEXIS 48394, at *7-8 n.4  (W.D. Pa. May 31, 2007), *adopted by* 2007 U.S. Dist. LEXIS 45019 (W.D. Pa. June 20, 2007) (recommending denial of motion to dismiss tortious interference claim based on "gist of the action" doctrine, in part, where defendants argued that the "gist of the action" doctrine barred tortious interference claim because it was based in contract, while, at the same time, taking the contrary position that the contract did not exist).

7

Dismissal of Synthes' various tort claims is premature for these reasons, at best.

> **3.      Synthes' Tortious Interference with Contract Claim as to Powell Addresses Conduct Outside the Scope of Powell's Contractual Obligations to Synthes.**

Count III of Synthes' Amended Complaint asserts a cause of action against the Defendants, including Powell, for tortious interference with contract.  Powell contends that this claim is merely an effort by Synthes to recast its breach of contract claims into separate tort claims.  (Powell Mem. at 14-16.)  This argument is meritless because Synthes contract with Powell covers different conduct and the claims arise from distinct duties.

Synthes' tortious interference with contract claim alleges that the Defendants have tortiously interfered with three separate sets of contracts: (1) Synthes' contractual relationships with current and former Synthes' employees, including Defendants Powell, Marotta, and Brown; (2) Synthes' contractual relationships with its vendors; and (3) Synthes' contractual relationships with its customers.  (Am. Compl. at ¶¶ 220-226.)  Synthes alleges that Powell unlawfully interfered with Synthes' contracts with customers from outside his former sales territory and with Synthes' contracts with employees with respect to duties other than those in the non-solicitation clause of Powell's non-compete.  (*See, e.g.*, Am. Compl. at ¶¶ 152-153 (describing Powell's unlawful acquisition of Synthes' confidential, proprietary, and trade secret information and Synthes' product in violation of Synthes' contractual relationships with its former and current employees); *id*. at ¶¶ 156-159, 223, 283-284 (describing Powell's interference with Synthes' contractual relationships with its customers relating to sales, consignment, and inventory management systems).)  All of this is conduct different from that addressed in Synthes' agreements with Powell.

8

Where a party alleges other tortious conduct that interfered with a parties' contractual relationship beyond the breach of its contractual obligations, application of the "gist of the action" doctrine is improper.  *See Deangelo Bros., Inc. v. Platte River Ins. Co.*, No. 3:09-CV-1198, 2010 U.S. Dist. LEXIS 64324, at *19 (M.D. Pa. June 29, 2010) (holding that "gist of the action" doctrine did not act as bar to tortious interference with contract claim where allegations went beyond the breach of plaintiff's contractual obligations and therefore could not be said to arise solely from the duties created by the contract or the breach thereof).[8]

Powell asks the Court to dismiss Synthes' tortious interference claim by analogizing the facts of this case to this Court's decision in *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588 (E.D. Pa. 2010).  (*See* Powell Mem. at 15-16.)  Powell's argument is misplaced as the facts of *Brown & Brown* are distinguishable from the instant action.

In *Brown & Brown*, the plaintiffs alleged that the defendants' tortiously interfered with the plaintiffs' customer contracts by soliciting the plaintiffs' customers and that the defendants' tortiously interfered with the plaintiffs' employee contracts by soliciting or attempting to solicit the plaintiffs' employees to induce them to breach their employment agreements with the plaintiffs.  745 F. Supp. 2d at 621-22.  The court looked to the defendants' employment agreements, which contained provisions regarding the non-solicitation of customers that specifically prohibited the defendants from directly or indirectly soliciting or inducing any existing or prospective customers of the plaintiff.  *Id*. at 599.  The contracts also prohibited the

---

[8] Furthermore, where a plaintiff could have a claim for tortious interference with contract even if it had never entered into a contractual relationship with the defendant, the "gist of the action" doctrine cannot serve as a bar to plaintiff's claim.  *See Med. Marketing*, 2007 U.S. Dist. LEXIS 48394, at *7-8  (holding that where plaintiff would have a claim for tortious interference with a contract even if it had never contracted with defendant, tortious interference claim cannot be barred by "gist of the action" doctrine).

9

defendants from soliciting the plaintiffs' employees to work for a competitor.  *Id.*  The court found that the "gist of the action" doctrine barred the plaintiffs' claim because both of the alleged violations involved conduct which fell "squarely within the scope of" the defendants' employment agreements and were thus "subsumed" by the plaintiffs' breach of contract claim. *Id.*

Here, unlike in *Brown & Brown*, the allegations in Synthes' tortious interference with contract claim go beyond the breach of Powell's contractual obligations to Synthes such that Synthes' tortious interference claim cannot be said to arise from duties imposed by the contracts. *See Deangelo Bros., Inc.*, 2010 U.S. Dist. LEXIS 64324, at *19.  The non-competition and non-solicitation provisions in Powell's Sales Consultant Confidentiality, Non-Solicitation and Non-Competition Agreement ("Non-Competition Agreement") contain reasonable restrictions on Powell's post-employment activities.  For example, the non-competition provision specifically prohibits Powell from competing with Synthes in certain accounts that Powell worked on Synthes' behalf.  (Am. Compl., Ex. K, at 3.)  In addition, the non-solicitation provision in Powell's Non-Competition Agreement only prohibited Powell from soliciting Synthes' customers within his assigned sales territory in Colorado as well as those Synthes' customers with whom he had worked for one year prior to the termination of employment with Synthes. (*Id.*)  In this case, Synthes' alleges that Powell tortiously interfered with Synthes' contractual relationships with its vendors and customers outside the restricted territory and with whom Powell had no prior working relationship.  Unlike the plaintiffs' claim in *Brown & Brown*, Synthes' tortious interference claim does not fall "squarely within the scope of" Powell's Non-

Competition Agreement such that the source of these duties arises from the contract.  Thus,

Synthes' tortious interference claim cannot be barred by the "gist of the action" doctrine.[9]

Powell's reliance on *Chemtech International, Inc. v. Chemical Injection Technologies,*

*Inc.*, 170 Fed. Appx. 805 (3d Cir. 2006), is similarly misplaced.  In *Chemtech*, a nonprecedential

opinion, the court found that the allegations of the plaintiff's complaint, even when taken in the

light most favorable to the plaintiff, simply alleged that the defendant harmed the plaintiff by

conducting business with the plaintiff's customers.  170 Fed. Appx. at 809.  Because the only

duty the defendant was alleged to have violated was a duty not to compete, a duty which cannot

be imposed by law as a matter of social policy, but only by contract, the court found that the

source of the duty was contractual and that the "gist of the action" doctrine barred the tortious

interference claim.  *Id.*

Here, the well-pleaded allegations in the Amended Complaint demonstrate that Synthes'

tortious interference claim goes beyond alleging a breach of a contractual duty not to compete.

Indeed, unlike the defendant in *Chemtech*, Synthes has alleged that the Defendants, including

Powell, have willfully and knowingly interfered with Synthes' contractual relationships with its

current and former employees, vendors, and customers, all without privilege or justification, and

with the specific intent of harming Synthes.  (*See* Am. Compl. at ¶¶ 220-226.)  These are

allegations describing the unlawful conduct of the Defendants through their interference with

---

[9] Similarly, the non-solicitation provision in Powell's Non-Competition Agreement relating to the solicitation or hiring of employees does not subsume Synthes' allegations as to Powell's tortious interference with Synthes' contractual relationships with its former and current employees.  The non-solicitation provision only restricts Powell from soliciting any employee to leave their employment with Synthes, offering any employee of Synthes employment elsewhere, or hiring any employee of Synthes to work elsewhere.  (*See* Am. Compl., Ex. K.)  That agreement does not address solicitation of current Synthes' employees for Synthes' confidential information and Synthes' product - conduct covered by Synthes' tortious interference allegations.

Synthes' contractual relations, conduct which is actionable in tort.   As a result, Synthes' tortious interference claim cannot be barred by the "gist of the action" doctrine and Powell's Motion must be denied.

### 4.    The "Gist of the Action" Cannot Bar Synthes' Conversion Claim.

Contrary to Powell's assertions, the gist of the action doctrine cannot bar Synthes' conversion claim.  In Count VII of the Amended Complaint, Synthes asserts a claim against all the Defendants, including Powell, for conversion.  Powell contends that Synthes' conversion claim is barred because Synthes has no express property interest in its customers and business.  (Powell Mem. at 19.)  However, Powell's argument not only mischaracterizes Synthes' claim but also disregards precedent.

First, Synthes' conversion claim against Defendant Powell is based on Powell's unlawful exercise of domain and control over Synthes' *confidential and proprietary business information and its product* – not its customers and business, as Powell argues.  (*See* Am. Compl. at ¶¶ 262-263.)[10]

Second, Synthes' rights to its business information and product do not originate in contract.  "'Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right

---

[10] Additional allegations underlying Synthes' conversion claim relate to Defendants Marotta's and Brown's failure to assign Emerge to Synthes, including all business models, plans, strategies, names, logos, and slogans and all implants, instrumentation, and intellectual property associated with them and with any other products developed or marketed by Emerge, based on the assignment provision in Marotta's and Brown's Non-Disclosure Agreements. (*See* Am. Compl. at ¶¶ 265-267.)  Synthes does not contend that Powell failed to assign Emerge to Synthes based on the provisions of his Non-Disclosure Agreement.  (*See* Am. Compl. at ¶¶ 204-205 (discussing only Marotta's and Brown's failure to assign as basis for breach of contract action)).)  Powell's argument to the contrary in support of dismissal of Synthes' conversion claim under the "gist of the action" doctrine is therefore misplaced and should not be considered.

and benefit.'" *Partners Coffee*, 2009 U.S. Dist. LEXIS 113209, at *19 (citing *United States v. Al Hedaithy*, 392 F.3d 580, 594 (3d Cir. 2004) (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987))).  Accordingly, in *Partners Coffee*, the court refused to dismiss the plaintiff's conversion claim on the "gist of the action" grounds as the claim was based on the defendant's improper access of the plaintiff's computer system to gain confidential business information.  2009 U.S. Dist. LEXIS 113209, at *19-20 (noting that "it is understood in our society that businesses will not interfere with each other's confidential information whether bound to each other by contract or not"); *see also Brown & Brown*, 745 F. Supp. 2d at 623 (finding that plaintiffs' conversion claim was not barred by the "gist of the action" doctrine where plaintiff had property interest in its documents, information, marketing materials, and promotional materials).

Finally, even where a contractual provision governs the property at issue, the "gist of the action" doctrine will not bar a claim for conversion where a party has a property interest in the thing that is the subject of the conversion claim.  *Orthovita, Inc. v. Erbe*, No. 07-2395, 2008 U.S. Dist. LEXIS 11088, at *18-19 (E.D. Pa. Feb. 14, 2008) (emphasis added) (citing *Berger & Montague, P.C. v. Scott & Scott, LLC*, 153 F. Supp. 750, 753-54 (E.D. Pa. 2001)).  In *Orthovita*, the plaintiff alleged a property interest in its trade secrets, confidential information, and computer files and on that basis, the court found that this property could be the subject of both a breach of contract claim and tort claim.  *Id at *18.*

Because Synthes has an express property interest in its confidential and proprietary business information and product[11] in the things Synthes alleges that Defendant Powell tortiously

---

[11] This is contrary to the cases on which Powell relies in support of dismissal of Synthes' conversion claim, all of which involve chattels that the plaintiffs have no express property interest in and arise solely from the contract between the parties.  (*See* Powell Mem. at 17.)

converted, the "gist of the action" doctrine cannot bar Synthes' claim.  Moreover, even if this property is the subject of Powell's contracts with Synthes, the "gist of the action" doctrine cannot serve as a bar to the conversion claim.  *See Partners Coffee*, 2009 U.S. Dist. LEXIS 113209, at *19-20; *Orthovita*, 2008 U.S. Dist. LEXIS, at *18-19.[12]

Accordingly, Defendant Powell's motion to dismiss Synthes' conversion claim based on the "gist of the action" doctrine must be denied

### 5.    The "Gist of the Action" Doctrine Cannot Serve As a Bar to Synthes' Unfair Competition and Civil Conspiracy Claims Where the Tort Claims Underlying These Claims Survive Dismissal.

Counts X and XII of the Amended Complaint assert claims for unfair competition and civil conspiracy which, by definition, incorporate the totality of the tortious conduct for which Synthes alleges Powell and the other Defendants are each liable.  Powell contends that both of these claims are barred by the "gist of the action" doctrine.  (Powell Mem. at 19-20.)  Again, Powell is mistaken.

