# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SYNTHES, INC., SYNTHES USA HQ, INC.,   :
SYNTHES USA, LLC, SYNTHES USA SALES,   :
LLC, and SYNTHES USA PRODUCTS, LLC,   :
                                 :   CIVIL ACTION
               Plaintiffs,   :
                                 :
  v.   :
                                 :   NO.  11-1566
EMERGE MEDICAL, INC., JOHN P.   :
MAROTTA, ZACHARY W. STASSEN, ERIC   :
BROWN, and CHARLES Q. POWELL   :
                                 :
              Defendants.   :

## MEMORANDUM

RONALD L. BUCKWALTER, S.J.                    August     15, 2012

Currently pending before the Court is the Motion to Dismiss of Defendant Zachary W.

Stassen.  For the following reasons, the Motion is denied

## I. FACTUAL AND PROCEDURAL HISTORY[1]

### A. General Information About Synthes and Its Efforts to Protect Confidential Information

Plaintiff Synthes, Inc. ("Synthes")[2] is a worldwide leader in the medical device industry,

marketing and selling medical implant devices, including plates, screws, rods, biomaterials,

instrumentation, and other devices for orthopedic surgery.  (Am. Compl. ¶ 24.)  Its customers

---

[1] The factual background is taken directly from Plaintiff's Amended Complaint, as required at this stage of the proceedings.  Lee v. Super King Sauna N.J., No. Civ.A.11-2710, 2011 WL 3652490, at *2 (E.D. Pa. Aug. 18, 2011).

[2] Plaintiffs actually include Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC.  For ease of discussion, the Court refers to Plaintiffs in the singular as either "Synthes" or "Plaintiff."

include hospitals, hospital employees and directors, and physicians together with their employees and staff nurses.  (Id. ¶ 25.)

Synthes markets and sells its products through a sales force comprised of Regional Sales Consultants and Associate Sales Consultants.  (Id. ¶ 27.)  These individuals report to Regional Managers, are assigned to specific territories within regions, and are generally paid on a commission basis.  (Id.)  The Regional Managers are responsible for the maintenance and growth of sales in the territories within their regions, and are also responsible for hiring, training, and management of Sales Consultants.  (Id. ¶ 28.)  They are often compensated based on sales within their regions and may also receive base compensation in addition to commissions.  (Id.)  Synthes Area Vice Presidents, in turn, are responsible for the maintenance and growth of sales in their regions and areas, and are responsible to hire and manage Regional Managers.  (Id. ¶ 29.)  Their compensation structure is similar to that of the Regional Managers.  (Id.)  Finally, the Vice President of Sales for Synthes's Trauma Division oversees all of the divisions' sales employees and sales activities.  (Id. ¶ 30.)

Because Synthes invests millions of dollars annually to develop its technology, systems, products, and strategies, and to educate and train its employees, it requires all employees to sign an Employee Innovation and Non-Disclosure Agreement ("Non-Disclosure Agreement").  (Id. ¶ 31.)  In addition, employees hired in sales, marketing, and product development capacities must sign a Confidentiality, Non-Solicitation, and Non-Competition Agreement ("Non-Competition Agreement").  (Id. ¶ 32.)  These Agreements, in part, protect against the disclosure of confidential information, prohibit solicitation of Synthes's employees and Synthes's existing or prospective customers, and prohibit activities during and after employment with or on behalf of any individual

or entity that competes or intends to compete with Synthes, subject to geographic and temporal limitations.  (Id. ¶¶ 31, 32.)  In exchange for the employees' execution of these Agreements, Synthes provides them with proprietary information, customer relationships, and valuable training programs. (Id. ¶ 33.)  Synthes takes other measures to protect these interests by requiring the return of various information upon the employees' separation from Synthes's employment.  (Id. ¶¶ 34–36.)

      **B.**      **Defendant John Marotta's Employment With Synthes**

Defendant John P. Marotta applied to Synthes on April 1, 2004, without any background in the orthopedic medical device industry.  (Id. ¶ 38.)  On June 21, 2004, he accepted a position as a Sales Consultant in Synthes's Trauma division, working in the Desert Valley region.  (Id. ¶ 39.) Prior to commencing work, Marotta signed both the Non-Competition Agreement and Non-Disclosure Agreement, each dated June 25, 2004.  (Id. ¶¶ 40–41.)  At the same time, Marotta was given Synthes's Employee Policy Manual and, later, the amended Employee Policy Manual.  (Id. ¶ 42.)

At the start of Marotta's employment, Synthes provided him with extensive training and access to customer and other confidential information.  (Id. ¶¶ 43–44.)  He was highly successful and highly compensated and, as a result, Synthes offered him a promotion to Regional Manager in 2007.  (Id. ¶¶ 44–45.)  On February 1, 2008, Marotta began his tenure as a Regional Manager, prior to which time he reviewed and executed a second Non-Competition Agreement.  (Id. ¶¶ 47–48.) Upon becoming a Regional Manager in Colorado, Marotta's responsibilities substantially increased, and he was responsible for identifying, developing, and implementing strategic territory expansion opportunities; evaluating and developing Sales Consultants' individual business plans; and leading sales strategies and activities for all of Synthes's new product introductions.  (Id. ¶ 49.)  Due to his

good service, Marotta's compensation increased progressively.  (Id. ¶ 50.)  In addition, he was enrolled in an MBA program, at Synthes's expense, subject to his agreement to repay Synthes for those tuition costs in the event he left the company.  (Id.)  Throughout his employment, Synthes entrusted Marotta with substantial confidential and proprietary information.  (Id. ¶¶ 51–52.)  Finally, Synthes provided Marotta with specialized training on the technical aspects of Synthes's products.  (Id. ¶ 53.)

Under the Non-Competition and Non-Disclosure Agreements between Marotta and Synthes, Marotta agreed not to "disclose or communicate" Synthes's confidential and proprietary information "to any competitor or other third party" at any time during or after leaving Synthes's employ or to "use or refer to" such information "for any purpose . . . except as necessary for [him] to properly perform services for Synthes during [his] employment."  (Id. ¶ 55.)  Further, Marotta agreed that any inventions, innovations, or technical or business ideas conceived or developed during his employment were the exclusive property of Synthes.  (Id. ¶ 56.)  In addition, Marotta's Sales Consultant Non-Competition Agreement specifically prohibited him from competing with Synthes, for a period of one year following the termination of his employment with Synthes, in the territories for which he was responsible either at that time or one year prior.  (Id. ¶ 57.)  It also contained a non-solicitation covenant prohibiting him, for a period of one year, from soliciting business from Synthes's customers within his territory in Arizona.  (Id. ¶ 59.)  His Regional Manager Non-Competition Agreement contained similar prohibitions.  (Id. ¶¶ 58, 60.)  Aside from the foregoing covenants, both Non-Competition Agreements had choice of law provisions requiring the application of Pennsylvania law.  (Id. ¶ 62.)

4

## C.   Defendant Eric Brown's Employment With Synthes

Defendant Eric Brown applied to Synthes on November 2, 1995, with no related background in the orthopedic medical device industry, and was offered a position as a Consultant in Synthes's Trauma division, initially based in Cincinnati, Ohio.  (Id. ¶ 67–68.)  Brown accepted the offer, effective November 9, 1995, and as a pre-condition to commencing employment, he signed a Non-Disclosure Agreement on November 22, 1995.[3]  (Id. ¶ 69.)  Brown also received and reviewed Synthes's Employee Policy Manual and Sales Policy Manual, and later received and reviewed the amended Employee Policy Manuals, as well as Synthes's Global Code of Business Ethics and IT Security Policy.  (Id. ¶ 70.)  Synthes thereafter provided extensive training to Brown in pertinent areas of the industry.  (Id. ¶ 71.)

