# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SYNTHES, INC., SYNTHES USA HQ, INC., : | |
| SYNTHES USA, LLC, SYNTHES USA SALES, : | |
| LLC, and SYNTHES USA PRODUCTS, LLC, : | |
| : | CIVIL ACTION |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | NO.  11-1566 |
| EMERGE MEDICAL, INC., JOHN P. : | |
| MAROTTA, ZACHARY W. STASSEN, ERIC : | |
| BROWN, and CHARLES Q. POWELL : | |
| : | |
| Defendants. : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                      September 19, 2012

     Currently pending before the Court is the Motion to Dismiss of Defendant Charles Q.

Powell.  For the following reasons, the Motion is granted in part and denied in part.

## I.     PERTINENT FACTUAL AND PROCEDURAL HISTORY[1]

### A.     General Information About Synthes and Its Efforts to Protect Confidential Information

    Plaintiff Synthes, Inc. ("Synthes")[2] is a worldwide leader in the medical device industry

---

[1]  The factual background is taken directly from Plaintiff's Amended Complaint, as required at this stage of the proceedings.  Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991).  The Third Circuit Court of Appeals has explained that "in deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally may not consider matters extraneous to the pleadings unless it is a matter of public record or is 'integral to or explicitly relied upon in the complaint.'" In re Burlington Coat Factory § Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted).  As such, to the extent Defendant Powell references facts from his Declaration, attached as Exhibit A to his Motion, the Court disregards them.  In addition, the Court does not consider the exhibits attached to Plaintiff's Sur-reply Brief.

[2]  Plaintiffs actually include the affiliated companies of Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC.  For ease

which markets and sells medical implant devices, including plates, screws, rods, biomaterials, instrumentation, and other devices for orthopedic surgery.  (Am. Compl. ¶ 24.)  Its customers include hospitals, hospital employees and directors, and physicians together with their employees and staff nurses.  (Id. ¶ 25.)

Synthes markets and sells its products through a sales force comprised of Regional Sales Consultants and Associate Sales Consultants.  (Id. ¶ 27.)  These individuals report to Regional Managers, are assigned to specific territories within regions, and are generally paid on a commission basis.  (Id.)  The Regional Managers, in turn, are responsible for the maintenance and growth of sales in the territories within their regions, as well as the hiring, training, and management of Sales Consultants.  (Id. ¶ 28.)  They are often compensated based on sales within their regions and may also receive base compensation in addition to commissions.  (Id.)  Synthes Area Vice Presidents bear responsibility for the maintenance and growth of sales in their regions and areas and are charged with hiring and managing Regional Managers.  (Id. ¶ 29.)  Their compensation structure is similar to that of the Regional Managers.  (Id.)  Finally, the Vice President of Sales for Synthes's Trauma Division oversees all of the divisions' sales employees and sales activities.  (Id. ¶ 30.)

Because Synthes invests millions of dollars annually both to develop its technology, systems, products, and strategies and to educate and train its employees, it requires all employees to sign an Employee Innovation and Non-Disclosure Agreement ("Non-Disclosure Agreement").  (Id. ¶ 31.)  In addition, employees hired in sales, marketing, and product development capacities must sign a Confidentiality, Non-Solicitation, and Non-Competition Agreement ("Non-Competition Agreement").  (Id. ¶ 32.)  These Agreements, in part, protect against the disclosure of confidential

---

of discussion, the court refers to Plaintiffs in the singular as either "Synthes" or "Plaintiff."

information, prohibit solicitation of Synthes's employees and Synthes's existing or prospective customers, and prohibit activities during and after employment with or on behalf of any individual or entity that competes or intends to compete with Synthes, subject to geographic and temporal limitations.  (Id. ¶¶ 31, 32.)  In exchange for the employees' execution of these Agreements, Synthes provides the employees with proprietary information, customer relationships, and valuable training programs.  (Id. ¶ 33.)  Synthes takes other measures to protect these interests by requiring the return of various information upon the employees' separation from Synthes's employment.  (Id. ¶¶ 34–36.)

      **B.**      **Defendant Charles Q. Powell's Employment With Synthes**

Defendant Charles Q. Powell applied to Synthes on March 11, 2004, without any background in the orthopedic medical industry.  (Id. ¶ 91.)  On March 18, 2004, Powell accepted Synthes's offer of a position as a Territory Assistant in its Trauma division based in the Great Lakes West Territory in the area of Chicago, Illinois.  (Id. ¶ 92.)  Prior to commencing employment, Powell executed a Non-Competition Agreement on March 18, 2004, and a Non-Disclosure Agreement on March 14, 2004.  (Id. ¶¶ 93–94.)  Powell also reviewed Synthes's Employee Policy Manual, Sales Policy Manual, Global Code of Business Ethics, IT Security Policy, and, subsequently, the amended Policy Manual.  (Id. ¶ 95.)  Synthes provided Powell with extensive training in the trauma aspects of the orthopedic industry and continued to provide such training on an ongoing basis.  (Id. ¶ 96.)  Over time, his responsibilities increased and he was promoted to Associate Sales Consultant in September 2004, and ultimately to Sales Consultant in June 2006.  (Id. ¶ 97.)  With each promotion, Powell executed additional Confidentiality, Non-Solicitation, and Non-Competition Agreements, the latest versions of which were signed on June 1, 2006.  (Id. ¶ 97.)

As a Sales Consultant in Colorado in the Denver East Territory and the Eastern Slope

Territory, Powell reported directly to Defendant John P. Marotta, and he was highly successful and well-compensated. (Id. ¶¶ 99–100.) Throughout his tenure with Synthes, Powell was privy to valuable customers contacts, goodwill, and business information. (Id. ¶ 101.) Synthes also provided Powell with substantial, specialized training on the technical aspects of Synthes's products and the medical procedures in which these products are used. (Id. ¶ 103.)

Powell's Non-Competition Agreement required that he not "disclose or communicate" Synthes's confidential and proprietary information "to any competitor or other third party" at any time during or after leaving Synthes's employ or to "use or refer to" such information "for any purpose . . . except as necessary for [him] to properly perform services for Synthes during [his] employment." (Id. ¶ 105.) In addition, Powell's Non-Competition Agreement specifically (1) prohibited Powell from competing with Synthes for a period of one year following the termination of his employment with Synthes; (2) prohibited him from soliciting Synthes's customers within his territory in Colorado and with whom he had worked for a period of one year following the termination of his employment with Synthes; and (3) mandated that Pennsylvania law govern the Agreement. (Id. ¶¶ 106–109.)

In addition to the obligations in his Non-Disclosure and Non-Competition Agreements, Powell was obligated to reimburse Synthes for various tuition expenses it paid in connection with his executive MBA program. (Id. ¶ 114.) In the year preceding his resignation, Synthes paid Powell $34,598.75 for tuition expenses he incurred. (Id. ¶ 114.) Synthes's policies provided that if Powell ceased employment with Synthes within one year of completion of the courses, he would have to reimburse Synthes for those tuition expenses paid within the last year. (Id.) To date, however, Powell has not paid Synthes for $16,485.05 of the costs. (Id.)

4

Defendant Powell resigned from Synthes on March 15, 2010, effective March 30, 2010, and informed Synthes's Human Resources representatives that he had accepted employment in a sales capacity with Sonoma Orthopedics, which Plaintiff believes to be a portfolio company of a venture capital firm founded and managed by Defendant Zachary Stassen's father.  (Id. ¶ 116.)  According to Plaintiff, Powell's intent was ultimately to join a new company—Emerge—founded by his co-Defendants John Marotta, Eric Brown, and Zachary Stassen.  (Id. ¶ 117–18.)

C.      The Alleged Conspiracy to Develop Emerge

In the spring of 2009, Defendant John Marotta—at the time a Synthes employee—first conceived the idea for a new business.  (Id. ¶ 125.)  By the summer, Marotta, along with Defendants Eric Brown (also a then-Synthes employee) and Zachary Stassen were actively involved in the development of a new business model.  (Id.)  This model was not disclosed to Synthes.  (Id.)  The business targeted a specific sub-segment of Synthes's business that included surgical screws, drill bits, and guide wires.  (Id. ¶ 126.)  They believed they could eliminate the need to provide direct sales support in the operating room, thereby changing the general methods of delivery of products and services in an innovative manner.  (Id.)  According to Plaintiff, however, this business model was developed using knowledge, information, and resources obtained by Marotta and Brown in connection with their employment with Synthes.  (Id.).  At some point in the planning process, Brown proposed naming the new company "Emerge."  (Id.)

In the summer of 2009, Marotta reached out to an accounting and consulting firm regarding possible names for an "orthopedic and medical device and healthcare consultant" company and researched companies that design corporate logos.  (Id. ¶ 128).  Around the same time, Marotta and Brown facilitated a series of discussions and meetings between Stassen and a Synthes Sales

Consultant in Texas in order to garner information about Synthes's business methods.  (Id. ¶ 129.)
The Defendants then sought to raise money for this new company from potential investors.  (Id. ¶
130.)  The business plan and a private placement memorandum were developed through January of
2010, and then used in January and February 2010 to solicit investors, including Synthes's
customers and employees.  (Id. ¶ 131.)

By December of 2009, Marotta began making filings with the United States Patent and
Trademark Office ("PTO") relating to the name and logo for Emerge.  (Id. ¶ 134.)  On January 13,
2010—three months before his resignation from Synthes—Marotta met with Venture Law Advisors,
who then filed Emerge's articles of incorporation with the Colorado Secretary of State.  (Id. ¶ 136.)
Around that time, Marotta e-mailed himself a copy of a Regional Manager Non-Competition
Agreement saved under his name.  (Id. ¶ 137.)  Leading up to his resignation, Marotta also e-mailed
confidential Synthes documents and information to his personal e-mail account.  (Id. ¶ 138.)

On February 22, 2010, Mr. Stassen, then purporting to be Emerge's Chief Operating Officer
and a member of the board of directors, filed a Form Notice of Exempt Offering of Securities with
the United States Securities Exchange Commission ("SEC"), indicating that Emerge intended to
obtain $1.5 million in investment capital and already had obtained two investors for $200,000 just
days before the filing.  (Id. ¶ 139.)  Synthes avers that Marotta and Stassen personally solicited
Synthes's employees and customers during late 2009 and early 2010 concerning, at a minimum,
their willingness to invest in Emerge.  (Id. ¶ 140.)  Marotta also sought investments from customers
in other territories.  (Id. ¶ 142.)  Around the same time, Marotta began discussions with Synthes
employees who had knowledge of the Defendants' plans and activities about employment
opportunities outside of Synthes.  (Id. ¶ 143.)  By the time Marotta's resignation was effective on

April 15, 2010, Emerge was fully operational, and Marotta was involved in all aspects of the business.  (Id. ¶ 147.)

On June 23, 2010, Emerge Surgical, Inc. filed with the Colorado Secretary of State to change its name to Emerge Medical, Inc.  (Id. ¶ 150.)  Less than one month later, Marotta made a new trademark filing with the PTO for the name and logo of "Emerge Medical."  (Id. ¶ 151.)  Beginning no later than the summer of 2010, Marotta, Stassen, Powell, and Emerge allegedly acquired and used Synthes's confidential and proprietary information by directing and/or encouraging others to access Synthes's computer systems.  (Id. ¶ 152.)  Further, Marotta and Powell failed to return all Synthes products in their possession at the time of their resignation, for the purpose of reverse engineering the drill bits, guide wires, and cannulated screws that they are now marketing to Synthes customers.  (Id. ¶ 154.)  Finally, Marotta, Stassen, Powell, and Emerge purportedly made deliberately false and misleading representations about Emerge's products.  (Id. ¶ 155.)

**D.**      **Commencement of Litigation**

On March 4, 2011, Synthes initiated the current federal action against both John Marotta and Emerge Medical, Inc.  Thereafter, on March 6, 2012, Plaintiff filed an Amended Counterclaim adding three new defendants and setting forth thirteen causes of action as follows: (1) breach of fiduciary duty and/or duty of loyalty against Marotta and Brown (id. ¶¶ 169–88); (2) breach of contract under the Non-Competition and Non-Disclosure Agreements against Marotta, Brown, and Powell (id. ¶¶ 189–214); (3) tortious interference with contract against all Defendants (id. ¶¶ 215–26); (4) aiding and abetting breach of fiduciary duty against Marotta, Brown, Stassen, and Emerge (id. ¶¶ 227–36); (5) misappropriation of trade secrets under Pennsylvania common law and the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5302, et seq., against all Defendants (id.

7

¶¶ 237–49); (6) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against all Defendants (id. ¶¶ 250–60); (7) conversion and replevin against all Defendants (id. ¶¶ 261–68); (8) false or deceptive advertising under the Lanham Act, 15 U.S.C. § 1125(a), against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 269–81); (9) trespass to chattels against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 282–86); (10) unfair competition against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 287–97); (11) fraud against all Defendants (id. ¶¶ 298–302); (12) civil conspiracy against all Defendants (id. ¶¶ 303–09); and (13) breach of contract or, in the alternative, unjust enrichment against Powell.  (Id. ¶¶ 310–16.)

On April 18, 2012, Defendant Charles Powell filed the instant Motion to Dismiss.  Plaintiff responded on May 29, 2012, Defendant Powell submitted a Reply Brief on June 22, 2012, Plaintiff filed a Sur-reply Brief on July 2, 2012, Defendant Powell filed a Supplemental Reply Brief on August 3, 2012, and Plaintiff filed a supplemental Sur-Reply brief on August 23, 2012, making this Motion ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P.12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss.  "First, the tenet that a court must accept as true all of the

8

allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.  Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232-34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233.  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."

9

Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.    DISCUSSION

Defendant Powell now sets forth several broad legal theories seeking dismissal of the

majority of the claims against him.  First, he asserts that the gist of the action doctrine bars

Plaintiff's claims for tortious interference with contract, conversion, unfair competition, and civil

conspiracy.[3]  Second, he contends that Plaintiff fails to state a claim under the Computer Fraud and

Abuse Act.  Finally, he argues that many of the remaining counts of the Amended Complaint should

be dismissed for failure to meet the pleading standards set forth under Iqbal and Twombly.  The

Court addresses each argument separately.

### A.    Gist of the Action Doctrine

As a general rule, Pennsylvania courts are cautious about permitting tort recovery on

contractual breaches.  Glazer v. Chandler, 200 A.2d 416, 418 (Pa. 1964).  In eToll, Inc. v.

Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. Ct. 2002), the Pennsylvania Superior Court

emphasized that the "gist of the action" doctrine "is designed to maintain the conceptual distinction

between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting

ordinary breach of contract claims into tort claims."[4]  Id. at 14.  The simple existence of a

---

[3]  Defendant Powell also argues that the fraud claim against him should be dismissed both
because Plaintiff has failed to satisfy the pleading standards of Federal Rule of Civil Procedure
9(b) and because it is barred by the gist of the action doctrine.  In response, Plaintiff notes that
the fraud claim relates only to the conduct by Defendants Marotta, Stassen, Brown, and Emerge.
(Pl.'s Resp. Opp'n Powell Mot. Dismiss 3 n.2.)  In an effort to "remove any confusion," Synthes
agrees to the dismissal of this claim as to Defendant Powell.  (Id.)  Accordingly, the Court
dismisses this claim without prejudice and need not address Powell's substantive arguments
regarding this claim.

[4]  Although the Pennsylvania Supreme Court has not explicitly adopted the gist of the
action doctrine, both the Pennsylvania Superior Court and multiple United States District Courts
have predicted that it will.  Woods v. ERA Med LLC, No. Civ.A.08-2495, 2009 WL 141854, at

contractual relationship between two parties does not preclude one party from bringing a tort claim against the other.  Smith v. Lincoln Benefit Life Co., No. Civ.A.08-1324, 2009 WL 789900, at *20 (W.D. Pa. Mar. 23, 2009), aff'd, 2010 WL 3730196 (3d Cir. Sep. 24, 2010); see also Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 (3d Cir. 2001).  The doctrine, however, forecloses a party's pursuit of a tort action for the mere breach of contractual duties, "'without any separate or independent event giving rise to the tort.'"  Smith, 2009 WL 789900, at *20 (quoting Air Prods. and Chems., Inc. v. Eaton Metal Prods. Co., 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003)).

