# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SYNTHES, INC., SYNTHES USA HQ, INC.,　　:
SYNTHES USA, LLC, SYNTHES USA SALES,　:
LLC, and SYNTHES USA PRODUCTS, LLC,　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:　　CIVIL ACTION
　　　　　　　　Plaintiffs,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:　　NO.  11-1566
EMERGE MEDICAL, INC., JOHN P.　　　　　:
MAROTTA, ZACHARY W. STASSEN, ERIC　　:
BROWN, and CHARLES Q. POWELL,　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Defendants.　　　　　　　　　:
_____:
　　　　　　　　　　　　　　　　　　　　　　　　　:
EMERGE MEDICAL, INC.,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Counterclaim-Plaintiff,　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
SYNTHES, INC., SYNTHES USA HQ, INC.　　:
SYNTHES USA, LLC, SYNTHES USA SALES,　:
LLC, and SYNTHES USA PRODUCTS, LLC,　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Counterclaim-Defendants.　:

## <u>MEMORANDUM</u>

BUCKWALTER, S.J.　　　　　　　　　　　　　　　　　　　September 28, 2012

Currently pending before the Court is a Motion to Dismiss Counterclaims filed by

Counterclaim-Defendants Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC, Synthes USA

Sales, LLC, and Synthes USA Products, LLC ("Plaintiff" or "Synthes").[1]  For the reasons which

follow, the Motion is granted in part and denied in part.

---

[1]  Although there are multiple plaintiffs, for ease of discussion, the Court refers to
Plaintiffs in the singular as either "Synthes" or "Plaintiff."

I.      **RELEVANT FACTUAL HISTORY**[2]

Counterclaim-Plaintiff Emerge Medical, Inc. ("Emerge") is a Colorado for-profit corporation with its principal place of business in Colorado. (Countercl. Compl. ¶ 5.) Counterclaim-Defendant Synthes, a self-proclaimed "worldwide leader in the medical device industry," is a multi-national corporation that employs more than 10,000 people worldwide with a market cap value exceeding $22 billion. (Id. ¶ 6.)

In 2004, John Marotta—a defendant in the principal case—went to work for Synthes as a Sales Consultant in Arizona. (Id. ¶ 7.) Due to his efforts alone, Synthes's market share in Arizona increased fifteen fold by 2008. (Id.) A mere fraction of the sales attributable to Marotta involved Generic Device Fixation Hardware. (Id.) Marotta's achievements, however, came with great personal sacrifice and time away from his family. (Id.) Ultimately, due to his success, Synthes moved Marotta to Colorado to act as its Regional Manager. (Id. ¶ 8.)

Currently, Marotta is the Chief Executive Officer of Emerge, a company formed to sell generic but lot traceable drill-bits, guidewires, and surgical screws ("Generic Device Fixation Hardware") for which orthopedic surgeons have little-to-no brand preference and for which no intellectual property is attached. (Id. ¶ 9.) Emerge's products are lot-traceable because, unlike Synthes, Emerge engraves its Generic Device Fixation Hardware so upon removal or use in bone fixation it is clear who manufactured the product. (Id.) Emerge is a recently-formed company that has yet to turn a profit, in sharp contrast to Synthes which reported sales and earnings growth of 10% and 7% respectively for the first half of 2011. (Id. ¶ 10.)

According to the Counterclaim Complaint, Synthes is a monopoly in the Orthopaedic

_____

[2] The factual background is taken directly from Emerge's Counterclaim Complaint, as required at this stage of the proceedings. Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991).

Trauma space with over 50% market share.  (Id. ¶ 11.)  Emerge has engaged in the sale of Generic Device Fixation Hardware in territories where it is lawful to do so.  (Id. ¶ 12.)  Accordingly, there is no likelihood of consumer confusion with respect to any of the Generic Device Fixation Hardware laser marked by Emerge.  (Id. ¶ 13.)  Further, Emerge never made false representations in connection with the sale of Generic Device Fixation Hardware belonging to Synthes, or Generic Device Fixation Hardware similar or identical to that developed by Synthes.  (Id. ¶ 14.)  Nor has Emerge ever marketed as its own Generic Device Fixation Hardware belonging to Synthes that was either similar or identical in nature.  (Id. ¶ 15.)  In the process of conducting its business, Emerge has "introduced fair pricing to the marketplace with Generic Device Fixation Hardware while maintaining high standards of quality and lowering costs for its hospital partners."  (Id. ¶ 16.)

Since the formation of Emerge, Synthes has purportedly attempted to thwart Emerge's success through the improper actions of its employees and agents.  (Id. ¶ 17.)  These actions include, but are not limited to, the dissemination of false, defamatory, libelous, and malicious information about Emerge's personnel and products, while using oppressive litigation tactics aimed at intimidating and eliminating Emerge.  (Id.)

On March 4, 2011, Synthes initiated the current federal action against both John Marotta and Emerge Medical, Inc. essentially claiming that Marotta breached multiple employment agreements during the formation of Emerge.  Emerge filed an Answer and Affirmative Defenses, but no Counterclaim.  Thereafter, on March 6, 2012, Plaintiff filed an Amended Complaint adding three new defendants and setting forth thirteen causes of action, all in connection with various breaches by the Defendants of non-competition contracts and accompanying tort violations.  In response, on April 3, 2012, Emerge filed its Answer and Counterclaim, alleging eight causes of action as follows: (1) trade libel (id. ¶¶ 18–23); (2) tortious interference with prospective contractual relationships (id.

¶¶ 24–31); (3) unfair competition (id. ¶¶ 32–39); (4) illegal monopolization violating Section 2 of the Sherman Act (id. ¶¶ 40–50); (5) attempted monopolization violating section 2 of the Sherman Act (id. ¶¶ 51–61); (6) violation of section 13 of the Clayton Act (id. ¶¶ 62–75); (7) request for declaratory judgment on Synthes's claim of tortious interference with contract (id. ¶¶ 76–78); and (8) request for declaratory judgment on Synthes's claim of aiding and abetting a breach of fiduciary duty.  (Id. ¶¶ 79–87.)

On May 18, 2012, Synthes filed a Motion to Dismiss Defendant and Counterclaim-Plaintiff Emerge Medical, Inc.'s Alleged "Abuse of Process" and Antitrust Counterclaims and, or, in the alternative, to Bifurcate and Stay All Proceedings and Discovery Related to Each Alleged Counterclaim.  Emerge responded on June 4, 2012, and Synthes filed a Reply Brief on June 25, 2012, making this Motion ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P.12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-

4

pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.  Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232-34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level'") (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static.  Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations.  Phillips, 515 F.3d at 233.  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.   DISCUSSION

Via the present Motion, Synthes seeks dismissal of both Emerge's abuse of process counterclaims and its antitrust counterclaims.  In addition, Synthes requests that this Court bifurcate

and stay all of Emerge's alleged counterclaims and all related discovery.  The Court first addresses the challenges to the abuse of process and the antitrust counterclaims and then turns to the bifurcation question.

### A.   Abuse of Process Counterclaims

In its Opening Memorandum, Synthes seeks dismissal of Emerge's purported "abuse of process" counterclaim.  Emerge, however, has explicitly clarified that its Counterclaim Complaint includes no such claim, thus mooting this portion of Synthes's Motion to Dismiss.  By way of its Reply Brief, Synthes now requests, under Federal Rule of Civil Procedure 12(f), that the Court strike any references to "oppressive litigation tactics" or "abuse of process" on the grounds that they are redundant, immaterial, and impertinent material.

Rule 12(f) of the Federal Rules of Civil Procedure provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter."  Fed. R. Civ. P. 12(f).  "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters."  McInerney v. Moyer Lumber and Hardware, Inc., 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002).  Although "[a] court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)," such motions are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case."  River Road Devel. Corp. v. Carlson Corp., No. Civ.A.89-7037, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990).  Thus, striking a pleading or a portion of a pleading "is a drastic remedy to be resorted to only when required for the purposes of justice."  DeLa Cruz v. Piccari Press, 52 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (quotations omitted).

The paragraphs challenged by Synthes in this case read as follows:

1.     These Counterclaims assert claims of trade libel, tortious interference with prospective contractual relationships, violations of Pennsylvania unfair competition law, violations of illegal monopolization under Section 2 of the Sherman Act, violations under Section 13 of the Clayton Act, *abuse of process* to address the malicious willful and unlawful conduct of Synthes.

. . .

17.    Since the formation of Emerge, Synthes has attempted to thwart Emerge's success through the improper actions of Synthes' employees and agents.  These actions include, but are not limited to, the dissemination of false, defamatory, libelous and malicious information about Emerge's personnel and products, while *using oppressive litigation tactics* aimed at intimidating and eliminating Emerge.

