# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SYNTHES, INC., SYNTHES USA HQ, INC., SYNTHES USA, LLC, SYNTHES USA SALES, LLC, and SYNTHES USA PRODUCTS, LLC, | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION |
| v. | : : | |
| EMERGE MEDICAL, INC., JOHN P. MAROTTA, ZACHARY W. STASSEN, ERIC BROWN, and CHARLES Q. POWELL | : : : : | NO.  11-1566 |
| Defendants. | : : | |
| EMERGE MEDICAL, INC. , | : : | |
| Counterclaim-Plaintiff, | : : : | |
| v. | : : | |
| SYNTHES, INC., SYNTHES USA HQ, INC. SYNTHES USA, LLC, SYNTHES USA SALES, LLC, and SYNTHES USA PRODUCTS, LLC, | : : : : | |
| Counterclaim-Defendants. | : : | |

## <u>MEMORANDUM</u>

BUCKWALTER, S. J.                                                                                     June 11, 2014

      Currently pending before the Court is the Motion for Summary Judgment on Defendant

Emerge Medical, Inc.'s Amended Counterclaims by Plaintiffs Synthes, Inc., Synthes USA HQ,

Inc., Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC

(collectively "Synthes").  For the following reasons, the Motion is granted in its entirety.

## I.      STATEMENT OF FACTS

The factual and procedural background of this case is a lengthy and convoluted one.  The

underlying facts were summarized in great detail in the Court's Memorandum Opinion dated

June 5, 2014.  In lieu of rehashing this complicated history, the Court incorporates by reference

the recitation of facts set forth in the previous Memorandum.  Synthes, Inc. v. Emerge Med., Inc.,

No. Civ.A.11-1566, 2014 WL 2579286 (E.D. Pa. June 5, 2014).  Notwithstanding that reference,

the Court will set forth in this opinion the particular facts relevant to the counterclaims at issue.

As explained previously, this case involves an action by Synthes against several of its

former employees as well as the competing company they created called Emerge Medical, Inc.

("Emerge").  Synthes generally alleges that these former employees breached various non-

competition agreements and they, together with Emerge and another outside individual,

committed various torts in connection with the creation and development of Emerge.

On March 4, 2011, Synthes initiated the current federal action against both John Marotta,

one of the former Synthes employees, and Emerge.  Thereafter, on March 6, 2012, Plaintiff filed

an Amended Complaint adding three new defendants—Zachary Stassen, Eric Brown, and Chaun

Powell—and setting forth thirteen causes of action as follows: (1) breach of fiduciary duty and/or

duty of loyalty against Marotta and Brown (Am. Compl. ¶¶ 169–88); (2) breach of contract under

the Non-Competition and Non-Disclosure Agreements against Marotta, Brown, and Powell (id.

¶¶ 189–214); (3) tortious interference with contract against all Defendants (id. ¶¶ 215–26); (4)

aiding and abetting breach of fiduciary duty against Marotta, Brown, Stassen, and Emerge (id. ¶¶

227–36); (5) misappropriation of trade secrets under Pennsylvania common law and the

Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5302, et seq., against all Defendants (id.

2

¶¶ 237–49); (6) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against all Defendants (id. ¶¶ 250–60); (7) conversion and replevin against all Defendants (id. ¶¶ 261–68); (8) false or deceptive advertising under the Lanham Act, 15 U.S.C. § 1125(a), against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 269–81); (9) trespass to chattels against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 282–86); (10) unfair competition against Defendants Marotta, Stassen, Powell, and Emerge (id. ¶¶ 287–97); (11) fraud against all Defendants (id. ¶¶ 298–302); (12) civil conspiracy against all Defendants (id. ¶¶ 303–09); and (13) breach of contract or, in the alternative, unjust enrichment against Powell.  (Id. ¶¶ 310–16.)

On April 3, 2012, Emerge filed its Answer with Affirmative Defenses and Counterclaims to Synthes's Amended Complaint.  (Emerge's Answer & Aff. Defenses.)  Following dismissal of its antitrust counterclaims, Emerge filed an Amended Answer with Affirmative Defenses setting forth the following counterclaims against Synthes: (1) trade libel; (2) tortious interference with prospective contractual relationships; and (3) unfair competition under Pennsylvania law. (Emerge Am. Answer & Aff. Defenses.)  It also made a request for declaratory relief on Synthes's claims of tortious interference with contract and aiding and abetting breach of fiduciary duty.  (Id.)  The Court now reviews the facts that form the basis of these various counterclaims.

A.      **The Litigation Letters**

Beginning in January 31, 2012, Synthes sent letters to customers and prospective customers of Emerge addressing the ongoing dispute between Emerge and Synthes (the "litigation letters").  These litigation letters stated, in pertinent part, as follows:

> We learned recently that your facility may have purchased or may be considering purchasing products manufactured by Emerge Medical and that these may have been placed in the Synthes Inventory Management System cabinets as interchangeable.

3

Because there has been confusion caused, in our opinion, by Emerge's marketing claims, we wish to make you aware of the following:

- Synthes is currently in litigation with Emerge Medical and one of its founders, John Marotta, *Synthes, Inc. et al. v. Emerge Medical and John Marotta,* Civil Action No.2:11-cv-01566-RB (E.D. Pa.).

- Synthes has established design and manufacturing tolerances for its implants and instruments and carefully monitors the manufacturing process according to its own proprietary standards.

- Despite claims from Emerge, Emerge's products are not identical to Synthes or manufactured side-by-side.

- By way of example, Synthes' titanium products are made from a titanium alloy which is different (and more costly) than most manufacturers but which has significant surgical and patient benefits. The alloy used by Synthes is less notch sensitive, with better corrosive resistance, and, in our view, superior bio-capability so it is less likely to produce inflammation in patients.

- Emerge's products have not been approved by Synthes or the FDA for use in combination with Synthes' products. Synthes does not warrant and cannot accept liability for the use of Emerge's products in combination with Synthes' products or as a substitute for them.

- Emerge has not sought nor obtained Synthes' permission to alter the Synthes Inventory Management System or commingle product.

All of us in the healthcare industry strive to improve patient outcomes while containing and reducing costs. At the same time, however, we must be aware of hidden risks and costs attendant to what may promise to be cost-saving measures.

(Plaintiffs' Appendix[1] ("Pls.' Appx.") 723.) Since January 31, 2012, Synthes has sent a total of

forty-six litigation letters. (Plaintiffs' Statement of Undisputed Facts ("PSUF") ¶ 1152;

Defendants' Response to Plaintiffs' Statement of Undisputed Facts ("DRPS") ¶ 1152.) Five of

---

[1] Plaintiffs' Appendix is Synthes's comprehensive appendix of exhibits which it submitted in support of its Motion for Summary Judgment as to Liability on its Amended Complaint. Both parties cite to these exhibits in their Motions and Responses. The court refers to this compilation as "Pls.' Appx." followed by the appropriate tab number.

4

the letters contained an additional sentence on the last page, stating that "In an effort to avoid complications of this kind and to address your facility's cost constraints, Synthes looks forward to discussing these issues with you soon."  (Defs.' Resp. Opp'n Summ. J., Exs. 9–13.)  The author of the letter, Synthes in-house litigation counsel Denise Houghton, explained that by "complications," she meant "the Emerge commingling of Synthes' product in the Synthes SIMS cabinets."  (Pls.' Appx. 690, Dep. of Denise Hougton ("Hougton Dep."), 92:17–93:18, July 1, 2013.)

Although Synthes limited the targets of the letters to forty-six identified recipients who were customers or prospective customers of Emerge, (PSUF ¶ 1156; DRPS ¶ 1156), Emerge contends that the letters reached other individuals who had the potential to affect purchases by thousands of hospital customers or potential hospital customers.  (Defs.' Resp. Opp'n Summ. J., Ex. 7, Decl. of Chaun Powell ("Powell Decl."), ¶ 3–4, Dec. 9, 2013.)  For example, on June 6, 2013, Synthes sent a letter to the Materials Manager of the Meadville Medical Center.  (Id. ¶ 5.) That same day, the letter reached the desk of the person in charge of Meadville's purchasing group, Mark Landau, who could potentially influence purchases by fifty-one hospitals/health systems at ninety-three sites.  (Id.)  Mr. Landau then forwarded this letter to Premier GPO, a group purchasing organization representing 2,400 facilities across the country.  (Id.)  Similarly, Synthes sent a letter, dated March 21, 2012, to Richard M. Philbrick, the CEO of Southwest Region HealthTrust Purchasing Group, who could potentially influence purchases by 1,400 hospitals nationwide.  (Id. ¶ 6.)  The same holds true for multiple other officials among the forty-six recipients of Synthes's letters.  (Id. ¶¶ 7–13.)

B.      **Other Allegedly Disparaging Statements**

In addition to the letters, Emerge alleges that Synthes made other statements that rise to

the level of trade libel:

- Statements by Synthes' Trauma Division Vice President, Ken Carpenter and Synthes Trauma Division President, I.V. Hall, claiming that that [sic] Synthes will put Emerge out of business.

- Making disparaging phone calls and site visits to Emerge's customers and relating false and or misleading statements concerning the relative quality of Emerge's products, misrepresenting the FDA approval status of Emerge Products, and giving unsolicited and false legal advice concerning the state of Emerge's insurance coverage and the level of litigation risk associated with the use of Emerge Products. The statements made in such phone calls and site visits are false, uninhibitedly anti-competitive, and extraordinarily damaging to Emerge's market position, Emerge's ability to compete in the Market for Generic Device Fixation Hardware, and the market and consumers themselves.

- Statements by Tim Hineueber, Synthes' Fairview Regional Manager, mandating that Fairview not use Emerge products and not use Emerge products with Synthes products.

- Statements made by Synthes' Tim Neuharth while in the surgical suite following an issue with an Emerge drill bit used in a Synthes rod, in which Neuharth told the surgeon during the procedure that the issue would never happen with a Synthes bit. Additionally, Neuharth added that Synthes offers these drill bits for free.

- Statements by Greg Talley of Synthes informing customers that they should not do business with Emerge or consider doing business with Emerge because Synthes is putting Emerge out of business and they will no longer be around.

- Repeated statements by Synthes' Lance Pfeiffer, stating that Emerge does not have account representatives to service the accounts and the Emerge product is inferior to Synthes' product.

- Encouraging Emerge supplier Orchid Orthopedics Unique not to do business with Emerge and instructing them to sever all ties to Emerge.

6

- Complaining via phone and email to Emerge about dull drill bits, ostensibly on behalf of a physician.  When Emerge contacted the physician directly to research the complaint, the doctor stated that he would not comment, but was surprised and upset that a complaint was made by a Synthes representative on the physician's his [sic] behalf.

- Statements by a Synthes representative Dave Lembo to a shared physician client, stating that an unidentified, dull drill bit was an Emerge bit. Following the misstatement, Lembo encouraged the office manager to lodge a complaint against Emerge.