Synthes' unfair competition claim is based on the Defendants' conspiracy to destroy Synthes' business and compete unfairly with Synthes; the violation of certain contractual, common law, and statutory obligations to Synthes; the misappropriation of confidential, proprietary and trade secret information; the tortious interference with Synthes' contractual relationships; the wrongful solicitation of Synthes' employees and customers; the illicit acquisition of Synthes' product which was reversed engineered to develop Emerge's products; and, as disregarded by Powell in his recitation of the activities forming the basis of this claim,

---

[12] To the extent Powell received this confidential and proprietary business information and product after his employment with Synthes, which Synthes has alleged (*see, e.g.*, Am. Compl. at ¶¶ 152, 154), this property is not governed by the terms of his Non-Competition and Non-Disclosure Agreements, which only pertain to information and product received during his employment with Synthes.  (*See* Am. Compl. Exs. J & K.)

the misrepresentations concerning the nature, qualities, characteristics, and origin of Emerge's products.[13]  (Am. Compl. at ¶¶ 288-295.)  Synthes' conspiracy claim is based on the Defendants' tortious and otherwise unlawful conduct in the development and operation of Emerge, a company designed to wrongfully compete with, and harm, Synthes and its business.  (*See* Am. Compl. at ¶¶ 304-308.)

Because the tort claims underlying Synthes' unfair competition[14] and civil conspiracy[15] claims survive dismissal, these claims cannot be barred by the "gist of the action" doctrine.  *See, e.g.*, *Ueberroth v. Goldner, Papandon, Childs & Deluccia, LLC*, No. 11-3119, 2012 U.S. Dist. LEXIS 33165, at *15 (E.D. Pa. Mar. 12, 2012) (where plaintiffs have properly stated a claim for conversion, conspiracy claim will not be dismissed); *Integrated Waste Solutions, Inc. v. Goverdhanam*, No. 10-2155, 2010 U.S. Dist. LEXIS 127192, at *47 (E.D. Pa. Nov. 30, 2010) (refusing to dismiss civil conspiracy claim where Computer Fraud & Abuse Act claim underlying the conspiracy survived dismissal); *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 506-07 (E.D. Pa. 2008*)* (denying motion to dismiss civil conspiracy claim where tort

---

[13] This latter allegation regarding Defendants' misrepresentations is significant because it forms the basis of Synthes' Lanham Act claim and involves conduct which has no relation to Powell's contractual obligations.  Where, as here, the claims arising from these misrepresentations are wholly independent and separate from claims for Powell's violation of his contractual duties, the "gist of the action" doctrine cannot bar Synthes' unfair competition claim.  *See, e.g.*, *TruePosition, Inc. v. Sunon, Inc.*, No. 05-CV-3023, 2006 U.S. Dist. LEXIS 32918, at *9-10 (E.D. Pa. May 23, 2006) (holding that unfair competition claim under the California Unfair Competition Law was not barred by the "gist of the action" doctrine where the misrepresentation forming the basis of the claim was not related to the performance of the product sold under the contract and thus did not sound in contract alone).

[14] Pennsylvania courts have recognized causes of action for  common law unfair competition where there is evidence of, among other things, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information.  *See Synthes (U.S.A.) v. Globus Med., Inc.*, No. 04-1236, 2007 U.S. Dist. LEXIS 50812, at *24-25 (E.D. Pa. July 12, 2007) (citations omitted).

[15] Civil conspiracies are not actionable in and of themselves; rather they require the existence of an underlying tort. *See PNC Mortgage v. Superior Mortgage Corp.*, No. 09-5084, 2012 U.S. Dist. LEXIS 25276, at *93 (E.D. Pa. Feb. 27, 2012) (citing *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999)).

15

claims for tortious interference and breach of fiduciary duty survived dismissal under the "gist of the action" doctrine).

      **B.**    **Contrary to Powell's Distorted Presentation of the Amended Complaint's Allegations, Synthes Can Maintain its Claim under the Computer Fraud & Abuse Act.**

In attacking Synthes' claim for violation of the Computer Fraud and Abuse Act ("CFAA") (Amended Complaint Count IV), Powell continues his highly selective reading of Synthes' allegations. He argues that the Amended Complaint "fails to set forth any factual allegations relating to Defendant Powell," (Powell Mem. at 21), but overlooks the contents of paragraphs 152-153, 241-246, and 252-254 of the Amended Complaint. Based on the fair reading the Amended Complaint deserves, Synthes alleges that Powell, with the other Defendants, "improperly and unlawfully acquired, used, and disclosed Synthes' confidential, sensitive, propriety, and trade secret information, including, upon information and belief, information they acquired by directing, inducing and encouraging others to access Synthes' computer systems." (Am. Compl. at ¶ 152.) The Amended Complaint further alleges that the Defendants "acquired, used, and disclosed confidential and proprietary business information obtained and misappropriated from Synthes to help them develop and implement Emerge's business model to identify and/or design, develop, test, and manufacture products competitive with certain of Synthes' products, to manage inventory and purchase orders, to develop Emerge's marketing efforts to customers, and otherwise effectuate their scheme to compete wrongfully with Synthes." (*Id.* at ¶ 241.) Moreover, Synthes alleges that Powell and the other Defendants "were not authorized to access or use Synthes' computer systems for the purpose of misappropriating Synthes' confidential, proprietary and trade secret information. Nor were

Defendants authorized to access Synthes' computer systems indirectly through Synthes employees or by directing, inducing or encouraging ***Synthes' employees***"—*i.e.*, someone other than themselves—"to do so without authorization or in excess of any authorization." (*Id.* at ¶ 254 (emphasis added).)  These allegations collectively constitute a short and plain statement of the facts on which Synthes claims that Powell and the other Defendants violated the CFAA, and for that reason alone, Powell's motion must be denied.

Powell also attempts to evade the CFAA claim by roundly misinterpreting Synthes' allegations.  According to Powell, Synthes fails to state a claim because it has not pleaded the contents of a computer policy restricting ***his*** access to Synthes' computers.  (*See* Powell Mem. at 22.)  Powell misreads Synthes' allegations and the limited basis on which Synthes seeks relief under the CFAA against him and the other Defendants named.  First, Powell misunderstands the relevant time period.  Synthes alleges that beginning in "the summer of 2010"—*i.e.*, ***after Marotta and Powell had resigned their employment with Synthes***—Powell and Marotta "improperly and unlawfully acquired, used, and disclosed Synthes' confidential, sensitive, proprietary, and trade secret information, including, upon information and belief, information they acquired by directing, inducing, and encouraging others to access Synthes' computer systems."  (Am. Compl. at ¶ 152.)  Thus, from the face of the Amended Complaint, Synthes' CFAA claim is not based on conduct during Powell's employment.  Rather, Synthes' CFAA claim focuses on Powell's and Marotta's unlawful accessing of Synthes' data after their employment, including by inducing then current Synthes employees to funnel to them Synthes' confidential information to which they would not otherwise have had access.  Synthes' policies are more relevant to Powell's and Marotta's full awareness of the wrongfulness of their conduct

and the access at the time they unlawfully obtained the information.  And, in that regard, Synthes has alleged that Powell, and, for that matter, Marotta, "received and reviewed Synthes' Employee Policy Manual, Sales Policy Manual, Global Code of Business Ethics, and IT Security Policy and in 2009, Powell received and reviewed Synthes' amended Employee Policy Manual. Among other policies, those manuals detail Synthes' standards of ethics as well as policies related to conflicts of interests, inventions and innovations, expense reimbursements, sales to customers, confidentiality and the use and return of Synthes' products, equipment and computer systems."  (Am. Compl. at ¶ 95.)  Copies of each of the relevant Synthes policies and Marotta's and Powell's policy acknowledgements executed during the course of their employment with Synthes have been produced already.  Those policies amply identify the critical restrictions Synthes imposes on access to its computer systems.  Synthes is not, at this pleading phase, required to enumerate policy language restricting anyone's access to its computer systems. Regardless, however, Synthes' has already done so through discovery, and Powell and the other Defendants are well aware of the contents of those company-wide restrictions.

Next, Powell quibbles with Synthes' allegations regarding the interstate nature of Synthes' allegations.  (*See* Powell Mem. at 24-25 (contending that Synthes has not alleged "an interstate or foreign communication by Powell").)  But Synthes has alleged that the "computer systems used by the Synthes employees from whom the Defendants obtained Synthes confidential, proprietary, and trade secret information as set forth above, are 'protected computers,' pursuant to 18 U.S.C. § 1030, in that they were computers that are and were used regularly and consistently by Synthes to conduct business and communicate both throughout the United States and internationally, and, thus, in and effecting interstate or foreign commerce or

18

communication." (Am. Compl. at ¶ 252.) These allegations must be read in conjunction with

other allegations throughout the Amended Complaint detailing that Synthes is a business whose

global corporate headquarters is in Pennsylvania, and that Defendants Marotta and Powell are

residents of Colorado working for Emerge, which is based in Colorado. (*See id.* at ¶¶ 11-18, 23-

30, 39, 49, 68, 72, 92, 98, 119-20.) That is all that is required to establish the interstate

component of this Court's jurisdiction. Powell relies exclusively on *Patrick Peterson Custom*

*Homes, Inc. v. Bach*, 586 F. Supp 2d 1026, 1034 (N.D. Ill. 2008), for the proposition that

Synthes must allege his specific interstate conduct or communications in relation to the unlawful

access of its protected computers. (Powell Mem. at 24.) But whatever value the decision in

*Peterson* once had, if any, that decision was overruled by the 2008 amendments to the CFAA,

which eliminated the phrase "if the conduct involved an interstate or foreign communication"

from Section 1030(a)(2)(C). More recent authority on this point distinguishes *Peterson* on this

very ground.[16] *See, e.g.*, *The Dedalus Found. v. Banach*, Civil Action No. 09-2842, 2009 U.S.

Dist. LEXIS 98606, at *6-10 & n.3 (S.D.N.Y. Oct. 16, 2009) (denying motion to dismiss).

Finally, Powell argues that Synthes' CFAA claim fails because, according to Powell,

Synthes "cannot establish that [it] suffered 'loss' within the meaning of the CFAA." (Powell

Mem. at 26.) In addition to overstating Synthes' burden at this stage of this proceeding, Powell

again distorts Synthes' claims and ignores Synthes' allegations. Contrary to Powell's assertions,

Synthes has not alleged that the $5,000 jurisdictional basis for its CFAA claims is "lost business

opportunities, damaged reputation," or "missed revenue." (*See id*.) Instead, Synthes alleges that,

---

[16] It should also go without saying that Colorado-based Defendants would have acquired electronic copies of
confidential information belong to Synthes, a business whose global corporate headquarters and operations are in
Pennsylvania, did so through interstate communications in some respect.

after leaving Synthes' employ, Powell, with the other Defendants, directed, induced, or encouraged then-current Synthes employees to provide them with highly sensitive and proprietary business information that they then could use to "develop and implement Emerge's business model, to identify and/or design, develop, test, and manufacture products competitive with certain of Synthes' products, to manage inventory and purchase orders, to develop Emerge's marketing efforts to customers, and otherwise effectuate their scheme to compete wrongfully with Synthes." (*See* Am. Compl. at ¶¶ 152, 241.)  Synthes further alleges that none of the Defendants was "authorized to access or use Synthes' computer systems for purposes of misappropriating Synthes confidential, proprietary and trade secret information," "[n]or were Defendants authorized to access Synthes' computer systems indirectly through Synthes employees or by directing, inducing, or encouraging Synthes employees to do so without authorization or in excess of any authorization." (*Id.* at ¶ 254.)  Defendants conduct resulted in, among other things "impairment to the integrity, confidentiality, and availability of data, programs, systems, and information contained in the protected computers." (*Id.* at ¶ 256.)  And, as to the jurisdictional threshold, Synthes further alleges that, as a result of Defendants' conduct, it "has incurred losses exceeding $5,000 in a one year period," made up of "the cost of responding to wrongful actions of the Defendants, conducting damage assessments, identifying and tracing the information that Defendants misappropriated, and restoring data, programs, systems and information to the conditions in which they existed prior to the Defendants' wrongful activity." (*Id.* at ¶ 257.)  Having identified that qualifying "loss," Synthes' also alleges that its economic damages will consist of lost revenue and other consequential damages incurred

by Synthes related to the wrongful access.  (*Id.*)  *See also* 18 U.S.C. § 1030(g) ("Damages for a violation…are limited to economic damages.").

The damages that Synthes alleges it suffered fall squarely within the statutory definition of the term "loss" as Synthes seeks to recover its "reasonable costs" of "responding to an offense, conducting a damage assessment, and restoring the data, program, system or information prior to the offense, and any revenue loss, cost incurred."  18 U.S.C. § 1030 (e)(11).  In addition, the "damage" for which Synthes seeks to recover includes "impairment to the integrity" of Synthes' system and the data on that system.  18 U.S.C. § 1030 (e)(8).  A number of courts in this circuit have acknowledged that this is, indeed, the kind of damage for which a plaintiff can seek recovery under the CFAA.  *See, e.g.*, *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Fraley*, 497 F. Supp. 2d 627, 647-48 (E.D. Pa. 2007) (finding that "the statute allows the cost of time spent assessing computer systems to be counted towards the loss for requirement"); *P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Super Store, LLC*, No. 04-4554, 2007 U.S. Dist. LEXIS 15216 at *14-15 (D.N.J. March 2, 2007) (acknowledging that investigating Defendants' actions and taking remedial steps to prevent Defendants further actions were costs explicitly identified in the CFAA's definition of loss).