In September 1997, Brown transferred to a Consultant position in Austin, Texas, was subsequently promoted to Regional Manager of the Rocky Mountain Region, effective January 1, 2006, and ultimately promoted to Area Vice President of the Rocky Mountain Region, effective January 1, 2008.  (Id. ¶ 72.)  Defendant Marotta replaced Brown as Regional Manager of the Rocky Mountain Region and reported directly to Brown.  (Id. ¶¶ 72, 75.)  With each promotion, Brown executed separate Non-Competition Agreements, with the latest signed on January 1, 2008.  (Id. ¶ 73.)  During his fifteen-year employment with Synthes, Brown had direct contact with Synthes's customers, became intimately familiar with Synthes's customers' preferences, and had access to proprietary, sensitive, and confidential information within Synthes.  (Id. ¶¶ 74, 77–78.)  In exchange for his continued success, Brown received million of dollars in compensation and bonuses over the course of his tenure.  (Id. ¶ 76.)

---

[3]  The Amended Complaint states that he signed the Agreement on November 22, *2009*. The Court presumes that this is an error

As set forth in the Area Vice President Non-Competition Agreement between Brown and Synthes, Brown agreed not to "disclose or communicate" Synthes's confidential and proprietary information "to any competitor or other third party" at any time during or after leaving Synthes's employ or to "use or refer to" such information "for any purpose . . . except as necessary for [him] to properly perform services for Synthes during [his] employment." (Id. ¶ 81.) Also under this Non-Competition Agreement, as well as his Non-Disclosure Agreement, Brown further agreed that any inventions, innovations, or technical or business ideas conceived or developed during his employment were the exclusive property of Synthes. (Id. ¶ 82.) The Non-Competition Agreement also (1) specifically prohibited Brown from competing with Synthes during his employment and for a period of one year following the termination of his employment with Synthes; (2) prohibited him from soliciting customers and employees during his employment and for a period of one year following the termination of his employment with Synthes; and (3) contained a choice of law provision, under which Pennsylvania law was to govern the agreement. (Id. ¶¶ 83–86.)

### D.   Defendant Charles Q. Powell's Employment With Synthes

Defendant Charles Q. Powell applied to Synthes on March 11, 2004, without any background in the orthopedic medical industry. (Id. ¶ 91.) On March 18, 2004, Powell accepted Synthes's offer of a position as a Territory Assistant in its Trauma division based in the Great Lakes West Territory in the area of Chicago, Illinois. (Id. ¶ 92.) Like the other Defendants, prior to commencing employment, Powell executed a Non-Competition Agreement on March 18, 2004, and a Non-Disclosure Agreement on March 14, 2004. (Id. ¶¶ 93–94.) Powell also reviewed Synthes's Employee Policy Manual, Sales Policy Manual, Global Code of Business Ethics, IT Security Policy, and, subsequently, the amended Policy Manual. (Id. ¶ 95.) Synthes provided Powell with extensive

training in the trauma aspects of the orthopedic industry, and continued to provide such training on an ongoing basis.  (Id. ¶ 96.)  Over time, his responsibilities increased and he was promoted to Associate Sales Consultant in September 2004, and ultimately to Sales Consultant in June 2006. (Id. ¶ 97.)  With each promotion, Powell executed additional Confidentiality, Non-Solicitation, and Non-Competition Agreements, the latest versions of which were signed on June 1, 2006.  (Id. ¶ 97.)

As a Sales Consultant in Colorado in the Denver East Territory and the Eastern Slope Territory, Powell reported directly to Defendant Marotta, and was highly successful and well-compensated.  (Id. ¶¶ 99–100.) Throughout his tenure with Synthes, Powell was privy to valuable customers contacts, goodwill and business information.  (Id. ¶ 101.)  Synthes also provided Powell with substantial, specialized training on the technical aspects of Synthes's products and the medical procedures in which these products are used.  (Id. ¶ 103.)

Like the other Defendants, Powell's Non-Competition Agreement required that he not "disclose or communicate" Synthes's confidential and proprietary information "to any competitor or other third party" at any time during or after leaving Synthes's employ or to "use or refer to" such information "for any purpose . . . except as necessary for [him] to properly perform services for Synthes during [his] employment."  (Id. ¶ 105.)  In addition, Powell's Non-Competition Agreement (1) specifically prohibited Powell from competing with Synthes for a period of one year following the termination of his employment with Synthes; (2)  prohibited him from soliciting Synthes's customers within his territory in Colorado and with whom he had worked for a period of one year following the termination of his employment with Synthes; and (3) mandated that Pennsylvania law govern the Agreement.  (Id. ¶¶ 106–109.)

In addition to the obligations in his Non-Disclosure and Non-Competition Agreements,

Powell was obligated to reimburse Synthes for various tuition expenses it paid in connection with his executive MBA program.  (Id. ¶ 114.)  In the year preceding his resignation, Synthes reimbursed Powell for tuition expenses he incurred in connection with this program, in the amount of $34,598.75.  (Id. ¶ 114.)  Synthes's policies provided that if Powell ceased employment with Synthes within one year of completion of the courses for which he had been reimbursed, he would have to reimburse Synthes for those tuition expenses paid within the last year.  (Id.)  To date, however, Powell has not paid Synthes for $16,485.05 of those reimbursements.  (Id.)

**E.    Defendants' Resignations**

On March 15, 2010, Defendant Marotta resigned from Synthes, effective April 15, 2010, without giving any indication of his future plans.  (Id. ¶ 115.)  Marotta told Synthes's Human Resources representatives that his new employment would be with a non-competitor, and that he would be joining his uncle, who was purportedly involved in a non-competitive business named Center Healthcare.  (Id.)  Defendant Brown, Marotta's supervisor, purportedly knew of Marotta's true plans at the time, but corroborated Marotta's lies.  (Id.)  By the time he resigned, Marotta had purportedly already formed his competing company, Emerge Surgical, Inc. ("Emerge") and started to target Synthes's customers.  (Id.)

Defendant Powell also resigned from Synthes on March 15, 2010, effective March 30, 2010, and informed Synthes's Human Resources representatives that he had accepted employment in a sales capacity with Sonoma Orthopedics, which Plaintiff believes to be a portfolio company of a venture capital firm founded and managed by Defendant Zachary Stassen's father.  (Id. ¶ 116.)  Plaintiff alleges that Marotta had solicited at least one other Synthes employee regarding a sales position with Sonoma Orthopedics, and had done this to obscure the formation of Emerge and avoid

any fallout with Synthes, with the intent that Powell would ultimately join Emerge.  (Id. ¶ 117.)

At the same time as Marotta's and Powell's resignations, Defendant Brown requested and obtained a transfer to a lower level position with Synthes as Regional Manager in the Lone Star Region of Texas, effective April 1, 2010, citing health and family issues.  (Id. ¶ 118.)  Despite assurances that he planned to remain with Synthes for the remainder of his career, he resigned from the Regional Manager position in Texas on August 2, 2011.  (Id. ¶ 120.)