"When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort."  Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999).  To make this determination, the court must ascertain the source of the duties allegedly breached.  Sunburst Paper, LLC v. Keating Fibre Int'l., No. Civ.A.06-3957, 2006 WL 3097771, at *2 (E.D. Pa. Oct. 30, 2006).  The doctrine bars tort claims:  "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract."  Id. (citing eToll, 811 A.2d at 19).  "In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort."  Id.  Whether the gist of the action doctrine applies in any particular setting is a question of law.  Alexander Mill Servs., LLC v. Bearing Distrib., Inc., No. Civ.A.06-1116, 2007 WL 2907174, at *8 (W.D. Pa. Sept. 28, 2007).

---

*6 n.11 (E.D. Pa. Jan. 21, 2009) (citing cases).

In the present case, Plaintiff asserts a breach of contract claim against Defendant Powell as follows:

> 192.   Powell . . . [was] . . . contractually prohibited from competing with Synthes during [his] employment and for a period of one year after terminating [his] employment with Synthes, and, separate from [his] non-competition obligations, [was] . . . contractually prohibited from soliciting employees or customers during the term of [his] employment and for a period of one year after terminating [his] employment with Synthes.
>
> . . .
>
> 201.   Powell breached [his] contractual non-disclosure obligations with respect to Synthes' confidential information by failing to return all confidential information and property to Synthes at the termination of [his] employment with Synthes, including the documents produced by Marotta, Stassen, Powell, and Emerge during discovery in this litigation.
>
> 202.   Upon information and belief, . . . Powell ha[s] further breached [his] contractual duties to Synthes by, directly or indirectly, providing Synthes' sensitive, confidential, proprietary, or trade secret information to Emerge (including its current and former officers, directors, employees, and consultants), Stassen, and third parties, in violation of the confidentiality obligations in their Non-Competition and Non-Disclosure Agreements.
>
> 203.   Upon information and belief, Powell breached his contractual non-competition and non-solicitation obligations to Synthes during the one-year period of time following the termination of his employment with Synthes, including during his employment with Sonoma Orthopedics, during which time he competed with Synthes and solicited customers from his former sales territories, and during his employment with Emerge, during which time he competed with Synthes and solicited customers from his former sales territories (whether for investment opportunities in Emerge, sales of Emerge products, or regarding Emerge's business model).

(Am. Compl. ¶¶ 192, 201–03.)  Defendant Powell now contends that, in light of these claims for breach of contract, Plaintiff's related claims against him for tortious interference with contract, conversion, unfair competition, and civil conspiracy are barred by the gist of the action doctrine.[5]

_____

[5] Plaintiff argues that dismissal under the gist of the action doctrine is premature because the validity and scope of the contracts are in dispute.  He reasons that, throughout the litigation, Emerge—Powell's co-Defendant who is represented by the same counsel—has contended that

The Court considers each claim individually.

### 1.    Tortious Interference with Contract

Pennsylvania courts, following the Restatement (Second) of Torts, define the tort of

---

the scope of the agreements at issue is limited and confers upon Synthes only certain narrow rights. (Pl.'s Resp. Opp'n Powell Mot. Dismiss 6.)  Defendant Marotta has made similar assertions. (Id. at 6, n.7.)  Because several Defendants have disputed the scope and enforceability of the contracts at issue in the litigation, Plaintiff contends that the Court should not dismiss any tort claim using the gist of the action doctrine. (Id. (citing Premier Payments Online, Inc. v. Payment Systems Worldwide, 848 F. Supp. 2d 513 (E.D. Pa. 2012)).

This argument is mistaken on several grounds.  First, Plaintiff does not contend that Powell himself has challenged the scope and enforceability of the contracts.  Rather, this argument has been raised only by Powell's co-Defendants.  Moreover, and more importantly, the case cited by Plaintiff is inapposite.  In Premier Payments, a question arose not as to the scope and enforceability of a valid contract, but whether a valid contract existed in the first place.  Id. at 529.  Similarly, the cases referenced in Premier Payments also involved questions as to the actual existence of a contract.  See Hart v. Univ. of Scranton, 838 F. Supp. 2d 324, 329 (M.D. Pa. Dec. 16, 2011) (declining to apply gist of the action doctrine where the "very existence of the contract" was "unsettled"); M.H. Rydek Elec., LLC v. Zober Indus., Inc., No. Civ.A.07-3885, 2007 WL 3407130, at *2 (E.D. Pa. Nov. 15, 2007) (noting that "many courts [ ] have been reluctant to apply the gist of the action doctrine to dismiss tort claims where the existence of a contract is still in question") (collecting cases).  In the present case, however, no party questions the existence of the pertinent contracts, only the scope and the extent of enforceability of such contracts.  Indeed, this Court has previously dismissed tort claims under the gist of the action doctrine even where the scope and validity of the contractual provisions at issue were in question.  See Brown & Brown v. Cola, 745 F. Supp. 2d 588, 619–25 (E.D. Pa. 2010) (dismissing misappropriation, conversion, and breach of fiduciary duty claims under gist of the action doctrine even where scope and validity of non-competition provision in an employment agreement was in dispute).

In a related argument, Plaintiff also contends that this Court should not dismiss the tort claims under the gist of the action doctrine because Federal Rule of Civil Procedure 8(d) allows a plaintiff to plead alternative theories of liability.  This contention, however, is simply a linguistic re-working of its previous argument.  Had Synthes pled facts in its Amended Complaint suggesting a dispute as to whether the contracts at issue existed, such alternative pleading would have been plausible.  Absent such allegations, however, the gist of the action doctrine may be applied at the motion to dismiss stage.  See Bengal Converting Servs., Inc. v. Dual Printing, Inc., No. Civ.A.11-6375, 2012 WL 831965, at *4 (E.D. Pa. Mar. 13, 2012) (holding that "[w]hile litigants are indeed permitted to plead causes of action in the alternative they still must plead facts that support the alternative pleading"; thus, where plaintiff did not plead facts suggesting a dispute over the existence of the contract, the gist of the action doctrine could apply to bar claims).

intentional interference with existing contractual relations as:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss to the other from the third person's failure to perform the contract.

Binns v. Flaster Greenberg, P.C., 480 F. Supp. 2d 773, 778 (E.D. Pa. 2007) (quoting Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978)).  In order to prevail on a claim for interference with contractual relations, the plaintiff must plead and prove four elements: (1) the existence of a contractual relation; (2) the defendant's purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of any privilege or justification on the part of the defendant; and (4) damages resulting from the defendant's conduct.  Gundlach v. Reinstein, 924 F. Supp. 684, 693 (E.D. Pa. 1996).  "A tortious interference with contract claim is barred by the gist of the action doctrine if it is not independent of a contract claim that is pled along with it." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 505 (E.D. Pa. 2008).  In other words, a tortious interference with contract claim that coincides directly and solely with a contractual prohibition on the identical activity will fall within the gist of the action doctrine.  See Brown & Brown v. Cola, 745 F. Supp. 2d 588, 621–22 (E.D. Pa. 2010) (holding that tortious interference claims against former employees of the plaintiff regarding alleged unlawful solicitation of both customers and employees were clearly subsumed by the breach of contract claims since the defendants' employment contracts contained provisions prohibiting these actions).

In the present case, several contractual provisions in Powell's Non-Competition Agreement are pertinent.  First, the confidentiality provision of the Non-Competition Agreement states:

> At all times during and after my employment with Synthes, I will not disclose or communicate any of [Synthes's confidential and proprietary information] to any

14

competitor or other third party, or use or refer to any of this information for any purpose, or remove materials containing any of this information from Synthes' premises, except as necessary for me to properly perform services for Synthes during my employment. . . . I also understand that these provisions apply to all information I may receive that is confidential or proprietary to any customer or other company who does business with Synthes.

(Am. Compl., Ex. K., at 2.)  In addition, the non-solicitation of customers and prospects provision

states:

I will not, for a period of one year after my employment with Synthes terminates for any reason, solicit or contact, directly or through others, for the purpose of competing or interfering with any part of Synthes' business, (1) any customer of Synthes that I solicited at any time during the last three years of my employment; (2) any prospective customer of Synthes that received or requested a proposal or offer from me on behalf of Synthes at any time during the last three years of my employment; or (3) any customer or prospective customer of Synthes for which I had any responsibility, directly or indirectly, at any time during the last three years of my employment.

(Id. at 3.)  The non-solicitation or hiring of employees provision indicates:

I will not, for a period of one year after my employment with Synthes terminates, directly or indirectly solicit any employee of Synthes to leave their employment with Synthes, offer any employee of Synthes employment elsewhere or hire any employee of Synthes to work elsewhere.

(Id.)  Finally, the non-competition provision provides, in pertinent part:

I agree I will not, for a period of one year after my employment with Synthes terminates for any reason, work for (as an employee, consultant, contractor, agent or representative) any competitor of Synthes in the territory or territories that I am now, or have been responsible for at any time during the last year of my employment with Synthes. Competitors shall be deemed any persons or entities who now, or in the future, sell, or intend to sell, orthopedic, bone fixation, maxillofacial medical, endoscope and/or spinal implant device or instrumentation technologies, products, or services.

(Id.)

Separate and apart from the claims in Count II of the Amended Complaint that Powell

breached some of these contractual provisions, Count III asserts a separate cause of action against

Powell for tortious interference with contractual relations.  Specifically, this Count alleges, in

pertinent part:

219.   At the time that Powell began working for Emerge, and before, Synthes had existing contractual relationships with Powell, and Marotta, Stassen, and Emerge knew or should have known about those contractual relationships.

220.   The Defendants have tortiously interfered with Synthes' contractual relationships with Marotta, Brown, and Powell by causing Marotta, Brown, and Powell to breach their contractual obligations to Synthes.

221.   The Defendants have tortiously interfered with Synthes' contractual relationships with other current and former Synthes employees, contractual relationships that Defendants knew or should have know[n] about, including employees the Defendants solicited regarding, without limitation:

•   Investment in Emerge;
•   Employment opportunities with Emerge, Sonoma Orthopedics, or other companies affiliated with Split Rock Partners, LLC;
•   The unlawful acquisition of confidential information and trade secret information;
•   Access to Synthes' customers;
•   The unlawful acquisition of Synthes product; and
•   The concealment of those employees' activities on behalf of Emerge or of their knowledge of the Defendants' activities.

222.   The Defendants' [sic] knew or should have known about Synthes' contractual relationships with certain vendors, and the Defendants have tortiously interfered with Synthes' contractual relationships with those vendors.

223.   The Defendants' [sic] knew or should have known about Synthes' contractual relationships with its customers, including, without limitation, contractual relationships relating to sales, consignment, and inventory management systems, and the Defendants have tortiously interfered with Synthes relationships with its customers.

(Am. Compl. ¶¶ 219– 23.)  Defendant Powell now contends that because Plaintiff's tortious

interference claim is based upon the allegation that Powell, along with Marotta, Brown, and Stassen,

solicited Synthes's employees, customers, and vendors in order to compete with Synthes, this claim

is nothing more than an effort to re-cast Plaintiff's breach of contract claims into separate tort

claims.

In response, Plaintiff argues that Synthes's tortious interference with contract claim against Powell addresses conduct *outside* the scope of Powell's contractual obligations to Synthes.  More precisely, according to Plaintiff, this claim alleges that Powell tortiously interfered with three separate sets of contracts: (1) Synthes's contractual relationships with current and former Synthes employees; (2) Synthes's contractual relationships with its vendors; and (3) Synthes's contractual relationships with its customers outside his former sales territory.  (Pl.'s Resp. Opp'n Powell Mot. Dismiss 8 (citing Am. Compl. ¶¶ 220–26, 152–53, 156–59, 223, 283–84).)  As such, Plaintiff avers that the tortious interference claim goes beyond the contractual prohibitions to challenge conduct that is unlawful only in tort.

In light of these varied allegations of tortious interference, the Court must conduct a more individualized analysis of each specific claim.  First, as to Powell's alleged tortious interference with Synthes's contractual relationships with current and former employees, the Amended Complaint asserts that Powell solicited such employees to invest in Emerge; accept employment elsewhere; provide confidential and trade secret information; provide access to Synthes's customers; provide access to Synthes product; and conceal his activities on behalf of Emerge.  (Id. ¶ 221.)  The non-solicitation of employees provision in the Non-Competition Agreement, however, explicitly provides that Powell could not, within one year after my employment with Synthes, "directly or indirectly solicit any employee of Synthes *to leave their employment with Synthes, offer any employee of Synthes employment elsewhere or hire any employee of Synthes to work elsewhere.*" (Am. Compl., Ex. K at 3 (emphasis added).)  As such, to the extent the tortious interference with employees claim alleges Powell's improper solicitation of Synthes employees to leave Synthes and accept employment elsewhere, the alleged conduct falls squarely within the scope of this provision

17

and must be dismissed under the gist of the action doctrine.  To the extent the tortious interference with employees claim alleges activity beyond that—such as solicitation of employees for information, investment capital, or access to trade secrets—the cause of action falls outside the bounds of the Agreement and is not barred by the gist of the action doctrine.

Second, as to Powell's alleged interference with Synthes's contracts with its vendors, the Court does not deem this claim to be subsumed by the breach of contract claim.  (Id. ¶ 222.) Notably, nothing within Powell's Non-Competition Agreement expressly precludes him from dealing with Synthes's vendors.  Moreover, while Defendant Powell suggests that this claim might be subsumed by the Agreement's prohibition on use of confidential information, it is notable that vendor information is not included in the Agreement's definition of "proprietary and confidential information."[6]  Accordingly, this portion of Plaintiff's tortious interference claim is not barred by the gist of the action doctrine.

Third and finally, as to Powell's alleged interference with Synthes's contractual relationships with its customers, the analysis is slightly more complicated.  The Amended Complaint alleges that Powell "knew or should have known about Synthes' contractual relationships with its customers,

---

[6]  According to the Agreement, proprietary and confidential information includes:

(1) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (3) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies; (4) physical security systems, access control systems, network and other equipment designs; (5) employment and payroll records; (6) forecasts, budgets and other non-public financial information; (7) product performance information, product technical information and product know-how; and (8) expansion plans, management policies and other business strategies and polices.

(Am. Compl., Ex. K at 2.)

including, without limitation, contractual relationships relating to sales, consignment, and inventory management systems, and the Defendants have tortiously interfered with Synthes relationships with its customers." (Id. ¶ 223.) As set forth above, however, the non-solicitation of employees portion of the Non-Competition Agreement only precluded Powell from soliciting Synthes customers or prospective customers within three groups: (1) any customer of Synthes that Powell solicited at any time during the last three years of his employment; (2) any prospective customer of Synthes that received or requested a proposal or offer from Powell on behalf of Synthes at any time during the last three years of his employment; or (3) any customer or prospective customer of Synthes for which Powell had any responsibility, directly or indirectly, at any time during the last three years of his employment. (Id., Ex. K at 3.)

Plaintiff now argues that its claim only contends that "Powell tortiously interfered with Synthes' contractual relationships with its . . . customers outside the restricted territory and with whom Powell had no prior working relationship." (Pl.'s Mem. Opp'n Powell Mot. Dismiss 10.) Defendant Powell, on the other hand, asserts that "as support for the proposition that Powell interfered with Synthes's customers outside of his former sales territory, Plaintiffs rely on allegations that its customers were directed to 'reorder Synthes' surgical drill bits' from Emerge and this process was facilitated in part by Emerge's use of Synthes' part numbers." (Def. Powell's Reply Br. 7.) Because the confidentiality provision in Powell's Non-Competition Agreement precluded him from disclosing or communicating any proprietary and confidential information to "any competitor or other third party," (Am. Compl., Ex. K, at 2), Powell's use of such information to solicit Synthes customers is "inextricably interwoven with the contractual duties at issue." (Def. Powell's Reply Br. 7.)

19

At this juncture of the litigation, the Court lacks sufficient information to decide whether the gist of the action doctrine applies.  Certainly, to the extent Plaintiff alleges that (a) Powell interfered with Synthes's contractual relationships with customers/prospective customers that Powell either solicited, serviced, or otherwise had contact with during his last three years of employment or (b) Powell improperly used Synthes confidential and proprietary information to interfere with Synthes's customers' contracts, that claim may be subsumed by the Non-Competition Agreement.  To the extent, however, that Plaintiff challenges Powell's solicitation of customers outside the categories defined in the Non-Competition Agreement, such a claim would be beyond the Non-Competition Agreement and, thus, would not be barred by the gist of the action doctrine.[7]  "'Caution must be exercised in dismissing a tort action on a motion to dismiss because whether tort and contract claims are separate and distinct can be a factually intensive inquiry.'"  Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc., No. Civ.A.11-4568, 2011 WL 6046923, at *8 (E.D. Pa. Dec. 6, 2011) (quoting Haymond v. Lundy, Nos. Civ.A.99-5015, 99-5048, 2000 WL 804432, at *8 (E.D. Pa. June 22, 2000)).  Indeed, "the application of the gist of the action doctrine depends on the facts of each particular case."  Sensus USA, Inc. v. Elliott Bay Eng'g, Inc., No. Civ.A.10-1363, 2011 WL 2650028, at *7 (W.D. Pa. July 6, 2011).  Where, as here, the factual nature of the allegations is unclear, "this issue is best left for resolution on a post-amendment motion to dismiss or, even more appropriately, on a post-discovery motion for summary judgment."  Id.  Heeding these cautionary words, the Court declines to rule on this portion of Defendant Powell's Motion.