. . .

33.    Counterclaim Defendants Synthes [sic] has wrongfully and intentionally attempted to thwart Emerge's rise in the orthopedic device business by engaging in a continuous course of conduct involving disseminating false and malicious information about Emerge's personnel and products while using *oppressive litigation tactics aimed at intimidating and eliminating Emerge*, wrongfully obtaining trade secret and other confidential information from Emerge, and unfairly competing in the orthopedic device business by, inter alia, making false and disparaging statements concerning Emerge and its products.

(Countercl. Compl. ¶¶ 1, 17, 33 (emphasis added).)  Synthes now argues that such allegations must be stricken because they are not the basis for any counterclaim or for the relief Emerge seeks, and are thus "redundant, immaterial, [and] impertinent."  (Synthes's Reply Br. 2 n.3.)

The Court, however,  does not find the challenged allegations to be either completely irrelevant to the controversy or particularly impertinent or scandalous.  Indeed, many of Emerge's claims against Synthes contend that the tortious acts were done intentionally, willfully and wantonly, or with a specific intent to injure Emerge.  The allegations of "oppressive litigation tactics" and "abuse of process," while not forming the basis of any specific claim against Synthes, are used to exemplify Synthes's alleged continuing "state of mind."  Moreover, Synthes has not identified—and this Court cannot discern—how the inclusion of such allegations would either

7

prejudice it or confuse the issues in this case.  Given the general reluctance to grant motions under Rule 12(f), the Court declines to strike the challenged language from the Counterclaim Complaint.

### B.    <u>Antitrust Claims</u>

Synthes next challenges Counts IV, V, and VI of the Counterclaim Complaint, which allege illegal monopolization violating Section 2 of the Sherman Act, 15 U.S.C. § 2, attempted illegal monopolization violating Section 2 of the Sherman Act, and violation of Section 13 of the Clayton Act as amended by the Robinson-Patman Act, respectively.  The elements of these claims overlap in many respects.  First, to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff "must allege '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.'" <u>Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.</u>, 159 F.3d 129, 141 (3d Cir. 1998) (quoting <u>Schuylkill Energy Res. v. Pa. Power & Light Co.</u>, 113 F.3d 405, 412–13 (3d Cir. 1997)).  Second, to state a claim for attempted monopolization under § 2 of the Sherman Act, a plaintiff must plead "'(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" <u>Broadcom Corp. v. Qualcomm Inc.</u>, 501 F.3d 297, 317 (3d Cir. 2007) (quoting <u>Crossroads Cogeneration Corp.</u>, 159 F.3d at 141).  Third and finally, Section 2(a) of the Robinson-Patman Act, a 1936 amendment to the Clayton Act, provides, in pertinent part, as follows:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination or with customers of either of them. . . .

15 U.S.C. § 13(a).  "In order to establish a *prima facie* violation of section 2(a) of the Act, a plaintiff must demonstrate a reasonable possibility that a price difference may harm competition."  J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990) (citing Falls City Indus., Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 435 (1983)).

The pleading of these various elements is "subject to the notice-pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Broadcom Corp., 501 F.3d at 317 (quotation omitted).  Antitrust claims are generally construed liberally, making the standard for dismissal under Rule 12 rigorous.  McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246 (1980); Hospital Bldg. Co. v. Trustees, 425 U.S. 738, 746 (1976); Knuth v. Erie–Crawford Dairy Coop. Ass'n, 395 F.2d 420, 423 (3d Cir. 1973).  Because the specific facts and details are "largely in the hands of the alleged [monopolists]," see Poller v. Columbia Broad. Sys., 368 U.S. 464, 473 (1962), dismissals should be granted "very sparingly."  See Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976).

Nonetheless, facts must still be pled with reasonable particularity in order to permit an inference that a federal antitrust claim is cognizable, particularly given the "massive factual" nature of such claims.  See Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters, 459 U.S. 519, 528 n.17 (1983); Commonwealth of Pa. ex. rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 179 (3d Cir. 1988).  "[A] litigant must adumbrate in each counterclaim an intelligible definition of the elements of its antitrust claim, even under the liberal notice pleading requirements of the Federal Rules of Civil Procedure."  Syncsort Inc. v. Sequential Software, Inc. 50 F. Supp. 2d 318, 328–29 (D.N.J. 1999) (quoting CCPI Inc. v. Am. Premier, Inc., 967 F. Supp. 813, 819 (D. Del. 1997)).  As remarked by Judge Friendly of the United States Court of Appeals for the Second

9

Circuit, "[a] mere allegation that defendants violated the antitrust laws as to a particular plaintiff and commodity no more complies with Rule 8 than an allegation which says only that defendant made an undescribed contract with the plaintiff and breached it, or a defendant owns a car and injured plaintiff by driving it negligently." Klebanow v. NY Produce Exch., 344 F.2d 294, 299 (2d Cir. 1965). "The factual specificity required for antitrust claims stems in part from the fact that the antitrust laws were designed for the 'protection of competition, not competitors.'" Id. (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 518 (3d Cir. 1998) (further quotations omitted)). Ultimately "defendants cannot be said to have violated antitrust laws in ways that have not been alleged." Zimmerman, 836 F.2d at 180.

Synthes now seeks dismissal of Emerge's antitrust counterclaims on several grounds. First, it asserts that Emerge has not defined either a relevant geographic market or relevant product market based on reasonable interchangeability and the cross-elasticity of demand. Second, it contends that Emerge has not pled Synthes's monopoly power, the dangerous probability that Synthes would achieve monopoly power, or a reasonable expectation that Synthes would later recoup predatory losses with monopoly profits. Finally, Synthes avers that the antitrust counterclaims each fail to the extent they are based on predatory or discriminatory pricing. In light of the foregoing pleading principles, the Court now considers each argument individually.

### 1.    Relevant Geographic Market and Product Market

"Both the Clayton Act and the Sherman Act require a showing of anticompetitive effect on a line of commerce within 'an appropriate section of the country.'" Joseph Ciccone & Sons, Inc. v. E. Indus., Inc., 559 F. Supp. 671, 674 (E.D. Pa. 1983) (quoting United States v. Brown Shoe Co., 370 U.S. 294 (1962)). Thus, whether proceeding under either Act, "[a]n antitrust plaintiff must plead

facts sufficient to demonstrate a viable relevant market." Syncscort, Inc., 50 F. Supp. 2d at 327

(citations omitted); see also Yeager's Fuel, Inc. v. Pa. Power & Light Co., 953 F. Supp. 617, 644

(E.D. Pa. 1997) ("Plaintiffs bear the burden of defining the relevant market.").   The relevant market

consists of both a geographic market and a product market.  Spectrum Sports, Inc. v. McQuillan,

506 U.S. 447, 459 (1993).  Notably, the market must be adequately defined in the relevant pleading

and theories set forth in an opposition brief are not sufficient substitutes.  Syncsort, 50 F. Supp. 2d

at 333.

     In the present case, Synthes argues that Emerge does not commit to any geographic market

whatsoever, as it alleges nothing more than the fact that Synthes is a "multi-national corporation."

Moreover, Synthes avers that Emerge has failed to plead the facts necessary to establish a relevant

product market.  Ultimately, Synthes argues that "[t]hese failures in Emerge's pleading are

representative of a larger failure to plead the 'outer boundaries of a product market' through

allegations regarding 'reasonable interchangeability and cross-elasticity of demand' and identifying

a market that 'encompass[es] all interchangeable product substitutes.'" (Synthes's Mem. Supp. Mot.

to Dismiss 20.)

### a.    Relevant Geographic Market

     "The relevant geographic market consists of the area in which customers would look to

purchase the product."  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 922 F. Supp 1055, 1061

(E.D. Pa. 1996) (citing Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991)).

"Consequently, the geographic market is not comprised of the region in which the seller attempts to

sell its product, but rather is comprised of the area where his customers would look to buy such a

product."  Tunis Bros., 952 F.2d at 726 (quoting Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa., 745

F.2d 248, 260 (3d Cir. 1984)).  A plaintiff must therefore focus on elasticity of demand, *i.e.*

consumer behavior.  Dicar, Inc. v. Stafford Corrugated Prods., Inc., No. Civ.A.05-5246, 2010 WL 988548, at *11 (D.N.J. Mar. 12, 2010).  Where a plaintiff has "not focused on the elasticity of demand (i.e. consumer behavior)," it has not "adequately plead a geographic market."  Id. at *11–12.  "The definition of the relevant geographic market . . . is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration."  Borough of Lansdale v. Phila. Elec. Co., 692 F.2d 307, 311 (3d Cir. 1982).  To survive a Rule 12(b)(6) motion to dismiss, however, Plaintiff's alleged market must be "plausible."  Glaberson v. Comcast Corp., No. Civ.A.03-6604, 2006 WL 2559479, at *12 (E.D. Pa. Aug. 31, 2006) (quoting Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)).