- Emails by Craig Turczynski, Regional Manager Synthes Orthopedic Trauma, to a hospital Materials Manager offering the highest savings on Synthes products if the Materials Manager's employer hospital signed a Letter of Commitment agreeing not to use Emerge products.

(Am. Countercl., Docket No. 114, ¶ 17.)

On August 2, 2013, Emerge produced an expert report from Donald R. House, who opined that, as a direct result of Synthes's conduct, Emerge incurred economic damages of close to $6 million and expected to incur future damages of over $88 million.  (PSUF ¶ 1175; DRPS ¶ 1175.)

### C.    Actions of Synthes Salesperson Tim Todack

Emerge also alleges that Synthes salesperson Tim Todack misappropriated documents belonging to Banner Healthcare ("Banner Healthcare" or "Banner"), a Synthes and Emerge customer, by accessing Banner's password-protected intranet without permission and then using unlawfully-obtained information to unfairly compete against Emerge for Banner's business. Todack admitted that while in a Banner operating room, he used a computer— normally used by healthcare professionals to obtain patient information—to access Banner's protected intranet and retrieve an internal PowerPoint presentation Banner had prepared regarding its cost-saving initiatives and objectives.  (Def.'s Resp. Opp'n Summ. J., Ex. 1, Dep. of Tim Todack ("Todack

7

Dep.") 292:24–295:15, May 7, 2013; Def.'s Resp. Opp'n Summ. J., Ex. 2.)  Todack conceded

that he had not been specifically granted permission to access Banner's intranet, but he explained

that "I've never been told I cannot use a computer.  I'm asked by the nursing staff to be able to

use that computer to get information for them as far as chart sheets.  And so I have been

instructed by Banner employees to be able to use that computer to get information."  (Todack

Dep. 295:4–10.)

> Todack then circulated this information within Synthes, stating as follows:
>
> Here is the information they are disseminating on reprocessing to their Materials
> managers and OR Managers.
> Just finding layers upon layers of work they have already done to prepare for these
> negotiations.
> Please note the letter to the vendors.  That is approximately what was expressed to
> me about the Emerge threat when I first found out that they had been in my facility.
> Layers upon layers
> More to come

(Def.'s Resp. Opp'n Summ. J., Ex. 3.)  The named recipients of the email were Stephen Bertz,

Synthes West Area Vice-President, and Michael Knapp, Synthes Regional Manager for the Los

Angeles Region as well as the acting Regional Manager for Todack's area in Arizona.  (Id.)  The

documents, however, traveled further within the Synthes organization.  Via a second e-mail,

Todack sent a second PowerPoint presentation from Banner and noted that "Page 15 ment[ions]

Emerge and a hoped approximate savings of 200k.  Just another mention as well of physician

involvement in the implementation."  (Def.'s Mem. Opp'n Summ. J., Ex. 2.)

> Banner's corporate representative, Sue Hellriegel, testified that Banner has a password-

protected computer intranet services to connect Arizona Banner facilities to Banner facilities in

other states.  (Def.'s Resp. Opp'n Summ. J., Ex. 4, Dep. of Sue Hellriegel ("Hellriegel Dep.")

21:25–22:9, May 22, 2013.)  She explained that these computers contained documents that Banner considered confidential and proprietary, including the PowerPoint presentation accessed by Todack.  (Id. at 22:14–16, 27:13–21.)  She went on to note that if a vendor representative was authorized by nursing staff to access the Banner intranet in order to get information for chart sheets, the vendor representative would exceed his authorization if he reviewed and downloaded such documents.  (Id. at 27:23–28:4.)

      **D.**    **Filing of Present Motions**

Fact discovery in this matter closed on July 1, 2013.  (PSUF ¶ 1181; DRPS ¶ 1181.) Expert discovery closed on September 30, 2013.  (PSUF ¶ 1182; DRPS ¶ 1182.)  On November 18, 2013, the parties filed a multitude of dispositive motions, including the Motion currently at issue.[2]  Responses were filed on December 10, 2013, and Reply Briefs were filed on December 20, 2013.  Synthes's Motion for Summary Judgment on Emerge's Counterclaims are now ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

---

[2]  The Court has already ruled in the parties' Cross-Motions for Summary Judgment as to Liability, granting each in part and denying each in part.  Still pending is Synthes's Motion for Sanctions against Emerge.  The sole motion at issue in this opinion is Synthes's Motion for Summary Judgment as to Emerge's Counterclaims.

return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

### A.   Trade Libel Claim

Trade libel, also called "injurious falsehood" or "commercial disparagement," consists of the publication of a disparaging statement concerning the business of another and is actionable where:

> (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the publication is false or acts in reckless disregard of its truth or falsity.

Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 246 (Pa. 2002) (citing Restatement (Second) of Torts § 623(a)).  As set forth above, Emerge's trade libel claim is based on (a) Synthes's letters to customers and (b) statements by other Synthes representatives.  The Court addresses these grounds separately.

#### 1.   Synthes Letters to Customers

Synthes initially contends that to the extent Emerge's trade libel claim is based on the litigation letters, it fails on two grounds.  First, Synthes argues that the statements contained in those letters are either true or do not concern Emerge.  Second, Synthes asserts that Emerge has failed to adduce evidence that the statements in Synthes's letters caused pecuniary loss.  The Court finds that both arguments have merit.

##### a.   Falsity

"Trade defamation" is defined as "[t]he damaging of a business by a false statement that tends to diminish the reputation of that business.  Trade defamation may be trade libel if it is recorded, or trade slander if it is not."  Black's Law Dictionary, 449 (9th ed. 2009).  Pursuant to

11

Pennsylvania law, the challenged publication, on its face, must be "directed against the goods or products of a corporate vendor." U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 924 (3d Cir. 1988) (internal quotations omitted); see also Mun. Revenue Serv., Inc. v. Xspand, Inc., 700 F. Supp. 2d 692, 706–07 (M.D. Pa. 2010); Centennial Sch. Dist. v. Independence Blue Cross, 885 F. Supp. 683, 687–88 (E.D. Pa. 1994). Truth is an absolute defense to defamation. Gilbert v. Bionetics Corp., No. Civ.A.98–2668, 2000 WL 807015, at *3 (E.D. Pa. June 6, 2000). The legal standards applicable to defamation claims for determining the truth or falsity of statements are appropriately applied in determining the sufficiency of a claim for commercial disparagement. QVC, Inc. v. MJC Am., Ltd., No. Civ.A.08-3830, 2011 WL 2843746, at *4 (E.D. Pa. July 18, 2011) (citing Gilbert, 2000 WL 807015, at *3–9 (following standard used to determine the truth or falsity of a statement in the context of a defamation claim in finding that the plaintiffs failed to set forth evidence to demonstrate allegedly disparaging statements were untrue resulting in summary judgment for defendant on trade libel claim)). "The truth required to avoid liability for defamation is not complete truth but substantial truth." Gilbert, 2000 WL 807015 at *3. Under Pennsylvania law, "proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter." Id.

It is the function of the trial court to determine whether a challenged publication is capable of a defamatory meaning. Maier v. Maretti, 671 A.2d 701, 704 (Pa. Super. 1995); Livingston v. Murray, 612 A.2d 443, 446 (Pa. Super. 1992). When making such an assessment, the court must consider the effect of the entire article and the impression it would engender in the minds of the average reader among whom it is circulated. Livingston, 612 A.2d at 446; Maier, 671 A.2d at 705. A publication that contains negative statements, but is not otherwise false does

not give rise to a claim of trade libel and, as such, is subject to a summary judgment ruling.  See

The Knit With v. Knitting Fever, Inc., Nos. Civ.A.08-4221, 08-4775, 2010 WL 3792200, at *8

(E.D. Pa. Sept. 28, 2010) ("Although the September 2008 press release contained negative

statements about the yarns supplied by KFI, Defendant has not produced even a scintilla of

evidence that such statements are false. . . . As such, the Court grants summary judgment in favor

of Plaintiff on this count of the Counterclaim.").

As set forth above, the letters at issue state as follows:

We learned recently that your facility may have purchased or may be considering
purchasing products manufactured by Emerge Medical and that these may have
been placed in the Synthes Inventory Management System cabinets as
interchangeable.

Because there has been confusion caused, in our opinion, by Emerge's marketing
claims, we wish to make you aware of the following:

•  Synthes is currently in litigation with Emerge Medical and one of its
founders, John Marotta, *Synthes, Inc. et al. v. Emerge Medical and John
Marotta,* Civil Action No.2:11-cv-01566-RB (E.D. Pa.)

•  Synthes has established design and manufacturing tolerances for its implants
and instruments and carefully monitors the manufacturing process according
to its own proprietary standards.

•  Despite claims from Emerge, Emerge's products are not identical to Synthes
or manufactured side-by-side.

•  By way of example, Synthes' titanium products are made from a titanium
alloy which is different (and more costly) than most manufacturers but which
has significant surgical and patient benefits.  The alloy used by Synthes is less
notch sensitive, with better corrosive resistance, and, in our view, superior
bio-capability so it is less likely to produce inflammation in patients.

•  Emerge's products have not been approved by Synthes or the FDA for use in
combination with Synthes' products.  Synthes does not warrant and cannot
accept liability for the use of Emerge's products in combination with
Synthes' products or as a substitute for them.

13

- Emerge has not sought nor obtained Synthes' permission to alter the Synthes Inventory Management System or commingle product.

All of us in the healthcare industry strive to improve patient outcomes while containing and reducing costs. At the same time, however, we must be aware of hidden risks and costs attendant to what may promise to be cost-saving measures.

In an effort to avoid complications of this kind and to address your facility's cost constraints, Synthes looks forward to discussing these issues with you soon.

(Def.'s Resp. Opp'n Summ. J., Exs. 9–13.) Considering each of the statements in the letters individually, the Court finds that the statements therein are either true or do not concern Emerge for purposes of a trade libel claim.

First, the letters state, "Synthes is currently in litigation with Emerge Medical and one of its founders, John Marotta, *Synthes, Inc. et al. v. Emerge Medical and John Marotta,* Civil Action No.2:11-cv-01566-RB (E.D. Pa.)." Neither party contests the validity of this statement or the propriety of disclosing it.

Second, the letters indicate that "Synthes has established design and manufacturing tolerances for its implants and instruments and carefully monitors the manufacturing process according to its own proprietary standards." Again, both parties seem to agree to the truth of this point.