For the foregoing reasons, Powell's Motion must be denied.

C.    **The Well-Pleaded Allegations of Synthes' Remaining Claims Satisfy the Pleading Standards Set Forth in *Twombly* & *Iqbal*.**

1.    **Standard for Dismissal Under Rules 8(a)(2) and 12(b)(6).**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must comport with the minimal requirements of Rule 8(a)(2), as construed by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  Rule 8(a)(2)

requires "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted).

To determine the sufficiency of a complaint under *Twombly* and *Iqbal*, the Third Circuit follows a three-step process:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Twp.*, 629 F. 3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1947, 1950).[17]  In conducting this analysis, courts are not bound to accept as true legal conclusions couched as factual allegations, statutory buzz words, or "naked assertions devoid of further factual enhancement."  *Iqbal*, 129 S. Ct. at 1949 (internal quotations and alterations omitted); *Twombly*, 550 U.S. at 556, 564; *see also Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 523 (E.D. Pa. 2008) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) ("not bound to accept as true a legal conclusion couched as a factual allegation").  Finally, courts must not "conjure up unpleaded facts" in an effort to salvage or cure deficient allegations.  *Twombly*, 550 U.S. at 562 (citing *O'Brien v. Di Grazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) and *McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39, 42-43 (6th Cir. 1988).

---

[17] Although *Iqbal* describes the Rule 8(a)(2) analysis as "two-pronged," the Third Circuit includes the identification of the elements necessary for a plaintiff's claim as an initial, separate step in that analysis.  *See Santiago*, 629 F.3d at 130.  The distinction drawn elevates form over substance, and application of the two-step approach mandated by the Supreme Court remains appropriate.  *See, e.g., Creston*, 2012 U.S. Dist. LEXIS 16132 at *7 (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009)).  Regardless, this Memorandum of Law will follow the processes adopted by the Supreme Court in *Iqbal* and the Third Circuit in *Santiago*.

Synthes' Amended Complaint meets this standard.

> **2.      Powell's Employment Agreements With Synthes Are Enforceable Under Both Colorado and Pennsylvania Law.**

Count II of the Amended Complaint asserts a cause of action against Powell for the breach of his obligations to Synthes under his Non-Competition and Non-Disclosure Agreements. Powell argues that Synthes' contract claim should be dismissed because these Agreements are unenforceable under Colorado law.[18] (Powell Mem. at 31-33.) This argument holds no weight and cannot support dismissal of Synthes' contract claim because Synthes' agreements are enforceable under both Pennsylvania and Colorado law, as courts in both jurisdictions have determined.

Powell's Non-Competition Agreement contains a choice of law provision which requires the application of Pennsylvania law to Synthes' claims. (Am. Compl., Ex. K at p. 4.) "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them."[19] *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (citing *Smith v. Commonwealth Nat'l Bank*, 557 A.2d 775 (Pa. Super. 1989)). In the context of restrictive covenants, courts in Pennsylvania will give effect to a choice of law provision when the state the law of which has been selected enjoys a substantial relationship to the parties or the transaction and the application of the law is not contrary to the public policy of another state with a stronger interest in the transaction. *Verizon Commc'ns, Inc. v. Pizzirani*, 462

---

[18] This argument is the first place in the nearly 30 pages of briefing that Powell argues Colorado, as opposed to Pennsylvania, law should apply. Interestingly, Marotta, whose non-competition agreement with Synthes contains the same choice of law provision, and who similarly lives and works in Colorado, has never contested the applicability of Pennsylvania law to Synthes' contract claims.

[19] Pennsylvania choice of law rules apply to this analysis. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497 (1941).

F. Supp. 2d 648, 655 (E.D. Pa. 2006).   Under Section 187(2) of the Restatement (Second) of

Conflict of Laws, adopted by Pennsylvania courts, a choice of law provision will stand unless:

> (a) "the chosen state has no substantial relationship to the parties
> or the transactions and there is no other reasonable basis for the
> parties' choice, or"
>
> (b) "application of the law of the chosen state would be contrary to
> a fundamental policy of a state which has a materially greater
> interest than the chosen state in the determination of the
> particular issue and which . . . would be the state of the
> applicable law in the absence of an effective choice of law by
> the parties."

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2); *Perma-Liner Indus. v. United States*

*Sewer & Drain, Inc.*, 630 F. Supp. 2d 516, 522 (E.D. Pa. 2008) (citing *InterMetro Indus. Corp. v.*

*Ken*t, No. 3:cv-07-0075, 2007 U.S. Dist. LEXIS 10559, at *6-7 (E.D. Pa. Feb. 12, 2007)).

Because he cannot argue that Pennsylvania does not have a substantial relationship to the

parties or the transactions, Powell focuses exclusively on Section 187(2)(b) of the Restatement.

(*See* Powell Mem. 30-31.)   But, even under Colorado's statute on covenants not to compete,

Powell's Non-Competition Agreement is enforceable.   Colorado law deems a covenant not to

compete void unless a party seeking enforcement can demonstrate that the covenant falls within

a statutory exception.   *See* COLO. REV. STAT. § 8-2-113(2),[20]   One exception is known as the

---

[20] According to the statute, "[a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:

> (a) Any contract for the purchase and sale of a business or the assets of a business;
>
> (b) Any contract for the protection of trade secrets;
>
> (c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;
>
> (d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel."

"trade secrets" exception.   "To meet the trade secrets exception, the primary purpose of the covenant not to compete must be the protection of trade secrets and the covenant must be reasonably limited in scope." *Haggard v. Synthes Spine*, No. 09-cv-00721-CMA-KMT, 2009 U.S. Dist. LEXIS 54818, at \*14-15 (D. Colo. June 12, 2009) (citing *Harvey Barnett, inc. v. Shidler*, 338 F.3d 1125, 1133 (10th Cir. 2003) and *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. Ct. App. 1997)).

As a matter of fact, a Colorado federal court has already determined that a Synthes' sales consultant non-competition agreement quite similar to the one in this case falls within the trade secrets exception under Colorado law and is therefore enforceable.   In *Haggard*, the district court found that the sales consultant's non-competition agreement with Synthes was enforceable under Colorado law because it fell within the Colorado statute's trade secrets exception.   2009 U.S. Dist. LEXIS 54818, at \*14-18.[21]   In doing so, the court engaged in a thorough analysis of the agreement and its substantive provisions and found that it fell within the trade secrets exception because:   (1) the primary purpose of the agreement was the protection of trade secrets; and (2) the agreement was reasonably limited in scope for the protection of those trade secrets.   *Id.* Therefore, even the application of Colorado law is no bar to the enforcement of Powell's Non-Competition Agreement with Synthes.

---

COLO. REV. STAT. § 8-2-113(2).

[21] The non-competition agreement at issue in *Haggard* is virtually identical to, and in some instances less restrictive than, Powell's Non-Competition Agreement.  For example, both agreements contain an identical non-competition provision prohibiting competition for a period of one-year in the consultant's current territory, or territory for which the consultant had responsibility for during his last year of employment with Synthes.  In addition, both agreements contain similar non-solicitation clauses which prohibit the solicitation of certain customers for a period of one-year. *Compare* Am. Compl., Ex. K, *with Haggard*, 2009 U.S. Dist. LEXIS 54818, at \*4-5.

Because Powell's Non-Competition Agreement is enforceable under Colorado law, the application of Pennsylvania law to Powell's Non-Competition Agreement is not contrary to a fundamental policy of Colorado.[22]  For this reason and based on the other interests involved, this Court should honor the choice of law provision in the parties' contract and apply Pennsylvania law to Synthes' contract claim against Powell.  And under Pennsylvania law, Powell's Non-Competition Agreement is also enforceable.  *See Synthes (U.S.A.) v. Myer*, Case No. 343 EDA 2009, Superior Court of Pennsylvania, Memorandum Opinion dated September 9, 2009 (affirming Jan. 7, 2009 Opinion and Order, Civil Action No. 2008-10358-IR (Pa. C.C.P. Chester County) (J. Streitel) finding Synthes' agreement enforceable under Pennsylvania law and granting injunctive relief), a true and correct copy of the *Myer* decisions are attached hereto as Exhibit ("Ex.") 1.[23]

Because Powell is unable to show that his contracts with Synthes are void and/or otherwise unenforceable under either Colorado or Pennsylvania law, Powell's Motion must be denied.

**3.      Synthes Has Adequately Pled a Claim for Misappropriation of Trade Secrets Against Powell.**

---

[22] Synthes acknowledges that the *Haggard* court, in determining whether the non-competition agreement was enforceable under Colorado law, underwent a conflict of laws analysis and determined that the application of Pennsylvania law would be contrary to a fundamental policy of Colorado.  2009 U.S. Dist. LEXIS 54818, at *7-13.  However, the *result* in *Haggard* proves that the enforcement of Synthes' sales consultant non-competition agreements, such as Powell's, does not violate Colorado law because it falls within the trade secrets exception of Section 8-2-113(2).

[23] Given the fact that the application of Pennsylvania law to Powell's Non-Competition Agreement does not violate a fundamental policy of Colorado, Colorado cannot be said to have a materially greater interest than Synthes concerning the enforceability of Powell's restrictive covenants.  Pennsylvania, on the other hand, as Synthes' home, has a vital interest in the determination of this issue because so many Synthes employees are present in Pennsylvania and/or have close contacts with the state where so much of Synthes' business transpires.

Count V of the Amended Complaint asserts a misappropriation of trade secrets claim under both the Pennsylvania common law and the Pennsylvania Uniform Trade Secrets Act, 12 PA. C.S.A. § 5302, *et seq.*  Powell argues that Synthes has failed to state a claim because Synthes has allegedly failed to:  (1) identify its trade secrets; and (2) describe Powell's alleged use of a valid trade secret.  Powell's arguments are inherently flawed.  (Powell Mem. at 34-38.)

The Pennsylvania Uniform Trade Secrets Act ("PUTSA"), which is applicable here, defines a trade secret as information that "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir. 2010) (citing 12 PA. C.S.A. § 5302).  Whether information rises to the level of a trade secret is a question of fact which generally requires discovery. *Kimberton*, 2011 U.S. Dist. LEXIS 139980, at *12-13; *see also Bimbo Bakeries*, 613 F.3d at 113. "Courts have found 'trade secrets' to include 'certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections and the terms of specific customer accounts including contract expiration dates and revenues generated.'" *Youtie v. Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 621 (E.D. Pa. 2009) (quoting *BIEC Int'l, Inc. v. Global Steel Servs., Ltd.*, 791 F. Supp. 489, 545 (E.D. Pa. 1992)).

A party misappropriates a trade secret under the PUTSA when he "acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and

then discloses or uses that trade secret without the other's consent." *Bimbo Bakeries*, 613 F.3d at

110 (citing 12 PA. C.S.A. § 5302). Specifically, PUTSA defines "misappropriation" to include:

> (1)    acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
>> (i) used improper means to acquire knowledge of the trade secret;
>> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>> (A) derived from or through a person who had utilized improper means to acquire it;
>>> (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>> (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 PA. C.S.A. § 5302. In other words, misappropriation occurs through the acquisition,

disclosure, and/or use of the trade secrets. *See Youtie*, 653 F. Supp. 2d at 623-26 (analyzing

misappropriation through both acquisition and disclosure of trade secrets); *see also Eastman*

*Chem. Co. v. Alphapet Inc.*, No. 09-971-LPS-CJB, 2011 U.S. Dist. LEXIS 127757, at *10-11 (D.

Del. Nov. 4, 2011) (describing forms of misappropriation under Delaware's similar Uniform

Trade Secrets Act).

    First, the Amended Complaint amply identifies the information that Synthes contends

constitutes "trade secrets", including, without limitation:

❑  As a Sales Consultant in Colorado in the Denver East Territory and the Eastern Slope Territory (*i.e.*, in the area of Vail, Colorado), Powell had direct and primary contact with Synthes' customers and became intimately familiar with *Synthes' customers' preferences,*

*needs, priorities, purchasing and ordering histories, decision-making personnel, and practices as well as additional sensitive and confidential information concerning his territory and Synthes' business practices and strategies.* (Am. Compl. at ¶ 98 (emphasis added).)

❑ Throughout his employment with Synthes as a Territory Assistant, Associate Sale Consultant, and ultimately Sales Consultant, Synthes entrusted Powell with its most valuable customer contacts, goodwill, and business information. Synthes also assigned and introduced Powell to existing and prospective customers in those territories. Synthes provided Powell with direct access to Synthes' valuable business relationships. In his roles, Powell had access to and used Synthes products and equipment as well as Synthes' sensitive, confidential, proprietary, and trade secret information, all of which he would not have obtained access to but for his working for Synthes in that capacity. (Am. Compl. at ¶ 101.)

❑ The confidential, sensitive, proprietary, and trade secret information Synthes entrusted to Powell included, without limitation, *information about Synthes' customers, business activities, and strategies as well as information regarding Synthes' product development plans, pipeline, and launches; technology and product performance; expansion plans; pricing; competitive terms; contract and sales administration; compensation and personnel; and other sensitive information related to Synthes' business.* (Am. Compl. at ¶ 102 (emphasis added).)