**F.    The Alleged Conspiracy to Develop Emerge**

In the spring of 2009, Marotta first conceived the idea for a new business.  (Id. ¶ 125.)  By the summer, Brown, Marotta, and Zachary Stassen were actively involved in the development of a new business model, which was not disclosed to Synthes.  (Id.)  This business targeted a specific sub-segment of Synthes's business that includes surgical screws, drill, bits, and guide wires.  (Id. ¶ 126.)  They believed they could eliminate the need to provide direct sales support in the operating room, thereby changing the methods of delivery of products and services in an innovative manner.  (Id.)  According to Plaintiff, however, this business model was developed using knowledge, information, and resources obtained by Marotta and Brown in connection with their employment with Synthes.  (Id.)  At some point in the planning process, Brown proposed naming the new company "Emerge" and, ultimately, a company was incorporated under its original name, "Emerge Surgical, Inc."  (Id. ¶ 127.)

In the summer of 2009, Marotta reached out to an accounting and consulting firm regarding possible names for an "orthopedic and medical device and healthcare consultant" company and had also researched companies that design corporate logos.  (Id. ¶ 128.)  Around the same time, Marotta and Brown facilitated a series of discussions and meetings between Stassen and a Synthes Sales

9

Consultant in Texas, resulting in Stassen accompanying that Sales Consultant on a day-long field ride, interfacing with Synthes's customers and witnessing surgical procedures in order to garner information about Synthes's business methods.  (Id. ¶ 129.)  The Defendants then undertook to raise money for this new company from potential investors.  (Id. ¶ 30.)  The business plan and a private placement memorandum were developed through January of 2010, and then used in January and February 2010 to solicit investors, including Synthes's customers and employees.  (Id. ¶ 131.)

Marotta's calendar entries—which are stored on Synthes's system—confirm that, in the summer of 2009, he began to collaborate with Defendant Zachary Stassen, who later became Emerge's Chief Operating Officer and a director.  (Id. ¶ 132.)  Marotta sought legal advice from Venture Law Advisors LLC, the same law firm that eventually filed Emerge's articles of incorporation, as well as many other law firms.  (Id. ¶ 132.)  Marotta's calendar entries and phone records also reveal that Marotta's collaboration with potential investors, Synthes customers, Brown, Stassen, Stassen's father, and lawyers continued regularly into the winter of 2009 and through Marotta's resignation in April of 2010.  (Id. ¶ 133.)

By December of 2009, Marotta began making filings with the United States Patent and Trademark Office ("PTO") relating to the name and logo for Emerge.  (Id. ¶ 134.)  At some point, a decision was made that Brown would not, for the immediate future, become an active participant in the business because the operations of Emerge fell within the geographic coverage of his Non-Competition Agreement.  (Id. ¶ 135.)  Marotta, on the other hand, chose to be directly involved, despite the fact that Emerge's operations also fell within the scope of his Non-Competition Agreement.  (Id.)  On January 13, 2010—three months before his resignation from Synthes—Marotta met with Venture Law Advisors, who then filed Emerge's articles of

incorporation with the Colorado Secretary of State.  (Id. ¶ 136.)  Around that time, Marotta e-mailed himself a copy of a Regional Manager Non-Competition Agreement saved under his name.  (Id. ¶ 137.)  Leading up to his resignation, Marotta also e-mailed confidential Synthes documents and information to his personal e-mail account.  (Id. ¶ 138.)

Mr. Stassen, then purporting to be Emerge's Chief Operating Officer and a director, filed, on February 22, 2010, a Form Notice of Exempt Offering of Securities with the Securities Exchange Commission ("SEC"), indicating that Emerge intended to obtain $1.5 million in investment capital and already had obtained two investors for $200,000 just days before the filing.  (Id. ¶ 139.)  In that document, Mr. Stassen described Marotta, who was still employed by Synthes, as "a founder of the Issuer [Emerge] and will become an executive officer and director of [Emerge] upon completion of this offer" of securities.  (Id.)  Indeed, Synthes avers that Marotta and Stassen personally solicited Synthes's employees and customers during late 2009 and early 2010 concerning, at a minimum, their willingness to invest in Emerge.  (Id. ¶ 140.)  Marotta also sought investments from customers in other territories.  (Id. ¶ 142.)  Around the same time, Marotta began discussions with Synthes employees who had knowledge of the Defendants' plans and activities about employment opportunities outside of Synthes.  (Id. ¶ 143.)  By the time Marotta's resignation was effective on April 15, 2010, Emerge was fully operational and Marotta was involved in all aspects of the business.  (Id. ¶ 147.)

On June 23, 2010, Emerge Surgical, Inc. filed with the Colorado Secretary of State to change its name to Emerge Medical, Inc.  (Id. ¶ 150.)  Less than one month later, Marotta made a new trademark filing with the PTO for the name and logo of "Emerge Medical."  (Id. ¶ 151.)  Beginning no later than the summer of 2010, Marotta, Stassen, Powell, and Emerge acquired and used

Synthes's confidential and proprietary information by directing and/or encouraging others to access Synthes's computer systems.  (Id. ¶ 152.)  Further, Marotta and Powell failed to return all Synthes products in their possession at the time of their resignation, for the purpose of reverse engineering the drill bits, guide wires, and cannulated screws that they are now marketing to Synthes customers.  (Id. ¶ 154.)  In addition, Marotta, Stassen, Powell, and Emerge made representations about Emerge's products that are false and deliberately misleading.  (Id. ¶ 155.)

### G.    Commencement of Litigation

On March 4, 2011, Synthes initiated the current federal action against both John Marotta and Emerge Medical, Inc.  Thereafter, on March 6, 2012, Plaintiff filed an Amended Complaint adding three new defendants and setting forth thirteen causes of action as follows: (1) breach of fiduciary duty and/or duty of loyalty against Marotta and Brown (id. ¶¶ 169–88); (2) breach of contract under the Non-Competition and Non-Disclosure Agreements against Marotta, Brown, and Powell (id. ¶¶ 189–214); (3) tortious interference with contract against all Defendants (id. ¶¶ 215–26); (4) aiding and abetting breach of fiduciary duty against Marotta, Brown, Stassen, and Emerge (id. ¶¶ 227–36); (5) misappropriation of trade secrets under Pennsylvania common law and the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5302, et seq., against all Defendants (id. ¶¶ 237–49); (6) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 against all Defendants (id. ¶¶ 250–60); (7) conversion and replevin against all Defendants (id. ¶¶ 261–68); (8) false or deceptive advertising under the Lanham Act, 15 U.S.C. § 1125(a), against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 269–81); (9) trespass to chattels against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 282–86); (10) unfair competition against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 287–97); (11) fraud against all Defendants (id. ¶¶ 298–302); (12) civil

conspiracy against all Defendants (id. ¶¶ 303–09); and (13) breach of contract or, in the alternative, unjust enrichment against Powell. (Id. ¶¶ 310–16.)

On April 18, 2012, Defendant Zachary Stassen filed the instant Motion to Dismiss. Plaintiff responded on May 29, 2012, Defendant Stassen submitted a Reply Brief on June 22, 2012, and Plaintiff filed a Sur-reply Brief on July 2, 2012, making this Motion ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) require the court to accept as true the allegations of the pleadings and all reasonable inferences therefrom, and to resolve all factual disputes in favor of the plaintiff. Fed. R. Civ. P. 12(b)(2); see also Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002). The rule, however, "does not limit the scope of the court's review to the face of the pleadings"; rather the court must consider any affidavits submitted by the parties. Scott v. Lackey, No. Civ.A.02-1586, 2005 WL 2035598, at *1–2 (M.D. Pa. Aug. 11, 2005).