---

[7] Defendant Powell cites to Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co., No. Civ.A.09-236, 2009 WL 4572911, at *8 (W.D. Pa. Dec. 4, 2009) in support of the proposition that the tortious interference with customer relationships claim is subsumed by the confidentiality portion of the Non-Competition Agreement.  Absent discovery in this case, the Court cannot determine whether Partners Coffee is relevant.

In sum, the Court reaches a tripartite ruling on Plaintiff's tortious interference claim.  First, to the extent that the claim alleges that Powell interfered with Synthes's contractual relationships with current and former Synthes employees by soliciting them to leave Synthes's employment or accept employment elsewhere, Defendant Powell's Motion to Dismiss is granted under the gist of the action doctrine.  Second, Defendant Powell's Motion is denied to the extent it seeks dismissal under the gist of the action doctrine of the portions of the tortious interference claim alleging both (a) solicitation of Synthes's employees for information, investment, concealment, and access to trade secrets; and (b) interference with Synthes's contractual relationships with its vendors.  Finally, the Court finds the Motion premature with respect to whether the gist of the action doctrine bars Synthes's claim that Powell tortiously interfered with Synthes's relationships with its customers.

### 2.      Conversion

Conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification."  Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp., Ltd., 974 F. Supp. 822, 844–45 (E.D. Pa. 1997) (citation omitted).  Although "[t]he mere existence of a contract between the parties does not automatically foreclose the parties from raising a tort action[,] . . . a party cannot prevail on its action of conversion when the pleadings reveal merely a damage claim for breach of contract."  Neyer, Tiseo & Hindo, Ltd. v. Russell, No. Civ.A.92-2983, 1993 WL 53579, at *4 (E.D. Pa. Mar. 2, 1993) (internal citations omitted).  Courts have dismissed conversion claims under the gist of the action doctrine where the alleged entitlement to the chattel arises solely from the contract between the parties.  Rahemtulla v. Hassam, 539 F. Supp. 2d 755, 777 (M.D. Pa. 2008) (citing Murphy v. Mid East Oil Co., No. Civ.A.06-1343, 2007 WL 527715, at *5–6 (W.D. Pa. Feb.14, 2007) (dismissing

conversion claim because it was dependent on the defendant's noncompliance with the terms of the agreements); Montgomery v. Fed. Ins. Co., 836 F. Supp. 292, 301-02 (E.D. Pa. 1993) (dismissing conversion claim because of, *inter alia,* the "firmly accepted . . . doctrine that an action for conversion will not lie where damages asserted are essentially damages for breach of contract"); Pittsburgh Constr. Co. v. Griffith, 834 A.2d 572, 584 (Pa. Super. Ct. 2003) (stating that where success of the conversion claim "depend[s] entirely on the obligations as defined by the contract," the "gist of the action" doctrine applies)).

Notably, however, "[w]hen a plaintiff has a property interest in the thing that is the subject of a [conversion] claim, the gist of the action doctrine does not bar recovery under a conversion theory even though the property may also be the subject of a contract." Orthovita, Inc. v. Erbe, No. Civ.A.07-2395, 2008 WL 423446, at *6 (E.D. Pa. Feb. 14, 2008) (citing Berger & Montague, P.C. v. Scott & Scott, LLC, 153 F. Supp. 2d 750, 753–54 (E.D. Pa. 2001). In Partners Coffee Company, LLC v. Oceana Services. & Products. Co., No. Civ.A.09-236, 2009 WL 4572911, at *6–7 (W.D. Pa. Dec. 4, 2009), the court clarified the distinction between claims of conversion that are barred by the gist of the action doctrine and those that are not. Following an asset purchase agreement between two competing companies, the plaintiff came to believe that the defendant had intercepted and diverted payments due to plaintiff, contacted customers to compete for services, and surreptitiously installed a computer device which allowed him to log into plaintiff's computer system and obtain confidential business information and trade secrets. Id. at *6. The court found that the first two parts of that conversion claim (diverting payments and contacting customers) were intertwined with the terms of the Asset Purchase Agreement since the contract defined which company owned these items. Id. It declined, however, to find that the third part of the conversion claim, i.e., that

22

defendants improperly accessed the plaintiff's computer system in order to gain confidential business information, "to be intertwined with any contract provision since it is understood in our society that businesses will not interfere with each other's confidential information whether bound to each other by contract or not." Id. at *7.

In the case at bar, Defendant Powell asserts that Plaintiff's conversion claim fails because Synthes has no express property interest in its customers and business beyond those articulated in the Confidentiality and Non-Disclosure Agreements. Moreover, Powell claims that its entitlement to confidential and proprietary information is subsumed by the Non-Disclosure Agreement, which states in pertinent part:

> I agree . . .
>
> (a) to disclose and assign to SYNTHES as its exclusive property, all inventions and technical or business innovations including computer software developed or conceived by me solely or jointly with others on company time or my own time during the period of my employment, (1) that are along the lines of the businesses, work or investigations of SYNTHES or its affiliates, or (2) that result from or are suggested by any work which I may do for SYNTHES or (3) that are otherwise made through the use of SYNTHES time, facilities or materials.
> . . .
> (d) upon any termination of my employment to deliver to SYNTHES promptly all items which belong to SYNTHES or which by their nature are for the use of SYNTHES employees only, including without limitation, all written and other materials which are of a secret or confidential[] nature relating to the business of the company or its affiliates.

(Am. Compl., Ex. J (footnote omitted).) As such, Powell now contends that the conduct allegedly constituting conversion clearly falls within this express language.

This argument reads the conversion claim against Powell too broadly. Plaintiff's Amended Complaint states as follows:

> 262.    The Defendants have intentionally, willfully, and unlawfully taken, acquired, appropriated, kept, and used and have unlawfully exercised domain and control

over, ***Synthes' confidential proprietary business information***, depriving Synthes of its right of property in, or use or possession of, such confidential and proprietary business information.

263.   The Defendants have also intentionally, willfully, and unlawfully taken, acquired, appropriated, kept, used (and, in some instances, altered or destroyed), and have unlawfully exercised domain and control over, ***Synthes product***, including, but not limited to, drill bits, cannulated and other screws, guide wires, external fixation components, implant and instrumentation sets and caddies, and other implants and instrumentation, depriving Synthes of its right of property in, or use, possession, or sale of, such product.

(Am. Compl. ¶¶ 262–63 (emphasis added).)  Thus, the conversion claim does not allege any taking of customers or business—only confidential and proprietary information.[8]  Moreover, as set forth above, societal norms, not the parties' contracts, govern the ownership of such information and recognize that it belongs exclusively to Plaintiff.  When, as here, a plaintiff has a property interest in the thing subject to the conversion claim, the gist of the action doctrine does not bar a tort theory of recovery, despite the fact that the property is also the subject of a separate contract.  In other words, Defendant Powell's duty not to take Plaintiff's confidential and proprietary information stemmed not from any contractual obligation, but rather from social policy existing outside the terms of the contract.  Accordingly, the Court shall not dismiss this claim on a gist of the action theory.

### 3.      Unfair Competition

"A claim of unfair competition under Pennsylvania law requires proof that the defendant has 'passed off' the goods of one manufacturer or vendor as those of another, thus creating confusion

---

[8]  By way of its Response Brief, Plaintiff clarifies that its conversion claim against Powell is based *solely* on Powell's unlawful exercise of domain and control over Synthes's confidential proprietary business information and its product.  (Pl.'s Resp. Opp'n Powell Mot. Dismiss 12.) Any additional allegations in that count referencing a failure to assign Emerge to Synthes—including all business models, plans, strategies, names, logos, and slogans, and/or other instrumentation and implants—are asserted only against Defendants Marotta and Brown. (Id. at 12, n.10.)

between his own goods, and those of the rival." <u>Scanvec Amiable, Ltd. v. Chang</u>, 80 F. App'x 171, 180 (3d Cir. 2003) (citations omitted).  The doctrine of unfair competition, however, is not restricted to passing off goods.  <u>Granite State Ins. Co. v. Aamco Transmissions, Inc.</u>, 57 F.3d 316, 319 (3d Cir. 1995).  "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information."  <u>Synthes (U.S.A.) v. Globus Med., Inc.</u>, No. Civ.A.04-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005) (citations omitted).

In the present case, the unfair competition claim against Powell—which is also asserted against Defendants Marotta, Stassen, and Emerge—alleges that the Defendants have engaged in unfair competition by, in part, committing the following acts: engaging in a conspiracy to take or destroy integral parts of Synthes's business and compete unfairly; violating contractual, common law, and statutory obligations owed to Synthes; misappropriating confidential, proprietary, and trade secret information; tortiously interfering with Synthes's contractual relationships; wrongfully soliciting Synthes's employees and customers; illicitly acquiring Synthes's product to design, develop, and test products for Emerge; and engaging in a pattern of activity that evidences that they have enjoyed unlawful advantages in the competitive trauma market.  (Am. Compl. ¶ 288.) Defendant Powell now contends that each of these categories of alleged conduct are specifically addressed in the Non-Competition and Non-Solicitation Agreements and, thus, are barred by the gist of the action doctrine.

As set forth above, however, the Court has found that Plaintiff's tortious interference claims

and conversion claims against Defendant Powell survive a gist of the action challenge.  Such claims,

therefore, can serve as a legal basis for the unfair competition claim.  See Synthes, 2005 WL

2233441, at *8.  To the extent the Amended Complaint recites a list of other conduct underlying the

allegation of unfair competition, the Court need not dissect each individual contention.  Rather, all

that is required for Plaintiff to maintain this claim is "evidence of, among other things, trademark,

trade name, and patent rights infringement, misrepresentation, tortious interference with contract,

improper inducement of another's employees, and unlawful use of confidential information."  Id.

Because such conduct has been properly alleged, the unfair competition claim shall not be

dismissed.[9]

### 4.    Civil Conspiracy

To make out a claim for common law civil conspiracy under Pennsylvania law, a plaintiff

must allege: "(1) a combination of two or more persons acting with a common purpose to do an

unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act

done in pursuance of the common purpose; and (3) actual legal damage."  Chantilly Farms, Inc. v.

W. Pikeland Twp., No. Civ.A.00-3903, 2001 WL 290645, at *12 (E.D. Pa. Mar. 23, 2001) (quoting

Smith v. Wagner, 588 A.2d 1308, 1311–12 (Pa. Super. 1991)).  A plaintiff must also show that "the

sole purpose of the conspiracy is to cause harm to the party who has been injured."  Becker v.

---

[9]  Defendant Powell engages in an extensive discussion of the allegation within the unfair competition claim that he violated his duty not to compete.  Specifically, he cites Chemtech International, Inc. v. Chemical Injection Technologies, Inc., 170 F. App'x 805 (3d Cir. 2006) for the proposition that because only a contract can confer a duty not to compete, an unfair competition allegation based on improper competition is barred by the gist of the action doctrine.  A plain reading of the present unfair competition claim, however, reveals that it does not rely on any alleged violation of the non-compete clause.  As noted above, the tortious interference, passing off, and conversion allegations alone are sufficient to sustain an unfair competition claim.

Chicago Title Ins. Co., No. Civ.A.03-2292, 2004 WL 228672, at *13 (E.D. Pa. Feb. 4, 2000) (citing

Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)).

Unlike a claim for unfair competition, a cause of action for civil conspiracy requires a

distinct underlying tort as a predicate to liability.  In re Orthopedic Bone Screw Prods. Liab. Litig.,

193 F.3d 781, 789 (3d Cir. 1999); Kist v. Fatula, No. Civ.A.06-67, 2007 WL 2404721, at *9 (W.D.

Pa. Aug. 17, 2007).  "Since liability for civil conspiracy depends on performance of some underlying

tortious act, the conspiracy is not independently actionable; rather, it is a means of establishing

vicarious liability for the underlying tort."  Boyanowski v. Capital Area Intermediate Unit, 215 F.3d

396, 407 (3d Cir. 2000) (quotation omitted).  Thus, "if the underlying tort is found not to exist, the

related claim for civil conspiracy to commit that tort necessarily fails."  Kist, 2007 WL 2404721, at

*9.

Defendant Powell assumes that each of the torts upon which Plaintiffs' civil conspiracy

claim could be based fails under the gist of the action doctrine, thus requiring the civil conspiracy

claim to likewise fail.  As explained in detail above, however, Plaintiff's tortious interference and

conversion claims survive a gist of the action challenge.  As such, a civil conspiracy claim based on

these underlying torts survives as well.

### B.    Claims Under the Computer Fraud and Abuse Act

Defendant Powell's second broad challenge to the Amended Complaint focuses on Plaintiff's

claim of a violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  To bring a

claim pursuant to § 1030(a)(4) of the CFAA, a plaintiff must allege: (1) that the defendant has

accessed a "protected computer"; (2) has done so without authorization or by exceeding such

authorization as was granted; (3) has done so "knowingly" and with "intent to defraud"; and (4) as a

27

result has "further[ed] the intended fraud and obtain[ed] anything of value."  18 U.S.C. § 1030(a)(4).

In the present matter, Plaintiff alleges that the computer systems used by Synthes employees were "protected computers" under the CFAA.  (Am. Compl. ¶ 252–53.)[10]  Beginning in the summer of 2010, after Powell and the other Defendants terminated their employment with Synthes, they "improperly and unlawfully acquired, used, and disclosed Synthes' confidential, sensitive, proprietary, and trade secret information, including . . . information they acquired by directing, inducing and encouraging others to access Synthes' computer systems."  (Am. Compl. ¶ 152.) Plaintiff goes on to allege that Defendants were not authorized to access or use Synthes computers for the purpose of misappropriating information, nor were they authorized to access the computer systems indirectly by inducing other Synthes employees to do so.  (Id. ¶ 254.)  By engaging in such wrongful actions, then, Plaintiff claims that Defendants "knowingly and wrongfully obtained information from the protected computers with the intent to defraud Synthes and to further their illicit conspiracy; used such protected computers for fraudulent purposes; misappropriated valuable information belonging to Synthes from the protected computers; and damaged the information stored on the protected computers."  (Id. ¶ 255.)  Ultimately, Plaintiff claims damage to the protected computers and the information stored therein.  (Id. ¶ 256.)

Defendant Powell now contends that a claim against him under the CFAA cannot survive on several grounds.  First, he avers that Plaintiff cannot establish that he either accessed a protected computer without authorization or exceeded authorized access during his employment.  Second, he

_____

[10]  Specifically, Plaintiff asserts that authorization to those computers was limited by electronic barriers and passwords as well as Synthes's written employment, ethics, and computer usage and IT security policies and agreement, and that access to those computers was strictly limited to use for Synthes's business.  (Am. Compl. ¶¶ 252–53.)

argues that Plaintiff cannot establish that the conduct upon which it predicates the CFAA claim involved "an interstate or foreign communication."  Finally, Powell asserts that Plaintiff has not alleged facts to support a finding that it suffered a "loss" for purposes of invoking the CFAA's civil remedy.  For clarity of discussion, the Court takes each argument individually.