Emerge now contends that it has described its geographic market as the "United States Healthcare market at large" and that the United States "can, in appropriate instances, be a relevant geographic market."  (Emerge Resp. Opp'n Mot. to Dismiss 10.)  A careful reading of the Counterclaim Complaint reveals that Emerge has not properly pled the United States as the relevant geographic market for purposes of this case.  As a primary matter, nothing in the Counterclaim Complaint itself indicates that the United States is the relevant geographic market.  Rather, the only seemingly pertinent allegations aver that: (1) "Synthes, a self-proclaimed 'world-wide leader in the medical device industry,' is a multi-national corporation that employs more than 10,000 people worldwide with a market cap value exceeding $22  billion" and (2) "Synthes Predatory Anti-Competitive has proximately caused injury to Emerge's business and property, the Market for Generic Device Fixation Hardware *in the United States*, the healthcare consumer, and *the United States Healthcare market at large*."  (Countercl. Compl. ¶¶  6, 49, 60, & 74 (emphasis added).)  An attempt to read these allegations as an effort to identify the relevant geographic market would strain the bounds of liberal interpretation.  Rather, such statements appear to be nothing more than

standard pleading statements made to define (a) one of the parties to the litigation and (2) allege the requisite injury for the antitrust causes of action.

Even assuming *arguendo* that these paragraphs could be interpreted as an effort to define the relevant geographic market as the United States (a strained interpretation at best), such allegations would be insufficient.  The law is clear that the relevant geographic market is not defined by the market in which the defendant conducts its business, or even where the injury is felt.  Home Health Specialists, Inc. v. Liberty Health Sys., No. Civ.A.92-3413, 1994 WL 463406, at *3 (E.D. Pa. Aug. 24, 1994) ("Service area is the geographic area where a business tries to sell its goods or services.  There is no basis for inferring that a service area constitutes a geographic market unless the Plaintiff offers evidence of elasticity of demand and barriers to entry.").  Rather, the relevant geographic market is where customers would rationally look for the goods or services he or she seeks.  Tunis Bros., 952 F.2d at 726.  Emerge has made no effort to explain why the relevant market is limited to the United States, particularly where Synthes is alleged to be a "multi-national corporation." "Where, as here, there is no indication that a consumer would be unable to purchase a product abroad, the Court will not arbitrarily limit the geographic market to the United States."  Dicar, Inc., 2010 WL 988548, at *12.

Ultimately, "[t]he mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market."  Tunis Bros., 952 F.2d at 727; see also Andela v. Am. Ass'n for Cancer Research, 389 F. App'x 137, 141 (3d Cir. 2010) (holding that plaintiff's conclusory allegation that the relevant geographic market was "the world" did not adequately define the market).  Emerge's Counterclaim Complaint does not even go so far as to delineate a geographical area, let alone

reference the market as perceived by consumers and suppliers.[3]  Accordingly, the Court deems it insufficient to plead this element.

### b.     Relevant Product Market

The relevant product market is defined as "those 'commodities reasonably interchangeable by consumers for the same purposes.'"  Tunis Bros., 952 F.2d at 722 (3d Cir. 1991) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)).  "'Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively.  A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible.'"  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir. 1997) (quoting Allen-Myland, Inc. v. Int'l Bus. Machs. Corp., 33 F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted)).  "Reasonable interchangeability is also indicated by 'cross-elasticity of demand between the product itself and substitutes for it.'"  Id. at 437 & n.6 (remarking that "[c]ross-elasticity is a measure of reasonable interchangeability") (quoting Brown Shoe Co. v. U.S., 370 U.S. 294, 325 (1962)).  Other factors to be considered in assessing reasonable interchangeability include price, use and qualities.  Queen City Pizza, 124 F.3d at 437; see also SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3d

---

[3]  The sole case cited by Emerge on this issue is Howard Hess Dental Labs Inc. v. Dentsply Int'l, 602 F.3d 237 (3d Cir. 2010), which it cites for the proposition that an alleged market defined as the market for "artificial teeth and/or premium artificial teeth in the United States" was "sufficient to satisfy the market definition necessary to proceed with anti-trust claims under the Sherman Act."  (Emerge Resp. Opp'n Mot. to Dismiss 10.)  This case, however, is inapposite.  The Third Circuit never actually considered any argument as to the adequacy of pleading the relevant market and, therefore, never ruled that such an allegation was sufficient to satisfy relevant pleading standards.  Moreover, the complaint in that case explicitly defined a relevant market, whereas the present matter lacks even a reasonable inference to a relevant geographic market.

Cir. 1978) (describing the relevant product market as "those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other").  The failure to plead a relevant product market is, standing alone, a sufficient basis for dismissal of an antitrust claim.  Syncsort, Inc., 50 F. Supp. 2d at 331 (citing Queen City Pizza, 124 F.3d at 436)).

Like its efforts to plead a relevant geographic market, the Counterclaim Complaint in this case is similarly deficient in its efforts to plead a relevant product market.  Emerge's Response Brief contends, in conclusory fashion, that it has described its relevant product market as the "Market for Generic Fixation Hardware" and has satisfied its pleading burden by alleging that "'Emerge's Generic Device Fixation Hardware is fully interchangeable with similarly numbered Generic Device Fixation Hardware that is produced and sold (and sometimes given away) by Synthes,' and that 'Emerge has introduced fair pricing to the marketplace with Generic Device Fixation Hardware while maintaining high standards of quality and lowering costs for its hospital partners.'" (Emerge Resp. Opp'n Mot. to Dismiss 13 (quoting Countercl. Compl. ¶¶ 9, 16).)  It goes on to assert that its relevant product market thus consists of the market for "Generic Device Fixation Hardware" such as "screws, drill bits, and guidewires compatible for use with Synthes plates."  (Id. at 10, 13–14.)

This argument is fraught with error.  The most glaring problem is that the Counterclaim Complaint simply does not say what Emerge represents it says.  For example, paragraph 9, which, according to Emerge's brief, states that "Emerge's Generic Fixation Hardware is fully interchangeable with similarly numbered Generic Device Fixation Hardware that is produced and sold (and sometimes given away) by Synthes," actually reads:

> 9.     Marotta is the Chief Executive Officer of Counterclaim Plaintiff Emerge
>        Medical Inc. a company formed to sell generic but lot traceable drill-bits,
>        guidewires, and surgical screws ("Generic Device Fixation Hardware") for

> which orthopedic surgeons have little-to-no brand preference and for which no intellectual property is attached.  Emerge's products are lot-traceable, because unlike Synthes, Emerge engraves its Generic Device Fixation Hardware so upon removal or use in bone fixation it is very clear who manufactured the product.

(Countercl. Compl. ¶ 9.)  Paragraph 16, in somewhat repetitive fashion, states:

> 16.     Since its inception, Emerge has sought to sell generic, but lot-traceable, Generic Device Fixation Hardware for which orthopedic surgeons have little-to-no-brand preference and for which no intellectual property is attached because the technology of Generic Device Fixation Hardware has not changed in years.  Emerge's products are lot-traceable, because unlike Synthes, Emerge engraves its products so that, upon removal or use in bone fixation implantation, it is very clear who manufactured the product.  In this process, Emerge has introduced fair pricing to the marketplace with Generic Device Fixation Hardware while maintaining high standards of quality and lowering costs for its hospital partners.

(Id. ¶ 16.)  At no point in the Counterclaim Complaint is there any reference to interchangeability with Synthes's products or any suggestion that Emerge's products are "roughly equivalent" to Synthes's products for the uses to which they are put.

Equally problematic is the absence of any discussion of the cross-elasticity of demand between the product itself and substitutes for it.  This failure is complicated by the fact that Emerge defines the relevant market only as "Generic Device Fixation Hardware," including "drill-bits," "guidewires," and "surgical screws," without any reference to the price of and/or demand for surgical fixation devices as whole and without indicating whether such fixation hardware is limited to orthopedic uses.  Merely indicating that orthopedic surgeons have no "brand-preference" for one over the other fails to specify precisely what types of fixation hardware—regardless of brand—can be substituted for the other.  Nor is there any indication of distinctions among apparently comparable products within the market and what, if any, other competitors exist in the market.