Third, Synthes represents that "[d]espite claims from Emerge, Emerge's products are not identical to Synthes or manufactured side-by-side." As to this statement, Emerge contend that Synthes has not produced evidence to support its validity. Such a bald argument, however, fails in several respects. Primarily, Emerge misunderstands the applicable burden of proof. To obtain summary judgment, Synthes must simply point to an *absence* of proof that the statements were

14

false.  To avoid summary judgment, the burden then falls on Emerge to come forward with enough evidence on which a reasonable factfinder could determine that the challenged statement is, in fact, false.  Neurotron Inc. v. Med. Serv. Assoc. of Pa., Inc., 254 F.3d 444, 448–49 (3d Cir. 2001); Philips v. Selig, 157 F. Supp. 2d 419, 427 (E.D. Pa. 2001).  Emerge has produced no such evidence.

Moreover, Synthes has provided ample evidence that this statement is accurate.  With respect to whether the products were "identical," Emerge, has admitted that it was "formed to produce and sell [drill bits, guide wires, and screws] similar, *but not identical* to that which Synthes  also produces and sells."  (Pls.' Appx. 2, Emerge Am. Answer to Am. Compl. ¶ 3 (emphasis added).)  In accordance with this admission, Defendant Powell testified:

> Q.  I'm sorry, you were explaining what's false about this statement.  And you were stating that the semantics of the word identical render this false?
> A.  Okay.  As it—as it pertains to the product itself I'm not claiming that the product is identical.  I guess I failed to—to fully read that.  But the outcome of the product could potentially be in some instances identical.
> Q.  So just so we're clear, you're not stating that the statement "Emerge's products are not identical" is false?
> A.  The products themselves I am not claiming to be identical.
> Q.  So stated differently—and again, where we started out this conversation was I was asking you where in this letter there were statements that were false.  And you pointed to the third bullet.  And we then had a conversation about another aspect of the bullet.  But now we're circling back and I just need to confirm that I'm understanding you correctly that you are not stating that Emerge—that the statement "Emerge's products are not identical to Synthes" is false?
> A.  *That is correct.  No two products from any manufacturer or between any two manufacturers will be identical.*

(Pls.' Appx. 31, Dep. of Chaun Q. Powell ("Powell Dep."), 266:8–267:11, June 10, 2013 (emphasis added).)  Zachary Stassen testified, as follows:

> Q.  So in the ordinary meaning of the word.  Okay?  So that's how I'm using it.

15

>   So with that definition, the way it's defined in the dictionary, it's an untrue statement to say that Emerge's products are identical to Synthes', isn't it?
>
> A.  No.  Identical, you could say identical in function, identical—I mean, you know, I—I know it said identical in that document as stand alone, but that's why I said it depends on the context of identical.
>
> Q.  A stand-alone statement that the product—that the two sets of products are identical to each other is a false statement, is it not?
>
> A.  I would say identical in appearance. Sometimes, yes. But—I'm—I won't say that they're—by saying they're identical is—that they're not is too absolute.
>
> Q.  If somebody says, the Emerge products are identical to Synthes products, that's a false statement, isn't it?
>
> A.  I guess not how it—necessarily how I would define it or to a customer or somebody of that nature.
>
> . . .
>
> Q.  Okay.  And we just looked at one [representation] in which a statement was made by your chief executive officer that the products are identical to Synthes'.
>
> A.  Yes.
>
> Q.  It doesn't say in appearance, doesn't say in function, it says, as they are identical to Synthes'.  That statement is incorrect, isn't it?
>
> A.  Maybe on some levels.

(Pls.' Appx. 19, Dep. of Zachary Stassen ("Stassen Dep."), 193:19–195:22, July 22, 2011.)  He went

on to state:

> Q.  In paragraphs 78 and 79, you talk about the descriptions of Emerge Medical products, and you indicate that you discussed with both Mr. Marotta and Mr. Powell that you felt that Emerge Medical shouldn't use the term 'identical' in describing its products as compared to Synthes products.  Is that right?
>
> A.  Correct.
>
>  . . .
>
> Q.  Why was it—why would it not be appropriate to use that term?
>
> . . .
>
> A.  I just felt that "compatible" or "interchangeable" was a more accurate description.

(Pls.' Appx. 21, Stassen Dep., 236:12–237:2, June 4, 2013.)  John Marotta agreed:

> Q.  Mr. Marotta, I have a general question for you.  Is it Emerge's position in this litigation that its products, and in—in the context of this question I'm talking about products on the market, its drill bits, guide wires and cannulated screws are identical to Synthes products of a similar nature?

A.   They're substitutes for Synthes products.  My—it's—it's—how do you identify identical?

Q.   I'm just asking a question.  Is it Emerge's position in this litigation that its products are identical to—the products being cannulated screws, drill bits and guide wires, to Synthes similar products in the market?

A.   Sure.  And—and I've asked you to clarify identical because of tolerances. From a usability perspective if you have a 4.0 cannulated screw, a 4.0 screw is a 4.0 screw.  These products are all the same.  There's no patents on cannulated screws or drill bits.  So it's hard for me to answer your question is that our position on identical.  I think the products look the same.  They function the same.  From a salesman's perspective they're identical.  *From an engineering perspective I don't think you can say they're identical.  So if you take five Synthes products and line them up they wouldn't be the same.* So it's hard to answer that question.

Q.   From an engineering perspective if a—if a device has different tolerances it's not identical, is it?  I'm sorry, let me say that again.  From an engineering perspective two—two devices side by side that have different tolerances are not identical?

A.   Well, I would say they're intolerant.

(Pls.' Appx. 10, Dep. of John Marotta ("Marotta Dep."), 222:17–223:20, June 27, 2013 (emphasis added).)

With respect to the statement that Emerge and Synthes products are not manufactured "side-by-side," Emerge contends that the "obvious truth" is that "some Emerge and Synthes products are manufactured side-by-side, as both companies' market products that are manufactured by Orchid."  (Def.'s Resp. Opp'n Summ. J. 14–15 (citing Pls.' Appx. 10, Marotta Dep. 249:8–249:19, June 27, 2013 (cannulated screws); id. at 247:17–249:14 (drill bits)).) Nonetheless, the fact that *some* Synthes product and *some* Emerge product are manufactured at the same facility does not undermine the veracity of Synthes's statement that Synthes product and Emerge product are not, as a general rule, manufactured side-by-side.  As expressly indicated by Synthes's expert Terry Corbin in an uncontradicted report:

[C]ontrary to its representations in the market, Emerge products are not made in the

17

same place as Synthes products or milled according to the same specifications side-by-side.  In connection with this report, I requested that Synthes prepare a spreadsheet identifying the manufacturer of the products sold by Emerge (according to the sales data produced to date by Emerge and Cardinal Health) during the time period Emerge has been selling product.  That spreadsheet is attached as Appendix IV and reveals that the overwhelming majority of Synthes drill bits, cannulated screws, and guide wires are manufactured by Synthes itself, with only a small number of drill bits manufactured by select outside vendors.

(Pls.' Appx. 691, Corbin Report, at 38 n.49 & Appendix IV.)  Similarly, Marotta testified:

> Q.    Do you know the answer to whether all of Synthes drill bits are made in the US—USA or—or not?
>
> A.    Yes.
>
> Q.    What's the answer to that?
>
> A.    The answer is most of the Synthes drill bits are made in the United States and some are made in—I think it's Tutelage or somewhere in Switzerland.
>
> Q.    So some are made outside the—the United States?
>
> A.    Yes.
>
> Q.    And does Emerge Medical know where Synthes cannulated screws are made?
>
> A.    Does Emerge Medical know?  I know.
>
> Q.    You're the CEO of Emerge.
>
> A.    I don't know if other folks in—in Emerge know.
>
> Q.    Well, let's start with you as CEO.  What—What do you know about where Synthes cannulated screws are made?
>
> A.    I think most of them are made in Monument, but I think that they've over—outsourced some of that in the past.  I don't know if they continue to do that.
>
> Q.    As of 2010, 2011, 2012, do you know if any cannulated screws were being outsourced during that period of time?
>
> A.    I was told by a manufacturer that they had worked on some cannulated screw—or screws from Synthes.
>
> Q.    Which manufacturer?
>
> A.    I don't recall who it was.
>
> Q.    Do you as the C—the CEO of Emerge know where Synthes guide wires are manufactured?
>
> A.    Yes, I—I think—I was told they were made at Onex Medical or Tegra.  Some of their guide wires, I think, are done in-house.

(Pls.' Appx. 10, Marotta Dep., 240:24–242:1, June 27, 2013.)  In short, given the undisputed evidence that the majority of Synthes product is not manufactured side-by-side with Emerge

product, Synthes could accurately state that "Emerge's products are not identical to Synthes or manufactured side-by-side."[3]

As a final point on this statement, the Court cannot disregard the context in which it was made.  During its marketing campaign, Emerge made representations to its target customers that Emerge products are "identical" to those of Synthes and are  "milled side-by-side" with Synthes products.  (Pls.' Appx. 621, 664, 725.)  Synthes's statement that the products are not milled side-by-side was, therefore, not made in a vacuum, but rather was offered in an effort to diffuse any misconceptions created by Emerge that all Synthes products and all Emerge products were produced by and within the same factory.  In light of this backdrop, Synthes's statement cannot be construed as trade libel.

Fourth, the letters go on to claim, "[b]y way of example, Synthes' titanium products are made from a titanium alloy which is different (and more costly) than most manufacturers but which has significant surgical and patient benefits.  The alloy used by Synthes is less notch sensitive, with better corrosive resistance, and, in our view, superior bio-capability so it is less likely to produce inflammation in patients."  Again, the Court finds no falsity in this statement. Marotta expressly conceded that Synthes's titanium products are made from a titanum alloy that Emerge uses for Emerge's titanium products.  (Pls.' Appx. 36, Marotta Dep., 599:3–603:17, June 6, 2011.)  Marcy Slone also admitted that the two alloys are different.  (Pls.' Appx. 490, Dep. of

---

[3]  In an apparent effort to prove the veracity of its representation to customers that the two companies products are manufactured side-by-side, Emerge's Response focuses on the fact that Emerge products are manufactured side-by-side with some Synthes products.  In doing so, however, Emerge ignores the fact that it must prove, not the truth of its own statements to customers, but rather the falsity of Synthes's statements.  By acknowledging that the majority of Synthes product is produced in-house, it effectively concedes that Synthes's statement is correct.

Marcy Slone ("Slone Dep."), 136:18–21, Sept. 12, 2011.)

As to the second sentence of this statement regarding the benefits of Synthes's alloy, Synthes has met its summary judgment burden by pointing out the absence of evidence to support Emerge's claims.  Emerge now fails to meet its own burden of coming forward with evidence showing that the titanium alloy used by Synthes does *not* have significant surgical and patient benefits, and is *not* less notch sensitive with better corrosive resistance.  Celotex, 477 U.S. at 322 (holding that if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate); see also Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co., 943 F. Supp. 509, 526 (E.D. Pa. 1996) (holding that in order to sustain a claim for trade libel under Pennsylvania law, the complainant must prove, in part, "[t]hat the disparaging statement of fact is untrue, or that the disparaging statement of opinion is incorrect"), abrogated on other grounds by A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198 (3d Cir. 2000).