❑ During these training sessions, Powell also received sensitive information regarding *Synthes' contract and sales administration, personnel, and other departments*…. (Am. Compl. at ¶ 103 (emphasis added).)

❑ Beginning no later than the summer of 2010, Marotta, Stassen, Powell, and Emerge improperly and unlawfully acquired, used, and disclosed Synthes' confidential, sensitive, proprietary, and trade secret information, including, upon information and belief, *information they acquired by directing, inducing, and encouraging others to access Synthes' computer systems.* (Am. Compl. at ¶ 152 (emphasis added).)

All of the confidential and proprietary information Synthes has identified may qualify as trade secrets. *See Youtie*, 653 F. Supp. 2d at 621 (citing *BIEC Int'l*, 791 F. Supp. at 545); *see also Council for Educ. Travel v. Agata Czopek*, No. 1:11-CV-00672, 2011 U.S. Dist. LEXIS 99230, at *12(M.D. Pa. Sept. 2, 2011) ("Indeed, the type of information alleged to be confidential and proprietary is within the scope of protectable interests."). Accepting the factual allegations of the Amended Complaint as true, as the Court must do for purposes of this motion,

Synthes has identified the confidential and proprietary business information it considers to be the trade secrets at issue in this matter and used that information.  (Am. Compl. ¶ 152.)  Ultimately, the determination of whether or not this information actually constitutes a trade secret is a question to be decided by a jury, but that issue is not appropriate for resolution on motions to dismiss.  *Agata*, 2011 U.S. Dist. LEXIS 99230, at *13.

Similarly, Powell's second argument that Synthes has failed to describe Powell's alleged use of a valid trade secret is mistaken.  Misappropriation is not, as Powell contends, limited to the *use* of trade secrets.  *See* 12 PA. C.S.A. § 5302.  Rather, misappropriation can occur through acquisition, disclosure, or use of the trade secrets.  *See Youtie*, 653 F. Supp. 2d at 623-26; *Eastman Chem.*, 2011 U.S. Dist. LEXIS 127757, at *10-11.  Second, the Amended Complaint describes how the Defendants, including Powell, used Synthes' trade secrets:

❑ Beginning no later than the summer of 2010, Marotta, Stassen, Powell, and Emerge improperly and unlawfully *acquired, used, and disclosed* Synthes' confidential, sensitive, proprietary, and trade secret information, including, upon information and belief, information they acquired by directing, inducing, and encouraging others to access Synthes' computer systems.  (Am. Compl. at ¶ 152 (emphasis added).)

❑ Upon information and belief, the Defendants improperly and unlawfully *acquired, used, and disclosed* confidential and proprietary *business information obtained and misappropriated from Synthes to help them develop and implement Emerge's business model, to identify and/or design, develop, test, and manufacture products competitive with certain of Synthes' products, to manage inventory and purchase orders, to develop Emerge's marketing efforts to customers, and to otherwise effectuate their scheme to* compete wrongfully with Synthes.  (Am. Compl. at ¶ 241 (emphasis added).)

❑ Defendants knew, before and at the time of their *acquisition, use, and/or disclosure* of it, that this information constitutes "trade secret" information under Pennsylvania law because: (i) the information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) it is reasonable for Synthes to maintain the secrecy of such information.  (Am. Compl. at ¶ 242 (emphasis added).)

❑ The Defendants' *acquisition, use, and disclosure* of such information have given Emerge an unfair and wrongful advantage.  (Am. Compl. at ¶ 244 (emphasis added).)

The plain language of the Amended Complaint clearly alleges acquisition, use, and disclosure by the Defendants of Synthes' trade secrets and does so with sufficient specificity to meet the *Twombly/Iqbal* standard.[24]  These allegations are more than just mere "conclusions" or a "formulaic recitation of the elements of a cause of action."  To the contrary, Synthes' allegations provide sufficient factual information to put Powell on notice of the plausible grounds for its misappropriation claim.

In sum, Synthes' misappropriation of trade secret claim is sufficiently pled under Rule 8 and thus survives dismissal.

### 4. Powell's Motion to Dismiss Synthes' Conversion Claim Fails As Synthes Has Pleaded All The Necessary Elements.

With little analysis and less legal authority, Powell contends that Synthes' conversion claim should be dismissed because the Amended Complaint fails to include factual allegations that Powell converted Synthes' confidential and proprietary business information or product.[25]  (Powell Mem. at 38-39.)  Contrary to Powell's assertions, the factual allegations set out in paragraphs 98, 101-103, 152, 241, 242, and 244 of the Amended Complaint describe how Powell

---

[24] In addition to these allegations, the evidence produced to date demonstrates that, after Powell's employment with Synthes and while he was working for Emerge, Powell received and used Synthes' confidential customer usage and pricing data in his role as Emerge's Director of U.S. Sales.  (*See* Pls.' Mem. of Law in Opp'n to Def. Zachary W. Stassen's Mot. to Dismiss Pl.'s Am. Compl. (Dkt. No. 68) at 22-23, n. 23, and Exs. 39 & 43.)

[25] Powell also contends that Synthes has similarly failed to set forth factual allegations to support its claim that Powell failed to assign Emerge to Synthes, and thus converted Emerge and all of Emerge's business models, plans strategies, names, logos, and slogans and all implants, instrumentation, and intellectual property associated with them and with any other products developed or marketed by Emerge.  Again, as discussed in note 10, *supra*, Powell misconstrues the allegations in the Amended Complaint as Synthes is not alleging that Powell failed to assign Emerge to Synthes pursuant to the terms of his Non-Disclosure Agreement.  Because this activity does not form the basis of Synthes' conversion claim against Powell, Synthes will not address it in the instant motion.

came into possession of Synthes' confidential and proprietary business information and product and, most importantly, how Powell converted this information and product through his use and disclosure.[26]

Under Pennsylvania law, conversion "is the deprivation of another's right of property, or use or possession of chattel, or other interference, therewith without the owner's consent and without legal justification." *Hartford Fire Ins. Co. v. Lewis*, No. 08-1198, 2009 U.S. Dist. LEXIS 5178, at *17-18 (E.D. Pa. Jan. 26, 2009) (internal quotations and citations omitted). Conversion does not require proof of specific intent; rather, a plaintiff must only demonstrate "'an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" *Warminster Equities, LLC v. Warminster Commerce, LLC*, No. 10-520, 2010 U.S. Dist. LEXIS 107347, at *8-9 (E.D. Pa. Oct. 7, 2010) (quoting *Schonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. 1987)); *Farm Credit Leasing Servs. Corp. v. Ferguson Packaging Mach., Inc.*, No. 07-1900, 2007 U.S. Dist. LEXIS 89330, at *18-19 (E.D. Pa. Dec. 5, 2007).

A party may be liable for conversion by: "(1) acquiring possession of the chattel with the intent to assert a right to it which is adverse to the owner; (2) transferring the chattel and thereby depriving the owner of control; (3) unreasonably withholding possession of the chattel from one who has the right to it; and (4) misusing or seriously damaging the chattel in defiance of the owner's rights." *Hartford*, 2009 U.S. Dist. LEXIS 5178, at *18. "A cause of action in conversion is properly asserted if the plaintiff had actual or constructive possession of a chattel

---

[26] In addition, and as set out in Section III.C.3, *supra*, these allegations also relate to Powell's role in the misappropriation of Synthes' trade secrets.  (*See also* n. 24, *supra* (describing Powell's misappropriation of Synthes' confidential customer usage and pricing data in his role as Emerge's Director of U.S. Sales).)

or an immediate right to possession of a chattel at the time of the alleged conversion." *Ueberroth*, 2012 U.S. Dist. LEXIS 33165, at *10.

Synthes has adequately pled a claim for conversion. First, as discussed above, Synthes has an express property interest in its confidential and proprietary business information as well as its product that has not yet been sold to another. *See Partners Coffee*, 2009 U.S. Dist. LEXIS 113209, at *19 ("Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit." (citing *Al Hedaithy*, 392 F.3d at 594 (quoting *Carpenter*, 484 U.S. at 26)). Second, the factual allegations cited above state that Defendants, including Powell, have deprived Synthes of its right of property in, or use or possession of, its confidential and proprietary business information and product, all without consent and legal justification. These allegations are sufficient to state a claim for conversion under Pennsylvania law. *See Warminster Equities*, 2010 U.S. Dist. LEXIS 107347, at *10-12 (allegations showing the deprivation of third-party defendant's right of property in, or use or possession of, rent payments by defendant, where defendant had no legal justification to do so was sufficient to plead a claim for conversion).

Therefore, Powell's motion to dismiss Synthes' conversion claim fails. *See id.* (denying motion to dismiss conversion claim where factual allegations set forth sufficient facts to support claim); *Hartford*, 2009 U.S. Dist. LEXIS 5178, at *18-19 (same).

### 5. Synthes' Lanham Act Claim Is Sufficiently Pled.

Count VIII of the Amended Complaint asserts a cause of action for false or deceptive advertising under the Lanham Act. Powell rests his entire argument on the contention that

Synthes cannot establish that the misrepresentations at issue constitute "commercial advertising or promotion."  (*See* Powell Mem. at 39-42.)  Powell is mistaken.

As to false advertising, the Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any…false or misleading description of fact, or false or misleading representation of fact, which…in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable to a civil action by any person who belies that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a).   To establish a Lanham Act claim based on a false or misleading representation of a product, a plaintiff must show:  "(1) that the defendant made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decision; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."  *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 92 (3d Cir. 2000) (citing *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994)); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002).

As a threshold matter, a plaintiff must show that the defendant's statements amount to "commercial advertising or promotion", which has been interpreted as: "(1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purposes of influencing consumers to buy the defendant's goods or services; (4) that is sufficiently

disseminated to the relevant purchasing public to constitute advertising or promotion within that industry." *ZS Assocs. v. Synergy, Inc.*, No. 10-4274, 2011 U.S. Dist. LEXIS 55711, at *20 (E.D. Pa. May 23, 2011) (quoting *Caldon, Inc. v. Advanced Measurement & Analysis Group*, 515 F. Supp. 2d 565, 578 (E.D. Pa. 2007)).   The level of circulation required to constitute advertising and promotion will vary from industry to industry and from case to case.   *Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc.*, No. 00-CV-3683, 2001 U.S. Dist. LEXIS 10709, at *34 (E.D. Pa. July 26, 2001).

"[T]he touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F. 3d 48, 57 (2d Cir. 2002); *see also Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 460-62 (D.N.J. 2009) (holding that alleged oral statements by defendants' sales representatives to defendants' potential customers constituted "commercial advertising or promotion" where calls were not made in isolation and were part of a large scale marketing plan to penetrate the relevant market).   This is consistent with the broad remedial purposes of the Lanham Act, *e.g.*, to protect the purchasing public.   *See Mobius Mgmt. Sys. v. Fourth Dimension Software*, 880 F. Supp. 1005, 1020-21 (S.D.N.Y. 1994) (holding that a single letter addressed to a potential customer designed to discourage the customer from purchasing plaintiff's product constituted commercial advertising or promotion under Section 43(a)).

To be actionable, the statements need not be made in a formal advertising campaign, but may consist of more informal types of promotion.   *See Synergy*, 2011 U.S. Dist. LEXIS 55711, at

*20-23 (holding that a press release disseminated to influential media outlets constituted "commercial advertising or promotion within the industry" sufficient to survive a motion to dismiss); *Caldon, Inc.*, 515 F. Supp. 2d at 578-79 (finding that defendants' disparaging statements and misrepresentations made in regulatory submissions which were publicized to the industry and potential purchasers of their products constituted commercial advertising or promotion); *see also* 2-7 GILSON ON TRADEMARKS § 7.02[6][b][i][D] (Matthew Bender 2010).

For example, oral statements made by salespeople to customers as well as sales presentations to purchasers may constitute "commercial advertising or promotion" under the Lanham Act.  *See Bracco Diagnostics*, 627 F. Supp. 2d at 460-62 (holding that alleged oral statements made by defendants' sales representatives were actionable under the Lanham Act); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996) (finding sales presentation to a significant percentage of industry customers constitutes commercial advertising under the Lanham Act).

Here, the representations forming the basis of Synthes' false advertising claim – *e.g.*, Defendants' statements to customers that Emerge's products are "identical," of "substantial equivalence," or made in the same location as Synthes' products, and statements that the FDA has made a determination that Emerge's drill bits and guide wires are substantially equivalent to Synthes' drill bits and guide wires – constitute "commercial advertising or promotion" sufficient to survive dismissal.  (*See* Am. Compl. at ¶ 274.)  Similar to the statements made by defendants' sales representatives in *Bracco Diagnostics*, the statements made by Powell and the other Defendants have not been made in isolation.  Instead, these statements have been made as part of a widespread campaign to penetrate the relevant market, including a sales and marketing strategy

36

to target health systems and group purchasing organizations with facilities, operations, and affiliates nationwide.