Although a defendant has the initial burden of raising the defense of lack of personal jurisdiction, once such a defense is raised, the burden shifts to the plaintiff to demonstrate facts that suffice to support an exercise of personal jurisdiction. Provident Nat. Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987); Cumberland Truck Equip. Co. v. Detroit Diesel Corp., 401 F. Supp. 2d 415, 418 (E.D. Pa. 2005). Plaintiff may do so through affidavits or competent evidence that show sufficient contacts with the forum state to establish personal jurisdiction. De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP, No. Civ.A.08-0533, 2008 WL 4822033, at *3 (E.D. Pa. Nov. 4, 2008). Such contacts must be established with "reasonable particularity," but need only amount to a prima facie case in favor of personal jurisdiction. Mellon

Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992) (quoting Provident, 819 F.2d at 437).  If the plaintiff meets this burden, the defendant must then establish the presence of other considerations that would render jurisdiction unreasonable.  De Lage Landen Fin. Servs., 2008 WL 4822033, at *3 (citing Carteret Sav. Bank v. Shushan, 954 F.2d 141, 150 (3d Cir. 1992)).

## III.   DISCUSSION

Defendant Stassen presently seeks dismissal from this action based on an alleged absence of personal jurisdiction over him.  Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a non-resident defendant to the extent provided by the law of the state in which the federal court sits.  Fed. R. Civ. P. 4(k)(1)(A); see also Martin v. Citizens Fin. Group, Inc., No. Civ.A.10-260, 2010 WL 3239187, at *3 (E.D. Pa. Aug. 13, 2010).  In this case, the forum state is Pennsylvania, thus necessitating the application of Pennsylvania's long-arm statute.  Under this statute, personal jurisdiction of Pennsylvania courts over nonresident defendants is permitted "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."  42 Pa. Cons. Stat. § 5322(b); see Mellon Bank, 960 F.2d at 1221 ("The Pennsylvania statute permits the courts of that state to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment.").  Therefore, a court's inquiry is solely whether the exercise of personal jurisdiction over the defendant would be constitutional under the Due Process Clause.  Mellon Bank, 960 F.2d at 1221.  Pursuant to these constitutional considerations, physical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant.  IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir.1998).  Instead, personal jurisdiction may be based on either a

14

defendant's contacts with the forum or on some form of consent to personal jurisdiction.  Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001); De Lage Landen Fin. Servs., 2008 WL 3889996, at *3.  Such consent may take the form of a contractual forum selection clause.  De Lage Landen Fin Servs., 2008 WL 3889996, at *3.

In the present case, Plaintiff alleges that Stassen is subject to the jurisdiction of this Court on three grounds.  First, it asserts that the Court maintains personal jurisdiction over Stassen pursuant to the forum selection provisions in Marotta's and Brown's agreements with Synthes.  Second, it contends that, because Stassen has minimum contacts with Pennsylvania and has directed his tortious conduct at Synthes in Pennsylvania, the Court maintains specific personal jurisdiction over him.  Finally, Plaintiff claims that, in addition to satisfying the traditional minimum contacts analysis, Stassen's conduct satisfies the Calder "effects" test.  Because the Court agrees with the first argument and finds that personal jurisdiction exists pursuant to the forum selection provisions, the present Opinion focuses solely on that argument.[4]

"It is widely accepted that non-signatory third-parties who are closely related to [a] contractual relationship are bound by forum selection clauses contained in the contracts underlying the relevant contractual relationship."  First Fin. Mgmt. Grp., Inc. v. Univ. Painters of Balt., Inc., No. Civ.A.11-5821, 2012 WL 1150131, at *3 (E.D. Pa.  Apr. 5, 2012) (quoting Donachy v. Intrawest U.S. Holdings, Inc., No. 10–4038, 2011 WL 2973543, at *2 (D.N.J. July 21, 2011))

---

[4]  Pennsylvania law provides that "[w]here a party has consented to personal jurisdiction via a contractual provision, the minimum contacts due process analysis usually employed to analyze jurisdiction on a Rule 12(b)(2) motion to dismiss is not appropriate."  De Lage Landen Fin. Servs., 2008 WL 4822033, at *3; see also ELA Med., Inc. v. Arrhythmia Mgmt. Assoc., Inc., No. Civ.A.06-3580, 2007 WL 892517, at *3 (D. Minn. Mar. 21, 2007) ("Consent is an independent traditional basis for personal jurisdiction and thus precludes any need to engage in such an analysis of a defendant's contacts with the forum.").

(internal quotation marks omitted); see also D'Elia v. Grand Caribbean Co., Ltd., No. Civ.A.09–1707, 2010 WL 1372027, at *3 (D.N.J. Mar. 30, 2010) ("In the Third Circuit, a non-signatory party may enforce a forum selection clause in a contract if the party is a third-party beneficiary of the contract or is closely related to the contractual relationship or dispute such that it is foreseeable that the party will be bound."); Hay Acquisition Co., I, Inc. v. Schneider, No. Civ.A.04-1236, 2005 WL 1017804, at *8 (E.D. Pa. Apr. 27, 2005) ("In the Third Circuit, a third-party will not be bound by a forum selection clause in the absence of a certain relationship to either the contract containing the forum selection clause or the parties thereto."); Jordan v. SEI Corp., No. Civ.A.96-1616, 1996 WL 296540, at *6 (E.D. Pa. June 4, 1996) ("Forum selection clauses bind nonsignatories that are closely related to the contractual relationship or that should have foreseen governance by the clause."). "Third parties that 'should have foreseen governance by the clause' may also be bound by it." University Painters, 2012 WL 1150131, at *3 (quoting Donchy v. Intrawest U.S. Holdings, Inc., No. Civ.A.10-4038, 2011 WL 2973543, at *2 (D.N.J. July 21, 2011)).

Courts have deemed a third party's conduct to be "closely related" to a contractual relationship or dispute—and thus bound the third parties to forum selection clauses—in a wide variety of situations.  See, e.g., Hugel v. Corp. of Lloyd's, 999 F.2d 206, 209–10 (7th Cir. 1993) (holding that corporations owned and controlled by the party signing the contract containing the forum selection clause may be bound by the clause); LaRoss Partners, LLC v. Contact 911, Inc., __ F. Supp. 2d __, 2012 WL 2856099, at *11 (E.D.N.Y. July 10, 2012) (finding that where signatory company and nonsignatory company shared officers and directors, agents, and a business address, the parties were closely related for purposes of applying a forum selection clause to the non-signatories); Great N. Ins. Co. v. Constab Polymer-Chemie GmbH & Co., No. Civ.A.01-882, 2007

16

WL 2891981, at *8 (N.D.N.Y. Sept. 28, 2007) (finding that insurer-subrogee relationship allows for application of forum selection clause to non-signatory); Affiliated Mtg. Protection, LLC v. Tareen, No. Civ.A.06-4908, 2007 WL 203947, at *4 (D.N.J. Jan. 24, 2007) (holding that where a third party's conduct is closely related to the contractual relationship or the contractual dispute and where the third party enjoys financial benefit from the contract, the forum selection clause applies to the third party).  Ultimately, "it is clear from these cases that courts considering this question of whether a non-signatory may be bound by a forum selection clause take a common sense, totality of the circumstances approach that essentially inquires into whether, in light of those circumstances, it is fair and reasonable to bind a non-party to the forum selection clause."  Regions Bank v. Wyndham Hotel Mgmt., Inc., No. Civ.A.09-1054, 2010 WL 908753, at *6 (M.D. Tenn. Mar. 12, 2010).  "[T]his approach places emphasis on whether it should have been reasonably foreseeable to the non-signatory that situations might arise in which the non-signatory would become involved in the relevant contract dispute."  Id.