1.      **Whether Plaintiff Has Established that Powell Either Accessed a Protected Computer Without Authorization or Exceeded Authorized Access**

Under the CFAA, a plaintiff must show, among other things, that the defendant accessed the computer either "without authorization" or that he "exceeded authorized access."  An employee accesses a computer "without authorization" when he "'has no rights, limited or otherwise, to access the computer in question.'"  Grant Mfg. & Alloying, Inc. v. McIlvain, No. Civ.A.10-1029, 2011 WL 4467767, at *7 (E.D. Pa. Sept. 23, 2011) (quoting LVRC Holdings, LLC v. Brekka, 581 F.3d 1127, 1133 (9th Cir. 2009)); see also Integrated Waste Solutions, Inc. v. Goverdhanam, No. 10-2155, 2010 WL 4910176, at *8 & n.3 (E.D. Pa. Nov. 30, 2010).  Notably, the CFAA prohibits unauthorized *access* to information rather than unauthorized *use* of such information.  18 U.S.C. § 1030(a)(4). Although the Third Circuit has yet to address the meaning of "without authorized access," courts in this district have held, in the employer-employee context, that "an employee who may access a computer by the terms of his employment is 'authorized' to use that computer for purposes of [the] CFAA even if his purpose in doing so is to misuse or misappropriate the employer's information." Bro-Tech Corp. v Thermax, Inc., 651 F. Supp. 2d 378, 407 (E.D. Pa. 2009); see also LVRC Holdings, 581 F.3d at 1133 (holding that "without authorization" means "without permission").[11]

_____

[11]  The First and Seventh Circuits, along with a number of district courts, have concluded that, under agency law principles, an employee can "exceed authorized access" within the meaning of the CFAA by using confidential information the employee is authorized to access "in

As noted, however, sections 1030(a)(2)© and (a)(4) are not limited to situations in which a defendant accesses a computer without authorization, but also permit liability where the defendant "exceeds authorized access."  The CFAA defines "exceeds authorized access" as accessing a computer "without authorization" and using "such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  Id. § 1030(e)(6).  More succinctly stating the distinction between "unauthorized access" and "exceeds authorized access," the Ninth Circuit has explained that "a person who 'intentionally accesses a computer without authorization,' . . . accesses a computer without any permission at all, while a person who 'exceeds authorized access,' . . . has permission to access the computer, but accesses information on the computer that the person is not entitled to access."  LVRC Holdings, 581 F.3d at 1133  "Whether an employee has exceeded authorized access depends on the computer access restrictions imposed by his employer."  Grant Mfg., 2011 WL 4467767, at *7.  "Where an employer places limitations on the computer information an employee is entitled to obtain or alter or the manner in which the employee is entitled to obtain or alter such information, and notifies employees of such limitations, an employee who runs afoul of the limitations exceeds his authorized access under the CFAA."  Id.  Importantly, the inquiry focuses not on the employee's motivation in accessing the computer or information, but rather on whether the access to that information was authorized.  See Brett Senior & Assoc., P.C. v. Fitzgerald, No. Civ.A.06-1412, 2007 WL 2043377, at *4 (E.D. Pa. July 13, 2007) (rejecting

---

a manner inconsistent with the duty of loyalty to the employer."  Bro-Tech Corp., 651 F. Supp. 2d at 406 (citing Int'l Airport Ctrs., LLC v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006); Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1125 (W.D. Wash. 2000)).  Using this logic, some courts have found that the agency relationship (and therefore the rights of access) terminate when the employee "acquires adverse interests . . . to the principal."  Int'l Airport Ctrs, 440 F.3d at 421.  We decline to apply this view based on the weight of contrary authority from within the Court's own Circuit.

employer's position that the employee's access of the computer was unauthorized or exceeded authorized access because he eventually used the information in an improper manner, and concluding instead that the lawfulness of the employee's entry into the computer system defeated the progress of the CFAA claim against him); Consulting Prof'l Res., Inc. v. Concise Techs. LLC, No. Civ.A.09-1201, 2010 WL 1337723, at *6 (W.D. Pa. Mar. 9, 2010) ("While disloyal employee conduct might have a remedy in state law, the reach of the CFAA does not extend to instances where the employee was authorized to access the information he later utilized to the possible detriment of his former employer.")).

Defendant Powell contends that Plaintiff has failed, in two respects, to allege facts sufficient to satisfy this element.  First, he argues that Plaintiff neglects to establish that Defendant Powell ever "accessed" a computer or computer system since, after his employment ended, he never personally used Synthes's computer systems.[12]  Second, he asserts that the Amended Complaint relies on Powell's unauthorized use of *information* rather than *computers*.

Neither argument withstands judicial review.  First, the Court finds that the allegations of the

---

[12]   The Amended Complaint—read in conjunction with Plaintiff's current briefing—clearly reveals that the temporal scope of the CFAA claim against Defendant Powell is from the summer of 2010 forward.  Indeed, paragraph 152 states,  "*[b]eginning no later than the summer of 2010*, Marotta, Stassen, Powell, and Emerge improperly and unlawfully acquired, used, and disclosed Synthes' confidential, sensitive, proprietary, and trade secret information, including, upon information and belief, information they acquired by directing, inducing, and encouraging others to access Synthes' computer systems."  (Am. Compl. ¶ 152 (emphasis added).)  Plaintiff's Memorandum in Opposition to the Motion to Dismiss clarifies that "from the face of the Amended Complaint, Synthes' CFAA claim is not based on conduct during Powell's employment.  Rather, Synthes' CFAA claim focuses on Powell's and Marotta's unlawful accessing of Synthes' data after their employment, including by inducing then current Synthes employees to funnel to them Synthes' confidential information to which they would not otherwise have had access."  (Pl's Resp. Opp'n Mot. Dismiss 17.)  Accordingly, the Court finds that the CFAA allegations against Defendant Powell are restricted to his actions occurring from the summer of 2010 forward.

Amended Complaint clearly allege set forth "access" within the meaning of the CFAA.  As noted

above, the Amended Complaint states that Defendant Powell "improperly and unlawfully acquired,

used, and disclosed Synthes' confidential, sensitive, proprietary, and trade secret information,

including . . . information they acquired by directing, *inducing and encouraging others to access*

*Synthes' computer systems.*"  (Am. Compl. ¶ 152 (emphasis added).)  Accordingly, his "access" was

not personal, but rather it was carried out through others acting at his direction.  While the Third

Circuit has not addressed the meaning of the word "access" within the CFAA, our analysis is guided

by several other considerations.  Primarily, the plain language of the statute requires only

"access"—no modifying term suggesting the need for "personal access" is included.  Moreover,

other courts have used the common meaning of the word "access" and defined it as "gaining

admission to."  See WEC Carolina Energy Solutions LLC v. Miller, 687 F.3d 199, 204 (4th Cir.

2012) ("Thus, we note at the outset that 'access' means '[t]o obtain, acquire,' or '[t]o gain admission

to.'") (quoting Oxford English Dictionary (3d ed. 2011; online version 2012)); Sw. Airlines Co. v.

BoardFirst, L.L.C., No. Civ.A.06-891, 2007 WL 4823761, at *12 (N.D. Tex. Sept. 12, 2007)

(utilizing the "dictionary definition" of "access" as "mean[ing] 'to get at' or 'gain access to'")

(quoting Merriam-Webster's Collegiate Dictionary ("Websters") 6 (10th ed. 1998)); Am. Online, Inc.

v. Nat'l Health Care Disc., Inc., 121 F. Supp. 2d 1255, 1272 (N.D. Iowa 2000) ("As a noun,

'access,' in this context, means to exercise the freedom or ability to make use of something. . . . ")

(citing Websters 6).  Finally, the purpose of the Act sheds some light on the term's meaning.  "'At

its core, the Act is intended to protect the "confidentiality, integrity, and security of computer data

and networks" by prohibiting misuse of a computer and providing civil and criminal sanctions for

knowing or intentional violations.'"  Eagle v. Morgan, No. Civ.A.11-4303, 2011 WL 6739448, at *6

32

(E.D. Pa. Dec. 22, 2011) (quotations omitted).  Requiring personal access of a computer would, in some respects, hinder the intent of the act.

Consistent with our interpretation, many courts have found that one's act of inducing another to access a computer that he or she is otherwise not authorized to use constitutes "access" for purposes of CFAA liability.  See, e.g., Se. Mech. Servs., Inc. v. Brody, No. Civ.A.08-1151, 2008 WL 4613046, at *14 (M.D. Fl. Oct. 15, 2008) (noting that although the defendants may not have directly accessed the plaintiff's computers, evidence that the defendants implicitly induced and/or encouraged others—even those authorized to do so—to access the computers and supply information to the defendants was sufficient to allege access; "[w]here a new employer seeks a competitive edge through the wrongful use of information from the former employer's computer system, plaintiff will likely win on the merits of a CFAA claim."); Binary Semantics, Ltd. v. Minitab, Inc., No. Civ.A.07-1750, 2008 WL 763575, at *15 (M.D. Pa. Mar. 20, 2008) (finding that where employee of plaintiff company acted at the direction of defendant company when she accessed plaintiff company's protected computer to steal trade secrets and provide them to defendant company, the defendant company could be held liable for the CFAA violation); cf Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1124–25 (W.D. Wash. 2000) (holding that defendant violated CFAA because plaintiff's employee acted as agent for defendant and sent emails to defendant containing trade secrets and proprietary information belonging to plaintiff).  Reading the plain language of the statute in conjunction with the dictionary definition of "access," the purpose of the CFAA, the persuasive reasoning in the aforementioned cases, and the absence of any contrary authority, the Court finds that the allegations asserting that Powell induced

current Synthes employees[13] to access the Synthes computer system and provide him with

confidential and proprietary information sufficiently allege "access" for purposes of the CFAA.[14]

     Having found "access" by Powell, the Court must next address Powell's second

argument—whether the Amended Complaint properly alleges unauthorized *access and use of a*

*computer system* and not just unauthorized *use of information*.  On this point, several factually

distinguishable cases provide an insightful contrast.  First, in <u>Brett Senior & Assoc., P.C. v.</u>

<u>Fitzgerald</u>, an employer filed an action against a former employee alleging that he had violated a

confidentiality agreement when he accessed the employer's computer system to transfer confidential

files to a competing firm.  2007 WL 2043377, at *3.  The court rejected the employer's position that

the employee's improper use of information created CFAA liability in light of his lawful entry into

---

[13]  While Plaintiff challenges the fact that the third-party employees that allegedly
accessed the computers on behalf of Powell are not identified, the Court does not find that such
level of specificity is required at this early stage of litigation, prior to the completion of
discovery.

[14]  Defendant Powell cites <u>Integrated Waste</u>, 2010 WL 4910176 for the proposition that
the failure of the Amended Complaint to allege that Powell *personally* accessed Synthes's
protected computers when he was not authorized to so is fatal to the CFAA claim.  (Def.
Powell's Reply Br. 9.)  <u>Integrated Waste</u>, however, does not impose any such requirement of
personal access.  Rather, the decision held that where "the Amended Complaint allege[d] only
that Defendants induced Plaintiff by fraudulent means to provide them with *access to*
*confidential information*, which Defendants then misappropriated for their own purposes," the
plaintiff had failed to state a claim under the CFAA.  <u>Id.</u> at *8 (emphasis added).  The present
case alleges that Defendant Powell actually obtained unauthorized access to the computers by
inducing current Synthes employees to do so on his behalf.
     Nor does this Court's decision in <u>Eagle v. Morgan</u>, <u>supra</u>, support the notion that personal
access to a computer is required.  In <u>Eagle</u>, the plaintiff and counterclaim-defendant, Linda
Eagle, had never "accessed" a "protected computer," either personally or through inducement of
another.  2011 WL 6739448, at *8.  Rather, by misrepresenting that she still worked with her
former employer, she convinced AT&T representatives to access her former employer's AT&T
account and move her business telephone number under her name.  <u>Id.</u> at *8.  Thus, that case
involved access to an account as opposed to access to a "computer system."

the employer's computer system.  Id. at * 3.  Similarly, in B & B Microscopes v. Armogida, 532 F.

Supp. 2d 744 (W.D. Pa. 2007), the court rejected the employer's contention that the defendant's

conduct in accessing a company laptop violated the CFAA.  Id. at 758.  It further denounced the

persuasiveness of cases holding that an employee's authorized access to a computer is withdrawn if

that access is construed as a breach of duty of loyalty to the employer.  Id.  Finally, in Consulting

Professional Resources, Inc. v. Concise Technologies LLC, the plaintiff, while admitting that the

defendant had authorized access to the confidential information on the plaintiff's computer, argued

that the defendant's eventual use of the information accessed violated her employment contract.  Id.

at *6.  The court held that, "[w]hile disloyal employee conduct might have a remedy in state law, the

reach of the CFAA does not extend to instances where the employee was authorized to access the

information he later utilized to the possible detriment of his former employer."  Id.

        In the present case, had Synthes alleged that Powell lawfully accessed a computer during his

employment but then misused that information against Synthes's interests, Powell's argument would

have merit.  The Amended Complaint, however, alleges that Powell, through current Synthes

employees, "accessed" a computer system at a time when he was no longer employed by Synthes.

Having already left Synthes's employ, Powell was not authorized to access or use Synthes computers

for the purpose of misappropriating information, nor was he authorized to access the computer

systems indirectly by inducing other Synthes employees to do so.[15]  (Id. ¶ 254.); see generally SBM

---

        [15]  Defendant Powell argues that "had Plaintiffs actually intended for [the Amended
Complaint's allegations] to pertain to Defendants' post-employment authorization—as they now
contend—then Plaintiffs' interpretation of this allegation implies that Defendants were
authorized to access Synthes' computer systems after their employment ended for other
purposes."  (Def. Powell's Reply Br. 9.)  The Court disagrees.  The allegation that "Defendants
were not authorized to access or use Synthes' computer systems for the purpose of
misappropriating Synthes' confidential, proprietary, and trade secret information" (Am. Compl. ¶

Site Servs., LLC v. Garrett, No. Civ.A.10-385, 2012 WL 628619, at *5 (D. Colo. Feb. 27, 2012) (finding that defendant's access to the laptop became unauthorized when his employment ended and the defendant company requested return of his laptop).  Unlike in Brett Senior, B&B Microscopes, Inc., and Consulting Professional Resources, the present case does not involve a CFAA claim based on an employee's use of information acquired during authorized computer access to benefit a future employer.  Rather, it involves Powell's unauthorized access to Synthes's computer system to obtain information to benefit his future company.  Such allegations, viewed under the standard set forth by Federal Rule of Civil Procedure 12(b)(6), are sufficient to establish that Powell gained unauthorized access to Synthes computers, thereby stating a claim under the CFAA.[16]

### 2.  Whether the Conduct Upon Which the CFAA Claim is Predicated Involves "An Interstate or Foreign Communication"

Defendant Powell next argues that Plaintiff's CFAA claim must fail because Plaintiff cannot demonstrate that the conduct upon which they predicate their claim "involved an interstate or foreign communication."  As the CFAA claim is asserted under 18 U.S.C. § 1030(a)(2)(c), and because that

---

254) means precisely what it says.  It does not suggest that the converse must be true—*i.e.*, that Defendants were authorized to access the computer systems for other purposes.

[16]  By way of a Supplemental Sur-reply Brief ("Supp. Sur-reply"), Plaintiff argues that the recent Fourth Circuit decision in WEC Carolina Energy Solutions, LLC v. Miller, 687 F.3d 199 (4th Cir. 2012) strictly interpreted the CFAA and limited its terms' application "to situations where an individual accesses a computer or information on a computer without permission."  Id. at 203.  It declined to extend the CFAA to "the improper *use* of information validly accessed."  Id. at 204.

This case is inapposite.  In WEC Carolina, the defendant, *before resigning*, acted at his subsequent employer's direction to download proprietary information for the benefit of his subsequent employer.  Id. at 202.  Thus, the defendant had authorization to access the computer and the information, but subsequently used that information for an improper purpose.  In the present case, Defendant Powell allegedly accessed Synthes's computer system at a time when he did *not* have authorization to do so.  This critical distinction makes WEC Carolina uninstructive here.

statute requires such "interstate or foreign communication," Powell contends that the CFAA claim must be dismissed.

Powell's argument, however, relies on an outdated version of the statute. Prior to 2008, the statute provided that it was a crime to "intentionally access[ ] a computer without authorization or exceed [ ] authorization, and thereby obtain[ ] . . . (c) information from any protected computer if the conduct involved interstate or foreign communication[.]" 18 U.S.C. § 1030(a)(2)(c) (2002). In 2008, however, Congress amended the statute to strike the language "if the conduct involved interstate or foreign communication." 18 U.S.C. § 1030(a)(2)(c) (2008). Because the conduct at issue occurred in 2010, the later version of the statute—which contains no requirement of interstate or foreign commerce—applies to this case.[17]

In any event, the Amended Complaint expressly alleges that "[t]he computer systems used by the Synthes employees from whom the Defendants' obtained Synthes' confidential, proprietary, and trade secret information . . . are 'protected computers,' pursuant to 18 U.S.C. § 1030, in that they were computers that are and were used regularly and consistently by Synthes to conduct business and communicate both throughout the United States and internationally, and, thus, in and affecting interstate or foreign commerce or communication." (Am. Compl. ¶ 252.) Further, according to the Amended Complaint, Synthes's global headquarters is in Pennsylvania, while Defendant Powell is a resident of Colorado, who was acting on behalf of Emerge, based in Colorado. (Id. ¶¶ 11, 14, 18.) The reasonable inference from these allegations is that Powell's accessing of Synthes's computer

---

[17] Powell's reliance on <u>Patrick Peterson Custom Homes, Inc. v. Bach</u>, 586 F. Supp. 2d 1026, 1034 (N.D. Ill. 2008) is unpersuasive. That matter involved conduct occurring in 2006 and 2007, meaning that the pre-amendment version of the CFAA applied and an allegation of interstate or foreign commerce was required. <u>Id.</u> at 1030, 1032.

systems involved interstate communication.  Therefore, the Court rejects this argument.