16

Indeed, the Counterclaim Complaint lacks any allegations as to whether there are any reasonably interchangeable alternatives for its products.[4]  See Syncsort Inc., 50 F. Supp. 2d at 332 (finding market definition insufficient where it omitted mention of any potential entrants into the market or other products available from other suppliers which are comparable to or substitutes for the product from the point of view of consumers).  Finally, Emerge does not explain why the Generic Device Fixation market standing alone, as opposed to the broader orthopedic trauma, is the relevant product market, particularly of Emerge's concession that it sells products that "are part of the market for orthopedic medical devices."  (Emerge's Answer ¶ 11.)  Simply put, Emerge's cursory definition of the relevant product market provides no guidance whatsoever as to the outer bounds of that market. As such, "[t]his Court is not required to accept [Emerge's] definition of the relevant product market because it is 'a legal conclusion couched as a factual allegation' that is unsupported by [Emerge's] filings."  Bldg. Mats. Corp. of Am. v. Rotter, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

The Third Circuit has emphasized that, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable

---

[4]  To the extent Emerge's Response Brief now appears to refine its alleged product market as one limited to "the fixation hardware used in affixing Synthes' medical devices," (Emerge's Resp. Opp'n Mot. Dismiss 12), this allegation also does not appear in the Counterclaim Complaint and, therefore, may not be considered by the Court.  Nor will this Court consider Emerge's unpled argument that the Generic Device Fixation Hardware products marketed by Synthes and Emerge "are interchangeable, and Synthes' Predatory Anti-Competitive conduct directly affects the sale of Emerge's Generic Device Fixation Hardware . . . [because] [t]he two product lines are in direct competition insomuch as a customer who purchases from [Synthes], will not purchase the same or similar product from Emerge, and vice versa."  (Emerge Resp. Opp'n Mot. to Dismiss 20–21.)  Even assuming arguendo that such allegations were included in the Counterclaim Complaint, the Court still finds them insufficient to meet the aforementioned pleading standards for alleging relevant product market, since Emerge fails to allege the existence or absence of any other comparable products in the market.

substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." Queen City Pizza, 124 F.3d at 436; see also Syncsort Inc., 50 F. Supp. 2d at 331 ("The failure to plead a relevant product market is, standing alone, a sufficient basis for dismissal of an antitrust claim."). Numerous courts have applied this standard to dismiss complaints insufficiently pleading a relevant product market. See, e.g., Bldg. Mats. Corp., 535 F. Supp. 2d at 525 (dismissing antitrust claims where plaintiff alleged that the relevant product market was asphalt shingle roof ridge vents without any reference to the price of and/or demand for asphalt shingle roof ridge vents relative to the roofing products industry as a whole, and without reference to the rule of reasonable interchangeability and the cross-elasticity of demand); Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc., No. Civ.A.03-232, 2003 WL 22797730, at *5 (E.D. Pa. Nov. 18, 2003) (granting Rule 12(b)(6) dismissal of counterclaim defining relevant product market as "hemocompatible or biocompatible polymeric resins designed to remove middle molecular weight compounds or toxins from physiological fluids, including human blood," without any reference to the rule of reasonable interchangeability of use or cross-elasticity of demand); Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ.A.01-4254, 2002 WL 31246922, at *5 (E.D. Pa. Aug. 9, 2002) (dismissing antitrust claims because plaintiff did "not ground its allegations regarding product market with reference to the rule of reasonable interchangeability and cross-elasticity of demand").

In light of such jurisprudence, and given the lack of any allegations in the Counterclaim Complaint attempting to define either a relevant geographic market or a relevant product market, the antitrust counterclaims cannot withstand Rule 12(b)(6) scrutiny. Accordingly, the Court shall grant Synthes's Motion to Dismiss on this ground.

**2.    Synthes's Monopoly Power, the Dangerous Probability Synthes Will Achieve Monopoly Power, or a Reasonable Expectation that Synthes Would Later Recoup Predatory Losses with Monopoly Profits**

As noted above, claims of illegal monopolization or attempted monopolization require a showing of monopoly power or the dangerous probability of achieving monopoly power respectively.  For purposes of a claim of *illegal monopolization*, the Supreme Court has defined monopoly power as "the power to control prices or exclude competition and may ordinarily be inferred from a predominant share of the relevant market."  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).  "[T]he size of market share is a primary determinant of whether monopoly power exists. . . ."  Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa., 745 F.2d 248, 261 (3d Cir. 1984); see also Gordon v. Lewistown Hosp., 423 F.3d 184, 211–12 (3d Cir. 2005) ("Once the markets are defined, we must determine whether [the defendant]'s market share is sufficient to infer the existence of market power").  "A predominant share of the market, or a lesser market share combined with other relevant factors, may suffice to demonstrate monopoly power."  Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 201 (3d Cir. 1992).  Absent an allegation regarding market share, an antitrust claim is subject to dismissal.  Globespanvirata, Inc. v. Texas Instrument, Inc., No. Civ.A.03-2854, 2006 WL 543155, at *4 (D.N.J. Mar. 3, 2006).  Other factors are also relevant in considering whether a defendant has monopoly power, including: the size and strength of competing firms; freedom of entry into the field; pricing trends and practices in the industry; the ability of consumers to substitute comparable goods or services from outside the market; and consumer demand.  Fineman, 980 F.2d at 202 (citations omitted).

For purposes of a claim of *attempted monopolization*, a defendant's market share is also the "[m]ost significant" factor in proving a dangerous probability of achieving monopoly power.  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 513 (3d Cir. 1994).  Similar to claims for illegal

monopolization, however, "although the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive."  Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 112 (3d Cir. 1992). "[F]actors to be reviewed 'include the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand.'"  Pastore, 24 F.3d at 513 (quoting Barr Labs., 978 F.2d at 112).

Emerge's Counterclaim Complaint is virtually devoid of allegations regarding Synthes's market share, let alone any of the other factors involved in determination of monopoly power or dangerous threat of achieving monopoly power.  Read in the light most favorable to Emerge, the Counterclaim Complaint makes the following pertinent allegations:

> Synthes is a monopoly in the Orthopaedic Trauma space with over 50% market share.

(Countercl. Compl. ¶ 11.)

> There is a dangerous probability that Synthes, by driving Emerge and its other competitors out of business through use of the above noted Predatory Anti-Competitive conduct, will achieve a monopoly.

(Id. ¶¶  45, 56.)

> If Synthes is not compelled to cease the above Predatory Anti-Competitive Conduct it will achieve a monopoly, and once the monopoly is achieved Synthes will be free to raise its prices back to the high levels that were charged prior to the entry of competition including Plaintiff Emerge, into the market, and beyond.

(Id. ¶¶ 46, 57.)  These allegations consist merely of "labels and conclusions, and a formulaic recitation of the elements of a cause of action," which "will not do."  Twombly, 127 S. Ct. at 1965. Because they are "threadbare recitals" unsupported by any factual allegations, the Court need not accept them as true.

Even more problematic than the obvious conclusory nature of these allegations is the glaring absence of the key elements required to plead monopoly power. Most notably lacking in these paragraphs is any indication of market share. While Emerge randomly asserts that Synthes is a monopoly in the "Orthopedic Trauma space with over 50% market share," (id. ¶ 11), the relevant product market—according to the Counterclaim Complaint and Emerge's current briefing—is not "Orthopedic Trauma space." Rather, as discussed above, it is the limited and ill-defined subset of "Generic Fixation Devices," including drill bits, guidewires, and surgical screws. Using that definition, Emerge has failed to put forth any allegations regarding Synthes's market share in that particular product market.[5]

Perhaps in recognition of the deficiency of its market share allegations, Emerge argues that although market share is the predominant factor in alleging monopoly power, a small market share is not dispositive in the presence of other factors suggesting market power.[6] While true, Emerge

---

[5] Assuming *arguendo* that Orthopedic Trauma space could somehow be construed as the relevant product market, it is well-established that 50% market share or just over is insufficient to establish monopoly power. See, e.g., Fineman, 980 F.2d at 201–02 ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power . . . A significantly larger market share than 55 percent has been required to demonstrate *prima facie* monopoly power.") (citing Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 489 (5th Cir. 1984) (referring to Judge Learned Hand's formulation that 90% is enough, 60% is not likely to suffice, and 33% is insufficient to constitute monopoly power)); Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 112 (3d Cir. 1992) (holding that a 50% market share was insufficient to create "a dangerous probability" of monopolization); Slocomb Indus., Inc. v. Chelsea Indus., Inc., No. Civ.A.82-2546, 1984 WL 2945, at *5 (E.D. Pa. Feb. 17, 1984) ("Even assuming that Poly-Tex has a 50% share of this market, that would be insufficient to establish 'monopoly power' under the Sherman Act.").