Finally, as to the last part of the statement that Synthes's alloy has "superior bio-capability so it is less likely to produce inflammation in patients," the letters preface that phrase with the statement "in our view," meaning that it is a statement of opinion rather than a defamatory statement of fact.[4]  Kurowski v. Burroughs, 994 A.2d 611, 618 (Pa. Super. Ct. 2010) ("A statement in the form of an opinion is actionable only if it may reasonably be understood to

---

[4]  Synthes also argues that the expression of opinion by Synthes's Chief Litigation Counsel, who authored the letters, is protected under the First Amendment and is conditionally privileged.  Having found that this statement is otherwise not actionable, the Court need not address this point.

20

imply the existence of *undisclosed* defamatory facts justifying the opinion.") (emphasis in original) (quotation omitted).  As Emerge has shown no evidence that this opinion implies the existence of an undisclosed defamatory fact justifying the opinion, it is not actionable.

Fifth, the contested letters state that "Emerge's products have not been approved by Synthes or the FDA for use in combination with Synthes' products.  Synthes does not warrant and cannot accept liability for the use of Emerge's products in combination with Synthes' products or as a substitute for them."  As to this statement, Emerge argues that neither Synthes nor FDA "approval" is required, making the statement "grossly misleading."  The Court again disagrees.  Primarily, Emerge does not argue the literal falsity of these statements.  It presents no evidence that Synthes or the FDA ever approved Emerge's products for use *in combination* with Synthes's products.  Nor does Emerge contend that there is any untruth to Synthes's refusal to accept liability for any use of Emerge products.[5]

Moreover, as to the purported misleading inference portrayed by this statement that Synthes or FDA approval is required, Emerge's argument again disregards the context in which the statement was made.  Repeatedly, Emerge represented to potential customers that Emerge products are "FDA cleared" and were compatible with Synthes products.  (See, e.g., Pls.' Appx. 675 ("Emerge makes exact replicas of your Synthes drill bits, guide wires, and cannulated screws.  These items are 40–50 percent off the Synthes list price, fit directly into your hospital

---

[5]  Emerge argues that, "[t]here is no evidence, nor can there be, that Synthes warrants its own cutting instruments, such as drill bits," thereby making this statement misleading  (Defs.' Resp. Opp'n Summ. J. 10.)  The above statement, however, does make any such inference.  Plain reading of the language suggests exactly what it says—that Synthes will not accept any responsibility for any use of Emerge's products in place of or in combination with Synthes's products.

owned sets, and are all FDA cleared."); 676 ("FDA equivalent 510(k) cleared orthopedic

devices"; "FDA clearance indicating substantially equivalent performance to Synthes"); 677

("The FDA 510K testing demonstrated equivalent quality performance.").)  In response, Synthes

appropriately clarified that this FDA approval did not involve any clearance of Emerge products

*for use with* Synthes products.  To the extent there was any misleading inference, it came from

Emerge itself.  The subsequent Synthes letters merely indicated, not that FDA approval was

required, but that there has been no FDA approval of the concurrent use of the two companies'

products.  To that end, the Court finds nothing false or misleading in this statement.

Sixth, the letter states that "Emerge has not sought nor obtained Synthes' permission to

alter the Synthes Inventory Management System or commingle product."  Emerge claims that

this statement is misleading because neither the FDA nor Synthes has authority to grant such

approval.  (Defs.' Resp. Opp'n Summ. J. 12 n.5.)  The Court finds Emerge's argument meritless

in light of the unequivocal evidence of record.  Indeed, Defendant Powell expressly admitted the

truth of this statement as follows:

> Q.    [I]s it fair to say that you did not get permission from anyone at Synthes to
> access or commingle product, to access the cabinets or commingle product
> in the cabinet?
> A.    That is correct.

(Pls.' Appx. 35, Powell Dep., 53:14–23, July 7, 2011.)  Given such an admission by Emerge's

own representative, and absent any contradictory evidence, the Court cannot find any issue of

fact suggesting that this statement is false.

Seventh, Emerge takes issue with the closing sentences of the letter, which state: "All of

us in the healthcare industry strive to improve patient outcomes while containing and reducing

costs.  At the same time, however, we must be aware of hidden risks and costs attendant to what

may promise to be cost-saving measures . . .  In an effort to avoid complications of this kind and

to address your facility's cost constraints, Synthes looks forward to discussing these issues with

you soon."[6]  Emerge asserts that the statement infers a "contention that Emerge products can

result in risk and cost to customers."  (Def.'s Resp. Opp'n Summ. J. 9.)  Such an inference,

however, is not plausible.  At no point does the letter suggest that use of Emerge's products alone

creates risk or "complications."  Rather, the unmistakable import of the letter is that the

commingling of Synthes and Emerge products could result in complications.  The author of the

letters, Denise Houghton, confirmed her intention at her deposition when she indicated the

"complications" to which she was referring were "[t]he commingling of product.  The Emerge

commingling of Synthes' product in the Synthes' SIMS cabinets."  (Pls.' Appx. 690, Dep. of

Denise Houghton ("Hougton Dep."), 93:9–17, July 1, 2013.)  Moreover, the evidence of record

demonstrates that there had, in fact, been complications/complaints resulting from the

intermingling of Synthes and Emerge products during surgical procedures.  (Pls.' Appx. 694.)

Emerge offers no evidence to create a genuine issue of material fact as to the truth or falsity of

this statement or to otherwise meet its burden of proving the falsity element of its trade libel

claim.

Finally, faced with an inability to prove the falsity of any individual statement, Emerge

contends that, read as a whole, the litigation letters portray a misleading picture of Emerge by

omitting key details.  For example, Synthes states that the parties are in litigation, but does not

say why they are in litigation.  Additionally, the letters state that neither Synthes nor the FDA

---

[6]  This lengthier version of the litigation was sent out only five times.

approved the commingling of Synthes and Emerge products, but does not state that neither FDA

nor Synthes approval is required.  Moreover, the letters state that Synthes and Emerge products

are not manufactured side-by-side without explaining that some, albeit a small percentage of,

Synthes and Emerge products are manufactured in the same factory.  Overall, Emerge contends

that "'the literal accuracy of separate statements will not render a communication true where . . .

the implication of the communication as a whole was false.'" (Def.'s Resp. Opp'n Summ. J. 12

(quoting QVC, Inc. v. MJC Am., Ltd., No. Civ.A.08-3830, 2011 WL 2843746, at *4 (E.D. Pa.

July 18, 2011)).)

        As noted above, however, "[t]he truth required to avoid liability for defamation is not

complete truth, but rather substantial truth."  Gilbert, 2000 WL 807015 at *3–4.  Under

Pennsylvania law, "proof of substantial truth must go to the 'gist' or 'sting' of the alleged

defamatory matter."  Id. at *3.  Ultimately, the test is "whether the [alleged] libel as published

would have a different effect on the mind of the reader from that which the pleaded truth would

have produced."  Id. (quotations omitted).  The mere fact that the speaker could have, but chose

not to, include information that was more favorable to the claimant does not render a statement in

untrue.  Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985).

        A general reading of the litigation letters in the context of the circumstances surrounding

this case does not convey to the Court any type of false or defamatory meaning.  It is undisputed

that throughout its marketing efforts, Emerge repeatedly stated it was manufacturing drill bits,

guide wires, and cannulated screws identical to and completely interchangeable with Synthes

products, that Emerge's products were FDA 510(k) cleared, and that Emerge products could be

stored alongside Synthes products in the SIMS cabinets.  In doing so, Emerge did not disclose

that the products were not completely identical to Synthes's products, were not all milled side-by-side with Synthes's products, were not FDA-cleared to be interchanged with Synthes products, and were not legally permitted to be stored in SIMS cabinets owned by Synthes.  Thus, to the extent that the Synthes litigation letters merely filled in the gaps left by Emerge's own incomplete representations, Emerge's argument is disingenuous.  Particularly under these circumstances, Synthes was not required to give the "complete truth," but only the "substantial truth."  Moreover, the mere fact that Synthes indicated that it was in litigation with Emerge without disclosing the reasons for the litigation does not render the statement misleading or untrue.  Ultimately, no reasonable jury could find that recipients of the litigation letters—many of whom had already been subject to Emerge's incomplete representations about its products—would have been misled by the statements in these litigation letters.  Given that truth is a complete defense to a trade libel allegation, the Court finds that Synthes is entitled to summary judgment on this claim.

### b.     Pecuniary Loss

Alternatively, Synthes argues that even if Emerge could establish the falsity element of its trade libel claim, its cause of action fails at the pecuniary damage element.  Upon review of the record, the Court also finds merit to this argument.

To state a claim for trade libel, a plaintiff must plead special damages.  KBT Corp., Inc. v. Ceridian Corp., 966 F. Supp. 369, 375 (E.D. Pa. 1997).  Generally, "'Pennsylvania law requires that a plaintiff claiming commercial disparagement plead damages with considerable specificity,' by setting out in its complaint the names of the customers lost and financial loss resulting from the tort."  Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 416 (E.D. Pa.

2009) (quoting <u>Swift Bros. v. Swift & Sons, Inc.</u>, 921 F. Supp. 267, 276 (E.D. Pa. 1995)).

Specifically:

> [I]t [is] . . . necessary for the plaintiff to allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication. If the plaintiff desire[s] to predicate its right to recover damages upon general loss of custom, it should . . . [allege] facts showing an established business, the amount of sales for a substantial period preceding the publication, and amount of sales subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.

<u>Forum Publ'ns, Inc. v. P.T. Publishers, Inc.</u>, 700 F. Supp. 236, 244 (E.D. Pa. 1988) (quotations and citations omitted); <u>see also</u> <u>Am. Bd. of Internal Med. v. Von Muller</u>, No. Civ.A.10-2680, 2011 WL 857337, at *7 (E.D. Pa. Mar. 10, 2011) (holding that a plaintiff must plead specific damages by setting out the names of customers lost and financial loss resulting from the tort); <u>Corr. Med. Care, Inc. v. Gray</u>, No. Civ.A.07-2840, 2008 WL 248977, at *17 (E.D. Pa. Jan. 30, 2008) (holding that Pennsylvania courts require a plaintiff claiming commercial disparagement to plead damages with considerable specificity by setting out the names of the lost customers and showing by figures how much has been lost financially).[7]

---

[7] Emerge challenges Synthes's reliance "on a 20-year-old unreported case for the proposition that a trade libel claimant must establish pecuniary loss by identifying each customer and each lost sale." (Def.'s Resp. Opp'n. 15.) Emerge then goes on to argue that the case on which Synthes relies actually holds "that a trade libel claimant 'may prove pecuniary loss through a general diminution in sales of the product actually caused by [the] disparagement.'" (<u>Id.</u> at 15–16 (quoting <u>Brooks Power Sys, Inc. v. Ziff Commc'ns, Inc.</u>, No. Civ.A.93-3954, 1994 WL 444725 (E.D. Pa. Aug. 17, 1994).)