The evidence produced to date confirms that Powell, as Emerge's Director of U.S. Sales, made these statements to customers and potential customers for the purpose of obtaining business on behalf of Emerge.  For example, in an email to one customer, which Defendants have still not produced to date, Powell made the following statements regarding the nature, characteristics, and qualities of Emerge's products, all of which Synthes contends are false:

- Emerge "manufacture[s] everything exclusively in the US to be identical to its predicate product (Synthes).  The FDA testing found this to be true in the tests composed which indicated statistical equivalence in performance."

- "With statistical equivalence in performance and a virtually identical appearance, there is literally no difference in the instruments or implants that the surgeon chooses…."

- "I would like to build your confidence that these items are in fact identical [to Synthes] with the exception of the label."

(*See* SYNTHES-034983-984, attached hereto as Ex. 2.)[27]  Additionally, in a video broadcast distributed by a well-known publisher in the orthopedics industry, Powell has made similar representations regarding Emerge's products.  *See* Test_Emerge Medical, RRY Publications, Jan. 22, 2012, *available at* http://www.youtube.com/watch?v=17IaP7TesTg (last accessed May 22, 2012) (describing the quality of Emerge's products as compared to competitive product, including Synthes, as well as the FDA approval process).

---

[27] The evidence also suggests that Powell has made similar representations to other hospital systems regarding the identical nature of Emerge's and Synthes' products as well as the representation and suggestion that the FDA has found, or been asked to find, that all of Emerge's products are "substantially equivalent" to Synthes' products (or any other predicate devices.  (*See* JM 001480 & EM0000609-622, attached hereto as Exs. 3 & 4, respectively.)

The allegations and evidence set forth above are sufficient to set forth a claim for false advertising under the Lanham Act. This is particularly so at the motion to dismiss stage where Synthes has no way of knowing the extent of the Defendants' misrepresentations in the relevant market because this information is in the possession of the Defendants, including Powell, who have failed to provide this information to Synthes, despite Synthes' repeated requests. Only further discovery will provide facts confirming or disproving Synthes' allegations. As a result, dismissal of Synthes' Lanham Act claim at this stage of the litigation is improper. *See, e.g.*, *TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*, No. 10-1054, 2011 U.S. Dist. LEXIS 145932, at *32-33 (E.D. Pa. Dec. 19, 2011).

### 6.    Synthes Has Stated a Claim for Trespass to Chattels.

Count IX of the Amended Complaint asserts a cause of action against Powell, and others, for trespass to chattels for Powell's conduct related to the use and labeling of Synthes Inventory Management System ("SIMS") cabinets and Synthes' sets as well as his actions in re-labeling Synthes inventory provided to Synthes' customers on consignment. Specifically, Synthes alleges the following:

❑   In November of 2010, for example, labels bearing Emerge's name and logo that directed Synthes customers to reorder Synthes' surgical drill bits from Emerge appeared in a Synthes Inventory Management System ("SIMS") cabinet in an account in Marotta's former territory in Arizona as well as on product sealed in Synthes packaging. To facilitate this process and to convince customers that Emerge's products are "identical" to and fully interchangeable with Synthes' products (as Defendants falsely represent), Emerge was also using Synthes' part numbers, differentiating them only by appending the suffix ".EM" and commingling Emerge products with Synthes products in Synthes' inventory systems and surgical sets. (Am. Compl. at ¶ 156.)

❑   Since that time, Emerge's labels have begun to appear in additional SIMS and sets stored at other of Synthes' customers' facilities, and Emerge has obtained clearance from the FDA for a "Cannulated Screw Fixation System" that is purportedly "substantially equivalent" to Synthes' cannulated screw system. (Am. Compl. at ¶ 157.)

38

Under Pennsylvania law, trespass to chattels is defined as "the act of intentionally (a) dispossessing another of their chattel, or (b) using or intermeddling with chattel in the possession of another." *Partners Coffee*, 2009 U.S. Dist. LEXIS 113209, at *26-27 (internal quotations and citations omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 217.

Powell contends that the Amended Complaint fails to allege facts to support a "critical" component of Synthes' claim, *e.g.*, that Synthes was the "possessor" of the cabinets, sets, and inventory at issue. (Powell Mem. at 43.) In support of his argument, Powell cites to the language of Section 216 of the Restatement (Second) of Torts which provides that: "[A] person who is in 'possession of a chattel' is one who has physical control of the chattel with the intent to exercise such control on his own behalf, or on behalf of another." (*Id.*)

What Powell fails to bring to the Court's attention, however, are the comments to Section 216 which explain the language and negate Powell's argument in support of dismissal. Specifically, comments c and d to Section 216 state in pertinent part:

> c. Cases arise in which one who has been in possession of a chattel temporarily relinquishes physical control of it, without abandoning the chattel. In such a case, so long as no other person has obtained possession by acquiring physical control over the chattel *with the intention of exercising such control on his own behalf, or on behalf of another, the law protects the property interest by attributing the possession to the original possessor*.

> d. Situations may also arise in which one person, without having the actual physical control of the chattel, has the right to immediate physical control of it as against all others. In such a case, so long as the possession of the chattel has not been acquired by any other person, the law protects the property interest by attributing possession to the one who thus has the right to it. *Likewise, even where another has physical control of the chattel, the person with*

> *the right to it will be treated as in possession, if the person with the*
> *actual physical control or custody does not have the intent stated*
> *in this Section.*

RESTATEMENT (SECOND) OF TORTS § 216, cmts. c & d (emphasis added).  The comments make

clear the distinction between "possession" and "control" such that it is not necessary to be in

actual physical control of the property to be the possessor.  *See, e.g.*, *ED&F Man Biofuels, Ltd. v.*

*MV Fase*, 728 F. Supp. 2d 862, 877 n.11 (S.D. Tex. 2010).

Here, despite not having actual physical control of the property at issue, Synthes is the

"possessor" of this property such that Powell's use and intermeddling with Synthes' property

constitutes trespass to chattels.  In its dealings with certain of its customers, Synthes retained

ownership of the SIMS cabinets, implant sets, and inventory that is on consignment with the

customer and stored at Synthes' customers facilities.  Synthes' customers, although having

physical control over the SIMS cabinets, implant sets, and consigned inventory, do not have the

intent to exercise control on their own behalf, or that of another until such a time as those

customers use those products in surgery.  Thus until that event transpires, the property interest

remains with Synthes, the original possessor.  *See id.*

Furthermore, contrary to Powell's assertions, Synthes' allegations are not based on the

"mere possibility" that the property was owned by Synthes at the time of the trespass.  Rather,

Synthes has alleged that the Defendants, including Powell, have trespassed upon Synthes'

possessory rights in its SIMS systems and cabinets, implant sets, and consigned inventory

through their use and labeling of this property.  To the extent that Synthes qualified its

allegations to state that this activity constitutes trespass "to the extent the inventory was loaned

or consigned, and therefore, owned by Synthes at the time, and to the extent the SIMS were fully

40

or partially owned by Synthes at the time," (*see* Am. Compl. at ¶ 284), Synthes was doing so in order to make clear that it was not alleging that every instance of Powell's use or labeling of Synthes' SIMS, sets, or inventory constituted trespass to chattels because Synthes does not retain ownership of this property in every situation. Rather, Synthes' ownership rights vary from customer to customer depending on the parties' contracts. In light of this fact, Synthes has properly limited its allegations and thus, cannot be said to have failed to make factual allegations that "rise about the speculative level" such that dismissal of its claim is proper.

Based on the foregoing, Powell's motion to dismiss must be denied.

### 7.     Synthes Has Properly Alleged a Civil Conspiracy Against All Defendants, Including Powell.

In a second attempt to dismiss Synthes' civil conspiracy claim against him, Powell argues that Synthes has failed to state a claim for civil conspiracy because Synthes has not alleged that Powell's, and the other Defendants', *sole* intent was to injure Synthes. (Powell Mem. at 44-46.) Powell's position is untenable in light of the allegations in the Amended Complaint.

To establish a claim for civil conspiracy under Pennsylvania law, a plaintiff must demonstrate: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *EXL Labs., LLC v. Egolf*, No. 10-6282, 2011 U.S. Dist. LEXIS 25295, at *29 (E.D. Pa. Mar. 11, 2011) (citing *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-88 (Pa. Super. 1997))). A claim for civil conspiracy requires proof of malice, or intent to injure. *Id.* (citing *Thompson Coal Co. v. Pike*

*Coal Co.*, 412 A.2d 466, 472 (Pa. 1979)); *see also RDK Truck Sales & Service Inc. v. Mack Trucks, Inc.*, No. 04-4007, 2009 U.S. Dist. LEXIS 43245, at *79 (E.D. Pa. May 19, 2009).

While it is true that a "showing that an alleged conspirator acted for professional or business benefit will preclude a finding of malice," *see Giordano v. Claudio*, 714 F. Supp. 2d 508, 534 (E.D. Pa. 2010), the sheer "fact that an action advances one's business interest is not sufficient to warrant summary dismissal." *RDK*, 2009 U.S. Dist. LEXIS 43245, at *100-101 (denying defendants' motion for summary judgment on a civil conspiracy claim notwithstanding the fact that the defendants' "improper actions" were "economically beneficial to them").  And in fact, where the basis of the conspiracy claim is the unlawful and improper actions of the co-conspirators, such that a plaintiff's injuries are "not simply an incidental side-effect of otherwise legitimate business interests, but rather the fruits of the unlawful conspiracy," a plaintiff has alleged the requisite malice sufficient to survive dismissal.  *See id.* at *101-02.

Powell argues that Synthes has failed to allege that the *sole* purpose of the Defendants' conspiracy was to injure Synthes.  (Powell Mem. at 46.)  The court in *EXL Laboratories, LLC* addressed and dismissed a similar argument.  2011 U.S. Dist. LEXIS 25295, at *30 ("Defendants argue that Plaintiff fails to allege that the '*sole* purpose of the conspiracy was to injure' Plaintiff.").  In rejecting the defendants' argument, the court found that the allegations underlying plaintiff's misappropriation of trade secrets, conversion, and unfair competition claims, which alleged that the defendants' acted with the intent to harm plaintiff, were sufficient to allege malice or intent to injure.  *Id.* at *31.

Similar to the plaintiffs in *RDK Truck Sales & Service* and *EXL Laboratories, LLC*, Synthes has adequately alleged malice or intent to injure sufficient to survive dismissal of its

42

civil conspiracy claim. Specifically, Synthes alleges that the Defendants, including Powell, have at all times "specifically intended to injure Synthes." (Am. Compl. at ¶ 306.)[28] Furthermore, in each of the claims against Powell underlying Synthes' civil conspiracy claim, Synthes has alleged a specific intent to harm Synthes. (*See id.* at ¶ 225 ("The Defendants' interference with Synthes' contractual relationships was willful and wanton and has been carried out with a specific intent to injure Synthes in the conduct of its business."); ¶ 247 ("The Defendants' acquisition, use, and disclosure of Synthes' trade secret information have been willful and malicious and intended to harm Synthes…."); ¶ 255 ("By engaging in the wrongful actions alleged herein, the Defendants knowingly and wrongfully obtained information from the protected computers with the intent to defraud Synthes and to further their illicit conspiracy…."); ¶¶ 262-263 (describing the intentional, willful, and unlawful conversion of Synthes' information and product); ¶ 278 ("Marotta, Stassen, Powell, and Emerge have acted knowingly, in bad faith, and in a willful, malicious, wanton, reckless, and grossly negligent manner in making false and misleading descriptions and representations specifically intended to injure Synthes."); ¶ 285 ("Marotta, Stassen, Powell, and Emerge have acted intentionally, willfully, and unlawfully in using and labeling Synthes-owned SIMS and sets and in labeling inventory Synthes has provided to its customers on a consignment basis….").)

---

[28] While it is true that Synthes does not use the word "sole" intent to describe the purpose of the Defendants' unlawful conduct, this is just semantics and should not bar an otherwise properly pled claim. To the extent that the word "sole" is determinative of the dismissal of Synthes' conspiracy claim, which the above authority makes clear it is not, Synthes should be permitted leave to amend its pleading to include this language. *See Am. Bd. of Internal Med. v. Muller*, No. 10-CV-2680, 2011 U.S. Dist. LEXIS 25169, at *36 (E.D. Pa. Mar. 11, 2011) (dismissing claim for civil conspiracy with leave to re-plead where it is conceivable that counterclaimant could state a viable cause of action if given the opportunity to file an amended pleading).

All of the allegations cited above are sufficient to establish a claim for civil conspiracy as the harm alleged to Synthes is not "an incidental side-effect of otherwise legitimate business interests, but rather the fruits of the unlawful conspiracy."  *See EXL Labs.*, 2011 U.S. Dist. LEXIS 25295, at *31; *RDK*, 2009 U.S. Dist. LEXIS 43245, at *101-02.  Any economic benefit that inured to Powell and the other Defendants as a result of Emerge's operation is insufficient to preclude Synthes' well-pleaded claim.  Accordingly, Powell's motion to dismiss Synthes' civil conspiracy claim must be denied.