In this case, Plaintiff relies on the theory that Defendant Stassen should have foreseen becoming embroiled in a contract dispute governed by the forum selection clauses because he, Brown, and Marotta corroborated, in direct violation of the Non-Competition Agreements, against the interests of Plaintiff.  Several factually analogous cases guide the Court's analysis of this argument.  First, in Financial Management Group, Inc. v. University Painters of Baltimore, Inc., No. Civ.A.11-5821, 2012 WL 1150131 (E.D. Pa. Apr. 5, 2012), the plaintiff was a well-known house painting company that licensed its trademark and trade name "University Painters" to numerous licensees on the East Coast.  Id. at *1.  In 1999, Michael Herzog entered into a licensing agreement with the plaintiff and then formed his company, Herzog Painting, Inc., which conducted business as

"University Painters" until 2005, when it changed its name to "University Painters of Baltimore"

("UPB"). Id.  The original contract with the plaintiff prohibited Herzog from participating in any

way in a business, venture, or activity involving painting anywhere in the United States or Canada

for three years following the expiration of the contract. Id.  Around 2008, the licensing agreement

failed and the plaintiff terminated the contract. Id.  Prior to termination, however, the Herzog

family began operating the company Perfect Painters in the geographic location Plaintiff originally

licensed to Michael Herzog. Id.  The plaintiffs brought suit in Pennsylvania, even though all parties

were residents of Maryland. Id. at *2.  Following a challenge by the defendants, the plaintiffs

argued that the court had personal jurisdiction over all of the Herzogs, including those that were not

signatories to the license agreement, due to the forum selection clause within that agreement. Id.

On review of this argument, the court noted that the Herzog family members worked with Michael

Herzog at UPB and subsequently formed Perfect Painters with Michael Herzog, allegedly competing

in violation of the non-compete clause in the contract. Id. at *4.  Remarking on the lack of any

responsive evidence by the defendants, the court found that because "these parties were employees

of UPB is enough for . . . them [to be] 'closely related' for purposes of the forum selection clause

analysis," particularly in light of the fact that UPB was a small, family-run business. Id. at *4.  The

court went on to reason that, "[t]hat these Defendants worked together for Perfect Painters, against

Plaintiff's interests, buttresses the Court's conclusion that they should have foreseen that the forum

selection clause would be enforced against them." Id.  As such, the court bound the entire Herzog

family to the forum selection clause. Id.

Likewise, the Court finds guidance from ELA Medical, Inc. v. Arrhythmia Management

Associates, Inc., No. Civ.A.06-3580, 2007 WL 892517 (D. Minn. Mar. 21, 2007).[5]  In that matter, plaintiff ELA Medical, Inc. ("ELA") hired Defendant Deborah Whitney, in 1998, as a sales associate.  Id. at *1.  In March or April of 2002, Whitney, through her professional corporation Defendant Arrhythmia Management Associates ("AMA"), and ELA entered into an Independent Sales Representative Agreement ("Contract") governing Whitney's relationship with ELA as an independent contractor selling ELA's products.  Id.  Whitney signed on behalf of AMA, as its President and Secretary, and separately signed a personal guaranty of AMA's performance of its obligations under the Contract.  Id.  This Contract contained both a forum-selection clause, specifying Minnesota as the chosen forum, as well as an express non-competition provision, generally providing that Whitney would not—for a period of one year after the end of the agreement—"solicit or do business with any actual or potential customers of the Company with whom [Whitney] . . . had contact or about whom [Whitney] . . . had exposure to any Confidential Information, during the term of this Agreement."  Id. at *2.  In August 2006, Whitney notified ELA that she was terminating the Contract and entered a new contractual sales relationship with Defendant Biotronik, Inc., an Oregon corporation.  Id.  ELA responded by filing an action against Whitney, AMA, and Biotronik, generally alleging that Whitney and AMA breached ELA's contract and that Biotronik tortiously interfered with the contract.  Id.  On a motion to dismiss for lack of personal jurisdiction, the court found that Biotronik was bound by the forum selection clause in Whitney's non-compete.  Id. at *6.  It reasoned that, "[h]ere, Biotronik, the non-party to the

_____

[5]  "Because matters of venue and forum selection clauses are procedural in nature, federal law governs the construction and application of forum selection clauses in diversity cases." D'Elia v. Grand Caribbean Co., Ltd., No. Civ.A.09-707, 2010 WL 1372027, at *3 n.5 (D.N.J. Mar. 30, 2010) (citing Jumara v. State Farm Ins., Co., 55 F.3d 873, 877 (3d Cir. 1995)).  As such, given the relative dearth of jurisprudence within the Third Circuit discussing this issue, the Court turns to relevant cases in other federal courts.

Contract, is not just the new employer of the individual who agreed to venue in Minnesota and the exercise of personal jurisdiction over her by the Minnesota courts in the Contract with her former employer.  It appears that Biotronik actively sought the employ of Whitney knowing that she was then employed by ELA under the Contract containing the clauses at issue." Id.  The court went on to note that "[a]ll three defendants thus seem to share a common interest in this action—that is, facilitating the immediate employment of Whitney as a sales representative for Biotronik unfettered by any restrictions in the Contract." Id.  Further, it found that Biotronik had acknowledged that it was clearly aware of the contract for some time, knew that ELA intended to file suit to enforce the contract, and expressly sought "a judicial declaration of ELA's, AMA's, Ms. Whitney's *and Biotronik's* respective rights and duties under the Agreement." Id. (emphasis in original).  The court concluded that, "[h]aving sought such a declaration, Biotronik cannot now claim that the resulting litigation it expected ELA to file for breach of that contract would not be subject to its provision mandating a Minnesota forum." Id.

Finally, in Hy Cite Corp. v. Advanced Marketing International, Inc., No. Civ.A.05-722, 2006 WL 3377861 (W.D. Wis. Apr. 10, 2006), several individual plaintiffs originally entered into distributor agreements with Advanced Marketing International ("Advanced Marketing"), a seller of kitchen equipment, under which they sold their kitchen equipment and products. Id. at *1.  Those agreements contained choice of law and venue provisions. Id.  In 2005, each individual entered into distributor agreements with Hy Cite, a competitor of defendant. Id.  As a result, Advanced Marketing sent Hy Cite a cease and desist letter. Id.  The parties then engaged a series of litigation, with both sides separately seeking relief. Id. at *1–2.  In one of the declaratory judgment actions, Advanced Marketing sought dismissal due to the forum selection clauses in the individual plaintiffs'

20

distributorship agreements with it.  Id. at *2.  The court agreed with defendant, noting that "Hy Cite

seeks a declaration that it did not tortiously interfere with individual plaintiffs' agreements.

Individual plaintiffs seek a declaration that their agreements are illegal and unenforceable.

Accordingly, the sole basis for the controversy between the parties concerns enforceability of

individual plaintiffs' agreements which renders plaintiff Hy Cite's claim entirely dependent on the

agreements."  Id. at *5.  The court thus concluded that "[b]ecause plaintiff Hy Cite's claim is both

inextricably intertwined with individual plaintiffs' claims and entirely dependent on individual

plaintiffs' agreements it satisfies the closely related and foreseeability requirements."  Id.; see also

St. Jude Med., S.C., Inc. v. Biosense Webster, Inc., No. Civ.A.12-621, 2012 WL 1576141, at *5 (D.

Minn. May 4, 2012) (new employer of individual employee that breached an employment agreement

with former employer was bound by forum selection clause in employee's agreement because it was

so closely related to the dispute involving tortious contractual interference that it was foreseeable

that it would be bound).