### 3.  Whether Plaintiff Has Alleged Sufficient Facts to Support a Finding that It Suffered a "Loss" Relative to Invoking the CFAA's Civil Remedy

Defendant Powell's final challenge to Synthes's CFAA claim asserts that Plaintiff has failed to allege a compensable loss under the CFAA.  Again, the Court finds that, under the Twombly/Iqbal standards, this argument has no merit.

The CFAA provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator." 18 U.S.C. § 1030(g).  The statute defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  Courts have held that, to fall within this definition, the alleged "loss" must be related to the impairment or damage to a computer or computer system.  Fontana v. Corry, No. Civ.A.10-1685, 2011 WL 4473285, at *7 (W.D. Pa. Aug. 30, 2011); see also Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio, No. Civ.A.09–2751, 2010 WL 4224473, *6 (E.D. Pa. Oct. 22, 2010) ("Various courts have interpreted 'loss' to mean the remedial costs of investigating a computer for damage, remedying damage done, and costs incurred while the computer is inoperable.")).  Moreover, courts have found that lost revenue resulting from an interruption of service constitutes "loss" for purposes of the statute. Fontana, 2011 WL 4473285, at *7 (citing cases).  On the other hand, a claim for future lost revenue due to the dissemination of trade secrets does not qualify as a "loss" under the CFAA.  Id. at *8 (citing cases).  Likewise, a "loss of assets, overdraft fees, returned check fees, late fees, reputational damages arising from a damaged credit score, and termination of certain contracts due to insufficient

funds for payment" are insufficient to constitute loss.  <u>Clinton Plumbing</u>, 2010 WL 4224473, at *7.

The Amended Complaint, in this case, alleges as follows:

256.  The damage that the Defendants caused to the protected computers and the information stored therein resulted in, among other things, the impairment to the integrity, confidentiality, and availability of data, programs, systems, and information contained in the protected computers.

257.  Based upon such wrongful actions, Synthes has incurred losses exceeding $5,000.00 in a one year period; the costs of responding to the wrongful actions of the Defendants, conducting damage assessments, identifying and tracing the information the Defendants have misappropriated, and restoring data, programs, systems, and information to the conditions in which they existed prior to the Defendants' wrongful activity; lost revenue; and other consequential damages incurred by Synthes related thereto.

(Am. Compl. ¶¶ 256–57.)  Admittedly, the allegations are somewhat vague and fail to precisely identify what damage Synthes suffered to its computer system.  <u>See</u> <u>Sealord Holdings, Inc. v. Radler</u>, No. Civ.A.11-6125, 2012 WL 707075, at *6 (E.D. Pa. Mar. 6, 2012) ("We are of the opinion that while Sealord does aver general damage to its computers and interruption of service, such averments are not specific enough to satisfy the requirements of <u>Twombly</u>, 550 U.S. at 556, and Federal Rule of Civil Procedure 12(b)(6).").  Nonetheless, the Court finds that these allegations just skirt over the pleading lines defined by <u>Twombly</u> to place Defendant Powell on sufficient notice of the claims against him.  Indeed, many of the losses identified in the Amended Complaint—such as costs of responding to the wrongful actions, conducting damage assessments, and restoring data and programs—fall precisely into categories of damages identified as cognizable by applicable jurisprudence.  <u>See</u> <u>Clinton Plumbing</u>, 2010 WL 4224475, at *6.  Discovery will ultimately bear out the substance and validity of such allegations.  Accordingly, Defendant's Motion on this ground will be denied.

4.      **Conclusion as to CFAA Claim**

In sum, the Court finds that Plaintiff has sufficiently pled a claim under the CFAA to survive Defendant Powell's Motion to Dismiss.  The allegations explicitly state that Defendant Powell accessed Plaintiff's computer systems, through others, without authorization and that Synthes suffered a cognizable loss.  Notably, this ruling does not, in any way, opine on the ultimate merit of this claim.  Rather, it simply constitutes a determination that the CFAA claim should not be dismissed at this early stage of litigation.

C.      **Pleading of the Remaining Counts of the Complaint Against Powell**

Via a final broad challenge to the Amended Complaint, Defendant Powell contends that many of the remaining causes of action against him have not been properly pled under the Twombly/ Iqbal standards and, thus, must be dismissed.  The Court individually considers each count.

1.      **Breach of Contract Claim**

Count II of the Amended Complaint alleges that Powell, along with the other Defendants, breached their obligations under the Non-Competition and Non-Disclosure Agreements.  Defendant Powell now asserts that the choice of law provision in the Non-Competition Agreement is not applicable and that Colorado law should apply.  In turn, Powell contends that, under Colorado law, the Non-Competition Agreement is void.  To resolve this issue, the Court first engages in a choice of law analysis and then considers the validity of the Agreement under the applicable law.

a.      **Choice of Law**

Defendant Powell's Non-Competition Agreement contains an explicit choice of law provision mandating the application of Pennsylvania law to Synthes's claims.  (Am. Compl., Ex. K at 4.)  "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice

of law provisions in contracts executed by them." Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994).  Nonetheless, Pennsylvania law has adopted section 187 of the Restatement (Second) of Conflict of Laws, which recognizes two circumstances in which choice-of-law provisions will not be enforced: (1) where "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (2) where "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." Gay v. CreditInform, 511 F.3d 369, 389–90 (3d Cir. 2007) (quoting Restatement (Second) of Conflict of Laws § 187); see also Stone St. Servs., Inc. v. Daniels, No. Civ.A.00-1904, 2000 WL 1909373, at *4 (E.D. Pa. Dec. 29, 2000) ("An express choice of law provision in a contract will be upheld so long as: (1) the contract bears a reasonable relationship to the state whose law is chosen to govern and (2) application of the chosen law does not violate a 'strong public policy' that would otherwise protect a party.").

Considering these two exceptions, the Court finds that neither applies in the present case. First, Pennsylvania has a substantial relationship to the parties, lending good reason for the parties' choice of Pennsylvania law.  The affiliated companies comprising Synthes are Pennsylvania corporations with their principal place of business in Pennsylvania.  This point alone is sufficient to provide a basis for the parties' choice of law. See Restatement (Second) of Conflict of Laws § 187, cmt. f (remarking that the law of the state selected in the contract has a substantial relationship to the parties or the contract where the selected state is the principal place of business for one of the parties).  Additionally, although many of Synthes's sales consultants, including Powell, conduct their operations in multiple states, Pennsylvania remains the center of Synthes's corporate work.  As

41

such, Synthes has an interest in maintaining uniformity in dealings with its employees who are scattered throughout the various states.[18]  Accordingly, the Court finds no reason to disregard the forum selection clause under the first exception.

The second exception to the enforcement of forum selection clauses—violation of the public policy of another state—mandates a more complex analysis.  "Colorado law embodies a strong public policy which disfavors covenants not to compete, protecting employees 'from non-competition clauses except in carefully defined circumstances.'"  Nutting v. RAM Sw., Inc., 106 F. Supp. 2d 1121, 1124 (D. Colo. 2000) (quoting Colorado Accounting Machs., Inc. v. Mergenthaler, 609 P.2d 1125, 1126 (Colo. 1980)).  This public policy is embodied in Colo. Rev. Stat. § 8-2-113, which limits non-competition agreements, as follows:

> (2) Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
>
> > (a) Any contract for the purchase and sale of a business or the assets of a business;
> >
> > (b) Any contract for the protection of trade secrets;
> >
> > (c) Any contractual provision providing for recovery of the expense of educating

---

[18]  Defendant Powell cites to the Tenth Circuit case of King v. PA Consulting Group, Inc., 485 F.3d 577 (10th Cir. 2007), to support its argument that Colorado is a substantially closer connection to the dispute at issue than Pennsylvania.  This argument is flawed on several grounds.  First and foremost, choice of law provisions are not disregarded merely because one state has a "closer connection" than another.  Rather, they are disregarded where the chosen state has "no substantial relationship" to the parties or the dispute.  Restatement (Second) of Torts § 187.

Moreover, in King, the chosen state's sole connection to the dispute was that it was the employing company's state of incorporation and the company maintained a human resources office there.  It was, however, headquartered in Washington, D.C.  Id. at 586.  The former employee lived and worked in Colorado and the contract was signed there.  Id. at 585–86.  By contrast, in this case, Synthes is actually headquartered in Pennsylvania.

and training an employee who has served an employer for a period of less than two years;

(d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

Colo. Rev. Stat. § 8-2-113.  "Colorado courts have consistently recognized the policy of voiding noncompetition agreements, except in the circumstances set out in § 8–2–113(2)."  Am. Express Fin. Advisors, Inc. v. Topel, 38 F. Supp. 2d 1233, 1238 (D. Colo. 1999).  "To be enforced, such agreements must fall into one of the statutory exceptions and meet the common law rule of reasonableness."  Id.

The sole statutory exception potentially applicable here is that set forth in Section 8-2-112(2)(b)—the trade secret exception.  "'For a covenant not to compete to fit within the trade secret exception to § 8-2-113(2), the purpose of the covenant must be the protection of trade secrets, and the covenant must be reasonably limited in scope to the protection of those trade secrets.'"  Harvey Barnett, Inc. v. Shidler, 338 F.3d 1125, 1133 (10th Cir. 2003) (quoting Gold Messenger, Inc. v. McGuay, 937 P.2d 907, 910 (Colo. Ct. App. 1997)).  Thus, the company seeking to enforce the agreement "must show that it possesses trade secrets that are worth protecting and that [the employee] had access to these secrets."  Doubleclick Inc. v. Paikin, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005).  "What constitutes a 'trade secret' is a question of fact for the trial court."  Porter Indus., Inc. v. Higgins, 680 P.2d 1339, 1341 (Colo. App. 1984).

Colorado courts facing factual situations analogous to the one before us have repeatedly found covenants not to compete to involve trade secrets where the agreements themselves indicate that the purpose of the covenant is to protect such secrets.  For example, in Gold Messenger, Inc. v. McGuay, the plaintiff was a corporation that developed a comprehensive system for setting up and

operating an advertising circular business.  Id. at 908.  The defendant franchisee purchased a

franchise from the plaintiff and, under the franchise agreement, received plaintiff's operations and

procedures manual.  Id. at 908–09.  The agreement contained a covenant not to compete which

provided that, at the termination of the franchise, the franchisee may not compete directly or

indirectly with Gold Messenger for three years and within fifty miles of Gold Messenger franchise

territories.  Id. at 909.  Subsequently, after the franchisee failed to pay royalties required under the

agreement, the plaintiff terminated the franchise agreement.  Id.  The court found that it was "evident

from the preamble to the franchise agreement that the agreement was entered into with the express

purpose of protecting trade secrets."  Id. at 910.  In pertinent part, that preamble provided:

> WHEREAS, Franchisor is the owner of certain techniques, know-how, trade secrets
> and procedures (the Know–How) which are used in connection with Franchisor's
> Controlled Circulation Advertising Publication business and Franchisor's
> Franchisees; and
> WHEREAS, Franchisor [has] developed a unique system for operating [the] business,
> including business forms, bookkeeping and accounting materials and techniques,
> management and control systems, and, in general, a style, system, technique and
> method of business operation ...
> WHEREAS, Franchisee recognizes that it does not currently have the expertise
> contained in the developments as stated above and desires to use those developments
> pursuant to a franchise agreement . . .
> WHEREAS, [Franchisee] has a full and adequate opportunity to be thoroughly
> advised of the terms and conditions of this Franchise Agreement by counsel of its
> own choosing; and
> WHEREAS, the parties wish to enter in the following terms and conditions of this
> Franchise Agreement.

Id.  Reading that preamble in conjunction with the covenant not to compete, the court found that the

covenant precluded the franchisee from using the confidential information contained in the manual

to compete unfairly against franchisor or other franchisees.  Id. at 911.  "Thus, by both its purpose

and its scope, the covenant [was], in essence, for the protection of trade secrets."  Id. at 911.

Similarly, in Haggard v. Synthes Spine, the plaintiff was a sales consultant for Synthes Spine in Colorado, Southern Wyoming, and Western Nebraska. No. Civ.A.09-721, 2009 WL 1655030, at *1 (D. Colo. June 12, 2009). As part of his employment, he signed a "Confidentiality, Non-Solicitation and Non-Competition Agreement," as well as an "Employee Innovation and Non-Disclosure Agreement" substantially similar in nature to the Agreements signed by Defendant Powell. Id. Synthes terminated the plaintiff after learning that the plaintiff was running an unrelated cigar business when he should have been working for Synthes. Id. On at least one occasion prior to his termination, and on multiple occasions after his termination, Plaintiff talked with senior level managers for a competitor of Defendant, Globus Medical, Inc. ("Globus"). Id. They discussed the possibility of Plaintiff working for Globus in largely the same capacity that he worked for Defendant, i.e., as a sales consultant headquartered in Northern Colorado. Id. Defendant claimed that these discussions were part of a grand scheme by Globus to steal employees, customers, and trade secrets from the defendant. Id. The plaintiff, however, brought suit seeking a declaration that the non-competition agreements were unenforceable. Id. Applying Colorado law, the court held that the non-competition agreements fell within the trade secret exception, since they sought to protect defendant Synthes's information, including: (1) customer and prospect identities, including their specific requirements, addresses, and telephone contacts; (2) prices, renewal dates, and other detailed terms of customer and supplier contracts; (3) pricing policies, logistics methods, marketing and sales strategies, product know-how, product technologies, and product development strategies; (4) physical security systems, access control systems and network designs; (5) employment and payroll records; (6) forecasts, budgets and other non-public financial information, product information, and product know-how; and (7) expansion plans, management policies, and other

45

business strategies.[19]  Id. at *8.

Finally, in Am. Express Fin. Advisors, Inc. v. Topel, 38 F. Supp. 2d 1233 (D. Colo. 1999), a Colorado court considered whether a choice of law provision specifying application of Minnesota law in a covenant not to compete should be enforced.  Id. at 1238.  In that case, the plaintiff, a Colorado resident, had worked as a financial planner for plaintiff pursuant to a Planner Agreement. Id. at 1236–37.  Pursuant to the Planner Agreement, defendant received training and purported confidential trade secret information, comprised of customer identities, addresses, financial holdings, investment objectives, and buying preferences.  Id. at 1237.  The Planner Agreement prohibited him, for a period of one year after resigning from plaintiff, from soliciting or selling investments and financial services, directly or indirectly, to those customers in the territory he served or learned about through his affiliation with plaintiff.  Id.  Despite the fact that the Agreement specified the application of Minnesota law to disputes between the parties, the defendant argued that Colorado law should apply because "the application of Minnesota law would violate the strong public policy of this State to void noncompetition agreements."  Id. at 1238.  The court, considering

_____

[19]  Although the court in that case found that the choice of law provision calling for the application of Pennsylvania law was not enforceable because of the strong public policy interest of Colorado, this Court finds that analysis inapplicable to the present case.  The Haggard court issued that opinion in the context of a preliminary injunction and, perhaps in an abundance of caution, found that the "distinctions between Colorado and Pennsylvania law regarding the burden of enforceability are critical and they reflect that application of Pennsylvania law in this case *may violate* the fundamental public policy of Colorado."  Haggard, 2009 WL 1655030, at *4 (emphasis added).  The correct analysis, however, is whether "application of the law of the chosen state *would be contrary* to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue."  Restatement (Second) of Conflict of Laws § 187 (emphasis added).  Because this Court does not find that application of Pennsylvania law "would be contrary" to a fundamental policy of Colorado—in light of the application of the trade secret exception—there is no basis to disregard the forum selection clause.

46

the Restatement (Second) of Conflict of Laws § 187—the same provision incorporated by Pennsylvania law—found "good reason for the parties' choice of Minnesota law." Id. It remarked that the plaintiff's principal place of business was in Minnesota and that "[t]his fact alone provides a sufficient basis for the parties' choice of law." Id. Further, it noted that "application of Minnesota law would not be contrary to a fundamental policy of Colorado." Id. It explained that "[plaintiff's] post-termination covenants are concerned with providing protection for its interests in its confidential and trade secret customer information. Colorado specifically enforces contracts for the protection of trade secrets . . .Therefore, there is no conflict with Colorado law." Id. at 1238–39.