[6] Citing Fineman, Emerge argues that "in the face of other such factors, bare size of market share may become partially or completely irrelevant." (Emerge Resp. Opp'n Mot. Dismiss 11 (citing Fineman, 980 F.2d at 201–02).) At no point in Fineman, however, does the Third Circuit ever suggest that market share can become "irrelevant." Rather, the law is clear that while the size of a defendant's market share is not the *exclusive* determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it

still fails to set forth *any* allegations as to *any* of the other factors relevant to monopoly power or the dangerous probability of achieving monopoly power such as the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, the ability of consumers to substitute comparable goods or services from outside the market, and consumer demand. Quite to the contrary, Emerge alleges that the products at issue are products for which orthopedic surgeons "have little-to-no brand preference and for which no intellectual property is attached because the technology of Generic Device Fixation Hardware has not changed in years." (Countercl. Compl. ¶ 16.) Such a statement indicates that there are no barriers to entry and that consumers can easily substitute goods and services from outside the market.

In a final effort to bolster its inadequate pleading of monopoly power, Emerge argues that an analysis of market share and the other factors is "mooted" because "the market in question is the fixation hardware used in affixing Synthes' medical devices, and until Emerge began operations, no other entity—other than Synthes— provided Synthes compatible products." (Emerge Resp. Opp'n Synthes Mot. Dismiss 11.) Notably, however, no such allegation regarding Synthes's dominance in the relevant market appears in the Counterclaim Complaint. See Syncsort, 50 F. Supp. 2d at 331 (noting that theories set forth in an opposition brief are not a sufficient substitute for pleading). Indeed, the Counterclaim Complaint itself makes several references to "Emerge and other competitors" or "Emerge and its other competitors," (Countercl. Compl. ¶¶ 26, 70), suggesting that Synthes faces competition beyond simply Emerge. Moreover, Emerge also admits in its original Answer that "the orthopedic device industry is competitive."[7] (Answer ¶ 17.) Finally, even

---

remains a relevant and *primary* determinant. Pa. Dental Ass'n, 745 F.2d at 260.

[7]  In its Reply Brief, Synthes argues that, throughout this litigation, Emerge has represented to the Court, to the public and to its investors that the orthopedic trauma market is a highly competitive market shared by many competitors. In making this argument, Synthes cites

assuming the Generic Fixation Hardware market is presently controlled by Synthes, the mere absence of other competitors does not *per se* suggest monopoly power, particularly where Emerge fails to suggest that the products at issue were so unique, the barriers to entry were so great, or the elasticity of consumer demand so rigid as to prevent any competition.[8]  See Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 381 (3d Cir. 2005) ("Plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a relevant product market, of the alleged monopolist's dominant share of that market, *and* of high barriers to entry.") (emphasis added).

In short, given the bare allegations of the Counterclaim Complaint, the Court finds that Emerge has failed to properly plead Synthes's monopoly power or dangerous probability of achieving monopoly power.  Therefore, the Court dismisses the antitrust claims on this ground as well.

**3.**        **Allegations of Discriminatory Pricing**

Via its next argument, Synthes contends that Emerge has failed to properly plead discriminatory pricing in support of its cause of action under the Robinson-Patman amendments to

---

to various deposition statements and public statements to investors wherein Emerge representatives admitted that Emerge's products were not unique and that the market was highly competitive.  (Synthes's Reply Br. 7–8.)  Synthes claims that Emerge cannot now discard these prior representations and allege that the market is controlled by Synthes.

The Third Circuit Court of Appeals, however, has explained that "in deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally may not consider matters extraneous to the pleadings unless it is a matter of public record or is 'integral to or explicitly relied upon in the complaint.'"  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted).  As such, to the extent Synthes rests its arguments on representations made by Emerge outside the pleadings, the Court shall not consider them.

[8]  Notably, a claim that Synthes already maintains—or maintained prior to Emerge's formation—a 100% market share would moot any assertion of "attempted monopolization."

the Clayton Act.[9]   A claim under Section 2(a) of the Robinson-Patman Act requires the plaintiff to

plead "price discrimination," which is "nothing more than a difference in price charged to different

purchasers or customers of the discriminating seller for products of like grade or quality."

Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d l267, 1271 (3d Cir. 1995) (citing cases).

"The different prices, however, must have been charged at reasonably contemporaneous times."

Precision Printing Co., Inc. v. Unisource Worldwide, Inc., 993 F. Supp. 338, 348 (W.D. Pa. 1998).

Moreover, "the statute as a practical matter could not, and does not, ban all price differences

charged to 'different purchasers of commodities of like grade and quality.'"   Brooke Grp. Ltd. v.

Brown & Williamson Tobacco Corp., 509 U.S. 209, 220 (1993) (quotations omitted).   "Congress

did not intend to outlaw price differences that result from or further the forces of competition."   Id.

Instead, "the Robinson-Patman Act condemns price discrimination only to the extent that it

threatens to injure competition."   Id.   Ultimately, a claim alleging "primary-line price

_____

[9]  In the same section of its Motion to Dismiss, Synthes also contends that, to the extent
the Sherman Act claims rely on predatory pricing to satisfy the requisite anti-competitive conduct
element, these claims are deficient.  As noted above, both claims of monopolization and
attempted monopolization under Section of the Sherman Act require a showing of some form of
anti-competitive conduct.  Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297, 308 (3d Cir. 2007)
(monopolization claim under Section 2 of the Sherman Act); Ideal Dairy Farms, Inc. v. John
Labatt, 90 F.3d 737, 750 (3d Cir. 1996) (attempted monopolization claim under Section 2 of the
Sherman Act).  While anti-competitive conduct can take multiple forms, one possible form is
predatory pricing, which is "below cost pricing wherein there is a 'deliberate sacrifice of present
revenues for the purpose of driving rivals out of the market and then recouping the losses through
higher profits earned in the absence of competition.'" Double H Plastics, Inc. v. Sunoco Prods.
Co., 575 F. Supp. 389, 394 (E.D. Pa. 1983) (citing Areeda and Turner, Predatory Pricing and
Related Practices under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 698 (1975)).
The Court, however, need not rule on this argument for several reasons.  Most
importantly, these claims have already been dismissed in their entirety based on other pleading
deficiencies.  Moreover, the Sherman Act claims in this case are premised on a variety of well-
pled forms of anti-competitive conduct—not just predatory pricing—meaning that,
notwithstanding the other pleading defects in the Sherman Act claims, this element has been
satisfied.  As such, the Court focuses solely on whether Emerge has properly pled discriminatory
pricing for purposes of the Clayton Act claim.

discrimination" under the Robinson-Patman Act,  has two prerequisites: (1) the plaintiff must "prove that the prices complained of are below an appropriate measure of its rival's costs" and (2) "the competitor had a reasonable prospect . . . of recouping its investment in below-cost prices."  Id. at 222–24.

In the present case, Emerge's Clayton Act claim is virtually identical to the Sherman Act claims and alleges generally that Synthes engaged in "Predatory Anti-Competitive conduct" with the intent to maintain and/or achieve a monopoly in the market for Generic Device Fixation Hardware and that such

> Actions constitute a clear violation of section 13 of the Clayton Act, which prohibits predatory anti-competitive conduct, 'where the effect of such [conduct] may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either [Synthes or Emerge].'  15 U.S.C.A. § 13, 13(a), 13(b) & 13(c).

(Countercl. Compl. ¶¶ 63–75.)  In an effort to further detail the extent of the "Predatory Anti-Competitive Conduct," Emerge sets forth the following allegations:

> Since the formation of Emerge, Synthes has attempted to thwart Emerge's  success through the improper actions of Synthes' employees and agents.   These actions include, but are not limited to, the dissemination  of false, defamatory, libelous and malicious information about Emerge's personnel and products, while using oppressive litigation tactics aimed at intimidating and eliminating Emerge.   Some of the actions undertaken in bad faith by Synthes' representatives include,  but are not limited to the following Predatory  Anti-Competitive conduct:
>
> •   Sending letters to customers of Emerge containing false and  or misleading statements  concerning  the relative quality of Emerge's  products, misrepresenting the FDA  approval  status of Emerge Products,  and giving unsolicited  and false legal advice concerning  the state of Emerge's insurance coverage and the level of litigation  risk  associated  with  the use of Emerge Products. . . . The statements   contained  in  such letters   are false, uninhibitedly predatory and anti-competitive, and  extraordinarily damaging to Emerge's market position, Emerge's  ability to compete in the market for

25

Generic Device Fixation Hardware, and the market and consumers themselves.

- Statements by Synthes' Trauma Division Vice President, Ken Carpenter and Synthes Trauma Division President, I.V. Hall, claiming that Synthes will put Emerge out of business.