The Court finds this portion of Emerge's argument troubling as it is a clear misstatement of the law. First, as noted above, the proposition that a trade libel claimant must establish pecuniary loss by identifying each customer and each lost sale remains good law today. Moreover, Emerge's citation of <u>Brooks</u> for the principle that it may prove pecuniary loss through a general diminution in sales actually caused by the disparagement ignores the caveats put on that principle. In <u>Brooks</u>, the court cited the Pennsylvania Supreme Court case of <u>Menefee v.</u>

In the present case, Emerge concedes that, as of August 6, 2013, Synthes had sent a total

of forty-six litigation letters and has identified, through a log, each of the recipients of the letters

and the date on which they were sent.  (PSUF ¶¶ 1152–53; DRPS ¶¶ 1152–53.)  Moreover, as

indicated in the foregoing statement of facts, Emerge can identify many of the alleged secondary

recipients of those letters.  Yet, Emerge's damages expert has opined only that, as a direct result

of Synthes's conduct, "Emerge had already incurred economic damages of $5,944.102 and is

expected to incur future economic damages of $88,190.259 . . ."  (Pls.' Appx. 700, Donald House

Expert Report, at 2.)  He also stated that "[i]n examining the available evidence, it is clear that

there has indeed been a marked reduction in Emerge's sales coincident with the specific,

deliberate efforts by Synthes to disparage Emerge and its products."  (Id.)  Emerge concedes that

its expert has not identified any customers that Emerge lost as a result of Synthes's alleged

---

Columbia Broad. Sys., Inc., 329 A.2d 216 (Pa. 1974) and the Restatement of Torts § 633, cmt. f,
which state:

> The disparaging matter may, if widely disseminated, cause pecuniary loss by
> depriving its possessor of a market in which, but for the disparagement, his land or
> other thing might with reasonable certainty have found a purchaser. In such case *the
> impossibility of showing the identify of the particular person or persons who were
> dissuaded from purchasing the thing by the publication of the disparaging matter
> makes evidence of the owner's inability to avail himself of a ready market for the
> thing in question sufficient proof of the loss and often of its extent*. . . .  Thus, a
> tradesman whose goods are denounced as adulterated can prove not only the
> existence of the pecuniary loss necessary to recovery but also its extent by showing
> that after the dissemination of the disparaging matter the sales of his goods have
> fallen off to an extent explainable only as the result of the defamatory publication.
> . . .

Brooks, 1994 WL 444725, at *3 (quoting Menefee, 329 A.2d at 221) (emphasis omitted; other
emphasis added) (quoting Restatement (Second) of Torts § 633).  In this case, Emerge has not
shown, or even alleged, that the litigation letters were so widely disseminated that it would be
impossible to identify the particular persons dissuaded from purchasing its products.  Indeed, as
indicated above, Emerge knows the precise forty-six recipients of the litigation letters.
Accordingly, its reliance on this principle is mistaken.

conduct.  (PSUF ¶ 1177; DRPS ¶ 1177.)  It further admits that the expert has not analyzed which customers or specific sales Emerge lost, if any, because of the letters Synthes sent.  (PSUF ¶¶ 1178–79; DRPS ¶¶ 1178–79.)  Indeed, Emerge's expert conceded that his analysis was at a "higher market level" and did not involve looking at any particular hospital's patterns.  (Pls.' Appx. 701, Dep. of Donald R. House ("House Dep."), 113–114, Oct. 11, 2013; see also id. at 123:15–16 ("I did not do an analysis on a customer level, that is correct."); id. at 145:11–13 (conceding that despite the fact that less than fifty customers received letters, he "did not look at a specific decision made in a specific hospital.  That was not my method.").)  Moreover, nothing in the expert report specifically connects the litigation letters to the losses Emerge suffered or explicitly rules out other possible causes for Emerge's falling sales, other than noting that temporal proximity of the letters and the fall in sales supports the causal connection.[8]  (Id. at 144–155 (conceding that a laundry list of factors that could impact the decision of a particular hospital were not included in the market analysis).)  Dr. House explicitly stated that his causal analysis rested on the "the fact that the letters were written and the letters were sent, and they contain disparaging remarks.  On the basis of that alone, one would expect to see a relation between the receipt of the letters and sales."  (Id. at 94:19–95:1.)  Given that Emerge has had more than ample time to conduct discovery on this issue, its inability to come forward with

---

[8] Emerge argues that, in his deposition, House claimed to have examined other factors that "appeared coincident to the dissemination of the letters" and found that they were not "aligned in a temporal way in time that would explain the downturn of Emerge sales."  (House Dep. 155:23–17.)  Notably, however, House expressly admitted that he:  (1) did not look at a specific document that involved a risk analysis done between Emerge and Cardinal Health that analyzed the risks associated with various events in the market place; (2) did not review any internal Emerge documents explaining why Emerge salespeople believed they had lost accounts or failed to penetrate accounts; and (3) did not do any individual analysis by hospital or customer.  (Id. at 154:17–158:1.)

specific evidence sufficient to satisfy the requisite standard requires that summary judgment be entered in favor of Synthes on this claim.

In a final effort to avoid this outcome, Emerge contends that the litigation letters rise to the level of defamation *per se*, meaning that it need only prove general damages, which it has done via its expert report.  This theory, however, is legally incorrect.  "Defamation and disparagement are two distinct torts. . . . While alike in many respects, there are important differences between the two. . . . These differences are largely explained by the interests the two torts are intended to protect. The action for defamation serves to protect one's interest in character and reputation.  The cause of action for disparagement, on the other hand, protects economic interests by providing a remedy to one who suffers pecuniary loss from slurs affecting the marketability of his goods."  Zerpol Corp. v. DMP Corp., 561 F. Supp. 404, 408 (E.D. Pa. 1983).  "Because the tort of disparagement protects against pecuniary loss, the elements of the cause of action are much more stringent than those for defamation."  Id. at 408–09.  As Emerge has never alleged defamation in its counterclaim,[9] and the Court will not allow it to amend its counterclaim at this juncture simply because it cannot prove the special damages required for its

---

[9]  The cases on which Emerge relies in an effort to convert its trade libel case into a defamation per se claim are inapposite.  In Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378 (E.D. Pa. 2009), the court merely noted that the specific damage requirement was relaxed where the disparagement rises to the level of defamation per se, but suggested that a plaintiff must actually claim defamation per se to take advantage of that rule.  Id. at 416.  In any event, the court in that case dismissed the commercial disparagement claim for failure to establish damages.

Moreover, in both Municipal Revenue Serv., Inc. v. Xspand, Inc., 700 F. Supp. 2d 692, 707 (M.D. Pa. 2010) and U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 923–24 (3d Cir. 1990), the plaintiffs had actually pled both a defamation claim and a commercial disparagement claim.  Nothing in these cases suggested that a commercial disparagement claim may be converted into a defamation claim, even where no defamation claim has been pled, simply because the statement forming the basis of the disparagement claim may rise to the level of defamation.

trade libel claim.

In sum, the Court finds that Emerge has failed to create a genuine issue of material fact as to the viability of its commercial disparagement claim based on the litigation letters. Therefore, the Court must grant Plaintiffs' Motion for Summary Judgment on this issue.

### 2.    Other Statements By Synthes Representatives

Separate and apart from the litigation letters, Emerge also rests its trade libel counterclaim on ten alleged statements by Synthes representatives set out in detail above. Synthes now argues that these statements fail to support the trade libel claim for multiple reasons: (1) the statements do not concern Emerge's products or services and are not actionable as trade libel; (2) the statements are of future intent and thus not actionable as trade libel; (3) there is no evidence that certain statements were "published" to third parties; (4) the only evidence of the statements attributed to Synthes's representatives is inadmissible hearsay; and (5) Emerge has failed to adduce the required evidence of pecuniary loss. As the Court finds merit to the last point, we limit our discussion to that argument.[10]

As set forth above, to state a claim for trade libel, a plaintiff must plead special damages. KBT Corp., 966 F. Supp. at 379. "'Pennsylvania law requires that a plaintiff claiming commercial disparagement plead damages with considerable specificity,' by setting out in its complaint the names of the customers lost and financial loss resulting from the tort." Bro-Tech

---

[10] Notably, many of Synthes's other arguments have merit as well. For example, the statement by Synthes's Trauma Division VP Ken Carpenter to Synthes's Trauma Division President I.V. Hall claiming that Synthes will put Emerge out of business is merely an internal statement never published to a third party, thereby making it non-actionable. Moreover, emails by Synthes representatives to third parties offering savings on Synthes products if they agree not to use Emerge products are not false statements that disparage the quality of Emerge goods or services.

Corp., 651 F. Supp. 2d at 416 (quoting Swift Bros., 921 F. Supp. at 276).  Despite the fact that

Emerge identifies with precision the challenged statements, the makers of those statements, and

the recipients of those statements, Emerge's expert Dr. House, completely neglects to make any

connection between these additional statements and any damages to Emerge.  In his expert

report, Dr. House acknowledges that the conduct challenged by the Counterclaim includes both

the litigation letters, as well as the allegedly disparaging statements and e-mails to actual and

potential customers and to Emerge's subcontractor manufacturer.  (Pls.' Appx. 700, House

Expert Report at 6.)  He then goes on to reason that:

> Such statements are known to potentially affect Emerge's sales and ability to
> compete in the marketplace.  Accordingly, one would expect Emerge's actual sales
> to be less than its sales in the absence of Synthes' alleged conduct.  Since the
> available evidence supports these allegations, one would expect Emerge to have
> suffered loss of past and future sales.
> *The evidence from Emerge's sales demonstrates a clear impact of Synthes'
> conduct.  Figure 1 presents this clear evidence.  Figure 1 presents the timing of
> Synthes's **letters** to existing and potential customers, combined with Emerge's actual
> quarterly sales.*  The peak sales in 3rd Quarter 2012 registers the effects of the
> Cardinal Health distribution agreement.

(Id. (emphasis added).)  Notably, in presenting this "clear evidence" of the impact of Synthes's

conduct on Emerge's sales, Dr. House completely disregards the timing of Synthes's allegedly

disparaging statements to existing and potential customers.

When questioned on this issue during his deposition, House failed to provide any more

clarity.  He stated:

> I've been asked to review the conduct of Synthes; I've been asked to review
> the performance or the sales of Emerge; I've been asked to review the allegations;
> and if, in fact, there seems to be a causal relation between the conduct of Synthes and
> the sales of Emerge, can I construct a calculation of damages?
> . . .
> So my offer of opinion, useful opinion to the Court, would be limited to are

the allegations of a nature, from an economist's perspective, or of a type of conduct that have the potential of affecting sales?  And, yes, they are.