## IV.    CONCLUSION

For the foregoing reasons, Synthes respectfully requests that the Court enter an Order in the form attached hereto denying in its entirety Defendant Powell's Motion to Dismiss Synthes' Amended Complaint.

Respectfully submitted,

Dated:  May 29, 2012                    **BLANK ROME LLP**

 _s/ *Anthony B. Haller*_____
Anthony B. Haller
Identification No. 37017
Michael P. Broadhurst
Identification No. 80906
Kevin M. Passerini
Identification No. 203169
One Logan Square
Philadelphia, PA  19103
(t) (215) 569-5690/5438/5466
(f) (215) 832-5690/5438/5466
haller@blankrome.com
broadhurst@blankrome.com
passerini@blankrome.com

*Attorneys for Plaintiffs Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC*

44

**<u>EXHIBIT 1</u>**

J. A19012/09

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SYNTHES (U.S.A.) AND SYNTHES SPINE COMPANY, L.P., | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : : | |
| v. | : : | |
| JACQUELINE MYER, | : : | |
| Appellant | : | No. 343 EDA 2009 |

Appeal from the Order Entered January 7, 2009,
in the Court of Common Pleas of Chester County,
Civil Division, at No. 2008-10358-IR.

BEFORE:  STEVENS, BOWES AND FITZGERALD,* JJ.

MEMORANDUM:                    **FILED SEPTEMBER 9, 2009**

Jacqueline Myer appeals from the January 7, 2009 order granting
Synthes (U.S.A.) and Synthes Spine Company, L.P. (collectively "Appellee")
a preliminary injunction and preventing her from working for Globus Medical,
Inc. ("Globus") or any other competitor of Appellee for a period of one year
from the date of her resignation from Appellee or until September 11, 2009.[1]

---

[1]  In the order, the trial court also directed Appellant to comply with a non-disclosure/confidentiality agreement and to refrain from soliciting or contacting Appellee's prospects or customers until September 11, 2009. Appellant does not challenge these aspects of the January 7, 2009 order. Instead, she argues that her ordered compliance with the confidentiality and non-solicitation clauses of her contract with Appellee adequately protected its interests in this matter and obviated the need for the preliminary injunction that prevented her from working for Globus.

* Former Justice specially assigned to the Superior Court.

J. A19012/09

The trial court concluded that a restrictive covenant that Appellant had executed was valid. We affirm.

Appellee, a global concern, designs and manufactures various materials for surgical correction of the human skeleton and soft tissue. It hired Appellant on June 1, 2000. Before beginning her employment with Appellee, Appellant executed an agreement that contained, *inter alia*, the following restrictive covenant.

> **NO COMPETITION**: I am employed by SYNTHES in a key management or technical position and I agree I will not, for a period of one year after my employment terminates for any reason, work for (as an employee, consultant, contractor, agent or representative) any competitor of SYNTHES. Competitors shall be deemed any person or entity that now, or in the future, sells, or intends to sell, orthopedic, bone fixation, maxillofacial medical, endoscopic and/or spinal implant device or instrumentation technologies, products, or services.

In other sections of this agreement, Appellant acknowledged that the restrictions of the agreement were reasonable and necessary to protect her employer's business interest, that there was adequate consideration for the agreement, and that Appellee would be irreparably harmed by Appellant's employment by one of its competitors, regardless of the position or territory.

Appellant worked for Appellee selling surgical implantation devices to surgeons until September 10, 2008, when she informed Appellee that she was ceasing employment with it. On September 15, 2008, she began to work for Globus, a direct competitor of Appellee. **See** Appellant's brief at 5.

- 2 -

J. A19012/09

On September 23, 2008, Appellee filed the present action alleging that Appellant had breached the above quoted restrictive covenant, and sought injunctive relief.   On October 1, 2008, the court issued a temporary restraining order prohibiting Appellant from continuing her employment with Globus.   Hearings on Appellee's request for injunctive relief were held on November 20, 21, and 26, 2008.   On January 7, 2009, the court issued the order presently contested on appeal.   Appellant raises the following issues:

> Did the trial court abuse its discretion by entering a preliminary injunction that prohibited plaintiffs' former employee from working in any capacity for any of the plaintiff's competitors or for any of the plaintiffs' affiliates' competitors, where
>
> (1) the plaintiffs' right to enforcement of the non competition covenant is not clear given the job that the former employee was hired by a competitor to perform is fundamentally different from any job she was trained for, and held with plaintiffs, and the former employee was also separately prohibited from soliciting plaintiffs' customers and prospects for the period of one year and from ever disclosing plaintiffs' confidential information,
>
> (2) there was no evidence to support a conclusion that the plaintiffs have suffered actual harm or would suffer immediate and irreparable harm if the former employee were permitted to work for the competitor, and
>
> (3) the harm to the former employee from being prevented from working in the industry in which she has the bulk of her experience significantly outweighs any speculative harm the plaintiffs may suffer without enforcement of the non-competition covenant?

Appellant's brief at 2-3.

J. A19012/09

Preliminarily, we note that we review "a trial court order refusing or granting a preliminary injunction for an abuse of discretion." **Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.**, 828 A.2d 995, 1000 (Pa. 2003) (citing **Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz**, 602 A.2d 1277, 1286-87 (Pa. 1992)). On appeal from the grant or denial of such an injunction, an appellate court does "not inquire into the merits of the controversy" and instead, is permitted only to "examine the record to determine if there were any apparently reasonable grounds for the action of the court below." **Id**. (quoting **Roberts v. Board of Directors of School District**, 341 A.2d 475, 478 (Pa. 1975)). "Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied" is an appellate court to overrule the trial court's decision in such a matter. **Id**. Our Supreme Court has emphasized that this standard of review is "highly deferential." **Id**.

Herein, we conclude that the trial court had apparently reasonable grounds to issue the injunction based upon the clear and unequivocal language of the non-competition agreement and the evidence adduced at the three hearings. **See J.C. Ehrlich Co., Inc. v. Martin**, 2009 PA Super 127, 6 (quoting **Hess v. Gebhard & Co., Inc.**, 808 A.2d 912, 917 (Pa. 2002) ("In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions

- 4 -

J. A19012/09

imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent."). After a careful review of the record and the arguments advanced on appeal, we hereby affirm on the basis of the well-reasoned opinions of the Honorable Phyllis R. Streitel dated January 7, 2009, and March 25, 2009.

Order affirmed.

Judgment Entered.

Prothonotary

Date:_____

SYNTHES (U.S.A.) AND         :        IN THE COURT OF COMMON PLEAS
SYNTHES SPINE               :
COMPANY, L.P.               :        CHESTER COUNTY, PENNSYLVANIA
    Plaintiffs          :
                        :        CIVIL ACTION – LAW
    VS.                 :
                        :        NO. 2008-10358-IR
JACQUELINE MYER             :
    Defendant           :        SUPERIOR CT. NO. 343 EDA 2009

Edward J. Greene, Esquire, on behalf of Plaintiffs
Anthony Haller, Esquire, on behalf of Plaintiffs
Thomas R. Riley, Jr., Esquire, on behalf of Plaintiffs
Jeanette N. Simone, Esquire, on behalf of Plaintiffs
Michael Broadhurst, Esquire, on behalf of Plaintiffs
Paul Greco, Esquire, on behalf of Defendant
Alan Novak, Esquire, on behalf of Defendant
Frank R. Emmerich, Jr., Esquire, on behalf of Defendant
John A. Guernsey, Esquire, on behalf of Defendant

## STATEMENT OF THE COURT

An appeal having been taken, pursuant to Pa.R.A.P. 1925(a), the following statement is submitted.

On September 26, 2008, Plaintiff filed an Emergency Petition for a Temporary Restraining Order and Preliminary Special Injunction. A hearing was scheduled and thereafter, a Temporary Restraining Order and Rule to Show Cause was entered on October 1, 2008. Plaintiff complied with the order and filed a $20,000 bond on October 1, 2008.

Following a multi-day hearing, this court filed an opinion and preliminary injunction order on January 7, 2009. Defendant filed a timely Notice of Appeal on January 26, 2007. On January 27, 2009, this court entered an order directing her to submit a Concise Statement of Errors Complained of on Appeal within twenty-one (21) days. Defendant

S:civil opins.synthes statement of the court.3/25/2009

filed said statement on February 17, 2009.  She sets forth five items of complaint on appeal.

In compliance with Pa.R.A.P. 1925(a), we respectfully state that the reasons for the January 7, 2009 Order already appear of record.  Those reasons are set forth in this court's January 7, 2009 Opinion.  A copy of said Opinion and Order is attached hereto and made a part hereof.  However, due to the exact language of Defendant's issues on appeal, this court finds it necessary to supplement its Opinion with the following.

Appellant Myer complains at paragraph 1.c. of her Concise Statement of Errors Complained of on Appeal:

"1.     The Court abused its discretion or committed an error of law by issuing an overbroad injunction that went far beyond what was necessary to protect Synthes' legitimate business interests, in the following respects:
        ...
c.      The injunction prohibits Ms. Myer from working for a "direct competitor" but fails to define that term, and as such the injunction is too vague to provide Ms. Myer with fair notice of which entities she may not work for.

This court submits the term is defined and is not vague.  As noted at the outset in the undersigned's Opinion, Ms. Myer signed a "Confidentiality, Innovation, Non-Disclosure, Non-Solicitation and Non-Competition Agreement when her employment with Synthes began.  In the "NO COMPETITION" paragraph of the Agreement, it states "Competitors shall be deemed any person or entity that now, or in the future, sells, or intends to sell, orthopedic, bone fixation, maxillofacial medical, endoscopic and/or spinal implant device of instrumentation technologies, products, or services."  In its Order of January 7, 2009, this court ordered that Myer comply and abide in all respects with the Agreement, including but not limited to:

2

S:civil opins.synthes statement of the court.3/25/2009

      a.     refraining from working in the United States or Europe, for any direct competitor of Synthes, including without limitation Globus Medical, Inc., until September 11, 2009, one year from the date of her resignation from Synthes;

The reference "direct competitor" is merely shorthand for the definition of competitor set forth in the agreement.

In paragraph 4 of her Concise Statement of Errors Complained of on Appeal, Myer complains that this court erred by "issuing an injunction enforcing the non-competition covenant in [her] Agreement with Synthes because an injunction enforcing just the non-solicitation covenant would have sufficed to protect Synthes' customer relationships, the only business interest the Court identified in its Order that it was seeking to protect."

Synthes' customer relationships are of utmost importance in their highly specialized, competitive industry. However, it is not the only business interest noted in the court's Opinion, it is not the only matter in need of protection, nor is it subject to adequate protection merely by the "No Solicitation of Customers & Prospects" paragraph of the Agreement.

In the "Acknowledgments" section of the Agreement, Myer agrees that Synthes expends substantial time and money to train employees to develop and improve technologies, to develop and maintain a database of prospects and maintain and expand its customer base. As stated in the Opinion, Synthes trained Myer in many areas, including basic and advanced spine courses, blood borne pathogens, radiology, a fluoroscopy device and forms and work instructions.

Additionally, Myer did cadaver labs, was privy to various confidential information

3

s:civil opins.synthes statement of the court.3/25/2009

at Synthes and was part of the New Idea Committee for the company. In addition to customer relationships, all of these areas, plus the overall goodwill of the company were exposed to risk by Myer immediately jumping to employment with a key competitor. Furthermore, after her years and experience at Synthes, Myer is now familiar with other Synthes personnel. She would be a good resource to enable Globus to continue to draw other Synthes employees to its staff. These areas are not protected by the "No Solicitation of Customers & Prospects" section of the Agreement. As noted in the "Acknowledgments" section of the Agreement, signed by Myer, Synthes would be irreparably harmed by her subsequent employment by a Synthes competitor, regardless of the position or territory, due to the high likelihood or possibility of inadvertent or other disclosures of Synthes' proprietary and confidential information. In the "Remedies" section, Myer acknowledges that it would be extremely difficult to measure the damages that might result from her breach of the Agreement and that a breach may cause irreparable injury to Synthes that could not be compensated by money damages.

Accordingly, based upon the above and the findings of fact and conclusions of law as set forth in this court's January 7, 2009 Opinion and Order, it is clear that the order is well reasoned and supported by the facts and law. Defendant's claims on appeal are without merit and should be dismissed.

BY THE COURT:

PHYLLIS R. STREITEL                    J.

DATE: *March 25, 2009*

4

SYNTHES (U.S.A.) and SYNTHES            : IN THE COURT OF COMMON PLEAS OF
SPINE COMPANY, L.P.