       Although somewhat disparate in their facts, these cases share the common thread that the

close business relationships between the signatories and non-signatories to the pertinent agreements,

together with the fact that the dispute among the parties centered on the interpretation of the

agreements, provided a sufficient basis on which to apply the forum selection clauses to the non-

signatory.  This thread similarly runs through the factual record of the present case.  Both Marotta's

and Brown's Non-Competition Agreements provided, in pertinent part: "I agree that this agreement

shall exclusively be enforced by any federal or state court of competent jurisdiction in the

Commonwealth of Pennsylvania and hereby consent to the personal jurisdiction of these courts."

(Am. Compl., Ex. E p.6 & Ex. F p. 6.)  The Amended Complaint alleges that all Defendants,

including Stassen, tortiously interfered with Brown and Marotta's contractual relationships with Synthes.  (Am. Compl. ¶ 216.)  Specifically, it asserts that, at both the time that Marotta and Brown were working with Stassen on the development of Emerge's business model and at the time that Marotta began working for Emerge, "Synthes had existing contractual relationships with Marotta and Brown, and . . . Stassen . . . knew or should have known about those contractual relationships." (Id. ¶¶ 217–18.)  Notwithstanding this knowledge, Stassen tortiously interfered with Synthes's contractual relationships with Marotta, Brown, and Powell.  (Id. ¶ 220.)

To support these broad allegations, Plaintiff has created an appreciable evidentiary record[6] to establish that Stassen is so "closely related" to the present dispute as to make it foreseeable that he would be bound by the forum selection clauses.  First, Plaintiff provides material evidencing that Stassen worked closely with Marotta and Brown for several months to develop Emerge despite Marotta and Brown's continuing employment with Synthes.  (See Pl.'s Resp. Opp'n Stassen Mot. Dismiss, Ex. 1 (e-mails dating from 8/3/09 to 11/8/09 between Marotta, Brown, and Stassen regarding set-up, formation of, and business plans for Emerge); id., Ex. 2 (business plan for Emerge identifying Stassen as "Chief Financial Officer and Founder," Brown as "Chief Executive Officer and President, Chairmen [sic] of the Board and Founder," and Marotta as "Chief Operations Officer and Founder").)  Second, Plaintiff produces evidence that Stassen had extensive knowledge of the Non-Competition Agreements and worked with lawyers to structure Emerge's initial business in

---

[6] Notably, once a jurisdictional defense is raised, the plaintiff bears the burden of showing that sufficient minimum contacts have occurred between the defendant and the forum to support jurisdiction.  Provident Nat'l Bank v. Calif. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).  To meet this burden, the plaintiff must produce "sworn affidavits or other competent evidence" since a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings."  Time Share Vacation Club v. Atl. Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984).

such a way that Emerge hoped would avoid the appearance of a breach of those agreements.  (See id., Ex. 3, Dep. of Zachary Stassen ("Stassen Dep."), 139:19–24, Jul. 22, 2011 ("You know, as it relates to the company, the—we took the approach of the whole company abiding by the—at least the geographic region in terms of doing business associated with the [Non-Competition Agreement], as referred to here."); id., Ex. 4 (e-mail from Brown to Stassen indicating that the non-compete agreement must be discussed; id., Ex. 7 (e-mail chain between Marotta, Brown and Stassen wherein Stassen writes, "When I refer to finding solutions, it is in reference to exhausting all potential ways to solve the non-compete issue," with Brown responding that he would be talking with his attorney in Austin about this issue); id., Ex. 12 (Minutes of the Board of Directors of Emerge Medical, Inc. on July 29, 2010, at which Stassen was present, acknowledging the restrictions contained in Marotta's employment agreement with Synthes).)  Third, Plaintiff points to evidence that Stassen and the others made efforts to warn Emerge's prospective investors about Marotta's agreement with Synthes and the possibility of Synthes's filing suit to protect its interests under those agreements. (See id., Ex. 14 (Emerge's Confidential Private Placement Memorandum listing Stassen as the contact person and noting that "[s]ome of our key potential employees, including Mr. Marotta, were previously or are currently employed at other medical device companies . . . [and] [w]e could in the future be subject to claims that these employees or consultants, or we, have inadvertently or otherwise violated a non-compete agreement or used or disclosed trade secrets.").)[7]  Finally, the

---

[7] Defendant Stassen contends that the Private Placement Memorandum does not support a finding that Stassen actually foresaw being haled into court in Pennsylvania since the crucial statement in that document did not explicitly refer to Stassen in any way.  The Court disagrees. The statement in the Private Placement Memorandum remarked that "*[w]e* may be subject to damages resulting from claims that our employees, our consultants or we have violated a non-competition agreement or wrongfully used or disclosed alleged trade secrets of their former employers."  (Id. Ex. 14 (emphasis added).)  The beginning of the Memorandum identifies

record is replete with evidence that Stassen remained cognizant of the perils associated with the

non-compete provisions and made them the forefront of future discussions with Brown and Powell.

(See id. Ex. 8 (December 16, 2009 letter from Brown to Marotta, Stassen, and others stating "John

Zack and I met for a couple of hours last night and . . . [decided that] [t]he most prudent direction at

this time is to respect my non-compete and delay any association or participation in the company

while I am under an agreement."); id., Ex. 12, July 29, 2010 Emerge Board Minutes (acknowledging

and ratifying Powell's Non-Competition Agreement with Synthes).)

    In light of this evidence, the Court must find, as in University Painters, that Plaintiff has

proven by a preponderance of the evidence that Stassen is, in fact, so closely related to the dispute

between Synthes and Defendants Brown and Marotta that he should have reasonably foreseen that

he would be bound by these forum selection clauses.  Stassen worked closely with Brown and

Marotta to form Emerge while the latter two men were still employed by Synthes, thus helping them

to compete in violation of the Non-Competition Agreements.[8]  Throughout their collaboration, the

Non-Competition Agreements were a source of frequent discussion, requiring the assistance of

outside counsel.  Indeed, the impact of these provisions on Stassen and Emerge was reflected in the

myriad of e-mail and in person discussions.  The close business relationship between Stassen,

Brown, and Marotta, combined with the fact that the men jointly worked against Plaintiff's interests,

suggests that Stassen should have foreseen—and in fact did foresee—that he faced a broad

---

Zachary Stassen as the Chief Operating Officer and the individual to whom all inquiries relating
to Emerge or the Offering should be directed, thereby suggesting that he is included among the
"we."

    [8]  Notably, Stassen does not challenge the validity and enforceability of the forum
selection clauses against Brown and Marotta.

likelihood of suit by Plaintiff on a theory of tortious interference with Brown's and Marotta's contracts. Being well aware of this potential litigation, he should have in turn anticipated that the forum selection clause in Brown's and Marotta's Non-Competition Agreements would be enforced against him in such a suit claiming a violation of those Agreements.