In the present case, the Court likewise finds that—at least at this preliminary stage of proceedings—application of Pennsylvania law to the Agreements at issue would not violate the fundamental public policy of Colorado. The Confidentiality, Non-Solicitation, and Non-Competition Agreement signed by Powell stated, in pertinent part:

> I acknowledge that: . . . Synthes is in a highly competitive industry; . . . [D]uring my employment with Synthes, I will have access to, receive, learn develop and/or conceive technical customer, prospect, financial or other information that is proprietary and confidential to Synthes; . . . this information must be kept in strict confident to protect Synthes' business and maintain its competitive position in the marketplace, and this information would be useful to Synthes' existing and potential competitors for indefinite periods of time; . . . Synthes would be irreparably harmed by my subsequent employment by a competitor of Synthes, *due to the likelihood or possibility that there would be inadvertent or other disclosures of Synthes' proprietary and confidential information or that there would be improper or inappropriate interference with its valuable customer relationships[.]*

(Am. Compl., Ex. K at 1 (emphasis added).)   As in Gold Messenger, this preamble—entitled "Acknowledgments"—makes it evident that the agreement was entered into with the express purpose of protecting trade secrets. Thereafter, as in Haggard and American Express, the

"Confidentiality" portion of the Agreement goes on to specifically identify the proprietary and

confidential information sought to be protected, including:

> (1) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (3) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies; (4) physical security systems, access control systems, network and other equipment designs; (5) employment and payroll records; (6) forecasts, budgets and other non-public financial information; (7) product performance information, product technical information and product know-how; and (8) expansion plans, management policies and other business strategies and policies.

(Id. at 2.)  This information mirrors the information explicitly recognized as "trade secrets" in the

Haggard agreement.  Reading the "Acknowledgments" and "Confidentiality" sections in conjunction

with the ensuing "non-solicitation" and "non-competition" provisions of the Agreement, it is

abundantly obvious that the Non-Competition Agreement is not, as Defendant Powell presumes,

designed to "hinder former employees' ability to compete with their former employer."[20]  (Def.

Powell's Reply Br. 4.)  Rather, it is precisely for the protection of Synthes's trade secrets.

---

[20]  In his Reply Brief, Powell argues that because neither the non-solicitation provisions nor the non-competition provision in the Agreement contain a specific reference to the Plaintiff's alleged confidential information, the primary purpose of those provisions is not to protect confidential information.  The Court must disagree.  The Agreement is a total of four pages long, the first two pages of which discuss the purpose of the Agreement and the confidential information sought to be protected.  After defining Synthes's business interests in protecting its confidential and proprietary information, the last sentence of the "Acknowledgements" section states "the restrictions in this agreement are reasonable and necessary to protect Synthes' legitimate business interests."  (Am. Compl., Ex. K.)  Reading the Agreement as a whole—in lieu of Defendant Powell's proposal to read provisions in isolation—the Court finds that the primary and express purpose of the Agreement and provisions contained therein is to protect Plaintiff's trade secrets.  See Williams v. Metzler, 132 F.3d 937, 947 (3d Cir. 1997) ("In the process of defining the objective intent of the parties, a court must examine the entire agreement.").

Accordingly, this Court finds that Colorado law would deem Powell's Non-Competition Agreement covered by the trade secret exception.

As noted above, the second exception to the policy of enforcing choice of law provisions requires that application of the law of the chosen state "would be contrary" to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue. Because Colorado specifically enforces non-competition contracts designed for the protection of trade secrets, and because Powell's Non-Competition Agreement is concerned precisely with the protection of such trade secrets, Pennsylvania law is not contrary to a fundamental policy of Colorado. Accordingly, the Court will enforce the choice of law provision in the Agreement and apply Pennsylvania law to the current dispute.

### b.      Whether the Agreement is Enforceable Under Pennsylvania Law

Having concluded that the choice of law clause in the Agreement is enforceable and that Pennsylvania law applies, the Court must now determine whether the Non-Competition Agreement as a whole is valid. "Covenants not to compete are generally disfavored under Pennsylvania law as against public policy, but they may be enforceable when they are ancillary to an employment relationship or to a sale of a business." Darius Int'l, Inc. v. Young, No. Civ.A.05-6184, 2008 WL 1820945, at *36–37 (E.D. Pa. Apr. 23, 2008) (citing Jacobson & Co. v. Int'l Envtl. Corp., 235 A.2d 612 (Pa. 1967)). Stated more specifically, "[a] non-competition agreement is enforceable if it is (1) related to either a contract for the sale of goodwill or other subject property or to a contract for employment; (2) supported by adequate consideration; (3) reasonably necessary to protect a legitimate business interest; and (4) reasonably limited in both time and territory." Id. (citing Piercing Pagoda, Inc. v. Hoffner, 351 A.2d 207, 210–11 (Pa. 1976)). "In evaluating whether the

49

covenant is reasonably necessary and reasonably limited, the Court considers whether the agreement's breadth is reasonable as to (1) geographical scope, (2) duration, and (3) types of activities embraced; and whether the purchaser's need for protection is outweighed by the hardship imposed on the seller or by the public interest."  <u>Darius</u>, 2008 WL 1820945, at *37.

In the present case, the parties do not dispute that the Non-Competition Agreement at issue was related to a contract for employment and supported by adequate consideration.  Moreover, the Agreement itself recognizes that it was designed to protect Synthes's legitimate business interest in the protection of its confidential and proprietary information.  Finally, Defendant Powell offers no argument—let alone any supporting authority—to suggest that the Agreement is unreasonable in either time or geographic scope.  Indeed, the provision only restricts Powell from competing in the region for which he was responsible during his last year at Synthes for a period of one year. Pennsylvania courts have routinely enforced covenants in similar or greater temporal scope.  <u>Maaco Franchising, Inc. v. Augustin</u>, No. Civ.A.09-4548, 2010 WL 1644278, at *3 (E.D. Pa. Apr. 20, 2010) (one year); <u>Intermetro Indus. Corp. v. Kent</u>, No. Civ.A.07-0075, 2007 WL 1140637, at *7 (M.D. Pa. Apr. 17, 2007) (one year); <u>Admiral Servs., Inc. v. Drebit</u>, No. Civ.A.95-1086, 1995 WL 134812, at *6 (E.D. Pa. Mar. 28, 1995) (two years); <u>Piercing Pagoda</u>, 351 A.2d 207, 212–13 (three years).  Absent any glaringly overbroad provisions in the Agreement, the Court finds, for purposes of the Motion to Dismiss, that the Agreement is valid and enforceable under Pennsylvania law.

### 2.     **Misappropriation Claim**

The Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa.C.S. § 5301, <u>et seq.</u> "creates a statutory cause of action for injunctive relief, compensatory damages and exemplary damages for the actual loss caused by misappropriation of trade secrets and the unjust enrichment

caused by such misappropriation." <u>Youtie v. Macy's Retail Holding, Inc.</u>, 626 F. Supp. 2d 511, 522 (E.D. Pa. 2009).  Under PUTSA, a person has misappropriated a trade secret "when he acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that trade secret without the other's consent." <u>Bimbo Bakeries USA, Inc. v. Botticella</u>, 613 F.3d 102, 110 (3d Cir. 2010) (citing 12 Pa. Cons. Stat. § 5302).

Defendant Powell seeks dismissal of Plaintiff's misappropriation claim against him on two grounds.  First, Plaintiff allegedly fails to identify trade secrets sufficient to satisfy federal pleading standards.  Second, Plaintiff purportedly fails to describe Powell's alleged use of a valid trade secret. The Court separately considers each allegation.

### a.      <u>Whether Plaintiff Has Identified Trade Secrets</u>

PUTSA defines a "trade secret" as:

> Information, including a formula, drawing, pattern, compilation including a costumer list, program, device, method, technique or process that: (1) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. § 5302.  Pennsylvania courts look to a series of factors to determine whether information is protected as a trade secret.[21]  Whether information rises to the level of a trade secret

---

[21]  These factors include:

(1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company

under PUTSA is a question of fact not appropriate for resolution on a motion to dismiss.  Council for Educ. Travel, USA v. Czopek, No. Civ.A.11-672, 2011 WL 3882474, at *5 (M.D. Pa. Sept. 2, 2011); Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009).  As such, courts within the Third Circuit have not required a party alleging misappropriation to describe trade secrets with particularity in order to survive a motion to dismiss.  See, e.g., Reckitt Benckiser Inc., et al., v. Tris Pharma, Inc., et al., No. Civ.A.09-3125, 2011 WL 773034 (3d Cir. Feb. 28, 2011) ("[A] claim of misappropriation of trade secret 'does not require specific pleading of the precise information that constitutes the trade secret in order to survive a motion to dismiss.'") (interpreting New Jersey law) (internal citations omitted); Czopek, 2011 WL 3882474, at *4; Center Pointe Sleep Assocs., LLC v. Panian, No. Civ.A.08-1168, 2009 WL 789979, at *3 (W.D. Pa. Mar. 18, 2009) (finding that a general description of the trade secrets at issue was sufficient and that the exact trade secret in question need not be pleaded with particularity); Ideal Aerosmith, Inc. v. Acutronic USA, Inc., No. Civ.A.07-1029, 2007 WL 4394447, at *8 (W.D. Pa. Dec. 13, 2007) (finding complaint sufficient where it described the alleged trade secrets as "information concerning the development, marketing and sale of Ideal's Aero 4000 motion controller, customer communications and other property"); Pennfield Precision, Inc. v. EF Precision, Inc., No. Civ.A.00-280, 2000 WL 1201381, at *4 (E.D. Pa. Aug. 15, 2000) ("[C]ourts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secret.") (quotations omitted).

---

and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

Bimbo Bakeries, 613 F.3d at 109.

In the present case, Plaintiff has adequately pled the existence of trade secrets.  In particular, the Amended Complaint contains the following allegations:

98.  As a Sales Consultant in Colorado in the Denver East Territory and the Eastern Slope Territory (*i.e.*, in the area of Vail, Colorado), Powell had direct and primary contact with Synthes' customers and became intimately familiar with Synthes' customers' preferences, needs, priorities, purchasing and ordering histories, decision-making personnel, and practices as well as additional sensitive and confidential information concerning his territory and Synthes' business practices and strategies.

. . .

101.  Throughout his employment with Synthes as a Territory Assistant, Associate Sale Consultant, and ultimately Sales Consultant, Synthes entrusted Powell with its most valuable customer contacts, goodwill, and business information. Synthes also assigned and introduced Powell to existing and prospective customers in those territories. Synthes provided Powell with direct access to Synthes' valuable business relationships. In his roles, Powell had access to and used Synthes products and equipment as well as Synthes' sensitive, confidential, proprietary, and trade secret information, all of which he would not have obtained access to but for his working for Synthes in that capacity.

102.  The confidential, sensitive, proprietary, and trade secret information Synthes entrusted to Powell included, without limitation, information about Synthes' customers, business activities, and strategies as well as information regarding Synthes' product development plans, pipeline, and launches; technology and product performance; expansion plans; pricing; competitive terms; contract and sales administration; compensation and personnel; and other sensitive information related to Synthes' business.

103.  Synthes also provided Powell with substantial, specialized training on the technical aspects of Synthes' products and the medical procedures in which these products are used as well as on techniques for educating operating room personnel and surgeons so that Powell could be an effective resource to those surgeon customers during medical procedures concerning the use of existing and new implants and instrumentation.  During these training sessions, Powell also received sensitive information regarding Synthes' contract and sales administration, personnel, and other departments. Synthes provided Powell with such training on an ongoing basis throughout his tenure with Synthes.

(Am. Compl. ¶¶ 98, 101–03.)   At the pleading stage of litigation, such allegations are more than

sufficient to survive a Motion to Dismiss.   Whether such information ultimately constitutes trade

secrets remains a factual question for resolution following the close of discovery.

**b.      Whether Plaintiff Has Sufficiently Alleged Use**

In an alternate challenge, Defendant Powell asserts that the Amended Complaint is devoid of

facts to establish that Powell "used" any alleged trade secret.   Rather, according to Powell, the

allegations of "use" are nothing more than "a collection of threadbare recitations of the legal

elements of the claim."  (Powell's Mem. Supp. Mot Dismiss 37.)

Under PUTSA, "misappropriation" is defined to include:

(1) acquisition of a trade secret of another by a person who knows or has reason to
know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of another without express or implied consent
by a person who:

(I) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that his
knowledge of the trade secret was:

(A) derived from or through a person who had utilized improper
means to acquire it;

(B) acquired under circumstances giving rise to a duty to maintain its
secrecy or limit its use; or

(C) derived from or through a person who owed a duty to the person
seeking relief to maintain its secrecy or limit its use; or

54

(iii)    before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Stat. § 5302.  Thus, misappropriation is not, as Defendant Powell presumes, limited to "use," but rather includes misappropriation by both acquisition and disclosure.  To establish misappropriation by acquisition under the PUTSA, defendants must establish "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 12 Pa. Cons. Stat. § 5302(1).  PUTSA defines "improper means" as "[i]nclud[ing], but [ ]not limited to, theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means."  Id.; see also Youtie v. Macy's Retail Holding, Inc., 653 F. Supp. 2d 612, 624 (E.D. Pa. 2009).  To establish misappropriation by disclosure under the PUTSA, defendants must establish that plaintiff disclosed their trade secret without express or implied consent and either (1) used improper means to acquire knowledge of the trade secret; (2) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was either derived from a person utilizing improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy, or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy; or (3) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.  Youtie, 653 F. Supp. 2d at 625 (citing 12 Pa. Cons. Stat. § 5302).

The Amended Complaint in the case before the Court adequately pleads that Powell was involved in misappropriation through acquisition, use, and disclosure, as follows:

- Beginning no later than the summer of 2010, Marotta, Stassen, Powell, and Emerge improperly and unlawfully acquired, used, and disclosed Synthes' confidential, sensitive, proprietary, and trade secret information, including, upon information and belief, information they acquired by directing, inducing, and encouraging others to access Synthes' computer systems. (Am. Compl. ¶ 152.)

- Upon information and belief, the Defendants improperly and unlawfully acquired, used, and disclosed confidential and proprietary business information obtained and misappropriated from Synthes to help them develop and implement Emerge's business model, to identify and/or design, develop, test, and manufacture products competitive with certain of Synthes' products, to manage inventory and purchase orders, to develop Emerge's marketing efforts to customers, and to otherwise effectuate their scheme to compete wrongfully with Synthes. (Am. Compl. ¶ 241.)

- Defendants knew, before and at the time of their acquisition, use, and/or disclosure of it, that this information constitutes "trade secret" information under Pennsylvania law because: (I) the information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) it is reasonable for Synthes to maintain the secrecy of such information. (Id. ¶ 242.)

- The Defendants' acquisition, use, and disclosure of such information have given Emerge an unfair and wrongful advantage. (Id. ¶ 244.)

Considered collectively, these allegations make clear that Defendant Powell, among others, wrongfully acquired Synthes's trade secrets, disclosed them to the competing company Emerge, and then wrongfully used them to help develop Emerge's business model. Such proprietary information was not merely the product of Powell's own aptitude, skill, or subjective ability, but rather specific trade secrets about Synthes strategies, business models, and business activities. Accordingly, the Court finds that such pleading is more than sufficient to place Powell on notice of the basis of the

misappropriation claim against him.[22]

### 3.   Conversion

Defendant Powell next challenges Plaintiff's conversion claim.  In particular, he asserts that Plaintiff fails to include any factual allegations to make it plausible that Powell converted Synthes's confidential business information or product.  Moreover, he contends that Plaintiff fails to provide facts to support a claim that Powell converted "models, plans, strategies, names, logos, and slogans and all implants, instrumentation, and intellectual property associated with them and with any other products developed or marketed by Emerge."[23]  (Am. Compl. ¶ 265.)

---

[22]  Defendant Powell cites to Air Prods & Chems, Inc. v. Johnson, 442 A.2d 1114 (Pa. Super. Ct. 1982) for the proposition that "general, public disclosure of a trade secret, by a party seeking to protect its interests results in an abandonment of that trade secret."  Id. at 1128. "Similarly, the act of making trade secrets available to the public by incorporating those secrets into the design of a product risks public disclosure because, without engaging in any improprietous act, the trade secret may be copied."  Id.  According to Powell, any act by Powell of taking a Synthes product in his possession at the time of resignation and using it to reverse engineer various drill bits, guide wires, and cannulated screws cannot be misappropriation since those products were released to the public, thereby disclosing the trade secrets.