- Making disparaging phone calls and site visits to Emerge's customers and relating false and or misleading statements concerning the relative quality of Emerge's products, misrepresenting the FDA approval status of Emerge Products, and giving unsolicited and false legal advice concerning the state of Emerge's insurance coverage and the level of litigation risk associated with the use of Emerge Products. The statements made in such phone calls and site visits are false, uninhibitedly anti-competitive, and extraordinarily damaging to Emerge's market position, Emerge's ability to compete in the Market for Generic Device Fixation Hardware, and the market and consumers themselves.

- Statements by Tim Hinueber, Synthes' Fairview Regional Manager, mandating that Fairview not use Emerge products and not use Emerge products with Synthes products.

- Statements made by Synthes' Tim Neuharth while in the surgical suite following an issue with an Emerge drill bit used in a Synthes rod, in which Neuharth told the surgeon during the procedure that the issue would never happen with a Synthes bit. Additionally, Neuharth added that Synthes offers these drillbits for free.

- Statements by Greg Talley of Synthes informing customers that they should not do business with Emerge or consider doing business with Emerge because Synthes is putting Emerge out of business and they will no longer be around.

- Repeated statements by Synthes' Lance Pfeiffer, stating that Emerge does not have account representatives to service the accounts and the Emerge product is inferior to Synthes' product.

- Encouraging Emerge supplier Orchid Orthopedics Unique not to do business with Emerge and instructing them to sever all ties to Emerge.

- Complaining via phone and email to Emerge about dull drill bits, ostensibly

on behalf of a physician.  When Emerge contacted the physician directly to research the complaint, the doctor stated that he would not comment, but was surprised and upset that a complaint was made by a Synthes representative on the physician's behalf.

- Statements by a Synthes representative Dave Lembo to a shared physician client, stating that an unidentified, dull drill bit was an Emerge bit.  Following the misstatement, Lembo encouraged the office manager to lodge a complaint against Emerge.

- Emails by Craig Turczynski, Regional Manager Synthes Orthopedic Trauma, to a hospital Materials Manager offering the highest savings on Synthes products if the Materials Manager's employer hospital signed a Letter of Commitment agreeing not to use Emerge products.

- "Bundling" and/or "tying" Synthes' Generic Device Fixation Hardware products to the sale of implants and other medical devices such that Generic Device Fixation Hardware is given to the consumer for FREE and/or at a substantial discount with the purchase of instruments or implants used for the surgical treatment of bone disease or trauma.  This bundling and/or tying results in the Generic Device Fixation Hardware being sold and/or given away at a price below an appropriate measure of cost, and at predatorily anti-competitive prices, including entirely free of charge.  This predatory anti-competitive bundling and tying will have the effect of forcing prices of Generic Device Fixation Hardware to levels well below appropriate measures of cost, and to levels at which Emerge cannot maintain a viable business.  Emerge has no other product lines or markets in which it participates to offset the below cost and/or free pricing structure being used by Synthes to force Emerge out of business.

(Id. ¶ 17.)

Viewing these allegations in the light most favorable to Emerge, the Court finds that while

Emerge has potentially alleged some *predatory* pricing, it has not alleged any

*discriminatory* pricing.  Nothing in the Counterclaim Complaint sets forth any difference in price

charged to different purchasers or customers of Synthes for products of like grade or quality.  Nor

does Emerge make any effort to allege that the prices charged by Synthes are below an appropriate

measure of *Synthes*'s costs,[10] <u>Brook Grp.</u>, 509 U.S. at 222, or that Synthes has a reasonable prospect of recouping its investment in the below-cost prices.[11]   <u>See</u> <u>Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC</u>, 414 F. App'x 334, 336 (2d Cir. 2011) (finding complaint conclusory and insufficient to allege that defendant's price was below cost where complaint was silent with respect to what defendant ultimately charged its consumers or what defendant's actual costs were).   At most, Emerge has alleged that Synthes will "bundle" its services, *i.e.*, it will reduce prices on or give away Generic Device Fixation Hardware for customers who use Synthes-manufactured instruments or implants—a service which Emerge cannot provide due to the fact that it only produces the Device Fixation Hardware.   Emerge has not shown, however, that such "bundling" is *per se* illegal or creates any reasonable inference that Synthes is gratuitously offering one price or a "bundling" deal to some customers, while offering a different price to or withholding the "bundling" deal from other customers.   <u>See</u> <u>Coalition for a Level Playing Field, L.L.C., v. Autozone, Inc.</u>, 737 F. Supp. 2d 194, 212 (S.D.N.Y. Sep. 7, 2010) ("There is no per se rule that bars a seller from granting a functional discount to a vertically-integrated buyer.").   Finally, nothing in the Counterclaim Complaint makes any allegation that Synthes's pricing has targeted Emerge's customers, as opposed to Synthes customers as a whole, in an effort to lure such customers back to Synthes.

---

[10]   Emerge asserts that the Generic Device Fixation Hardware was sold and/or given away "at a price below an appropriate measure of cost," but fails to define what that measure was or what the costs were.  (Countercl. Compl. ¶ 17.)  Indeed, later in the Counterclaim Complaint, Emerge alleges that it sells its Generic Device Fixation hardware at lower prices than that sold by Synthes.  (<u>Id.</u> ¶ 66.)

[11]   Although Emerge speculates that if Synthes is not compelled to cease its anti-competitive conduct, it will be free to raise prices back to the high levels charged prior to competition, (Countercl. Compl. ¶ 71), this allegation does not suggest that Synthes has engaged in any discriminatory, or even predatory pricing.

More simply put, Emerge has not alleged the most basic of premises for a showing of discriminatory pricing— "a difference in price charged to different purchasers or customers of the discriminating seller for products of like grade or quality."  Stelwagon Mfg. Co., 63 F.3d at 1271. Had there been some factually-based allegation that Synthes was pricing its Generic Device Fixation Hardware lower for Emerge customers or potential customers, but charging customers not in Emerge's service market a higher price, the discriminatory pricing allegation may have survived. No such inference can reasonably be made, however, from the allegations in the Counterclaim Complaint.  Accordingly, the Clayton Act claim must be dismissed on this ground as well.

### 4.      Conclusion as to Antitrust Claims

What remains before the Court are conclusory and haphazard allegations that purport to impute antitrust liability to Synthes.  While the Twombly/Iqbal standards do not require any kind of heightened pleading of antitrust claims, they do demand "more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  As a result, "[s]ome claims require more factual explication than others to state a plausible claim for relief."  West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010), cert. denied, 132 S. Ct. 98 (2011).  This is particularly true in the context of antitrust claims which are, by their very nature more factually intensive.  See Commonwealth of Pa. ex. rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 179–80 (3d Cir. 1908).  Thus, a failure to properly delineate a relevant geographic market, as defined by the antitrust jurisprudence, will result in dismissal of the case. Tunis Bros., 952 F.2d at 727.  Moreover, where an antitrust plaintiff fails to define a proposed relevant product market "with reference to the rule of reasonable interchangeability and cross-

elasticity of demand," the complaint is "legally insufficient and a motion to dismiss may be granted." Queen City Pizza, 124 F.3d at 436.  Finally, with respect to monopoly power or dangerous probably of achieving monopoly power, a complaint, to survive a motion to dismiss, "must allege 'something more' than mere market share, such as 'the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand.'" Broadcom Corp., 501 F.3d at 317 (quoting Crossroads Cogeneration Corp. v. Orange & Rockland Utils., 159 F.3d 129, 141 (3d Cir. 1998)). Ultimately, the Third Circuit has approved of a dismissal with prejudice of a "bare bones" antitrust claim without any supporting facts.  Zimmerman, 836 F.2d at 179–80 (citing Heart Disease Research Found. v. Gen. Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972)).

In the present case, the antitrust claims as sparsely pled in the Counterclaim Complaint suffer from all these deficiencies and more.  Short of making broad inferences only tenuously connected to actual allegations, the Court can discern no allegations that make any plausible attempt to define either the relevant geographic market or the relevant product market.  Moreover, aside from some blanket and conclusory statements that Synthes was the sole competitor in the Generic Fixation Device Hardware market until the entry of Emerge (statements later contradicted by Emerge's reference to "other competitors"), the Counterclaim Complaint fails to make any factual allegations that create an inference of monopoly power or the dangerous probability of achieving monopoly power.  Finally, while Emerge manages to detail examples of Synthes's anti-competitive conduct, it fails to allege *discriminatory* pricing, which is the sole conduct underlying its Clayton

Act claim.[12]  Given the barebones pleading offering little by way of factual substance, the Court

must grant Synthes's Motion to Dismiss Emerge's antitrust counterclaims.