Do I find evidence that is consistent with the allegations; that is, can I conclude that there's a causal relationship between the alleged conduct and Synthes [sic] sales *with respect to the letters*?  I do draw that conclusion.

Given my conclusion that there was injury, at least with respect to the letters, *and I assume that there's injury with respect to the other allegations*, do I find evidence that sales are lower than they otherwise would have been in the but-for world.  I find that they are, and I can measure damages.

(Pls.' Appx. 701, House Dep. 68:16–69:19 (emphasis added).)[11]  In other words, the only expert conclusion drawn by Dr. House is that there exists a causal relationship between Emerge's sales and the letters.  Any causal connection between the other statements and Emerge's damages rests on nothing more than a mere assumption.  When pressed further on this matter, Dr. House testified as follows:

Q. . . . [W]hen we get to the body of your report and the data that you rely on for causation, it seems to be, from my reading, focused on the letters.  Is that correct?
. . .

A. Yes and no.  The materials that I have reviewed, emails, and obviously including the letters and the content of the letters, and the other items that are alleged that are listed on page 6 embodied more than just the letters.

*I have not yet been able to relate, nor have I tried, such things as the emails; such things as the encouragement, item number five, that Emerge will cease operations.*

*I have not yet related those specific items that are included in the alleged conduct to a pattern of reduced sales.  So I have done part of the work, but not all of that work.*

(Id. at 62:12–63:8 (emphasis added).)

Q. Did you make any effort in the analysis that you have provided in your report and is referenced in the calculations that are appended to the report to distinguish between harm you believe was caused by the letters as opposed

---

[11]  Notably, Emerge's only effort to establish pecuniary loss relies solely on this testimony.  The fact that Dr. House concedes that he made no expert conclusion as to the impact of the other conduct, but rather relied simply on an assumption, undermines Emerge's argument.

32

to the other three points on page 6 of your report that relate to the counterclaim?

A.      I the calculation of damages, no.  I took them as a group.

Q.      You took all five points as a group---

A.      Correct.

Q.      —in the calculation of damages?

A.      Correct.  I will say the timing of the beginning of the damages were directly related to the receipt of the letters.

         *I have not yet completed, and I'm not sure that I've received all the materials, perhaps I have, related to the other points in the allegations.*

(Id. at 72:24–73:18 (emphasis added).)

        At this juncture, after several years of discovery, which has long been completed, Emerge's inability to provide any evidence of specific pecuniary damage related to the alleged defamatory statements is fatal to its trade libel claim.  Nothing in Dr. House's report even attempts to connect a broad loss of Emerge sales with the other conduct set forth in the Counterclaim, let alone provides the required names of the customers lost and financial loss resulting from the tort.  Nor did Dr. House's predication of damages on a general loss of customers allege facts showing the impossibility of setting forth the names of particular customers who withdrew or withheld their business.  In short, as Emerge has failed to meet its burden of creating a genuine issue of fact on the question of pecuniary damage resulting from the other alleged conduct, its trade libel claim based on such conduct cannot survive summary judgment review.

        **B.      Tortious Interference Claim**

        Synthes next seeks summary judgment on Emerge's tortious interference with prospective contractual relationships cause of action.  Under Pennsylvania law, to prevail on a claim for tortious interference with existing or prospective contractual relationships, a party must prove:

33

"(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference." Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009).

The first element requires proof of the existence of a prospective contractual relationship. "Defining a 'prospective contractual relationship' can be difficult." Phillips v. Selig, 959 A.2d 420, 428 (Pa. Super. Ct. 2008). "It is something less than a contractual right, something more than mere hope." Id. (internal quotation marks omitted). "To satisfy this first element, a plaintiff must show that it is reasonably probable that, but for the wrongful acts of the defendant, the plaintiff would have had a contractual relationship with a third party." BP Envtl. Servs., Inc. v. Republic Servs., Inc., 946 F. Supp. 2d 402, 412 (E.D. Pa. 2013). In determining this "reasonable probability," "Pennsylvania courts have consistently required more evidence than the existence of a current business or contractual relationship." Phillips, 959 A.2d at 429.

The second element, that of intent, deals with the fact that there is no general cause of action in Pennsylvania for *negligent* interference with contractual relations. Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc., 28 F. Supp. 2d 947, 952 (E.D. Pa. 1998). "It is not sufficient to show that the defendant intentionally breached its contract. A plaintiff must show that the defendant acted for the malevolent purpose of interfering with the plaintiff's existing or prospective business relationships." Id. at 951 (citations omitted). "It is also not

34

enough to show the defendant should have foreseen that its breach of contract would cause plaintiff to lose business.  Otherwise, virtually every breach of a commercial contract to supply a plaintiff with a needed product, component or service would support an intentional interference claim." Id. at 952.

Finally, in the context of tortious interference with contractual relation claims, "[t]he presence of a privilege is not an affirmative defense, rather, the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff." Bahleda v. Hankison Corp., 323 A.2d 121, 122–123 (Pa. Super. 1974).  The absence of privilege or justification element of a claim for interference with contractual relations is closely related to intent.  Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978).  Under the Restatement (Second) of Torts:

> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
>> (a) the relation concerns a matter involved in the competition between the actor and the other and
>>
>> (b) the actor does not employ wrongful means and
>>
>> (c) his action does not create or continue an unlawful restraint of trade and
>>
>> (d) his purpose is at least in part to advance his interest in competing with the other.
>
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Restatement (Second) of Torts § 768; see also Acumed LLC, 561 F.3d at 215 ("Pennsylvania has adopted section 768 of the Restatement (Second) of Torts, which recognizes that competitors, in

certain circumstances, are privileged in the course of competition to interfere with others'
prospective contractual relationships.").

Under the confines of this law, Emerge sets forth three broad bases for its tortious
interference claims: (1) the actions by Synthes salesperson Tim Todack in misappropriating
documents belonging to Banner Health and using them to compete with Emerge; (2) the
litigation letters; and (3) "other" allegedly tortious conduct by Synthes.  Synthes contends that
none of these tortious interference claims can survive summary judgment review.[12]  The Court
considers each individually.

### 1.      The Actions of Tim Todack

As described in more detail above, Emerge alleges that Mr. Todack allegedly
misappropriated documents belonging to Banner Healthcare by accessing Banner's password-
protected intranet without permission and then used this unlawfully-obtained information to
unfairly compete against Emerge for Banner's business.  Synthes now contends that any tortious
interference claim founded on these actions must fail on several grounds.

Primarily, Synthes correctly notes that Emerge did not raise this factual scenario
anywhere in its Amended Counterclaim.  Moreover, Emerge did not identify this incident during
Emerge's Rule 30(b)(6) deposition taken in June 2013, or in expert discovery.  Accordingly, it
asserts that Emerge cannot now broaden the scope of its tortious interference counterclaim

---

[12]  The Court notes that the tortious interference allegations raised by Emerge in its
Counterclaim here are substantially different that the tortious interference claims raised by
Synthes in its Complaint.  Synthes alleges that the Defendants tortiously interfered with existing
contracts by improperly inducing various individuals/companies that were under contracts with
Synthes to breach those contracts.  By contrast, Emerge alleges that Synthes tortiously interfered
by prospective customer relationships by unfairly competing with Emerge for that business.

beyond the originally-pled scope of the litigation letters.  Nonetheless, while Emerge's newfound

discovery of a basis for its counterclaim at this late stage of litigation is somewhat troubling, the

Court notes that Emerge had clearly set forth a claim for tortious interference with prospective

contractual relations.  Although federal pleading standards do not allow a party to raise new

*claims* at the summary judgment stage, Dewees v. Haste, 620 F. Supp. 2d 625, 635 n.7 (M.D. Pa.

2009), Synthes has identified no case law that precludes a party from setting forth new factual

grounds for already-pled claims based on information discerned through discovery.

Even considering these actions, however, the claim as described in Emerge's Response in

Opposition to Summary Judgment does not create any genuine issue of material fact sufficient to

survive summary judgment review.  Primarily, Emerge fails to establish that Todack used any

improper means.  See Acumed LLC, 561 F.3d at 215–16 ("[F]or conduct to be wrongful it must

be actionable for a reason independent from the claim of tortious interference itself.").  Emerge

does not contend that Todack misappropriated *Emerge* confidential information, but rather

*Banner* confidential information—a claim it has no standing to pursue.  Moreover, Emerge has

provided no clear information that Todack improperly accessed the document at issue.  Banner's

corporate representative, Sue Hellriegel, testified hypothetically that if a vendor representative

was authorized by nursing staff to access the Banner intranet in order to get information for chart

sheets, the vendor representative would exceed his authorization if he reviewed and downloaded

documents of the type Mr. Todack had taken.  (Hellriegel Dep. 27:23–28:4.)  Nonetheless, she

had no personal knowledge as to the scope of Todack's authorization and whether any of the

actual documents at issue were improperly accessed by Todack or otherwise exceeded the

authorization he was given.[13]  (Id. at 35:25–40:12.)

Second, Emerge has failed to respond to—and thus failed to create a genuine issue of

material fact regarding—Synthes's claim that it was privileged as a business competitor.[14]  As

Emerge bears the burden of proving absence of privilege, its failure to address Synthes's

evidence and argument supporting privilege is fatal to its claim.

Finally, and perhaps most notably, Emerge has failed to show that any legal damage it

suffered occurred as a direct result of Todack's conduct.  Specifically, Emerge has not

shown—either by expert testimony/report or by other evidence—that Todack's taking and

distribution of a Banner Health document had any impact on its relationship with Banner Health

that would not have occurred but for Todack's action.  In fact, other than alleging that Todack

circulated these documents to various Synthes executives, Emerge provides no explanation for

how Synthes used this information to improperly compete against Emerge for Banner's business.

Absent at least a minimal effort to flesh out this allegation and connect these actions with some

identifiable damage, Emerge's tortious interference claim based on this isolated incident must be

---

[13]  The Court notes that if this were the only argument Synthes raised in support of its summary judgment motion on this portion of the tortious interference claim, the Court might be less inclined to find that no genuine issue of material fact exists.  The scantness of evidence on this point by Emerge, however, taken in conjunction with Emerge's failure to produce sufficient evidence as to the other elements of the tortious interference claim convinces the Court that summary judgment is warranted.

[14]  "One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors.  In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor." Restatement (Second) of Torts § 768 cmt. b (1979).

dismissed.[15]

### 2.    The Litigation Letters

Emerge also fails to create a genuine issue of material fact as to whether the litigation letters constitute tortious interference with contractual relations.  First, as stated above, "for conduct to be wrongful it must be actionable for a reason independent from the claim of tortious interference itself."  Acumed, 561 F.3d at 215–16.  The Court has already found that the letters themselves are not trade libel and, thus, not actionable for a reason independent from the tortious interference claim.