                                        : CHESTER COUNTY, PENNSYLVANIA

         v.                             : CIVIL ACTION

JACQUELINE MYER

                                        : NO. 2008-10358-IR

Edward J. Greene, Esquire, on behalf of Plaintiffs
Anthony Haller, Esquire, on behalf of Plaintiffs
Thomas R. Riley, Jr., Esquire, on behalf of Plaintiffs
Jeanette N. Simone, Esquire, on behalf of Plaintiffs
Michael Broadhurst, Esquire, on behalf of Plaintiffs
Paul Greco, Esquire, on behalf of Defendant
Alan Novak, Esquire, on behalf of Defendant
Frank R. Emmerich, Jr., Esquire, on behalf of Defendant
John A. Guernsey, Esquire, on behalf of Defendant

## OPINION AND ORDER

Jacqueline Myer resigned from Synthes on September 10, 2008 after more than

eight years with the company, and immediately began to work for Globus Medical, a

direct competitor.  Ms. Myer did so despite having signed, in consideration of her

employment with Synthes, a "Confidentiality, Innovation, Non-Disclosure, Non-

Solicitation and Non-Competition Agreement" in May, 2000 when her Synthes

employment began.  Synthes filed a Complaint which sought injunctive relief and for

breach of contract.

Following hearing, the court ordered on October 1, 2008 that Plaintiff file a bond

in the amount of $20,000[1] and imposed a Temporary Restraining Order on Defendant,

prohibiting her from working for Globus Medical, Inc. for a period of one year or until

the court ruled upon the Motion for Preliminary Injunction, among other points ordered.

The hearing on the preliminary injunction was continued at the parties' request

---

[1]  The bond was filed on October 1, 2008.

from November 3, 2008 to November 20, 2008.  It was held on November 20, 21 and
26, 2008.

**Findings of Fact.**

    Synthes is a leading global medical device company which develops, produces
and markets instruments, implants and biomaterials for surgery.  (Exhibit P-68).  It
consists of five business units, Trauma, Spine, Cranio-Maxillofacial, Biomaterials and
Power Tools.  Id.  It engages in production in North America and Europe and has
global services in both places as well as in the regions of Asia-Pacific, Latin America,
the Middle East and Africa.  Id.

    Ms. Myer was an employee of Synthes in the Synthes Spine Unit at the
company headquarters in West Chester, Pennsylvania.  She started there in May
2000, after graduating from college with a business degree.  Following work as an
associate product manager and product manager, she became a senior product
manager in 2003.  She stated on her resume, "Responsibilities included:  surgeon
interaction, market research, forecasting, market introduction strategies, ... acted as
key liaison for multi million dollar company partnership with tissue bank, ... and
[d]eveloped and introduced two ... product lines that have generated over $37 million
in sales revenue."  (Exhibit P-4).

    After three years, in 2006, Ms. Myer was promoted to Group Manager of the
Surgeon Response Group.  She stated that her team's duty was to timely design and
manufacture custom and specialty implants and instruments.  Id.  Ms. Myer's
description of her responsibilities included "working closely with surgeon customers to
provide devices that meet their needs."  Id.  She claimed her team's work had been

2

critical in protecting or converting several million dollars in business and that several projects were for very high profile customers. Id. She held this position until she left Synthes for Globus.

Ms. Myer's job application at Globus confirmed her resume claims. It stated that her Surgeon Response Group duties at Synthes included working very closely with surgeon customers and her earlier positions included surgeon interviews. (Exhibit P-39). Also, when asked by Globus to "list additional skills, training, qualifications and work experience relevant to the position you are applying for" (emphasis added), Ms. Myer listed:

> Observed numerous spine surgeries
> Experienced working in cadaver labs
> Have established working relationships with Spine Surgeons
> In the U.S. and Europe (very limited in Europe)

(Exhibit P-39 and N.T., 11/20/08, pgs. 23-24).

Ms. Myer's testimony also confirmed her interaction with surgeons. She agreed that one surgeon could represent $3 million of revenue for Synthes on an annual basis. (N.T., 11/20/08, pgs. 72-73). "Conversion" meant having a surgeon client convert to Synthes from another company. (N.T., 11/20/08, p. 73). Certain surgeons are the clinical investigators. (N.T., 11/20/08, p. 102). Globus is trying to get more surgeon investigators and one of Ms. Myer's primary intended responsibilities at Globus was to build and maintain a group of surgeon investigators. (Exhibit D-4; N.T., 11/20/08, pgs. 102-103). When she left Globus, its interspinous product group was still trying to get additional surgeons to be investigators. N.T., 11/20/08, pgs. 103-104). Globus' lumbar Pro Disc study was just beginning and Ms. Myer was to get

3

surgeons to participate in that study.  Id.

Ms. Myer was a friend of Kelly Baker, Director of Clinical and Regulatory Affairs at Globus.  (N.T., 11/20/08, p. 94).  Ms. Baker was a former Synthes employee who left in 2003 to join other Synthes employees who had formed Globus.  Id.  Ms. Baker contacted Ms. Myer about the possibility of a job at Globus on August 16, 2008.  Id.  This occurred six days after the expiration of a no-hire, no-solicitation understanding reached between Synthes and Globus based on litigation that went to trial in the summer of 2007.  (N.T., 11/20/08, pgs. 94-95).  Ms. Myer was aware that the "big lawsuit" involved Synthes' concerns over use of its confidential information and violation of its non-compete agreement.  (N.T., 11/20/08, p. 109).

On August 27, 2008, Ms. Myer met with Ms. Baker and David Paul, the Chief Executive Officer at Globus, formerly the director of Synthes Spine Product Development.  (N.T., 11/20/08, pgs. 96-97).  He originally hired Ms. Myer at Synthes.  (N.T., 11/20/08, p. 97).  There was discussion of Ms. Myer's non-compete agreement at the meeting.  (N.T., 11/20/08, p. 107).  Ms. Myer consulted with a lawyer they provided, Kelly Huller, who was the legal director for Globus.  (N.T., 11/20/08, p. 106).  When Ms. Myer accepted the Globus job, she knew she had a non-compete agreement in place.  (N.T., 11/20/08, p. 105).

The non-competition agreement is contained within the "Confidentiality, Innovation, Non-Disclosure, Non-Solicitation and Non-Competition Agreement." (Exhibit P-6).  The Acknowledgments section and Remedies section make clear that the signer agrees that the restrictions of the agreement are reasonable and necessary to protect Synthes' business interests, that adequate consideration has been given

4

and that it would be extremely difficult to measure damages resulting from a breach which may cause irreparable injury not compensable by money damages.  Ms. Myer also signed an "Employee Innovation and Non-Disclosure Agreement" with Synthes. (Exhibits P-7, D-35; N.T., 11/20/08, p. 211).

When she went to Globus, Ms. Myer left Synthes' Surgeons Response Group which interacted directly with surgeons, including personal visits and surgical observations.  (N.T., 11/20/08, pgs. 118-119; Exhibit P-15).  It's purpose was to counteract competitor's inroads with surgeons, by catering to their needs for specialty items.  (N.T., 11/20/08, p. 120).  The Surgeons Response Group's long term goal was to offer surgeons specialized attention and service to help build relationships and thus an effective conversion tool.  Id.[2]  Ms. Myer admitted that Synthes and Globus compete directly for the same doctors.  (N.T., 11/20/08, p. 124).

Ms. Myer not only had contact with surgeons when she was in the Surgeon Response Group her last two years at Synthes, she also worked closely with certain doctors on the design and development of implants and instrumentation for the Oracle Project.  (N.T., 11/20/08, p. 132).  Additionally, she did cadaver labs with various surgeons.  (N.T., 11/20/08, p. 135).  Moreover, she had access to varied confidential information at Synthes and was part of the Synthes New Idea Committee in the summer of 2008.  (N.T., 11/20/08, pgs 141-166).

In the Surgeons Response Group, Ms. Myer's team worked on custom implants or specialty instruments.  (N.T., 11/20/08, pgs. 259-260).  As overseer of the Surgeons Response Group, she described her responsibilities as "putting out fires."  (N.T.,

11/20/08, pgs. 261 and 265-266). She testified she met surgeons maybe ten times per year and a couple more than once. (N.T., 11/20/08, p. 266). As she tried to answer questions about the surgeons, she noted, "... you see surgeons at various meetings, but you might never know their name, but recognize their face." (N.T., 11/20/08, p. 270). She also described having dinner with a surgeon who, over wine, described an idea he had, which she presented to the New Idea Committee. (N.T., 11/21/08, p. 8). In addition, in both positions at Synthes, Ms. Myer attended some of the meetings with key surgeons at headquarters. (N.T., 11/21/08, p. 38).

Synthes trained Ms. Myers in a basic spine course and advanced spine course, as well as blood borne pathogens, radiology and operating the C arm, a fluoroscopy device in the cadaver lab. (N.T., 11/21/08, pgs. 10-11). In addition, she was trained on forms and work instructions. (N.T., 11/21/08, p. 11). She received very complimentary employee reviews at Synthes. (Exhibit P-107).

Dominique Messerli, Synthes Director of Early DeGen, testified. (*See* N.T., 11/21/08). He worked with Ms. Myer for 5-6 years. He described the highly confidential product development Ms. Myer was involved with and her expertise in certain implants as well as her excellent management skills. With the Oracle product, Ms. Myer was the product manager and leader and was instrumental in surgeon interactions and cadaver labs. She had great involvement with the core surgeons and built a very impressive relationship with some of the surgeons. (N.T., 11/21/08, p. 23). She was successful in engaging and in getting Dr. W,[3] a well-known, very busy

---

[2] Conversion of one surgeon can generate $3 million in revenue annually.

[3] The parties did not want to reveal full names on the record for confidentiality purposes.

surgeon, to the cadaver labs. (N.T., 11/21/08, p. 25). Mr. Messerli testified that Ms. Myer performed "extremely well when she was at Synthes." (N.T., 11/21/08, pgs. 32-35). She handled and processed information very well. He was always impressed with her ability to know and recall details.

After Ms. Myer left the position of senior product manager at Synthes, Synthes was unable to continue to engage Dr. W. as much as when she was part of the team. (N.T., 11/21/08, pgs. 25 and 63). The surgeons were very disappointed that Ms. Myer was assigned to a different group; they enjoyed working with her and they would love to be able to continue to work with her. (N.T., 11/21/08, p. 64).

On September 15, 2008, Ms. Myer began working for Globus Medical. (N.T., 11/20/08, p. 188). Globus Medical competes head-to-head with Synthes, by making products used to surgically treat spine disease. As Group Manager for the Clinical Affairs teams, her job at Globus differs from that at Synthes. Her job description indicates that she will coordinate, execute and oversee clinical trials for Globus Class III devices which are subject to Investigational Device Exemption Studies, or, IDE studies. (Exhibit P-11). She was to manage the individuals responsible for the IDE Studies. (N.T., 11/20/08, p. 209). She never worked for Synthes in an IDE capacity. She claims that her new position fundamentally differs from her Synthes positions. (N.T., 11/20/08, p. 209). It involves only Class III medical devices, unlike what she worked on at Synthes. (N.T., 11/20/08, pgs. 233-234).

Globus was going to pay Ms. Myer a substantial increase in salary to support

7

her in what she claimed was a career change for her.  (N.T., 11/20/08, pgs. 112-114).[4]

She was hired to be group manager for Globus' clinical affair teams.  Despite the

description, in her first week of work, Ms. Myers was invited by Amit Sinha of Globus,

to attend talks and a lab with two doctors, Dr. G. and Dr. L. (N.T., 11/21/08, pgs. 190-

191; Exhibit P-38).  Her manager, Ms. Baker, responded to Ms. Myer's inquiry if she

could attend, "Absolutely."  (Exhibit P-38).  Ms. Myer admitted that Dr. G. was the

same Dr. G. who had been mentioned twice in the hearing, a doctor she had directly

dealt with at Synthes.  (N.T., 11/21/08, p. 190).  Dr. G. was giving "kind of an

educational talk" per Ms. Myer.  She admitted that it had nothing to do with her job at

clinical affairs.  (N.T., 11/21/08, p. 191).

On Monday, September 21, Ms. Myer flew to Orlando at Ms. Baker's request, to

attend the Congress of Neurological Surgeons (CNS).  (N.T., 11/21/08, p. 192).  It is a

meeting of eminent neurosurgeons.  Ms. Myer sat at the booth for Globus' interspinous

product.  (N.T., 11/21/08, p. 193).  She was prepared to answer surgeon questions on

the Flexus Study.  She also went to events that Globus sponsored at CNS.  Id.  There

were Globus product development people and sales people there with her.  (N.T.,

11/21/08, pgs. 194-195).

Had the temporary restraining order not been entered, Ms. Myer was scheduled

to attend the National Association of Spine Surgeons in Canada with a variety of other

Globus personnel.  (N.T., 11/21/08, pgs. 195-196).  As a big meeting of spine

surgeons, Ms. Myer agreed that there could well have been a number of surgeons

present, with whom she had contact at Synthes.  (N.T., 11/21/08, p. 196).

---

[4]  Ms. Myer was to receive $115,000 salary, $25,000 bonus, plus $50,000 in  stock options.

Despite Defendant's claims, in testimony and argument, that the new position was fundamentally different, it is noted that the Globus job description for her position as Group Manager, Clinical Affairs, lists as one of her primary responsibilities, "Build and maintain a cadre of high quality thought-leading group of surgeon investigators to help Globus complete efficient clinical studies." (Exhibit D-4).