In an effort to end-run this outcome, Stassen offers several rebuttal arguments.[9] First, Stassen distinguishes many of the cases cited by Plaintiff to contend that none support exercise of personal jurisdiction over him because he is neither a third-party beneficiary to the Non-Competition Agreements nor is he owned or controlled by Marotta or Brown. (See Def. Stassen's Reply Br. 3–4 (distinguishing Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 203 (3d Cir. 1983); Hay Acquisition Co., I, Inc. v. Schneider, No. Civ.A.04-1236, 2005 WL 1017804 (E.D. Pa. Ap. 27, 2005); PGT Trucking, Inc. v. Lyman, No. Civ.A.11-300, 2011 WL 2470053 (W.D. Pa. June 17, 2011); Hugel v. Corp. of Lloyd's, 999 F.2d 206 (7th Cir. 1993); Atlas Commc'ns v. Waddill, No. Civ.A.97-1373, 1997 WL 700492 (E.D. Pa. Oct. 31, 1997); Jordan v. SEI Corp., No. Civ.A.96-1616, 1996 WL 296540 (E.D. Pa. Jun. 4, 1996)).) This argument,

---

[9] Plaintiff argues that Stassen's failure to address the forum selection clause argument in its opening brief in support of his Motion to Dismiss constitutes a waiver of that argument. It goes on to assert that Stassen was well aware that Plaintiff premised its claim that Stassen is subject to the personal jurisdiction of this Court based on Brown and Marotta's employment agreements. Nonetheless, Stassen's opening brief offered nothing more than a cursory dismissal of this argument.

The Court finds no such waiver. Defendant Stassen premised his Motion to Dismiss on the broad argument that the Court had no personal jurisdiction over him. He went on to discuss, in detail, the principles of general and specific jurisdiction and to demonstrate how neither form of personal jurisdiction was applicable here. Via a footnote, with several case citations, Plaintiff dismissed the forum selection clause argument on the ground that it "barely merits mention." (Def. Stassen's Mem. Supp. Mot. Dismiss 7 n.2.) Defendant Stassen was not required to rebut otherwise unknown arguments by Plaintiff in order to preserve this position. Indeed, it was not until after Plaintiff fully fleshed out its theory in its lengthy Response brief that Stassen had any substance to which he could respond.

however, misunderstands Plaintiff's position.  Plaintiff's citation of these cases was solely in the context of asserting that "courts in this circuit have held that 'a range of transaction participants, parties and non-parties, should be subject to forum selection clauses,'" (Pl.'s Resp. Opp'n Stassen Mot. Dismiss 9)—a proposition fully supported by this jurisprudence.  At no point does Plaintiff attempt to analogize the facts or holdings of those cases to the present matter.

Second, Defendant Stassen attempts to identify "critical distinctions" in the University Painters decision that preclude it from having any impact on the present matter.  Chief among these distinctions, according to Defendant, is the alleged "temporal proximity" requirement in that case. Specifically, Stassen asserts that in University Painters "all of the non-signatory defendants in that case were 'closely related' to the signatory defendant *at the time that he signed the forum selection clause*."  (Def. Stassen's Reply Br. 5.)  The non-signatory defendants were family members of the signatory, were employees of the company created by the signatory pursuant to the agreement containing the forum selection clause, and later joined the signatory in the new competing company. As such, they were deemed to be "closely related" to the agreement containing the forum selection clause.  According to Defendant, this temporal proximity requirement was likewise recognized in In re Mushroom Transp. Co., 247 B.R. 395 (E.D. Pa. 2000).  Id. at 398–99.  The present case, however, lacks such temporal proximity because Marotta and Brown signed their non-compete agreements long before they met Stassen in spring and summer 2009 and, thus, Stassen could not possibly have been closely related to either of them when they signed their agreements.

This argument, however, misreads both the University Painters decision and the Mushroom Transportation decision to include a fictional "temporal proximity" requirement necessary to bind a non-signatory to forum selection clause.  Stassen's most glaring error is his misstatement that

26

University Painters found that "all of the non-signatory defendants in that case *were* 'closely related' to the signatory defendant at the time that he signed the forum selection clause." (Def. Stassen's Reply Br. 5 (emphasis added & some emphasis omitted).)  In actuality, the court in that case held that the plaintiff had proven that all of the non-signatory defendants "*are* closely related to the contractual relationship established by [the signatory defendant] when he signed the contract containing the forum selection clause, and should have foreseen that they would be bound by that clause." University Painters, 2012 WL 1150131, at *4.  Reading this passage as written reveals that the court was concerned with the present close relationship between the parties, not the relationship at the time the contract was signed.  The phrase "when he signed the contract containing the forum selection clause" modifies only the phrase "the contractual relationship established by [the signatory defendant]."  Indeed, University Painters actually reaffirmed the principles that "non-signatory third-parties who *are* closely related to [a] contractual relationship" and "[t]hird parties that should have foreseen governance by the clause" are bound by forum selection clauses contained in the contracts underlying the relevant contractual relationship."  Id. at *3 (internal quotation marks omitted, emphasis added).

Likewise, no such temporal proximity requirement was inherent in the Mushroom Transportation holding.  In that matter, the court merely observed that "[t]he cases in which courts have concluded that there was a sufficiently close relationship have all involved non-parties who were proximate to the contract at the time of formation."  247 B.R. at 398–99.  Beyond this remark, made in *dicta*, the court never held that a temporal proximity was crucial to finding that a forum selection clause applied to a non-signatory.  Rather, it—like University Painters—reaffirmed that "such clauses are enforceable only against nonsignatories that *are* closely related to the contractual

relationship or that should have foreseen governance by the clause." Id. at 398 (emphasis added) (internal quotation marks omitted).

In fact, this Court's own review of relevant jurisprudence finds no mention of any temporal proximity requirement necessary to bind a non-signatory to a forum selection clause. All that is required is facts demonstrating a close relationship to the signatory or to the contractual dispute, such that application of the forum selection clause was reasonably foreseeable. See St. Jude, 2012 WL 1576141, at *5 (defendant employer of employee that breached an employment agreement with former employer was bound by forum selection clause in employee's agreement because it was so closely related to the dispute involving tortious contractual interference that it was foreseeable that it would be bound); ELA Med., 2007 WL 892517, at *6 (enforcing forum selection clause in party's employment contract to party's subsequent employer who actively sought the party's employ well after she had signed the contract, on the grounds that the subsequent employer was closely related to the dispute); Hy Cite, 2006 WL 3377861, at *5 (finding that subsequent distributor for plaintiffs was bound by forum selection clauses previously signed by plaintiffs with previous distributor because the subsequent distributor's arguments were entirely dependent on the distributor agreements, thus satisfying the closely related and foreseeability requirements).[10]

---

[10]  The Court remains aware that many of these cases involve the non-signatories as plaintiffs bringing declaratory judgment actions to avoid application of the contract.  The Court deems this point irrelevant.  As eloquently explained by one of our sister courts,

> But the Court does not believe that the closely-related-party doctrine is limited to third-party plaintiffs. Indeed, when deciding whether the doctrine applies, a court must answer only the following question: should the third party reasonably foresee being bound by the forum-selection clause because of its relationships to the cause of action and the signatory to the forum-selection clause? . . . The Court perceives no reason why a third party sued as a defendant, as opposed to one voluntarily joining an action as a plaintiff, cannot reasonably foresee that it might be bound by a forum-

Third, Defendant Stassen urges that University Painters is not analogous because the non-signatories that the court deemed bound by the forum selection clause were family members of the signatory, worked with him at the company created by the license agreement containing the forum selection clause, and then joined him as employees of the new company created to compete with the plaintiff.  Defendant goes on to contend that, as a result of these precise facts, the court found the individual non-signatory defendants "closely related' to the agreement such that they could reasonably foresee that they would be bound by the agreement.  Stassen concludes that "[n]othing in the University Painters opinion suggests that the court would bind an employee of the competing company to the licensing agreement's forum selection clause had said employee not also been an employee of the original company created pursuant to the licensing agreement."  (Def. Stassen's Reply Br. 6.)