Plaintiff's misappropriation claim against Powell, however, does not rely on any alleged taking of Synthes products for reverse engineering purposes.  Rather it focuses on Powell's taking and use of protectable trade secret information about Synthes's customers, business activities, and strategies as well as information regarding Synthes's product development plans, pipeline, and launches; technology and product performance; expansion plans; pricing; competitive terms; contract and sales administration; compensation and personnel; and other sensitive information related to Synthes's business.  (Am. Compl. ¶ 102.)

[23]  Powell argues that Plaintiff concedes to dismissal with prejudice of the conversion claim to the extent it alleges that "Defendants" failed to assign Emerge and/or its property. Plaintiff, however, has made clear that Powell's unlawful exercise of domain and control over Synthes's confidential and proprietary business information and products acts as the basis for its conversion claim.  It does not contend that Powell failed to assign Emerge to Synthes based on the provisions of his Non-Disclosure Agreement.  (Pl.'s Resp. Opp'n Powell Mot. to Dismiss 31 n.25.)  By merely clarifying the contours of its conversion claim, Plaintiff does not concede to dismissal with prejudice of that claim either as against Powell or against any other Defendant. For future purposes, however, Plaintiff's conversion claim against Powell is restricted to an

"[U]nder Pennsylvania law, conversion is the 'deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification.'"  Universal Premium Acceptance Corp. v. York Bank & Trust Co., 69 F.3d 695, 704 (3d Cir. 1995) (quoting Cenna v. United States, 402 F.2d 168, 170 (3d Cir. 1968)); See also Epstein v. Saul Ewing, LLP, 7 A.3d 303, 314 (Pa. Super. Ct. 2010).  "A conversion can occur in several ways: 1) acquiring possession of property with the intent to assert a right to it adverse to the owner; 2) transferring the property and therefore depriving the owner of control; 3) unreasonably withholding possession of the property from the one who has the right to it; and 4) misusing or seriously damaging the property in defiance of the owner's rights."  Fenton v. Balick, 821 F. Supp. 2d 755, 760 (E.D. Pa. 2011) (citing Fort Wash. Res., Inc. v. Tannen, 846 F. Supp. 354, 361 (E.D. Pa. 1994)) (further citations omitted).  "Where one lawfully comes into possession of a chattel, a conversion occurs if a demand for the chattel is made by the rightful owner and the other party refuses to deliver."  Prudential Ins. Co. of Am. v. Stella, 994 F. Supp. 318, 323 (E.D. Pa. 1998) (dealing with a termination of an employee and the continued possession of confidential documents which allegedly were the sole property of the employer).

Contrary to Defendant Powell's argument, the Court finds that Synthes has indeed adequately pled a conversion claim against Powell.  First, Synthes has properly alleged that it had an express property interest in its confidential proprietary information. [24] See Brown & Brown, Inc. v.

_____

allegation that he converted Plaintiff's confidential and proprietary business information.

[24]  (See Am. Compl. ¶ 101 ("The confidential, sensitive, proprietary, and trade secret information Synthes entrusted to Powell included, without limitation, information about Synthes' customers, business activities, and strategies as well as information regarding Synthes' product development plans, pipeline, and launches; technology and product performance; expansion plans; pricing; competitive terms; contract and sales administration; compensation and

58

Cola, 745 F. Supp. 2d 588, 623 (E.D. Pa. 2010) (finding that confidential information acquired or

compiled by a corporation in the course and conduct of its business is a species of property to which

the corporation has the exclusive right and benefit) (quotations omitted).  Second, the Amended

Complaint alleges that all Defendants, including Powell, acquired the property, thereby depriving

Synthes of control over it.[25]  Next, Synthes has alleged an improper and unreasonable withholding of

possession of the property.[26]  Finally, the Amended Complaint indicates that the information was

personnel; and other sensitive information related to Synthes' business."); id. ¶ 103 ("Synthes
also provided Powell with substantial, specialized training on the technical aspects of Synthes'
products and the medical procedures in which these products are used as well as on techniques
for educating operating room personnel and surgeons so that Powell could be an effective
resource to those surgeon customers during medical procedures concerning the use of existing
and new implants and instrumentation.  During these training sessions, Powell also received
sensitive information regarding Synthes' contract and sales administration, personnel, and other
departments. Synthes provided Powell with such training on an ongoing basis throughout his
tenure with Synthes.").)

[25]  (See Am. Compl. ¶ 152 ("Beginning no later than the summer of 2010, Marotta,
Stassen, Powell, and Emerge improperly and unlawfully acquired, used, and disclosed Synthes'
confidential, sensitive, proprietary, and trade secret information, including, upon information and
belief, information they acquired by directing, inducing, and encouraging others to access
Synthes' computer systems."); id. ¶ 241 ("Upon information and belief, the Defendants
improperly and unlawfully acquired, used, and disclosed confidential and proprietary business
information obtained and misappropriated from Synthes to help them develop and implement
Emerge's business model, to identify and/or design, develop, test, and manufacture products
competitive with certain of Synthes' products, to manage inventory and purchase orders, to
develop Emerge's marketing efforts to customers, and to otherwise effectuate their scheme to
compete wrongfully with Synthes.").)

[26]  (See Am. Compl. ¶ 242 ("Defendants knew, before and at the time of their acquisition,
use, and/or disclosure of it, that this information constitutes 'trade secret' information under
Pennsylvania law because: (i) the information derives independent economic value from not
being generally known to, and not being readily ascertainable by proper means by, other persons
who can obtain economic value from its disclosure or use; and (ii) it is reasonable for Synthes to
maintain the secrecy of such information."); id. ¶ 246 ("The Defendants knew or had reason to
know that they acquired, used, or disclosed Synthes' trade secret information through improper
means, and knew or had reason to know that Marotta, Stassen, Powell, and other current and

misused in defiance of the owner's rights.[27]  Because such allegations put Defendant Powell on notice of the precise conversion allegations against him, this portion of the Motion to Dismiss must be denied.

### 4. Lanham Act Claim

Plaintiff's Lanham Act claim alleges that Synthes and Emerge are competitors in the orthopedic trauma medical device industry.  (Am. Compl. ¶ 271.)  In an effort to bolster Emerge's competitive status, Defendants, including Powell, purportedly made statements concerning the nature, characteristics, qualities, and origin of certain of Emerge's goods that are competitive with Synthes's products, including statements that Emerge's products are "identical," of "statistical equivalence," or made in the same location as Synthes's products.  (Id. ¶ 274.)  Moreover, they have represented that the FDA has made a determination that Emerge's drill bits and guide wires are substantially equivalent to Synthes's drill bits and guide wires.  (Id. ¶¶ 272, 274.)  According to Plaintiff, these statements are literally false, or, alternatively, are materially deceptive and misleading to Synthes's customers.  (Id. ¶¶ 273, 277.)  As a result, Plaintiff brings a claim pursuant to the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), for making false and disparaging remarks about

---

former Synthes employees or other third parties from whom any of them obtained information had duties and obligations to Synthes to maintain the secrecy of and to limit the disclosure and use of Synthes' confidential and proprietary business information.")

[27]  (See Am. Compl. ¶ 244 ("The Defendants' acquisition, use, and disclosure of such information have given Emerge an unfair and wrongful advantage."); id. ¶ ("The Defendants' acquisition, use, and disclosure of Synthes' trade secret information have been willful and malicious and intended to harm Synthes, and the Defendants' conducts also threatens to recur. Emerge and its Board of Directors have permitted Marotta, Stassen, and Powell to engage in this tortious conduct, and by refusing to terminate them, have permitted the continuation of this tortious conduct.").)

Synthes's products and services and making misleading statements about the quality of its own

goods and services.

Under 15 U.S.C. § 1125(a)(1)(B):

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125(a)(1).  Subsection (a)(1)(B) specifically requires that the misleading

representations appear in "commercial advertising or promotion."  Without contesting any of the

other Lanham Act elements, Defendant Powell now argues that Plaintiff has failed to properly allege

that he disseminated any allegedly misleading representations to the purchasing public, in

satisfaction of the "commercial advertising and promotion" component of the claim.

A threshold inquiry in addressing whether an alleged false statement is actionable under 15

U.S.C. § 1125(a)(1)(B) is determining if the statement was disseminated "commercial advertising or

promotion."  Synygy, Inc. v. Scott-Levin, 51 F. Supp. 2d 570, 576 (E.D. Pa. 1999) (quoting 15

U.S.C. § 1125(a)(1)(B)).  Although neither the Lanham Act itself nor the Third Circuit has defined

61

"commercial advertising or promotion," "the touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002). Courts have generally "developed a four element test to define these terms in accordance with the Act's language and congressional intent." Premier Comp Solutions, LLC v. Penn Nat'l Ins. Co., No. Civ.A.07-1764, 2012 WL 1038818, at *7–8 (W.D. Pa. Mar. 28, 2012) (citing cases). "Commercial advertising or promotion for purposes of the Lanham Act consists of (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's products; (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry." Id. (quoting Synygy, Inc., 51 F. Supp. 2d at 576). Notably, neither private statements to competitors nor isolated statements to potential customers constitute sufficient dissemination to be defined as advertising within the meaning of the Lanham Act. Pitney Bowes, Inc. v. ITS Mailing Sys., Inc., No. Civ.A.09-5024, 2010 WL 1005146, at *5 (E.D. Pa. Mar. 17, 2010). "[I]t is well-settled that the challenged statements, at the very least, must be 'widely disseminated' and 'part of an organized campaign to penetrate the relevant market.'" Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 460–61 (D.N.J. 2009) (citing Fashion Boutique, 314 F.3d at 56–57).

Nonetheless, "[t]he form of the statements is not dispositive, and courts find statements to be commercial speech even where promulgated outside the traditional advertising campaign." Accenture Global Servs. GMBH v. Guidewire Software, Inc., 581 F. Supp. 2d 654, 667 (D. Del. 2008). As more succinctly stated by the Tenth Circuit:

the representations need not be made in a classic advertising campaign, but may consist instead of more informal types of promotion. . . .  Furthermore, we assume, *arguendo,* that the extent of distribution necessary to constitute commercial advertising or promotion in a particular case may be an elastic factor, so that a relatively modest amount of activity may be sufficient in the context of a particular case. . . .  Nevertheless, these terms by their plain, everyday meaning connote *some* level of *public* dissemination of information.

Sports Unlimited, Inc. v. Lankford Enters., Inc., 275 F.3d 996, 1004–05 (10th Cir. 2002) (internal

quotations and citations omitted) (emphasis in original).  "To pass the pleading threshold in a

Lanham Act § 43(a)(1)(B) case, a plaintiff at the very least must identify some medium or means

through which the defendant disseminated information to a particular class of consumers." MMM

Healthcare, Inc. v. MCS Health Mgmt. Options, 818 F. Supp. 2d 439, 450–51 (D.P.R. 2011).

In this case, the Amended Complaint contains the following allegations regarding

commercial advertising and promotion:

155.    In addition to using Synthes' confidential information during the design of Emerge's product, Marotta, Stassen, Powell, and Emerge have also engaged in unlawful conduct through the marketing and sale of Emerge product, including making representations about Emerge's products that are literally false and deliberately misleading.

156.    In November of 2010, for example, labels bearing Emerge's name and logo that directed Synthes customers to reorder Synthes' surgical drill bits from Emerge appeared in a Synthes Inventory Management System ("SIMS") cabinet in an account in Marotta's former territory in Arizona as well as on product sealed in Synthes packaging.  To facilitate this process and to convince customers that Emerge's products are "identical" to and fully interchangeable with Synthes' products (as Defendants falsely represent), Emerge was also using Synthes' part numbers, differentiating them only by appending the suffix ".EM" and commingling Emerge products with Synthes products in Synthes' inventory systems and surgical sets.

157.    Since that time, Emerge's labels have begun to appear in additional SIMS and sets stored at other of Synthes' customers' facilities, and Emerge has obtained

clearance from the FDA for a "Cannulated Screw Fixation System" that is purportedly "substantially equivalent" to Synthes' cannulated screw system.

158.    Emerge is now selling cannulated screws and guide wires in addition to the surgical drill bits they began to implement in November of 2010, and numerous Synthes customers in Marotta's former region and territory, and throughout the country, are now buying the types of products they previously purchased from Synthes directly from Emerge, resulting in a direct and substantial loss of business to Synthes.

159.    Indeed, upon information and belief, a system of hospitals that was one of Emerge's first customers directed all of the facilities within its system to switch from Synthes to Emerge. Such an outcome is precisely the outcome Marotta, Stassen, Powell, and Emerge hoped for when they first targeted the system, knowing that sales at a beta site could lead to sales throughout the entire health system, including sales to Synthes' customers in Marotta's former sales region and territory.

. . .

272.    Marotta, Stassen, Powell, and Emerge have made unambiguous descriptions or representations, regarding specific, material characteristics of Emerge's competitive product offerings to Synthes' customers in connection with the commercial advertising, marketing, distribution, sale, and implementation of those products that are literally false, either explicitly or by necessary implication.

273.    Additionally, Marotta, Stassen, Powell, and Emerge have made descriptions or representations regarding material characteristics of Emerge's competitive product offerings to Synthes customers in connection with the commercial advertising, marketing, distribution, sale, and implementation of those products that are materially deceptive and misleading, explicitly or by necessary implication, and that mislead and/or confused Synthes' customers and caused those customers to convert their business to Emerge.

274.    The statements made by Marotta, Stassen, Powell, and Emerge concern the nature, characteristics, qualities, and origin of certain of Emerge's goods that are competitive with Synthes' products, including, but not limited to, statements that Emerge's products are "identical," of "statistical equivalence," or made in the same location as Synthes' products, and statements that the FDA has made a determination that Emerge's drill bits and guide wires are substantially

equivalent to Synthes' drill bits and guide wires.

(Am. Compl. ¶¶ 155–59, 272–74.)[28]

At first blush—and taken in isolation—these allegations appear to identify only sporadic instances of dissemination, in lieu of the requisite public dissemination of the purportedly false advertising.  Upon closer reading, however, the reasonable inferences from these allegations, however, suggest that they merely exemplify a broad and widespread dissemination of the statements to the relevant purchasing public, such that they constitute advertising or promotion within the industry.  See Artz v. Cont'l Cas. Co., 720 F. Supp. 2d 706, 709 (E.D. Pa. 2010) (noting that plaintiff must be given every favorable inference from allegations in the complaint).  In other words, the representations identified by Plaintiff appear to be mere examples of a larger marketing campaign targeting doctors and hospitals.  See Bracco Diagnostics, 627 F. Supp. 2d at 461 (noting that although advertising is generally understood as widespread communication through print or broadcast media, promotion may take other forms such as displays at trade shows and sale presentations to buyers) (citations omitted).  A requirement that Plaintiff describe in detail the precise scope of Emerge's advertising campaign would far exceed the pleading mandates under the Federal Rules of Civil Procedure and the Twombly/Iqbal standards.[29]  As such, the Court finds, for

_____

[28] Plaintiff's Response Brief also references an e-mail to a customer, a video broadcast distributed by a well-known publisher in the orthopedics industry, and a PowerPoint presentation made to a health system.  (Pl.'s Resp. Opp'n Powell Mot. Dismiss, Exs. 2–4.) Because Rule 12(b)(6) motions to dismiss must be decided on the basis of the pleadings, the Court does not consider this outside evidence in ruling on the present Motion.

[29] Indeed, the Court finds inapposite the cases either upon which Defendant Powell relies or which the Court has independently found to support the notion that cases showing only isolated instances of false advertising do not reflect commercial advertising or promotion. Unlike this matter, all of those cases were decided either after a preliminary injunction hearing,

purposes of the present motion, that the alleged false statements by Defendants were part of a large

scale marketing plan to penetrate the relevant market or disseminate a message to potential

customers.  Defendants will have the opportunity to test the truth of such allegations at the close of

discovery.

In an alternate but related argument, Defendant Powell contends that, as an individual

corporate employee, he cannot be held independently liable under the Lanham Act for Emerge

Corporation's alleged "widespread campaign to penetrate the relevant market."  (Def. Powell's

Reply Br. 12 (quoting Plaintiff's Resp. Opp'n Mot. Dismiss 35).)  To that end, he attempts to

distinguish all of the cases cited by Plaintiff on the grounds that they involved claims against

corporate entities, not individual defendants such as Powell.