### 5.  Leave to Amend

In a last-ditch effort to preserve these claims, Emerge requests leave to amend its

Counterclaim Complaint to correct any defects.  Federal Rule of Civil Procedure 15(a) sets out the

---

[12]  Notably, Synthes also argues that the antitrust claims fail due to Emerge's improperly pleading of harm to competition.  To establish antitrust injury, a plaintiff must show: (1) harm of the type the antitrust laws were intended to prevent and (2) an injury to the plaintiff that flows from that which makes the defendant's acts unlawful.  Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 489 (1977); Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3rd Cir. 2010).  Notably, "[b]usiness practices—however unseemly, hurtful, or even otherwise unlawful—do not constitute antitrust violations unless they harm, or at least endanger competition." In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 695–96 (E.D. Pa. 2007) (citing Tunis Bros. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1992)).  In other words, an antitrust plaintiff must allege that the "'challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare." Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996) (quoting Tunis Bros., 952 F.2d at 728).  These requirements "ensure[] that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990).

Synthes now asserts that the antitrust claims must additionally fail because Emerge does not allege harm to consumers, but rather only competitive harm to Emerge itself.  While acknowledging the general sparsity of the antitrust cause of action, however, the Court finds that the injury allegations just skirt past Twombly/Iqbal standards.  The Counterclaim Complaint alleges that "[t]here is a dangerous probability that Synthes, by driving Emerge and its other competitors out of business through use of the above noted Predatory Anti-Competitive conduct, will achieve a monopoly."  (Countercl. Compl. ¶ 45.)  It goes on to assert, that, "[i]f Synthes is not compelled to cease the above Predatory Anti-Competitive conduct it will achieve a monopoly, and once the monopoly is achieved Synthes will be free to raise its prices back to the high levels that were charged prior to the entry of competition, in including Plaintiff Emerge, into the market, and beyond."  (Id. ¶ 46.)  Finally, it claims that "Synthes' monopoly on the market for Generic Device Fixation Hardware and subsequent uninhibited ability to raise prices will have a deleterious effect on the market, the consumers, and runs contrary to the universal public policy goal of lowering the cost of healthcare in the United States."  Such allegations appear to sufficiently allege the requisite harm at this juncture of the proceedings.  Nonetheless, in light of the aforementioned ruling to dismiss the antitrust claims, the Court need not conclusively decide this issue.

standard for granting leave to amend a complaint when, as is the case here, a responsive pleading has been served:  "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  The Rule clearly states that "[t]he court should freely give leave when justice so requires."  Id.  Nonetheless, "[t]he policy favoring liberal amendment of pleadings is not . . . unbounded."  Dole v. Arco Chem. Co., 921 F.2d 484, 487 (3d Cir. 1990).  A district court may deny leave to amend a complaint where "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party."  Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  "While a District Court has substantial leeway in deciding whether to grant leave to amend, when it refuses this type of request without justifying its decision, this action is 'not an exercise of its discretion but an abuse of its discretion.'"  Id. (quoting Foman, 371 U.S. at 182).

It is well-settled in the Third Circuit that delay alone does not justify denying a motion to amend.  Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001); see also Collins v. City of Gloucester, No. Civ.A.06-2589, 2008 WL 1374213, at *6 (D.N.J. Apr. 9, 2008) ("'The mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay.'") (quoting Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984)).  Rather, it is only where delay becomes "'undue,' placing an unwarranted burden on the court, or . . . 'prejudicial,' placing an unfair burden on the opposing party" that denial of a motion to amend is appropriate.  Adams, 739 F.2d at 868; Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008); Tarkett, Inc. v. Congoleum Corp., 144 F.R.D. 289, 291 (E.D. Pa. 1992).  "Implicit in the

32

concept of 'undue delay' is the premise that Plaintiffs, in the exercise of due diligence, could have sought relief from the court earlier."  In re Pressure Sensitive Labeldstock Antitrust Litig., No. MDL.03-1556, 2006 WL 433891, at *1 (M.D. Pa. Feb. 21, 2006).  As such, the question of undue delay requires the court to focus on the movant's reasons for not amending sooner, while "bearing in mind the liberal pleading philosophy of the federal rules."  Cureton, 252 F.3d at 273; see also Lindquist v. Buckingham Twp., 106 F. App'x 768, 775 (3d Cir. 2004) (noting that the question of undue delay, as well as the question of bad faith, requires that the court focus on the plaintiff's motives for not amending their complaint to assert this claim earlier).  "Tactical decisions and dilatory motives may lead to a finding of undue delay."  Leary v. Nwosu, No. Civ.A.05-5769, 2007 WL 2892641, at *4 (E.D. Pa. Oct. 2, 2007).  Moreover, "substantial or undue prejudice to the non-moving party is a sufficient ground for denial of leave to amend."  Cureton, 252 F.3d at 273. Specifically, courts have considered "whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories. " Id.  Nonetheless, "[t]here is no presumptive period in which a motion for leave to amend is deemed 'timely' or in which delay becomes 'undue.'" Arthur v. Maersk, Inc., 434 F.3d 196, 205 (3d Cir. 2006).  Rather, "[w]hether delay is undue depends on the facts and circumstances of the case." Nat'l Recovery Agency, Inc. v. AIG Domestic Claims, Inc., No. Civ.A.05-0033, 2006 WL 1289545, at *4 (M.D. Pa. May 9, 2006).  Ultimately, "the obligation of the district court in its disposition of the motion is to articulate the imposition or prejudice caused by the delay, and to balance those concerns against the movant's reasons for delay."  Coventry v. U.S. Steel Corp., 856 F.2d 514, 520 (3d Cir. 1988).

   Given these considerations and in light of the procedural history of this case, the Court finds

itself compelled to deny leave to amend.  By way of background, the present case was filed on

March 4, 2011, at which time Emerge was one of only two named defendants.  Emerge timely filed

its Answer on April 6, 2011, but asserted no counterclaims against Synthes.  The parties engaged in

litigation for approximately six months and the Court set a trial date for October 24, 2011, before

the parties ultimately entered into settlement negotiations.  These negotiations proceeded from

October 2011 through December 2011, all to no avail.  At no point during this time period did

Emerge ever indicate any intention to file any counterclaims, let alone antitrust counterclaims.

On December 20, 2011, Emerge filed a motion seeking leave to assert counterclaims against

Synthes.  Emerge's proposed Counterclaim Complaint set forth claims of trade libel, tortious

interference with prospective contractual relationships, unfair competition, abuse of process, and

two declaratory judgment requests based on many of the same factual allegations now found in the

present Counterclaim Complaint.  The proposed pleading contained no mention of any antitrust

allegations.  Ultimately, a scheduling conference was held with the Court that same day, at which

time Synthes advised the Court and re-notified Emerge's counsel of its intent to seek leave to amend

its own Complaint to include additional claims and parties.  Given that Emerge would not agree to

Synthes's amendment of the Complaint, Synthes filed its own Motion to Amend on January 11,

2012, which had the effect of temporarily staying Emerge's Motion to Amend its Answer.  Emerge

then vigorously objected to Synthes's amendment on grounds of undue delay, futility, and bad faith.

After thorough consideration of the arguments and rigorous review of the potential futility of the

arguments, the Court, via Memorandum Opinion issued on March 6, 2012, granted leave to amend.

This ruling was based, in part, on the fact that the factual core of the litigation remained the same

34

and that the amendments were nothing more than efforts to include all participants and assert all pertinent legal theories.  Shortly thereafter, the parties stipulated to a new scheduling order, which closed all discovery by the beginning of October of 2012.  Yet still, Emerge did not even hint at its plans to proceed on any antitrust claims.

It was not until April 3, 2012, when Emerge filed its Answer to the Amended Complaint and Counterclaim Complaint, that it included not only the previously proposed causes of action, but also three brand new claims alleging antitrust violations.  As noted above, these claims were sparsely pled and cannot withstand Rule 12(b)(6) scrutiny.  Eighteen months having passed since the commencement of the litigation, the Court now faces the dilemma of whether to allow re-pleading of such deficient, bare-bones antitrust counterclaims.  Cognizant that this delay alone is insufficient to deny leave to amend, the Court finds that multiple other factors counsel against granting such relief.

First, the fact that Emerge "in the exercise of due diligence, could have sought relief from the court earlier," requires the Court to consider its possible reasons for not amending sooner.  In re Pressure Sensitive Labelstock, 2006 WL 433891, at *1.  The Court, however, can glean nothing from the record to indicate why the antitrust counterclaims were not brought at an earlier stage.  Emerge was one of the original defendants in the case filed by Synthes in March 2011.  At that time, Emerge should have been privy to any necessary information required to plead such claims, particularly since John Marotta—Emerge's co-founder and original co-defendant—had worked for years at Synthes.  Even assuming Emerge was not immediately aware of the pertinent facts, the majority of the allegations in the Counterclaim Complaint regarding Synthes's anticompetitive

conduct were known by Emerge no later than December 2011, as they were included as part of a proposed Counterclaim Complaint attached to its Motion for Leave to Amend.  Emerge has not identified any facts that it has only recently learned through the ongoing discovery, without which it could not have pled the antitrust causes of actions.