Second, Emerge has failed to establish an *improper* intent to interfere.  A party alleging tortious interference "must show that the defendant acted for the malevolent purpose of interfering with the plaintiff's existing or prospective business relationships."  Valley Forge, 28 F. Supp. 2d at 951.  As set forth in great detail above, however, it is undisputed that, throughout its marketing efforts, *Emerge* repeatedly stated it was manufacturing drill bits, guide wires, and cannulated screws identical to and completely interchangeable with Synthes products, that Emerge's products were FDA 510(k) cleared, and that Emerge products could be stored alongside Synthes products in the SIMS cabinets.  As such, all reasonable inferences from the evidence indicate that Synthes's letters merely sought to respond to Emerge's own statements and were all prefaced with the following statement: "Because there has been confusion caused, in our opinion, by Emerge's marketing claims, we wish to make you aware of the following: . . ."  (Pls.' Appx. 723.)

---

[15]  Emerge's Response Brief contends that it could be awarded nominal damages even it could not prove actual loss.  This argument conflates two of the requirements of a tortious interference claim.  The Court's concern at this juncture is Emerge's failure to prove causation.

Moreover, Emerge's citation to random emails between Synthes employees does nothing to show that these letters were sent with the purposeful intent of interfering with Synthes contracts.  Simply because Synthes employees may have communicated with each other their dislike of Emerge or intent to eliminate Emerge as a competitor does not translate into the finding that the litigation letters were sent with the requisite ill intent.  (See Def.'s Resp. Opp'n Summ. J., Ex. 18 (January 27, 2013 email from one Synthes employee to two others identifying as a "Must Succeed" for the 2013 Annual Business Plan to "Eliminate Emerge threat"without any reference or connection to litigation letters); Id., Ex. 19 (emails among Synthes employees regarding a hospital's indication that Cardinal Health employees offered to duplicate Synthes product and put their product in Synthes trays; one employee writes "Let us know what legal says.  Emerge was started by an ex synthes guy that I thought we sued into oblivion.").)[16]

Third, Emerge fails to show that Emerge's conduct was not privileged.  As noted above, the Restatement expressly states that "[o]ne who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if . . . the relation concerns a matter involved in the competition between the actor and the other . . . the

---

[16]  Moreover, Emerge's citation to an email from a Synthes sales representative to a Banner Health representative is unavailing.  In that email, the Synthes representative acknowledged that Banner had already agreed to move back to Emerge and stated, "I am under the impression there were patient safety related issues with one of the Banner facilities that evaluated Emerge and they have switched back to Synthes.  As you may know, Emerge has represented its products as 'identical' to Synthes products which is not true.  These and other claims are presently being litigated by Synthes.  The attached letter from our Litigation Department provides further information for your review and consideration."  (Emerge's Resp. Opp'n Summ. J., Ex. 21.)  By its plain terms, the sending of the litigation letter to the Banner Health representative could not be the *cause* of Emerge's loss of Banner Health's business since Banner had already made the decision to switch back to Emerge *prior* to ever receiving the letter.

actor does not employ wrongful means and . . . his action does not create or continue an unlawful restraint of trade and . . . his purpose is at least in part to advance his interest in competing with the other."  Restatement (Second) of Torts § 768.  The comment to the Restatement goes on to note that "[o]ne's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors.  In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. *And he may seek to do so directly by express inducement* as well as indirectly by attractive offers of his own goods or services."  Id. at cmt. to subsection (1).  The comment to clause (b) goes on to explain:

> If the actor employs wrongful means, he is not justified under the rule stated in this Section.  The predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section.  On the other hand, the actor may use persuasion and he may exert limited economic pressure.  Subject to Clause (c) (see Comment f), he may refuse to deal with the third persons in the business in which he competes with the competitor if they deal with the competitor.  Or he may refuse other business transactions with the third person relating to that business.

> The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise.  Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service.  If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged.  If, however, he diverts the competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success is either due to or will result in superior efficiency or service and thus promote the interest that is the reason for encouraging competition.  For this reason economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference.

Restatement (Second) of Torts § 768 cmt. to clause (b).

The Court has already found that the litigation letters were not "wrongful" as defamation

or trade libel.  Moreover, it is undisputed that Synthes and Emerge were competitors and the letters directly concerned relations involved in the competing business and not some affair unrelated to their competition.  Although Emerge contends that the litigation letters were "directed to Emerge customers and potential customers in order to discourage them from considering Emerge," (Def.'s Resp. Opp'n Summ. J. 25), the Restatement explicitly says that such actions are privileged.[17]  Emerge fails to acknowledge the Restatement's comments, let alone explain why they do not conclusively dictate the outcome of this case.[18]

Last, but certainly not least, Emerge points to no evidence on which a reasonable factfinder could find the existence of a prospective contractual relationship.  Indeed, the record is devoid of evidence showing "that it is reasonably probable that, but for the wrongful acts of the defendant, the plaintiff would have had a contractual relationship with a third party."  BP Envtl. Servs., 946 F. Supp. 2d at 412.  Emerge has not even identified any customers with which it had a reasonable likelihood of a relationship, let alone put forth evidence of a reasonable likelihood that the relationship would have occurred but for Synthes's actions.

---

[17]  To the extent Emerge argues that the letters were fundamentally misleading, the Court has already dealt with this contention under the trade libel discussion above.

[18]  Emerge's citation to University Graphics, Inc. v. Pro-Image, Corp. 913 F. Supp. 338 (M.D. Pa. 1996) is inapposite.  Emerge cites that case for the proposition that, "'[T]he Pennsylvania Supreme Court has determined that the relevant inquiry must focus on the propriety of a defendant's conduct considering the factual scenario as a whole.'"  Id.  (quoting Ruffing v. 84 Lumber Co., 600 A.2d 545, 549 (Pa. Super. 1991)).  The court in that case, however, found that the defendant's expressing its concerns about a competitor being a tenant in the same building and even threatening litigation and/or a breach of its lease with the landlord was conduct that fell "within the 'rules of the game' permitted by society."  Id. at 347.  Ultimately, the court held that "no reasonable jury could find that the defendant intentionally interfered with the plaintiff's prospective contract."  Id.  This case, therefore, supports the Court's finding that Synthes's conduct in this case was not tortious.

In short, the Court notes that to the extent Emerge bases its tortious interference claim on the litigation letters, its claim must fail.  Emerge has not shown that the letters were independent wrongful conduct or that Synthes acted with the requisite intent.  Moreover, Emerge has adduced no evidence to undermine Synthes's obvious privilege as a competitor.  Finally, Emerge has not identified a single prospective contractual relationship that it would have likely entered into an agreement with had Synthes not sent these letters.

### 3.      Synthes's Conduct as a Whole

In what is perhaps a final effort to avoid summary judgment on its tortious interference counterclaim, Emerge contends that the Court must focus on the factual scenario as whole, which includes Todack's actions, the litigation letters, and the following additional conduct:

- Synthes extending offers to tie its products competitive with Emerge products to unrelated "drill bit" and "ex-fix" programs with the express goal of pushing Emerge out of various hospitals.  (Emerge's Resp. Opp'n Summ. J. 26 (citing id., Ex. 23.).)
- Synthes's response to customer consideration of Emerge with "business reviews" that were less a review and more a threat to stop all business.  (Id. (citing id., Exs. 24 & 25).)
- Synthes's internal reference to certain contracts with customers as "agreement[s] to get rid of Emerge."  (Id. (citing id., Ex. 26–28).)

Emerge then alleges broadly that "[t]hese wrongful acts exceed the bounds of the so-called 'business competitor's privilege,'" but expands no further on this point.  (Id. at 27.)

Emerge's argument, however, disregards the fundamental underpinnings of a tortious interference claim.  Such claims are not meant to stifle competitive activity or prevent a competitor from taking active measures to lure customers away from a competitor.  Rather, "[t]he central inquiry is whether the defendant's interference is sanctioned by the 'rules of the game' which society has adopted, looking at the propriety of the defendant's conduct as a

43

whole." Fishkin v. Susquehanna Partners, G.P., 563 F. Supp. 2d 547, 589 (E.D. Pa. 2008) (citing

Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 185 (3d Cir. 1997)), aff'd in part, 340 F.

App'x 110 (3d Cir. 2009).  Federal courts have predicted that the "Pennsylvania Supreme Court

would define wrongful means as predatory means, physical violence, fraud, civil suits, criminal

prosecutions and other independently actionable conduct. This standard strikes an appropriate

balance between encouraging healthy economic competition while prohibiting conduct that

ultimately interferes with the operation of the free market." Assembly Tech. Inc. v. Samsung

Techwin Co., Ltd., 695 F. Supp. 2d 168, 178 (E.D. Pa. 2010).  Wrongful means does not include

conduct that is not independently actionable.  Id.

    Emerge has not produced any evidence that Synthes has not played by the "rules of the

game."  Indeed, the additional conduct—even when considered in conjunction with Todack's

actions and the litigation letters—is nothing more than permissible, and indeed acceptable,

competitive conduct.  Emerge seems to rest solely upon the fact that Synthes made efforts simply

to interfere with Emerge's potential customers, without creating any genuine issue of material

fact as to whether such efforts were independently wrongful.[19]  Were such activity encompassed

by a tortious interference claim, normal market competition would face irreparable harm.  In

short, although Emerge has alleged *interference* with contracts, it has not alleged *tortious*

---

[19] To the extent Emerge contends that Synthes's alleged "tying" of products is wrongful
because they constitute antitrust violations, its argument is misplaced.  This Court dismissed
Emerge's antitrust counterclaims over one year ago.  Synthes, Inc. v. Emerge Med., Inc., No.
Civ.A.11-1566, 2012 WL 4473228, at *16 (E.D. Pa. Sept. 28, 2012).
    Emerge cites Dauro Advertising, Inc. v. General Motors Corp., 75 F. Supp. 2d 1165,
1170 (D. Colo. 1999) for the proposition that tying is improper conduct is improper conduct that
can give rise to a claim for tortious interference.  In that case, however, the court retained the
antitrust claims, whereas, in this case, the Court dismissed the antitrust claims at the Rule
12(b)(6) claims.  Id.

*interference* with contracts.  As no reasonable factfinder could conclude that Synthes tortiously

interfered, the Court must grant summary judgment in favor of Synthes on this claim.

### C.      Pennsylvania Unfair Competition Claim

Next, Synthes seeks summary judgment on Emerge's remaining counterclaim for

Pennsylvania unfair competition.  Pennsylvania recognizes a common law claim of unfair

competition under the Restatement (Third) of Unfair Competition.  Air Prods. and Chems., Inc.

v. Inter-Chem., LTD, et al., No. Civ.A.03-6140, 2003 WL 22917491, at *12 (E.D. Pa. Dec. 2,

2003) (quoting Fresh Made, Inc. v. Life Way Foods, No. Civ.A.01-4254, 2002 WL31246922, at

*9 (E.D. Pa. Aug. 9, 2002)). The Restatement provides, in relevant part:

> One who causes harm to the commercial relations of another by engaging in a
> business or trade is not subject to liability to the other for such harm unless . . . the
> harm results from . . . acts or practices of the actor determined to be actionable as an
> unfair method of competition, taking into account the nature of the conduct and its
> likely effect on both the person, seeking relief and the public.