**Conclusions of Law.**

A preliminary injunction should be granted only if all of the following four "essential prerequisites" are proven:  (i) a strong likelihood of success on the merits; (ii) a showing of immediate and irreparable harm that cannot be compensated by money damages; (iii) a showing that greater injury will result if preliminary injunctive relief is denied than if such injunctive relief is granted; and (iv) a showing that a preliminary injunction would restore the status quo.  Allegheny Anesthesiology Assocs., Inc. v. Allegheny Gen'l. Hosp., 826 A.2d 886, 891 (Pa.Super. 2003), app. denied, 844 A.2d 550 (Pa. 2004).[5]

Restrictive covenants, of which non-disclosure and non-competition covenants are the most frequently utilized, are commonly relied upon by employers to shield their protectible business interests.  Hess v. Gebhard & Co., Inc., 808 A.2d 912, 917 (Pa. 2002).  In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent.  Id.[6]

---

[5] Citing Temple University of the Commonwealth System of Higher Education v. Allegheny Health Education and Research Foundation, 690 A.2d 712, 718 (Pa.Super. 1997) (citations omitted).
[6] Citing Sidco Paper Co. v. Aaron, 351 A.2d 250 (Pa. 1976); Morgan's Home Equip. Corp. v. Martucci,

The law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer.  Id.[7]  Because restrictive covenants have been held to impose a restraint on an employee's right to earn a livelihood, they should be construed narrowly.  Allegheny Anesthesiology Assocs., Inc., 826 A.2d at 892.  Generally, interests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills.  Hess, 808 A.2d at 920.[8]

Here, we have a restrictive covenant incident to Ms. Myer's employment relationship with Synthes.  She signed it when hired and was well aware of the covenant when she interviewed with Globus, a direct competitor of Synthes.[9]  She also signed a similar but more stringent covenant not to compete with Globus.  (Exhibit P-8).  The restrictions imposed here were for one year, a reasonable time-frame.  The geography was not limited in this global company's covenant.  However, the lack of a limitation does not require that the covenant fail.  As noted in Bell Fuel Corporation v. Cattolico, 544 A.2d 450, 456-457 (Pa.Super. 1988), where the covenant imposes broader restrictions than necessary to protect the employer, a court of equity may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer.[10]  The court may grant partial enforcement of an overbroad covenant by excising offensive portions of the covenant

---

136 A.2d 838 (Pa. 1957).
[7] Citing Sidco., 351 A.2d at 254.
[8] Citing Morgan's Home Equip., 136 A.2d at 846.
[9] Ms. Myers was also familiar with the prior lawsuit between Synthes and Globus.
[10] Citing Sidco Paper Co. v. Aaron, 351 A.2d at 254.

or by adding language.[11]

Based upon the evidence, which included Ms. Myer's own representation about contact with surgeons in the United States and Europe, it is reasonable to limit the "no competition" clause to read, in part, "I am employed by SYNTHES in a key management or technical position and I agree I will not for a period of one year after my employment terminates for any reason, work for … any competitor of SYNTHES in the United States or Europe." (underlined portion is added). (Exhibit P-6).

Next, the court finds that the restrictions in the covenant are reasonably necessary for the protection of the employer. Synthes and Globus are highly competitive. They make products for the same purpose – spine repair. They are located in adjoining counties and Globus has numerous employees who previously worked for Synthes. They have been involved in extensive litigation related to confidential information and covenants not to compete. The companies' vehicle to develop and market their surgical products is the spine surgeon. The sought-after target customer is the spine surgeon, who uses the product and requires the hospitals to supply it.

It is simple. Synthes' contact with the surgeon is critical to the company's success. Because Synthes recognized Ms. Myer's skills in communicating with surgeons in her first six years of employment, they put her in charge of the Surgeon Response Group two years ago. As she stated in that role, "Surgeons Response Group's goal equals Positive Experience!!!" (Exhibit P-17). One of Ms. Myer's tasks was conversion of surgeons to Synthes' customers.

---

[11] Citing Sidco, supra.

11

Ms. Myers, in her argument, downplays her surgeon contact and focuses on how different her new role will be at Globus. In her brief, Ms. Myer claims her new job is an "administrative one." (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction," p. 7). Yet the first thing Globus did was send Ms. Myer out to a surgeon meeting and to conferences where she would meet and greet surgeons she knew from Synthes and new surgeons.[12]

Ms. Myer was highly respected by the many surgeons she worked with in her years at Synthes. She was the "face" of Synthes, to the valuable surgeon customers she worked with in Synthes cadaver labs and whom she met in Synthes development of products. She was the one at the Surgeons Response Group who oversaw quick responses to win over customers. In 2007 and 2008 alone, she met with surgeons at least seventeen times per the summary map submitted in Synthes' closing. She had met with Dr. G. at least four times since 2005, before she saw him again during her first week at Globus.

Plaintiff has shown a strong likelihood of success on the merits of its request. Because of the competitive nature of Synthes and Globus and the past work history of Ms. Myer with Synthes, to allow her to work at Globus as described would subject Synthes to immediate and irreparable harm that cannot be compensated by money damages.[13] Defendant argues the non-disclosure agreement amply protects Synthes; this is clearly not the case because Ms. Myer's moving to Globus is an even broader

---

[12] "Dr. G" was one Synthes customer she saw during her first week at Globus.
[13] One surgeon conversion to Synthes could generate millions in revenue. This is only one of many possibilities of damage.

12

threat,[14] going to the good will[15] of Synthes and to Ms. Myer's awareness of customer lists, status, personal knowledge of and relationships with customers, etc. Covenants are designed to prevent a disturbance in the relationship that has been established between an employee and their company contacts through prior dealings. John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc., 369 A.2d 1164, 1167 (Pa. 1977). "It is the possible consequences of this unwarranted interference with customer relationships that is unascertainable and not capable of being fully compensated by money damages." Id. Accordingly, where a covenant of this type meets the reasonableness test, it is prima facie enforceable in equity. Id.[16] Synthes also has an interest in the unique skills and specialized training Ms. Myer gained at Synthes' expense from formal training as well as on-the-job training provided.[17]

Synthes and Globus both use restrictive covenants in their employment contracts to protect their business interests in this highly specialized, competitive industry. If the injunctive relief here is denied, Synthes will suffer much greater injury than if the relief is granted. It will put at risk the loss of Dr. G. from Synthes as well as other surgeons who have had positive contact with Ms. Myer as well as the instability within the company due to the then questionable validity of the non-competition agreements with its other employees and business partners. This far outweighs the injury to Ms. Myer of having to wait out the remaining two-thirds of the year before she

---

[14] See, Hess, 808 A.2d at 921.

[15] Hess, 808 A.2d at 922.

[16] Citing Bettinger v. Carl Berke Associates, Inc., 314 A.2d 296, 298 (Pa. 1974).

[17] See, e.g., Pennsylvania Funds Corp. v. Vogel, 159 A.2d 472 (Pa. 1960).

13

may work for Globus or any other Synthes competitor.[18]  Furthermore, Ms. Myer's problem is "self-inflicted."  She knew of the agreement, the past litigation, and the competition between the two companies.  The record reflects that Ms. Myer has not performed a job search, so it is not known what harm or in what amount she would suffer if she is precluded, per the agreement, from competing against Synthes for eight more months.  Only a preliminary injunction will restore the parties to the status quo that existed prior to Ms. Myer's breach.

For the foregoing reasons, I enter the following

### PRELIMINARY INJUNCTION ORDER

AND NOW, this __7__ day of January, 2009, after a full hearing on the evidence and written submissions of the parties, and it appearing to the Court:

a)      That Synthes has demonstrated a clear likelihood of success on the merits of its claim against Myer;

b)      That Synthes will suffer immediate and substantial irreparable injury of a Preliminary Injunction does not issue before full trial on the merits;

c)      That Synthes will suffer greater harm by the denial of the requested injunctive relief than would the Defendant by the granting thereof;

d)      That a preliminary injunction will restore the status quo as existed prior to Myer's wrongful conduct; and

e)      That Synthes has no adequate remedy at law.

---

[18]  The court was notified that Globus was continuing to pay her salary pending this decision.

14

NOW, THEREFORE, upon the posting at the Prothonotary by Plaintiff on or before Tuesday, January 13, 2009, an additional injunction Bond[19] in the amount of $95,000,[20] it is hereby ORDERED, ADJUDGED and DECREED, as follows:

1.      Defendant Myer shall comply and abide in all respects with the Employee Innovation and Non-Disclosure Agreement and Confidentiality, Innovation, Non-Disclosure, Non-Solicitation and Non-Competition Agreement attached as Exhibits A and B to Plaintiffs' Verified Complaint in Equity, including, but not limited to:

      a.   refraining from working in the United States or Europe, for any direct competitor of Synthes, including without limitation Globus Medical, Inc., until September 11, 2009, one year from the date of her resignation from Synthes;

      b.   refraining from directly or through others soliciting or contacting Synthes' prospects or customers at any time during the last three years of her Synthes employment, for a period of one year from the date of her resignation.

2.      That the court's Order shall remain in full force and effect until such time as this court specifically orders otherwise.

3.      Notice of entry of this Order shall be provided to all parties by Synthes in any manner provided for the service of legal papers under Pa.R.Civ.P. 440.

            BY THE COURT:

            _____

            PHYLLIS R. STREITEL        J.

---

[19]  The $95,000 bond will be in addition to the $20,000 bond filed on October 1, 2008 or it may be a replacement bond, totaling $115,000 ($95,000 plus $20,000).
[20]  Both bonds or the replacement bond shall remain in place pending further Order of court.

**<u>EXHIBIT 2 (REDACTED)</u>**



REDACTED

*Call me I will give you a tour of the first 3 Floors It's beautiful!*

**From:** Chaun Powell [chaun.powell@emergemedical.com]
**Sent:** Thursday, February 03, 2011 2:09 PM
**To:**
**Subject:** Emerge Medical
**Attachments:** Emerge Product Pricing 2011.xlsx; Corporate Overview.pdf; 6.5mm comparison.pdf

A pleasure speaking with you today.

As we discussed, after spending the better part of a decade with Synthes, I understand your concern about the patient and the quality of our product. We manufacture everything exclusively in the US to be identical to its predicate product (Synthes). The FDA testing found this to be true in the tests composed which indicated statistical equivalence in performance.

I believe that there was also some confusion around the scope of what Emerge does and the execution.

Scope-
Emerge only targets low physician preference items such as drill bits, cannulated screws, and guide wires (as directed by our surgical team). Your IM nails, locking and non-locking plates, Ex-Fix, etc will remain with Synthes. Any case that Frank is currently attending, he will continue to attend and represent Synthes in those surgeries. We target low PPI because the technology hasn't changed in years, the reps rarely show up for those surgeries anyway ( hip pinnings, SCFE's,  medial mal fx,s wrist and elbow pinnings, etc) and yet the big players still get away with charging 7-15% annul price increases for these items. We come in at 40-50% off the list price on these items and would offer Children's an ANNUAL 1% Price DECREASE. In three years with the price decrease, the savings rates jump to almost 65%.

Execution-
Our items are numbered identically to the Synthes items with the addition of (.EM). For instance, a 2.5mm drill bit (Synthes # 310.25) would be labeled 310.25.EM. With the numbering system, our items then fit directly into your already owned Synthes Sets. The same goes for screws. With statistical equivalence in performance and a virtually identical appearance, there is literally no difference in the instruments or implants that the surgeon choses, the sets that are pulled, or process of restocking in CS. We do not add additional inventory to your shelves or change the instruments that your surgeons are comfortable with as they continue to use the Synthes instruments which are hospital owned.

One of your other questions dealt with other Children's hospitals and potential references. We are in negotiations with Boston Children's and will be following up with Denver Children's shortly. Locally, we are doing business with Chandler, Mercy Gilbert, Gateway, AOSH, and moving forward with Scottsdale as well. As I mentioned, although we incorporated over a year ago, we opened our doors to sell in September. You are amongst the first Children's hospitals that we have called because of the success in the area. We are also doing business with teaching institutions and residency programs across the country that also have pediatric subspecialties.

2/4/2011



SYNTHES
EXHIBIT

RL 23 7/11

CONFIDENTIAL

SYNTHES-034983

REDACTED

Page 2 of 2

After speaking with ███ and ███ our potential savings at ████████'s is over 100,000.00.  I would like to build your confidence that these items are in fact identical with the exception of the label.  If you are open to it, I will bring samples of Emerge drill bits and screws to you the next time that I am in town.  In the meantime, I am attaching some pictures, the price and cross reference list, as well as the Emerge Corporate Overview.

Thank you again for your time.  I look forward to continuing our dialogue.

My Best,

Chaun Powell
Director of US Sales
Direct  303.217.8409
Fax    800.698.1440
EMERGEMEDICAL.COM

 EMERGE
MEDICAL

This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential, attorney-work product or otherwise protected from disclosure. Dissemination, distribution or copying of this email or the information herein by anyone other than the intended recipient is prohibited.

2/4/2011

CONFIDENTIAL

SYNTHES-034984