Again, this argument imports a limitation into University Painters that does not exist.  While the court in that case remarked, "[t]hat these parties were employees of UPB is enough for this Court to find them "closely related" for purposes of the forum selection clause analysis," it likewise found that the fact "[t]hat these Defendants worked together for Perfect Painters, against Plaintiff's interests" was similarly sufficient to buttress the same conclusion.  2012 WL 1150131, at *4.  The court further recognized that its holding was not limited to its facts and remarked that "[c]ourts have

---

selection clause agreed to by one or more of its co-defendants.  Moreover, accepting the Defendants' argument would mean that the application of the closely-related-party doctrine would turn on timing: if the third party joined the signatory in bringing a preemptive declaratory-judgment action, then the doctrine would apply, but if the third party and the signatory lost the race to the courthouse and were sued first, then the doctrine would not apply.  This is a nonsensical result that does not comport with the purpose behind the doctrine.

Medtronic, Inc. v. Endologix, Inc., 530 F. Supp. 2d 1054, 1057 (D. Minn. 2008)

found sufficiently close relationships and foreseeability in a number of contexts."  Id. at *3.

In the present case, Stassen, Brown, and Marotta—like the defendants in University

Painters—"worked together for [Emerge] against Plaintiff's interests."  While Stassen—unlike the

defendants in University Painters—did not work with Brown and Marotta at Synthes, he clearly

knew of the existence of the Non-Competition Agreements, understood that they impacted his

efforts to form and operate Emerge with Brown and Marotta, actively sought out ways to evade the

legal implications of those contracts, and had concerns about potential litigation regarding those

contracts.  He then joined forces with Brown and Marotta as the founders, board members, and

officers of the newfound Emerge in a directly competition relationship with Synthes.  See Universal

Grading Serv. v. eBay, Inc., No. Civ.A.08-3557, 2009 WL 2029796, at *16 (E.D.N.Y. June 10,

2009) (holding that a close business relationship between a signatory and non-signatory is an

important factor in determining if it was foreseeable that the non-signatory would be bound).

Clearly, then, a tortious interference claim against Stassen remains so inextricably intertwined with

the contracts such as to make it reasonably foreseeable to him that he would be subject to the forum

selection clause.

Finally, by way of a last-ditch effort to avoid this Court's exercise of personal jurisdiction

over him, Stassen argues that Plaintiff cannot use a "co-conspirator" theory to bind Stassen to

Marotta's and Brown's forum selection clauses.  More specifically, Defendant contends that none of

Plaintiff's multitude of exhibits establishes anything more than Stassen's efforts to form a legitimate

business that honored Marotta's and Brown's obligations to Synthes.  Moreover, Defendant

contends that no case cited by Plaintiff stands for the proposition that allegations of civil conspiracy,

by themselves, can support personal jurisdiction.  Rather, the plaintiff must also show that

"substantial acts in furtherance of the conspiracy occurred in the forum state, of which the out-of-state co-conspirator was or should have been aware."  (Def.'s Reply Br. 11 (quoting <u>Murray v. Nat'l Football League</u>, No. Civ.A.94-5971, 1996 WL 363911, at *16 (E.D. Pa. Jun. 28, 1996)) (further quotations omitted).

This argument merits little discussion, however, because Plaintiff does not rely on a conspiracy theory to impute personal jurisdiction to Stassen.  Rather, Plaintiff relies on the principle, set forth in <u>University Painters</u>, that "when signatories and non-signatories [to a contract containing a forum selection clause] act together against the interests of the plaintiff, the non-signatory co-conspirators may also be bound by the forum selection clause."  <u>University Painters</u>, 2012 WL 1150131, at *3.  This principle has been repeated in multiple other cases.  <u>See, e.g.</u>, <u>Magi XXI, Inc v. Stato Della Citta Del Vaticano</u>, 818 F. Supp. 2d 597, 608 (E.D.N.Y. 2011) (finding the non-signatory Vatican State to be a closely related party because plaintiff claimed that the signatory defendants and the Vatican State acted together to defraud plaintiff, and plaintiffs' claims against the Vatican State were "essentially identical to those it assert[ed] against [the signatory defendants]");[11] <u>Villanueva v. Barcroft</u>, 822 F. Supp. 2d 726, 739 (N.D. Oh. 2011) (finding

---

[11]  Defendant Stassen attempts to distinguish this case on the ground that it was the non-signatory defendant, Vatican State, that was attempting to avail itself of the forum selection clause, as opposed to a signatory plaintiff attempting to impose a forum selection clause on a non-signatory defendant.  This is a distinction without a difference.  It is well-established that "when the dispute is between a non-signatory and a signatory, either one may invoke the forum-selection clause against the other so long as they are closely related such that its invocation is foreseeable."  <u>Burrows Paper Corp. v. Moore & Assoc.</u>, No. Civ.A.07-62, 2007 WL 2089682, at *3 (N.D.N.Y. 2007).  Indeed, in <u>In re Mushroom Transp. Co.</u>, <u>supra</u>:

There is an argument to be made that non-parties to a contract seeking to enforce a forum selection clause should be required to make an even greater showing than parties to a contract seeking to enforce such a clause against non-parties. It is one thing for a party, with rights and obligations under a contract, to seek its enforcement

defendant non-signatory bound by forum selection clause in contract where all of plaintiff's claims against the defendant arose out of that contract and where all defendant—both signatory and non-signatory—"acted in concert" to defraud the plaintiff); Weingard v. Telepathy, Inc., No. Civ.A.05-2024, 2005 WL 2990645, at *6 (S.D.N.Y. Nov. 7, 2005) (finding non-signatory defendants closely related to signatory defendants based on the plaintiff's allegations that they all acted in concert to deprive him of an internet domain name that he acquired through a Registration Agreement signed with the signatory defendants).  More simply put, Plaintiff relies on the ample evidence of record, discussed in detail above, that Stassen conspired with Brown and Marotta to form Emerge—a direct competitor of Plaintiff—notwithstanding Stassen's obvious knowledge of the explicit non-competition provisions in Brown and Marotta's contracts.[12]  Such facts are sufficient—without any further showing of either the elements of conspiracy or the conspiracy's contacts with the forum state—to exercise personal jurisdiction over Stassen.

 In sum, the record is clear that Stassen worked closely with Brown and Marotta against the

---

  against others. It is quite . . . another, however, for a[] non-party individual or organization to seek to enforce a particular clause against a contracting party. It stretches logic and reason to assert that non-party parties with absolutely no rights or obligations under a contract (indeed, who were nowhere in the picture when the contract was signed) should be allowed to enforce a clause against a party to the contract in later litigation.

Id. at 399 n.4.  As the present case involves a signatory attempting to bind a non-signatory, it is arguable that Plaintiff bears a lighter burden of showing a "close relationship" than that required in Magi XXI.

 [12]  The Court notes that this comment is not intended as any pre-judgment of Plaintiff's tortious interference claims or as any finding that the Non-Competition Agreements were violated.  Rather, it is simply an observation regarding the close working relationship of the Defendants to form a competing company.  Whether or not their actions actually violated the Agreements is a question for another day.

interests of Plaintiff.  Taking the allegations of the Amended Complaint as true, these actions were in direct violation of Brown and Marotta's Non-Competition Agreements, of which Stassen was well aware.  Indeed, the core of Plaintiff's claims against Defendant Stassen involve his interference with these Agreements.  Because his actions were so inextricably intertwined with the Agreements and the breach of contract claims by Plaintiff against Brown and Marotta, he should have reasonably foreseen being bound by the forum selection clauses contained therein.  Accordingly, the Court deems the forum selection clauses applicable to Defendant Stassen, making him subject to this Court's personal jurisdiction.  In turn, Defendant Stassen's Motion to Dismiss must be denied.