This argument is without merit.  "A corporate officer is individually liable for the torts he

personally commits and cannot shield himself behind a corporation when he is an actual participant

in the tort."  Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978).  "[T]he joint tortfeasor

principles for corporate officers established by the Third Circuit in Donsco, Inc., 587 F.2d at 606,

appears to be clearly applicable to Lanham Act claims."  Max Daetwyler Corp. v. Input Graphics,

Inc., 541 F. Supp. 115, 116–17 (E.D. Pa. 1982).  Since Plaintiff's Amended Complaint asserts that

Powell was, to a large extent, personally involved in the "widespread campaign" of false advertising,

he may be named as a defendant in the Lanham Act claim.

---

or on a summary judgment motion following discovery.  Proctor & Gamble Pharms. v.
Hoffmann-LaRoche Inc., No. Civ.A.06-0034, 2006 WL 2588002, at *32 (S.D.N.Y. Sep. 6, 2006)
(preliminary injunction hearing); Fashion Boutique, 314 F.3d at 58 (summary judgment);
Auto–Chlor Sys. of Minn., Inc. v. JohnsonDiversey, 328 F. Supp. 2d 980, 1019–20 (D. Minn.
2004) (summary judgment); Optimum Techs., Inc. v. Home Depot, Inc., No. Civ.A.04-3260,
2005 WL 3307508 (N.D. Ga. Dec. 2, 2005) (summary judgment).

In sum, the Court declines to dismiss the Lanham Act claim against Defendant Powell. Accordingly, this portion of the Motion is denied.

### 5.    Trespass to Chattels Claim

The next claim subject to challenge by Powell's Motion to Dismiss is Count IX of the Amended Complaint, alleging trespass to chattels.  Pennsylvania law defines trespass to chattels as the act of intentionally "(a) dispossessing another of their chattel, or (b) using or intermeddling with chattel in the possession of another."  Healthcare Advocates, Inc. v. Harding, Earley, Follmert & Frailey, 497 F. Supp. 2d 627, 650 (E.D. Pa. July 20, 2007) (citing Pestco, Inc. v. Assoc. Prods., Inc., 880 A.2d 700, 708 (Pa. Super. Ct. 2005)); see also Restatement (Second) of Torts ¶ 217.  The Restatement (Second) of Torts defines a person who is "in possession of a chattel" as "one who has physical control of the chattel with the intent to exercise such control on his own behalf, or on behalf of another."  Restatement (Second) of Torts § 216.

The Amended Complaint sets forth the following allegations with respect to the trespass to chattels claim:

156.    In November of 2010, for example, labels bearing Emerge's name and logo that directed Synthes customers to reorder Synthes' surgical drill bits from Emerge appeared in a Synthes Inventory Management System ("SIMS") cabinet in an account in Marotta's former territory in Arizona as well as on product sealed in Synthes packaging.  To facilitate this process and to convince customers that Emerge's products are "identical" to and fully interchangeable with Synthes' products (as Defendants falsely represent), Emerge was also using Synthes' part numbers, differentiating them only by appending the suffix ".EM" and commingling Emerge products with Synthes products in Synthes' inventory systems and surgical sets.

157.    Since that time, Emerge's labels have begun to appear in additional SIMS and sets stored at other of Synthes' customers' facilities, and Emerge has obtained clearance from the FDA for a "Cannulated Screw Fixation System" that is

purportedly "substantially equivalent" to Synthes' cannulated screw system.

. . .

283.    The conduct set forth above also establishes Marotta's, Stassen's, Powell's, and Emerge's liability for trespass as to their conduct related to the use and labeling of Synthes' SIMS and sets and the labeling of any Synthes inventory provided to Synthes' customers on consignment. This conduct constitutes an unlawful use of and intermeddling with Synthes' property and an interference with Synthes' use and enjoyment of its property.

284.    Marotta's, Stassen's, Powell's, and Emerge's conduct with respect to the use and labeling of Synthes' SIMS and sets and the labeling of any Synthes inventory provided to Synthes' customers on consignment constitutes tortious interference with Synthes' contractual relationships with its customers for the sale, consignment, and storage of product, and it also, or in the alternative, constitutes the tort of trespass to chattels under Pennsylvania law to the extent the inventory was loaned or consigned, and, therefore, owned by Synthes at the time, and to the extent the SIMS were fully or partially owned by Synthes at the time.

285.    Marotta, Stassen, Powell, and Emerge have acted intentionally, willfully, and unlawfully in using and labeling Synthes-owned SIMS and sets and in labeling inventory Synthes has provided to its customers on a consignment basis, and they have encouraged others to do so, without any right or privilege to do so and without Synthes' consent.

286.    Marotta's, Stassen's, Powell's, and Emerge's conduct has directly caused Synthes harm, and Synthes has been and will continue to be damaged by the Defendants' conduct.

(Am. Compl. ¶¶ 156–57, 283–85.)

Defendant Powell now asserts that the allegations do not set forth a plausible claim of trespass to chattels, as Synthes has failed to allege facts to support a critical component of the claim—that it was the "possessor" of the chattels at issue.  Rather, according to Powell, the allegations tend to reflect that the chattels were in the possession of Synthes's customers and were physically located at the customers' medical facilities.  He goes on to assert that "Plaintiff[']s allegations are based on the *mere possibility* that the property was owned by Synthes at the time of

the alleged trespass."  (Def. Powell's Mem. Supp. Mot. Dismiss 43.)

In response, Plaintiff contends that the comments to Restatement (Second) of Torts § 216 negate Powell's argument.  Specifically, these comments state:

> c. Cases arise in which *one who has been in possession of a chattel temporarily relinquishes physical control of it, without abandoning the chattel.*  In such a case, so long as no other person has obtained possession by acquiring physical control over the chattel with the intention of exercising such control on his own behalf, or on behalf of another, the law protects the property interest by attributing the possession to the original possessor.  It is not within the scope of the Restatement of this Subject to state what constitutes an abandonment of the chattel.
> . . .
> d. Situations may also arise in which *one person, without having the actual physical control of the chattel, has the right to immediate physical control of it as against all others.*  In such a case, so long as the possession of the chattel has not been acquired by any other person, the law protects the property interest by attributing possession to the one who thus has the right to it.  Likewise, even where another has physical control of the chattel, the person with the right to it will be treated as in possession, if the person with the actual physical control or custody does not have the intent stated in this Section.

Restatement (Second) of Torts § 216, cmts. c & d (emphasis added).  According to these comments, it is not necessary that one be in actual physical control of the property to be the "possessor."  Therefore, Plaintiff argues that despite not having actual physical control of the property at issue—the SIMS cabinets, implant sets, and inventory on consignment with the customer and stored at customers' facilities—it had "possession" of those items since the customers did not have the intent to exercise control of those items until they were to be used in surgery.  (Pl.'s Resp. Opp'n Powell Mot. Dismiss 40.)  Moreover, Synthes asserts that trespass is alleged only "to the extent the inventory was loaned or consigned, and therefore, owned by Synthes at the time, and to the extent the SIMS were fully or partially owned by Synthes at the time."  (Id. at 40–41 (quoting Am. Compl. ¶ 284).)  Thus, not every instance of Powell's use or labeling of Synthes's SIMS sets or inventory constituted trespass to chattels because Synthes did not retain ownership of the property in every situation.  Rather, its ownership rights

varied from customer to customer depending on the parties' contracts.  (Id. at 41.)

While Plaintiff's argument stands on somewhat tenuous grounds, the Court nonetheless deems it sufficient to survive Rule 12(b)(6) scrutiny.  Plaintiff has alleged that many of its SIMS were still fully or partially owned by Synthes at the time of the alleged interference and that they were only loaned or on consignment with Synthes customers.  Taking these assertions as true, Plaintiff's right to relief on the trespass to chattels claim has been raised above the speculative level.  To the extent discovery reveals that Synthes owned none of the property at issue at the time of the alleged trespass, Defendants may seek summary judgment on this claim.

### 6.    Civil Conspiracy Claim

To state a cause of action for civil conspiracy, the plaintiff must demonstrate: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage."  Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (citation and internal quotations omitted).  An "'actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor.'"  Levin v. Upper Makefield Twp., 90 F. App'x 653, 667 (3d Cir. 2004) (citing In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 789 (3d Cir. 1999)).  Ultimately, "only a finding that the underlying tort has occurred will support a claim for civil conspiracy."  Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 506 (E.D. Pa. 2008) (quotation omitted).

Importantly, "[p]roof of malice, *i.e.,* an intent to injure, is essential in proof of a conspiracy." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979).  "Malice requires . . . that the

70

*sole* purpose of the conspiracy was to injure the plaintiff," and that this intent was without

justification.  Doltz v. Harris & Assoc., 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003) (emphasis added).

As malice can only be found when the *sole* purpose of the conspiracy is to injure the plaintiff, a

showing that a person acted for professional reasons, and not solely to injure the plaintiff, negates a

finding of malice.  See Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009);

Thompson Coal Co., 412 A.2d at 472 (noting that the intent to injure must be without justification,

which cannot exist when an act is merely done "with the intention of causing temporal harm,

without reference to one's own lawful gain, or the lawful enjoyment of one's own rights") (quoting

Rosenblum v. Rosenblum, 181 A. 583, 585 (Pa. 1935)).

     The civil conspiracy count incorporates all of the other allegations of the Amended

Complaint and then alleges as follows:

304.    The Defendants' conduct set forth above establishes a civil conspiracy among them to develop and operate a company that would wrongfully compete with Synthes.

305.    The Defendants' conspiracy has, at all times, involved a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by an unlawful means or for an unlawful purpose.

306.    This combination of the Defendants has, at all times, specifically intended to injure Synthes.

307.    The actions of this combination of Defendants, including the overt actions set forth in Paragraphs 1 – 302 above, were taken in pursuance and furtherance of the conspiracy's common purpose to found, develop, and operate a business that unlawfully competes with Synthes.

308.    Synthes has suffered, and will continue to suffer, substantial and irreparable damage as a result of the Defendants' conspiracy and tortious conduct.

(Am. Compl. ¶¶ 304–08.)  Defendant Powell now argues that this claim fails because Plaintiff has

not alleged a *sole* intent to injure on the part of Defendant Powell or any other Defendant.  Rather,

the allegations of the Amended Complaint reflect that Defendants were operating Emerge as a competitive, for-profit business, and that they actions they took were for the purpose of expanding that business, not solely for injuring Plaintiff.

On this point, the Court must agree with Defendant Powell.  The Amended Complaint specifically alleges that the common purpose of the conspiracy was to "found, develop, and operate a business that unlawfully competes with Synthes."  (Id. ¶ 307.)  Although cursorily alleging that "[t]his combination of the Defendants has, at all times, specifically intended to injure Synthes," the intent of the particular Defendants is not equivalent to an allegation that the basis for their conspiracy was to injure.  Indeed, a careful reading of the allegations discussing the foundation of the conspiracy reveals that it was intended to develop a new company which would provide financial benefit to those participating, but the actions taken in furtherance of that conspiracy were purportedly unlawful and had the incidental effects of competitively injuring Synthes.  (Id. ¶¶ 124–68.)  Moreover, other portions of the Amended Complaint expressly acknowledge that the Defendants misappropriated information "to help them develop and implement Emerge's business model, to identify and/or design, develop, test, and manufacture products competitive with certain of Synthes' products, to manage inventory and purchase orders, to develop Emerge's marketing efforts to customers, and to otherwise effectuate their scheme to compete wrongfully with Synthes."  (Id. ¶ 241.)  The fact that it may have been necessary to deceive Plaintiff or to otherwise willfully and maliciously commit various torts against Plaintiff[30] in order to carry out this scheme does not equate

---

[30]  As Plaintiff points out, several other allegations pertaining to other causes of action in the Amended Complaint state that Defendants' actions were "willful and wanton," "knowing," "intentional," "wrongful," and done with the "intent to defraud."  (Am. Compl. ¶¶ 255, 262–63, 285.)  These allegations do not demonstrate an intent to harm.  Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292, 313 (E.D. Pa. 2008) ("Bald assertions that certain actions were

to an allegation that the conspiracy was formed with the sole intent to injure Plaintiff.  See Spitzer v. Abdelhak, No. Civ.A.98–6475, 1999 WL 1204352, at *9 (E.D. Pa. Dec. 15, 1999) ("As Plaintiffs have stated elsewhere, the Defendant's purpose of the conspiracy was to benefit themselves personally and professionally.  The fact that it may have been necessary to deceive Plaintiffs in order to carry out their scheme in no way indicates that they acted with malice solely to injure Plaintiffs."). In other words, according to Plaintiff's own allegations, the Defendants' alleged improper actions were taken for the *purpose* of economically benefitting them in their new endeavor, but had the side effect of affecting Synthes's operations and profitability.  At no point in the Amended Complaint does Plaintiff expressly state that any purpose of the conspiracy—let alone the sole purpose—was to injure Synthes.[31]  Accordingly, this claim, as alleged against Defendant Powell, shall be dismissed.[32]

---

malicious are insufficient; it must be alleged that the 'sole purpose of the conspiracy was to injure the Plaintiffs.'") (quotations omitted). Although Plaintiff includes allegations within its tortious interference and misrepresentation claims that those torts were "intended to harm" or "intended to injure" Synthes, (Am. Compl. ¶¶ 225, 278), such allegations neither imply that the sole purpose of the *conspiracy* was to injure, nor do they negate Plaintiff's concessions that the conspiracy was, at heart, designed to economically and commercially benefit Defendants.

[31]  The Court finds the cases cited by Plaintiff on this point unconvincing.  First, Plaintiff references EXL Labs., LLC v. Egolf, No. Civ.A.10-6282, 2011 WL 880453 (E.D. Pa. Mar. 11, 2011).  In that matter, the civil conspiracy cause of action portion of the complaint only alleged that the defendants sought to create another business entity through their conspiracy.  Id. at *10. The complaint, however, alleged that the defendants misappropriated trade secrets—the tort underlying the conspiracy—for the purpose of interfering with the plaintiff's existing and potential contracts and that such actions were taken with the intent to harm the plaintiff.  Id.  The court rejected the defendant's argument that plaintiff had failed to allege that the "sole purpose" of the conspiracy was to injure.  Id.

Second, Plaintiff relies on RDK Truck Sales & Serv. Inc. v. Mack Trucks, Inc., No. Civ.A.04-4007, 2009 WL 1441578 (E.D. Pa. May 19, 2009), wherein the defendant sought to dismiss the civil conspiracy claim against it on the ground that intent to injure was not the sole basis of the conspiracy.  Id. at *33.  The court found, however, that "[plaintiff] is not alleging that the legitimate business actions of [defendants] form the basis of its civil conspiracy claim. Instead, it is the improper actions of [defendants] that—while economically beneficial to them—form the basis of Mack's civil conspiracy claim."  Id.  It went on to note that plaintiff's

## IV.    CONCLUSION

In light of the foregoing, the Court finds that Defendant Powell's Motion to Dismiss should be granted in part in denied in part.  First, to the extent the tortious interference with contract claim (Count III) alleges that Defendant Powell improperly solicited Synthes employees to leave Synthes and accept employment elsewhere, that claim is barred by the gist of the action doctrine and must be dismissed.  The remainder of the tortious interference claim, however, remains unaffected by the gist of the action doctrine.  Second, Plaintiffs' civil conspiracy claim (Count XII) fails because the Amended Complaint does not—and at this juncture cannot—plausibly allege that the sole purpose of the conspiracy was to injure Plaintiffs.  Finally, with respect to the remainder of claims in the Amended Complaint, the Court finds that Plaintiffs' allegations are sufficiently specific to allow the Court to infer more than the mere possibility of misconduct.  As these claims survive Rule 12(b)(6) scrutiny, the Motion to Dismiss them shall be denied.  An appropriate order follows.

---

allegations could lead a reasonable fact-finder to infer that plaintiff's injuries "were not simply an incidental side-effect of otherwise legitimate business interests, but rather the fruits of an unlawful conspiracy." Id.

The present matter, however, is distinguishable.  In the foregoing cases, the complaints contained at least some allegations that the purpose of the conspiracy was to injure the plaintiff.  A thorough review of the present case, on the other hand, reveals no such allegation to indicate that Defendants acted with the sole intent to injure Plaintiff, with economic benefit being only an incidental side effect.

[32]  Via a footnote in its Response in Opposition, Plaintiff requests leave to amend to include the language that it was Defendants' "sole" intent to injure Synthes.  Because Plaintiff has already alleged that the purpose of the conspiracy was to further Defendants' new business, however, Plaintiffs could not now truthfully allege that the *sole* purpose of the conspiracy was to harm Synthes.  Accordingly, leave to amend is denied as futile.