Second, despite having had fifteen months in which to develop and plead its antitrust theories against Synthes, Emerge has provided the most bare-boned of complaints.  Had Emerge at least made an effort to allege relevant markets, market share, elasticity of demand, and other of the rudimentary elements of a cookie cutter antitrust claim, the Court may have been more inclined to allow amendment to cure any deficiencies.  The utter lack of supporting factual allegations, however, suggests that the antitrust claims are baseless and that any effort to amend them would be futile.[13]  This finding is compounded by the fact that Emerge's Brief in Opposition to Synthes's Motion to Dismiss fails to shed any substantial light on the core of the antitrust claims, but rather continues to rely on the same potentially tortious and anti-competitive behavior by Synthes without the accompanying antitrust elements.  Having so utterly neglected to plead or otherwise defend these claims, it is doubtful whether Emerge could do so if given a another bite at the apple.

Third, the Court remains mindful that litigation of this case is well underway, with depositions having been taken and written discovery already exchanged.  The most recent scheduling order, entered on September 13, 2012, calls for the close of fact discovery on December 14, 2012, and for expert discovery on March 7, 2013.  Discovery on the antitrust claims, however,

---

[13] "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted.  Holst v. Oxman, 290 F. App'x 508, 510 (3d Cir. 2008).

has not even begun.  It is widely recognized that antitrust claims are among the most complex cases

to litigate.  In re Ins. Brokerage Antitrust Litig., 282 F.R.D. 92, 102–03 (D.N.J. 2012); In re

Linerboard Antitrust Litig., Nos. Civ.A.98-5055, 99-1000, 99-1341, 2004 WL 1221350, at *10

(E.D. Pa. June 2, 2004); see also Mid-West Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573, 578

(3d Cir. 1979) (noting that "[c]omplexity and "speculativeness" are "endemic to antitrust

litigation").  Allowing amendments to these claims, followed by time for filing a responsive

pleading and/or another potential motion to dismiss, would doubtlessly make this scheduling order,

now in its fifth iteration, completely unworkable.  In turn, any progress in this litigation, which has

now been pending for approximately a year and a half, will be further stymied.

　　　　Finally, Emerge's request for leave to amend—set forth cursorily in one page of its thirty

page brief—offers no reason for the delay in asserting its claims, no explanation for why it did not

assert them earlier, no claim that it required some discovery to uncover requisite facts, no denials of

bad faith tactics, and no representation that the progress of the case will not be unduly prejudiced.

Rather, Emerge simply argues that the Court should allow the amendment under Federal Rule of

Civil Procedure 15's statement that leave should be "freely given when justice so requires."[14]

---

[14]  The sole case offered by Emerge in support of its request for leave to amend is Fresh
Made, Inc. v. Lifeway Foods, Inc., No. Civ.A.01-4254, 2002 WL 31246922 (E.D. Pa. Aug. 9,
2002), wherein the court granted leave to amend an antitrust claim that had not properly pled a
relevant market.  That case, however, is clearly distinguishable on several grounds.  Primarily,
the antitrust claims were raised as the basis for the initial complaint against defendant.  Id. at *2.
Although the complaint had already been amended once, it was done so only to include
additional tort claims on top of the antitrust claims that were present from the outset of the case.
Id.  Moreover, the amended complaint in that case had made some effort to plead a relevant
market, although it had failed to do so in terms of reasonably interchangeability and cross-
elasticity of demand.  Id. at *5–6.  The motions to dismiss these claims came within seven
months of the start of the litigation.  Id. at *2.  Finally, the plaintiff in that case did not lodge any
objection to the request for leave to amend.  Id. at *13.

Thereafter, when faced with Synthes' multiple arguments in its Reply Brief as to why leave to amend is improper, Emerge has remained silent.

Ultimately, the Court is bound to infer that the antitrust claims were not brought in a genuine effort to remedy monopolistic behavior by Synthes, but rather as an attempt to insert some tactical delay into a case against Emerge and its founders that was rapidly gaining steam. Had Emerge at least given some attention to the elements of the claims and the <u>Twombly</u>/<u>Iqbal</u> standards, the Court would have been more hesitant to so swiftly dismiss the claims. However, the timing of the claims' insertion, the broad and conclusory pleading of their elements, and the failure of Emerge to offer any explanation for these problems, all combined with the delay that will result from their amendment, require this Court to deny leave to amend.

### C.    **Bifurcation of Remaining Counterclaims**

In a final argument, Synthes requests that the remaining counterclaims for trade libel, tortious interference with prospective contractual relationships, unfair competition, and the two declaratory judgment actions be bifurcated under Federal Rule of Civil Procedure 42(b). Synthes further asks that all proceedings and discovery relating to these counterclaims be stayed until

---

Unlike <u>Fresh Made</u>, the present case is based primarily on breach of contract and tortious interference claims and was proceeding for approximately nine months before Emerge first sought leave to amend its Answer and assert any counterclaims. Even at that time, however, it never proposed to file antitrust causes of action. Indeed, it was not for another three and half months—after Synthes already filed an Amended Complaint—that Emerge first sought to raise antitrust counterclaims. That Counterclaim Complaint, unlike the one in <u>Fresh Made</u>, made no effort to properly plead a relevant market, let alone the other elements of an antitrust cause of action. Finally, unlike in <u>Fresh Made</u>, Emerge's current requests for leave to amend faces significant opposition from Synthes. As such, the Court does not deem the <u>Fresh Made</u> case supportive of Emerge's argument in support for leave to amend.

completion of trial as to the Defendants' liability.

Rule 42(b) of the Federal Rules of Civil Procedure allows a district court to bifurcate a trial in its discretion. Rule 42(b) provides that, "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). Whether to bifurcate a trial is a "matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance." Sprinturf, Inc. v. Southwest Recreational Indus., Inc., No. Civ.A.01-7158, 2004 WL 96751, at *1 (E.D. Pa. Jan. 15, 2004) (quoting Lis v. Robert Packer Hosp., 579 F.2d 819, 824 (3d Cir.1978)); see also 9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2388 (2d ed. 2002) ("[U]ltimately the question of separate trials under Rule 42(b) should be, and is, a matter left to the discretion of the trial court. . . ."). "The moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties." Innovative Office Prods., Inc. v. Spaceco, Inc., No. Civ.A.05-4037, 2006 WL 1340865, at *1 (E.D. Pa. May 15, 2006). "Courts, when exercising their broad discretion to bifurcate issues for trial under Rule 42(b), should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension of the issues presented in the case." Enzo Life Sciences, Inc. v. Digene Corp., No. Civ.A.02-212, 2003 WL 21402512, at *4 (D. Del. June 10, 2003) (citation omitted). "In deciding whether one trial or separate trials will best serve [the above factors] . . . the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." Id. (quoting In re Innotron Diagnostics, 800 F.2d 1077, 1084 (Fed. Cir. 1986)).

This Court is not inclined to grant bifurcation in this case.  The core of this matter involves the actions of the multiple Defendants to allegedly breach various employment agreements with Synthes and set up a company that is highly competitive with a portion of Synthes's business. Emerge's remaining counterclaims seek not only declarations regarding the illegality of the employment agreements and the restrictive covenants therein, but also relief for Synthes's actions in attempting to ensure that Emerge as a company does not succeed.  Ultimately, this case will turn on the same common nucleus of operative facts and, at the conclusion, either Synthes will succeed in proving that the Defendants acted wrongfully or Emerge will succeed in proving that it was lawfully created and that Synthes's efforts to destroy its very foundation form the basis for tort liability.  No substantial additional discovery will be required, no delay in deadlines will be occasioned, and neither party will suffer any prejudice as a result of the joint consideration of all claims at issue. Indeed, judicial economy mandates that such issues be jointly tried.[15]  Accordingly, the Court denies Synthes's request to bifurcate the remaining counterclaims.

## IV.    CONCLUSION

In light of the foregoing, the Court will dismiss with prejudice the entirety of Emerge's antitrust counterclaims set forth in Counts IV, V, and VI of the Counterclaim Complaint.  The Court, however, will deny Synthes's Motion to Strike any allegations in the Counterclaim Complaint relating to "oppressive litigation tactics" or "abuse of process" and will decline to bifurcate the remaining counterclaims from the rest of the case.

An appropriate Order follows.

---

[15]  The same could not be said if the antitrust claims were to remain in this case.

40