Restatement (Third) Unfair Competition § 1(a).  Comment (g) to the Restatement explains that

"a competitor who diverts business from another . . . through the wrongful use of confidential

information, for example, may in some circumstances be subject to liability for unfair

competition even if the conduct is not specifically actionable under the rules relating to deceptive

marketing or appropriation of trade secrets."  Id. § 1(a) cmt. g.  Comment g goes on to explain

the rationale underlying the "catch-all" provision:

> A primary purpose of the law of unfair competition is the identification and redress
> of business practices that hinder rather than promote the efficient operation of the
> market. Certain recurring patterns of objectionable practices form the basis of the
> traditional categories of liability specifically enumerated in [§ 1]. However, these
> specific forms of unfair competition do not fully exhaust the scope of statutory or
> common law liability for unfair methods of competition, and [the Restatement]
> therefore includes a residual category encompassing other business practices

45

determined to be unfair.

Id. Thus, "Section 1(a), read together with Comment g, contemplates a fluid, 'residual rule of liability' for unfair practices that defies a definitive test." Envtl. Tectonics Corp. v. Walt Disney World Co., No. Civ.A.05-6412, 2008 WL 821065, at *16 (E.D. Pa. Mar. 26, 2008). "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." Synthes (USA) v. Globus Med., Inc., No. Civ.A.04-1235, 2007 WL 2042184, at *8 (E.D. Pa. Sept. 14, 2005) (citing cases). "Courts often look to 'generalized standards of fairness and social utility' as a compass for assessing whether a practice is unfair under the 'residual rule' of Section 1(a)." Envtl. Tectonics, 2008 WL 821065, at *16 (quoting Restatement (Third) Unfair Competition § 1(a) (1995)).

Nonetheless, "[g]enerally speaking, despite the broad language contained in the Restatement, "courts have . . . been reluctant to interfere in the competitive process." Id. (quotations omitted). "A person seeking relief under the residual rule . . . bears the burden of establishing that the method of competition employed by the actor is unfair." Id. (quotations omitted).

In response to Synthes's Motion for Summary Judgment on this claim, Emerge now offers two factual bases for its unfair competition claim. First, it contends that the Court can find unfair competition based on the "false and misleading letters sent to targeted customers as part of [Synthes's] effort to poison the well against Emerge, as well as the misleading statements

46

identified in Synthes' Motion." Emerge contends that these statements demonstrate Synthes's

substantial interference with Emerge's ability to compete. As set forth extensively above,

however, the Court has fully addressed these letters and statements and has found nothing

wrongful or defamatory. Absent some showing that the letters of statements were "unfair" or

otherwise tortious in some manner, they cannot form the basis of an unfair competition claim.[20]

Second, Emerge contends that Tim Todack's misconduct in securing confidential Banner

documents for use against Emerge were unlawful and therefore actionable as unfair competition.

It goes on to reason:

> Mr. Todack's conduct is unlawful under the Computer Fraud and Abuse Act (one of
> the very statute Synthes seeks to deploy against Emerge). . . . Even assuming Mr.
> Todack was authorized to access Banner computers in order to enter patient
> information, as he claims, Mr. Todack clearly exceeded that authority by
> downloading documents that benefitted Synthes in its pricing contract negotiations
> with banner, to both Banner's and Emerge's detriment. [citations to Computer Fraud
> and Abuse Act law omitted]

(Emerge's Resp. Opp'n Summ. J. 29.)

This claim is deficient in multiple respects. First, at no point throughout the entirety of

this litigation did Emerge ever raise a claim under the Computer Fraud and Abuse Act

("CFAA"). "Federal pleading standards do not allow a party 'to raise new claims at the summary

judgment stage. . . . Liberal pleading does not require that, at the summary judgment stage,

defendants must infer all possible claims that could arise out of the facts set forth in the

---

[20] The only case cited by Emerge in support of this claim is Yeager's Fuel, Inc. v.
Pennsylvania Power & Light Co., 953 F. Supp. 617 (E.D. Pa. 1997). In that case, however, the
court declined to grant summary judgment on the plaintiffs' common law unfair competition
claim because "the record contain[ed] fact issues concerning whether [the defendant] violated the
various federal antitrust statutes." Id. at 668. In this case, the Court has found no factual issues
as to any other of Emerge's claims of tortious activity by Synthes.

complaint.'"  <u>Dewees v. Haste</u>, 620 F. Supp. 2d at 635 (quoting <u>Gilmour v. Gates, McDonald &</u>

<u>Co.</u>, 382 F.3d 1312, 1314–15 (11th Cir. 2004)).  Having never before suggested a cause of action

under the CFAA, Emerge may not do so now.

   Moreover, based on the facts alleged, Emerge does not have standing to raise this claim.

The statute provides that:

> *Any person who suffers damage or loss by reason of a violation of this section* may
> maintain a civil action against the violator to obtain compensatory damages and
> injunctive relief or other equitable relief. A civil action for a violation of this section
> may be brought only if the conduct involves 1 of the factors set forth in subclauses
> (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(I). . . .

18 U.S.C.A. § 1030(g).  The statute defines "loss" as "any reasonable cost to any victim,

including the cost of responding to an offense, conducting a damage assessment, and restoring

the data, program, system, or information to its condition prior to the offense, and any revenue

lost, cost incurred, or other consequential damages incurred because of interruption of service."

18 U.S.C. § 1030(e)(11).  Courts have held that, to fall within this definition, the alleged "loss"

must be related to the impairment or damage to a computer or computer system.  <u>Fontana v.</u>

<u>Corry</u>, No. Civ.A.10-1685, 2011 WL 4473285, at *7 (W.D. Pa. Aug. 30, 2011).  Notably, a claim

for future lost revenue due to the dissemination of trade secrets does not qualify as a "loss" under

the CFAA.  <u>Clinton Plumbing</u>, 2010 WL 4224473, at *6 (citing cases).  Likewise, harm to

ongoing business ventures, i.e., an alleged loss of business, is insufficient to show "loss."

<u>Fontana</u>, 2011 WL 4473285, at *8.

   Emerge, however, alleges only that *Banner Health's* computers were accessed and

*Banner Health's* documents were taken.  Emerge's only alleged losses resulting from Todack's

access of the computers—losses that have not been supported by any evidence of record—claim

48

a dissemination of trade secrets, and not even Emerge's trade secrets.  Emerge does not, and

cannot, allege that it suffered any impairment or damage to its computer or computer system,

especially because there is no claim that Todack ever accessed *Emerge* computer systems.  As

such, Emerge is not "a person who suffer[ed] damage or loss," as defined in the CFAA, and thus

cannot bring an action based on this section.

Finally, even assuming *arguendo* that Emerge could raise a new claim under the CFAA

as its basis for the unfair competition claim and that Emerge had standing to raise such a claim,

Emerge fails to explain how Todack's conduct violated the CFAA.  To bring a claim pursuant to

§ 1030(a)(4) of the CFAA, a plaintiff must allege: (1) that the defendant has accessed a

"protected computer;" (2) has done so without authorization or by exceeding such authorization

as was granted; (3) has done so "knowingly" and with "intent to defraud;" and (4) as a result has

"further[ed] the intended fraud and obtain [ed] anything of value." 18 U.S.C. § 1030(a)(4).  As

noted above, Emerge has not established any genuine issue of material fact as to whether Todack

improperly accessed Banner Health's protected computer or exceeded his authorization both

knowingly and with an intent to defraud.  Emerge's mere citation to this cause of action does not

rescue Emerge's unfair competition claim.

Without any underlying unlawful or tortious activity, Emerge's unfair competition claim

cannot survive.  Thus, the Court grants summary judgment on this claim in favor of Synthes and

against Emerge.

### D.   Declaratory Judgment Action

Lastly, Synthes asserts that the Court should decline to exercise jurisdiction over

Emerge's declaratory judgment claims.  Specifically, Emerge requests a declaration by this Court

that it has not tortiously interfered with Synthes and any of its current or former Synthes employees, as well as a declaration that Emerge has not aided and abetted any current or former Synthes employee to breach any fiduciary duty owed to Synthes.

The Declaratory Judgment Act provides that "[in] a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995). The Third Circuit Court of Appeals has indicated that the Declaratory Judgment Act "contemplates that district courts will exercise discretion in determining whether to entertain such actions." State Auto Ins. Cos. v. Summy, 234 F.3d 131, 133 (3d Cir. 2001). In other words, the Declaratory Judgment Act "confers a discretion on the courts rather than an absolute right upon the litigant." Wilton, 515 U.S. at 287.

The Court now sees no reason to exercise jurisdiction over Emerge's declaratory judgment claims. With respect to Emerge's declaratory judgment action regarding the aiding and abetting breach of fiduciary duty claim, the Court already found, in the June 5, 2014 Memorandum Opinion, that Emerge was entitled to summary judgment on this claim. Accordingly, the declaratory judgment action on this claim is moot. Synthes, Inc. v. Emerge Med., Inc., No. Civ.A.11-1566, 2014 WL 2579286, at *44–45 (E.D. Pa. June 5, 2014). Moreover, as to the tortious interference claim, the Court has found that this claim should be partially dismissed, but that questions of material fact remain as to some aspects of that claim.

50

The parties will therefore need to litigate those issues before a factfinder, meaning that the Court will not be able to issue a declaratory judgment ruling on this claim. Absent a reason to exercise jurisdiction over these claims—particularly in light of the late stage in which this litigation stands—the Court will grant this portion of Synthes's Motion.

## IV.   CONCLUSION

In sum, the Court finds that Synthes is entitled to summary judgment on all of Emerge's counterclaims. With respect to its trade libel claim, Emerge has failed to create any issue of material fact as to whether the litigation letters or other statements were false or resulted in actionable damages. With respect to its tortious interference claim, Emerge has not put forth sufficient evidence upon which a reasonable factfinder could determine that all elements of that claim are satisfied. As to the unfair competition claim, Emerge has rested its allegations on the same conduct underlying the previous two claims, and because such conduct is not otherwise tortious or unlawful, it cannot support an allegation of unfair competition. Finally, having already considered the substantive merits of the subjects on which Emerge seeks a declaratory judgment, the Court declines to exercise jurisdiction over the declaratory judgment claims. Therefore, summary judgment is entered in favor of Synthes and against Emerge on the entirety of Emerge's Amended Counterclaim.

An appropriate Order follows.