**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SYNTHES, INC., SYNTHES USA HQ, INC.,   :
SYNTHES USA, LLC, SYNTHES USA SALES,  :
LLC, and SYNTHES USA PRODUCTS, LLC,   :
                                    :    CIVIL ACTION
          Plaintiffs,                 :
                                      :
          v.                          :
                                      :    NO. 11-1566
EMERGE MEDICAL, INC., JOHN P.           :
MAROTTA, ZACHARY W. STASSEN, ERIC  :
BROWN, and CHARLES Q. POWELL      :
                                      :
          Defendants.                :
_____ :
                                        :
EMERGE MEDICAL, INC. ,              :
                                      :
          Counterclaim-Plaintiff,    :
                                        :
          v.                          :
                                      :
SYNTHES, INC., SYNTHES USA HQ, INC.   :
SYNTHES USA, LLC, SYNTHES USA SALES,  :
LLC, and SYNTHES USA PRODUCTS, LLC,   :
                                      :
          Counterclaim-Defendants.  :

## TABLE OF CONTENTS FOR CROSS-MOTIONS FOR SUMMARY JUDGMENT TO LIABILITY

I.     **STATEMENT OF FACTS** ............................................... 2

     A.    Persons Relevant to the Suit .......................................... 2

           1.    The Parties .................................................. 2

           2.    Other Relevant Individuals ...................................... 7

B.  Background of the Key Players' Employment With Synthes . . . . . . . . . . . . . . . 8

    1.  Defendant Marotta's Employment With Synthes . . . . . . . . . . . . . . . . . . . 8

    2.  Defendant Brown's Employment With Synthes . . . . . . . . . . . . . . . . . . 12

    3.  Powell's Employment With Synthes . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    4.  Trafka's Employment with Synthes and Magnum Tool . . . . . . . . . . . . 17

C.  Written Obligations of the Parties and Other Individuals . . . . . . . . . . . . . . . . . 19

    1.  Synthes Written Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        a.  Contractual Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        b.  Employment Policies and Obligations . . . . . . . . . . . . . . . . . . . . 26

    2.  Emerge's Written Contracts and Policies . . . . . . . . . . . . . . . . . . . . . . . . 26

    3.  Vendors' Written Contractual Obligations to Synthes . . . . . . . . . . . . . . 28

    4.  SIMS and Customers' Written Contractual Obligations to Synthes . . . . 28

D.  The Formation of Emerge Prior to April 15, 2010 . . . . . . . . . . . . . . . . . . . . . . 29

    1.  Brief Background of Emerge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    2.  Detailed Timeline of Emerge-Related Activities Prior to
        April 15, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    3.  Emerge's Business Plans and Investor Materials (Pre-April 2010) . . . . . 38

        a.  The Private Placement Memorandum . . . . . . . . . . . . . . . . . . . . . 38

        b.  Investor Presentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        c.  Additional Statements Regarding Emerge's Business Model . . . 40

    4.  Emerge's Finding of Investors and Raising Money . . . . . . . . . . . . . . . . 41

    5.  Early Design and Development of Emerge Product . . . . . . . . . . . . . . . . 42

E.     Emerge's Use of Synthes Products and Information . . . . . . . . . . . . . . . . . . . . . . 43

    1.    Acquisition and Use of Synthes Product . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    2.    Acquisition, Use, and Disclosure of Synthes's Confidential and
        Proprietary Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        a.    Information Related to Synthes's Manufacturing Costs . . . . . . . 45

        b.    Information Related to Synthes' External Fixation and LCP
            Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        c.    Information Related to Synthes's Critical Features,
            Dimensions, and Tolerances . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        d.    Information Related to Synthes's Engineering Specifications . . . 47

        e.    Information Related to Synthes's Cortical and
            Cancellous Screws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        f.    Information Related to Synthes's Usage Data in Emerge's
            Early Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        g.    Information Related to Synthes's Cannulated Screw
            Comparison Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

        h.    Synthes Documents Marotta Emailed to His Personal Email
            Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

        i.    Marotta's & Powell's Retention of Synthes's Emails . . . . . . . . . 51

        j.    Information Related to Synthes's Strategic Business
            Acquisition Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

F.     Emerge Obtains FDA Clearance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

G.    Emerge's Pilot Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    1.    Banner Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    2.    AOSH/USPI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    3.    Catholic Healthcare West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

        4.     Other System-Wide Sales and Early Targets . . . . . . . . . . . . . . . . . . . . . . . 58

H.    Emerge's Sales Process, Strategy, Implementation, and Commingling
       of Product . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

I.     Cardinal Health  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

J.     Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**II.**    **STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**III.**   **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

A.    Claim Against Marotta for Breach of Fiduciary Duty (Count I) . . . . . . . . . . . . 65

        1.     Defendant's Motion for Partial Summary Judgment on Breach of
            Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

        2.     Plaintiffs' Motion for Summary Judgment on Breach of
            Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

B.    Claim of Aiding and Abetting Breach of Fiduciary Duty Against Emerge . . . . . 79

C.    Claim Against Marotta for Breach of Contract Under the Non-Competition
       and Non-Disclosure Agreements (Count II) . . . . . . . . . . . . . . . . . . . . . . . . . . 86

        1.     The Assignment Provision of the Non-Disclosure Agreement . . . . . . . 86

        2.     The Non-Competition and Non-Solicitation Provisions
            of the RM NCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

            a.     Breach of the Non-Competition Provision  . . . . . . . . . . . . . . . . 97

            b.     Breach of the Non-Solicitation of Customers Provision . . . . . . 104

            c.     Breach of the Non-Solicitation of Employees Provision . . . . . . 108

        3.     Sales Consultant Non-Competition Provision . . . . . . . . . . . . . . . . . . . 113

        4.     Return of Property Provision and Confidentiality and
            Non-Disclosure Provisions in the RM NCA and NDA . . . . . . . . . . . . 121

            a.     Small Fragment Set . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

iv

        b.     Synthes Product in Marotta's Garage . . . . . . . . . . . . . . . . . . . 125

        c.     Synthes Emails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

D.    Misappropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

      1.     Whether the Items at Issue Constituted Trade Secrets . . . . . . . . . . . . . 132

        a.     Synthes Information Regarding Manufacturing Costs
               and Usage Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

        b.     Product Design Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

      2.     Whether Emerge Misappropriated Synthes's Trade Secrets . . . . . . . . . 142

        a.     Information Regarding Manufacturing Costs
               and Usage Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

        b.     Synthes Product Drawings and Information Related to
               External Fixation Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

        c.     Synthes Product Drawings and Information Related to
               Critical Features, Dimensions, and Tolerances for Screws
               Emerge Developed and Screws Emerge Identified as
               Additional Product Offerings . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

        d.     Synthes Engineering Specifications and Information
               Related to Products Emerge Designed and Identified as
               Additional Product Offerings . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

        e.     Drawings and Information Related to Synthes Cortical and
               Cancellous Screws and Product Emerge Identified as
               Additional Product Offerings . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

        f.     Strategic Business Planning Information Related to
               Companies Affiliated with Prospective Emerge Investors
               and Advisors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

      3.     Conclusion as to Misappropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

E.    False Advertising Under the Lanham Act . . . . . . . . . . . . . . . . . . . . . . . . . 153

F.    Computer Fraud and Abuse Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

G.    Trespass to Chattels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

H.    Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

I.    Tortious Interference With Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

    1.    Tortious Interference with Marotta's Contracts With Synthes . . . . . . . 177

        a.    Whether Emerge Had Knowledge of Marotta's Contractual
            Agreements with Synthes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

        b.    Whether Emerge Did Anything to Induce Marotta to
            Breach Either His NDA, His RM NCA, or His SC NCA
            With Synthes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

    2.    Tortious Interference with Powell's Non-Compete Agreement With
        Synthes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

    3.    Tortious Interference With Brown's Agreements With Synthes . . . . . . 186

    4.    Tortious Interference With Synthes's Contractual Relationships
        With Any of Its Customers or Vendors . . . . . . . . . . . . . . . . . . . . . . . . . 188

        a.    Tortious Interference With Vendors . . . . . . . . . . . . . . . . . . . . . 188

        b.    Tortious Interference with Customers . . . . . . . . . . . . . . . . . . . . 190

    5.    Marotta's Tortious Interference With Synthes's Contractual
        Relations With Other Synthes Employees . . . . . . . . . . . . . . . . . . . . . . . 191

J.    Civil Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

**IV.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SYNTHES, INC., SYNTHES USA HQ, INC.,    :
SYNTHES USA, LLC, SYNTHES USA SALES,    :
LLC, and SYNTHES USA PRODUCTS, LLC,     :
                                        :    CIVIL ACTION
       Plaintiffs,                      :
                                        :
    v.                                  :
                                        :    NO.  11-1566
EMERGE MEDICAL, INC., JOHN P.           :
MAROTTA, ZACHARY W. STASSEN, ERIC       :
BROWN, and CHARLES Q. POWELL            :
                                        :
       Defendants.                      :
_____     :
                                        :
EMERGE MEDICAL, INC. ,                  :
                                        :
       Counterclaim-Plaintiff,          :
                                        :
    v.                                  :
                                        :
SYNTHES, INC., SYNTHES USA HQ, INC.     :
SYNTHES USA, LLC, SYNTHES USA SALES,    :
LLC, and SYNTHES USA PRODUCTS, LLC,     :
                                        :
       Counterclaim-Defendants.         :

**MEMORANDUM**

BUCKWALTER, S. J.                                                    June 5, 2014

      Currently pending before the Court are the Cross-motions for Summary Judgment of

Plaintiffs Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC, Synthes USA Sales, LLC,

and Synthes USA Products, LLC (collectively "Synthes") and Defendants Emerge Medical, Inc.,

John P. Marotta, and Charles Q. Powell (collectively "Defendants"). For the following reasons, Synthes's Motion is granted in part and denied in part and Defendants' Motion is granted in part and denied in part.

## I.      STATEMENT OF FACTS[1]

The factual history of this case, while not particularly long in a temporal sense, contains numerous discrete events and actions that give rise to the multitude of claims at issue. As the parties have already engaged in lengthy motion practice, as well as a preliminary injunction hearing, the general facts are well-known to both the parties and the Court. While the Court declines to recite every fact set forth by the parties, the Court will engage in a somewhat detailed summary in order to encompass the facts pertinent to resolution of the motions at issue.[2]

### A.      **Persons Relevant to the Suit**

#### 1.      **The Parties**

Synthes, Inc. is a Delaware corporation with its principal place of business in

---

[1] In light of the close to 900 separate exhibits provided to the Court by the parties, citation to exhibits for each factual proposition would result in an unwieldy opinion with little additional substantive explanation. As such, for the sake of economy, when the parties agree on certain statements of fact, the Court will cite solely to the parties' Statements of Undisputed Facts and Responses. When a disagreement about a particular alleged fact exists or when the Court is quoting from a particular exhibit, the Court will cite to the actual exhibits provided by the parties. To the extent a party does not dispute the factual content of an exhibit cited in support of an allegation, but merely contests the evidentiary admissibility of the exhibit, the Court will rely on the cited exhibit, unless the objecting party provides contrary evidence.

[2] Both parties provided Statements of Fact, as well as Responses to the other party's Statement of Fact. Plaintiffs' Statement consists of 1,182 separate allegations that go into excruciating detail while, in stark contrast, Defendants' Statement contains only 35 separate allegations that only cursorily introduce the events underlying this case. The Court does not find either party's recitation of the facts to be satisfactory. Nonetheless, the Court will, for sake of organization, follow Synthes's basic outline of the facts and err on the side of being more comprehensive.

Pennsylvania, and is the parent company of the other Plaintiffs, which are also Delaware entities with their principal places of business in Pennsylvania. (Plaintiffs' Statement of Undisputed Facts ("PSUF") ¶ 1; Defendants' Response to Plaintiffs' Statement ("DRPS") ¶ 1.) Synthes has been described as a global leader in the highly competitive orthopedic device market. (PSUF ¶ 2; DRPS ¶ 2.) Its sales and marketing plan depends exclusively upon the preferences of orthopedic surgeons to influence the purchasing decisions of the hospitals and surgical centers where orthopedic surgeons practice. (PSUF ¶ 5; DRPS ¶ 5.)

Emerge Medical, Inc. ("Emerge") is a Colorado corporation formed on January 13, 2010, under the name Emerge Surgical, Inc. (PSUF ¶ 7; DRPS ¶ 7.) On June 23, 2010, Emerge Surgical, Inc. officially changed its name to Emerge Medical, Inc. (PSUF ¶ 8; DRPS ¶ 8.) Emerge competes with Synthes and was formed to produce and sell Generic Device Fixation Hardware "similar, but not identical to" that which Synthes also produces and sells. (PSUF ¶¶ 9–10; DRPS ¶¶ 9–10.) According to Emerge, it has "devised a new approach to the sales of [drill bits, guide wires, and screws] providing the American public with a like-numbered product that is similar to" drill bits, guide wires, and cannulated screws sold by Synthes. (PSUF ¶ 11; DRPS ¶ 11.) As of July 2012, Emerge sold only "drill bits, guide wires, and screws." (PSUF ¶ 12; DRPS ¶ 12.) Emerge's drill bits, guide wires, and screws may be "used to hold Synthes['] sophisticated implants in place." (Plaintiffs' Appendix ("Pls.' Appx.")[3] 2, Emerge Answer to Am. Compl. ¶ 156; PSUF ¶ 13; DRPS ¶ 13.) Currently, Cardinal Health, Inc. ("Cardinal

---

[3] Plaintiffs' Appendix is Synthes's comprehensive appendix of exhibits to which both parties cite in their Motions and Responses (although Defendants submit a minimal amount of additional exhibits). The court refers to this compilation as "Pls.' Appx." followed by the appropriate tab number.

Health") serves as the exclusive distributor of Emerge products.  (PSUF ¶ 15; DRPS ¶ 15.)

Defendant John P. Marotta is a former Synthes Sales Consultant and Regional Manager in Synthes's Trauma Division.  (PSUF ¶ 16; DRPS ¶ 16.)  Marotta was a founding member of Emerge and currently serves as Emerge's Chief Executive Officer, President, and Director. (PSUF ¶ 17; DRPS ¶ 17.)  As Chief Executive Officer ("CEO") of Emerge, Marotta has been responsible for operations and all aspects of Emerge's business, including product development, managing timelines, sales and marketing strategies, oversight of the development of sales and sales growth within the business, manufacturing, quality systems, financial responsibility for all aspects of the operation, and investor relations.  (PSUF ¶ 18; DRPS ¶ 18.)

Zachary Stassen was a founding member of Emerge and was Emerge's Chief Operating Officer and Director until July or August 2010, when he became Chief Financial Officer.  (PSUF ¶¶ 19–20; DRPS ¶ 19–20.)  On November 4, 2011, Stassen resigned as an officer and employee of Emerge.  (PSUF ¶ 21; DRPS ¶ 21.)  Nonetheless, Stassen remains a shareholder of Emerge. (PSUF ¶ 25; DRPS ¶ 25.)  Although originally a named Defendant in this action, Synthes and Stassen reached a settlement and the Court dismissed him from this action, without prejudice, on January 23, 2013.  (PSUF ¶¶ 28–29; DRPS ¶¶ 28–29.)

Eric Brown is a former Area Vice President of Sales for Synthes Trauma.  (PSUF ¶ 30; DRPS ¶ 30.)  At some point during his employment with Synthes, Marotta reported directly to Brown.  (PSUF ¶ 31; DRPS ¶ 31.)  In 2009, during Brown's employment with Synthes, Brown was contemplating a new business that involved providing consulting services to distributors and start-up companies that sold orthopedic medical devices, and had hired Stassen as a business consultant in connection with that idea.  (PSUF ¶ 32; DRPS ¶ 32.)  Following the introduction of

4

Marotta to Stassen in or about the summer of 2009, Brown, Marotta, and Stassen began to discuss other possible means for a new business, including the idea to sell generic medical device commodities. (PSUF ¶ 34; DRPS ¶ 34; Pls.' Appx. 26, at Interrog. Resp. No. 2.) Brown, however, was focused on a sales force model rather than the business model envisioned by Marotta and Powell. (Pls.' Appx. 19, Dep. of Zachary Stassen ("Stassen Dep."), 228:16–229:3, July 22, 2011.) Nonetheless, Brown remained involved in discussions with Marotta and Stassen regarding the formation of a new company. (PSUF ¶ 36; DRPS ¶ 36.) By the time of incorporation, however, it was determined that Brown would have no place in either the formation or management of Emerge because Stassen and Marotta believed that Brown's Non-Compete Agreement would be a barrier to his participation. (PSUF ¶¶ 37–38; DRPS ¶¶ 37–38; Pls.' Appx. 3, Dep. of John Marotta ("Marotta Dep."), 151:24–152:24, July 5, 2011.)[4] Although Brown was originally sued in connection with this lawsuit, he was dismissed without prejudice on January 23, 2013, as part of a settlement between him and Synthes. (PSUF ¶¶ 40–41; DRPS ¶¶ 40–41.) In that regard, Brown signed a settlement agreement which purports to assign to Synthes any and all interests that he held in Emerge or in certain intellectual property associated with Emerge. (PSUF ¶ 41; DRPS ¶ 41; Pls.' Appx. 27–28.)

Charles (Chaun) Q. Powell is a former Synthes Sales Consultant for Synthes Trauma who, during Marotta's tenure as Regional Manager of the Rocky Mountain Region, reported directly to Marotta. (PSUF ¶ 42; DRPS ¶ 42.) On March 15, 2010, Powell resigned from Synthes to work for Sonoma Orthopedic Products, Inc. (PSUF ¶ 43; DRPS ¶ 43.) In the summer

---

[4] Marotta was deposed on multiple dates during discovery. For sake of clarity, when citing Marotta's testimony, the Court will always reference the Appendix tab number, as well as the date of his testimony.

of 2010, Powell agreed to an August 1, 2010 start date with Emerge, after which he would work on a part-time basis in a consulting position. (PSUF ¶ 44; DRPS ¶ 44.) On August 30, 2010, Powell left Sonoma Orthopedic Products, Inc. and, the following day, joined Emerge as Director of U.S. Sales. (PSUF ¶ 44; DRPS ¶ 44.) In connection with his employment, Powell executed a Revised Offer of Employment letter with Emerge dated August 1, 2010, signed by Marotta as Chief Executive Officer of Emerge. (PSUF ¶¶ 45–46; DRPS ¶¶ 45-46.) In this letter, Emerge stated that "we understand that you may be subject to certain confidentiality and competition restrictions under a confidentiality and non-compete agreement with one or more former employers (each, a 'Non-Competition Agreement')." (Pls.' Appx. 32; PSUF ¶ 47; DRPS ¶ 47.) In addition, Powell "acknowledge[d] that John P. Marotta, Chief Executive Officer, [was] also bound by the provisions of a similar agreement with his prior employer (the 'Marotta Agreement')" and "agree[d] to abide by the terms of any Non-Compete Agreement and will not do anything in [his] capacity as an employee of the Company to breach any Non-Compete Agreement nor to cause any action to be taken against the Complaint [sic] or Mr. Marotta for breach of the Marotta Agreement." (Pls.' Appx. 32; PSUF ¶ 48; DRPS ¶ 48.) Around January 1, 2012, Powell became Emerge's Vice President of U.S. Sales. (PSUF ¶ 49; DRPS ¶ 49.) Since beginning his employment, Powell has reported directly to Marotta. (PSUF ¶ 50; DRPS ¶ 50.) Powell testified that he was responsible for overseeing all aspects of marketing the majority of Emerge's products; strategic planning; identifying potential products for development; the creation, review, and approval of Emerge's marketing materials generally; performing on-site implementation of Emerge products; generating price quotations for Emerge products; website development; providing suggestions on products Emerge was in the process of making; and

6

helping Cardinal Health understand the sales end of Emerge's business. (PSUF ¶ 51; DRPS ¶ 51; Pls.' Appx. 31, Dep. of Charles Powell ("Powell Dep."), 63:8–66:10, 71:1–72:1, 76:1–19, 91:20–92:17, June 10, 2013.)

### 2. Other Relevant Individuals

Marcy Slone served as Emerge's Vice President of Operations from the summer of 2010 until her termination in January 2011. (PSUF ¶ 52; DRPS ¶ 52.) In that role, her responsibilities included overseeing the operations of the company, supplier management responsibilities, some inventory management responsibilities, day-to-day management responsibilities, and some interaction with Orchid on the design of Emerge's products. (PSUF ¶ 53; DRPS ¶ 53.) According to Marotta, Slone had intimate knowledge of the design and development efforts of Emerge's "initial phase products," including Emerge's cannulated screws, drill bits, and guide wires. (PSUF ¶ 54; DRPS ¶ 54; Pls.' Appx. 36, Marotta Dep., 654:13–55:8, July 6, 2011.)

Victoria Trafka was employed by Synthes in 1998 as a manufacturing engineer at Synthes's Monument facility. (PSUF ¶ 58; DRPS ¶ 58.) In 2009, Marotta contacted Trafka regarding potential assistance with Emerge. (PSUF ¶ 59; DRPS ¶ 59.) Thereafter, in March 2010, Trafka began working for Emerge as a part-time consultant to assist Emerge in developing product concepts. (PSUF ¶ 60; DRPS ¶ 60.) During the period of time for which she served as a part-time engineering contractor for Emerge, Trafka's position included contract design work paid on an hourly basis. (PSUF ¶ 61; DRPS ¶ 61.) In this role, she referred to herself as "VP Engineering" for "Emerge Medical, Inc." (PSUF ¶ 62; DRPS ¶ 62.) As of March 2011, Trafka was a part-time, salaried employee of Emerge and, at times, worked over forty hours in a week. (PSUF ¶ 63; DRPS ¶ 63.) On August 1, 2012, Trafka became a full-time employee of Emerge

7

under the title of Vice President of Engineering and Quality.  (PSUF ¶¶ 65–66; DRPS ¶¶ 65–66.)
Her responsibilities in that role included, among other things: the design and development of
instrumentation and devices used in trauma-based surgeries, as well as establishing and assuring
compliance of Quality Systems to applicable regulations and standards; overseeing certain
outside contractors; determining the materials used by Emerge in the production of its products;
maintaining the design history file for Emerge's products; developing necessary regulatory
strategies; reviewing all associated regulatory submissions for clinical research and marketing
approval; communicating and resolving quality issues and applying root cause analysis to drive
corrective and preventative actions; and coordinating the reporting of adverse events.  (PSUF ¶
67; DRPS ¶ 67.)

Preston Baus is a former Synthes Sales Consultant for Synthes Trauma and began
working for Synthes in June 2004.  (PSUF ¶ 72; DRPS ¶ 72.)  In March 2006, Synthes promoted
Baus to a new role within Synthes as a Market Development Manager in Solothurn, Switzerland,
where he was responsible for driving sales of Synthes's trauma product line within his assigned
areas of responsibility.  (PSUF ¶ 73; DRPS ¶ 73.)  Thereafter, in January 2009, Baus became
Business Manager of EMEA Vet in Oberdorff, Switzerland, where he oversaw efforts to grow
business for Synthes Veterinary in his area.  (PSUF ¶ 74; DRPS ¶ 74.)  In September 2010, he
became a Sales Consultant for Synthes Trauma again, and remained in that position until he
resigned from Synthes on April 7, 2011.  (PSUF ¶ 75; DRPS ¶ 75.)

B.      **Background of the Key Players' Employment With Synthes**

1.      **Defendant Marotta's Employment With Synthes**

From June 2004 through April 15, 2010, Marotta was employed by Synthes in its Trauma

8

Division.  (PSUF ¶ 79; DRPS ¶ 79.)  Prior to his employment with Synthes, Marotta had no experience in the orthopedic medical device industry.  (PSUF ¶ 80; DRPS ¶ 80.)  As part of his employment with Synthes, Marotta received specialized training, had some limited access to Synthes's resources and information, and would travel to existing and prospective customers of Synthes.  (PSUF ¶¶ 81–82, 85–86; DRPS ¶¶ 81–82, 85–86.)  On occasion, Marotta would have access to Synthes's product development and manufacturing facilities.  (PSUF ¶ 87; DRPS ¶ 87.)

When Synthes first hired Marotta in 2004, he was employed as a sales consultant in a territory in the Desert Valley region of Arizona.  (PSUF ¶ 88; DRPS ¶ 88.)  In connection with his hiring, and as a condition of his employment with Synthes, Marotta entered into two agreements with Synthes: a Sales Consultant Confidentiality, Non-Solicitation, and Non-Competition Agreement ("SC NCA") and an Employee Innovation and Non-Disclosure Agreement ("NDA").  (PSUF ¶ 89; DRPS ¶ 89.)  According to Marotta's resume, his responsibilities as a Synthes Sales Consultant included "[m]anag[ing] a customer base including 97 surgeons," and "[p]roduct specialties includ[ing] Locked Plates, Cannulated Screws, IM Nails, External Fixation, Bio-Materials, and Power Equipment."  (Pls.' Appx. 17; PSUF ¶ 90; DRPS ¶ 90.)  As a Sales Consultant, Marotta had responsibility to develop, maintain, and expand customer relationships, including relationships at the hospital level with the operating room, materials management, sterile processing and other hospital staff, and physicians.  (PSUF ¶ 92; DRPS ¶ 92.)  In that role, he established direct contact with orthopedic surgeons, some of whom were Synthes customers, and became familiar with their preferences.  (PSUF ¶ 93; DRPS ¶ 93.)  His responsibilities included being physically present in the operating room to support surgeries with respect to all Synthes products.  (PSUF ¶ 94; DRPS ¶ 94.)

9

Marotta received a substantial amount of field inventory to help support operations in his territory. (PSUF ¶ 98; DRPS ¶ 98.) His territory included, among others, the following customer accounts: Banner Gateway Medical Center, Banner Baywood Medical Center, Banner Desert Medical Center, Chandler Regional Hospital, Mercy Gilbert Medical Center, and Arizona Orthopedic Hospital. (PSUF ¶ 99; DRPS ¶ 99.) Some of the physicians that worked at sales facilities within Marotta's Sales Consultant Territory include: Neil Motzkin, Peter Seipel, Dan Aschenbrener, Salvatore La Cognata, John Duggan, Danton Dungy, Dennis Armstrong, Daniel Mullen, Earl Feng, Jason Tani, and Anthony Theiler. (PSUF ¶ 100; DRPS ¶ 100.)

Marotta was a highly successful sales consultant in his Synthes Sales Consultant territory and had developed very good relationships and goodwill with both the physician customers and the hospitals. (PSUF ¶ 110; DRPS ¶ 110.) As such, Synthes promoted Marotta to Regional Manager for the Rocky Mountain Region in September 2007. (PSUF ¶ 111; DRPS ¶ 111.) Marotta's promotion took effect on February 1, 2008, however, Marotta indicated that he effectively became acting Regional Manager of Rocky Mountain Region back in October 2007. (PSUF ¶¶ 113–14; DRPS ¶¶ 113–14.) In connection with this promotion, Marotta received a compensation package, which included a minimal annual income guarantee of $320,000 for two years, and he executed a Regional Manager Confidentiality, Non-Solicitation, and Non-Competition Agreement ("RM NCA"). (PSUF ¶¶ 115–16; DRPS ¶ 115–16.) In addition, Marotta received a relocation package of approximately $190,000. (PSUF ¶ 117; DRPS ¶ 117.)

According to Marotta's resume, his responsibilities as Synthes Regional Manager involved management of a "$36 million P&L" and a total of twenty-six direct reports. (PSUF ¶ 118; DRPS ¶ 118.) He handled high level, multi-million dollar sales and negotiations in major

10

integrated delivery networks ("IDN"s) and established warehouse, distribution, and office operations in Colorado. (PSUF ¶ 119; DRPS ¶ 119.) In addition, among other job duties, Marotta had responsibility for maintaining and growing sales in his region; leading a sales time to achieve ongoing company sales goals; handling Regional business; establishing and nurturing effective working relationships with key accounts, surgeons, and AO faculty in the Region; and maintaining good customer relations with the hospitals and physicians in his region. (PSUF ¶¶ 120–22; DRPS ¶ 120–22.) Customer accounts within Marotta's region during this time included: Denver Health, Swedish Medical Center, University of Colorado University Hospital, St. Mary's Hospital and Regional Medical Center, Banner Health Facilities, USPI Facilities, Centura Health Facilities, an Intermountain Healthcare facility. (PSUF ¶ 124; DRPS ¶ 124.)

One of the physicians who worked at the Denver Health facility in the Rocky Mountain Region was Dr. Steve Morgan. (PSUF ¶ 128; DRPS ¶ 128.) Dr. Morgan is a leader in the field of orthopedics, is regarded as an expert in orthopedic trauma surgery, and is a member of the AO faculty. (PSUF ¶¶ 130–31; DRPS ¶¶ 130–31.) Marotta first met Dr. Morgan in Arizona and continued to have dealings with him on Synthes's behalf. (PSUF ¶¶ 126–27; DRPS ¶¶ 126–27.)

During Marotta's tenure as a Synthes Regional Manager, Synthes dispatched Marotta to Arizona in January 2010 while the assigned Regional Manager for that region, Chance Leonard, was on medical leave. (PSUF ¶ 132; DRPS ¶ 132.) As a regional manager, Marotta made some introductions between Leonard and the physicians in Marotta's former Sales Consultant territory. (PSUF ¶ 134; DRPS ¶ 134.) Marotta also attended some meetings with customer accounts in his former Sales Consultant territory. (PSUF ¶ 136; DRPS ¶ 136.) While Regional Manager, Marotta also assisted Leonard with his role in Arizona and helped him with an initiative called

11

"Operation Checkmate."  (PSUF ¶ 138; DRPS ¶ 138.)

During his employment, Synthes provided Marotta with information regarding its products and customers.  (PSUF ¶ 141; DRPS ¶ 141.)  Marotta also had access to and received technical, customer, prospect, financial, and other information that is proprietary and confidential to Synthes.  (PSUF ¶ 142; DRPS ¶ 142.)  Among this information was Synthes sales data, product introduction plans, profit and loss information, information related to the performance and ranking of Synthes Sales Consultants and territories/regions, information related to Synthes product development plans and product-specific promotions, information related to the compensation of Synthes's Sales Consultants, and information related to Synthes pricing strategies and negotiations.  (PSUF ¶¶ 143–44; DRPS ¶¶ 143–44.)  Marotta also visited Synthes's product development and manufacturing facilities, including Synthes's facilities in Monument, Colorado and Paoli, Pennsylvania.  (PSUF ¶ 145; DRPS ¶ 145.)

During his career with Synthes, Marotta earned in excess of $2.5 million.  (PSUF ¶ 146; DRPS ¶ 146.)  In addition to his compensation and relocation package, Marotta received business expense advances and tuition reimbursement for his MBA degree received in March 2010.  (PSUF ¶¶ 148–50, 152; DRPS ¶¶ 148–50, 152.)  According to Synthes's employee policy manuals and the applications for tuition reimbursement, if an employee leaves Synthes within one year of completing the courses for which reimbursement was paid by Synthes, the employee is required to reimburse Synthes for any tuition reimbursement paid within the past year.  (PSUF ¶ 153; DRPS ¶ 153.)  Marotta acknowledged this policy.  (PSUF ¶ 154; DRPS ¶ 154.)

**2.      Defendant Brown's Employment With Synthes**

Brown was employed by Synthes from November 9, 1995 to August 2, 2010.  (PSUF ¶

12

159; DRPS ¶ 159.)  Prior to commencing employment, Brown was required to execute an

Employee Innovation and Non-Disclosure Agreement ("Brown NDA").  (PSUF ¶ 160; DRPS ¶

160.)  In addition, Brown received and reviewed Synthes's Employee Policy Manuals and Sales

Policy Manual, and Synthes's Global Code of Business Conduct and Ethics and IT Security

Policy.  (PSUF ¶ 162; DRPS ¶ 162.)  During his tenure with Synthes, Brown also received

specialized training concerning the trauma industry, product segments, human anatomy, the

treatment of traumatic fractures, and the application of trauma products in the surgical

environment.  (PSUF ¶ 164; DRPS ¶ 164.)

       In April 2006, Brown received a promotion to Regional Manager of the Rocky Mountain

Region, effective June 1, 2006.  (PSUF ¶ 165; DRPS ¶ 165.)  As a condition of his promotion,

Brown executed a Regional Manager Confidentiality, Non-Solicitation and Non-Competition

Agreement ("Brown RM NCA") on April 24, 2006.  (PSUF ¶ 166; DRPS ¶ 166.)  He then

received a second promotion to Area Vice President of the Rocky Mountain Area effective

January 1, 2008, a condition of which required execution of an Area Vice President

Confidentiality, Non-Solicitation and Non-Competition Agreement ("AV NCA").  (PSUF ¶¶

167–68; DRPS ¶¶ 167–68.)

       During his employment with Synthes, Brown had regular and direct contact with

Synthes's customers and became intimately familiar with their business needs.  (PSUF ¶ 170;

DRPS ¶ 170.)  In addition, he had access to Synthes's confidential, sensitive, proprietary, and

trade secret information.  (PSUF ¶ 171; DRPS ¶ 171.)

       Around the same time that Marotta and Powell tendered their resignations from Synthes

on March 15, 2010, Brown requested and obtained a transfer to a lower level position with

13

Synthes as Regional Manager of the Lone Star Region of Texas, effective April 1, 2010. (PSUF ¶ 174; DRPS ¶ 174.) In close proximity to his transfer, Brown contacted Synthes Human Resources to inquire into the effect of his AVP NCA after taking the position as Regional Manager in Texas and whether a Regional Manager Non-Competition Agreement would supersede his AVP NCA. (PSUF ¶ 175; DRPS ¶ 175.) Synthes indicated that if Brown signed a Regional Manager Non-Competition Agreement for this new position in Texas, his AVP NCA would remain in effect. (Id.)

### 3. Defendant Powell's Employment With Synthes

Defendant Powell applied to Synthes on March 11, 2004, without any background in the orthopedic medical device industry. (PSUF ¶ 176; DRPS ¶ 176.) On March 18, 2004, Powell accepted a position as a Territory Assistant in Synthes's Trauma division based in the Great Lakes West Territory in the area of Chicago, Illinois. (PSUF ¶ 177; DRPS ¶ 177.) In connection with his hiring, Powell executed an Employee Innovation and Non-Disclosure Agreement ("Powell NDA"). (PSUF ¶ 178; DRPS ¶ 178.) Powell also received and reviewed Synthes's Employee Policy Manual and amended Employee Policy Manual, Sales Policy Manual, Global Code of Business Ethics, and IT Security Policy. (PSUF ¶ 179; DRPS ¶ 179.)

In September 2004, Synthes promoted Powell to Associate Sales Consultant and, in June 2006, to Sales Consultant for the territory covering Vail, Colorado. (PSUF ¶ 180; DRPS ¶ 180.) As part of his promotion, Powell reviewed and executed a Sales Consultant Confidentiality, Non-Solicitation, and Non-Competition Agreement on June 1, 2006. ("Powell SC NCA"). (PSUF ¶ 181; DRPS ¶ 181.) One of Powell's key responsibilities as a Sales Consultant was to build relations with surgeons, operating room personnel, and other key hospital personnel. (PSUF ¶

14

183; DRPS ¶ 183.)  Powell reported directly to Marotta during the time period when Marotta was Regional Manager for the Rocky Mountain Region.  (PSUF ¶ 187; DRPS ¶ 187.)

During his tenure with Synthes, Powell earned approximately $300,000 in 2008, and just over half of that in 2009.  (PSUF ¶ 188; DRPS ¶ 188.)  Synthes also paid over $34,000 in tuition reimbursement in connection with the MBA degree Powell obtained from the University of Denver while employed by Synthes.  (PSUF ¶ 189; DRPS ¶ 189.)  Powell completed his MBA program in August 2010.  (PSUF ¶ 190; DRPS ¶ 190.)  Powell was under the same tuition reimbursement policy as Marotta and acknowledged that he would have to reimburse Synthes for any tuition if he left within one year of completing the courses for which reimbursement was paid by Synthes.  (PSUF ¶¶ 191–92; DRPS ¶¶ 191–92.)

On March 15, 2010, Powell tendered his resignation to his direct supervisor, Marotta.  (PSUF ¶ 197; DRPS ¶ 197.)  Prior to that time, Powell had given his resume to Marotta for other positions within Synthes.  (PSUF ¶ 198; DRPS ¶ 198.)  Ultimately, Powell was offered employment with Sonoma Orthopedic Products, Inc., on February 25, 2010.  (PSUF ¶ 199; DRPS ¶ 199.)  He accepted the offer on March 1, 2010, and signed an employment agreement with Sonoma on March 15, 2010.  (PSUF ¶ 200; DRPS ¶ 200.)  Powell then disclosed to Synthes that he would be joining a competitor.  (PSUF ¶ 201 DRPS ¶ 201.)  In turn, Synthes sent a letter to Powell, on March 25, 2010, enclosing copies of the Powell SC NDA and Powell NDA, and indicating, in part, as follows:

Dear Chaun,

I am writing to remind you of our continuing obligations to Synthes under the Confidentiality, Non-Solicitation and Non-Competition Agreement ("Non-Competition Agreement") that you signed June 1, 2006 and the Innovation and Non-

15

Disclosure Agreement ("Non-Disclosure Agreement") that you signed on March 14, 2004. Copies of these Agreements are enclosed for your reference.

The Agreements prohibit you from disclosing Synthes' or its customers' confidential and proprietary information to any competitor or third party at any time. They also prohibit you from using such information for any purpose after leaving Synthes The Non-Competition Agreement also prohibits you from disclosing Synthes' or its customers' confidential and proprietary information to any competitor or third party at any time. It also prohibits you from using such information for any purpose after leaving Synthes. The Non-Competition Agreement also prohibits you, for a period of one-year following your employment with Synthes, from soliciting the prospects or customers or their affiliates with whom you had contact for Synthes. You are similarly prohibited from soliciting or hiring any Synthes employee to work elsewhere. Finally, you are required to return all materials that belong to Synthes immediately upon the termination of your employment. If you have not done so already, you should talk to your supervisor about returning these materials.

. . .

(PSUF ¶ 202; DRPS ¶ 202; Pls.' Appx. 113.) On the same day, Synthes sent a letter to Sonoma

Orthopedic Products, Inc., which enclosed copies of the Powell SC NCA and Powell NDA, and

stated, in part, as follows:

Dear Sir or Madam:

You should be made aware that one of your newly hired employees, Charles (Chaun) Powell, was recently employed by our company, Synthes (USA), and had signed an "Employee Innovation and Non-Disclosure Agreement" and a "Non-Competition Agreement" with us, in which he assumed certain legal obligations that extend to his subsequent employment activities. A copy of the Agreements, signed by Chaun, is enclosed for your reference.

The "Employee Innovation and Non-Disclosure Agreement" prohibits Chaun from disclosing Synthes' or its Customers' confidential and proprietary information, as defined in the agreement, to any competitor or third party at any time and from using such information for any purpose after leaving Synthes. Such information or knowledge would include, but not limited to, any or all product information gained as a result of his participation in our product technology, project information, manufacturing methods, technology, reports or reporting systems, product development process, test market activities, Sales Meetings and/or Annual Meetings, as well as any other proprietary information to which they have had access.

16

The "Non-Competition Agreement" also prohibits Chaun, for a period of one-year following his employment with Synthes, from soliciting the prospects or customers or their affiliates with whom he had contact for Synthes.

Any violation of the "Employee Innovation and Non-Disclosure Agreement" is also a violation of the Federal Uniform Trade Secrets Act which makes illegal any misappropriation or disclosure of Trade Secrets.
. . .

(PSUF ¶ 203; DRPS ¶ 203; Pls.' Appx. 115.)

Powell began his employment with Sonoma Orthopedic Products, Inc. as a Trauma Sales Representative on March 15, 2010. (PSUF ¶ 204; DRPS ¶ 204.) That employment included a three-month guarantee of $10,000 per month. (PSUF ¶ 205; DRPS ¶ 205.) On August 2, 2010, Powell tendered his resignation to Sonoma Orthopedic Products, Inc., to take effect on September 1, 2010. (PSUF ¶ 206; DRPS ¶ 206.)

### 4. **Trafka's Employment with Synthes and Magnum Tool**

Synthes offered Trafka a position as a manufacturing engineer at Synthes's Monument, Colorado facility on May 29, 1998. (PSUF ¶ 207; DRPS ¶ 207.) In connection with her employment, Trafka executed an Employee Innovation and Non-Disclosure Agreement and reviewed Synthes's Employee Policy Manual. (PSUF ¶¶ 208–09; DRPS ¶ 208–09.) As a manufacturing engineer at Monument, Trafka's duties were to create aid to manufacturing processes and then document those manufacturing processes. (PSUF ¶ 211; DRPS ¶ 211; Pls.' Appx. 39, Dep. of Victoria Trafka ("Trafka Dep."), 44:15–4:1, June 12, 2013.) In that role, she worked directly with both product development engineers and quality control engineers. (PSUF ¶ 212; DRPS ¶ 212; Trafka Dep. 48:9–49:14.) In April or May of 2001, Trafka resigned from Synthes. (PSUF ¶ 213; DRPS ¶ 213.)

17

From May 2005 until December 2010, Trafka was employed by Magnum Tool ("Magnum"). (PSUF ¶ 214; DRPS ¶ 214.) Magnum was a vendor used by Synthes for certain manufacturing products. (PSUF ¶ 218; DRPS ¶ 218.) At Magnum, Trafka held positions as project engineer, engineering manager, senior project development engineer, and International Standards Organization manager. (PSUF ¶ 215; DRPS ¶ 215.) During this time, Trafka agreed to maintain the confidentiality of Synthes's proprietary and confidential information accessible to Magnum employees in connection with Magnum's vendor relationship with Synthes. (PSUF ¶ 219; DRPS ¶ 219.) Indeed, she personally signed an agreement on behalf of Magnum, providing that:

> The Parties agree that any business and technical information, including but not limited to volume, forecasts, drawings, specifications, formulae and manufacturing processes, whether marked or unmarked, verbal or written, provided by either Party are to be considered proprietary and confidential, and are to be treated in a confidential manner by both the supplier and Synthes.

> It is further understood that duplication or disclosure of such information to a third party without written permission of the disclosing party is prohibited. This information and any material supplied by either Party remain the property of the disclosing Party and shall be returned in their entirety upon request.

(PSUF ¶ 220; DRPS ¶ 220; Pls.' Appx. 122.) During Trafka's employment with Magnum, she also entered into additional non-disclosure agreements with Synthes. (PSUF ¶ 221; DRPS ¶ 221.)

In connection with her employment with both Synthes and Magnum, Trafka was privy to information about Synthes's specifications for raw materials, machining and manufacturing of product, the finishing of Synthes products, and the inspection of Synthes products. (PSUF ¶ 222; DRPS ¶ 222.) She was also given information about how and where Synthes stores its product

18

drawings and how and where Synthes stores specifications related to raw materials, machining and manufacturing, finishing, and inspection. (PSUF ¶ 223; DRPS ¶ 223.) Finally, Trafka admitted that she had access to Synthes specifications and information regarding raw materials, machining, manufacturing, finishing, and inspection. (PSUF ¶ 224; DRPS ¶ 224.)

### C. **Written Obligations of the Parties and Other Individuals**

#### 1. **Synthes Written Obligations**

##### a. **Contractual Obligations**

Under Synthes's employee policies, "All employees are required to sign an Employee Innovation and NonDisclosure agreement prior to employment." (PSUF ¶¶ 225–26; DRPS ¶¶ 225–26.) In addition, Non-Competition Agreements are required as a condition of employment for all new Sales Consultants and other positions which may have access to proprietary and/or confidential business information. (PSUF ¶¶ 227–28 ; DRPS ¶¶ 227–28.) Further, in connection with a promotion, Synthes also requires employees, such as Regional Managers, to execute Synthes's Confidentiality, Non-Solicitation, and Non-Competition Agreements. (PSUF ¶ 229; DRPS ¶ 229.)

Marotta's Regional Manager Non-Competition Agreement ("RM NCA") required that he acknowledge the following:

> I acknowledge that: (1) Synthes (U.S.A.), its partners, and its and their parents, affiliates, subsidiaries, divisions, and related companies or entities, including but not limited to Synthes, Inc., Synthes Spine Company, L.P., Synthes Maxillofacial, Synthes North America, Inc., Spine Solutions, Inc., SYTH, Inc. and Norian Corporation (collectively referred to herein as "Synthes"), are engaged in the business of developing, designing, manufacturing, and selling surgical, medical and veterinary implants, medical biomaterial and endoscopic technologies, products and services in connection with osteosynthesis, musculoskeletal, maxillofacial and spine surgery, including, but not limited to, compression plates and screws, intermedullary nails,

external fixation devices, percutaneous devices, cranio-facial implants, mandible implants, spinal implants and screws, surgical instruments, osteobiologic and disc replacement products, and minimally invasive and endoscopic products (the "Business"); (2) the Business encompasses a broad range of technologies, products and services that Synthes now provides and may in the future develop internally or obtain through acquisitions, merger, sub-contracting or otherwise; (3) Synthes is in a highly competitive industry; (4) Synthes invests substantial time, money, and effort, on an ongoing basis, to train its employees with specialized skill and knowledge unique to Synthes and its Business, to develop technologies, products and services for the Business, to develop and maintain a proprietary data base of prospects, to maintain and expand its customer base, and to improve and develop its technologies, products and services; (5) from the outset of and during my employment with Synthes, I have had and will continue to have access to, receive, learn, develop and/or conceive technical, customer, prospect, financial or other information that is proprietary and/or confidential to Synthes; (6) this information must be kept in strict confidence to protect Synthes' Business and maintain its competitive position in the marketplace, and this information would be useful to Synthes' existing and potential competitors for indefinite periods of time; (7) from the outset of and during my employment with Synthes, I have had and will continue to have access to and will be required to maintain, supervise, develop and initiate customer relationships and goodwill that are valuable to Synthes and which it has a legitimate interest in protecting; (8) Synthes would be irreparably harmed by my subsequent work with, for or as a competitor of Synthes, in an executive, managerial, marketing, sales, technical, administrative, or product development capacity, due to the possibility that there would be inadvertent or other disclosures of Synthes's proprietary and/or confidential information or that there would be improper intererence with its valuable customer relationships and goodwill; (9) I acknowledge that my promotion to Regional Manager constitutes adequate consideration for signing this agreement and that, as further consideration for this agreement and the restrictions contained herein, I acknowledge that I have been given access to confidential, proprietary and trade secret information of Synthes; and (10) the restrictions in this agreement are reasonable and necessary to protect Synthes' legitimate business interests.

(PSUF ¶ 230; DRPS ¶ 230; Pls.' Appx. 68.)  This language is typical of many of the other NCA's signed by Synthes employees, including those of Brown and Powell.  (PSUF ¶ 231 (citing similar agreements).)  These agreements also specified what constituted confidential and proprietary information, including information concerning: (1) the identity of customers and prospects, their specific requirements, and their names, addresses, and telephone numbers; (2) prices, renewal

dates, and other detailed terms of customer and supplier contracts and proposals; (3) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology, and product development strategies; (4) physical security systems, access control systems, network, and other equipment designs; (5) employment and payroll records; (6) forecasts, budgets, and other non-public financial information; (7) product performance information, product technical information, and product know-how; and (8) expansion plans, management policies, and other business strategies and policies. (PSUF ¶ 232; DRPS ¶ 232; Pls.' Appx. 49, 68, 98, 104.)

Under these agreements, Marotta, Brown, and Powell agreed that, upon termination of their employment with Synthes, they would immediately return "all correspondence files, business card files, customer and prospects lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes, electronically stored information or data, and other materials that contain any of this information." (PSUF ¶ 233; DRPS ¶ 233.) The agreements indicated that the provisions applied "even to information of this type that is developed or conceived by me, alone or with others, at Synthes' instruction or otherwise" and that "these provisions apply to all information I may receive that is confidential and/or proprietary to any customer or other person or entity who does business with Synthes." (PSUF ¶ 234; DRPS ¶ 234; Pls.' Appx. 49, 68, 98, 104.)

Under Marotta's, Brown's, and Powell's and Employee Innovation and Non-Disclosure Agreements ("NDA"s), the three individuals agreed to the following:

> . . . to disclose and assign to SYNTHES as its exclusive property, all inventions and technical or business innovations, including computer software developed or conceived by me solely or jointly with others on company time or on my own time

21

during the term of my employment, (1) that are along the lines of the businesses, work or investigations of SYNTHES or its affiliates to which my employment relates, or as to which I may receive information due to my employment, or (2) that result from or are suggested by any work which I may do for SYNTHES or (3) that are otherwise made through the use of SYNTHES time, facilities or materials . . .

. . . upon any termination of my employment to deliver to SYNTHES promptly all items which belong to SYNTHES or which by their nature are for the use of SYNTHES employees only, including, without limitation, all written and other materials which are of a secret or confidential nature relating to the business of the Company or its affiliates . . .

. . . not to use, publish or otherwise disclose (except as my SYNTHES duties may require) either during or subsequent to my employment, any secret or confidential information or data of SYNTHES or any information or data of others, such as, but not limited to, sales dollars or units, product technology or product development, project information, manufacturing methods or technology, reports or reporting systems, which SYNTHES is obligated to maintain in confidence.

(PSUF ¶ 237; DRPS ¶ 237; Pls.' Appx. 52, 96, 100.) Synthes employees Victoria Trafka,

Chance Leonard, Sean North, Brennen Warren, Preston Baus, Brian Hahn, and Craig Lynn had

similarly-worded obligations under their respective Employee Innovation and Non-Disclosure

Agreements. (Pls.' Appx. 118, 126, 127, 128, 129, 130, 131.) Baus also maintained an

additional confidentiality and non-disclosure obligation in connection with his promotion within

Synthes to Market Development Manager in Solothurn, Switzerland, as follows:

The Employee shall not, during the term of his employment and thereafter disclose to any party of use for his own benefit any information concerning the business of the Company or any of its affiliated companies, which have become known to the Employee. "Information about the business" includes, without limitation, all business, organization and technical knowledge, know-how, proprietary or confidential information, names or addresses of customers of the Company or any of its affiliated companies and any other information which is known only to a limited number of persons and which is not intended to become known outside of the Company or any of its affiliated companies.

All written and other record and all tangibles concerning the Company or any of its affiliated companies and their business which are in the possession of the Employee

22

shall be carefully kept and shall be immediately returned to the Company upon its request, and in any case upon termination of the employment.

(Pls.' Appx. 132.)

Under their respective Sales Consultant Non-Competition Agreements ("SC NCA"s),

Marotta and Powell agreed as follows:

> I will not, for a period of one year after my employment with Synthes terminates for any reason, solicit or contact, directly or through others, for the purpose of competing or interfering with any part of Synthes' business, (1) any customer of Synthes that I solicited at any time during the last three years of my employment; (2) any prospective customer of Synthes that received or requested a proposal or offer from me on behalf of Synthes at any time during the last three years of m employment; or (3) any customer or prospective customer of Synthes for which I had any responsibility, directly or indirectly, at any time during the last three years of my employment . . .

> I agree I will not, for a period of one year after my employment terminates for any reason, work for (as an employee, consultant, contractor, agent or representative) any competitor of Synthes in the territory or territories that I am now, or have been responsible for at any time during the last year of my employment with Synthes.

(PSUF ¶ 240; DRPS ¶ 240; Pls.' Appx. 49, 104.) "Competitors" as stated in the SC NCAs, were

deemed to be "any persons or entities who now, or in the future, sell, or intend to sell, orthopedic,

bone fixation, maxillofacial, medical, endoscopic and/or spinal implant devices or instrumental

technologies, products, or services." (PSUF ¶ 241; DRPS ¶ 241; Pls.' Appx. 49, 104.) Again,

Synthes employees Colin Brown and Brennen Warren had similarly-worded obligations in their

own Confidentiality, Non-Soliciation, and Non-Competition Agreements. (Pls.' Appx. 133,

135.)

Upon his promotion to Regional Manager, Marotta again agreed to certain non-

competition provisions in his RM NCA, as follows:

23

NO CONTACT WITH OR SOLICITATION OF CUSTOMERS & PROSPECTS:
I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not solicit, contact, or provide services to (or attempt to do any of the foregoing), directly or indirectly, for the purpose or effect of competing or interfering with any part of Synthes' Business: (1) any customer of Synthes within my assigned territory; (2) any Customer of Synthes that I contacted, solicited, received compensation on sales, to whom I provided coverage, or in any way supported or dealt with at any time during the last two years of my employment; (3) any prospective Customer of Synthes that I contacted, for whom I had coverage responsibility, or who received or requested a proposal or offer from me on behalf of Synthes at any time during the last two years of my employment; (4) any existing or prospective Customer of Synthes for which I had any direct or indirect responsibility at any time during the last two years of my employment . . .

NO SOLICITATION OR HIRING OF EMPLOYEES:
I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not directly or indirectly, (1) solicit, induce, or encourage any employee of Synthes to leave his/her employment with Synthes, (2) offer any employee of Synthes employment elsewhere, (3) participate in the recruitment of any employee of Synthes to work elsewhere, or (4) hire any employee of Synthes to work elsewhere.

NO COMPETITION IN SAME REGION:
I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not, directly or indirectly, compete in my former Region with Synthes' Business. This means that I will not work for or be involved in the Business of any Competitor of Synthes in an executive, managerial, marketing, sales, technical, administrative or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative.

(PSUF ¶ 243; DRPS ¶ 243; Pls.' Appx. 68.)  The term "Customer" included hospitals, hospital

employees that influenced medical device purchasing decisions "including material management,

operating room, sterile processing, and related personnel; and physicians who may use the

devices, together with their partners, employees, and staff nurses."  (PSUF ¶ 245; DRPS ¶ 245;

Pls.' Appx. 68.)

Synthes employees Chance Leonard, Colin Brown, Mike Saunders, Sean North, and

24

Andy White had similarly-worded obligations under their respective Regional Manager

Confidentiality, Non-Solicitation, and Non-Competition Agreements. (Pls.' Appx. 134, 136,

137, 139.) Likewise, Synthes employees Josh Gorman, Jason Fowler, Brian Hah, and Preston

Baus had similarly-worded obligations under their respective Sales Consultant Confidentiality,

Non-Soliciation, and Non-Competition Agreements, with the exception of the non-competition

covenant limiting competition in their former Sales Consultant territory, as opposed to a regional

manager region. (Pls.' Appx. 140, 141, 142, 143.)

Under his Area Vice-President Non-Competition Agreement ("AVP NCA"), Brown

agreed to similar prohibitions on a national scale, as follows:

> NO CONTACT WITH OR SOLICIATION OF CUSTOMERS & PROSPECTS
> I agree that, during my employment and for a period of twelve (12) months after my
> employment with Synthes terminates for any reason, voluntary or involuntary, I will
> not solicit, contact, or provide services to (or attempt to do any of the foregoing)
> directly or indirectly, for the purpose or effect of competing or interfering with any
> part of Synthes' Business: (1) any Customer of Synthes within the United States; (2)
> any Customer of Synthes that I contacted, solicited, received compensation on sales,
> to whom I provided coverage, or in any way support or dealt with at any time during
> the last two years of my employment; (3) any prospective Customer of Synthes that
> I contacted, for whom I had coverage responsibility, or who received or requested a
> proposal or offer from me on behalf of Synthes at any time during the last two years
> of my employment; (4) any existing or prospective Customer of Synthes for which
> I had any direct or indirect responsibility at any time during the last two years of my
> employment . . .

> NO SOLICITATION OR HIRING OF EMPLOYEES:
> I agree that, during my employment and for a period of twelve (12) months after my
> employment with Synthes terminates for any reason, voluntary or involuntary, I will
> not directly or indirectly, (1) solicit, induce, or encourage any employee of Synthes
> to leave his/her employment with Synthes, (2) offer any employee of Synthes
> employment elsewhere, (3) participate in the recruitment of any employee of Synthes
> to work elsewhere, or (4) hire any employee of Synthes to work elsewhere.

> NO COMPETITION IN SAME REGION:
> I agree that, during my employment and for a period of twelve (12) months after my

employment with Synthes terminates for any reason, voluntary or involuntary, I will
not, directly or indirectly, compete with Synthes' Business within the United States.
This means that I will not work for or be involved in the Business of any Competitor
of Synthes in an executive, managerial, marketing, sales, technical, administrative or
product development capacity, whether as an owner, principal, partner, employee,
consultant, contractor, agent or representative.

(PSUF ¶ 251; DRPS ¶ 251; Pls.' Appx. 98.)

All of the Synthes Confidentiality, Non-Solicitation, and Non-Competition Agreements

cited above, including Marotta's SC NCA and RM NCA, Brown's AVP NCA, and Powell's SC

NCA, have choice of law provisions under which Pennsylvania law is to govern the agreements.

(PSUF ¶ 257; DRPS ¶ 257.)

### b.    Employment Policies and Obligations

In connection with his employment at Synthes, Marotta received the Synthes Employee

Policy Manual, the Global Code of Business Ethics, the Synthes Sales Policy Manual, and

Synthes's IT Security Policy, and, in 2009, Marotta received and reviewed Synthes's amended

Employee Policy Manual.  (PSUF ¶ 259; DRPS ¶ 259.) Marotta was trained on all of these

policies.  (PSUF ¶¶ 261, 263, 265, 267; DRPS ¶¶ 261, 263, 265, 267.)  Marotta generally

understood, based on these policies, that computer systems belonged to Synthes, that he was

expected to operate in accordance with the terms of the Employee Policy Manuals, that he

understood that he had an obligation to abide by Synthes's rules as an employee of Synthes, and

that, as a Regional Manager, he should enforce Synthes's rules.  (PSUF ¶¶ 269–72; DRPS ¶¶

269–72.)

### 2.    Emerge's Written Contracts and Policies

Upon joining Emerge, Marotta executed an Executive Employment Agreement.  (PSUF ¶

26

273; DRPS ¶ 273.) Marotta's Executive Employment Agreement contained, among others, the

following relevant provisions:

**6.    Confidential Information.**

6.1    **Company Information**.    Except for the benefit of Company, Executive agrees at all times . . . to hold in strictest confidence, and not to use, or to disclosure to any person, firm or corporation without written authorization . . . any Confidential Information (as defined below) of the Company.    For purposes of this Agreement *"Confidential Information"* is defined as any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers, software developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information . . .

6.2    **Former Employer Information.**    Executive agrees that he will not, during his employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity and that he will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.    The Company and Executive acknowledge that Executive is subject to certain confidentiality and competition restrictions with his former employer under the terms of a confidentiality, non-solicitation and non-competition agreement with his former employer (the *"NCA Agreement"*).    Executive will not and will not cause Company to breach the NCA Agreement and shall indemnify the Company from any costs and expenses which may be incurred by the Company as a result of a claimed breach of the NCA Agreement.

(Pls.' Appx. 146 (emphasis in original).)  In addition, this Employment Agreement contained its

own non-competition and confidential information provisions.  (Id.)

Emerge also required its employees—including Marotta and Powell—to sign

Confidential Information and Innovations and Proprietary Rights Assignment Agreements.

(PSUF ¶ 276; DRPS ¶ 276.)  Aside from provisions regarding the protection of Emerge

proprietary information, the document contained the following provision:

> **1.4 No Improper Use of Information of Prior Employers and Others.**
> During my employment or business relationship with the Company I will not
> improperly use or disclose any confidential information or trade secrets, if any, of any
> former employer or any other person to whom I have an obligation of confidentiality,
> and I will not bring onto the premises of the Company any unpublished documents
> or any property belonging to any former employer or any other person to whom I
> have an obligation of confidentiality unless consented to in writing by that former
> employer or person.  I will use in the performance of my duties only information
> which is generally known and used by persons with training and experience
> comparable to my own, which is common knowledge in the industry or otherwise
> legally in the public domain, or which is otherwise provided or developed by the
> Company. . . .

(Pls.' Appx. 147.)

### 3. Vendors' Written Contractual Obligations to Synthes

Synthes entered into Supplier Quality Agreements and Non-Disclosure Agreements with

the following vendors for the provision of the vendors' goods or services to Synthes: Orchid

Unique, Orchid Stealth, Orchid Bio-Coat, LLC, Magnum Tool Company, Inc., and Precision

Edge Surgical Product Company, LLC.  (Pls.' Appx. 148, 149.)  Each of the Supplier Quality

Agreements required vendors to adhere to certain Synthes-specific requirements regarding the

manufacture of Synthes products.  (Pls.' Appx. 148.)  The Non-Disclosure Agreements required

the vendors not to disclose any "Confidential Information" of Synthes.  (Pls.' Appx. 149.)

### 4. SIMS and Customers' Written Contractual Obligations to Synthes

Synthes' Inventory Management Systems ("SIMS") are cabinets which store Synthes

products.  (PSUF ¶ 283; DRPS ¶ 283.)  The SIMS cabinets are designed to "enhance and

standardize inventory management practices of [Synthes] customers as they relate to Synthes

products" and provide customers with "access to critical components . . . with storage units and workstations designed to improve organization and response in the operating room." (Pls.' Appx. 152.) The SIMS cabinets include features such as high-density drawer storage, a visual inventory, fully enclosed compartments, lockable cabinets, adjustable dividers, and labeled plastic dividers. (Id.)

Notably, Synthes SIMS cabinets are placed into a customer account and are either owned by Synthes, the customer, or a combination of both. (PSUF ¶ 299; DRPS ¶ 299.) Generally, if not on loan, Synthes enters into agreements with customers concerning the SIMS placed at the customer account. (PSUF ¶ 300; DRPS ¶ 300.) Each of the SIMS agreements states that "the storage units will house only Synthes products." (Pls.' Appx. 260–76, 278–80 (emphasis in original).) These provisions appear in SIMS agreements regardless of whether the customer owns all or part of the SIMS units. (PSUF ¶ 303; DRPS ¶ 303.)

**D.** **The Formation of Emerge Prior to April 15, 2010**

**1.** **Brief Background of Emerge**

In 2009, Brown, while still employed with Synthes, was contemplating a new business that involved providing consulting services to distributors and start-up companies that sold orthopedic medical devices. (PSUF ¶ 308; DRPS ¶ 308.) In connection with this idea, Brown hired Zachary Stassen as a consultant. (Id.) This business model was different from the business model that ultimately became Emerge. (PSUF ¶ 309; DRPS ¶ 309.)

In or around the spring of 2009, Marotta first conceived the business plan upon which Emerge would later be based. (PSUF ¶ 310; DRPS ¶ 310.) Shortly thereafter, Marotta discussed this idea with Brown. (PSUF ¶ 311; DRPS ¶ 311.) Following the introduction of Marotta to

29

Stassen in or about the summer of 2009, Brown, Marotta, and Stassen began to discuss other possible means for a new business, including the idea to sell generic medical device commodities. (PSUF ¶ 312–13; DRPS ¶ 312–13; Pls.' Appx. 26, Interrog. Resp. No. 2.) Brown, Marotta and Stassen saw an opportunity to create a business that would sell non-patented generic medical device commodities, although Brown remained focused on his distributorship idea. (Pls.' Appx. 6; Marotta Dep. 351:6–352:1.) At some point, Brown proposed naming the new company "Emerge" and, upon agreement by the others, a company was incorporated under the name "Emerge Surgical, Inc." (PSUF ¶ 316; DRPS ¶ 316.) Before incorporation, however, it was agreed that Brown would have no further place in the formation or management of Emerge. (Marotta Dep. 152:8–24.)

Following the initial meeting, Marotta and Stassen began analyzing the market to determine the feasibility of starting a generic orthopedic device company and, during the fall and winter of 2009, the two men drafted a business plan and private placement memorandum for Emerge. (PSUF ¶¶ 317–18; DRPS ¶¶ 317–18.) A November 2009 draft of the business plan identified Synthes as a competitor of Emerge, noting that it dominated the orthopedic trauma industry with a nearly 50% market share. (PSUF ¶ 319; DRPS ¶ 319.) While employed by Synthes, Marotta had begun to identify pressures or challenges on hospital administrations that suggested to him that there may be an alternative model of distribution to better serve them. (PSUF ¶ 326; DRPS ¶ 326.)

In January 2010, Stassen resigned from his primary employment. (PSUF ¶ 323; DRPS ¶ 323.) Emerge's Articles of Incorporation were filed on January 13, 2010. (PSUF ¶ 324; DRPS ¶ 324.) Prior to Marotta's resignation from Synthes, he had spoken with potential investors on

30

behalf of Emerge and engaged in numerous other actions to get Emerge up and running. (PSUF ¶¶ 328, 332–35; DRPS ¶¶ 328, 332–335.) Thereafter, from January 2010 to March 2010, Marotta and Stassen were focused on finding investors for Emerge's initial round of financing. (PSUF ¶ 329; DRPS ¶ 329.) As of March 26, 2010, a substantial amount of money had already been raised and was in the bank. (PSUF ¶ 331; DRPS ¶ 331.) Marotta did not terminate his employment with Synthes until April 15, 2010. (PSUF ¶ 337; DRPS ¶ 337.)

### 2. Detailed Timeline of Emerge-Related Activities Prior to April 15, 2010

Prior to Marotta's and Stassen's introduction, Brown and Stassen worked together on a business plan for an "outsourced sales force business concept." (PSUF ¶ 338; DRPS ¶ 338.) Marotta first conceived of the business plan on which Emerge would later be based—the concept of a company that sells generic orthopedic products—in the spring of 2009. (PSUF ¶ 341; DRPS ¶ 341.) Shortly thereafter, Marotta discussed his idea with Brown. (PSUF ¶ 342; DRPS ¶ 342.) In late July 2009, Brown met with Stassen and Stassen's father to discuss Brown's "outsourced sales force business concept," but Stassen and his father did not think this was a viable idea. (PSUF ¶¶ 343–44; DRPS ¶¶ 343–44.)

As noted above, in the summer of 2009, following Brown's introduction of Marotta to Stassen, the three began to discuss a possible idea to sell generic medical device commodities. (PSUF ¶¶ 346–47; DRPS ¶¶ 346–47.) On August 2, 2009, Marotta emailed Stassen and Brown a "first cut" of the Emerge business model, which identified an initial offering of drill bits and cannulated screws, a market strategy of no sales representatives and low-cost, non-surgeon preference items, and a management team of Brown, Marotta, and Stassen. (PSUF ¶¶ 348–50; DRPS ¶¶ 348–50.)

31

Following this "first cut" email, Marotta and Brown continued to formulate ideas for the new business.  (PSUF ¶ 356; DRPS ¶ 356.)  Marotta and Brown then inquired with various manufacturing companies as to the types of products they could make.  (PSUF ¶¶ 357–58; DRPS ¶¶ 357–58.)  During the remainder of August 2009, Marotta and Brown exchanged numerous emails regarding this new business venture.  (PSUF ¶¶ 359–64; DRPS ¶¶ 359–64.)  Marotta also sought out Synthes invoices for 2008 and 2009, which contained customer purchasing information, including historical purchases and specific pricing.  (PSUF ¶ 365–67; DRPS ¶¶ 365–67.)

On August 13, 2009, Marotta met with Stassen and Brown in Colorado to discuss the business concept.  (PSUF ¶ 368; DRPS ¶ 368.)  Armed with a viable idea, Stassen and Marotta prepared a business plan and private placement memo to raise money from potential investors.  (PSUF ¶ 369; DRPS ¶ 369.)  On August 16, 2009, Brown proposed the name "Emerge Surgical."  (PSUF ¶ 375; DRPS ¶ 375.)  That same day, Marotta emailed Brown and made reference to then-Synthes VP of Sales Louis Houff, stating "Houff will figure it out in about 10 months when we are eating his lunch."  (Pls.' Appx. 286; PSUF ¶¶ 376–77; DRPS ¶¶ 376–77.)  The back-and-forth emails continued, with a constant concern that they keep their activities "off" or "under the radar."  (PSUF ¶¶ 378–81; DRPS ¶¶ 378–81.)  Stassen, Brown, and Marotta also discussed meeting with other Synthes employees regarding their plans.  (PSUF ¶¶ 385–86, 388; DRPS ¶¶ 385–86, 388.)

At one point, Marotta accidentally sent an Emerge-related email to Brown's Synthes account.  (PSUF ¶ 390; DRPS ¶ 390.)  When Brown identified the error and Marotta recognized his mistake, the two agreed to forego using personal email from phones, use only personal

computers and phone, and discuss only bare essentials with everyone from there on, *i.e.* their

"stealth" plan. (PSUF ¶¶ 391–92, 396–99; DRPS ¶¶ 391–92; 396–99.) This plan continued

throughout Emerge's sales efforts in 2010. (PSUF ¶¶ 401–02; DRPS ¶¶ 401–02.)

On September 2, 2009, in Denver, Colorado, Marotta had dinner with Charlie Knight, a

Synthes employee, concerning Emerge. (PSUF ¶ 403; DRPS ¶ 403.) Marotta was considering

retaining him in connection with the formation strategy for the business described in Marotta's

August 2, 2009 "first cut" email. (PSUF ¶ 404; DRPS ¶¶ 404.) Marotta then submitted an

expense report to Synthes for the cost of this dinner, in the amount of $120.58, and identified a

Dr. Fitzgerald as the Synthes customer entertained for this expense. (PSUF ¶¶ 405–06; DRPS ¶¶

405–06.) Following some discussion about Knight's non-compete obligations, Marotta

ultimately retained Knight on behalf of Emerge in the fall of 2009. (PSUF ¶ ¶ 409–11; DRPS ¶¶

409–11.)

On September 18, 2009, Stassen sent Marotta and Brown a PowerPoint presentation with

the file name "Emerge Surgical — Zach Sections." (PSUF ¶ 417; DRPS ¶ 417.) This

presentation identified Brown as one of the "key management members." (PSUF ¶ 418; DRPS ¶

418.) Brown, in turn, noted that he was "organizing an amazing amount of data," was "planning

to create a Sales Strategy," and "our combined efforts will result in a very tangible plan to take

this to market." (PSUF ¶ 420; DRPS ¶ 420.) In the September and October time frame, Marotta

met with venture capitalists and began working with a vendor for the design of Emerge's

corporate logos. (PSUF ¶¶ 421–22; DRPS ¶¶ 421–22.)

Also in October 2009, Marotta met with Brown and Knight to discuss the non-compete

agreements Marotta and Brown each had with Synthes. (PSUF ¶ 423; DRPS ¶ 423.) In

subsequent emails, Brown "emphasized [their] adherence to the 'stealth' plan in order to avoid detection from Synthes and identified a number of legal issues that [they] needed to address in the upcoming week, including the recruitment of Synthes employees and whether Emerge could be formed prior to [Brown's] and Marotta's resignations from Synthes." (Pls.' Appx. 24, Brown's Statement ¶ 72; PSUF ¶ 426; DRPS ¶ 426.) Brown also "described in detail the idea of [Emerge's] model as an 'unbundling' of trauma segments" and "identified potential customers to target, including hospitals, group purchasing organizations, and surgical centers, many of which were Synthes' customers." (Brown's Statement ¶ 73; PSUF ¶ 427; DRPS ¶ 427.)

Throughout the remainder of September and October of 2009, Brown, Marotta, and Stassen exchanged many additional emails addressing strategy for Emerge. (PSUF ¶¶ 438–86; DRPS ¶¶ 438–86.) Synthes contends that many of these emails were sent during the course of Brown and Marotta's employment by Synthes and that several business lunches were expensed to and paid for by Synthes. (Id.)

In late October 2009, Marotta met with Victoria Trafka to discuss her interest in doing contract design work for Emerge. (PSUF ¶ 487; DRPS ¶ 487.) Marotta had originally been introduced to Trafka in 2008, through her husband Richard Brown, and was aware that Trafka was formerly a manufacturing engineer for Synthes at its Monument, Colorado facility. (PSUF ¶ 490; DRPS ¶ 490.) Marotta contacted Trafka in October 2009 because no one at Emerge had engineering knowledge and Trafka had compiled an extensive engineering background. (PSUF ¶ 491; DRPS ¶ 491.)

Thereafter, in November 2009, Marotta and Stassen developed a Private Placement Memorandum for Emerge to use with investors, which identified Brown as a "founder,"

"majority owner," "Chief Executive Officer," President," and "Chairman of the Board." (Pls.'
Appx. 292.)  Brown and Marotta had also developed a listing of potential Emerge products and
customers.  (PSUF ¶ 496; DRPS ¶ 496.)  In the twenty-first version of the draft, the
memorandum stated, under "Company Ownership," that "Emerge was established in January
2010 by founders John Marotta, Zack Stassen and Eric Brown whom are company owners."
(Pls.' Appx. 216.)  The business plan also contained a table and chart of "milestones" reflecting a
formation date in January 2010 and targeted dates for other objectives running from February
2010 to November 2010.  (Id.)  On December 2, 2009, however, Stassen sent Marotta an "initial
draft of the Company Overview for the Investment Memorandum," which contained no reference
to Brown under the Management Team.  (PSUF ¶¶ 507–08; DRPS ¶¶ 507–08; Pls.' Appx. 712.)
Indeed, as of December 14, 2009, it was determined that Brown could no longer participate in the
company because of the national scope of his AVP NCA with Synthes.  (PSUF ¶ 528; DRPS ¶
528.)

     The record reflects that Stassen and Marotta, on behalf of Emerge, met with several
Synthes customers in the December 2009 time frame.  Both Stassen and Marotta met with Denise
Rosnick from Denver Health in an effort to become Denver Health's supplier for low-cost
trauma products.  (PSUF ¶ 510–14; DRPS ¶ 510–14.)  In addition, Stassen and Marotta began
working with Dr. Morgan, also from Denver Health, with respect to the concepts portrayed in
Emerge's business plan.  (PSUF ¶¶ 520–23.)  In connection with Stassen and Marotta's meetings
with Dr. Morgan, Marotta expensed his meals to Synthes under the guise of meetings with other
Synthes clients.  (PSUF ¶¶ 532–38; DRPS ¶¶ 532–38.)  Marotta also met with Dr. Motzkin
regarding Motzkin's interest in investing in Emerge—meetings which were likewise subsidized

by Synthes.  (PSUF ¶ 556–57, 566–71; DRPS ¶ 556–57, 566-71.)

Emerge's Articles of Incorporation were filed with the Colorado Secretary of State on January 13, 2010, and they listed Emerge's principal executive office as Marotta's home address in Denver, Colorado.  (PSUF ¶ 545–46; DRPS ¶¶ 545–46.)  The Initial Written Consent of the Board of Directors indicated that Marotta and Stassen were 50/50 owners of Emerge and that each had invested $5,000.  (PSUF ¶ 548, DRPS ¶ 548.)  Stassen was listed as Chief Executive Officer, President, Chief Operating Officer, Chief Financial Officer, and Secretary of Emerge. (PSUF ¶ 549; DRPS ¶ 549.)

On February 9, 2010, Marotta emailed Stassen's father identifying Synthes employees Bryan Murray, Brennen Warren, and Colin Brown as potential employees for Sonoma Orthopedics.  (PSUF ¶ 578–79; DRPS ¶¶ 578–79.)  Thereafter, on February 11, 2010, a meeting was scheduled between Marotta and Powell.  (PSUF ¶ 583; DRPS ¶ 583.)  Powell emailed his resume to Marotta's personal account.  (PSUF ¶ 584; DRPS ¶ 584.)  Marotta then forwarded the resumes of several Synthes people to Sonoma for consideration.  (PSUF ¶ 590; DRPS ¶ 590.)

Notably, throughout 2009 and 2010, Marotta submitted his telephone bills to Synthes and Synthes reimbursed him for these payments.  (PSUF ¶ 603–04; DRPS ¶¶ 603–04.)  In addition, Marotta submitted an expense report to Synthes for reimbursement of his February communication expenses, including for wireless numbers used, in part, for Emerge purposes. Synthes also reimbursed Marotta for these expenses. (PSUF ¶¶ 605–08; DRPS ¶¶ 605–08.)

On March 15, 2010, Marotta submitted his official letter of resignation to Brown, his Synthes Area Vice President and supervisor.  (PSUF ¶ 614; DRPS ¶ 614.)  That same day, he submitted an inventory check out memorandum to Synthes, effective April 15, 2010, and then

36

forwarded both the letter and memorandum to Stassen and Knight. (PSUF ¶¶ 615, 617; DRPS ¶¶ 615, 617.) After submission of his resignation, but while still employed by Synthes, Marotta had two separate meetings with Synthes sales management personnel, Tony Randazzo and Ken Carpenter, at which time he suggested that he was going to work with his uncle. (PSUF ¶¶ 618–19; DRPS ¶¶ 618–19; Pls.' Appx. 18, Marotta Dep., 116:18–117:7, June 26, 2013.) Specifically, he stated that "I will be working for one of my Uncle's companies, he is a Health Care Services guy. It's a good move for me. One of his companies in which he is on the board of is in Tennessee called Centerre." (PSUF ¶ 620; DRPS ¶ 620; Pls.' Appx. 18, Marotta Dep. 113:16–21, June 26, 2013.) Brown knew that Marotta "was planning to join Emerge and that Emerge's plan was to enter the orthopedic market focused on drill bits and cannulated screws." (Pls.' Appx. 24, Brown Statement ¶ 93, PSUF ¶¶ 621–22; DRPS ¶¶ 621–22.) Brown, however, never told anyone at Synthes what Marotta's plans were. (PSUF ¶ 623; DRPS ¶ 623.)

As of March 26, 2010, Emerge's initial round of financing brought in approximately \$2 million. (PSUF ¶¶ 630–31, DRPS ¶¶ 630–31.) Around that time, Emerge sent physical samples of Synthes products to Orchid for reverse engineering and design of Emerge's initial product offerings of drill bits, guide wires, and cannulated screws. (PSUF ¶¶ 632–33; DRPS ¶¶ 632–33.) In addition, Trafka sent Marotta information regarding the manufacture of reaming rods, including information regarding the production of Synthes reaming rods. (PSUF ¶ 634; DRPS ¶ 634.) By late June 2010, Orchid was evaluating samples of reaming rods and working on reverse engineering Synthes reaming rods on behalf of Emerge. (PSUF ¶ 635; DRPS ¶ 635.)

Multiple other steps were taken by Marotta and Stassen to finalize Emerge's start up in March 2010. The two men toured potential office space, obtained business cards, and purchased

office supplies. (PSUF ¶ 636; DRPS ¶ 636.) Marotta executed a form W-4 on April 1, 2010, listing Emerge Surgical, Inc. as his employer. (PSUF ¶ 637; DRPS ¶ 637.) During the rest of April 2010, Marotta had communications with multiple Synthes employees, often in connection with the employees' efforts to obtain new opportunities outside of Synthes. (PSUF ¶¶ 639–48; DRPS ¶¶ 639–48.)

### 3. Emerge's Business Plans and Investor Materials (Pre-April 2010)

#### a. The Private Placement Memorandum

Marotta was personally involved in the preparation and finalization of Emerge's Private Placement Memorandum ("PPM") for its initial round of financing, which occurred during the course of Marotta's employment with Synthes. (PSUF ¶¶ 649–51; DRPS ¶¶ 649–51.) Marotta and Stassen understood that the PPM needed to be accurate and truthful. (PSUF ¶¶ 652–56; DRPS ¶¶ 652–56.) The description of the business indicated that Emerge "plans to take a new approach to distribution, focusing more on hospital administration and department heads rather than marketing to individual surgeons." (Pls.' Appx. 166; PSUF ¶ 664; DRPS ¶ 664.) Emerge's initial plan was to target specific products in specific segments of the orthopedic implant industry, referred to as "unbundling." (PSUF ¶ 667; DRPS ¶ 667.) Emerge's target market was the entire $92 billion U.S. device market, but it chose to initially focus on the $2 billion trauma segment of the orthopedic device market. (PSUF ¶¶ 668–69; DRPS ¶¶ 668–69.) The PPM identified Emerge's initial products as representing a potential $500 million market. (PSUF ¶ 670; DRPS ¶ 670.) In order to accomplish this goal, the PPM noted that "it is our observation that hospitals have been and continue to decrease the presence of sales representatives in the hospital in an effort to disintermediate the sales reps with the physicians." (PSUF ¶ 672; DRPS ¶

38

672.)  This concept of disintermediation involved selling to hospitals directly and attempting to take sales representatives and physicians out of purchasing decisions.  (PSUF ¶ 673; DRPS 673.) Under the "Initial Products" section of the PPM, Emerge identified its initial product portfolio as cannulated screws, drill bits, and guide wires.  (PSUF ¶ 675; DRPS ¶ 675.)

The PPM identified Marotta and Stassen as 50/50 owners in Emerge as of January 30, 2010.  (PSUF ¶ 680; DRPS ¶ 680.)  The PPM also listed Dr. Steven Morgan, John Lewis (Marotta's uncle), and Stassen's father as advisors.  (PSUF ¶ 681, DRPS ¶ 681.)  Notably, Dr. Morgan is currently a director of Emerge and was granted additional options for his involvement as a director and his duties as a medical advisor.  (PSUF ¶ 682; DRPS ¶ 682.)  As part of the potential risks for investors, the PPM contained a discussion of Marotta's RM NCA.  (PSUF ¶ 683; DRPS ¶ 683.)  It did not, however, identify or discuss Marotta's SC NCA or NDA or Synthes's written employment policies.  (PSUF ¶ 686; DRPS ¶ 686.)  Notably, Marotta did not provide his SC NCA or NDA or Synthes's employment policies to Stassen or Knight for review and had not even thought about the NDA until after Synthes filed suit.  (PSUF ¶¶ 687, 689; DRPS ¶¶ 687, 689.)

During Emerge's second round of financing, Emerge circulated another Private Placement Memorandum that contained language characterizing certain aspects of Emerge's business model as "new" and "unique."  (PSUF ¶ 692; DRPS ¶ 692.)  This second Private Placement Memorandum was distributed to existing investors, some of whom were physicians, as well as new physicians who had not previously invested.  (PSUF ¶ 693; DRPS ¶ 693.)

### b.    **Investor Presentations**

In January 2010, Emerge gave an investor presentation in order to attract investor interest

in the organization. (PSUF ¶¶ 694–95; DRPS ¶¶ 694–95.) The stated "Corporate Goal" in the presentation indicated that "Emerge Surgical will be the <u>first</u> medical device company willing to partner with hospitals to provide true and meaningful cost savings while at the same time delivering product of the highest quality." (Pls.' Appx. 436; PSUF ¶ 696; DRPS ¶ 696.) The presentation identified a "Unique Approach to Product Distribution" and noted that Synthes was one of Emerge's competitors. (PSUF ¶¶ 697–98; DRPS ¶¶ 697–98.)

The slide entitled "Implementation" depicted how a hospital manages product inventory and how Emerge fits in. (PSUF ¶ 699; DRPS 699.) The photographs on this slide contained photographs of Synthes Inventory Management System (SIMS) and dividers with Synthes's logo on them. (PSUF ¶ 700; DRPS ¶ 700.)

In order to have someone from the medical community represented and to show that the organization had credible business minds behind it, Dr. Morgan was listed as an advisor on the final investor presentation. (PSUF ¶¶ 702-03; DRPS ¶¶ 702-03.) Stassen testified that Dr. Morgan's listing may have helped raise money. (PSUF ¶ 704; DRPS ¶ 704; Stassen Dep. 203:10-15.)

### c.     <u>Additional Statements Regarding Emerge's Business Model</u>

Marotta has stated that "Emerge has devised a new approach to the sales of Implantation Hardware providing the American public with like-numbered, [sic] product that is similar to the Synthes Implantation Hardware and that can be stored alongside Synthes' sophisticated orthopedic implants and used with Synthes' inventory management systems and surgical sets." (Pls.' Appx. 7, Marotta Answer to Am. Compl. ¶ 156; Pls.' Appx 2, Emerge Answer to Am. Compl. ¶ 156.) A press release of April 4, 2011 characterized Emerge as offering "the industry's

40

first-ever line of high-quality generic implants and instruments." (Pls.' Appx. 141; PSUF ¶ 708; DRPS ¶ 708.)  In a subsequent press release dated April 7, 2011, Marotta indicated that Emerge's "supply chain model offers hospitals and physicians high-quality products at significantly lower cost, changing the way medical device sales are approached . . ." (Pls.' Appx. 167; PSUF ¶ 709; DRPS ¶ 709.)

### 4. Emerge's Finding of Investors and Raising Money

Beginning in January 2010, Marotta was personally involved in Emerge's fundraising efforts and contacted a number of potential investors regarding the formation of Emerge.  (PSUF ¶ 710; DRPS ¶ 710.)  From January 2010 to March 2010, Marotta and Stassen were focused on finding investors for Emerge's initial round of financing.  (PSUF ¶ 711; DRPS ¶ 711.)  In these efforts, Marotta used the Private Placement Memorandum.  (PSUF ¶ 712; DRPS ¶ 712.)  Prior to leaving Synthes, Marotta, on behalf of Emerge, targeted a lengthy list of orthopedic surgeons regarding investment in Emerge.  (PSUF ¶ 713; DRPS ¶ 713.)  Dr. Morgan also became involved in soliciting investors on behalf of Emerge.  (PSUF ¶ 714; DRPS ¶ 714.)  Synthes Sales Consultant Brennen Warren also introduced Marotta and Stassen to Dr. David Laverty for purposes of discussing Emerge and soliciting potential investments in Emerge.  (PSUF ¶ 715; DRPS ¶ 715.)  Ultimately, twenty-one orthopedic surgeons invested in Emerge during Emerge's initial round of financing in early 2010.  (PSUF ¶ 716; DRPS ¶ 716.)

Aside from speaking with surgeons, Marotta was also involved in discussions with Synthes employees—including Colin Brown, Mike Saunders, Andy White, Craig Lynn, and Brian Hahn—regarding potential investments in Emerge.  (PSUF ¶ 717; DRPS ¶ 717.)  All of them or their spouses, with the exception of Brian Hahn, invested in Emerge in the initial round

of financing. (PSUF ¶ 718; DRPS ¶ 718.) Synthes later terminated these Synthes employees because it believed that investment in a privately-held competing business such as Emerge constituted a violation of Synthes's policies. (PSUF ¶ 719; DRPS ¶ 719.)

### 5.  Early Design and Development of Emerge Product

As noted above, in January 2010, Marotta had discussions with Orchid about contracting for design and manufacturing services for Emerge. (PSUF ¶ 721; DRPS ¶ 721.) Stassen was aware that Orchid was a vendor of Synthes at that time. (PSUF ¶ 724; DRPS ¶ 724.) Emerge and Orchid discussed the fact that Synthes's product would be the "gold standard" for the design and development of Emerge product. (PSUF ¶ 725; DRPS ¶ 725.) Marotta and Orchid representative Brian McLaughlin exchanged a series of emails between January 26, 2010 and February 24, 2010, regarding product designs for Emerge. (PSUF ¶¶ 727–32; DRPS ¶¶ 727–32.) On March 16, 2010, Orchid sent Emerge a proposal on which Marotta's approval appears on behalf of Emerge as CEO. (PSUF ¶¶ 737–38; DRPS ¶¶ 737–38.) The proposal required payment of an $8,000 deposit, which Marotta believes he paid and for which he was later reimbursed by Emerge. (PSUF ¶ 739; DRPS ¶ 739.)

Prior to April 15, 2010, Emerge sent physical samples of Synthes cannulated screws to Orchid to assist in reverse engineering those products and begin the design of Emerge's initial product offerings. (PSUF ¶ 740; DRPS ¶ 740.) The process of reverse engineering cannulated screws involved, in part, looking at the screw samples provided by Emerge, taking measurements from those samples, looking at industry standards for screws, and then creating CAD models and drawings. (PSUF ¶ 742; DRPS ¶ 742.) Orchid had also begun working on draft versions of prints for Emerge's initial product offerings of drill bits, guide wires, and cannulated screws, and

42

was in communication with Emerge regarding those drawings.  (PSUF ¶¶ 745–46; DRPS ¶¶ 745–46.)  The design prints Emerge ultimately submitted to the FDA in the 510(k) submission for its "cannulated screw fixation system" are dated March 29, 2010, which is prior to the termination of Marotta's employment with Synthes.  (PSUF ¶ 747; DRPS ¶ 747.)

On August 24, 2010, Orchid emailed Marotta and Stassen regarding the possible development of an "external fixation" system and attached a Synthes technique guide for a large external fixation system.  (PSUF ¶¶ 748–49; DRPS ¶¶ 748–49.)  In addition, on September 16, 2010, Orchid sent Marotta and Stassen a proposal for the design and development of locking screws, which was also something being considered and discussed at Emerge.  (PSUF ¶¶ 750–51; DRPS ¶¶ 750–51.)  On August 30, 2011, however, Emerge received a letter from the CEO of Orchid, Michael E. Miller, informing Emerge that Orchid would fulfill existing contractual agreements with Emerge, but would not take any additional orders, as follows:

> Over the past several weeks, Orchid has had a unique opportunity to examine its working relationship with Emerge Surgical.  After careful review of products and services provided to Emerge Surgical, Orchid Orthopedics has concluded that it is in Orchid's best interest to decline any further business with Emerge Surgical. Orchid appreciates Emerge selecting our company to perform certain manufacturing and design services.  However, as stated above, Orchid must respectfully decline any additional orders for products and services.  Orchid will honor its contractual agreements to fill any purchase order that has been acknowledged as of August 30, 2011.

(Pls.' Appx. 624; PSUF ¶ 752; DRPS ¶ 752.)

### E.   Emerge's Alleged Use of Synthes Products and Information

#### 1.   Acquisition and Use of Synthes Products

As of at least early April 2010, Emerge was shipping Synthes products to Orchid.  (Pls.' Appx. 178; PSUF ¶ 753; DRPS ¶ 753.)  Marotta had a significant volume of Synthes-branded

43

product in his home garage. (PSUF ¶ 758; DRPS ¶ 758.) By the time Marcy Slone joined Emerge in early 2010, Emerge already had obtained Synthes product that was being stored at the Emerge office and covered with a black curtain. (PSUF ¶¶ 760–61; DRPS ¶¶ 760–61.) When Powell later joined Emerge in September 2010, he brought some Synthes product with him. (PSUF ¶ 762; DRPS ¶ 762.) Even before Powell officially joined Emerge, however, Powell provided product to Emerge while he was employed with Sonoma Orthopedic Products, Inc. (PSUF ¶ 762; DRPS ¶ 763.) Later in 2010, Emerge, through Marotta and Powell, asked for sample Synthes product from a number of Synthes representatives, including: Jason Fowler, Colin Brown, Josh Gorman, Blake Whitson, Brad Chun, Jason Ramirez, and Scott Jones. (PSUF ¶¶ 764–65; DRPS ¶ 764–65.) Only Gorman, Fowler, and Brown provided any such product. (PSUF ¶¶ 766, 768; DRPS ¶¶ 766, 768.)

Emerge does not have any records documenting the origins of the tested product, but Marotta believed that the Synthes product sent to Orchid came from Josh Gorman, Jason Fowler, and Colin Brown. (PSUF ¶ 772; DRPS ¶ 772.) In connection with the 510(k) submission for Emerge's "cannulated screw fixation system, Orchid conducted engineering testing in the summer of 2010 on the Synthes products that were selected by Emerge to be the predicate devices. (PSUF ¶ 774; DRPS ¶ 774.)

## 2. Acquisition, Use, and Disclosure of Synthes's Confidential and Proprietary Information

The record reflects that Emerge received Synthes confidential and proprietary information from several sources, including Marcy Slone, who was later terminated by Emerge on January 27, 2011, and Preston Baus, a former Synthes employee. (PSUF ¶ 796; DRPS ¶ 796; Pls.' Appx.

29, 503, 504, 507, 514.)  This information took multiple different forms.

<blockquote>

a.     **Information Related to Synthes's Manufacturing Costs**

</blockquote>

On April 17, 2010, Marotta emailed Baus requesting that Baus send him "Synthes manufacturing costs," to which Baus replied with an Excel file containing Synthes manufacturing costs. (Pls.' Appx. 504; PSUF ¶¶ 810–11; DRPS ¶¶ 810–11.)  Synthes contends that its manufacturing costs constitute highly confidential information.  (PSUF ¶ 812.)  At the time Baus sent the Excel spreadsheet, Emerge was in the "design input phase," which is the first step in developing product so that Emerge could have it manufactured.  (PSUF ¶ 814; DRPS ¶ 814.)

<blockquote>

b.     **Information Related to Synthes' External Fixation and LCP Products**

</blockquote>

On August 2, 2010, Marotta emailed Slone various design drawings, including drawings for Synthes external fixation products.  (PSUF ¶ 815; DRPS ¶ 815; Pls.' Appx. 508, 513.)  Marotta had received these drawings from Baus on July 17, 2010, while Baus was still employed by Synthes.  (PSUF ¶ 817; DRPS ¶ 817.)  Marotta testified that he assumed Baus should not have been giving him this information.  (Pls.' Appx. 3, Marotta Dep., 38:4–5, July 5, 2011; PSUF ¶ 819, DRPS ¶ 819.)  Nevertheless, these documents were ultimately circulated among Emerge employees.  (PSUF ¶ 820; DRPS ¶ 820.)

Around that same time in August 2010, Emerge was exploring the possibility of producing a limited number of external fixation components and locking screws as additional product offerings, and they received proposals for their design and development from Orchid.  (PSUF ¶¶ 821–22; DRPS ¶¶ 821–22.)  By that point in time, Emerge had already obtained certain external fixation prints from Preston Baus.  (PSUF ¶ 824; DRPS ¶ 824.)

### c.   Information Related to Synthes's Critical Features, Dimensions, and Tolerances

On July 17, 2010, Baus also provided Marotta with a Synthes Critical Features document, which bore a Synthes logo and included critical features, dimensions, and tolerances for certain Synthes products, including locking, non-locking, and cannulated screws.  (PSUF ¶ 826; DRPS ¶ 826.)  Synthes has characterized its Critical Features document as highly confidential and trade secret information belonging to Synthes.  (PSUF ¶ 827, DRPS ¶ 827.)  Slone agreed that the specific tolerance information on the Synthes Critical Features document is not something Synthes would want a competitor to obtain.  (PSUF ¶ 829; DRPS ¶ 829.)

This Critical Features document was circulated among Emerge employees and, in addition, was sent by Slone to Orchid.  (PSUF ¶¶ 830–31; DRPS ¶¶ 830–31.)  In July 2010, when Orchid received this document, Orchid shredded it because it "looked like something [Orchid] shouldn't have had" and was something that "wasn't in the public domain."  (Pls.' Appx. 489, Dep. of Ron Litke ("Litke Dep."), 132:7–134:7, Sep. 16, 2011.)  Slone indicated that she then altered the Synthes Critical Features document by removing information related to products other than cannulated screws, changing the font, removing the Synthes employee email header, and substituting an Emerge logo for the Synthes logo.  (PSUF ¶ 835; DRPS ¶ 835.)  The document, however, still contained some critical features for cannulated screws.  (PSUF ¶ 837; DRPS ¶ 837.)  Notably, Emerge claims that Slone altered this document without Emerge's consent.  (PSUF ¶ 835; DRPS ¶ 835.)  Slone then sent the altered document to Ron Litke at Orchid, stating "Here is a brief document outlining some critical features for the cannulated screws.  It may be helpful at some point."  (Pls.' Appx. 520.)  Also on July 21, 2010, Emerge sent the same altered

46

document, entitled "Emerge Critical Features 7-21-2010.doc," to Tom Berg and Steve Sorlie at Mountain Manufacturing.  (PSUF ¶ 840; DRPS ¶ 840.)  Mountain Manufacturing is a vendor Emerge had initially used for the prototyping of Emerge's cannulated screws.  (PSUF ¶ 842; DRPS ¶ 843.)

Around this time, Emerge was making revisions to its initial cannulated screw design.  (PSUF ¶¶ 845–46; DRPS ¶¶ 845–46.)  In the summer and early fall of 2010, there were differences between Emerge's screws as compared to the Synthes screws.  (PSUF ¶ 847; DRPS ¶ 847.).  Emerge indicated concern to Orchid about these differences in light of its strategy to have its products "blend seamlessly with the Synthes product."  (PSUF ¶ 848; DRPS ¶ 848.)  Orchid, in turn, expressed concern about other design items and, as a result, Orchid redesigned Emerge's screws to eliminate differences and make them appear more like Synthes screws.  (PSUF ¶¶ 849–51; DRPS ¶¶ 849–51.)  Also during this time, there were communications among Emerge, Orchid, and Mountain Manufacturing regarding differences in screw samples and prints in connection with the prototyping of Emerge's cannulated screws.  (PSUF ¶ 852; DRPS ¶ 852.)  Based on an Emerge-issued Engineering Change Notice, Emerge's cannulated screw drawings were then revised.  (PSUF ¶¶ 853–54; DRPS ¶¶ 853–54.)

### d.      Information Related to Synthes's Engineering Specifications

In April 2012, Emerge produced in discovery five Synthes documents containing Synthes engineering specifications.  (PSUF ¶ 856; DRPS ¶ 856.)  These documents contain standards and specifications for, among other things, the design and dimensioning, tolerancing, manufacturing, finishing, and inspection of certain Synthes products.  (PSUF ¶ 858; DRPS ¶ 858.)  According to Stassen, these documents, in their native electronic format, came to be in Emerge's possession

47

when Stassen transferred these documents from a thumb drive used by Trafka to perform her work for Emerge to his Emerge laptop. (PSUF ¶ 861.) Stassen then transferred the documents from his Emerge laptop onto a new thumb drive and returned both drives to Trafka. (PSUF ¶ 862.) Trafka, however, denies that the files were transferred from her thumb drive. (DRPS ¶¶ 861–62; Trafka Dep. 207:1–208:11.)

> ### e.   Information Related to Synthes's Cortical and Cancellous Screws

In the spring of 2010, Emerge and Hammill Manufacturing began discussions about the manufacture of certain products, and Marotta met with John Hammill. (PSUF ¶ 870; DRPS ¶ 870.) Initially, Emerge's discussions focused on quotes for the manufacture of Emerge's drill bits, guide wires, and cannulated screws, with Emerge sending Hammill Manufacturing the latest versions of all the screw and washer prints Orchid had prepared on April 30, 2010. (PSUF ¶ 874; DRPS ¶ 874.) On May 19, 2010, however, Hammill Manufacturing emailed Emerge that it had "decided to pass" on Emerge's manufacturing request. (PSUF ¶ 875; DRPS ¶ 875.) Nonetheless, Marotta met with John Hammill again on May 25, 2010 to discuss budgetary pricing for the manufacturing of Emerge screws and, subsequently, on June 3, 2010, Emerge sent out prints to John Hammill. (PSUF ¶¶ 876–81; DRPS ¶¶ 876–81.) Ultimately, in mid-June 2010, Hamill Manufacturing sent Emerge a quote for the manufacture of cancellous screws. (PSUF ¶¶ 883–85; DRPS ¶¶ 883–85.) The quote file had six drawings for cancellous and cortical screws, each of which contained Synthes's logo and an admonition that, "This drawing and/or the electronic model used to create it are the property of Synthes and may not be reproduced by any means or transmitted to third parties without prior written permission of

Synthes.  All rights reserved." (Pls.' Appx. 577; PSUF ¶¶ 886, 891, 895; DRPS ¶¶ 886, 891, 895.)  Hammill Manufacturing testified that these drawings must have been received from Emerge.  (PSUF ¶¶ 887–90, 892–94; DRPS ¶¶ 887-90; 892–94.)  Marcy Slone admits that before sending paper copies of these Synthes cortical and cancellous screw prints to Hammill Manufacturing, she had obscured certain information on them with white labels and correction tape.  (PSUF ¶ 897; DRPS ¶ 897.)

**f.**     **Information Related to Synthes's Usage Data in Emerge's Early Accounts**

On May 19, 2010, Karen Foster, a Synthes sales support specialist in West Chester, Pennsylvania, emailed to Chance Leonard an attachment containing Synthes's usage reports for multiple facilities within the Catholic Healthcare West system, including Chandler Regional Hospital and Mercy Gilbert Medical Center.  (PSUF ¶ 906; DRPS ¶ 906.)  The following day, Foster emailed Leonard the 2008 and 2009 usage files for multiple Banner Health Facilities. (PSUF ¶ 907; DRPS ¶ 907.)

In the early summer of 2010, Marotta traveled to Arizona to meet with investors and potential customers of Emerge, and recalls visiting Leonard around this time.  (PSUF ¶¶ 909–10, 913; DRPS ¶¶ 909–10, 913.)  On May 1, 2010, Leonard executed an Emerge Confidentiality and Non-Disclosure Agreement.  (PSUF ¶ 911; DRPS ¶ 911.)  At some point in 2010, Emerge came to possess the identical usage data that Foster had prepared for Leonard.  (PSUF ¶ 914; DRPS ¶ 914; Pls.' Appx 655.)  Marotta, as Emerge's corporate designee, had no information as to how Emerge came into possession of Synthes usage and pricing information for these hospitals. (PSUF ¶ 920; DRPS ¶ 920.)  According to Stassen, however, following Marotta's May 2010 trip

49

to Arizona, Marotta gave Stassen a thumb drive containing Excel spreadsheets, which provided, among other things, usage data for Synthes products for approximately fifteen hospitals and ambulatory surgery centers in Arizona, information on the sales volume of particular Synthes products over a two-year time period, and the specific pricing offered to those institutions for those specific products at those times. (PSUF ¶¶ 921–22; DRPS ¶¶ 921–22.)

Marotta did not know if this usage data was used by Emerge in any way during the summer of 2010. (PSUF ¶ 923; DRPS ¶ 923.) According to Stassen, however, he used the Synthes Arizona usage data "to assess sales potential of various products and to determine the volume of various products that Emerge might manufacture" because "at this time, Emerge was in the process of determining what products to produce and what quantities to produce." (Pls.' Appx. 20, Stassen Decl. ¶ 69; PSUF ¶ 927; DRPS ¶ 927.) According to Slone, she used the Arizona usage data often throughout her employment with Emerge "to determine what quantities of product to manufacture and order." (PSUF ¶ 930; DRPS ¶ 930.) Powell also acknowledged using Arizona usage data in his role at Emerge. (PSUF ¶ 932; DRPS ¶ 932.) Ultimately, Emerge's first accounts in late 2010 and early 2011 included Banner Gateway, Chandler Regional, and Mercy Gilbert. (PSUF ¶ 933; DRPS ¶ 933.)

### g. Information Related to Synthes's Cannulated Screw Comparison Chart

During his employment with Synthes, Marotta obtained a chart listing various dimensions and characteristics for Synthes's cannulated screws entitled "Cannulated Screw Comparison Chart." (PSUF ¶ 934; DRPS ¶ 934.) He kept it in a folder a maintained for competitive product. (PSUF ¶ 935; DRPS ¶ 935.) On March 23, 2010, Marotta sent the "Cannulated Screw

Comparison Chart" to Orchid to aid Orchid in the development of Emerge's cannulated screw designs. (PSUF ¶ 936; DRPS ¶ 936.)

### h. Synthes Documents Marotta Emailed to His Personal Email Address

While still employed with Synthes, Marotta sent various Synthes information to his personal email account, including: Synthes Fall 2009 new product pipeline and plan; Synthes 2009 usage and pricing data for Centura Health; Synthes November 2008 to October 2009 usage and pricing data for Denver Health; October 19, 2009 pricing proposal and email negotiations with Access Mediquip; October and November 2009 P&L reports; Synthes' price increase information (including an explanation of the differences from the prior year's increase); and Marotta's contacts, calendar, tasks, and notes from his Synthes Outlook account. (PSUF ¶ 937; DRPS ¶ 937.) Marotta could not recall the reason for forwarding these documents to his personal email account. (PSUF ¶¶ 938–39; DRPS ¶¶ 938–39.)

### I. Marotta's & Powell's Retention of Synthes's Emails

After the initiation of litigation in March 2011, Emerge produced numerous emails that were sent or received during Marotta's and Powell's employment with Synthes using Marotta's and Powell's Synthes email accounts that each had retained after their resignations from Synthes and during their employment with Emerge. (PSUF ¶ 946; DRPS ¶ 946.) These emails included a presentation of an evaluation done on Synthes's performance in the surgery center market, as well as an email concerning Synthes screws on consignment at Denver Health. (PSUF ¶¶ 947, 949; DRPS ¶¶ 947, 949.)

**j.**     **Information Related to Synthes's Strategic Business Acquisition Discussions**

On January 10, 2010, Ken Carpenter, one of the Synthes sales management personnel, emailed to Brown and other Synthes Area Vice Presidents a Business Development Discussion Slide Deck noting that the presentation was "Extremely Confidential!!!"  (PSUF ¶ 952; DRPS ¶ 952.)  This slide deck contained reference to Sonoma Orthopedics and Cayenne Medical, both of which were part of Stassen's father's partnership's portfolio.  (PSUF ¶¶ 953–54; DRPS ¶¶ 953–54.)  At the end of January 2010, Stassen had lunch with Brown, at which time Brown showed Stassen a PowerPoint presentation containing Synthes's confidential information regarding strategic acquisition targets.  (PSUF ¶ 956; DRPS ¶ 956.)  Stassen indicated that he recognized two or three of the companies and remarked that Synthes might be targeting those companies because they were part of his father's partnership portfolio.  (PSUF ¶ 957; DRPS ¶ 957.)  Shortly thereafter, Stassen's father emailed him regarding the names on the list and, although Stassen understood it to be "super top secret," he went on to describe the information he saw in the presentation.  (PSUF ¶¶ 958–60; DRPS ¶¶ 958–60.)  Stassen's father then shared this information with Jim Hart, the former CEO of Cayenne Medical.  (PSUF ¶ 961; DRPS ¶ 961.)

**F.**     **Emerge Obtains FDA Clearance**

On August 17, 2010, Emerge filed a 510(k) submission with the FDA for its "cannulated screw fixation system."  (PSUF ¶ 962; DRPS ¶ 962.)  Thereafter, on November 23, 2010, Emerge obtained FDA 510(k) clearance for this system.  (PSUF ¶ 963; DRPS ¶ 963.)  The FDA determined that "the device is substantially equivalent (for the indications for use stated in the enclosure)."  (Pls.' Appx. 483; PSUF ¶ 964; DRPS ¶ 964.)  That indication for use provided that

"The Emerge Cannulated Screw Fixation System is intended to provide bone fixation in the management of fractures of both small and large bones and bone fragments, including those in the foot, patella, ankle, wrist, and elbow and arthrodesis of the foot, wrist, and elbow and small and long bone osteotomies." (Pls.' Appx. 483; PSUF ¶ 965; DRPS ¶ 965.)  A 510(k) review does not require a finding that a new device be identical to a predicate device, but rather "involves an assessment of whether the new device is at least as safe and effective as the predicate." (PSUF ¶¶ 966–67; DRPS ¶¶ 966–67.)

Emerge's drill bits and guide wires have not been cleared by the FDA under the 510(k) process and were not the subject of a 510(k) submission.  (PSUF ¶ 968; DRPS ¶ 968.)  In August 2012, Emerge submitted a 510(k) submission for its solid bone screw line.  (PSUF ¶ 969; DRPS ¶ 969.)  An email from an FDA reviewer stated that, based on a review of that submission, it could not "determine if the device is substantially equivalent to a legally marketed predicate device based solely on the information you provided." (Pls.' Appx. 607; PSUF ¶ 970; DRPS ¶ 970.)  Following the FDA's request for additional information, Emerge indicated that its intent was to use the bone screws "to provide bone fixation in the management of osteotomies, fusions, and fractures of metaphysis and diaphysis of both small and large bones in the pelvis.  The screws may be used alone, or with washers." (PSUF ¶¶ 971–75; DRPS ¶¶ 971–75.)

Emerge has considered additional product offerings similar to those sold by Synthes including, but not limited to, cortical and cancellous bone screws and a locking one-third tubular plate system.  (PSUF ¶ 976; DRPS ¶ 976.)   Ultimately, on December 12, 2012, the FDA approved Emerge's solid bone screws and, on July 3, 2013, a "locking one-third tubular plate system." (PSUF ¶ 977; DRPS ¶ 977.)  The bone screws were cleared with the indication for use

described above.  (PSUF ¶ 978; DRPS ¶ 978.)  The locking one-third tubular plate system was

cleared with the following indication for use: "fixation of fractures, osteotomies, and non-unions

of the clavicle, scapula, olecranon, humerus, radius, ulna, pelvis, distal tibia, and fibula,

including osteopenic bone."  (PSUF ¶ 979 (citing publicly available documents); DRPS ¶ 979.)

Emerge also has additional products in development at this time.  (PSUF ¶ 980; DRPS ¶ 980.)

G.      **Emerge's Pilot Customers**

Emerge's initial sales strategy was "to get some customers that were early adopters in the

new business model" so that Emerge could "prove the concept" and "then scale it up like any

business."  (Pls.' Appx. 18, Marotta Dep. 252:1–13, June 26, 2013.)  Marotta agreed that going

into a health system at the "C-Suite" level had the potential to open up sales throughout that

particular health system.  (PSUF ¶ 983; DRPS ¶ 983.)

1.      **Banner Health**

Banner Gateway Medical Center ("Banner Gateway") in Gilbert, Arizona was Emerge's

first customer.  (PSUF ¶ 984; DRPS ¶ 984.)  Marotta obtained approval at Banner Gateway for a

trial of Emerge product and understood that if Emerge was successful there, it might open up the

rest of the Banner Health System to Emerge.  (PSUF ¶ 985–86; DRPS ¶¶ 985–86.)  Currently,

and prior to April 15, 2010, Banner Health had locations in multiple states, including Colorado.

(PSUF ¶¶ 987–88; DRPS ¶¶ 987–88.)  Those in Colorado were in Marotta's region during his

last two years as Regional Manager of the Rocky Mountain Region.  (PSUF ¶ 989; DRPS ¶ 989.)

Banner Health was originally identified as one of Emerge's targets in November 2009,

and was proposed to the Emerge Board in October 2010.  (PSUF ¶¶ 991–94; DRPS ¶¶ 991–94.)

In that presentation, Emerge indicated that it had leads with the Banner Health facilities in

Colorado and described Banner Gateway Medical Center, as well as several other facilities, as a "Marotta Hospital." (PSUF ¶¶ 996–97; DRPS ¶¶ 996–97.)

Emerge prepared a PowerPoint presentation for Banner Health and, in September 2010, Marotta and Powell met with Mike Hatton, Inventory Coordinator at Banner Gateway Medical Systems in Arizona, to present Emerge products as a business opportunity for the Banner Gateway system. (PSUF ¶¶ 998, 1001; DRPS ¶¶ 998, 1001.) Hatton then emailed various corporate individuals at Banner Health, including Doug Bowen and Dee Whittington, vouching for the professional reputation of Mr. Marotta and touting their corporate model that he believed would work for Banner Health. (PSUF ¶ 1002; DRPS ¶ 1002.) On September 24, 2010, Marotta and Bowen exchanged email and phone correspondence confirming the existence of a client relationship. (PSUF ¶ 1005; DRPS ¶ 1005.) Emerge shipped its first product to Banner Gateway Medical Center on September 30, 2010, making it the first sale of product by Emerge. (PSUF ¶¶ 1009–10; DRPS ¶¶ 1009–10.)

Emerge then followed up with Dee Whittington of Banner Health about hospitals and doctors and, on November 3, 2010, a draft contract between Banner Health corporate and Emerge was prepared. (PSUF ¶¶ 1012, 1015; DRPS ¶¶ 1012, 1015.) That contract was not limited to specific Banner Health facilities or geographies. (PSUF ¶ 1016; DRPS ¶ 1016.) On January 20, 2011, Powell emailed Marotta and Dee Whittingon, stating in part, "John Marotta and Doug Bowen agreed to ease into the implementation of Emerge so as not to raise red flags" and that with Emerge's "entire product portfolio, we estimate potential savings to be between **100k and 150k at each Banner Hospital.**" (Pls.' Appx. 631 (emphasis in original).) Subsequently, on February 18, 2011, Marotta emailed Stassen and Powell with the word that

55

Banner Health was on board with Emerge and its business model and were planing on rolling out Emerge "Banner wide." (PSUF ¶ 1025; DRPS ¶ 1025.) Hatton then emailed Marotta to inform him that "Emerge Medical was brought up at OR Standards meeting last week by Dee Whittington and she said for everyone to go with Emerge products. The only problem lies in the fact that if the Synthes tray is on consignment, not purchased, that Banner lawyers say you can't put Emerge products in the trays." (Pls.' Appx. 636.) Later that same day, Marotta emailed Powell and Stassen indicating that he had received word that Banner Health had cleared Emerge on all products for all its hospitals. (PSUF ¶ 1030; DRPS ¶ 1030.)

Following these events and discussions, Emerge entered into a pricing agreement in May 2011 with the entire Banner Health system. (PSUF ¶ 1037; DRPS ¶ 1037.) Since then, Emerge has invoiced product to at least ten Banner Health facilities. (PSUF ¶ 1038; DRPS ¶ 1038.)

## 2. AOSH/USPI

In a presentation to the Emerge Board, Emerge identified Arizona Orthopedic Surgical Hospital ("AOSH") as one of its targets. (PSUF ¶ 1043; DRPS ¶ 1043.) AOSH is a United Surgical Partners International ("USPI") facility located in Arizona. (PSUF ¶ 1047; DRPS ¶ 1047.) USPI has facilities nationwide, including various facilities in Colorado. (PSUF ¶ 1049; DRPS ¶ 1049.) During the last two years of his tenure as Regional Manager of the Rocky Mountain Region, Marotta's region included USPI facilities. (PSUF ¶ 1051; DRPS ¶ 1051.)

Following introductions by Marotta, Powell made various contacts at AOSH, including the CEO, CFO, materials manager, and central sterilization coordinator. (PSUF ¶¶ 1041–42; DRPS ¶¶ 1041–42.) In October 2010, Emerge made a presentation to AOSH and, later that month, shipped its first order to AOSH. (PSUF ¶ 1045–46; DRPS ¶¶ 1045–46.)

56

On December 7, 2010, Andrew Arreola of AOSH provided Marotta with contact information for Angie Draper, the Director of Materials Management, at USPI. (PSUF ¶¶ 1053–54; DRPS ¶¶ 1053-54.) Thereafter, Marotta emailed her regarding Emerge and requested the opportunity to explain Emerge's business model to her. (PSUF ¶¶ 1056–57; DRPS ¶¶ 1056–57.) Powell followed up with Draper in early January and subsequently scheduled a meeting with USPI on January 11, 2011. (PSUF ¶¶ 1059–60; DRPS ¶¶ 1059–60.) After the meeting, Powell provided USPI with additional information regarding the money Emerge could save USPI annually. (PSUF ¶¶ 1061–66; DRPS ¶¶ 1061–66.) Since that time, Emerge has invoiced product to at least twenty-nine different USPI facilities. (PSUF ¶ 1068; DRPS ¶ 1068.)

### 3.    **Catholic Healthcare West**

Chandler and Mercy Gilbert are both part of the Catholic Healthcare West ("CHW") health system, now known as Dignity Health. (PSUF ¶ 1068; DRPS ¶ 1069.) CHW and Dignity Health have operations in Arizona, California, and Nevada and, at some point, Marotta's territory included CHW facilities. (PSUF ¶ 1071; DRPS ¶ 1071.) Dr. Motzkin is affiliated with Chandler Regional and has used Emerge's products. (PSUF ¶ 1072; DRPS ¶ 1072.)

In a presentation to its Board in 2010, Emerge identified Chandler Regional, Mercy Gilbert, and CHW as some of the target facilities and systems. (PSUF ¶ 1074; DRPS ¶ 1074.) On October 21, 2010, Marotta informed the Emerge Board that it would be implementing at Chandler Regional in two weeks. (PSUF ¶ 1075; DRPS ¶ 1075.) As with Banner Health, Chandler Regional and Mercy Gilbert were described as "Marotta Hospitals." (PSUF ¶ 1077; DRPS ¶ 1077.) Emerge shipped its first order to Chandler Regional Medical Center in Chandler, Arizona on November 22, 2010, and to Mercy Gilbert Medical Center in Gilbert, Arizona on

January 13, 2011.  (PSUF ¶ 1079–80; DRPS ¶ 1079–80.)

On April 6, 2011, Marotta informed Emerge's Board and Emerge's human resources consultant that Emerge received "the greenlight in Catholic Healthcare West to roll out in the entire system."  (Pls.' Appx. 557; PSUF ¶ 1082; DRPS ¶ 1082.)  Since November 22, 2010, Emerge has invoiced product to two CHW and Dignity Health facilities.  (PSUF ¶ 1083; DRPS ¶ 1083.)

### 4.    Other System-Wide Sales and Early Targets

According to Emerge's sales data, Emerge also invoiced the following hospitals in late 2010 and the first half of 2011: Simi Valley Hospital in California, Minnesota Valley Surgery Center in Minnesota, and Fairview Lakes Medical Center in Minnesota.  (PSUF ¶ 1084; DRPS ¶ 1084.)  Simi Valley Hospital is part of the Adventist Health System.  (PSUF ¶ 1085; DRPS ¶ 1085.)  A November 18, 2010 Emerge Board presentation identified Simi Valley Hospital and Aspen Surgery Center as recommendations from one of Emerge's investors.  (PSUF ¶ 1087; DRPS ¶ 1087.)  Likewise, that same presentation identified both Minnesota Valley Surgery Center and Fairview Lakes Medical Center as investor recommendations.  (PSUF ¶¶ 1089, 1093; DRPS ¶ 1089, 1093.)

### H.    Emerge's Sales Process, Strategy, Implementation, and Commingling of Product

Emerge was formed to produce and sell Generic Device Fixation Hardware similar, but not identical, to that which Synthes also produces and sells.  (PSUF ¶ 1094; DRPS ¶ 1094.)  According to Emerge, it "has devised a new approach to the sales of Generic Device Fixation Hardware [such as drill bits, guide wires, and screws] providing the American public with a like-

58

numbered product that is similar to the Generic Device Fixation Hardware sold by Synthes, at a fraction of the price demanded by Synthes . . . and can be stored alongside Synthes sophisticated orthopedic implants and used with Synthes inventory management systems and surgical sets." (Pls.' Appx. 2, Emerge Answer to Am. Compl. ¶ 156.)  As of July 2012, Emerge sold only drill bits, guide wires, and screws.  (PSUF ¶ 1096; DRPS ¶ 1096.)  According to Emerge, its "Generic Device Fixation Hardware" may be used to hold Synthes's sophisticated implants in place. (PSUF ¶ 1097; DRPS ¶ 1097.)  To that end, Emerge attempted to make its products look and feel like Synthes's products so that it could market them as substitutes for Synthes products.  (PSUF ¶ 1098; DRPS ¶ 1098.)  This strategy also included using a similar part numbering scheme for Emerge's products, where Emerge would use Synthes part numbers and add only ".EM" to the end.  (PSUF ¶¶ 1099–1100; DRPS ¶¶ 1099–1100.)

As CEO of Emerge, Marotta was responsible for Emerge's marketing strategies and for oversight of the development of sales growth in the business.  (PSUF ¶ 1101; DRPS ¶ 1101.) Both Marotta and Powell were responsible for sales beginning in September 2010.  (PSUF ¶ 1102; DRPS ¶ 1102.)  Prior to entering into its exclusive distributorship agreement with Cardinal Health on June 20, 2012—wherein Emerge and Cardinal Health worked in combination on the sale and marketing of Emerge products—Emerge also had distributors who assisted in sales. (PSUF ¶¶ 1104, 1106; DRPS ¶¶ 1104, 1106.)  Powell primarily managed these distributors, under Marotta's supervision.  (PSUF ¶ 1105; DRPS ¶ 1105.)

Prior to the Cardinal Health agreement, Emerge would typically begin the sales process by approaching the hospital system directly, either by phone, email, or in person, through corporate supply chain management.  (PSUF ¶ 1107; DRPS ¶ 1107.)  Emerge would inform the

59

potential customers of the need for competition in the industry and that there was no need to pay sales reps $250,000 a year and carve costs out of the system. (PSUF ¶ 1108; DRPS ¶ 1108.) During the sales pitches, Marotta would discuss and compare Emerge product to other competitors in the marketplace, including Synthes, and would make representations about the quality of Emerge products, including that Emerge's products had gone through 510(k) clearance and were tested against Synthes as predicate devices. (PSUF ¶¶ 1109–10; DRPS ¶¶ 1109–10.) Emerge's sales and marketing efforts and materials would regularly make representations about the characteristics and performance of its products, and would regularly compare its products to Synthes's. (PSUF ¶¶ 1111–14; DRPS ¶¶ 1111–14.) On many occasions, Emerge represented to customers that its products are identical to, equivalent to, or exact replicas of Synthes products. (PSUF ¶ 1119; DRPS ¶ 1119.) As a result, some Emerge customers have the impression that Emerge's products have the same specifications as Synthes products and that the products are, in fact, milled side-by-side in the same factory. (PSUF ¶ 1120–22; DRPS ¶¶ 1120–22.)

In the website promoting Emerge products and other marketing materials, Cardinal Health and Emerge represent to prospective customers that Emerge's products are "equivalent to market leading products when comparing composition, geometry, and strength." (Pls.' Appx 652, 671–74; PSUF ¶ 1123; DRPS ¶ 1123.) In its sales and marketing efforts, Emerge made representations that its products were equivalent, substantially equivalent, cleared by the FDA, or had gone through the FDA regulatory process in which drill bits and guide wires gain clearance. (PSUF ¶ 1124; DRPS ¶ 1124.)

Emerge's approach to the sales of Generic Device Fixation Hardware involved a process whereby Emerge product would be placed into Synthes SIMS cabinets and stored with like-

numbered Synthes product, and stickers would be placed on some Synthes product directing customers to reorder from Emerge.  (PSUF ¶ 1127; DRPS ¶ 1127.)  As a result, Emerge products would be removed from the SIMS cabinet, sterilized, and delivered to the operating room, making it possible that Emerge products would be placed on a tray along with other Synthes product.  (PSUF ¶ 1128; DRPS ¶ 11128.)

Emerge placed some of its product in Synthes SIMS cabinets and commingled it with Synthes product.  (Pls.' Appx. 153, 177.)  Emerge implemented its initial products at Chandler Regional on November 3, 2010.  (PSUF ¶ 297; DRPS ¶ 297.)  As of July 2011, Powell changed the dividers in Synthes SIMS cabinets at the following hospitals: Banner Gateway, Arizona Orthopedic, Chandler Regional, Fairview Ridges, Fairview Southdale, and Simi Valley Hospital.  (PSUF ¶ 297; DRPS ¶ 297.)

To respond to representations Emerge made publicly in the field and in marketing materials, Synthes sent letters to individuals at certain customers' accounts.  (PSUF ¶ 1130; DRPS ¶ 1130.)  Emerge, its representatives, and its experts have all agreed that Emerge products are not identical to Synthes products, and from an engineering perspective, no product in the world is identical.  (PSUF ¶¶ 1132–33; DRPS ¶¶ 1132–33.)  Emerge and its representatives have testified that all of its products do not require 510(k) clearance before marketing.  (PSUF ¶ 1134; DRPS ¶ 1134.)  Emerge has received some negative feedback from its customers concerning the performance of Emerge's products.  (PSUF ¶ 1136; DRPS ¶ 1136.)

## I.   **Cardinal Health**

Cardinal Health and Emerge first began to discuss a potential partnership in April of 2011 through the summer of 2011.  (PSUF ¶ 1137; DRPS ¶ 1137.)  Ultimately, around June 20, 2012,

61

Emerge and Cardinal Health entered into a Senior Subordinated Note and Warrant Purchase Agreement, which made Cardinal Health the exclusive distributor of Emerge products. (PSUF ¶¶ 1138–39; DRPS ¶¶ 1138–39.) In mid-2013, Emerge and Cardinal Health entered into an Asset Purchase Agreement, whereby Cardinal Health agreed to purchase 5,372 units of Emerge product inventory for $305,473. (PSUF ¶ 1140; DRPS ¶ 1140.) In addition, Emerge and Cardinal Health entered into a Senior Secured Line of Credit Promissory Note in which Cardinal agreed to extend a line of credit to Emerge in the amount of $14,900,000 at an interest rate of six percent compounded monthly. (PSUF ¶ 1141; DRPS ¶ 1141.) The proceeds from this line of credit could be used for, among other things, the recapitalization of Emerge, product development, general working capital, or the "defense or any settlement or judgment of the Synthes litigation." (Pls.' Appx. 12; PSUF ¶ 1142; DRPS ¶ 1142.) Finally, in mid-2013, Emerge and Cardinal Health entered into a Put and Call Rights Agreement whereby each party has respective rights concerning the sale of all shares of Emerge to Cardinal Health for purchase prices ranging from $18,200,000 to $25,000,000. (PSUF ¶ 1143; DRPS ¶ 1143.)

### J. Procedural History

On March 4, 2011, Synthes initiated the current federal action against both John Marotta and Emerge Medical, Inc. Thereafter, on March 6, 2012, Plaintiff filed an Amended Complaint adding three new defendants—Stassen, Brown, and Powell—and setting forth thirteen causes of action as follows: (1) breach of fiduciary duty and/or duty of loyalty against Marotta and Brown (id. ¶¶ 169–88); (2) breach of contract under the Non-Competition and Non-Disclosure Agreements against Marotta, Brown, and Powell (id. ¶¶ 189–214); (3) tortious interference with contract against all Defendants (id. ¶¶ 215–26); (4) aiding and abetting breach of fiduciary duty

against Marotta, Brown, Stassen, and Emerge (id. ¶¶ 227–36); (5) misappropriation of trade

secrets under Pennsylvania common law and the Pennsylvania Uniform Trade Secrets Act, 12

Pa.C.S. § 5302, et seq., against all Defendants (id. ¶¶ 237–49); (6) violation of the Computer

Fraud and Abuse Act, 18 U.S.C. § 1030, against all Defendants (id. ¶¶ 250–60); (7) conversion

and replevin against all Defendants (id. ¶¶ 261–68); (8) false or deceptive advertising under the

Lanham Act, 15 U.S.C. § 1125(a), against Defendants Marotta, Stassen, Powell, and Emerge (id.

¶¶ 269–81); (9) trespass to chattels against Defendants Marotta, Stassen, Powell, and Emerge (id.

¶¶ 282–86); (10) unfair competition against Defendants Marotta, Stassen, Powell, and Emerge

(id. ¶¶ 287–97); (11) fraud against all Defendants (id. ¶¶ 298–302); (12) civil conspiracy against

all Defendants (id. ¶¶ 303–09); and (13) breach of contract or, in the alternative, unjust

enrichment against Powell. (Id. ¶¶ 310–16.)

On April 3, 2012, Emerge filed its Answer with Affirmative Defenses and Counterclaims

to Synthes's Amended Complaint. (Emerge Answer & Aff. Defenses.) Following dismissal of

its antitrust counterclaims, Emerge filed an Amended Answer with Affirmative Defenses and

asserted the following counterclaims against Synthes: (1) trade libel; (2) tortious interference

with prospective contractual relationships; and (3) unfair competition under Pennsylvania law.

(Emerge Am. Answer & Aff. Defenses.) Emerge also made a request for declaratory relief on

Synthes's claims of tortious interference with contract and aiding and abetting breach of fiduciary

duty. (Id.)

Fact discovery in this matter closed on July 1, 2013. (PSUF ¶ 1181; DRPS ¶ 1181.)

Expert discovery closed on September 30, 2013. (PSUF ¶ 1182; DRPS ¶ 1182.) On November

18, 2013, the parties filed a multitude of dispositive motions, including the two motions currently

at issue.[5] Responses were filed on December 10, 2013 and Reply Briefs were filed on December

20, 2013. The Motions are now ripe for judicial consideration.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is

"material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv.

Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the

disputed evidence and decide which is more probative, or to make credibility determinations.

Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA

Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court

must consider the evidence, and all reasonable inferences which may be drawn from it, in the

light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

---

[5] Aside from its Motion for Summary Judgment on Liability, Synthes also filed a Motion
for Summary Judgment on Emerge's Counterclaims and a Motion for Sanctions against Emerge.
The sole motion filed by Emerge is its currently pending Motion for Partial Summary Judgment.
The Court currently deals only with the Cross-motions for Summary Judgment on liability as to
Plaintiffs' Amended Complaint.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending. Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.  DISCUSSION

### A.  Claim Against Marotta for Breach of Fiduciary Duty (Count I)

The first claim at issue in the present case is Synthes's cause of action for breach of fiduciary duty against Defendant Marotta. The Third Circuit Court of Appeals has held that obligations arising under a fiduciary duty are imposed "as a matter of social policy, rather than by

65

mutual consensus" and that such "larger social policies [are] embodied in the law of torts rather than the terms of the contract." Bohler-Uddeholm Am., Inc. v. Ellwood Grp. Inc., 247 F.3d 79, 105 (3d Cir. 2001) (internal quotation marks omitted). Generally, "[a fiduciary] relationship exists where one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." Commonwealth Dept. of Transp. v. E-Z Parks, Inc., 620 A.2d 712, 717 (Pa. Commw. Ct. 1993) (quotation omitted). "A business association may be the basis of a confidential relationship 'only if one party surrenders substantial control over some portion of his [or her] affairs to the other.'" Id. (quoting In re Scott's Estate, 316 A.2d 883, 886 (Pa. 1974)). Further, when a person authorizes another to act as his or her agent, the relationship between the two may be characterized as a fiduciary relationship. Sutliff v. Sutliff, 528 A.2d 1318, 1323 (Pa. 1987) (citing Restatement (Second) of Agency § 387 (1958)). "Under Pennsylvania law, the duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency and 'the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal.'" Garbish v. Malvern Fed. Sav. & Loan Ass'n, 517 A.2d 547, 553–54 (Pa. Super. 1986) (quoting Sylvester v. Beck, 178 A.2d 755 (Pa. 1962)).

Pennsylvania law dictates that an employee, as the agent of his employer, owes his employer a duty of loyalty. Crown Coal & Coke Co. v. Compass Point Res., LLC, No. Civ.A.07-1208, 2009 WL 891869, at *5 (W.D. Pa. Mar. 31, 2009). An agent's specific duties of loyalty include a duty to refrain from competing with the principal and from taking action on behalf of, or otherwise assisting, the principal's competitors throughout the duration of the agency

66

relationship, as well as a duty not to use property or confidential information of the principal for the agent's own purpose or those of a third party.  Restatement (Third) of Agency §§ 8.04 and 8.05 (2006).  Pursuant to this duty, an employee may not "act[ ] for a person or entity whose interests conflict[] with [the employer]." Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. Ct. 2003).  To establish a breach of fiduciary duty under Pennsylvania law, a plaintiff must prove "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit . . . was a real factor in bring[ing] about plaintiff's injuries." McDermott v. Party City Corp., 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998) (internal quotation marks omitted).

"[E]mployees at will do not breach a fiduciary duty to the employer by making preparations to compete upon termination of employment provided the employee does not use the confidential information of his employer, solicit the customers of his employer, or otherwise engage in conduct directly damaging his employer during the period of employment." Oestreich v. Environ. Inks & Coatings Corp., No. Civ.A.89-8907, 1990 WL 210599, at *6 (E.D. Pa. Dec. 17, 1990).  Thus, before the close of his employment, an employee may purchase a rival business and, upon the termination of the agency, immediately compete with his former employer.  He may not, however, "solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's." Restatement (Second) Agency § 393, cmt. e (1958); see also Spring Steels, Inc. v. Molloy, 162 A.2d 370, 375 (Pa. 1960) ("Even before the termination of agency, [the employee] is entitled to make arrangements to compete, except that he cannot properly use confidential information

67

peculiar to his employer's business and acquired therein."). On the other hand, where an employee, bound by a restrictive covenant, makes preparations to compete with his current employer, the employee could be said to have breached his duty of loyalty by seeking employment with admitted competitors of the employer while still employed because the results of the employees' activities could be construed as contrary to the express interests of employer. Mattern & Assocs., L.L.C. v. Seidel, 678 F. Supp. 2d 259, 269 n.10 (D. Del. 2010). Stated more succinctly:

> Pennsylvania law permits an agent or employee to "make arrangements to compete," but prohibits him from using "confidential information peculiar to his employer's business and acquired therein." Within this framework, an employee may properly inform customers of his current employer that he is leaving the employer to work elsewhere in the field, or to start his own competing business. In contrast, an employee who, while still working for her employer, makes improper use of her employer's trade secrets or confidential information, usurps a business opportunity from the employer, or, in preparing to work for a rival business, solicits customers for such rival business, may be liable for a breach of the duty of loyalty.

Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 414 (E.D. Pa. 2009) (footnotes omitted).

In the present case, Defendants seek a ruling that certain of Marotta's activities claimed by Synthes to be breaches of fiduciary duty are, in actuality, preparatory activities that cannot form the basis for such a claim. Synthes, on the other hand, contends that it is entitled to summary judgment on the entirety of this claim based on the undisputed evidence of record demonstrating that, over a period of nine months, Marotta was directly competing with Emerge. The Court addresses each argument individually.

### 1. **Defendants' Motion for Partial Summary Judgment on Breach of Fiduciary Duty**

As noted, Defendants seek partial summary judgment on this cause of action by asking

the Court to rule that the following activities constitute nothing more than mere preparation to compete, including: (1) conceiving the idea for Emerge; (2) discussing the business concept with former defendants Brown and Stassen; (3) analyzing the market opportunities for his business concept; (4) developing and drafting a business plan; (5) developing and drafting a private placement memorandum; (6) meeting with an attorney regarding his employment agreements with Synthes; (7) working with an accounting firm; (8) incorporating Emerge; (9) soliciting and meeting with potential investors and raising money for Emerge; (10) engaging an outside vendor for design and development of Emerge's initial product offerings; (11) developing a logo for Emerge; (12) retaining a lawyer to work on behalf of Emerge; (13) hiring a firm to file for trademark application; (14) meeting with potential members of a board of directors for Emerge; (15) recruiting a non-Synthes employee as a potential Emerge employee; (16) renting office space and buying supplies; (17) using an Emerge email address; (18) being a fifty-percent owner of Emerge; and (19) carrying out all of these activities "secretly" or in "stealth." (Defs.' Resp. Opp'n Mot. Summ. J. 5–6.) Defendants concede that all of these activities occurred, but contend that they amount to nothing more than preparation to compete.

At first glance, nothing in these activities appears to go beyond mere preparation or rises to the level of improperly using Synthes's trade secrets or confidential information, usurping business opportunities from Synthes, or soliciting customers for a rival business.[6] To make a

---

[6] In support of their argument that these activities are only "preparatory," Defendants cite to Spring Steels, Inc. v. Molloy, 162 A.2d 370 (Pa. 1960) and its progeny wherein the Pennsylvania courts have recognized that ability of an employee to prepare to compete with his/her employer immediately upon leaving such employment. In Mattern & Assocs., L.L.C. v. Seidel, 678 F. Supp. 2d 256, 268–69 n.10 (D. Del. 2010), the court, interpreting Spring Steels, remarked that where an employee is subject to a non-compete provision or other restrictive covenant, the search for competitive employment or otherwise normally preparatory activities

partial ruling on the nature of a limited set of activities, however, disregards the interplay between these activities and the other, less innocuous activities by Marotta. Although Defendants argue that their Motion does not seek a summary judgment determination on this "other" evidence of "other" conduct, such a piecemeal ruling as to the nature of the particular conduct they cite would thwart the well-established notion that "the ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts and circumstances of the particular case." Mercer Mgmt. Consulting, Inc. v. Wilde, 920 F. Supp. 219, 234 (D.D.C. 1996) (citing cases); see also HTS, Inc. v. Boley, 954 F. Supp. 2d 927, 947 (D. Ariz. 2013) ("[W]hether an employee's actions constitute a breach of the fiduciary duty of loyalty is a question of fact to be decided by the trier of fact 'based on a consideration of all the circumstances of the case.'") (quotations omitted); Restatement (Third) of Agency § 8.04 cmt. c (2006) ("In retrospect it may prove difficult to assess the propriety of a former agent's conduct because many actions may be proper or improper, depending on . . . the surrounding circumstances. For that reason it may be difficult to draw a clean distinction between actions prior to termination of an agency relationship that constitute mere preparation for competition, which do not contravene an employee's or other agent's duty to the principal, and actions that constitute competition.").

Thus, while the mere act of soliciting and meeting with potential investors for Emerge may not, on its own, constitute competitive conduct, meeting with potential investors—who are

---

could be construed as contrary to the express interests of the employer. Id. Given that Marotta was indisputably under several non-compete contracts, it remains questionable whether the supposed "preparatory" acts rose to the level of competitive activity.

also customers of Synthes—with the intent of luring them away from Synthes may be competitive.  Moreover, while meeting with accounting firms and lawyers alone may be deemed preparatory, meeting with such individuals during Synthes business time and billing such time to Synthes may be deemed competitive.  Although Marotta may have been entitled to engage an outside vendor for design and development of Emerge's initial product offerings, misappropriating confidential Synthes information in order to facilitate the design and development of competing products is not permissible.  Finally, the simple use of an Emerge email address may not be problematic, but the use of an Emerge email address to communicate with potential customers that are existing customers of Synthes could rise to the level of competition.

In short, Defendants' efforts to isolate various activities by Marotta and have the Court deem them preparatory is both premature and improper.  Given the sheer volume of information in this case, it is impossible to view these activities in a vacuum and hold, as a matter of law, that they constitute preparatory and not competitive activity for purposes of the breach of fiduciary claim.  As such, this portion of Defendants' Motion for Summary Judgment is denied.

> ### 2.  Plaintiffs' Motion for Summary Judgment on Breach of Fiduciary Duty

Beyond simply opposing Defendants' request for partial summary judgment on the breach of fiduciary duty claim, Synthes contends that it has affirmatively proved that Marotta actively breached his fiduciary duty resulting in cognizable damages to Synthes.[7]  Putting aside the record

---

[7]  The Court notes that between Synthes's opening brief and its reply brief in support of its Motion for Summary Judgment, Synthes has approximately thirty single-spaced footnotes in ten-point font on the issue of breach of fiduciary duty alone.  While all relevant arguments were considered, to the extent that a citation or tangential argument was not important enough to merit

of seemingly "preparatory" activity—i.e., incorporation of Emerge, maintenance of 50%

ownership in Emerge, development of designs—the evidence is replete with evidence of

additional activity taken by Marotta, during his employment with Synthes, to further the interests

of Emerge.  The question now becomes whether such activity was sufficiently contrary to

Synthes's interests such that the Court can rule, as a matter of law, that Marotta was competing

with Synthes during the term of his employment and, as such, breached his fiduciary duty.[8]

_____

discussion in the body of Synthes's argument, the Court declines to scour these voluminous
footnotes with a magnifying glass.

    [8] Synthes argues that its written policies that applied to all employees—including its
Employee Policy Manuals, The Global Code of Business Ethics, Synthes Sales Policy Manual,
and Synthes IT Security Policy—define the scope of the fiduciary duty, and that Marotta directly
violated many of these policies, thereby clearly establishing a breach of fiduciary duty.  In
support of this principle, Synthes cites to the Restatement (Third) of Agency § 8.01, which states
that, "[A]n agent has a fiduciary duty to act loyally for the principal's benefit in all matters
connected with the agency relationship." Id.  It goes on to note that comment c to this provision
provides that "[f]iduciary obligation, although a general concept, is not monolithic in its
operation.  In particular, an agent's fiduciary duties to the principal vary depending on the
parties' agreement and the scope of the parties' relationship. The scope of an agency relationship
can be analyzed by identifying the parties to the relationship, examining whether particular
interactions are as principal and agent, and specifying the duration of the relationship."
Restatement (Third) Agency § 8.01, cmt. c.  Similarly, comment b notes that "the fiduciary
character of an agent's position furnishes a crucial benchmark for the agent's interpretation of
instructions received from the principal and thereby facilitates the principal's ability to exercise
control over the agent." Id. cmt. b.
    Synthes's argument, however, is misplaced.  Although the employee policies may give
rise to separate causes of action, Synthes has cited no authority to show that the policies expand
the fiduciary duty owed by Marotta to encompass activities that are otherwise not actionable in
tort.  For example, Synthes cites the Code of Business Ethics, which mandates that employees
avoid conflicts of interests and should not engage in ownership of other businesses that may
conflict with Synthes's interests.  (PSUF ¶ 260.)  The jurisprudence is clear, however, that
preparation to compete, including affiliating with a competing business, is not per se violative of
the breach of fiduciary duty.  Synthes may not alter that principle through its own written
policies.
    The same principle holds true for Synthes's argument that the fiduciary duty is expanded
by Marotta's RM NCA, which prohibited him from soliciting customers or prospects, soliciting
employees, or competing in the same region during his employment with Synthes.  It is well

Given the undisputed evidence of record, the Court finds that Synthes is entitled to summary judgment on this claim. Marotta's competitive actions manifest themselves in four general ways. First, Defendants do not deny that Marotta solicited several existing and potential customers of Synthes for investment in Emerge. Indeed, Defendants admit that, prior to Marotta leaving Synthes's employment, he targeted and solicited thirty-two orthopedic surgeons for investment in Emerge. (PSUF ¶ 713 (citing exhibits); DRPS ¶ 713.) Ultimately, twenty-one of these surgeons, many of whom worked at sales facilities within Marotta's Sales Consultant Territory, invested in Emerge during Emerge's initial round of financing in early 2010. (PSUF ¶¶ 100, 716; DRPS ¶¶ 100, 716.) Defendants also admit that, prior to April 15, 2010, Marotta was involved in discussions with Synthes employees Colin Brown, Mike Saunders, Andy White, Craig Lynn, and Brian Hahn regarding potential investments in Emerge. (PSUF ¶ 717; DRPS ¶ 717.) With the exception of Brian Hahn, all of these employees or their spouses invested in Emerge. (PSUF ¶ 718; DRPS ¶ 718.)

Defendants respond that "meetings with investors, whether customers or employees of the plaintiff or not, and discussing a potential business venture or raising money" do not constitute actual competition that can form the basis of a breach of fiduciary duty claim. (Defs.' Resp. Opp'n Summ. J. 11.) This argument, however, overly constricts the reach of the duty of loyalty, which provides that although an employee before the end of his employment can

---

established that "[a] breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded in contractual obligations." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008) (citing eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002). Claims for breach of fiduciary duty and breach of contract can only coexist if the fiduciary duty is based on duties imposed as a matter of social policy and if the fiduciary duty is not based on a contractual agreement between the parties. Id. (citing Bohler-Uddeholm Am., Inc. v. Ellwood Grp., 247 F.3d 79 (3d Cir. 2001)).

properly purchase a rival business and upon termination of employment immediately compete, "[h]e is not . . . entitled to solicit customers for such rival business before the end of his employment *nor can he properly do other similar acts in direct competition with the employer's business.*" Restatement (Third) Agency § 8.01 cmt. e (emphasis added). Thus, while Marotta was not necessarily soliciting these surgeons to buy Emerge product on behalf of their affiliated medical facilities, the natural and logical inference from the evidence—one that is almost unavoidable—is that by obtaining physician investment, those physicians would seek to increase their investment's profitability by encouraging their affiliated medical facilities to purchase from Emerge rather than Synthes.[9]  Certainly, such acts are "similar acts in direct competition" with Synthes's business.

Second, the record remains undisputed that while Marotta was still employed at Synthes, he emailed to his personal email account various documents, including: Synthes's Fall 2009 new product pipeline and plan; Synthes's 2009 usage and pricing data for Centura Health; Synthes's November 2008 through October 2009 usage and pricing data for Denver Health; October 19, 2009 pricing proposal and email negotiations with Access Mediquip; October and November 2009 P&L reports; Synthes's price increase information with explanations; and Marotta's contacts, calendar, tasks, and notes from his Synthes Outlook account.  (PSUF ¶ 937, DRPS ¶

---

[9]  This logical inference is made clear by several January/February 2010 emails from Dr. Neil Motzkin, a Synthes customer with whom Marotta had worked as a Synthes sales consultant. Following a meeting with Marotta in January 2010 regarding investment in Emerge, Dr. Motzkin emailed Marotta two times, asking when he could expect to insert his first Emerge screws in Chandler Regional Hospital (his affiliated hospital) and whether the products will be of equivalent quality to Synthes's products.  (PSUF ¶¶ 555–57; DRPS ¶¶ 556–57.)  As such, although Dr. Motzkin was only sought after for "investment," he logically then expected to make purchases of Emerge's product over Synthes's product for use in his hospital.

937.) Such actions constitute "improper use of [an] employer's trade secrets or confidential information." Bro-Tech, 2009 WL 2854891, at *2.

Defendants attempt to manufacture a dispute of material fact on this point by arguing that it is unclear how Marotta used the information, whether he used it all in connection with Emerge, whether it was confidential, and whether his use was intended. This litany of questions does not suffice to defeat summary judgment. In his 2011 deposition, Marotta could offer no explanation for why he forwarded most of these documents to his personal email. (Pls.' Appx. 36, Marotta Dep., 685:15–87:17, July 6, 2011.) The evidence is undisputed that much of this data ended up in Emerge's possession and was available for use by Emerge employees. (PSUF ¶¶ 946–50; DRPS ¶¶ 946–50.) Further, although Defendants attempt to contest the confidentiality of some of the information, they offer no contradictory evidence to establish that this information is not confidential.[10] See Matsushita, 475 U.S. at 586–87 (holding that to defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."); Anderson, 477 U.S. at 249–50 (noting that the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue). Finally, Marotta's conclusory and self-serving testimony that possession of this information was "inadvertent" and a "mistake" is insufficient to withstand a motion for summary judgment. Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011) (holding that subsequent self-serving deposition testimony is insufficient to raise a genuine issue of material fact). Given the fact that these documents were copied by

---

[10] The Court discusses why this information is, in fact, confidential in § III.D.1.a, infra.

Marotta simultaneously with his active planning of Emerge, the sole reasonable inference is that the documents were part of competitive activity.[11] Unsupported claims of "inadvertent" activity are therefore insufficient to raise a genuine issue of material fact.

Third, while employed by Synthes, Marotta attended several Emerge-related meetings and meals and submitted his related expenses to Synthes, all of which were reimbursed. For example, on September 2, 2009, Marotta had dinner with Charlie Knight concerning Emerge, but submitted an expense report to Synthes for the cost of dinner and identified a Dr. Fitzgerald as the Synthes customer entertained for this expense. (PSUF ¶¶ 403–08; DRPS ¶¶ 403–08.) Also in September 2009, Marotta met with Cindy Cattell from Centura Health System regarding Emerge business and billed the time and lunch to Synthes. (PSUF ¶¶ 451–60; DRPS ¶¶ 451–60.) Thereafter, in October 27, 2009, Marotta attended a meeting with Elizabeth Stoller regarding Emerge's accounting and expensed it to Synthes under the pretense that he was meeting with other Synthes employees. (PSUF ¶¶ 470–77.) A subsequent meeting with Knight about Emerge occurred on October 27, 2009, for which Synthes was again billed. (PSUF ¶¶ 480–84; DRPS ¶¶ 480–84.) Marotta later met with Stassen and Dr. Morgan for breakfast on December 15, 2009 concerning Emerge-related business, but afterward he submitted an expense report to Synthes for breakfast with a Dr. Phil Stahel and Synthes employee Richard Haschke. (PSUF ¶¶ 532–38; DRPS ¶¶ 532–38.) Finally, Marotta sought and obtained expense reimbursements from Synthes

---

[11] Defendants contend that Synthes encouraged its sales associates to attempt to obtain competitors' price lists and then reasons that "Synthes is plainly not entitled to judgment as a matter of law on the basis of its disputed claim that Marotta sent himself a price increase list to be used in a competitor's business when it openly encouraged its own sales force to engage in the exact same behavior." (Defs.' Resp. Opp'n Mot. Summ. J. 15.) This argument is irrelevant. Even assuming that Defendants are correct, such actions do not justify Marotta's actions or make them any less a breach of fiduciary duty.

76

related to a mock presentation on the Emerge business plan to a group of Marotta's professors at the University of Denver, (PSUF ¶¶ 551–60; DRPS ¶¶ 551–60), and for cell phone expenses related to Emerge. (PSUF ¶¶ 605–13; DRPS ¶¶ 605–13.)[12] "For four of the expenses identified by Synthes, Marotta admits that the meals were not for Synthes-related business, and thus they were inadvertently submitted to Synthes for reimbursement." (Defs.' Resp. Opp'n Mot. Summ. J. 17 n.7.) Certainly, using Synthes resources for the purpose of starting a competitive company rises to the level of improper "competition."

Defendants now attempt to minimize these actions by stating that, "[t]o the extent that such minimal and inadvertent submissions were deemed to be a breach, they are not a material breach, and could not entitle Synthes to more than $512 in damages." (Id.) The fact remains, however, that Defendants admit to a breach of fiduciary duty, which, in combination with the other activities, entitles Plaintiffs to summary judgment on this claim. See Mattern & Assocs., L.L.C. v. Seidel, 678 F. Supp. 2d 256, 268 (D. Del. 2010) (finding defendant's actions of providing employer with false sales reports, collecting of overpayments of draws against commissions, and charging personal expenses to the employer's line of credit constituted breaches of fiduciary duty).

Fourth and finally, Synthes provides substantial evidence in support of its allegation that Marotta, while still a Synthes employee, sent Synthes product to Orchid for reverse engineering in the initial design of Emerge product. Defendants offer two arguments in response. First, they contend that "Marotta disagreed in his deposition that Emerge was in the design development

---

[12] The Court notes that there are other instances of allegedly fraudulent expense submissions, but there appears to be disputes of material fact regarding such submissions.

phase prior to his resignation from Synthes." (Id. at 15.) Aside from the fact that Marotta's

testimony was elusive and unclear at best as to what stage Emerge's product planning was in

prior to Marotta's resignation, his self-serving testimony cannot create a genuine issue of fact

when unequivocal documentary evidence establishes that Marotta was personally sending Orchid

samples of Synthes's products for design purposes. (Pls.' Appx. 178 (emails between Orchid,

Stassen, and Marotta in early April 2010 regarding Marotta and Stassen sending samples of drill

bits to Orchid for Emerge's drill prints); Pls.' Appx. 478 (April 1, 2010 email from Orchid to

Stassen and Marotta discussing Orchid's progress on cannulated screw design on behalf of

Emerge); Pls' Appx. 486 (April 14, 2010 email from Marotta to Trafka requesting that she send

small fragment set to Orchid).[13]  Defendants' second response contends that Synthes has no

evidence that Marotta stole or converted the Synthes products that were used in the initial

product designs.  Notably, however, Marotta conceded that Emerge had no records of where it

obtained the Synthes product from, so there was no way to track the source of the product. (Id.)

In addition, the above-cited emails clearly evidence that Marotta himself sent Synthes product to

Orchid prior to the conclusion of his employment.  Finally, Stassen stated in his Declaration that,

as of May 2010, Marotta had a "significant volume" of Synthes product in his garage at his

personal residence. (Pls.' Appx. 20, Stassen Declaration ¶ 54.)  Marcy Slone confirmed that by

the time she joined Emerge in June 2010, Marotta had a significant amount of Synthes product in

his possession. (Pls.' Appx. 21, Slone Declaration ¶¶ 16–18.)  Again, notwithstanding Marotta's

---

[13] Defendants argue that even if such initial product design took place while Marotta was
employed by Synthes, such preparations were non-actionable preparation to compete.   What
Defendants fail to recognize, however, is that while Marotta was permitted to make arrangements
to compete with Synthes prior to termination of employment, he was not permitted to use
confidential information peculiar to or acquired from his employer.

ambiguous and self-serving testimony as to the source of the Synthes product, the evidence of record demonstrates that it was Marotta who obtained and supplied Synthes product for the design of Emerge's initial products.

Taken individually, these various actions may not have conclusively established a breach of fiduciary duty. Considered in conjunction, however, the Court finds that no genuine issue of material fact remains as to whether Marotta breached his fiduciary duty to Synthes. While still employed with Synthes, Marotta actively solicited existing and potential Synthes customers to "invest" in Emerge, falsely charged Emerge-related expenses to Synthes, obtained and transferred confidential Synthes information to Emerge, and took Synthes product to assist in the development of competitive products. Marotta's own testimony, which often consists of an inability to recall or an uncertainty about the details of various events, simply cannot contradict the overwhelming evidence of record that Marotta went beyond mere preparation to compete and was actually competing with his employer. Accordingly, the Court grants Synthes's Motion for Summary Judgment as to liability on its breach of fiduciary duty claim against Defendant Marotta.

**B.      Claim of Aiding and Abetting Breach of Fiduciary Duty Against Emerge**

Next, both parties seek summary judgment on Synthes's claim against Emerge for aiding and abetting both Marotta's and Brown's breaches of fiduciary duty. Synthes contends that because Marotta was Emerge's co-founder, CEO, President, Director, and Chairman of the Board, and Stassen was a co-founder of Emerge, actions of both Marotta and Stassen may be imputed to Emerge. Defendants, on the other hand, argue that even if the Court finds that Marotta breached his fiduciary duty, Synthes's claim against Emerge for aiding and abetting

79

nevertheless fails.

Under Pennsylvania law, the elements that must be proven in order to maintain a claim for aiding and abetting a breach of fiduciary duty are: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach. Reis v. Barley, Snyder, Senft & Cohen, 667 F. Supp. 2d 471, 492 (E.D. Pa. 2009). In other words, "[i]n order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 174 (3d Cir. 2002) (claim for aiding and abetting breach of fiduciary duties under ERISA); see also Restatement (Second) Torts § 876, cmt. to subsection (b) (1979) ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.").

As to the first element, the Court has already determined that Marotta breached his fiduciary duty to Synthes. No similar finding, however, has been made with respect to Brown. Indeed, in his statement—given upon reaching a settlement with Synthes and being dismissed as a defendant from this case—Brown admits only that "[f]or a period of time beginning in August 2009 through December 2009, I was actively involved in discussions concerning the development of a company that would manufacture and sell bits and screws—products competitive with Synthes' products." (Pls.' Appx. 24, Brown's Statement ¶ 51.) Although Brown concedes that he took various actions that constituted a breach of his contractual duties to

80

Synthes, at no point in this statement does he admit to any actions that go beyond mere preparation to compete and which could be construed as an unequivocal breach of fiduciary duty to Synthes. Nor does Synthes attempt to clarify for the Court precisely what actions constituted a breach of fiduciary duty by Brown. Accordingly, Synthes's claim against Emerge for aiding and abetting Brown's breach of fiduciary duty must be dismissed.

As to the second element—knowledge of the breach by the alleged aider and abettor—Defendants do not appear to dispute that any breach of fiduciary duty by Marotta would have been known to Emerge through its agents Stassen and Marotta. There is no dispute in the record that Stassen and Marotta were well aware of Marotta's actions. Therefore, the Court deems this element satisfied.

Thus, the Court is left with the third element—substantial assistance or encouragement. On this point, Defendants contend that Synthes's claim fails in two respects. First, Defendants assert that Emerge cannot be liable for any of the pre-incorporation acts (pre-January 13, 2010) of its founders. In support of this position, Defendants contend that under Pennsylvania law, the corporation will be deemed to not yet be in existence until articles of incorporation are filed by the Commonwealth. In re Rothman, 204 B.R. 143, 150 (Bankr. E.D. Pa. 1996). Consistent with that notion, Defendants cite to the general principle that "[a] corporation is not liable for torts that its promoters committed before it came into existence. Similarly, a corporation cannot sue for a tort to the promoter if the promoter did not assign the cause of action or if the cause of action is not assignable." 1A Fletcher Cyclopedia Corporations, Ch. 9 § 218 (footnotes omitted).

This principle has been clarified, however, to recognize that "[g]enerally, a corporation is not liable for torts of its promoters prior to its creation unless it has rendered itself liable by its

81

own act after acquiring corporate existence.  A corporation is not liable for the fraud, negligence, or other torts of its promoters or corporators prior to its creation, *unless it has in some way rendered itself liable by its own act after acquiring corporate existence.*" 18 C.J.S <u>Corporations</u> § 104 (emphasis added); <u>see also</u> <u>Fishkin v. Susquehanna Partners</u>, 563 F. Supp. 2d 547, 588–89 (E.D. Pa. 2008) (finding corporation liable for pre-incorporation acts of promoter constituting tortious interference with contract and holding, under Pennsylvania law, that a company may become responsible for acts that occurred before it came into existence, if it subsequently ratifies those actions.  Ratification can be "established from actions or from passive acquiescence of the directors if they had full knowledge of the facts."), <u>aff'd in part</u>, 340 F. App'x 110 (3d Cir. 2009); <u>Blackwood Coal Co., Inc. v. Deister Concentrator Co., Inc.</u>, 626 F. Supp. 727, 729 (E.D. Pa. 1985) ("A promoter's activities, however, may form the basis for corporate liability when pre-incorporation acts have been ratified by post-incorporation acts of the corporation."); <u>Nanodetex Corp. v. Defiant Techs.</u>, 349 F. App'x 312, 322 (10th Cir. 2009) ("[C]orporations are usually prevented from retaining the benefits of wrongful conduct [of promoters] while escaping liability for it."); <u>Seibold v. Camulos Partners LP</u>, No. Civ.A.5176, 2012 WL 4076182, at *22 n.10 (Del. Ch. Sept. 17, 2012) ("The Noroton Entities would unquestionably be liable if they were in existence at the time that Seibold took the documents. Because they have benefitted exactly as if they had been in existence at that time, they should be liable in the same way.  It is well-established that, if a laterformed legal entity accepts benefits from earlier offenses, it may be liable for those offenses.").

Undoubtedly, in this case, Emerge ratified the acts taken by its officers and directors prior to incorporation.  "Proof of ratification need not be confined to formal acts of the board of

directors as shown by the minutes of the meeting.  It may be established from actions or from passive acquiescence of the directors if they had full knowledge of the facts. . . ."  Blackwood Coal Co., Inc. v. Deister Concentrator Co., Inc., 626 F. Supp. 727, 729 (E.D. Pa. 1985) (quotations omitted).  In this case, Emerge ultimately benefitted from any competitive acts taken by Marotta in violation of his breach of fiduciary duty.  Moreover, via the Emerge Board Minutes of January 28, 2010, June 3, 2010, and July 29, 2010, the Emerge Board stated that it was "FURTHER RESOLVED, that any actions taken by such officers [including Marotta and Stassen] prior to the date of the foregoing resolutions adopted hereby that are within the authority conferred thereby are hereby ratified, confirmed and approved as the acts and deeds of this Company."  (Pls.' Appx. 34 & 754.)

Defendants' second argument against this claim, however, has significantly more merit.  They assert that Emerge took no action that qualified as "substantial assistance or encouragement."  To defeat this claim, Synthes argues that Emerge is liable for aiding and abetting Marotta's breach of fiduciary duty given that Marotta and Stassen, as officers and agents of Emerge, were acting together in the development of Emerge during Marotta's employment with Synthes.  It asserts that Marotta and Stassen founded Emerge and were intimately involved in each step of Emerge's development while remaining cognizant of the complications arising from Brown's and Marotta's development of Emerge during their employment with Synthes.  Ultimately, Synthes argues that Emerge aided and abetted Marotta's breach of fiduciary duty through the following actions:

- Marotta solicited Synthes's customers or employers for over $1 million in financing with the expectation that those customers would use or promote Emerge's products.

- Emerge was the direct beneficiary of that fundraising and had more than $1.25 million in the bank in March 2010 during Marotta's employment with Synthes.
- Emerge was also the direct beneficiary of Marotta's solicitations of Dr. Morgan to serve as Emerge's chief medical officer and advisor and soon-to-be director, so that he could represent the surgeon investors and surgeon community and provide validation for Emerge to the market and investors.
- Emerge also benefitted from the Synthes product and confidential, proprietary, and trade secret Synthes information Marotta acquired during his employment with Synthes, including product that was shipped to Emerge's outside vendor, Orchid, and used during Marotta's employment with Synthes to design Emerge's initial product offerings.

(Pls.' Resp. Opp'n Summ. J. 68.)

None of these facts, however, rise to the level of aiding and abetting. "In order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." Foodtown, Inc., 296 F.3d at 174 (claim for aiding and abetting breach of fiduciary duties under ERISA); see also Restatement (Second) of Torts § 876 cmt. to clause (b) ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."). In practice, liability for aiding and abetting often turns on how much encouragement or assistance is substantial enough. The Restatement suggests five factors in making this determination: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind." Bair v. Purcell, 500 F. Supp. 2d 468, 496 (M.D. Pa. 2007) (citing in part Restatement (Second) of Torts § 876(b)). Crucially, by definition, a defendant cannot both "breach" and "aid/abet" a breach in the same instance. In re Jamuna Real Estate,

84

LLC, 416 B.R. 412, 437 (Bankr. E.D. Pa. 2009).

In the present case, the only affirmative actions taken were by Marotta, the individual, in breach of his individual fiduciary duty. The facts set forth in support of the aiding and abetting claim are nothing more than Emerge's passive receipt of benefits from Marotta's actions. There is no suggestion that Emerge—as an entity—encouraged or substantially assisted Marotta's actions. Emerge provided no funding, no additional means for Marotta to carry out his acts, and no other encouragement. Moreover, Synthes sets forth no evidence that any action by Emerge was the "substantial factor in causing the resulting tort." In short, Emerge took no steps whatsoever to facilitate Marotta's breach. While Synthes is correct that the acts of agents of the corporation are acts of the corporation itself, Synthes seeks to extend the aiding and abetting theory to encompass Marotta's actions that constituted the actual breach.[14] Such logic defies the

---

[14] Synthes contends that the facts of this case mirror those in In re Total Containment, Inc., 335 B.R. 589 (Bankr. E.D. Pa. 2005). The Court disagrees. In that matter, the court found that, with respect to three of the corporate defendants alleged to have aided and abetted, "the complaint does allege, given the notice pleading standard, sufficient facts to support a theory that these three corporations rendered substantial assistance to the alleged breaches of fiduciary duties that were involved with the July 2002 transfers." Id. at 611. It noted that "[a]ll three corporations were directly involved in the challenged asset sale and distributions from TCI." Id. As to two other corporate defendants, no actions or conduct were alleged at all, and the court dismissed the aiding and abetting claim against them. Id. In so finding, it rejected the trustee's theory that these latter defendants were liable "solely because individuals that allegedly control those corporations—Dutil, Desjardins and Gouin—breached their duties to TCI, not because these corporations took any actions in substantial support thereof." Id. at 611 n.13.

This case, unlike Total Containment, is at the summary judgment stage, meaning that Synthes must not merely allege that Emerge aided and abetted Marotta's breach. Rather, Synthes must set forth evidence showing precisely how Emerge provided substantial assistance to Marotta's breach. Synthes has not done so. Moreover, in Total Containment, the corporate defendants against whom the aiding and abetting count survived were actually parties to the underlying transactions that constituted the breach. None of the conduct identified by Synthes, however, establishes that Emerge took any action whatsoever. Rather, Synthes attempts to impute liability to Emerge based solely on the fact that Marotta, the person controlling Emerge, breached his duties to Synthes, not because Emerge took any action in substantial support

principle that, by definition, "a defendant cannot both 'breach' and 'aid/abet' a breach in the same instance." Jamuna Real Estate, 416 B.R. at 437. To accept that Marotta's own breaches of fiduciary duty equated to aiding and abetting by Emerge itself would merge these two separate causes of action and result in a scenario where every employee's breach of fiduciary duty on behalf of a competitor would give rise to an aiding an abetting cause of action against the competitor who is nothing more than a passive beneficiary. Clearly, the law does not intend such a result. Accordingly, the Court grants summary judgment in favor of Defendants on this claim.

###	C.	Claim Against Marotta for Breach of Contract Under the Non-Competition and Non-Disclosure Agreements (Count II)

The next claim at issue involves Synthes's allegation that Marotta breached three separate contracts: (1) his Employee Innovation and Non-Disclosure Agreement ("NDA"); (2) his Regional Manager Non-Competition Agreement ("RM NCA"); and (3) his Sales Consultant Non-Competition Agreement ("SC NCA"). Synthes has established, and Defendants do not dispute, that the Agreements are all valid and enforceable. Rather, the parties differ regarding whether Marotta actually breached any of these Agreements, such that he is liable for breach of contract. The Court considers each agreement separately.

###	1.	The Assignment Provision of the Non-Disclosure Agreement

Under his NDA, Marotta agreed, in part, to the following:

> . . . to disclose and assign to SYNTHES as its exclusive property, all inventions and technical or business innovations, including computer software developed or conceived by me solely or jointly with others on company time or on my own time during the term of my employment, (1) that are along the lines of the businesses, work or investigations of SYNTHES or its affiliates to which my employment relates, or as to which I may receive information due to my employment, or (2) that

---

thereof. This theory was squarely rejected by Total Containment.

result from or are suggested by any work which I may do for SYNTHES or (3) that
are otherwise made through the use of SYNTHES time, facilities or materials . . .

(Pls.' Appx. 52; PSUF ¶ 237; DRPS ¶ 237.)  Relying on this provision, Synthes now argues that

it "owns"—and Marotta is required to "assign"—all of Emerge's "offerings, business models,

plans, strategies, names, logos, and slogans and all implants, instrumentation, and intellectual

property associated with them and with any other products developed or marketed by Emerge."

(Am. Compl. ¶¶ 204, 206.)

In support of this argument, Synthes, working under a plain interpretation theory, argues

that the assignment provision "explicitly protects Synthes from having key employees in whom it

invests time, money, specialized training, and access to confidential and trade secret information

using Synthes' resources to develop business ideas emanating from their work and arrogating

those ideas to themselves."  (Pls.' Mem. Supp. Summ. J. 44.)  Synthes contends that as a result of

Marotta's access to the purchasing decision-makers at customer accounts during his time with

Synthes, he was able to develop relationships and learn about the challenges facing various

customers.  It goes on to reason that Marotta and his co-founders repeatedly and affirmatively

represented that Emerge was "innovative," the "first of its kind" in the orthopedic market, "game

changing," "revolutionary," and part of a "unique distribution method."  (PSUF ¶¶ 664, 674, 678,

691–92, 696–97, 706–09.)  They included those statements in their Private Placement

Memorandum, which is governed by the truth in disclosure rules under the Securities Act of

1934, and thus must be deemed truthful.  In turn, Synthes argues that the idea and model for

Emerge constitutes a "business innovation" as set forth in the NDA.  By virtue of the fact that the

Emerge business innovation was conceived by Marotta and his co-founders during the time of his

87

employment with Synthes and was "along the lines of businesses, work or investigations of Synthes," Marotta, according to Synthes, had an affirmative contractual obligation to disclose his business innovation idea.

In response, and in its own Motion for Summary Judgment on this point, Defendants contend that the plain language of the NDA assignment provision limits its scope to assignable intellectual property and, thus, the Emerge Business Plan is not property at all and thus cannot be assigned to Emerge. In any event, Defendants argue that Synthes cannot contract to permanently prohibit employees from ever competing with it merely because the idea for a competing business arose during employment. Moreover, Defendants claim that the names, logos, slogans, and product offerings of Emerge are neither "inventions" nor "technical or business innovations" subject to the NDA.

To resolve this dispute, the Court must interpret a sparsely-worded, albeit unambiguous, contract. "A court's purpose in examining a contract is to interpret the intent of the contracting parties, as objectively manifested by them." Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994). First, the court must make the preliminary inquiry as to whether the contract before it is ambiguous. Stendardo v. Fed. Nat'l Mortg. Ass'n, 991 F.2d 1089, 1094 (3d Cir. 1993). A contract provision is ambiguous if it is susceptible of two reasonable alternative interpretations. Id. Where the written terms of the contract are not ambiguous and can only be read one way, the court will interpret the contract as a matter of law. Hullett, 38 F.3d at 111. If the contract is determined to be ambiguous, then the interpretation of the contract is left to the factfinder, to resolve the ambiguity in light of extrinsic evidence. Id.

Pennsylvania courts apply the "plain meaning rule" of interpretation of contracts, which

88

assumes that the intent of the parties to an instrument is "embodied in the writing itself, and

when the words are clear and unambiguous the intent is to be discovered only from the express

language of the agreement." Cnty. of Dauphin v. Fid. & Deposit Co., 770 F. Supp. 248, 251

(M.D. Pa.) (quotation omitted), aff'd, 937 F.2d 596 (3d Cir. 1991). "Nevertheless, a

determination whether the language of an agreement is unambiguous may not be possible

without examining the context in which the agreement arose." Hullett, 38 F.3d at 111 (citing

Steuart v. McChesney, 444 A.2d 659, 662 (Pa. 1982)). Thus, a court is not always confined to

the four corners of the written document in determining whether ambiguity exists. Id. Rather,

the court must "consider the words of the contract, the alternative meaning suggested by counsel,

and the nature of the objective evidence to be offered in support of that meaning." Id. (quoting

Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980). "Under

ordinary principles of contract interpretation, the agreement is to be construed against its drafter."

Pellegrino Food Prods. Co., Inc. v. Am. Auto. Ins. Co., 655 F. Supp. 2d 569, 577 (W.D. Pa.

2008). Moreover, in the context of assignment contracts, such as the one at issue, the

Pennsylvania Supreme Court has made clear that "where the product of an inventive mind is

sought to be appropriated under an agreement to assign to another, the language of the agreement

must be clear and show an unmistakable intention that the particular matter covered by the

invention or patent is within the intention of the parties." White Heat Prods. Co. v. Thomas, 109

A. 685, 686 (Pa. 1920).

    In the present case, the key phrase in dispute in the NDA is "inventions and technical or

business innovations." To that end, the Court finds that this language does not show an

unmistakable intention by the parties to cover the Emerge Business Plan. As evidenced by the

cases cited by Synthes, assignment provisions are valid and enforceable under Pennsylvania law, but generally involve only *patented* inventions that can be assigned under the terms of the assignment contract.  See White Heat Prods., 109 A. at 686 (upholding contract requiring assignment of patents); Mosser Indus. Inc. v. Hagar, No. Civ.A.20, 1978 WL 21734 (Pa. Ct. Com. Pl. 1978) (holding that an agreement to assign all inventions developed by the defendant during his employment with plaintiff was valid and enforceable); Voith Hydro, Inc. v. Hydro West Grp., Inc., No. Civ.A.96-1170, 1997 WL 154400, at *5–6 (N.D. Cal. Mar. 26, 1997) (applying Pennsylvania law and holding that agreement to assign inventions in the scope of employment was valid and enforceable and required assignment of patented inventions that fell within contract's ambit); Univ. Patents, Inc. v. Kligman, 762 F. Supp. 1212, 1219 (E.D. Pa. 1991) (holding that the general rule that an individual owns the patent rights in the subject matter of which he is an inventor even though he conceived of the subject matter or reduced it to practice during the course of employment may be modified by written contract).  Given this body of law, it is well-established that the term "inventions" in an assignment contract refers to patented inventions to which rights may be assigned.

The question then becomes whether the term "business innovations" in the scope of the assignment contract at issue goes beyond the realm of intellectual property.  The United States Supreme Court has recognized that business methods—such as those at issue here—are not categorically outside the scope of patent law and that some business methods are eligible for patenting.  Bilski v. Kappos, 561 U.S. 593, 130 S. Ct. 3218, 3228 (2010).  Other courts dealing with similar language in assignment contracts have generally recognized that "business innovations," while conceptually dealing with more of a methodology than a particular product,

90

still deal with recognizable intellectual property and not mere ideas. See, e.g., Rothschild v. Cree, Inc., 711 F. Supp. 2d 173, 182 (D. Mass. 2010) (interpreting assignment contract that stated that employee "hereby assign[s] and agree[s] to assign . . . [to employer] . . . all inventions and technical or business innovations developed or conceived by me, alone or with others, while I am employed . . ." to mean that the employee automatically assigns any *patent* to the employer as soon as it comes into being, so long as it was conceived while the employee was working for the employer); Freedom Wireless, Inc. v. Boston Commc'ns Grp., Inc., 220 F. Supp. 2d 16, 18 (D. Mass. 2002) (interpreting contract requiring assignment of "inventions, innovations or improvements in the Company's methods of conducting business (including new contributions, improvements and discoveries)" to reference patented inventions). Indeed, Synthes has cited no authority wherein such an assignment provision was applied and enforced outside of the intellectual property arena.

The Court's interpretation is further bolstered by the use of the word "assign" in the NDA. Black's Law Dictionary defines the word "assign" as "[t]o convey; to transfer rights or property." Black's Law Dictionary (9th ed. 2009). Accordingly, to be able to "assign," a person or entity must generally have some legally identifiable rights in the thing to be assigned. "A patent is property, title to which passes from the inventor only by assignment, and an agreement to assign will be specifically enforced. As between employer and employee, rights are determined upon the contract of employment." Marshall v. Colgate-Palmolive-Peet Co., 175 F.2d 215, 216–17 (3d Cir. 1949). Assignment contracts in employment are traditionally used to overcome the general rules that "an individual owns the patent rights in the subject matter of which he is an inventor even though he conceived of the subject matter or reduced it to practice

91

during the course of employment" and that the "mere existence of an employer-employee relationship does not of itself entitle the employer to an assignment of any inventions which the employee devises during the employment." Kligman, 762 F. Supp. at 1219 (internal quotations omitted). Again, Synthes offers no case law wherein an assignment provision similar to the one it now seeks to enforce was used outside the patent or copyright context.

Synthes's attempts to liken its assignment provision to that in the Emerge non-disclosure and assignment contracts actually highlights the Court's position. Synthes argues that its NDA "parallels assignment provisions in Emerge's own agreements with its employees," which define "inventions" as "trade secrets, inventions, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques." (Pls.' Mem. Supp. Summ. J. 46 (quoting Pls.' Appx. 147).) Notably, however, the two contracts are markedly different. After going to great lengths to define the word "inventions" as including a broad variety of items, Emerge's assignment provision requires the assignment of "all my rights, title, and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) *whether or not patentable or registrable under copyright or similar statutes*, made or conceived or reduced to practice or learned by me . . ." (Id. (emphasis added).) This provision takes specific care to indicate that its assignment provision goes beyond the standard realm of patent and copyright laws and requires assignment of any proprietary rights to any new ideas that fit within its scope. The fact that Emerge's contract eliminates the requirement of patentability or registrability suggests that had Synthes wanted to expand the scope of its NDA beyond the common scope of such contracts, it could have included similar language, particularly as the drafter of the contract. Having failed to do so, and having

92

failed to make any effort to define the terms "invention" or "technical or business innovations," it is not now entitled to a broader reading of the language it chose. See White Heat Prods., 109 A. at 686 (Pa. 1920) ("[W]here the product of an inventive mind is sought to be appropriated under an agreement to assign to another, the language of the agreement must be clear and show an unmistakable intention that the particular matter covered by the invention or patent is within the invention of the parties."); see also Pellegrino Food Prods. 655 F. Supp. 2d at 577 ("Under ordinary principles of contract interpretation, the agreement is to be construed against its drafter.") (quotations omitted).

Finally, as a policy matter, the Court must decline to adopt Synthes's interpretation of its NDA. Public policy strongly discourages contracts that create an unreasonable restraint on trade. Freedom Wireless, Inc., 220 F. Supp. 2d at 18–19. "For over one hundred years, courts have looked skeptically upon employment contracts that require an employee to assign his inventions to his employer." Id. at 18 (citing cases). "Where such contracts are open-ended with respect to time limit or subject matter, they may be considered unenforceable as against public policy." Id. To interpret the plain language of the Synthes NDA to encompass a business plan, without any indication that the contract was so intended, would contravene this policy.

Given this interpretation, the court finds that the Emerge Business Plan, as well as the other Emerge property sought by Synthes, do not fall within the NDA. With respect to the Emerge Business Plan itself, none of the Defendants has obtained any type of intellectual property protection. Moreover, nothing in the record suggests that the Emerge Business Plan could become assignable intellectual property. In an effort to avoid this conclusion, Synthes recites a litany of representations made by Emerge employees describing the Emerge business

93

plan as the "first of its kind," "unique," "innovative," and "game-changing," to assert that the Emerge business plan is a "business innovation" subject to the NDA.  It goes on to argue that the Defendants worked tirelessly to maintain the secrecy of their business plan, suggesting it had qualities of a trade secret.  These very representations that Emerge made to its customers and potential customers, however, deprive the Emerge Business Plan from being a trade secret. Under Pennsylvania law, a "trade secret" is "[i]nformation . . . that (1) [d]erives independent economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use [and] (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  12 Pa. Cons. Stat. Ann. § 5302 (2013).  To the extent information is disclosed to the public, it does not constitute a trade secret.  See generally Fishkin, 563 F. Supp. 2d at 582.  As Synthes expressly concedes that the Emerge Business Plan was disclosed, not only in Emerge's business plans, drafts of the private placement memorandum, and investor PowerPoint presentations, but also in its public relations campaign and press releases, (Pls.' Mem. Supp. Mot. Summ. J. 48), the Court does not find that the Emerge Business Plan constitutes a trade secret that falls within the ambit of the NDA.

Second, as to Emerge's name, logos, and slogans, the Court likewise finds that they are not "inventions" or "innovations" within the scope of the NDA for two reasons.  Although the name and logo are trademarked, trademark law is concerned with "secur[ing] to the owner of the mark the goodwill of his business and . . . protect[ing] the ability of consumers to distinguish among competing producers."  Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 198 (1985).  It is not designed for the same purpose as patent law, which "seeks to foster and reward

94

invention" and to "promote[] disclosure of inventions to stimulate further innovation and . . .

permit the public to practice the invention once the patent expires." Aronson v. Quick Point

Pencil Co., 440 U.S. 257, 262 (1979).  Moreover, and perhaps more importantly, the Emerge

name, logos, and slogans are neither (a) along the lines of businesses, work or investigations of

Synthes; (b) the result of any work Marotta did for Synthes; or (c) products made through the use

of Synthes time, facilities or material.[15]  (Pls.' Appx. 52.)  Accordingly, under the plain terms of

the NDA, these items are not assignable to Synthes.

       Third, Synthes offers no argument—let alone a plausible argument—as to how Emerge's

products of cannulated screws, drill bits, and guide wires constitute "inventions" or "technical or

business innovations."  As Synthes and Emerge agree, Emerge's products resulted from the

reverse engineering of Synthes's products.  Moreover, Synthes repeatedly emphasizes that

Emerge was attempting to make products identical to and compatible with Synthes's.

Accordingly, the Court finds no "invention" or "technical or business innovation" which may be

assigned.

       Finally, although the Amended Complaint alleges that Emerge itself "belongs to

Synthes," (Am. Compl. ¶ 290), Synthes has offered no argument as to how Emerge, as a

---

[15] Synthes argues that the name and logos were developed while Brown and Marotta
were employed by Synthes.  (Pls.' Resp. Opp'n Summ. J. 31 n.21.)  The phrase in the NDA that
states "developed or conceived by me . . . on company time or on my own time during the term
of my employment" modifies only the phrase "computer software."  It does not require an
employee to assign to Synthes all inventions and technical or business innovations conceived
during his/her employment unless those inventions or innovations fall within one of the three
categories set forth above.  Synthes also argues that the name and logos were developed using
Synthes's resources or time.  (Id. at 35.)  The mere fact that the name and logos were developed
while Marotta was still employed by Synthes, however, does not equate to a finding that the
name and logos were developed using Synthes's time or resources.  Nor does Synthes present any
evidence of the use of Synthes resources for development of the Emerge name or logo.

Colorado-registered corporation, is an "invention" or "technical or business innovation" for purposes of the NDA. Therefore, the Court declines to find that it falls within the assignment provision.

In sum, notwithstanding Synthes's attempt to ascribe the broadest possible interpretation to the assignment provision of the NDA, the plain meaning of the contract—read in light of the common and ordinary usage of the terms and under the principle that such contracts are to be construed narrowly and against the drafting party—suggests a much narrower interpretation. The undisputed evidence of record reveals that none of the property Synthes now seeks—the Emerge Business Plan, Emerge product offerings, Emerge name and logos, and the Emerge incorporation itself—constitute inventions or technical or business innovations within the meaning of the contract provision. Accordingly, the Court enters summary judgment in favor of Defendants and against Plaintiffs on this claim.

## 2. The Non-Competition and Non-Solicitation Provisions of the RM NCA

Both parties also seek summary judgment with respect to Synthes's claim that Marotta breached his Regional Manager Non-Competition Agreement ("RM NCA"). In his RM NCA, Defendant Marotta agreed as follows:

> NO CONTACT WITH OR SOLICITATION OF CUSTOMERS & PROSPECTS:
> I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not solicit, contact, or provide services to (or attempt to do any of the foregoing), directly or indirectly, for the purpose or effect of competing or interfering with any part of Synthes' Business: (1) any customer of Synthes within my assigned territory; (2) any Customer of Synthes that I contacted, solicited, received compensation on sales, to whom I provided coverage, or in any way support or dealt with at any time during the last two years of my employment; (3) any prospective Customer of Synthes that I contacted, for whom I had coverage responsibility, or who received or

requested a proposal or offer from me on behalf of Synthes at any time during the last two years of my employment; (4) any existing or prospective Customer of Synthes for which I had any direct or indirect responsibility at any time during the last two years of my employment . . . [the "Non-Solicitation of Customers Provision"]

NO SOLICITATION OR HIRING OF EMPLOYEES:
I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not directly or indirectly, (1) solicit, induce, or encourage any employee of Synthes to leave his/her employment with Synthes, (2) offer any employee of Synthes employment elsewhere, (3) participate in the recruitment of any employee of Synthes to work elsewhere, or (4) hire any employee of Synthes to work elsewhere. [the "Non-Solicitation of Employees Provision"]

NO COMPETITION IN SAME REGION:
I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not, directly or indirectly compete in my former Region with Synthes' Business. This means that I will not work for or be involved in the Business of any Competitor of Synthes in an executive, managerial, marketing, sales, technical, administrative or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative. [the "Non-Competition Provision"]

(Pls.' Appx. 68; PSUF ¶ 243; DRPS ¶ 243.)  The Court considers each provision individually.

### a.  Breach of the Non-Competition Provision

As set forth above, under the Non-Competition Provision, Marotta agreed that, for a period of twelve months after termination of his employment with Synthes, he would not directly or indirectly compete in his former Region with Synthes's Business in any capacity.  The "Business" is defined as "the business of developing, designing, manufacturing, and selling surgical, medical and veterinary implants, medical, biomaterial and endoscopic technologies, products and services in connection with osteosynthesis, musculoskeletal, maxillofacial and spine surgery, including, but not limited to, compression plates and screws, intermedullary nails, external fixation devices, percutaneous devices, cranio-facial implants, mandible implants, spinal

implants and screws, surgical instruments, osteobiologic and disc replacement products, and minimally invasive and endoscopic products." (Pls.' Appx. 68; PSUF ¶ 244; DRPS ¶ 244.) The term "Region" is defined as "the geographic area for which I had responsibility within the last two years of my employment with Synthes, including all accounts within the territories assigned to sales consultants in this geographic area." (Pls.' Appx. 68.) The term "Competitor" is defined to mean an "persons or entities who now, or in the future, manufacture, develop, sell, or intend to sell, technologies, products, or services in the Business described above." (Id.)

In the present case, Marotta left Synthes's employ on April 15, 2010, meaning that he was prohibited from "competing" with Synthes through April 15, 2011 in the Rocky Mountain Region, which encompassed Denver, Colorado. The evidence is undisputed, however, that during the course of his employment with Synthes and during the one year period subsequent to the termination of that employment, Marotta worked for and was involved in the business of Emerge—an admitted competitor of Synthes—in an executive, managerial, marketing, and sales capacity, both as an owner and a principal. As set forth in detail in the foregoing statement of facts, Emerge was in the business of selling the precise products sold by Synthes and it directly targeted Synthes's customers. Moreover, the undisputed evidence reveals that Marotta not only worked for Emerge, but also directly set up the business of Emerge in multiple capacities. Finally, Emerge was incorporated and maintained its principal place of business in Denver, Colorado, solicited Synthes customers for investment in the Denver area, and solicited Synthes's employees in Colorado both to obtain sample product and to offer them employment opportunities. Simply put, the extensive record before the Court leaves no genuine issue of material fact as to whether Marotta breached the Non-Competition Provision of his RM NCA.

98

Nonetheless, Defendants offer a multitude of arguments in an attempt to avoid liability, none of which this Court finds convincing. First, Defendants assert that some of Marotta's conduct was "preparatory" and not competitive, meaning that there was no breach. This argument, however, conflates the requirements necessary to show breach of fiduciary duty with the requirements necessary to show breach of a covenant not to compete. The Restatement of Agency, which governs a cause of action for breach of fiduciary duty, acknowledges that the mere fact "[t]hat a relationship of agency exists does not foreclose the possibility that it may be preceded by or followed by another type of legal relationship between the same parties, nor does it foreclose the possibility that another type of legal relationship may exist contemporaneously between the same parties." Restatement (Third) of Agency § 8.01, cmt. c. Courts have recognized that only *in the absence* of a relevant covenant not to compete may employees make preparations to compete. See New L&N Sales & Mktg., Inc. v. Menaged, No. Civ.A.97-4966, 1998 WL 575270, at *7 (E.D. Pa. Sept. 9, 1998) ("Defendants were at-will employees and were not subject to any covenants not to compete with Plaintiff once they left the company, so their formation of a competing company, and even the steps they took to form the company while still employed by L&N, was not illegal."); Mattern & Assoc., L.L.C. v. Seidel, 678 F. Supp. 2d 256, 268 n.10 (D. Del. 2010) (noting that preparations to compete which would not be actionable under a breach of fiduciary duty theory may be actionable where an employee is bound by a restrictive covenant); Spring Steels, Inc. v. Molloy, 162 A.2d 370, 375 (Pa. 1960) (noting that *absent a restrictive agreement*, an employee may make preparations to compete before the end of his employment). Accordingly, Defendants' argument is misplaced.

Second, Emerge contends that even if the Court enforces the NCA as written, Marotta did

not breach the Agreement because he did not "compete" by making any sales in his former territory. Defendants then make a lengthy argument of the plain meaning of the word "competition" and assert that courts have construed "competition" to mean only actual competition in the marketplace. (See Defs.' Resp. Opp'n Summ. J. 35 (citing cases).) As there were no sales of product by Emerge in Colorado, Defendants claim that Marotta cannot be deemed to have competed.

Notably, however, in construing a covenant not to compete, the plain language of the contract—not some extrinsic definition of the word "competition"—controls the inquiry. See Plate Fabrication & Machining, Inc. v. Beiler, No. Civ.A.05-2276, 2006 WL 14515, at *5 (E.D. Pa. Jan. 3, 2006) (holding that plain and unambiguous language of a covenant not to compete controls the contract's interpretation); Synthes USA Sales, LLC v. Harrison, 83 A.3d 242, 250 (Pa. Super. Ct. 2013) (holding that in construing a restrictive covenant, the court must determine the meaning of the contract by its contents alone when the writing is clear and unequivocal). In this case, the plain language of the non-compete agreement expressly defines what it means to not "compete." Specifically, it states that "I will not, directly or indirectly compete in my former Region with Synthes' Business. *This means that I will not work for or be involved in the Business of any Competitor of Synthes in an executive, managerial, marketing, sales, technical, administrative or product development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative.* (Pls.' Ex. 68 (emphasis added).)[16] It

_____

[16] Defendants repeatedly argue that Synthes asks for an interpretation of the word "competition" that is overbroad and contrary to law, or that Synthes is trying to unilaterally expand the plain meaning of the word. Synthes, however, only asks for the Court to enforce the interpretation of the word as it is defined in the Agreement itself, i.e., a plain language reading.

is that language to which the Court must now give effect, not some definition of the term "competition" set forth by other cases with differently-worded non-competition agreements. Contrary to Defendants' contention, nothing in the applicable definition requires that Marotta engage in sales in the restricted territory in order to have violated his non-competition agreement.

Third, Defendants contend that if the Non-Competition provision is construed pursuant to its plain language, then it is overbroad and unenforceable because it is not narrowly tailored to protect the employer's legitimate interests. Because they are disfavored, non-competition agreements are enforced only where they (1) are "incident to an employment relationship between the parties"; (2) impose "restrictions . . . reasonably necessary for the protection of the employer;" and (3) are "reasonably limited in duration and geographic extent." Hess v. Gebhard & Co., Inc., 808 A.2d 912, 917 (Pa. 2002). "A restrictive covenant is reasonably necessary for the protection of the employer when it is narrowly tailored to protect an employer's *legitimate* interests." PharMethod, Inc. v. Caserta, 382 F. App'x 214, 220 (3d Cir. 2010) (emphasis in original). Moreover, in determining whether to enforce a noncompetition covenant, the Pennsylvania Supreme Court "requires the application of a balancing test whereby the court balances the employer's protectible business interests against the interest of the employee in earning a living in his or her chosen profession, trade or occupation, and then balances the result against the interest of the public." Hess, 808 A.2d at 920.

In this case, the non-competition agreement was incident to the employment relationship between Marotta and Synthes and was admittedly reasonable in both temporal and geographic scope. There is also no doubt that Synthes has a legitimate protectible business interest in its wide array of trade secrets. The only question remaining, then, is whether the prohibition on all

employment with a competing company imposed restrictions "reasonably necessary for the protection of the employer." The Court finds that it does. Pennsylvania law recognizes that both (a) protection of an employer's customer goodwill and protection of trade secrets, confidential information, goodwill, unique or extraordinary skills, and (b) specialized training that would benefit competitors are legitimate business interests that may be protected by a non-compete agreement. Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 424 (3d Cir. 2010); see also PharMethod, 382 F. App'x at 220 ("Interests that a covenant may legitimately protect include trade secrets, confidential information, good will, and unique or extraordinary skills."). Marotta acknowledged that these were the precise interests that Synthes was trying to protect by virtue of the NCA. Specifically, the Agreement states:

> I acknowledge that: . . . (3) Synthes is in a highly competitive industry; (4) Synthes invests substantial time, money, and effort, on an ongoing basis, to train its employees with specialized skill and knowledge unique to Synthes and its Business, to develop technologies, products and services for the Business, to develop and maintain a proprietary data base of prospects, to maintain and expand its customer base, and to improve and develop its technologies, products and services; (5) from the outset of and during my employment with Synthes, I have had and will continue to have access to, receive, learn, develop and/or conceive technical, customer, prospect, financial or other information that is proprietary and/or confidential to Synthes; (6) this information must be kept in strict confidence to protect Synthes' Business and maintain its competitive position in the marketplace, and this information would be useful to Synthes' existing and potential competitors for indefinite periods of time; (7) from the outset of and during my employment with Synthes, I have had and will continue to have access to and will be required to maintain, supervise, develop and initiate customer relationships and goodwill that are valuable to Synthes and which it has a legitimate interest in protecting; (8) Synthes would be irreparably harmed by my subsequent work with, for or as a competitor of Synthes, in an executive, managerial, marketing, sales, technical, administrative, or product development capacity, due to the possibility that there would be inadvertent or other disclosures of Synthes's proprietary and/or confidential information or that there would be improper intererence with its valuable customer relationships and goodwill; . . .; and (10) the restrictions in this agreement are reasonable and necessary to protect Synthes' legitimate business interests.

(Pls.' Appx. 68; PSUF ¶ 230; DRPS ¶ 230.)  Given that the non-compete provision imposes restrictions necessary to protect the legitimate business interests of Synthes, the Court rejects this portion of Emerge's argument.[17]

Finally, Defendants assert that, even giving full force to the aforementioned language, Synthes has not produced sufficient evidence that Marotta breached the Non-Competition Agreement.  Again, Defendants disregard not only the plain language of the covenant not to compete, but also the established facts of record.  It is undisputed that, immediately following his employment with Synthes, Marotta took over as CEO of Emerge, which was in direct competition with Synthes in Colorado.  Although Marotta and Emerge may not have directly sold product in Colorado during the following year, they operated out of a base in Denver and sold products to health systems with operations in Colorado with the hope that the solicitations would result in system-wide sales, including direct sales in Colorado.  Marotta and Emerge developed, tested, and gained approval for their sales from their base in Colorado, solicited customers in the Denver area for investment, and solicited Synthes employees in Colorado to provide them with Synthes product for purposes of Emerge's intent to reverse engineer such products.  Certainly, such actions violate Marotta's contractual promise in the Non-Competition Agreement that he would not, in his former Region, "work for or be involved in the Business of any Competitor of Synthes in an executive, managerial, marketing, sales, technical, administrative or product

---

[17] See also Synthes U.S.A. v. Myer, No. Civ. A.343-EDA-2009, slip op. (Pa. Super. Ct. Sept. 9, 2009) (holding that a non-competition agreement that prohibited an employee, for a period of one year, from working for "(as an employee, consultant, contractor, agent, or representative) any competitor of SYNTHES.  Competitors shall be deemed any person or entity that now, or in the future, sells, or intends to sell, orthopedic, bone fixation, maxillofacial medical, endoscopic and/or spinal implant device or instrumentation technologies, products, or services" was valid and enforceable as protecting company's legitimate interests).

development capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or representative."

In sum, under a plain language reading of the Non-Competition Provision of the RM NCA, the Court finds an unequivocal breach by Defendant Marotta. Both during and after his employment with Synthes, Marotta used the technical skills and specialized training obtained from Synthes to create a competing company in his former region, develop competing products, finance the competitor, and actively start soliciting customers. Such conduct falls well within the ambit of the Non-Competition Provision of Marotta's RM NCA, thus entitling Plaintiffs to summary judgment on this claim.

**b.**     **Breach of the Non-Solicitation of Customers Provision**

Synthes next contends that Marotta directly and indirectly solicited and contacted, and attempted to solicit or contact, customers both during his employment with Synthes and during the one-year period of time following the termination of his employment with Synthes, for the benefit of Emerge. Synthes goes on to assert that these customers included both customers from Marotta's assigned sales region in the Rocky Mountain Region and others with whom he had contact, for whom he had responsibility, or for whom he provided coverage in the last two years of his Synthes employment. Although Marotta spoke with many of these customers under the guise of seeking investment in Emerge, gaining advice as to Emerge's business model, or attempting to get such customers to participate as directors or advisors, Synthes claims that the intent was ultimately to bring these individuals or groups on as Emerge customers. Moreover, Synthes asserts that Marotta targeted for sales hospital systems with facilities in Colorado, such as Banner Health and United Surgical Partners International ("USPI").

104

Defendants do not seek summary judgment on this cause of action, but rather suggest that there are two genuine issues of material fact precluding a grant of summary judgment in Synthes's favor.  First, they contend that contacting individual orthopedic surgeons for *investment* in Emerge was not a breach of the Non-Solicitation of Customers Provision since contacting investors and raising funds is not competition but rather is mere preparation to compete.  Second, Defendants assert that Synthes has not produced sufficient evidence that Marotta breached the Non-Solicitation of Customers Provision since he only contacted hospital *systems*.  In support of this position, they contend that the plain language of the agreement prohibits contact with "customers," which are defined as "hospitals [and] hospital employees," but does not include any reference to larger umbrella organizations such as hospital systems.  They conclude that Synthes lacks evidence that Marotta solicited any of the individual hospitals within his Regional Manager region during his last two years of employment.

Both of these arguments adopt an excessively narrow view of the Non-Solicitation of Customers Provision.  As set forth above, it provides that:

> I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not solicit, contact, or provide services to (or attempt to do any of the foregoing), directly or indirectly, for the purpose or effect of competing or interfering with any part of Synthes' Business: (1) any customer of Synthes within my assigned territory; (2) any Customer of Synthes that I contacted, solicited, received compensation on sales, to whom I provided coverage, or in any way support or dealt with at any time during the last two years of my employment; (3) any prospective Customer of Synthes that I contacted, for whom I had coverage responsibility, or who received or requested a proposal or offer from me on behalf of Synthes at any time during the last two years of my employment; (4) any existing or prospective Customer of Synthes for which I had any direct or indirect responsibility at any time during the last two years of my employment . . .

(Pls.' Appx. 68.)  Under the plain meaning of this provision, Marotta was not simply prohibited

105

from "soliciting" customers or prospective customers of Synthes within his former territory, but was prohibited from contacting or providing services to them for the purpose of competing or interfering with any part of Synthes's business.  Clearly, soliciting surgeons with whom Marotta had contact while at Synthes for purposes of investing in Emerge—a company formed to directly compete with Synthes—constituted "contact" with customers "for the purpose or effect of competing or interfering with any part of Synthes' Business."  Indeed, Defendants concede that contacting investors is "preparation to compete"—in other words an activity "for the purpose or effect of competing with Synthes"—and thus expressly prohibited by the Non-Solicitation of Customers agreement.  (Defs.' Resp. Opp'n Summ. J. 38.)

Moreover, Defendants mistakenly contend that Synthes has failed to establish that each of the surgeons who invested in Emerge was covered by the terms of the RM NCA.  Synthes alleges, and Defendants readily admit, that Emerge sought interest to invest from Drs. Morgan,[18] Motzkin, Tuttle, Furry, Laverty, Sherman, Sobky, Hak, Seipel, Meinberg, Friedland, and Moen, (PSUF ¶ 713; DRPS ¶ 713), and that all except Dr. Meinberg ultimately invested.  (PSUF ¶ 716; DRPS ¶ 716.)  Further, Defendants have conceded that Drs. Morgan, Furry, Hak, and Tuttle all worked at facilities within the Rocky Mountain Region that comprised Marotta's territory within the last two years of his employment with Synthes.[19]

---

[18]  The parties engage in a lengthy discussion regarding Dr. Morgan.  Dr. Morgan invested in Emerge and served as Emerge's Chief Medical Advisor and as a director on Emerge's Board of Directors.  Defendants contend that these activities were not competitive, particularly because Dr. Morgan never did and still does not use Emerge's products.  Having found that Marotta breached the Non-Solicitation of Employees Agreement in multiple other respects, the Court need not address this issue.

[19]  The parties dispute whether other surgeons were contacted and which surgeons actually fell within the covered territory.  For purposes of this Motion, however, it is sufficient

106

As to Marotta's argument that his discussions with the corporate departments of hospitals—as opposed to individual hospitals—did not fall within the ambit of the RM NCA, his claim must fail.  The Non-Solicitation of Customers Provision states that the term "Customer" shall include, *"without limitation*, hospitals; hospital employees who influence or may influence the use or purchase of medical devices in the Business, as defined, including materials management, operating room sterile processing, and related personnel, and physicians who use or may use the devices supplied within the Business, as defined, and their partners, employees, and staff nurses." (Pls.' Appx. 68 (emphasis added).)  Again, it strains credulity to suggest that this definition excludes "hospital systems."  At a minimum, the corporate individuals to whom Marotta spoke within these hospital systems fall within the definition of "hospital employees who influence or may influence the use or purchase of medical devices in the Business."  Even if they did not, they certainly come within the catchall "without limitation," since hospital systems were undisputedly customers of Synthes.  Defendants expressly admit that Marotta's territory included Banner Health, which has locations in multiple states including Colorado.  (PSUF ¶¶ 99, 102–03; DRPS ¶¶ 99, 102–03.)  Marotta directly solicited Banner Health System through Banner Gateway Medical Center in Gilbert, Arizona, with the understanding that if Emerge was successful at Banner Gateway, it might open up the rest of the Banner Health System to Emerge. (PSUF ¶¶ 984–86; DRPS ¶¶ 984–86.)[20]

---

for the Court to find that Marotta solicited for investment at least some surgeons who were within his former territory.

[20] Again, the parties discuss other hospital systems with facilities in the Rocky Mountain Region that Marotta may or may not have solicited during the period of his non-compete.  As the Court has already found a breach, however, a summary judgment finding on liability is appropriate.

Simply put, the evidence overwhelmingly reveals that Defendant Marotta solicited and contacted, for the direct purpose of establishing the competing business of Emerge, multiple customers of Synthes that were within his assigned territory within the last two years of his employment with Synthes. Defendants' constrained readings of who constitutes a "customer" and ill-reasoned arguments as to why Marotta's activities were not competitive with Synthes simply cannot survive judicial scrutiny. Accordingly, summary judgment shall be entered on this claim in favor of Plaintiffs and against Defendants.

**c.      Breach of the Non-Solicitation of Employees Provision**

Lastly, under the RM NCA, Synthes seeks a summary judgment ruling that Marotta directly and indirectly solicited then-current employees for positions at competitive companies during his employment and during the one-year period of time following the termination of his employment. These solicitations related to Sonoma Orthopedics Product, Inc., a competitor of Synthes, on behalf of Synthes employee Brennen Warren; solicitations related to Chance Leonard; and solicitations involving Emerge relating to Brown and Josh Gorman. All such efforts, according to Synthes, violated the Non-Solicitation of Employees Provision of the RM NCA. In response, Defendants argue that Synthes has not produced sufficient evidence regarding any of these four employees.

As set forth above, the relevant provision provided that Marotta agreed that "during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not directly or indirectly, (1)*solicit, induce, or encourage any employee of Synthes to leave his/her employment with Synthes, (2)* offer any employee of Synthes employment elsewhere, (3) participate in the recruitment of any

108

employee of Synthes to work elsewhere, or (4) hire any employee of Synthes to work elsewhere."
(Pls.' Appx. 68 (emphasis added).) Nothing in this contractual language requires that Marotta
initiate contact with the employee to get him/her to leave Synthes or that the Synthes employee
actually leave his or her employment with Synthes. Rather, Marotta remained under a one-year
restriction to avoid any type of inducement or encouragement of any Synthes employee to leave
Synthes employment. By the same token, however, nothing in this agreement expressly prohibits
mere assistance of an employee actively looking to leave Synthes. Instead, the language of
contract speaks in terms of more active involvement: "solicit," "induce," "encourage,"
"recruit[]," "offer," and "hire."

Applying this plain language interpretation, the Court finds that a genuine issue of
material fact exists as to each of the individuals that Synthes claims were solicited by Marotta.
First, as to Brennen Warren, although Marotta was involved in helping Warren obtain
employment from Sonoma Orthopedics, the level of Marotta's involvement is unclear. On
February 9, 2010, while Marotta was still employed by Synthes, Marotta emailed Stassen's father
as follows:

> Hope all is well. Thank you again for your hospitality last week and of course the
> incredible contacts. Following up from our conversation regarding Sonoma
> Orthopedics direct model rollout. I have 3 candidates whom I would highly
> recommend to the organization. They all are responsible for $3 - 4 million in sales
> and would fit the skill set we discussed.
>
> Bryan Murray - Napa Valley, CA
>
> Brennen Warren - Austin, TX
>
> Coin Brown - Las Vegas, NV (he is from Texas and would like to return to Dallas -
> however, willing to relocate anywhere)

109

I would be happy to forward on their resumes if you would like. Let me know how
I can help.

(Pls.' Appx. 355.) Thereafter, on February 12, 2010, Marotta emailed Synthes Sales Consultant

Brennen Warren stating "I have sent your resume to Glen Coleman CEO of Sonoma. I am sure

he will be in touch. Zach and I will be meeting in Austin on March 4th, would you and Laverty

be available for a dinner meeting? Thanks again Brennan and I would ask you both to keep this

meeting very confidential." (Pls.' Appx. 357.) It is undisputed that Marotta forwarded Warren's

resume to Sonoma. (PSUF ¶ 588; DRPS ¶ 588.) Nonetheless, it is also undisputed that Warren

was actively looking for another job. (PSUF ¶ 589; DRPS ¶ 589.) Given this scenario, and

absent further details of what occurred at the various meetings, the Court declines to rule, as a

matter of law, that Marotta's mere forwarding of an otherwise unsolicited resume was expressly

prohibited by his Non-Solicitation Agreement.

As to Josh Gorman, the evidence is significantly more scant. It was Gorman who initially

contacted Marotta on April 8, 2010, saying, "The more and more I think about what it is that you

are doing, the more and more I want in. If there is a fit that you see possible, please let me

know." (Pls.' Appx. 402.) In a follow up email on April 14, 2010, Gorman wrote to Marotta:

> Hope everything is going well. I just wanted to send you an email to follow up on
> the non-disclosure that you were going to send. I know you have a lot on your plate
> right now, but I also wanted to express my sincerity in being able to work with you
> in the future. I think it's obvious that we have become a commodity and it would be
> a great opportunity to grow given the current environment. Cost and product will
> always be a viable argument, however service is being removed from the equation.

(Pls'. Appx. 403.) Marotta's sole response was, "Hi Josh - please find the attached. Call me

anytime. Let's keep things off email due to both of our noncompetes. I am looking forward to

keeping up a dialogue. Talk to you soon." (Id.) While a jury could infer from this exchange that

Marotta was actively soliciting or encouraging Gorman to leave Synthes, it could just as easily find that Marotta was simply responding to Gorman's affirmative job requests and that he did nothing further. Accordingly, the Court finds that a genuine issue of material fact remains as to Gorman.

Third, with respect to Chance Leonard, the evidence is similarly sparse. On April 9, 2010, Leonard forwarded to Marotta an email exchange Leonard had with the Senior Director of Field Clinical Operations at Medtronic regarding "VP Sales Search." (Pls' Appx. 404.) Leonard also passed on his resume to Marotta stating, "As always, I would appreciate your opinion and I value your feedback." (Pls.' Appx. 404.) When asked about this email at his deposition and whether he ever discussed helping Leonard with opportunities outside of Synthes, Marotta simply stated, "Yes, we helped Chance network throughout the medical device community." (Pls.' Appx. 18, Marotta Dep. 313:9–12, June 26, 2013.) Such assistance in networking fails to conclusively establish that Marotta solicited, induced, or encouraged Leonard to work elsewhere. As such, the Court again declines to grant summary judgment in favor of Synthes on this issue.

Finally, as to Eric Brown, Synthes cites to a wealth of allegations that Brown—as detailed more thoroughly above—was an active participant in the formulation and creation of Emerge. Indeed, in November of 2009, Stassen and Brown developed a Private Placement Memorandum for Emerge to use with investors, which identified Brown as a "founder," "majority owner," "Chief Executive Officer," President," and "Chairman of the Board." (Pls.' Appx. 292.) In the twenty-first version of the draft, the memorandum stated, under "Company Ownership," that "Emerge was established in January 2010 by founders John Marotta, Zack Stassen and Eric Brown whom are company owners." (Pls.' Appx. 216.) Until the end of 2009, Marotta, Stassen,

111

and Brown all contemplated the possibility that Brown would be involved in Emerge. (PSUF ¶ 527; DRPS ¶ 527.)

Nonetheless, it is equally undisputed that, as of December 2009, the three men mutually determined that Brown could no longer participate in Emerge because of the national scope of his non-compete agreement with Synthes. (PSUF ¶ 528; DRPS ¶ 528.) As of December 16, 2009, Brown noted that "John, Zack and I met for a couple of hours last night and came to the same conclusions as our dinner conversation. The most prudent direction at this time is to respect my non-compete and delay any association or participation in the company while I am under an agreement." (Pls.' Appx. 231.) Although Synthes now argues that solicitations and recruitment need not be completed in order for there to be a breach, the record simply does not allow the Court to conclude that Marotta took any of the affirmative actions necessary for a breach of the Non-Solicitation of Employees Provision. A jury could plausibly find that although Brown actively sought to be part of Emerge—an action that Marotta may have initially encouraged—Marotta ultimately decided that any further recruitment of Brown would be in violation of contractual duties owed to Synthes. Even if the Court could determine that Marotta took some action that violated his Agreement, the fact that Brown did not leave Synthes's employ as a result of his actions undermines a finding of "resultant damages," which is an element of liability for breach of contract. See Vives v. Rodriguez, 849 F. Supp. 2d 507, 521 (E.D. Pa. 2012) (holding that the elements of a cause of action for breach of contract are "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.").

Ultimately, while the evidence certainly suggests that Marotta might have engaged in

112

some activity in violation of his Non-Solicitation of Employees Provision, there is an equally

plausible inference that Marotta did nothing more than provide passive assistance.  In light of this

remaining issue of fact, the Court must deny Plaintiffs' Motion for Summary Judgment on this

cause of action.

### 3.    Sales Consultant Non-Competition Agreement

Synthes next alleges that Marotta is liable for breaches of the Non-Solicitation of

Customers Provision in his Sales Consultant Non-Competition Agreement.  That contract stated,

in pertinent part:

> I will not, for a period of one year after my employment with Synthes terminates for
> any reason, solicit or contact, directly or through others, for the purpose of competing
> or interfering with any part of Synthes' business, (1) any customer of Synthes that I
> solicited at any time during the last three years of my employment; (2) any
> prospective customer of Synthes that received or requested a proposal or offer from
> me on behalf of Synthes at any time during the last three years of his employment;
> or (3) any customer or prospective customer of Synthes for which I had any
> responsibility, directly or indirectly, at any time during the last three years of my
> employment . . .

(Pls.' Appx. 49.)  Synthes contends that because Marotta's RM NCA did not supersede his SC

NCA, the SC NCA remained in effect and required Marotta, in the year following his resignation

from Synthes, to refrain from soliciting customers in his Synthes Arizona territory or with whom

he had contact or responsibility, or for whom he provided coverage during the last *three* years

with Synthes, *i.e.* April 1, 2007 to April 15, 2010.  As Marotta and Emerge solicited many of

those customers both for investment and regarding the purchase of Emerge products, Synthes

now argues that Marotta is liable under this provision.

Defendants, on the other hand, seek summary judgment on this issue, claiming that the

SC NCA was no longer in effect by the time Marotta resigned from Synthes.  They assert that the

SC NCA was executed in 2004 when Marotta joined Synthes. He was then promoted to Regional Manager and moved to Synthes's Colorado region effective January 1, 2008, after which he no longer had responsibility for his former Arizona sales region. In connection with his promotion, he signed a new Regional Manager Non-Compete. Defendants reason that the one-year prohibition of the SC NCA therefore began to run on January 1, 2008, leaving Marotta free to solicit customers in his Arizona region as of January 1, 2009, and meaning that, as of the time he left Synthes, his SC NCA had expired.

Defendants' interpretation is mistaken on several levels. First, it is undisputed that, pursuant to its terms, the RM NCA did not contain an integration clause or otherwise supersede the SC NCA in any manner, meaning that the SC NCA continued in full force and effect even after Marotta's January 2008 promotion. Absent such integration terms, Defendants are required to show that there was a novation. It is well established that "parties can execute two or more agreements that cover the same subject matter, and when the terms of two agreements are inconsistent and cannot stand together, the new contract takes the place of the original agreement." Parke Bank v. Bank of Am., N.A., 532 F. App'x 148, 150 (3d Cir. 2013). "A new agreement that replaces a prior agreement, and introduces a new party, is referred to as a 'novation.'" Id. The essential elements of a novation are the displacement and extinction of a prior contract, the substitution of a new contract, the consent of the parties, and the validity of the new contract. Jones v. Commonwealth Cas. Co., 100 A. 450, 452 (Pa. 1917). "The party asserting a novation . . . has the burden of proving that the parties intended to discharge the earlier contract." Buttonwood Farms, Inc. v. Carson, 478 A.2d 484, 486 (Pa. Super. Ct. 1984). Such intention "may be shown by other writings, or by words, or by conduct or by all three." Id.

114

at 487. Notwithstanding this burden, Defendants have come forward with no evidence, written or otherwise, to show that the RM NCA was intended to supersede the SC NCA.[21] Had either party intended that the latter agreement supersede the former, the contract could have, and should have, expressly said so.[22]

---

[21] Defendants assert that they are not pleading "novation," but rather a "substituted agreement." (Pls.' Reply Supp. Summ. J. 30 n.22.) Novation, however, deals precisely with substituted agreements, *i.e.* the principle that when parties execute two agreements that cover the same subject matter and the two agreements are inconsistent and cannot stand together, the new contract takes the place of the original agreement.

[22] One federal court in Pennsylvania dealt with a similar scenario, albeit in dicta, and found that absent clear evidence of novation, a subsequent non-compete does not void a prior non-compete:

It should be noted that Mr. Kent's non-compete clause was incorporated into his initial employment contract as a territory manager in the Houston, Texas area. At that time, the national scope of the non-compete provision was likely unreasonable, given that Mr. Kent only knew of accounts and prospective customers in Texas, and had far less knowledge about Metro's discounts, pricing strategy, product margins, and product development. Mr. Kent obtained more confidential information when he was promoted to regional manager. *The parties appear to assume that the terms of Mr. Kent's initial employment agreement as a "Territory Mgr-Houston" also applied to his position as a regional manager.* In this regard, section 2 of the Employment Agreement provided that Mr. Kent was to perform "such services for EMPLOYER as may, from time to time, be assigned," thus indicating that the non-compete provision would remain in effect regardless of a material change in Mr. Kent's duties. The parties also presume that interpretation of the non-compete clause should be based on when Mr. Kent's employment ended, rather than when he signed the non-compete clause. In this regard, Mr. Kent's Answer and Counterclaim do not plead novation, with substitution of a new employment contract when he became a regional manager. See Jacobson & Co. v. International Environment Corp., 235 A.2d 612, 617 (Pa. 1967) (rejecting contention that restrictive covenant in employment agreement did not apply after employee became district supervisor because novation had neither been pled nor proven). *As in Jacobson, it is unlikely that Metro would have permitted a novation because the restrictive covenant would become more important when Mr. Kent assumed the position of a regional manager.*

Intermetro Indus. Corp. v. Kent, No. Civ.A.07-0075, 2007 WL 1140637, at *6 n.6 (M.D. Pa.

Second, Defendants contend that because the RM NCA prohibits Marotta from soliciting customers for whom he had responsibility in his last two years of employment with Synthes, and the SC NCA prohibits solicitation of customers for whom Marotta had responsibility in his last three years of employment with Synthes, the two contracts are irreconcilable. In other words, if both contracts apply, it is unclear which of the "look back" periods apply once Marotta leaves employment with Synthes—the two years of the RM NCA or the three years of the SC NCA. As such, they claim that the terms of the two agreements are inconsistent and cannot stand together.

This argument, however, disregards the fact that the two contracts run concurrently and seek to cover two different territories. In requiring the execution of the SC NCA, Synthes expressed its interest in ensuring that Marotta did not solicit the customers in that region within the three years following his last Synthes-related contact with them. When Marotta signed the RM NCA, the SC NCA look back period of three years continued to run. Had Marotta remained in his Regional Manager position for more than three years before leaving Synthes's employ, the Arizona territory would no longer fall within the area of prohibited solicitation and he would have only been barred from soliciting customers within the Rocky Mountain Region which he managed in his position as a Regional Manager.[23] Once he left Synthes, however, Marotta was bound to ensure that for a period of one year, he did not (a) solicit customers or prospective

_____

April 17, 2007) (emphasis added).

[23] Synthes has produced evidence that Marotta had Synthes-related contact with his Arizona customers during his tenure as a Regional Manager in the Rocky Mountain region. As such, Synthes argues that even if only the RM NCA applies, Marotta's contact with Arizona customers upon leaving Synthes violated his non-competition agreement.

Given that the Court finds that both contracts were in force, this issue need not be resolved.

116

customers of Synthes that he solicited at any time within his Arizona region or beyond in the past

three years; and (b) solicit any customer of Synthes within his Rocky Mountain territory or any

customer that he contacted, solicited, or had responsibility for in the last two years. Read

together, these contracts contain no inconsistency and result in no unlawful extension of his non-

compete.[24]

    Third, Defendants argue that Synthes's interpretation is inconsistent with the well-

established case law and policy that non-compete agreements are to be construed narrowly and

given effect only to the degree that they "protect the employer's legitimate interests." (Defs.'

Mem. Supp. Summ. J. 29 (quoting PharMethod, Inc., 382 F. App'x at 220).) They go on to argue

that Synthes "clearly believed its legitimate competitive interests were adequately protected by a

one-year period of freedom from competition from any Synthes employee. It is unreasonable to

---

[24] Defendants cite the Utah case of Trugreen Cos., L.L.C. v. Scotts Lawn Serv., 508 F. Supp. 2d 937 (D. Utah 2007), wherein the defendants had signed multiple non-compete agreements. Id. at 950. The court found that both the old and new agreements contained non-competition provisions, the primary difference being that the new agreements only prohibited competition during the time the defendants were employed at TruGreen, while the old agreements had a six month post-termination covenant. Id. at 951. The court found that because "the new agreement covered the exact same subject matter (non-competition) with a variation on the time involved" the new agreement superseded the old agreement. Id. Moreover, the court noted that the plaintiff's letters to the employees were "undisputed evidence that TruGreen itself viewed the early agreements as having been superceded." Id. By contrast, in this case, the two agreements do not cover the same subject matter. The SC NCA was concerned about Arizona territory, while the RM NCA was concerned with the Rocky Mountain region. Moreover, there is no extrinsic, undisputed evidence that Synthes viewed the SC NCA as being superseded.

    Likewise, Defendants citations to various Massachusetts cases are inapposite. "It is well-settled under Massachusetts law that each time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed." Grace Hunt IT Solutions, Inc. v. SIS Software, LLC, No. Civ.A.12-80, 2012 WL 1088825, at *4 (Mass. Super. Feb. 14, 2012) (quotation omitted). Defendants have not identified any comparable principle under Pennsylvania law, nor is this Court aware of one.

allow Synthes to extend indefinitely the competitive restrictions in this case at least tripling the length of the restriction—by simply asserting that its non-competes remain in effect even after the employee has moved to a different job in a different region and signed a different non–compete." (Defs.' Mem. Supp. Mot. Summ. J. 31.)  They conclude that Synthes "has no legitimate protectible business interest in preventing Marotta from competing in his former sales region for more than three years after he ceased to work in that region on Synthes' behalf." (Id.)

Again, the Court finds no merit in Defendants' argument.  In both the SC NCA and the RM NCA, Marotta specifically acknowledged that he would "have access to and will be required to maintain, develop, and initiate customer relationships that are valuable to Synthes and which it has a legitimate interest in protecting" and "Synthes would be irreparably harmed by my subsequent employment by a competitor of Synthes, due to the likelihood or possibility that there would be inadvertent or other disclosures of Synthes proprietary and confidential information or that there would be improper or inappropriate interference with its valuable customer relationships." (Pls.' Appx. 49, 68.)  By virtue of the SC NCA non-compete provision, Synthes wanted to ensure that Marotta did not take Synthes clients in the Arizona territory to a competitor for at least one year after he left Synthes's employ.  This was particularly important because, as a Sales Consultant, Marotta admittedly developed close ties to many of his customers in that area. When Marotta was promoted to Regional Manager, the new non-compete had only a two-year look-back period, but expanded the solicitation prohibitions to "any Customer of Synthes within [his] assigned territory," thereby recognizing that Marotta's customer relationships were somewhat more removed.  Obviously, while Marotta remained in Synthes's employment, Synthes did not fear his improper solicitation of clients for a competitor.  Once Marotta left his

118

employment, however, he was bound to ensure that—for a reasonable period of one year—he did not violate any of the restrictions in either of his existing non-competes. Had Marotta wanted to avoid the restriction on the Arizona clients, he could have simply remained employed by Synthes for another eight months since, by then, he would have arguably not worked within the Arizona territory for more than three years.

To now read the RM NCA as superseding the SC NCA would undermine Synthes's expressed legitimate interests. In that situation, Marotta could have accepted the promotion to Regional Manager, signed the RC NCA, worked in that capacity for a week before resigning, and would have been restricted from competing with his customers in only the past *two* years instead of the past *three* years. The necessity of protecting against this scenario is highlighted by the precise circumstances of this case. Almost immediately after leaving Synthes's employ, Marotta targeted, on behalf of Emerge, multiple Synthes customers in the Arizona region, including Banner Gateway in Gilbert Arizona, (PSUF ¶ 984–85; DRPS ¶¶ 984–85), Arizona Orthopedic Surgical Hospital in Arizona, (PSUF ¶¶ 1039–46; DRPS ¶¶ 1039–46), and Chandler Regional Hospital and Mercy Gilbert Medical Center. (PSUF ¶¶ 1073–80; DRPS ¶¶ 1073–80.). Defendant admits that, in 2007, his Arizona territory included Banner Gateway Medical Center, Chandler Regional Hospital, Mercy Gilbert Medical Center, and Arizona Orthopedic Hospital. (PSUF ¶ 99; DRPS ¶ 99.) For Marotta to now argue that Synthes did not have a legitimate business interest in avoiding this exact result would contradict the plain language of the agreements he signed.

Finally, Defendants claim that Marotta understood that upon signing the RM NCA, the SC NCA was no longer in effect, and that the Court should give effect to that understanding.

119

This argument disregards well-established principles of contract interpretation:

> Pennsylvania contract law begins with the firmly settled point that the intent of the parties to a written contract is contained in the writing itself. . . . Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence, instead, the meaning of a clear and unequivocal written contract must be determined by its contents alone. . . . *Where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.* . . . Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract.

Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 92–93 (3d Cir. 2001) (emphasis added) (internal citations, quotations, and alterations omitted). In this case, the SC NCA does not indicate that it would be voided upon Marotta's transfer to a new position within Synthes or upon signature of a subsequent non-compete contract. Nor does the RM NCA indicate that it supersedes or integrates all prior agreements regarding that subject matter. Thus, the mere allegation that "Marotta understood his Regional Manager Non-Compete to be the governing agreement from that point forward," (Defs.' Mem. Supp. Summ. J. 29), without any indication of the basis for that understanding, cannot overcome the clear and unambiguous contract language at issue.[25]

In short, the Court concludes that under the plain language of the two contracts at issue,

---

[25] Synthes discusses a situation wherein Synthes employee and former Defendant Eric Brown requested and obtained a transfer to a lower level position with Synthes effective April 1, 2010. In connection with this transfer, he contacted Synthes Human Resources to inquire whether his Area Vice-President Non-Compete would be superseded by signing a Regional Manager Non-Compete in connection with his lower level position. Synthes told him that his Area Vice-President Non-Compete would remain in effect.

While Synthes's handling of this similar situation is suggestive of their intent, it is applicable only to the contract between Brown and Synthes. It does not instruct the Court whether the same result was intended in the contracts between Marotta and Synthes. As such, the Court does not consider this evidence in ruling on this issue.

the RM NCA did not supersede the SC NCA.  In light of Defendants' concessions that in the year

following his resignation from Synthes, Marotta solicited Arizona hospitals with whom he had

contact as a Synthes Sales Consultant sometime in the last three years of his employment with

Synthes, the Court must enter judgment in favor of Synthes on this claim.

### 4.    Return of Property Provision and Confidentiality and Non-Disclosure Provisions in the RM NCA and NDA

Synthes's final breach of contract claim alleges that Marotta breached Return of Property

provisions in both his RM NCA and NDA.  Specifically, under the RM NCA, Marotta agreed

that, upon termination of his employment with Synthes, he would immediately return "all

correspondence files, business card files, customer and prospects lists, price lists, product lists,

software, manuals, technical data, forecasts, budgets, notes, electronically stored information or

data, and other materials that contain any of this information." (Pls.' Appx. 68.)  The agreement

indicated that the provisions applied "even to information of this type that is developed or

conceived by me, alone or with others, at Synthes' instruction or otherwise" and that "these

provisions apply to all information I may receive that is confidential and/or proprietary to any

customer or other person or entity who does business with Synthes." (Id.)  By way of his NDA,

Marotta further agreed that ". . . upon any termination of my employment to deliver to

SYNTHES promptly all items which belong to SYNTHES or which by their nature are for the

use of SYNTHES employees only, including, without limitation, all written and other materials

which are of a secret or confidential nature relating to the business of the Company or its

affiliates . . ." (Pls.' Appx. 52.)  In addition, Marotta agreed that he would not "use publish or

otherwise disclose . . . either during or subsequent to my employment, any secret or confidential

121

information or data of SYNTHES or any information or data of others, such as, but not limited

to, sales dollars or units, product technology or product development, project information,

manufacturing methods or technology, reports or reporting systems, which SYNTHES is

obligated to maintain in confidence."  (Id.)

Synthes now contends that it is undisputed that Marotta retained (a) a fragment set and

used it for Emerge; (b) product, including Synthes product, in his home garage immediately after

the termination of his employment with Synthes; and (c) emails from his Synthes email account

following the termination of his employment with Synthes.   Based on Marotta's retention of this

information and product, and subsequent disclosure of this information and product to Emerge,

Synthes contends that it is entitled to partial summary judgment as to Marotta's liability on this

claim.  Defendants respond that genuine issues of material fact remain both as to whether

Marotta failed to return Synthes product and whether Marotta disclosed or used Synthes

information.

### a.      Small Fragment Set

With respect to the "small fragment set," Defendants argue that this set (I) belonged to a

hospital, not to Synthes; (ii) was given freely by the hospital that owned it to Marotta in his

personal capacity, since it was part of an obsolete system; and (iii) was ultimately donated by

Marotta, as the hospital requested.  Accordingly, Defendants claim that Synthes is unable to

prove that the small fragment set was actually Synthes's property at any point during which it

was in Marotta's possession.

It is undisputed that, beginning in March 2010, Marotta and Emerge were shipping

Synthes product to Orchid.  (PSUF ¶ 753; DRPS ¶ 753.)  On April 14, 2010, one day prior to his

122

resignation, Marotta emailed Trafka stating, "I can't remember if you still have that small

fragment set? If so, can you please send it and anything else I left from VetOrthx." (Pls.' Appx.

486.) Trafka sent that small fragment set to Marotta at that time. (Pls.' Appx. 39.) When asked

about that fragment set at his deposition, Marotta testified as follows:

| | |
|---|---|
| Q. | What was the small frag set that you were referring to in this document? |
| A. | I believe that was a small frag set that was an obsolete system that a hospital had given to me while I was in Arizona. They wanted me to donate it. |
| Q. | So you were given this by a customer of Synthes; am I correct, the small frag set? |
| A. | I was given it to [sic] by a hospital |
| Q. | Right. |
| A. | Which is a customer of Stryker, Smith & Nephew, DePuy, Synthes. |
| Q. | Well, among others, it was a customer of Synthes; right? |
| A. | Yes, sir. |
| Q. | And you were the sales representative for Synthes at the time that they asked you, according to your testimony, to take back this set; right? |
| A. | I believe so. |
| Q. | And you understood at that time that you didn't personally own that set, that set belonged to Synthes. |
| A. | That set did not belong to Synthes. |
| Q. | To whom did it belong? |
| A. | The hospital. |
| Q. | And they were giving it to you in your capacity as a Synthes representative; correct? |
| A. | No. They were giving it to me in my personal capacity to donate it. |
| Q. | Okay. Instead of donating it, though, you used it for development work on your VetOrthx project. |
| A. | No. VetOrthx never went anywhere. Ultimately, the set was donated. |
| Q. | Okay. So, ultimately, the set was donated? |
| A. | Sure. |
| Q. | Well, she says she has the sets and some catalogs; right? So what is she referring to? |
| A. | The set. And it was given back. It was donated. |
| Q. | To who was it donated? |
| A. | To—I had given it to—oh, I can't remember. I can't recall the exact surgeon which was going on a mission trip. |
| Q. | Well, when did you give that— |
| A. | I don't recall. |
| Q. | Was it after this date? |

123

A.    I assume so.

Q.    Were any of the sets and catalogs referred to in this document used in the design and development of the Emerge product?

A.    No, sir.  We don't—we don't make small fragment sets or small fragment screws or plates.

Q.    Well, you don't make them yet; right?

A.    We don't make them.

. . .

Q.    Did anyone from Synthes authorize you to donate the set—

A.    It wasn't Synthes's property.

Q.    —after you—let me finish. —after we had left—after you had left Synthes?

A.    Sir, Synthes's consultants donate thousands, hundreds of thousands of dollars a year in equipment to surgeons every single day, including Michel Orsinger and I in Africa.

Q.    Well, you know, I appreciate your comments, Mr. Marotta, but there's a—in my humble opinion, a very large distinction between donating sets in Africa that are sponsored by the chief executive officer of Synthes and an individual who has left Synthes, gone into competition with them, getting sets from somebody else and then doing something with them.

So let me—I just—let me just explore what happened here.  Why did you ask Victoria Trafka shortly after you resigned, or, actually, around the time you were leaving Synthes, or these sets?

A.    Because she had that—she had that and the catalog.

Q.    And she was going to be assisting Emerge in the design and development of product; right?

A.    She was.  Uh-huh.

Q.    And is it your testimony that request had nothing to do with the design and development of Emerge product?

A.    We do not make small fragment sets, sir.

Q.    That wasn't my question.

A.    That's my answer.

Q.    Is it your testimony that that had nothing to do with the design and development of Emerge products?

A.    Yes.

(Pls.' Appx. 36, Marotta Dep. 537:3–541:20, July 6, 2011.)

Victoria Trafka testified that this was a manufacturer's set that Marotta had given her out of his car, however she had no knowledge of how he came to possesses it or whether he paid for it.  (Trafka Dep. 100:21–101:13.)  She testified that she understood that Marotta had originally

124

given her the set "[f]or reference in understanding the vet project" to produce designs of veterinary orthopedic products. (Id. at 104:21–106:5.)  She did not know what became of the small fragment set subsequent to her sending it to Marotta. (Id. at 106:15–107:4.)

Synthes now argues that there is no proof that the set was ever donated to anyone and that the only reasonable inference from the evidence is that Marotta had the set shipped to him for purposes of Emerge's reverse engineering the product.  The Court, however, disagrees.  While the evidence adduced by Synthes is compelling, it is insufficient to eliminate an obvious issue of credibility.  As Emerge does not manufacture or produce small fragment sets, it is entirely possible that Marotta accurately stated that set was donated, in which case it would not have been improperly retained by Marotta following his resignation from Synthes.  On the other hand, there is a plausible inference that Marotta improperly took Synthes product for purposes of usage by Emerge.  Such a conflict is properly resolved by a jury and not by the Court on summary judgment review.

### b.    Synthes Product in Marotta's Garage

Second, Synthes argues that Marotta's retention of Synthes product in his home garage immediately after the termination of his employment with Synthes constituted a violation of his contractual obligations to return "all items which by their nature belong to or are for the use of Synthes employees only."  Defendant responds that Synthes has no evidence to establish that Marotta possessed any Synthes product that belonged to Synthes at the time he left Synthes.

On this point, Defendants have failed to create a genuine issue of material fact sufficient to avoid summary judgment.  Zachary Stassen provided a sworn statement as follows:

54.    Around early May 2010, I went to Marotta's residence in the Cherry Creek

125

area of Denver. Marotta's garage contained a mixture of implants and implements, including significant volume of Synthes-branded product. I do not know where Marotta obtained the product. I assisted Marotta in loading the Synthes product into Marotta's full-size SUV, a black GMC Yukon Denali. The products mostly filled Marotta's SUV. Some of the product was in Synthes' graphic cases and the rest of the product was in large graphic tubs.

55.    Once the product arrived at Emerge, I helped unload it. We stored it in both a large metal tool chest and a tall metal shelving unit with a black curtain over it. These receptacle held a substantial amount of Synthes product.

(Pls.' Appx. 20, Stassen Statement ¶¶ 54–55.) Stassen confirmed this statement in his June 4, 2013 deposition and indicated that he did know where Marotta had gotten the product. (Pls.' Appx. 21, Stassen Dep. 117:14–118:10.) Marcy Slone also indicated that by the time she started to work with Emerge in June 2010, Marotta had stored Synthes product at Emerge's office. (Pls.' Appx. 29, Slone Statement ¶¶ 1, 16–18.) In addition, the documentary evidence clearly indicates that, just prior to his resignation, Marotta was personally sending Orchid samples of Synthes's products for design purposes. (Pls.' Appx. 178 (emails between Orchid, Stassen, and Marotta in early April 2010 regarding Marotta and Stassen sending samples of drill bits to Orchid for Emerge's drill prints); Pls.' Appx. 478 (April 1, 2010 email from Orchid to Stassen and Marotta discussing Orchid's progress on cannulated screw design on behalf of Emerge).)

Defendants fail to produce contradictory evidence to create a genuine issue of material fact as to Marotta's failure to return Synthes product after his resignation. First, Defendants argue that Slone and Stassen did not know the source of the Synthes product in question and that the product *could* have come into Marotta's possession *after* the termination of his employment. This point is speculative at best. Aside from the fact that Marotta offers no competing explanation or evidence for how or when he came to possess this product, the fact that he had

126

Synthes product after his resignation is, in itself, a violation of his duty to return Synthes property.[26] Moreover, Defendants cite to two brief statements in Marotta's deposition wherein Marotta simply denied having any Synthes product at the time of his resignation. (Pls.' Appx 18, Marotta Dep., 72:7–9, June 26, 2013 ("Q.  At the time you left Synthes, did you personally have Synthes product in your possession?  A.  No, sir."); Pls.' Appx. 36, Marotta Dep., 477:12–19, July 6, 2011 ("[A]s a regional manager, I had no product in my possession.  I was check out in—when I moved to Denver, all my product was left in Arizona.  So I had nothing with me.  No product was ever shipped to my house, except some bone models, which were given back.  But other than that . . .").)  Notably, however, when confronted with the Stassen and Slone statements, as well as the numerous documents showing his personal shipment of Synthes product to Orchid, Stassen could offer no explanation and indicated that he simply did not recall the events, who responded to Orchid's requests, or how Synthes product came into Emerge's possession.  (Pls.' Appx. 18, Marotta Dep., 72:15–100:13, June 21, 2013.)

More importantly, contrary to Defendants' belief that this testimony alone is sufficient to create a genuine issue of material fact, it is well established that:

> "[A]s a general proposition, 'conclusory self-serving affidavits are insufficient to withstand a motion for summary judgment.'" Gonzalez v. Sec'y for the Dept. of Homeland §, 678 F.3d 254, 263 (3d Cir. 2012) (quoting Kirleis v. Dickie, McCarney, & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009).  This rule has been extended to self-serving deposition testimony.  Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011).  However, the issue is not whether Plaintiff has relied solely on his own testimony to challenge the Motions, but whether Plaintiff's testimony, when

---

[26] Defendants suggest that the Court should not find either Slone's or Stassen's testimony and statements credible.  Credibility determinations are not appropriate on summary judgment review.  Rather, for the Court to disregard statements by Slone or Stassen, there must be some evidence in the record that contradicts or undermines their statements, and thus creates an issue of material fact.

juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature. <u>Gonzalez</u>, 678 F.3d at 264 ("[T]his is a case where the court, based on all of the evidence, can say with confidence that a rational trier of fact could not credit [plaintiff's testimony]." (quotation omitted)); <u>see also</u> <u>Irving</u>, 439 F. App'x at 127 ("In light of both his earlier testimony and other record evidence, [plaintiff's] self-serving deposition testimony is insufficient to raise a genuine issue of material fact.").

<u>Johnson v. MetLife Bank, N.A.</u>, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012). Marotta's testimony—which fails to contradict Slone and Stassen's statements, neglects to explain the documentary evidence showing his shipment of Synthes product to Emerge prior to and just after his resignation, and merely claims lack of recall as to the other events of that time—simply cannot raise a genuine issue of material fact when juxtaposed against the contrary evidence. Accordingly, the Court grants summary judgment in favor of Synthes on this claim.

### c. Synthes Emails

In the final portion of this claim, Synthes contends that Marotta breached not only his NDA, but also his RM NCA, by retaining emails from his Synthes email account following his termination of employment with Synthes and then by subsequently disclosing that information to Emerge. As set forth in more detail above, while still employed with Synthes, Marotta sent various Synthes information to his personal email account, including: Synthes Fall 2009 new product pipeline and plan; Synthes 2009 usage and pricing data for Centura Health; Synthes November 2008 to October 2009 usage and pricing data for Denver Health; October 19, 2009 pricing proposal and email negotiations with Access Mediquip; October and November 2009 P&L reports; Synthes's price increase information (including an explanation of the differences from the prior year's increase); and Marotta's contacts, calendar, tasks, and notes from his Synthes Outlook account. (PSUF ¶ 937; DRPS ¶ 937.) Marotta could not recall the reason for

forwarding these documents to his personal email account. (PSUF ¶¶ 938–39; DRPS ¶¶
938–39.) After the initiation of litigation in March 2011, Emerge produced numerous emails that
were sent or received during Marotta's and Powell's employment with Synthes using Marotta's
and Powell's Synthes email accounts that each had retained after their resignations from Synthes
and during their employment with Emerge. (PSUF ¶ 946; DRPS ¶ 946.) These emails included
a presentation of an evaluation done on Synthes's performance in the surgery center market, as
well as an email concerning Synthes screws on consignment at Denver Health. (PSUF ¶¶ 947,
949; DRPS ¶¶ 947, 949.)

Notably, Defendants do not attempt to dispute that Marotta actually retained these emails
following his departure from Synthes. Indeed, Marotta concedes this fact, but simply remarks
that the retention was "inadvertent." Regardless of whether the retention was willful or
inadvertent, however, Marotta's actions constituted a breach of the provision of the NDA
requiring the return of all Synthes property upon termination of employment. Therefore, the
Court grants Synthes' Motion on this issue.[27]

The only remaining question is whether Marotta breached the RM NCA by disclosing
these emails to third parties. As noted above, Marotta agreed that he would not "use publish or
otherwise disclose (except as my SYNTHES duties may require) either during or subsequent to
my employment, any secret or confidential information or data of SYNTHES or any information
or data of others . . ." (Pls.' Appx. 52.) Defendants now contend that Synthes has no evidence

---

[27] Defendants contend that "[t]o the extent that the inadvertent retention of Synthes
information acquired during his employment constitutes breach of contract, it is only a breach in
the most technical sense, and would result at best in nominal damages. (Defs.' Resp. Opp'n
Summ. J. 49–50 n.22.) As Synthes's Motion seeks summary judgment only as to liability, the
Court need not address Defendants' argument at this time.

that Marotta ever used or disclosed this information in any way at all. It is undisputed, however, that on June 29, 2011, after leaving Synthes and commencing full-time employment with Emerge, Marotta accessed the emails from his personal account and forwarded that information to an Emerge email account. (PSUF ¶ 949; DRPS ¶ 949.) During discovery, Emerge then produced an email between Marotta and Steward Layhe of Denver Health during Marotta's employment, meaning that the email was in Emerge's possession. Although Defendants attempt to reason that Marotta only emailed the information to himself, the fact remains that Marotta and Emerge are separate legal entities and the email ended up in Emerge's possession and was accessible to any member of Emerge.[28] This was particularly egregious in light of the fact that Emerge is a direct competitor of Synthes.[29] Accordingly, the Court finds in Plaintiff's favor on this claim.

---

[28] Defendants argue that Synthes cannot identify any evidence that Marotta made use of any confidential or proprietary information in that email, and that he was likely just accessing it to get contact information for Stewart Layhe. The original email of the thread was from Stewart Layhe, a Denver Health employee, whose contact information was included in the signature block. Marotta's email from his personal address to his Emerge address contained the text "Contact info below." (Pls.' Appx. 751.)

Defendants' argument, however, is irrelevant to the current issue. The question is whether Marotta disclosed confidential and proprietary Synthes information to a third party. The evidence is clear that Marotta disclosed these emails to Emerge. To the extent that information was never *used* by Emerge or any other third party in a way that harmed Plaintiffs, Defendants can later argue lack of damages.

[29] Synthes makes the off-hand comment that the prohibition on disclosure applies to "the myriad of information [Marotta] and Emerge obtained unlawfully after his employment with Synthes ended." (Pls.' Mem. Supp. Summ. J. 56.) Defendants vehemently disagree with this statement on the ground that the contractual prohibition does not extend to post-employment information. As resolution of this dispute is not necessary for this particular issue, the Court declines to address it here.

### D.    Misappropriation

Synthes next seeks summary judgment on its allegation of misappropriation against

Emerge.  Although Defendants do not seek a contrary summary judgment ruling, they

nonetheless dispute Synthes's Motion.

The Pennsylvania Uniform Trade Secrets Act ("PUTSA") "creates a statutory cause of

action for injunctive relief, compensatory damages and exemplary damages for the actual loss

caused by misappropriation of trade secrets and the unjust enrichment caused by such

misappropriation." Youtie v. Macy's Retail Holding, Inc., 626 F. Supp. 2d 511, 522 (E.D. Pa.

2009) (citing 12 Pa. Cons. Stat. § 303–4).  PUTSA "displaces conflicting tort, restitutionary and

other law of this Commonwealth providing civil remedies for misappropriation of a trade secret,"

with the exception of "(1) contractual remedies, whether or not based upon misappropriation of a

trade secret; (2) other civil remedies that are not based upon misappropriation of a trade secret; or

(3) criminal remedies, whether or not based upon misappropriation of a trade secret."  12 Pa.

Cons. Stat. § 5308(a)–(b).

Under PUTSA, a person has misappropriated a trade secret "when he acquires knowledge

of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and

then discloses or uses that trade secret without the other's consent." Bimbo Bakeries USA, Inc.

v. Botticella, 613 F.3d 102, 110 (3d Cir. 2010) (citing 12 Pa. Cons. Stat. § 5302).  PUTSA

defines a "trade secret" as: "Information, including a formula, drawing, pattern, compilation

including a customer list, program, device, method, technique or process that: (1) [d]erives

independent economic value, actual or potential, from not being generally known to, and not

being readily ascertainable by proper means by, other persons who can obtain economic value

131

from its disclosure or use[;] [or] (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 Pa. Cons. Stat. Ann. § 5302.

Defendants now argue that Synthes is not entitled to summary judgment because Synthes has not shown: (1) that manufacturing costs, customer usage data, and product designs were trade secrets or (2) that Emerge improperly acquired or used any trade secret information. The Court addresses each argument individually.

### 1.   Whether the Items at Issue Constituted Trade Secrets

#### a.   Synthes Information Regarding Manufacturing Costs and Usage Data

To constitute a "trade secret" under PUTSA, it must be an actual secret of peculiar importance to the business and constitute competitive value to the owner. Parsons v. Pa. Higher Educ. Assistance Agency, 910 A.2d 177, 185 (Pa. Commw. Ct. 2006); see also O.D. Anderson, Inc. v. Cricks, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003) (citations omitted) ("The crucial indicia for determining whether certain information constitutes a trade secret are 'substantial secrecy and competitive value to the owner.'"). Pennsylvania courts look to the following factors to determine whether information is protected as a trade secret:

> (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

Bimbo Bakeries, 613 F.3d at 109. Whether information rises to the level of a trade secret under

132

PUTSA is a question of fact. <u>Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.</u>, No. Civ.A.11-4568, 2011 WL 6046923, at *4 (E.D. Pa. Dec. 6, 2011).

"Courts have found 'trade secrets' to include 'certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections and the terms of specific customer accounts including contract expiration dates and revenues generated.'" <u>Youtie</u>, 653 F. Supp. 2d at 621 (quoting <u>BIEC Int'l, Inc. v. Global Steel Servs., Ltd.</u>, 791 F. Supp. 489, 545 (E.D. Pa. 1992) (citing <u>SI Handling Sys., Inc. v. Heisley</u>, 753 F.2d 1244, 1260 (3d Cir. 1988) (protecting cost and pricing information for the final product); <u>Union Carbide Corp. v. UGI Corp.</u>, 731 F.2d 1186, 1191 (5th Cir. 1984) (applying Pennsylvania law to protect marketing information and strategies); <u>Air Prods. & Chems., Inc. v. Johnson</u>, 442 A.2d 1114, 1121 (Pa. Super. 1982) (protecting business plans and financial projections); <u>Alexander & Alexander, Inc. v. Drayton</u>, 378 F. Supp. 824, 833 (E.D. Pa.), <u>aff'd</u>, 505 F.2d 729 (3d Cir. 1974) (protecting the terms of specific customer accounts.))).

"Customer lists and confidential business information cannot be trade secrets if they are easily or readily obtained, without great difficulty, through some independent source other than the trade secret holder." <u>BIEC Int'l</u>, 791 F. Supp. at 545 (citations omitted). Courts have also recognized that prices charged are not protectible because they can be obtained by the customer. <u>Brett Senior & Assocs., P.C. v. Fitzgerald</u>, No. Civ.A.06-1412, 2007 WL 2043377, at *7 (E.D. Pa. July 13, 2007); <u>Tyson Metal Prods., Inc. v. McCann</u>, 546 A.2d 119, 121–22 (Pa. Super. 1988)

133

(holding that pricing information could be obtained from other sources and therefore trade secret protection was unwarranted). Nonetheless, "[a] compilation of data that has independent economic value can be protected as a trade secret." Youtie, 653 F. Supp. 2d at 621–22 (citing cases). Thus, "[t]he fact that the same information can be gathered on any one customer by talking with the customer herself is irrelevant. The value in [a company's] customer information is in the compilation, categorization, and organization of information on thousands of customers, combined with the ability to search and format it into a readily usable form. This is what a competitor does not have and cannot easily recreate." Latuszewski v. Valic Fin. Advisors, Inc., No. Civ.A.03-540, 2007 WL 4462739, at *17 (W.D. Pa. Dec. 19, 2007), aff'd, 393 F. App'x 962 (3d Cir. 2010).

The Court must now determine whether Synthes has conclusively established that the manufacturing costs and usage data at issue are trade secrets. Defendants contend that "[t]here is substantial evidence in the record that both the manufacturing costs and customer usage data identified by Synthes can be obtained from other sources." (Defs.' Resp. Opp'n Summ. J. 54.) In particular, Stassen testified that hospitals routinely share historical purchase and pricing information with vendors, including Emerge. (Stassen Dep. 256:21–257:5 ("Q. Did hospitals routinely provide similar usage data to Emerge when bidding out for business? A. Yes. Q. While you were at Emerge, were there literally hundreds of similar spreadsheets provided to Emerge by hospitals? . . . Q. If you printed them out, it would be hundreds of pages, but probably not hundreds of files.").) Likewise, according to Defendants, Marotta testified that

134

customer pricing and usage data is public. (Pls.' Appx. 36, Marotta Dep. 686:24–687:14, July 6, 2011 ("Q. Do you see that there's a series of E-mails that deal with detailed usage information for Centura? A. Uh-huh. Q. And do you see that on November 4th, 2009, that you E-mailed that information from your Synthes E-mail address to a personal address? A. I do. Q. Do you recall the reason for doing that at that time? A. No. I can tell you that this information here is immaterial. Pricing is public.").) Finally, Defendants assert that manufacturing costs and estimates are routinely obtained from vendors. (Pls.' Appx. 563, Dep. of John E. Hammill, Jr. ("Hammill Dep."), 51:9–52:7, April 29, 2013) (noting that Hammill of Hammill Manufacturing Company would have discussed prices charged to other vendors at an initial budgetary meeting with Emerge).)

Defendants' argument, however, rests on the notion that the allegedly misappropriated manufacturing and usage data consists of single product, single vendor, or single customer data. Quite to the contrary, the information constituted compilations of data. For example, the manufacturing cost data that Marotta sought from Synthes employee Preston Baus shows cost data for tens of thousands of individual Synthes products. (Pls.' Appx. 504; PSUF ¶¶ 810–12; DRPS ¶¶ 810–12.) Likewise, the usage data that Karen Foster, Synthes sales specialist, emailed to Chance Leonard in May 2010 contained usage reports for multiple facilities within the Catholic Healthcare West system and the Banner Health system. (Pls.' Appx. 582, 583.) In both of these cases, the documents did not contain information that could easily be obtained from other sources. The value of the information was in the "compilation, categorization, and

135

organization of information" on thousands of customers and products, which could not be easily recreated by a competitor's mere talking with the customers. Indeed, although Defendants suggest that they could have gotten individual bits of this information from other vendors or customers, they fail to show that they could have recreated this volume of information.

Moreover, Defendants have failed to create a genuine issue of material fact as to the other factors for whether information is a trade secret. During their employment with Synthes, Marotta, Brown, and Powell signed agreements recognizing that the identities of customers, prices, pricing policies, usage histories, and manufacturing costs were considered confidential information. (PSUF ¶¶ 232, 235; DRPS ¶¶ 232, 235.) They specifically agreed to keep this information "in strict confidence to protect Synthes's business and maintain its competitive position in the marketplace." (PSUF ¶¶ 230–31; DRPS ¶¶ 230–31.) Finally, Synthes had in place numerous measures to maintain the secrecy of this information, including policies, non-disclosure contracts with employees and vendors, and physical security measures. Accordingly, the Court deems the manufacturing costs and usage data to be protectable trade secret information.

### b.   **Product Design Information**

Synthes next argues that Emerge acquired Synthes's product designs for cannulated screws, external fixation components, locking and non-locking screws, reaming rods, and cancellous and cortical screws. Defendants contend that a genuine issue of material facts exists as to whether these product designs qualify for trade secret protection because Defendants have

136

shown that these products can be reverse engineered.  They go on to assert that Emerge did, in

fact, reverse engineer cannulated screws long before it received Synthes's designs.  As to the

other products, Emerge has never sold external fixation components, locking or non-locking

screws, reaming rods, or cancellous or cortical screws and, thus, could not have used Synthes's

designs of these products to harm Synthes.  Finally, Defendants contend that neither Emerge nor

Marotta could possibly have known that any drawings were acquired by improper means, since

Marotta testified that he did not know how or from where Emerge obtained Synthes's drawings.

Given these alleged disputes of fact, the Court should, according to Defendants, deny Synthes's

Motion.

It is clear that, under Pennsylvania law, products are not entitled to trade secret protection

if they are susceptible to reverse engineering,[30] regardless of whether the alleged

misappropriators in fact went through such an exercise or relied on their memory.  SI Handling

Sys., 753 F.2d at 1262; see also Camelot Tech., Inc. v. RadioShack Corp., No. Civ.A.01-4719,

2003 WL 403125, at *6 (E.D. Pa. 2003) ("The standard in Pennsylvania regarding reverse

engineering is that there is no trade secret 'if, at the time of disclosure or use by a

misappropriator, the allegedly secret information could have been ascertained by inspection of

sold articles or by reverse engineering.'") (quotation omitted); Permagrain Prods., Inc. v. U. S.

Mat & Rubber Co., Inc., 489 F. Supp. 108, 112 (E.D. Pa. 1980) ("[I]t is well-settled that where a

---

[30] "Reverse engineering is a process by which one analyzes a finished product and,
working backwards, designs the machine capable of producing such a product." Anaconda Co. v.
Metric Tool & Die Co., 485 F. Supp. 410, 418 (E.D. Pa. 1980).

137

product's secret can be determined through 'reverse engineering,' protection for the product cannot be claimed.").

It is equally clear, however, that "manufacturing processes, as much as products and equipment, are protectible as trade secrets." Permagrain Prods, 489 F. Supp. at 112.  Product dimensions and tolerances cannot be obtained by disassembling the product. SI Handling Sys., 753 F.2d at 1256.  "Indeed, tolerances have previously been recognized as trade secrets par excellence, because they cannot be obtained by even the most precise measurements." Id. (citing Williams v. Curtiss-Wright Corp., 681 F.2d 161, 164 (3d Cir. 1982); Ecolaire Inc. v. Crissman, 542 F. Supp. 196, 203 (E.D. Pa. 1982); Anaconda Co. v. Metric Tool & Die Co., 485 F. Supp. 410, 418 (E.D. Pa. 1990)); see also Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1230 (Pa. Super. 1989) ("Our review of the record also reveals that the nature of the product information Siemens received was sufficiently secret and detailed, including for example information regarding the tolerances of various component parts of Star's handpieces, to warrant protection); see also Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 410 (6th Cir. 2006) ("[T]he design drawings here are properly considered trade secrets even though they contain a mixture of secret information (e.g., dimensions, tolerances, and data-reference points) and non-secret information."); Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009) ("We detect no error in the District Court's conclusion that the BFC TBU manufacturing drawings pertaining to 'dimensions and tolerances, surface finishes, material selection and treatments, lubrication specifications, and special instructions for manufacture,

138

testing, and assembly,' . . . contain trade secrets under New York law.").

In the present case, the documents at issue include various design drawings, including "Critical Features" documents for Synthes's external fixation products. (Pls.' Appx. 507, 508, 513). While Defendants do not dispute that they acquired and disclosed these documents, they contend that the documents are not entitled to trade secret protection. In support of their argument, Defendants rely on their expert, Linda Braddon, who explained that reverse engineering is a common practice in the medical device community and that, in her opinion, the Emerge cannulated screws were reverse engineered and not based on Synthes's drawings. (Braddon Report ¶ 3.) Defendants also cite to Synthes's expert, Dean Preston, who testified that "it is a fairly simple matter to make a close approximation" to a product using reverse engineering. (Pls.' Appx. 750, Dep. of Dean Preston ("Preston Dep."), 258:8–259:1, Oct. 11, 2013.) According to Defendants, the evidence supports the fact that Emerge actually reverse-engineered cannulated screws long before it received Synthes's designs and Critical Features documents. Indeed, Marotta signed an agreement with Orchid to begin designing product in March 2010 and Orchid submitted preliminary drawings for cannulated screws on March 30, 2010. Orchid then submitted cannulated screw design or 510(k) approval in the summer of 2010. Yet Preston Baus, a Synthes employee, did not send Marotta the Synthes Critical Features document until July 17, 2010. Thereafter, Marotta did not forward these documents to Marcy Slone until August 2, 2010, and she did not circulate them until August 6, 2010. According to Defendants, by August 2, 2010, Emerge's screws performed as well as or better than Synthes's

139

screws. Based on the fact that Emerge was able to reverse engineer Synthes screws without the

Critical Features documents, Defendants now contend that such documents were not entitled to

trade secret protection.

Defendants' argument, however, disregards several fundamental points. First, the mere

fact that Emerge may have reverse engineered portions of Synthes's cannulated screws does not

detract from the fact that it could not reverse engineer the product tolerances and dimensions to

"seamlessly" match Synthes's screws. Contrary to Defendants' citation of Synthes's expert, Mr.

Preston actually testified that "if you were going to reverse engineer a product, it is a fairly

simple matter to make a close approximation of that. It is a different matter entirely to make one

that would seamlessly function and that you could substitute for the original product and nobody

would be the wiser." (Preston Dep. 259:6–12.) He opined that Emerge only made a close

approximation. (Id. at 259:20–21.) This opinion is supported by the fact that in the summer and

early fall of 2010 there were differences between Emerge's screws and Synthes's screws and, in

correspondence with Orchid, Emerge expressed concern regarding these differences in light of

Emerge's strategy to have its products "blend seamlessly" with the Synthes approach. (Litke

Dep. 108:19-110:4, 113:20–117:9.) As of November 2010, Ron Litke of Orchid expressed

concern about the tolerances on the radius of the circle diameter of the cannulated screws and the

dimensions of the screws in order to match Synthes's screws. (Pls.' Appx. 533.) As such, with

the Synthes Critical Features documents in hand, Orchid redesigned Emerge's screws to

eliminate some of the differences. (Litke Dep. 108:19–110:4, 113:20–117:9.) In short, contrary

140

to Defendants' assertion, the evidence is undisputed that Emerge was not able to reverse engineer the precise dimensions and tolerances of Synthes's cannulated screws prior to receipt of the Critical Features documents. Consistent with the jurisprudence recognizing that product dimensions and tolerances cannot be reverse engineered and, thus, are subject to trade secret protection, the Court likewise finds that these Critical Features documents were subject to trade secret protection.

With respect to the Critical Features documents regarding the external fixation devices, Defendants' contention that it has never sold external fixation components, locking or non-locking screws, reaming rods, or cancellous or cortical screws has no bearing on whether the Critical Features documents constituted trade secrets. Defendants do not suggest that the tolerance and dimension information contained in those documents could be obtained elsewhere or that such products could be reverse engineered. Defendants attempt to rely on Marotta's testimony that "[t]ypically, if there's a document that has tolerances, they're classified as ASTM standards," which is public information. (Pls.' Appx. 3, Marotta Dep., 50:1–13, July 5, 2011.) Notably, however, Defendants have not established that *these* particular documents are in the public domain.

In short, the Court finds that the Critical Features documents containing information about product tolerances and dimensions carry the protection of trade secret. Thus, to the extent that Marotta or Emerge misappropriated such documents, they may be liable under PUTSA.

141

## 2. Whether Emerge Misappropriated Synthes's Trade Secrets

The second portion of Synthes's claim requires Synthes to establish that Defendants actually misappropriated Synthes's trade secrets. Misappropriation can occur either by acquisition or disclosure. To establish misappropriation by acquisition under the PUTSA, a plaintiff must establish "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 12 Pa. Cons. Stat. § 5302(1). The PUTSA defines "improper means" as "[i]nclud[ing], but [ ]not limited to, theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." Id. § 5302. To establish misappropriation by disclosure under the PUTSA, a plaintiff must establish that the defendant disclosed its trade secret without express or implied consent and either:

(I) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

    (A) derived from or through a person who had utilized improper means to acquire it;

    (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

    (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Id.

142

Synthes now argues that Emerge improperly acquired the foregoing trade secrets by inducing others to breach their contractual obligations, thus constituting misappropriation. The Court addresses each type of trade secret individually.

### a.    Information Regarding Manufacturing Costs and Usage Data

First, with respect to manufacturing costs, Marotta, on behalf of Emerge, emailed Preston Baus, a former Synthes employee, on April 17, 2010, requesting that Baus send him "Synthes manufacturing costs." (Pls.' Appx. 505.) The same day, Baus sent Marotta an Excel file containing Synthes's manufacturing costs.[31] (Pls.' Appx. 504.) At the time this spreadsheet was sent, Emerge was in the "design input phase," which is "the first step in developing product so that Emerge could have it manufactured." (PSUF ¶ 814; DRPS ¶ 814.) Aside from his Sales Consultant Non-Competition Agreement, Baus had additional confidentiality and non-disclosure obligations in connection with his promotion to Market Development Manager in Switzerland, which required that he "shall not, during the term of his employment and thereafter disclose to any party of use for his own benefit any information concerning the business of the Company or any of its affiliated companies, which have become known to the Employee." (Pls.' Appx. 239.) When asked whether, in light of these contractual obligations, Marotta considered there to be anything improper about his request to Baus, Marotta conceded that this "may not have been the

---

[31] In their Response to Plaintiffs' Statement of Undisputed Facts, Defendants assert that Baus only sent Marotta Synthes's European manufacturing costs. (DRPS ¶ 811.) This assertion is belied by the evidence. In response to Marotta's request for Synthes's manufacturing costs, Baus wrote, "Found the file, this should give you everything you need! I had to trim the file down to keep it small enough to send. So its just number, description on costs, if you need European pricing let me know." (Pls.' Appx. 504.)

right request to make." (Pls.' Appx. 10, Marotta Dep. 46:22–47:3, June 27, 2013.)  Given this

undisputed evidence, together with the Court's finding that this information constituted trade

secrets, the Court must find Emerge liable for misappropriation.[32]

As to usage data, on May 19, 2010, Karen Foster, a Synthes sales support specialist,

emailed Leonard an attachment containing Synthes usage reports for multiple facilities within the

Catholic Healthcare West system and, the following day, emailed Chance Leonard the 2008 and

2009 usage files for multiple Banner Health facilities.  (PSUF ¶¶ 906–07; DRPS ¶¶ 906–07.)

On May 1, 2010, Leonard executed an *Emerge* Confidentiality and Non-Disclosure Agreement.

(Pls.' Appx. 747).  Thereafter, in early summer 2010, Marotta traveled to Arizona and recalled

visiting Leonard.  At some point in 2010, Emerge came to possess the precise usage data that

Synthes had prepared for Chance Leonard.  Stassen explained that following Marotta's May 2010

trip to Arizona, Marotta gave Stassen a thumb drive containing Excel spreadsheets with usage

data for Synthes for approximately fifteen hospitals and ambulatory surgery centers in Arizona,

which provided sales volume of particular Synthes products over a two-year time period as well

as specific pricing offered to those customers.  (PSUF ¶¶ 921–22.)  Stassen downloaded all of the

information on the thumb drive Marotta brought back from Arizona and loaded the data onto an

---

[32]  As repeatedly emphasized, Marotta was the president and CEO of Emerge and was
acting in Emerge's interests when obtaining this information.  The wrongful conduct of the
individual corporate officers and directors can be imputed to the corporation if the conduct was
committed (1) "in the course of [the officer or director's] employment, and (2) for the benefit of
the corporation."  Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d
340, 358–59 (3d Cir. 2001).

Emerge computer.[33]

Stassen explained that he used this usage data "to assess sales potential of various products and to determine the volume of various products that Emerge might manufacture" because "at this time, Emerge was in the process of determining what products to produce and what quantities to produce. This information helped Emerge make decisions about which products to produce and in what volume, which helped Emerge maximize its limited resources." (Pls.' Appx. 20 at ¶ 69.) In addition, Marcy Slone indicated that she used the Arizona usage data "often" throughout her employment with Emerge "to determine what quantities of known product to manufacture and order." (Pls. Appx. 29 at ¶ 33.) Marotta himself could offer no recollection—let alone a contrary explanation—for how Emerge obtained or may have used that information. (Pls.' Appx. 10, Marotta Dep. 125:15–129:1.) Again, absent some genuine dispute of material fact of record, the Court must find in favor of Synthes on this claim.

> **b.** **Synthes Product Drawings and Information Related to
> External Fixation Products**

As noted above, in July 2010, Preston Baus sent Synthes design drawings to Marotta, including drawings or Synthes external fixation documents. (Pls.' Appx. 507.) Defendants contend that Emerge never sold external fixation components and that Marotta specifically told

---

[33] Defendants deny that the thumb drive was from Arizona. Stassen, however, expressly testified as follows: "Q. Did you download all the information on the thumb drive Marotta brought back from Arizona onto an Emerge computer. A. Yes. Q. Do have any reason to believe that information was later deleted from an Emerge computer? A. No. Q. Do you remember what was on the thumb drive that Marotta brought back from Arizona? A. It was spreadsheets full of data." (Stassen Dep. 256:5–14.)

Baus that Emerge had no use for this information.  (Pls.' Appx. 10, Marotta Dep., 37:20–38:5, June 27, 2013.)

Such testimony, however, does not create a genuine issue of material fact for the jury. First, it is undisputed that the critical features documents were ultimately circulated among Emerge employees.  Specifically, Marotta forwarded the document to Slone's personal email address.  Slone then forwarded it to "admin@emergemedical.com" and Shane Hanson's personal email address.  (PSUF ¶ 820; DRPS ¶ 820.)  Second, even if Marotta's testimony is fully credited and a jury could find that Emerge never *used* the documents, "use" of trade secrets is not a required element of misappropriation.  Rather, a plaintiff need only show that the defendant improperly acquired or disclosed the trade secrets—facts that are clearly established by the undisputed evidence.  Given Baus's previously-discussed non-disclosure obligations, which were known to Marotta and, therefore, to Emerge, the Court finds that Emerge misappropriated these documents.

        c.        **Synthes Product Drawings and Information Related to Critical Features, Dimensions, and Tolerances for Screws Emerge Developed and Screws Emerge Identified as Additional Product Offerings**

Similarly, as noted above, on July 17, 2010, Baus sent Marotta a Critical Features document bearing the Synthes logo, which identified critical features, dimensions and tolerances for certain Synthes products, including locking, non-locking, and cannulated screws.  (Pls.' Appx. 514.)  Again, by doing so, Baus violated his contractual confidentiality arrangements with Synthes.  Marotta then forwarded this document to Stassen's personal email on July 21, 2010 and

146

Slone's personal email address on August 2, 2010. (Pls.' Appx. 516, 518.) Marcy Slone, then Vice President of Operations for Emerge, testified that she recognized that such information was confidential and proprietary to Synthes. (Pls.' Appx. 490, Dep. of Marcy Slone ("Slone Dep."), 110:16–111:18 (Sept. 12, 2011).) Nonetheless, she sent the critical features documents to Orchid. (Id. at 107:17–109:2; Pls.' Appx. 10, Marotta Dep., 51:9–11, June 27, 2013.) She explained that she sent this document to Ron Litke at Emerge to allow Orchid "to compare the Synthes Critical Features document with Emerge's prints and look for any differences." (Pls.' Appx. 29, ¶ 26.) When Orchid received this document, it discarded it because it "looked like something [Orchid] shouldn't have had" and Orchid knew "it was something that wasn't in the public domain." (Litke Dep. 71:10–72:5, 132:7–134:7.) Slone then altered the document by removing information related to products other than cannulated screws, changing the font, removing the Synthes employee email header, and substituting an Emerge logo for the Synthes logo. (Pls.' Appx. 29, Slone Statement ¶ 30.) That altered document was then re-sent to Orchid. (Pls.' Appx. 520.)

Defendants' sole response to these inculpatory facts is that Slone's testimony creates a genuine issue of material fact as to whether Emerge "used" the materials. Indeed, according to Defendants, Slone knew that some of her actions were taken without Emerge's knowledge and consent. Further, they assert that Slone often acted without Emerge's knowledge or consent. (Pls.' Appx. 10, Marotta Dep. 56:4–57:13, June 27, 2013.) Ultimately, she was terminated because of this "rogue" behavior.

147

Defendants' argument again assumes that a misappropriation action requires a showing of use. The fact remains, and Marotta does not dispute, that Marotta improperly induced Baus to send him this information in violation of Baus's contractual obligations to Synthes. Moreover, although Marotta proclaims that he had no use for this information, he promptly forwarded it to both Slone and Stassen. Such actions foreclose any dispute of material fact as to whether he misappropriated it.

> **d.      Synthes's Engineering Specifications and Information Related to Products Emerge Designed and Identified as Additional Product Offerings**

The next set of documents at issue concern Synthes documents obtained from Victoria Trafka. As set forth above, in 1998, Victoria Trafka was employed by Synthes as a manufacturing engineer at Synthes's Monument facility. (PSUF ¶ 58; DRPS ¶ 58.) In connection with her employment, Trafka executed an Employee Innovation and Non-Disclosure Agreement and reviewed Synthes's Employee Policy Manual. (PSUF ¶¶ 208–09; DRPS ¶ 208–09.) As a manufacturing engineer at Monument, Trafka's duties were to create aid to manufacturing processes and then document those manufacturing processes. (PSUF ¶ 211; DRPS ¶ 211; Trafka Dep. 44:15–4:1.) In that role, she worked directly with both product development engineers and quality control engineers. (PSUF ¶ 212; DRPS ¶ 212; Trafka Dep. 48:9–49:14.) In April or May of 2001, Trafka resigned from Synthes. (PSUF ¶ 213; DRPS ¶ 213.)

From May 2005 until December 2010, Trafka was employed by Magnum Tool

148

("Magnum"), who was a vendor used by Synthes for certain manufacturing products.  (PSUF ¶¶ 214, 218; DRPS ¶¶ 214, 218.)  During this time, Trafka agreed to maintain the confidentiality of Synthes's proprietary and confidential information accessible to Magnum employees in connection with Magnum's vendor relationship with Synthes.  (PSUF ¶ 219; DRPS ¶ 219.)  As part of her employment with both Synthes and Magnum, Trafka was privy to information about Synthes's specifications for raw materials, machining, and manufacturing of product, the finishing of Synthes products, and the inspection of Synthes products.  (PSUF ¶ 222; DRPS ¶ 222.)

In 2009, Marotta contacted Trafka regarding potential assistance with Emerge.  (PSUF ¶ 59; DRPS ¶ 59.)  Thereafter, in March 2010, Trafka began working for Emerge as a part-time consultant to assist Emerge in developing product concepts.  (PSUF ¶ 60; DRPS ¶ 60.)  On August 1, 2012, Trafka became a full-time Emerge employee under the title of Vice President of Engineering and Quality.  (PSUF ¶¶ 65–66; DRPS ¶¶ 65–66.)  Among other things, her responsibilities in that role included the design and development of instrumentation and devices used in trauma-based surgeries.  (PSUF ¶ 67; DRPS ¶ 67.)

In April 2012, Emerge produced the following Synthes documents: Design Standards—Conical Threaded Screw Heads: ES0146, Rev. D; Two Flute Drills: ES0268, Rev. A; Design Standards—Hex Recess for Bone Screws: ES0270, Rev. B; Design Standard—Stardrive Recess; Design Standard—Stardrive Antrieb—ICDS ES0272, Rev. F; Implant Quality 316L Stainless Steel 2.0 mm. 7x7x7 Cable; and Iron Betaphase in Implant

149

Quality Ti Cp Metallographic Guidelines. (Pls.' Appx. 540–45.) These documents contain standards for design and dimensioning, tolerancing, manufacturing, finishing, and inspection of certain Synthes products. (Id.)

The Court, however, finds a genuine issue of material fact as to how Emerge came to be in possession of these documents. Although Stassen indicates that he transferred these files from Trafka's thumb drive (Pls.' Appx 20, Stassen Statement, at ¶¶ 84–86), Trafka explicitly denied that this happened. (Trafka Dep., 207:1–208:11.) The documents were then found in a folder named "Victoria Flash." (Pls.' Appx. 733, 5.) All of these documents were also stored on Emerge's shared "Jungle Disk" drive. (Id.) While the evidence is certainly compelling that these documents were taken by Trafka and transferred to Emerge, there are simply too many holes in the chain of custody, coupled with Trafka' own denial, for the Court to conclusively find that a misappropriation of these documents by Emerge occurred.

e.     **Drawings and Information Related to Synthes Cortical and Cancellous Screws and Product Emerge Identified as Additional Product Offerings**

In the spring of 2010, Emerge and Hammill Manufacturing began discussing the manufacturing of certain products. (PSUF ¶ 870; DRPS ¶ 870.) Initially, the discussions focused on quotes for the manufacture of Emerge's drill bits, guide wires, and cannulated screws, but, as of May 19, 2010, Hammill decided to pass on Emerge's request as to the manufacture of Emerge's cannulated screws. (PSUF ¶¶ 874–75; DRPS ¶¶ 874–75.) Nonetheless, Marotta and Hammill continued to meet regarding the budgetary pricing for Emerge's screws. (PSUF ¶¶

150

876–78; DRPS ¶¶ 876–78.)  On June 4, 2010, Marotta indicated that he sent prints to Hammill. (Pls.' Appx. 572.)  Thereafter, on June 15, 2010, Mike Librot of Hammill forwarded a "Cancellous Screw Quote from Hammill Manufacturing" to Slone and Marotta. (Pls.' Appx. 575.)

Subsequently, pursuant to a subpoena, Hammill Manufacturing produced documents, including a "quote file" with six Synthes drawings for cancellous and cortical screws that it used to draw up the quote for Emerge. (PSUF ¶ 886; DRPS ¶ 886.)  John Hammill of Hammill Manufacturing testified that somebody at his company had to have seen the drawings in order to produce the quote and that he was likely the one who obtained them from Emerge, and most likely from Marotta.  (Hammill Dep., 72:8–74:8.)  Although Marotta testified that he had no knowledge of how Hammill came into possession of these drawings, he did indicate that Slone was the source of the information.  (PSUF ¶¶ 887–89; DRPS ¶¶ 887–89.)  He further admitted that the information Hammill possessed contained the same product design information, with Synthes logos obscured, as Synthes design information.  (PSUF ¶ 896; DRPS ¶ 896.)  Slone herself conceded that she had obscured certain information on the Synthes cortical and cancellous screw prints with white labels and correction tape before sending the paper copies to Hammill.  (Pls.' Appx. 29, Slone Statement ¶¶ 10, 21.)

Defendants do not attempt to rebut any of this information other than by disavowing the actions of Slone.  The evidence, however, clearly reflects Marotta's involvement in dealings with Hammill and his participation in sending design information to Hammill.  Moreover, nothing in

151

the record suggests that Slone was acting outside the scope of her employment with Emerge when sending this design information. Accordingly, the Court finds in favor of Synthes on this point.

### f. Strategic Business Planning Information Related to Companies Affiliated with Prospective Emerge Investors and Advisors

The last piece of information that Synthes accuses Emerge of misappropriating is strategic business planning information related to companies affiliated with prospective Emerge investors and advisors. Synthes asserts that, on January 10, 2010, Ken Carpenter of Synthes emailed to Eric Brown, former Area Vice President of Sales for Synthes Trauma, a Business Development Discussion Slide Deck labeled "Extremely Confidential," which contained information regarding Synthes's business plans and acquisition strategies. At the end of January 2010, Brown showed Stassen this Slide Deck since several of the companies targeted for acquisition were part of Stassen's father's partnership's portfolio. Although Stassen declined to email the list to his father, he described the information he saw in detail.

Synthes's misappropriation claim with respect to this material fails in several respects. First, aside from the fact that Synthes itself described this information as "Extremely Confidential," Synthes has made no showing that this information was entitled to legal trade secret protection. Second, although Stassen was Chief Operating Officer ("COO") of Emerge, nothing in this evidence reflects that Stassen was working in that capacity or was otherwise acting on behalf of Emerge when he shared that information with his father. Indeed, an entirely logical and reasonable inference is that Stassen was acting in his role as an investment banker

152

and the son of another investment banker, rather than in his capacity as COO of Emerge. Therefore, the Court finds that a genuine issue of material fact remains on this point and that Synthes is not entitled to summary judgment.

### 3.    Conclusion as to Misappropriation

In sum, the Court finds that Synthes has established, as a matter of law, that Synthes's Manufacturing Costs, Usage Data, and Product Design information—in the formats at issue here—constituted unequivocal trade secret information, but that the Business Development Discussion Slide Deck did not.  Moreover, the Court also finds that the evidence clearly establishes Emerge's misappropriation of the manufacturing cost data, usage data, and much of the product design information, but that genuine issues of material fact remain as to several of the individual items identified above.  Accordingly, the Court grants summary judgment in favor of Synthes in part and denies it in part.

### E.    False Advertising Under the Lanham Act

The final claim on which Synthes seeks summary judgment is its allegation of false advertising against Emerge, Marotta, and Powell under the Lanham Act.  As a matter of course, Defendants contend that summary judgment on this issue is precluded by a genuine issue of material fact, but they do not themselves seek summary judgment on the claim.

Section 43(a) of the Lanham Act states, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

153

. . .

> (B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  To state a claim for false advertising, a plaintiff must plead facts alleging that the defendant made false or misleading statements or descriptions of fact in commercial advertising or promotion that "misrepresent[ed] the nature, characteristics, qualities, or geographic origin of his . . . goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).  "Only statements of fact capable of being proven false are actionable under the Lanham Act because, when personal opinions on nonverifiable matters are given, the recipient is likely to assume only that the communicator believes the statements, not that the statement is true." Parker v. Learn Skills Corp., 530 F. Supp. 2d 661, 679 (D. Del. 2008) (citations omitted). "[M]isdescriptions or false representations of specific characteristics of a product," which are actionable under the Lanham act, are distinguished from puffery, which is not actionable. Castrol, Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993).  The Third Circuit defined puffery as "exaggeration or overstatement expressed in broad, vague and commendatory language."  Id.

The false or misleading claim may be proved in one of two ways.  The movant must show that "the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." Novartis Consumer Health, Inc. v.

154

Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002). If the complainant can show literal falsity, "the court may grant relief without reference to the advertisement's impact on the buying public." Castrol Inc., 987 F.2d at 943. However, "only an unambiguous message can be literally false;" if the message is susceptible of more than one meaning, the complainant cannot assert literal falsity. See id. at 587. Where the movant is unable to demonstrate that the complained-of statement is literally false, a Lanham Act violation may still be established by proving that the commercial makes a false or misleading claim and that a substantial portion of consumers actually understand the ad to be making that claim. See Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc., 19 F.3d 125, 129 (3d Cir. 1994).

Defendants now argue that Plaintiffs are not entitled to summary judgment on this issue because: (1) Synthes has not demonstrated that the statements alleged to be misleading were sufficiently disseminated to constitute advertising or promotion; (2) whether the statements were false on their face is a disputed issue of fact; and (3) Synthes cannot establish damages under the Lanham Act.[34] As the Court finds that Synthes's claim fails at the first of these arguments, the Court limits its discussion to that point.

"The threshold matter in addressing an alleged false statement actionable under 15 U.S.C. § 1125(a)(1)(B) is whether the statement constitutes 'commercial advertising or promotion.'"

---

[34] Defendants also contend that to the extent Synthes relies on statements made by third parties, those statements are not actionable. Synthes concedes in its Reply Brief that it does not rely on any such statements.

155

Premier Comp Solutions, LLC v. Penn Nat'l Ins. Co., No. Civ.A.07-1764, 2012 WL 1038818, at
*7 (W.D. Pa. Mar. 28, 2012) (quoting 15 U.S.C. § 1125(a)(1)(B)).  In the absence of an express
definition of "commercial advertising or promotion" in the Lanham Act, courts have developed a
four element test to define these terms in accordance with the Act's language and congressional
intent.  Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 455–56 (D.N.J.
2009); Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc., 515 F. Supp. 2d 565, 578
(W.D. Pa. 2007).  "Commercial advertising or promotion for purposes of the Lanham Act
consists of (1) commercial speech; (2) by a defendant in commercial competition with the
plaintiff; (3) designed to influence customers to buy the defendant's products; (4) that is
sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion
within the industry."  Synygy, Inc. v. Scott-Levin, Inc, 51 F. Supp. 2d 570, 576 (E.D. Pa. 1999).
Only after determining that the relevant statement constitutes commercial advertising or
promotion does a court consider the remaining elements of a Lanham Act claim based on a false
or misleading representation of a product under 15 U.S.C. § 1125(a)(1)(B).  Premier Comp
Solutions, 2012 WL 1038818, at *7.  While courts disagree about whether the Lanham Act
reaches certain oral statements, it is well-settled that the challenged statements, at the very least,
must be "widely disseminated" and "part of an organized campaign to penetrate the relevant
market."  Fashion Boutique v. Fendi USA, Inc., 314 F.3d 48, 56–57 (2d Cir. 2002). "Although
advertising is generally understood to consist of widespread communication through print or
broadcast media, 'promotion' may take other forms of publicity used in the relevant industry,

156

such as displays at trade shows and sales presentations to buyers." Id. at 57.

Notably, it is well established that "isolated statements to potential customers generally do not constitute sufficient dissemination to be defined as advertising within the meaning of the Lanham Act" and "private statements to competitors—without more—falls short of commercial advertising as defined in the Act." Pitney Bowes, Inc. v. ITS Mailing Sys. Inc., No. Civ.A.09-5024, 2010 WL 1005146, at *5 (E.D. Pa. Mar. 17, 2010) (emphasis omitted) (citing Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc., No. Civ.A.00–3683, 2001 WL 856946, at *11 (E.D. Pa. July 26, 2001) ("Generally, isolated private statements are not sufficiently disseminated to constitute advertising.")). Thus, "[p]roof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement," and "isolated disparaging statements do not have redress under the Lanham Act." ConsulNet Computing, Inc. v. Moore, No. Civ.A.04-3485, 2007 WL 2702446, at *11 (E.D. Pa. Sept. 12, 2007) (quotations omitted).

In the present case, it is undisputed that Emerge and Marotta created a defined corporate marketing structure overseen by Powell as Emerge's Vice President of U.S. Sales. Prior to entering into its exclusive distributorship agreement with Cardinal Health on June 20, 2012, Emerge would begin the sales process by approaching a hospital system directly—either by phone, email or in person, through corporate supply chain management. Emerge would then describe its method of not relying on sales reps and would make representations about the characteristics and performance of its products. These statements were made via phone calls, emails, in-person meetings, websites, printed materials, presentations, trade show displays, and

157

social media.  Through all of these mediums, Emerge would discuss and compare Emerge

product to other competitors in the marketplace, including Synthes.  They would also make

representations about the quality of Emerge products, such as the statement that Emerge's

products had gone through 510(k) clearance and had been tested against Synthes as a predicate

device.  Synthes now contends that these precise representations were literally false.

Notwithstanding the truth or falsity of such representations, however, Synthes fails to

establish that the allegedly false statements were sufficiently disseminated as to constitute

advertising.  At the Motion to Dismiss stage, this Court remarked that "[a]t first blush—and

taken in isolation—these allegations [of the Complaint] appear to identify only sporadic

instances of dissemination, in lieu of the requisite public dissemination of the purportedly false

advertising.  Upon closer reading, however, the reasonable inferences from these allegations

suggest that they merely exemplify a broad and widespread dissemination of the statements to the

relevant purchasing public, such that they constitute advertising or promotion within the

industry."  Synthes, Inc. v. Emerge Med., Inc., No. Civ.A.11-1566, 2012 WL 4205476, at *33

(E.D. Pa. Sept. 19, 2012).  Discovery, however, has not borne out these inferences, still leaving

only the sporadic instances of dissemination.  Although Synthes claims to have shown that

"Defendants repeatedly represented through multiple means of communication and to hundreds

of recipients that Emerge drill bits, guide wires and screws are 'identical to' or 'replicas' of those

made by Synthes and that 'there is literally no difference in the implants," (Pls.' Reply Supp.

Summ. J. 66), Synthes's citation to the record does not reveal that false statements were

158

disseminated to hundreds of customers and potential customers. Indeed, upon careful review of the evidence cited by Synthes, the identified recipients include Banner Health and several other Banner Health Facilities, Phoenix Children's Hospital, Memorial Herman Hospital, USPI facilities, Presbyterian Health Services, Premier Inc., Healthcare Management, BNYHA, Fairview Health Services, and several other hospitals in the Arizona, Texas, Massachusetts, Georgia, and California regions. (PSUF ¶¶ 1094, 1114–20, 1131–33, 1160.) By all accounts, however, the relevant orthopedic device market is national since each hospital and surgeon is a potential customer. (See PSUF ¶¶ 668–69 (conceding that Emerge's target market was the entire $92 million U.S. device market and that it chose to focus initially on the $2 billion trauma segment of the orthopedic market).) At best, then, Synthes has only established that Emerge made allegedly false statements to some customers or potential customers of Emerge and not that Emerge has widely disseminated such statements throughout the relevant market. Absent a conclusive showing on this issue, Synthes is not entitled to summary judgment on this claim.

### F.   Computer Fraud and Abuse Act

Defendants seek summary judgment as to Count VI, in which Synthes alleges that Defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 (2012).[35] The CFAA, although initially a criminal statute that penalized computer hacking activities, presently authorizes private civil actions in certain situations. P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504, 510 (3d Cir. 2005) (citing 18 U.S.C. §

---

[35] Synthes does not seek summary judgment on this claim.

159

1030(g)).  To bring a claim pursuant to § 1030(a)(4) of the CFAA, a plaintiff must allege: (1) that

the defendant has accessed a "protected computer;" (2) has done so without authorization or by

exceeding such authorization as was granted; (3) has done so "knowingly" and with "intent to

defraud;" and (4) as a result has "further[ed] the intended fraud and obtain [ed] anything of

value." 18 U.S.C. § 1030(a)(4).  The CFAA provides that "[a]ny person who suffers damage or

loss by reason of a violation of this section may maintain a civil action against the violator." 18

U.S.C. § 1030(g).

      The statute defines "loss" as "any reasonable cost to any victim, including the cost of

responding to an offense, conducting a damage assessment, and restoring the data, program,

system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or

other consequential damages incurred because of interruption of service."  18 U.S.C. §

1030(e)(11).  Courts have held that, to fall within this definition, the alleged "loss" must be

related to the impairment or damage to a computer or computer system.  Fontana v. Corry, No.

Civ.A.10-1685, 2011 WL 4473285, at *7 (W.D. Pa. Aug. 30, 2011); see also Clinton Plumbing

& Heating of Trenton, Inc. v. Ciaccio, No. Civ.A.09-2751, 2010 WL 4224473, at *6 (E.D. Pa.

Oct. 22, 2010) ("Various courts have interpreted 'loss' to mean the remedial costs of

investigating a computer for damage, remedying damage done, and costs incurred while the

computer is inoperable.").  Thus, lost revenue resulting from an interruption of service or the

inoperability of computers constitutes "loss" for purposes of the statute.  Fontana, 2011 WL

4473285, at *7–8 (citing cases).  Notably, however, a claim for future lost revenue due to the

dissemination of trade secrets does not qualify as a "loss" under the CFAA. Clinton Plumbing, 2010 WL 4224473, at *6 (citing cases). Likewise, harm to ongoing business ventures, i.e., an alleged loss of business, is insufficient to show "loss." Fontana, 2011 WL 4473285, at *8. Finally, a "loss of assets, overdraft fees, returned check fees, late fees, reputational damages arising from a damaged credit score, and termination of certain contracts due to insufficient funds for payment" are insufficient to constitute loss. Clinton Plumbing, 2010 WL 4224473, at *7. A failure to prove a cognizable loss is a basis for a grant of summary judgment on a CFAA claim. Grant Mfg. & Alloying, Inc. v. McIlvain, No. Civ.A.10-1029, 2011 WL 4467767, at *5 (E.D. Pa. Sept. 23, 2011).

In an effort to establish loss in the present case, Synthes argues as follows:

> [T]he loss Synthes incurred and for which it seeks to recover is its "reasonable costs" of "responding to an offense, conducting a damage assessment, and restoring the data, program, system or information prior to the offense. . . ." 18 U.S.C. § 1030(e)(11). In addition, the "damage" for which Synthes seeks to recover includes "impairment to the integrity" of Synthes' system and the data on that system." . . .
>
> . . .
>
> Here, the amount of time, energy and financial resources Synthes spent investigating what happened to its confidential information and who was responsible, which totaled over $5,000 in a one year period, constitutes harm. Specifically, due to Defendant's actions in soliciting and obtaining Synthes' information in violation to the CFAA, Synthes hired a forensic consultant to assess when and how Defendants accessed its confidential information, the extent of the loss, and the results of these unlawful acts. This investigation yielded admissible evidence as to the harm that Defendants' conduct caused to Synthes. Synthes expert Brian T. Wolfinger drafted an extensive report pertaining to precisely the quantification of the monetary harm as to Synthes' expenses for the consultants' imaging, analysis and storage of the data at issue. . . . Moreover, Defendants had the opportunity to depose Wolfinger in the course of discovery.

161

(Synthes Resp. Opp'n Summ. J. 97–98.)

This argument, however, conflates loss resulting from the establishment/litigation of a misappropriation of data claim with loss relating to investigation of damage to the integrity of a computer system. This distinction was examined in Brooks v. AM Resorts, LLC, 954 F. Supp. 2d 331 (E.D. Pa. 2013). In that case, the plaintiff alleged that the defendant had violated the CFAA when it accessed his computer in March 2010. Id. at 338. In February 2011, the plaintiff filed the complaint and, in the eleven month interim, had not hired anyone to assess and/or remedy the damage to his computer. Id. Rather, it was not until October 2011, nine months after litigation began that the plaintiff hired a computer forensic expert to investigate the computer and prove that the defendant accessed his computer and email account. Id. There was no evidence that the expert spent any time investigating or responding to damage to the plaintiff's computer that occurred as a result of the defendant's unauthorized access. Id. The court found that "[w]hile fees paid to an expert for investigating and remedying damage to a computer may be a cognizable 'loss' under the CFAA . . . fees paid to an expert to assist in litigation do not fall within the CFAA's definition of 'loss.'" Id. As the expert's invoices covered services performed in September 2010 through February 2013, and all the invoices were addressed to the plaintiff's attorney, the court determined that the invoices were not covered by the CFAA. Id. at 339.

Similarly, in Consulting Professional Resources, Inc. v. Concise Technologies LLC, No. Civ.A. 09-1201, 2010 WL 1337723, at *7–8 (W.D. Pa. Mar. 9, 2010), the court "align[ed] itself with the courts favoring a narrow reading of the liability provisions of the CFAA." Id. at *8. It

162

held that "[t]o understand the word 'damage' to include inappropriate use of data after it has been accessed lends credence to an interpretation of the CFAA which imposes sanctions for those using computers with authorization and within their authorized access, a construction of the statute which this court has already rejected." Id. at *8; see also Telequest Int'l Corp. v. Dedicated Bus. Sys., Inc., No. Civ.A.06-5354, 2009 WL 3234226, at *2 (D.N.J. Sept. 30, 2009) (holding that a plaintiff must allege facts that the damage or loss incurred was related to investigating or remedying damage due to the computer or the computer's service and that costs incurred to investigate unauthorized access to a computer is not "damage" under the CFAA).

In the present case, Synthes asserts that the alleged unlawful access by Marotta took place in the summer of 2010, and Synthes did not file suit until March 2011. In the interim, Synthes took no action to investigate and remediate any damage done to its computer systems. Synthes's expert, Brian Wolfinger, expressly states in his report that he was contacted, not by Synthes officials, but rather by "Michael Broadhurst, Esquire from the law firm Blank Rome, LLP ("Blank Rome"), requesting digital forensics and data analysis services *for an ongoing litigation*." (Pls.' Appx. 206, Wolfinger Report, 1 (emphasis added).) Mr. Wolfinger's firm did not begin incurring any costs until October of 2011, well after litigation commenced. (Id. at 15–17.) In short, the damages allegedly sustained by Synthes as result of investigating Defendants' alleged unlawful access to Synthes computers are not fees incurred to investigate and remedy damage to the computer, but rather fees paid to an expert to assist in litigating the claims against Defendants. Given that Synthes has not alleged cognizable loss, the Court grants

163

summary judgment to Defendants on this claim.

### G.   <u>Trespass to Chattels</u>

Defendants next contend that they are entitled to summary judgment as to Count IX, which alleges trespass to chattels.  This claim, set forth against Defendants Marotta, Powell, and Emerge, is based on the allegation that Defendants put Emerge product into, removed, or changed Synthes's labels on Synthes Inventory Management System cabinets ("SIMS cabinets") that were on loan or consignment from Synthes at hospitals.  Synthes disputes this Motion, but does not itself seek summary judgment.

Pennsylvania law defines trespass to chattels as the act of intentionally "(a) dispossessing another of their chattel, or (b) using or intermeddling with chattel in the possession of another." <u>Healthcare Advocates, Inc. v. Harding, Earley, Follmert & Frailey</u>, 497 F. Supp. 2d 627, 650 (E.D. Pa. July 20, 2007) (citing <u>Pestco, Inc. v. Assoc. Prods., Inc.</u>, 880 A.2d 700, 708 (Pa. Super. Ct. 2005)); <u>see also</u> Restatement (Second) of Torts ¶ 217.  The Restatement (Second) of Torts defines a person who is "in possession of a chattel" as "one who has physical control of the chattel with the intent to exercise such control on his own behalf, or on behalf of another." Restatement (Second) of Torts § 216.

Defendants now set forth three bases for dismissal of this claim.  First, they contend that there is no evidence, or even an allegation, that Marotta himself accessed any SIMS cabinets. Second, they assert that although Powell, acting in the scope of his employment for Emerge, did place Emerge products and dividers in SIMS cabinets at certain medical facilities, Synthes has

164

not adduced any evidence that it owned the particular SIMS cabinets at issue. To the extent that Emerge accessed the SIMS cabinets and placed Emerge products in them, Powell testified that it did so only after receiving authorization from the particular medical facility. Finally, Defendants contend that there is no evidence that Emerge's access to the SIMS cabinets through Powell dispossessed Synthes of its property, impaired Synthes's property as to its "condition, quality, or value," or deprived Synthes of its use of property for a substantial period of time.

None of these arguments suffice to eliminate all genuine issues of material fact. First, as to Defendants' claim that Marotta did not access any SIMS cabinets, Synthes has produced two photographs of Marotta standing in front of a SIMS cabinet at Banner Gateway holding a divider labeled with an Emerge sticker. (PSUF ¶ 293.) Emerge had placed the photograph in a presentation made to the Emerge Board in 2010 to explain the implementation of its products in the Synthes SIMS cabinets. (Id. ¶¶ 293, 297–98.) Such photographs unequivocally create a genuine issue of material fact as to whether Marotta accessed the SIMS cabinets.

With respect to Defendants' second argument, Defendants concede that Powell placed Emerge products and dividers in SIMS cabinets, but assert that there is no evidence that Synthes owned the particular SIMS cabinets at issue. While there is no direct evidence as to precisely which SIMS cabinets Synthes owned, however, Defendants have conceded that Powell changed the dividers in multiple SIMS cabinets at Banner Gateway, Arizona Orthopedic, Chandler Regional, Fairview Ridges, Fairview Southdale, and Simi Valley Hospital, some of which contained Synthes-owned cabinets. (PSUF ¶¶ 297, 301; DRSF ¶¶ 297, 301.) Accordingly,

165

Synthes has produced sufficient evidence to establish a reasonable inference that the SIMS cabinets accessed by Powell were indeed Synthes-owned.

Moreover, the Court finds no merit in Defendants' argument that Powell placed product in Synthes's SIMS cabinets only after receiving authorization from the particular medical facility. Comment (a) to the Restatement (Second) of Torts § 253 states that "[i]f the person in possession of a chattel consents to the dealing with it *pursuant to the power to do so*, such authorization will prevent a recovery by the person entitled to the immediate possession of the chattel under the rule stated in § 219." Restatement (Second) o Torts § 253, cmt. a (emphasis added). As Synthes accurately notes, however, it had entered into agreements with customers concerning SIMS cabinets, expressly stating, "the storage units will house only Synthes products." (PSUF ¶¶ 300, 302–03; DRPS ¶¶ 300, 302–03.) As such, the hospitals did not have the authorization to consent to the use of the SIMS cabinets by a third party. In response to this evidence, Defendants contend that Synthes must show that Emerge, Marotta, or Powell "knew or had reason to know of the peculiar restriction" and nothing conclusively proves that they knew. (Pls.' Reply Supp. Summ. J. 61 (quoting Restatement (Second) of Torts § 253 & cmt. c).) At his deposition, however, Marotta testified as follows:

> Q. Were you aware that the agreements between Synthes and its customers contain a provision that the SIMS cabinets only be used for Synthes inventory?
>
> A. Some of the agreements were and some of them were not. Many hospitals, for example, Denver Health and—and Stryker owned all those SIMS cabinets. Hospitals if they bought them outright they wouldn't—
>
> . . .
>
> Q. My question wasn't what a hospital might do in breach of agreement or

166

contrary to an agreement.

A.  Uh-huh.

Q.  It was your knowledge of the agreement itself and provisions in the agreement.

A.  Uh-huh.

Q.  And I want to come back to that. Are you—Were you aware as a regional manager for Synthes, that the Synthes invent—management—inventory manager system agreements with hospitals stated specifically that the—the Synthes inventory management system should—should not be used for any other product and that it was exclusively for Synthes product?

A.  When I—when I was a regional manager in—in Denver I don't think we installed any new SIMS cabinets there. I think they all were there. I didn't see the new iterations of those Synthes inventory management system agreements with hospitals. I recall there was a change to those agreements when I was in Arizona, but I don't—I don't specifically remember that.

(Pls.' Appx. 18, Marotta Dep. 206:1–207:16, June 26, 2013.) Marotta agreed that he was generally familiar with some of the contractual agreements related to the Synthes Inventory Managements Systems. (Id. at 205:19–24.) Based on such testimony, an objective factfinder could easily make the reasonable inference that given Marotta's and Powell's employment with Synthes, they were well aware of this contractual restriction on medical facilities providing access to SIMS cabinets for non-Synthes products.

Finally, the Court finds no merit to Defendants' last argument that "there is no evidence that Emerge's access to the SIMS cabinets . . . dispossessed Synthes of its property, impaired Synthes property 'as to its condition, quality, or value,' or deprived Synthes of its use of its property 'for a substantial time.'" (Defs.' Mem. Supp. Summ. J. 54 (quoting Restatement (Second) Torts of § 218).) Under § 217 of the Restatement, a trespass to a chattel may also be committed by intentionally "using or intermeddling with a chattel in the possession of another."

167

Restatement (Second) Torts § 217; see also Healthcare Advocates, Inc. v. Harding, Earley,

Follmer & Frailey, 497 F. Supp. 2d 627, 650 (E.D. Pa. 2007).  "Intermeddling" means to

interfere.  Healthcare Advocates, 497 F. Supp. 2d at 650.  Clearly, an objective factfinder could

find that Powell and/or Marotta, on behalf of Emerge, intermeddled with Synthes's property by

mixing Emerge's labels and inventory with Synthes's labels and products in Synthes-owned

SIMS cabinets.

 In short, summary judgment is simply not appropriate on this claim.  Defendants' Motion

to that effect is denied.

### H. Fraud

 Count XI of Synthes's Amended Complaint sets forth a cause of action for fraud on the

grounds that Marotta defrauded Synthes "during and after [his] employment with Synthes by

misappropriating Synthes' resources, by materially misrepresenting [his] compliance with [his]

fiduciary and contractual obligations to Synthes, by misrepresenting and omitting [his] intention

to compete with Synthes (and Marotta's intention to do so immediately after his resignation), and

by misrepresenting and omitting [his] conception, development, and operation of Emerge."[36]

(Am. Compl. ¶ 299.)  Synthes also alleges that Emerge and Marotta have "fraudulently concealed

and/or failed to preserve physical and electronic documents and information highly relevant to

Synthes' claims in this matter."  (Id. ¶ 301.)  Defendants now contend that Synthes's fraud claim

fails because the fraud allegations are inextricably intertwined with Defendants' purported

---

[36]  Originally this claim was brought against all Defendants, but Synthes subsequently
dismissed the claim with respect to Powell.

contractual obligations and are thus barred by the gist of the action doctrine.

As a general rule, Pennsylvania courts are cautious about permitting tort recovery on contractual breaches.  Glazer v. Chandler, 200 A.2d 416, 418 (Pa. 1964).  In eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. Ct. 2002), the Pennsylvania Superior Court emphasized that the "gist of the action" doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims."[37]  Id. at 14.  The simple existence of a contractual relationship between two parties does not preclude one party from bringing a tort claim against the other.  Smith v. Lincoln Benefit Life Co., No. Civ.A.08-1324, 2009 WL 789900, at *20 (W.D. Pa. Mar. 23, 2009), aff'd, 2010 WL 3730196 (3d Cir. Sep. 24, 2010); see also Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 (3d Cir. 2001).  The doctrine, however, forecloses a party's pursuit of a tort action for the mere breach of contractual duties, "'without any separate or independent event giving rise to the tort.'"  Smith, 2009 WL 789900, at *20 (quoting Air Prods. and Chems., Inc. v. Eaton Metal Prods. Co., 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003)).

"When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort."  Sunquest Info. Sys., Inc. v. Dean Witter Reynolds,

---

[37] Although the Pennsylvania Supreme Court has not explicitly adopted the gist of the action doctrine, both the Pennsylvania Superior Court and multiple United States District Courts have predicted that it will.  Woods v. ERA Med LLC, No. Civ.A.08-2495, 2009 WL 141854, at *6 n.11 (E.D. Pa. Jan. 21, 2009) (citing cases).

169

Inc., 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999). To make this determination, the court must ascertain the source of the duties allegedly breached. Sunburst Paper, LLC v. Keating Fibre Int'l., No. Civ.A.06-3957, 2006 WL 3097771, at *2 (E.D. Pa. Oct. 30, 2006). The doctrine bars tort claims: "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." Id. (citing eToll, 811 A.2d at 19). "In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort." Id. Whether the gist of the action doctrine applies in any particular setting is a question of law. Alexander Mill Servs., LLC v. Bearing Distrib., Inc., No. Civ.A.06-1116, 2007 WL 2907174, at *8 (W.D. Pa. Sept. 28, 2007).

Pennsylvania courts have wrestled with whether the gist of the action doctrine applies to a cause of action for fraud. The elements of a fraud claim under Pennsylvania law include "a misrepresentation, an intent by the maker that the recipient be induced to act, justifiable reliance by the recipient upon the misrepresentation, and damage to the recipient as the proximate result." Olkowski v. Prudential Ins. Co. of Am., 584 F.Supp. 1140, 1141 (E.D. Pa. 1984). A claim for fraudulent inducement includes an additional element, that the misrepresentation was made with the specific intent to induce another to enter into a contract when the person had no duty to enter into the contract. In re Allegheny Int'l, 954 F.2d 167, 178 (3d Cir. 1992).

170

The Pennsylvania Superior Court has explicitly recognized that Pennsylvania law has "not carved out a categorical exception for fraud, and [has] not held that the duty to avoid fraud is always a qualitatively different duty imposed by society rather than by the contract itself." eToll, 811 A.2d at 19. Rather, as the court explained, the cases turn on the question of whether the fraud concerned the performance of contractual duties. Id. "If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties." Id. Accordingly, the gist of the action doctrine generally bars fraud claims in cases where a defendant's alleged failure to perform its duty under the contract is transformed into a claim that this failure amounts to fraud. Asbury Auto. Grp. LLC v. Chrysler Ins. Co., No. Civ.A.01–3319, 2002 WL 15925, at *3 (E.D. Pa. Jan. 7, 2002); see also Horizon Unlimited, Inc. v. Silva, No. Civ.A.97–7430, 1998 WL 88391, at *4–5 (E.D. Pa. Feb. 26, 1998) (holding that gist of the action doctrine barred fraud and negligent misrepresentation claims premised on allegedly false statements made in promotional literature about the product when the subsequent contract disclaimed any prior representations); Factory Mkt., Inc. v. Schuller, Inc., 987 F. Supp. 387, 394–95 (E.D. Pa. 1997) (finding that gist of the action doctrine barred fraud claims against roofer who agreed and repeatedly attempted to repair a chronically leaking roof, even though he knew from the outset that it was beyond repair, as the obligation to make the roof watertight was imposed by the contract, not in tort). Where, however, the fraud concerns an act collateral to and not interwoven with the terms of the parties' contract, such as a fraudulent inducement to enter

171

the contract, courts have been less willing to bar the claims.  "The distinction between fraud in the inducement and fraud in the performance claims with regard to the gist of the action doctrine is crucial.  This is because fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists."  Air Prods. and Chems., 256 F. Supp. 2d at 341.

Nonetheless, "[c]ourts have generally held that the gist of the action doctrine does *not* apply when the defendant not only breached the contract, but also made misrepresentations about the breach with the intent to deceive the plaintiff, such that the unsuspecting plaintiff continued the contractual relationship or failed to assert its contractual rights against the defendant." Greater Phila. Health Servs. II Corp. v. Complete Care Servs., L.P., No. Civ.A.2387, 2000 WL 33711052, at *2 (Pa. Com. Pl. Nov. 20, 2000) (emphasis in original) (citing Ne. Power Co. v. Backe-Durr, Inc., No. Civ.A.97-4836, 1999 WL 674332, at *12 (E.D. Pa. Aug. 23, 1999) (holding that gist of the action doctrine did not apply to bar a fraud claim where the defendant made specific misrepresentations about its performance under the contract with the intent to deceive the plaintiff); Polymer Dynamics, Inc. v. Bayer, No. Civ.A.99-4040, 2000 WL 1146622, at *6–7 (E.D. Pa. Aug. 14, 2000) (holding that gist of the action doctrine did not bar fraud claim where the defendant made false representations about its performance under a contract to induce plaintiff to continue its relationship with the defendant and to reveal confidential information to the defendant); Am. Guar. & Liab. Ins. Co. v. Fojiani, 90 F. Supp. 2d 615, 623 (E.D. Pa. 2000) (holding that gist of the action doctrine did not bar fraud claim where the defendant's false

172

representations about its financial health caused the plaintiff to continue investing time and

energy in its venture with the defendant); Fox's Foods, Inc. v. Kmart Corp., 870 F. Supp. 599,

609 (M.D. Pa. 1994) (denying summary judgment on fraud claim, among other reasons, because

the complaint alleged that the defendant intentionally made false assurances about its

performance under a contract in order to keep the plaintiff from asserting its contractual rights

against the defendant)).

     For example, in Orthovita, Inc. v. Erbe, No. Civ.A.07-2395, 2008 WL 423446 (E.D. Pa.

Feb. 14, 2008)—a case strikingly similar to the one at bar—the defendant, who was under

multiple non-compete, assignment, and confidentiality contracts with his employer, undertook

extensive efforts during the term of his employment to establish a competing company, relying

on many of plaintiff's trade secrets in doing so. Id. at *2–3. While still an officer of the plaintiff,

the defendant tried to hide his copying of computer files by deleting more than 5,500 files from

his company laptop and transferring information to non-traceable flash drives. Id. at *3. The

plaintiff argued that because the defendant fraudulently misrepresented that he remained a loyal

employee, the company did not terminate his employment, but continued to allow him to

participate in meetings involving the company's business strategy. Id. at *8. The defendant, in

the meantime, affirmatively took steps to hide his plot to steal the company's secrets and

proprietary information, thus deliberately harming the company. Id. The court declined to find

the fraud claim barred under the gist of the action doctrine on the theory that "courts have not

invoked the doctrine to bar tort suits 'when the defendant not only breached the contract, but also

made representations about the breach with the intent to deceive the plaintiff, such that the unsuspecting plaintiff continued the contractual relationship or failed to assert its contractual rights against the defendant.'" Id. "Because [plaintiff] expressly assert[ed] that [defendant] made misrepresentations which resulted in his continued employment and access to proprietary information, such facts, if proven, are analytically separate from the breach of the contract claim itself." Id.[38]

In the present case, the record is replete with evidence that Marotta made affirmative efforts to conceal his efforts in forming Emerge. Indeed, on repeated occasions, Marotta and the co-founders of Emerge agreed to work in "stealth" mode to avoid detection while Marotta was still employed with Synthes in an apparent effort to avoid detection by Synthes, skirt the inevitable termination that would result upon detection, and preclude Synthes's assertion of contractual rights against him. Under the foregoing jurisprudence, such alleged fraud falls outside the bounds of the contractual agreements and, if proven true, could give rise to a separate claim of fraudulent misrepresentation.

Similarly, the Court finds that Marotta's submission of fraudulent expense reports constitutes extra-contractual fraud. As set forth in great detail above, Marotta—in connection with many of his meetings with Emerge investors and co-founders—expensed the costs of those meetings to Synthes under the guise that Marotta was engaging in Synthes-related work.

---

[38] Although Defendants attempt to distinguish this case by arguing that it was decided on a motion to dismiss, that argument does not undermine the legal principle underlying the court's decision that efforts to conceal breaches of contract can give rise to a separate fraud claim.

Defendants now argue that the expenses were only fraudulent because they were actually incurred in connection with Marotta's improper competition with Synthes under the terms of his non-competition agreement. This argument is mistaken. The mere fact that Marotta submitted expenses to Synthes for non-Synthes work—regardless of whether such expenses were incurred in forming Emerge or competing with Synthes—is sufficient to allege fraud. In other words, the alleged fraud is not inextricably bound up with the contractual agreements at issue.[39]

Accordingly, the Court does not find that the gist of the action doctrine bars the fraud claim. In turn, Defendants Motion for Summary Judgment on this claim is denied.[40]

I.    **Tortious Interference With Contract**

Synthes also brings a claim against (a) Emerge alleging that it tortiously interfered with Synthes's contracts with Marotta, Brown, and Powell; and (b) all Defendants alleging that they tortiously interfered with Synthes's contracts with customers and vendors. Defendants now seek summary judgment on the entirety of this claim.

---

[39] Defendants again argue that a fraud claim based solely on the fraudulent expense reports cannot survive because those expenses were a de minimis amount and were inadvertently, not fraudulently, submitted. Marotta's mere self-serving testimony that he "inadvertently" submitted false expense reports, however, does not entitle Defendants to summary judgment on this claim, particularly given the evidence that Marotta was actively trying to hide his Emerge-related activities.

[40] Defendants also challenge Synthes's allegations that Defendants may have spoliated evidence. As Synthes has clarified, however, it merely wishes to present this evidence in support of its underlying fraud claim that Defendants sought to conceal their various actions. While Defendants contend that "it is undisputed that Synthes received in discovery the documents it claims were fraudulently concealed," such a bald statement in the face of the other evidence of record does not entitle Defendants to summary judgment.

175

Pennsylvania has adopted section 766 of the Restatement (Second) of Torts which sets out the tort of intentional interference with an existing contract. Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978). Section 766 provides that:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.

Restatement (Second) of Torts § 766. To prove tortious interference with an existing or prospective contract under Pennsylvania law, a plaintiff must prove four elements: (1) the existence of a contractual relationship or prospective contractual relationship between the plaintiff and another party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship or preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct. See Phillips v. Selig, 959 A.2d 420, 428–29 (Pa. Super. Ct. 2008); BP Envtl. Servs., Inc. v. Republic Servs., Inc., 946 F. Supp. 2d 402, 407 (E.D. Pa. 2013) see also Restatement (Second) of Torts, § 766–766B (1979).

Five separate allegations of tortious interference are at issue here: tortious interference with Marotta's contracts with Synthes; tortious interference with Powell's contracts with Synthes; tortious interference with Brown's contracts with Synthes; tortious intererence with Synthes's contractual relationships with vendors and customers; and tortious interference with Synthes's contractual relationships with its other employees. The Court addresses each

176

allegation separately.

1.      **Tortious Interference with Marotta's Contracts With Synthes**

Defendants first contend that summary judgment on the claim of tortious interference with Marotta's contract is warranted because: (1) there is no evidence in the record that Emerge had knowledge of Marotta's Employee Innovation Agreement or his Sales Consultant Non-Competition Agreement with Synthes; and (2) there is no evidence that Emerge did anything to induce Marotta to breach his Employment Innovation Agreement or Non-Competition Agreements with Synthes.

a.      **Whether Emerge Had Knowledge of Marotta's Contractual Agreements with Synthes**

Defendants initially allege that there is no evidence in the record that Emerge had knowledge of Marotta's Employee Innovation Agreement or his Sales Consultant Non-Competition Agreement with Synthes, and therefore, no evidence exists that Emerge induced or intentionally caused Marotta to breach those agreements. They assert that, at the time Emerge was being formed, Marotta did not recall signing the Employee Innovation Agreement, which was executed in 2004, and he did not become aware of its existence until he received a copy of Synthes's Complaint in 2011. Nor is there evidence establishing that anyone else at Emerge had knowledge of Marotta's Employment Inovation Agreement. Similarly, Defendants argue that Marotta did not inform anyone at Emerge about his Sales Consultant Non-Competition Agreement because, at the time he resigned from Synthes in April 2010, Marotta understood his Regional Manager Non-Competition Agreement to be the governing agreement.

177

As a primary matter, the Court notes that this argument effectively concedes that Marotta, and thus Emerge, had knowledge of Marotta's RM NCA. Therefore, the absence of knowledge argument will not suffice to dismiss any claim that Emerge tortiously interfered with Marotta's RM NCA.

As to the NDA, the Court finds that a genuine issue of material fact exists. Marotta testified that he did not recall the existence of the NDA until after Synthes filed suit. (Pls.' Appx. 3, Marotta Dep., 205:3–15, July 5, 2011.) Defendants, however, admit that Synthes's employee policies explicitly state that "All employees are required to sign an Employee Innovation and NonDisclosure agreement prior to employment" and that Marotta was informed of this upon being offered a position with Synthes. (Pls.' Appx. 49, 88.) Given this competing evidence, the Court cannot find, as a matter of law, that Marotta had no knowledge of his NDA at the time he was working on Emerge's behalf—knowledge which would then be imputed to Emerge.

Finally, as to Marotta's SC NCA, Marotta does not deny that he had knowledge of this contract. Rather, he simply argues that, at the time he resigned from Synthes in April 2010, Marotta understood his Regional Manager Non-Competition Agreement to be the governing agreement. In other words, Marotta merely asserts that he was well aware of his SC NCA, but simply did not understand its ongoing legal ramifications at the time he joined Emerge. As set forth in the Restatement (Second) of Torts:

> To be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is

178

interfering with the performance of the contract. . . . But it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have.

Restatement (Second) of Torts § 766, cmt. I. Certainly, a jury can find that Marotta, knowing of

the existence of this agreement, should have consulted with an attorney to ensure that it was no

longer at issue.[41]

### b. Whether Emerge Did Anything to Induce Marotta to Breach Either His NDA, His RM NCA, or His SC NCA With Synthes

Alternatively, Defendants contend that even if Emerge had knowledge of the NDA or the

SCA NCA, there is no evidence that Emerge did anything to induce Marotta to breach any of his

agreements with Synthes. According to the Restatement:

The word "inducing" refers to the situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences. Inducement operates on the mind of the person induced. The phrase "otherwise causing" refers to the situations in which A leaves B no choice, as, for example, when A imprisons or commits such a battery upon B that he cannot perform his contract with C, or when A destroys the goods that B is about to deliver to C. This is also the case when performance by B of his contract with C necessarily depends upon the prior performance by A of his contract with B and A fails to perform in order to disable B from performing for C. The rule stated in this Section applies to any intentional causation whether by inducement or otherwise. The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the

---

[41] Synthes argues that Emerge should have known that Marotta was subject to his SC NCA since Emerge had knowledge of Powell's SC NCA with Synthes. The Court, however, will not assume that Emerge's knowledge of Powell's contractual restrictions equates with Emerge's knowledge of Marotta's contractual restrictions.

179

unintended effect of deterring the third person from dealing with the other.

Restatement (Second) of Torts § 766, cmt. h.  It is well established under Pennsylvania law that a tortious interference claim cannot lie against the party to the contract in question because that party cannot also be a third-party interloper.  Surya Sys., Inc. v. Sunku, No. Civ.A.05-146, 2005 WL 1514225, at *3 (E.D. Pa. June 24, 2005); see also Center for Concept Dev., Ltd. v. Godfrey, No. 97-7910, 1999 WL 163006, at *3 (E.D. Pa. March 23, 1999) (citing as "hornbook law" the established principle that a party to a contract cannot tortiously interfere with its own contract); Fishkin v. Susquehanna Partners, G.P., 563 F. Supp. 2d 547, 587 (E.D. Pa. 2008) ("Because a company like TABFG can only act through its employees or managers, the claim that TABFG induced Fishkin and Chernomzav to breach their contracts is essentially that Fishkin and Chernomzav, acting through TABFG, induced themselves into breach.  Imposing liability under such a theory is problematic because it is not clear that the defendant corporation can be said to have induced a breach by a third party under these circumstances.").

The question now becomes whether Emerge, separately from Marotta, acted in a manner where interference was certain or substantially certain to occur as a result of Emerge's conduct. Synthes argues that "[t]he evidence of record demonstrates that, both during and after his employment with Synthes and through the use of Synthes' information, time, and resources, Marotta breached his fiduciary and contractual obligations to Synthes acting in concert with Emerge and Stassen." (Pls.' Resp. Opp'n Summ. J. 84–85.)[42]  It goes on to note that Marotta

---

[42]  In support of this proposition, Synthes provides a string cite to 460 paragraphs of its Statement of Undisputed Facts.  To ask the Court to re-review each of these is an unwieldy task

worked and was in constant communication with Stassen and that, following his Synthes employment, Marotta continued to work for Emerge in multiple leadership capacities, serving as Emerge's CEO, President, and Chairman, and was one of its major shareholders. Moreover, according to Synthes, following Emerge's incorporation, Emerge, through Marotta and Stassen:

- solicited investors on behalf of Emerge (including, certain Synthes employees and certain Synthes physician customers) and obtained financing for Emerge;
- solicited customers with Synthes regarding Emerge and investment in Emerge with expected promotion or use of Emerge's products (including customers in Colorado);
- worked with an accounting firm that billed Emerge for services it performed in February and March 2010;
- worked with Victoria Trafka, a manufacturing engineer, in connection with Emerge,
- engaged Orchid, an outside vendor, for the design and development of Emerge's initial product offerings;
- sent physical samples of Synthes product to Orchid to attempt to reverse engineer those products and began the design and development of Emerge's initial product offerings;
- designed prints for Emerge's initial product offerings;
- solicited Synthes customers in Marotta's former Sales Consultant territory and Regional Manager region for sales; and
- acquired, retained, disclosed, and/or sued Synthes' information and product, including, Synthes' emails and Synthes' confidentiality and proprietary information, drawings, and usage and pricing data.

(Pls.' Resp. Opp'n Summ. J. 85–86.)

Synthes's allegations, however, simply do not establish—or create any genuine issue of fact regarding—this tortious interference claim. Primarily, almost all of the actions identified were actions taken by Marotta. For example, Marotta obtained Synthes customer purchasing information (PSUF ¶¶ 356–37; DRPS ¶¶ 356–57), worked with Victoria Trafka, (PSUF ¶ 487;

_____

that the Court declines to undertake.

181

DRPS ¶ 487), met with customers of Synthes, including Dr. Morgan and Dr. Motzkin, as potential investors, (PSUF ¶¶ 532–38, 556–57, 710; DRPS ¶¶ 532–38, 556–57, 710), worked with the accounting firm that billed Emerge for services, (PSUF ¶ 332; DRPS ¶ 332), spoke with Synthes employees as potential investors, (PSUF ¶¶ 710–20; DRPS ¶¶ 710–20), engaged Orchid and sent Orchid physical samples of Synthes product for reverse engineering, (PSUF ¶¶ 335–36, 724, 737–38, 721–23, 740, 753; DRPS ¶¶ 335–36, 724, 737–38, 721–23, 740, 753), and asked Synthes representatives to supply samples of Synthes product, (PSUF ¶¶ 764–65; DRPS ¶¶ 764–65.)  Thus, Marotta's own actions in breach of his contract cannot form the basis for a tortious interference claim against Emerge simply by imputing Marotta's actions to the company.

More importantly, although Synthes broadly alleges that Stassen, as an agent of Emerge, also participated in these actions, it does not identify precisely what actions Stassen took on behalf of Emerge to induce Marotta's breach.  Indeed, the evidence reflects that out of the actions cited by Synthes in support of his claim, Stassen was only involved in Emerge's solicitation of customers and investors—actions that were entirely permissible.  To the extent that Stassen affirmatively engaged in actions to help finance Emerge, he lessened the likelihood that Marotta would need to further breach his duties by seeking investors.  In other words, the evidence of record reveals that any actions taken by Stassen were made only to benefit Emerge, not to induce a breach by Marotta.  Synthes identifies no conversations, emails, correspondence, or other evidence to suggest that Stassen, at any time, engaged in any "purposeful action" that was "specifically intended to harm the existing relation" between Synthes and Marotta, that he caused

Marotta to choose between breaching his contracts or not breaching them, that he engaged in any persuasion or intimidation of Marotta to breach his contracts, that he prevented Marotta from performing his contracts with Synthes, that he threatened Marotta in order to induce him to breach his contracts, or that he promised Marotta anything in exchange for his breach of his Synthes contracts.

In short, Synthes has failed to identify any evidence that Emerge—separate and apart from Marotta—induced Marotta in any way to breach his contracts with Synthes. Nor has Synthes demonstrated that Emerge, acting through Stassen, had an intent to harm Synthes by interfering with that contractual relationship. Rather, the sole evidence of record is that Marotta, acting of his own accord, breached his contracts with Synthes and that Emerge and Stassen benefitted from this breach. As such, the Court declines to find that liability can lie against Emerge for tortious interference with Marotta's contracts.

### 2. Tortious Interference with Powell's Non-Compete Agreement With Synthes

Defendants next claim entitlement to summary judgment on Synthes's allegation that Emerge tortiously interfered with Powell's non-compete agreement with Synthes. Specifically, they contend that Powell terminated his employment with Synthes of his own accord approximately six months prior to coming to work for Emerge, and initially began to work for a company called Sonoma Orthopedics. Powell testified that, when he resigned, he had no idea that Marotta had formed a company called Emerge Surgical and Marotta did not discuss Emerge with Powell until the summer of 2010, several months after Powell had voluntarily terminated

183

his employment at Synthes. In addition, according to Defendants, there is no evidence that Emerge engaged in any active persuasion, encouragement or inciting of Powell to breach his non-compete agreement with Synthes after he began working for Emerge. Indeed, when Emerge hired Powell, it required him to sign a contract wherein he agreed to abide by the terms of his non-competition agreements with Synthes.

Synthes responds that the evidence of record creates a genuine dispute of material fact as to whether Emerge tortiously interfered with Powell's contracts in two respects. First, Synthes contends that the facts establish that Marotta and Emerge placed Powell at Sonoma following his employment with Synthes and worked with Powell while at Sonoma. As Powell was responsible for the Colorado market while at Sonoma and worked with various Colorado physicians, this was in violation of Powell's noncompetition obligations to Synthes.

The Court, however, disagrees. The evidence of record does not establish that Emerge placed Powell at Sonoma. The only evidence is that a meeting between Marotta and Powell was scheduled for February 11, 2010, and, the following day, Powell emailed his resume to Marotta's personal email account stating, "Per our conversation, here is my CV. Thank you kindly or passing it on. Please let me know what I can do to follow up." (Pls.' Appx. 109; PSUF ¶¶ 583–84; DRPS ¶¶ 583–84.) During discovery, Sonoma produced the same resume provided to Marotta, with the exception of a handwritten note referencing "John Marotta Synthes Manager." (PSUF ¶¶ 585–86; DRPS ¶¶ 585–86.) Powell terminated his employment with Synthes in March 2010 to take a job with Sonoma, and Synthes admitted that Powell was not involved in the

184

development or formation of Emerge that occurred prior to Marotta's departure from Synthes on April 15, 2010. (Pls.' Resp. to Defs.' Statement of Facts ¶ 31.) Nothing in the record suggests that Marotta did anything more than forward Powell's resume to Sonoma in his capacity as a "Synthes Manager." The record is devoid of evidence that Marotta's actions were taken on behalf of or at the behest of Emerge.

Second, Synthes asserts that Emerge induced Powell to breach his obligations to return all Synthes property and information to Synthes at the termination of his employment. In support of this claim, it asserts that there is ample evidence that Powell began assisting Emerge with collecting Synthes product as early as May 10, 2010, and continued doing so once he joined Emerge as an employee. In addition, he solicited then-Synthes employees for additional product, accessed Synthes's price quotation software system on his personal laptop, and used/disclosed Synthes's usage and pricing data in connection with his Emerge employment.

On this point, the Court finds that a genuine issue of fact remains. The evidence is clear that, in May 2010, during his employment with Sonoma, Powell provided Synthes product to Emerge. (PSUF ¶ 763; DRPS ¶ 763; Pls.' Appx. 487.) Ultimately, when Powell joined Emerge as an employee in September 2010, he brought some Synthes product with him. (Pls.' Appx., Slone Statement, ¶ 19.) Moreover, Powell expressly conceded that upon joining Emerge, he and Marotta contacted several Synthes employees and asked them for Synthes product. (Pls.' Appx. 35, Powell Dep. 30:15–301:7, July 7, 2011.) Finally, Powell acknowledged that he used Synthes Arizona usage data in his role at Emerge, (PSUF ¶¶ 928–37; DRPS ¶¶ 928–37), which would

185

have violated his non-compete clause.  Faced with such evidence, a reasonable factfinder could

easily conclude that Emerge induced Powell to breach both his NDA and his SCA NCA with

Synthes in order for him to obtain employment with and remain employed by Emerge.[43]

Accordingly, the Court declines to dismiss this claim.

### 3.    Tortious Interference With Brown's Agreements With Synthes

Defendants also assert that summary judgment should be entered in their favor on

Synthes's claim of tortious interference with Eric Brown's contractual agreements with Synthes.

As discussed above, Synthes cites to a wealth of allegations that Brown was an active participant

in the formulation and creation of Emerge.  Indeed, in November of 2009, Stassen and Brown

---

[43]  Defendants vigorously argue that Synthes has failed to provide evidence to establish its
right to relief on this claim.  For example, with respect to the Synthes implants references in
Plaintiffs' Appendix Tab 487, Defendants contend that Synthes provides no evidence that Powell
actually gave Emerge the implants, that they were obtained during Powell's employment with
Synthes, that the implants belonged to Synthes as opposed to Sonoma, or that Emerge
intentionally caused Powell to collect and deliver these implants.  (Defs.' Reply Supp. Summ. J.
41.)  Likewise, as to the Synthes product that Powell brought with him to Emerge, Defendants
contend that there is no evidence as to where Powell got the product, when he got it, or who
owned it.  Finally, with respect to Powell's solicitation of Synthes employees for Synthes
product, Defendants claim that there is no evidence that Emerge ever received any product as a
result of those requests.
     Defendants' argument, however, misunderstands the summary judgment standard.  Were
Synthes seeking summary judgment on this claim, the Court would agree with Defendants that
too many issues of material fact remain in order for Synthes to prevail.  It is Defendants,
however, seeking summary judgment.  Plaintiffs are not required to produce "smoking gun"
evidence to avoid summary judgment, but rather must produce evidence sufficient to establish
that a reasonable jury could find in their favor.  Nutrition Mgmt. v. Harborside Healthcare Corp.,
No. Civ.A.01-0902, 2004 WL 2755547, at *3 (E.D. Pa. Nov. 30, 2004).  While Plaintiffs'
evidence on this claim is certainly not ironclad, it is more than sufficient for a reasonable jury to
infer that Powell breached his contract under the inducement of Emerge.

186

developed a Private Placement Memorandum ("PPM") for Emerge to use with investors, and it identified Brown as a "founder," "majority owner," "Chief Executive Officer," President," and "Chairman of the Board." (Pls.' Appx. 292.) In the twenty-first version of the draft PPM, the memorandum stated, under "Company Ownership," that "Emerge was established in January 2010 by founders John Marotta, Zack Stassen and Eric Brown whom are company owners." (Pls.' Appx. 216.) Until the end of 2009, Marotta, Stassen, and Brown all contemplated the possibility that Brown would be involved in Emerge. (PSUF ¶ 527; DRPS ¶ 527.)

As the Court also found above, however, as of December 2009, the three men mutually determined that Brown could no longer participate in Emerge because of the national scope of his non-compete agreement with Synthes. (PSUF ¶ 528; DRPS ¶ 528.) As of December 16, 2009—well before Emerge's incorporation—Brown noted that "John, Zack and I met for a couple of hours last night and came to the same conclusions as our dinner conversation. The most prudent direction at this time is to respect my non-compete and delay any association or participation in the company while I am under an agreement." (PSUF ¶ 531; DRPS ¶ 531.) Although Synthes now argues that Emerge ratified the conduct of Marotta and Stassen in conjunction with Brown by using information Brown supplied during the development phase in its investor materials, this record simply does not allow the reasonable inference that Emerge induced Brown in any manner to breach his contracts with Synthes. Synthes has not produced any evidence that Stassen and Marotta made any effort to bring Brown into the business or to encourage him to disregard his contractual arrangements. Thus, even if Emerge "ratified"

187

Stassen's and Marotta's pre-incorporation discussions with Brown, there is no proof that those discussions involved inducement of any breach. Moreover, and more importantly, Synthes concedes that Emerge, acting through Stassen and Marotta, declined to have any further dealings with Brown upon becoming fully aware of the scope of his agreements with Synthes.[44] The Court therefore grants Defendants' Motion for Summary Judgment on this claim.

### 4. Tortious Interference With Synthes's Contractual Relationships With Any of Its Customers or Vendors

The fourth tortious interference of contract claim asserts that Defendants tortiously interfered "with certain vendors" and "with its customers." (Am. Compl. ¶¶ 222–23.) The Court addresses each of these allegations separately.

### a. Tortious Interference With Vendors

Defendants argue that Synthes fails to either identify any vendor contracts with which Defendants are alleged to have tortiously interfered or show that any vendors breached their contracts. Quite to the contrary, however, Synthes identifies two different vendors with whom it entered into Non-Disclosure Agreements: Magnum Manufacturing Center, a part of Magnum

---

[44] Synthes also argues that Emerge "caus[ed] Brown to approve expense reports for expenses incurred on behalf of Emerge." (Pls.' Resp. Opp'n Summ. J. 91.) Notably, however, the evidence reveals only that Marotta submitted to Synthes reimbursement requests for expenses incurred on behalf of Emerge and that Brown, as Marotta's manager, approved them. (PSUF ¶¶ 551–60.) In his Statement, Brown explained that "[d]uring the course of Marotta's tenure as Regional Manager, [Marotta] would regularly submit expenses for me to review and approve for reimbursement. I was not aware that Marotta submitted any expenses for reimbursement by Synthes that were on behalf of Defendant Emerge Medical, Inc. ("Emerge"). Unless there was a red flag, I would generally approve Marotta's expenses reports for reimbursement." (Pls.' Appx. 24, Brown Statement, ¶ 33.) Nothing in this evidence shows that Brown had any knowledge whatsoever as to the falsity of these expense reports.

Tool Company ("Magnum"), and Orchid.  (PSUF ¶ 280; DRPS ¶ 280.)  In those Non-Disclosure

Agreements, the vendors agreed not to disclose, without prior written consent, any "Confidential

Information," defined as "proprietary or confidential information, whether or not marked as such,

including, but not limited to, information regarding the Disclosing Party's business, operations,

finances, customers, prospects and employees. . . .  any analysis, compilation, summary, study or

other report prepared by either the Disclosing Party or the Recipient in connection with the

Stated Purpose." (PSUF ¶¶ 281–82; DRPS ¶¶ 281–82.)  The Magnum agreement was actually

signed by Victoria Trafka on behalf of Magnum.  (PSUF ¶ 282; DRPS ¶ 282; Pls.' Appx 122.)

     Moreover, Synthes has more than adequately identified evidence of actions that a

reasonable factfinder could construe as vendor breaches of the contract.  In connection with her

employment with both Synthes and Magnum, Victoria Trafka was admittedly privy to

information about Synthes's specifications for raw materials, machining and manufacturing of

product, the finishing of Synthes products, and the inspection of Synthes products.  (PSUF ¶ 222;

DRPS ¶ 222.)  Trafka also admitted that she had access to Synthes specifications and information

regarding raw materials, machining, manufacturing, finishing, and inspection.  (PSUF ¶ 224;

DRPS ¶ 224.)  Marotta contacted Trafka in October 2009 to take advantage of her engineering

knowledge and background.  (PSUF ¶ 491–92; DRPS ¶¶ 491–92.)  Although Defendants suggest

the existence of evidence that the work Trafka did for Emerge was outside the scope of her

Magnum employment and done by her individually, such evidence does not eliminate the

remaining issues of material fact regarding the extent to which she used knowledge gained from

her employment at Magnum on behalf of Emerge.

The same holds true for Orchid.  Indeed, as set forth at length above, Emerge solicited and retained Orchid to reverse engineer Synthes products and design Emerge products as replicas of Synthes products.  Such facts would certainly allow a reasonable jury to determine that Emerge tortiously interfered with Synthes's vendor contract with Orchid.  Accordingly, the Court will not dismiss this claim.

### b.  <u>Tortious Interference with Customers</u>

As to Synthes's tortious interference with customers claim, Synthes asserts that it entered into SIMS contracts with its customers.  As explained above, Synthes SIMS cabinets are placed into a customer account and are either owned by Synthes, the customer, or a combination of both. (PSUF ¶ 299; DRPS ¶ 299.)  Generally, if not on loan, Synthes enters into agreements with customers concerning the SIMS placed at the customer account.  (PSUF ¶ 300; DRPS ¶ 300.) Each of the SIMS agreements states that "the storage units will house <u>only</u> Synthes products." (Pls.' Appx. 260–76 (emphasis in original).)  These provisions appear in SIMS agreements regardless of whether the customer owns all or part of the SIMS units.  (PSUF ¶ 303; DRPS ¶ 303.)

As set forth in greater detail above, there is ample evidence that Marotta and Powell were familiar with the SIMS contracts in hospitals and understood that it was a breach of those contracts to place Emerge product in them.  Marotta also understood that some of the contracts contained a provision that SIMS cabinets only be used for Synthes inventory.  To the extent

190

Defendants allege that Emerge placed its product in SIMS cabinets only with the consent of the hospitals that possessed the cabinets, a genuine issue of material fact remains as to whether Emerge knew that the hospitals under a SIMS contract could not give such consent. Thus, summary judgment on this claim is not proper.

### 5. Marotta's Tortious Interference With Synthes's Contractual Relations With Other Synthes Employees

Finally, Defendants move for partial summary judgment on Synthes's claim that Marotta tortiously interfered with Synthes's contractual relationships with other Synthes employees by soliciting them for employment elsewhere because that claim is barred by the "gist of the action doctrine." Synthes concedes this point. (Pls.' Resp. Opp'n Summ. J. 95.) As such, this portion of the claim is dismissed. Synthes's remaining claims against Defendants for tortious interference with Synthes's contractual relationships with employees as a whole, however, shall remain viable in this case.

### J. Civil Conspiracy

The final claim at issue is Synthes's cause of action for civil conspiracy. To state a cause of action for civil conspiracy, the plaintiff must demonstrate: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (citation and internal quotations omitted). An "'actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of

191

action if committed by one actor.'" Levin v. Upper Makefield Twp., 90 F. App'x 653, 667 (3d

Cir. 2004) (citing In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 789 (3d Cir.

1999)). Ultimately, "only a finding that the underlying tort has occurred will support a claim for

civil conspiracy." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 506 (E.D. Pa. 2008)

(quotation omitted).

Importantly, "[p]roof of malice, *i.e.,* an intent to injure, is essential in proof of a

conspiracy." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979). "Malice

requires . . . that the *sole* purpose of the conspiracy was to injure the plaintiff," and that this intent

was without justification. Doltz v. Harris & Assoc., 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003)

(emphasis added). As malice can only be found when the *sole* purpose of the conspiracy is to

injure the plaintiff, a showing that a person acted for professional reasons, and not solely to

injure the plaintiff, negates a finding of malice. See Bro-Tech Corp. v. Thermax, Inc., 651 F.

Supp. 2d 378, 419 (E.D. Pa. 2009); Thompson Coal Co., 412 A.2d at 472 (noting that the intent

to injure must be without justification, which cannot exist when an act is merely done "with the

intention of causing temporal harm, without reference to one's own lawful gain, or the lawful

enjoyment of one's own rights") (quoting Rosenblum v. Rosenblum, 181 A. 583, 585 (Pa.

1935)).

In this Court's prior opinion in connection with Defendant Powell's Motion to Dismiss,

the Court found that the element of "sole purpose" to injury was lacking:

> Defendant Powell now argues that this claim fails because Plaintiff has not
> alleged a *sole* intent to injure on the part of Defendant Powell or any other Defendant.

192

Rather, the allegations of the Amended Complaint reflect that Defendants were operating Emerge as a competitive, for-profit business, and that the actions they took were for the purpose of expanding that business, not solely for injuring Plaintiff.

On this point, the Court must agree with Defendant Powell. The Amended Complaint specifically alleges that the common purpose of the conspiracy was to "found, develop, and operate a business that unlawfully competes with Synthes." (Id. ¶ 307.) Although cursorily alleging that "[t]his combination of the Defendants has, at all times, specifically intended to injure Synthes," the intent of the particular Defendants is not equivalent to an allegation that the basis for their conspiracy was to injure. Indeed, a careful reading of the allegations discussing the foundation of the conspiracy reveals that it was intended to develop a new company which would provide financial benefit to those participating, but the actions taken in furtherance of that conspiracy were purportedly unlawful and had the incidental effects of competitively injuring Synthes. (Id. ¶¶ 124–68.) Moreover, other portions of the Amended Complaint expressly acknowledge that the Defendants misappropriated information "to help them develop and implement Emerge's business model, to identify and/or design, develop, test, and manufacture products competitive with certain of Synthes' products, to manage inventory and purchase orders, to develop Emerge's marketing efforts to customers, and to otherwise effectuate their scheme to compete wrongfully with Synthes." (Id. ¶ 241.) The fact that it may have been necessary to deceive Plaintiff or to otherwise willfully and maliciously commit various torts against Plaintiff in order to carry out this scheme does not equate to an allegation that the conspiracy was formed with the sole intent to injure Plaintiff. See Spitzer v. Abdelhak, No. Civ.A.98–6475, 1999 WL 1204352, at *9 (E.D. Pa. Dec. 15, 1999) ("As Plaintiffs have stated elsewhere, the Defendant's purpose of the conspiracy was to benefit themselves personally and professionally. The fact that it may have been necessary to deceive Plaintiffs in order to carry out their scheme in no way indicates that they acted with malice solely to injure Plaintiffs."). In other words, according to Plaintiff's own allegations, the Defendants' alleged improper actions were taken for the *purpose* of economically benefitting them in their new endeavor, but had the side effect of affecting Synthes's operations and profitability. At no point in the Amended Complaint does Plaintiff expressly state that any purpose of the conspiracy—let alone the sole purpose—was to injure Synthes. Accordingly, this claim, as alleged against Defendant Powell, shall be dismissed.

Synthes, Inc. v. Emerge Med., Inc., No. Civ.A.11-1566, 2012 WL 4205476, at *37 (E.D. Pa.

Sept. 19, 2012) (footnotes omitted). Although that ruling was made only with respect to

193

Defendant Powell as the moving party, the holding applies with equal force to the remainder of the Defendants. Synthes concedes this fact and does not otherwise dispute the entry of summary judgment in favor of Defendants on this claim. Therefore, this claim must be dismissed.

## IV.    CONCLUSION

At the close of this most lengthy opinion, the Court recognizes that, while much of this case has been conclusively resolved, there still remain several outstanding claims that require jury resolution. To summarize:

- With respect to the breach of fiduciary duty claim against Marotta, the Court grants Synthes's Motion for Summary Judgment and denies Defendants' Motion for Partial Summary Judgment.

- With respect to the aiding and abetting breach of fiduciary duty claim against Emerge, the Court grants Defendants' Motion for Summary Judgment and denies Synthes's Motion for Summary Judgment.

- With respect to the breach of the Assignment Provision in the NDA claim against Marotta, the Court grants Defendants' Motion for Summary Judgment and denies Synthes's Motion for Summary Judgment.

- With respect to the breach of the Non-Competition Provision of the RM NCA claim against Marotta, the Court grants Synthes's Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment.

- With respect to the breach of the Non-Solicitation of Customers Provision of the RM NCA claim against Marotta, the Court grants Synthes's Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment.

- With respect to the breach of the Non-Solicitation of Employees Provision of the RM NCA claim against Marotta, the Court denies both Motions for Summary Judgment.

- With respect to the breach of the SC NCA claim against Marotta, the Court grants Synthes's Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment.

194

- With respect to the breach of the Return of Property Provisions and Confidentiality and Non-Disclosure Provisions of the RM NCA and NDA claim against Marotta, the Court finds that a genuine issue of material fact remains with respect to the small fragment set and denies both parties' Motions on that point, but grants Synthes's Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment as to the Synthes product in Marotta's garage and the Synthes emails.

- With respect to the misappropriation claim, the Court grants Plaintiff's Motion for Summary Judgment with respect to manufacturing costs and usage data, Synthes product drawings and information related to external fixation products, Synthes product drawings and information related to critical features dimensions and tolerances for screws developed and identified as additional product offerings, and Synthes product drawings related to Synthes cortical and cancellous screws. The Court, however, denies Synthes's Motion as to Synthes's engineering specifications and information related to products identified as additional Emerge product offerings, and as to Synthes's strategic business planning information.

- With respect to the false advertising under the Lanham Act claim, the Court denies Synthes's Motion for Summary Judgment.

- With respect to the Computer Fraud and Abuse Act claim, the Court grants Defendants' Motion for Summary Judgment.

- With respect to the trespass to chattels claim, the Court denies Defendants' Motion for Summary Judgment.

- With respect to the fraud claim, the Court denies Defendants' Motion for Summary Judgment.

- With respect to the tortious interference with contract claim, the Court grants Defendants' Motion for Summary Judgment as to tortious interference with Marotta's contract, part of the tortious interference claim related to Powell's contract, and tortious interference with Brown's contract, but denies Defendants' Motion as it relates to part of Powell's contract, intererence with vendor contracts, interference with customer contracts, and interference with other Synthes employee contracts by soliciting them for employment elsewhere.

195

- With respect to the civil conspiracy claim, the Court grants Defendants' Motion for Summary Judgment.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SYNTHES, INC., SYNTHES USA HQ, INC., :
SYNTHES USA, LLC, SYNTHES USA SALES, :
LLC, and SYNTHES USA PRODUCTS, LLC, :
 : CIVIL ACTION
  Plaintiffs, :
 :
 v. :
 : NO. 11-1566
EMERGE MEDICAL, INC., JOHN P. :
MAROTTA, ZACHARY W. STASSEN, ERIC :
BROWN, and CHARLES Q. POWELL :
 :
  Defendants. :
_____:
 :
EMERGE MEDICAL, INC. , :
 :
  Counterclaim-Plaintiff, :
 :
 v. :
 :
SYNTHES, INC., SYNTHES USA HQ, INC. :
SYNTHES USA, LLC, SYNTHES USA SALES, :
LLC, and SYNTHES USA PRODUCTS, LLC, :
 :
  Counterclaim-Defendants. :

## ORDER

**AND NOW**, this *5th* day of *June*, 2014, upon consideration of **(1)** the Motion for Partial

Summary Judgment by Plaintiffs Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC,

Synthes USA Sales, LLC, and Synthes USA Products, LLC (collectively "Plaintiffs") as to

Liability on the Amended Complaint (Docket No. 207), the Response of Defendants Emerge

Medical, Inc., John P. Marotta, and Charles Q. Powell (collectively "Defendants") (Docket No.

224); and Plaintiffs' Reply Brief (Docket Nos. 231, 235); and **(2)** the Motion by Defendants for

Partial Summary Judgment on the Amended Complaint (Docket Nos. 205, 215); Plaintiffs'

Response (Docket Nos. 220, 223, 228); and Defendants' Reply Brief (Docket No. 237), together

with the parties' Statements of Fact and supporting exhibits,[1] it is hereby **ORDERED** as follows:

1. With respect to Count I of the Amended Complaint alleging Breach of Fiduciary Duty and/or Loyalty against Defendant Marotta, it is hereby **ORDERED** that:

   a. Plaintiffs' Motion for Summary Judgment is **GRANTED**;

   b. Defendants' Motion for Summary Judgment is **DENIED**; and

   c. **JUDGMENT IS ENTERED** in favor of Plaintiffs and against Defendants on this Count.

2. With respect to Count II of the Amended Complaint alleging Breach of Contract under the Non-Competition and Non-Disclosure Agreements against Defendant Marotta, it is hereby **ORDERED** that:

   a. As to the Assignment Provision in the Non-Disclosure Agreement:

      I. Plaintiffs' Motion for Summary Judgment is **GRANTED**;

      ii. Defendants' Motion for Summary Judgment is **DENIED**; and

      iii. **JUDGMENT IS ENTERED** in favor of Plaintiffs and against Defendants on this claim.

   b. As to the Non-Compete Provision of the Regional Manager Non-Competition Agreement:

      I. Plaintiffs' Motion for Summary Judgment is **GRANTED**;

      ii. Defendants' Motion for Summary Judgment is **DENIED**; and

      iii. **JUDGMENT IS ENTERED** in favor of Plaintiffs and against

---

[1] Given the fact that many of these documents were filed in duplicate and are under seal, the Court cannot definitively ascertain which docket numbers correspond with the relevant filings. In any event, this Order is intended to deal with Plaintiffs' Motion for Partial Summary Judgment as to Liability and Defendants' Motion for Partial Summary Judgment on the Amended Complaint.

Defendants on this claim.

c.     As to the Non-Solicitation of Customers Provision of the Regional Manager Non-Competition Agreement:

        I.       Plaintiffs' Motion for Summary Judgment is **GRANTED**;

        ii.      Defendants' Motion for Summary Judgment is **DENIED**; and

        iii.     **JUDGMENT IS ENTERED** in favor of Plaintiffs and against Defendants on this claim.

d.     As to the Non-Solicitation of Employees Provision of the Regional Manager Non-Competition Agreement, both parties' Motions for Summary Judgment are **DENIED**.

e.     As to the Sales Consultant Non-Competition Agreement:

        I.       Plaintiffs' Motion for Summary Judgment is **GRANTED**;

        ii.      Defendants' Motion for Summary Judgment is **DENIED**; and

        iii.     **JUDGMENT IS ENTERED** in favor of Plaintiffs and against Defendants on this claim.

f.     As to the Return of Property Provisions and Confidentiality and Non-Disclosure Provisions of the Regional Manager Non-Competition Agreement and Non-Disclosure Agreement:

        I.       Both parties' Motions for Summary Judgment are **DENIED** as they pertain to the small fragment set;

        ii.      On all other portions of this claim, Plaintiffs' Motion for Summary Judgment is **GRANTED**, Defendants' Motion for Summary Judgment is **DENIED**, and **JUDGMENT IS ENTERED** in favor of Plaintiffs and against Defendants on this claim.

3.     With respect to Count III of the Amended Complaint alleging Tortious Interference with Contract against all Defendants, it is hereby **ORDERED** that:

a.     As to Plaintiffs' claim for Tortious Interference with Marotta's contract:

        I.       Defendants' Motion for Summary Judgment is **GRANTED**; and

3

ii.     **JUDGMENT IS ENTERED** in favor of Defendants and against Plaintiffs on this claim.

b.     As to Plaintiffs' claim for Tortious Interference with Powell's contract:

     I.     Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED** in part as set forth in the accompanying Motion;

     ii.     **JUDGMENT IS ENTERED** in favor of Defendants to the extent Plaintiffs allege that Defendants tortiously interfered with Powell's contract by causing him to leave Synthes's employ.

c.     As to Plaintiffs' claim for Tortious Interference with Brown's contract:

     I.     Defendants' Motion for Summary Judgment is **GRANTED**; and

     ii.     **JUDGMENT IS ENTERED** in favor of Defendants and against Plaintiffs on this claim.

d.     As to Plaintiffs' claim for Tortious Interference with Vendor and Customer Contracts, Defendants' Motion for Summary Judgment is **DENIED**.

e.     As to Plaintiffs' claim for Tortious Interference with Employee Contracts by Soliciting Them for Employment Elsewhere:

     I.     Defendants' Motion for Summary Judgment is **GRANTED**; and

     ii.     **JUDGMENT IS ENTERED** in favor of Defendants and against Plaintiffs on this claim.

4.     With respect to Count IV of the Amended Complaint alleging Aiding and Abetting Breach of Fiduciary Duty against Defendants Marotta and Emerge, it is hereby **ORDERED** that:

a.     Defendants' Motion for Summary Judgment is **GRANTED**;

b.     Plaintiffs' Motion for Summary Judgment is **DENIED**;

c.     **JUDGMENT IS ENTERED** in favor of Defendants and against Plaintiffs on this claim.

5.     With respect to Count V of the Amended Complaint alleging Misappropriation

4

against Defendants, it is hereby **ORDERED** that:

    a.    As to manufacturing costs and usage data, Synthes product drawings and information related to external fixation products, Synthes product drawings and information related to external fixation products, Synthes product drawings and information related to critical features dimensions and tolerances for screws developed and identified as additional product offerings, and Synthes product drawings related to Synthes cortical and cancellous screws, Plaintiffs' Motion for Summary Judgment is **GRANTED** and **JUDGMENT IS ENTERED** in favor of Plaintiffs on these claims.

    b.    As to Synthes engineering specifications and information related to products identified as additional Emerge product offerings, and Synthes strategic planning information, Plaintiffs' Motion for Summary Judgment is **DENIED**.

6.    With respect to Count VI of the Amended Complaint alleging violation of the Computer Fraud and Abuse Act, it is hereby **ORDERED** that:

    a.    Defendants' Motion for Summary Judgment is **GRANTED**; and

    b.    **JUDGMENT IS ENTERED** in favor of Defendants on this claim.

7.    With respect to Count VIII of the Amended Complaint alleging False Advertising under the Lanham Act, it is hereby **ORDERED** that:

    a.    Defendants' Motion for Summary Judgment is **GRANTED**; and

    b.    **JUDGMENT IS ENTERED** in favor of Defendants on this claim.

8.    With respect to Count IX of the Amended Complaint alleging Trespass to Chattels, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment is **DENIED**;

9.    With respect to Count XI of the Amended Complaint alleging Fraud, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment is **DENIED**;

10.    With respect to Count XII of the Amended Complaint alleging Civil Conspiracy, it is hereby **ORDERED** that:

    a.    Defendants' Motion for Summary Judgment is **GRANTED**; and

b.      **JUDGMENT IS ENTERED** in favor of Defendants on this claim.[2]

It is so **ORDERED**.

BY THE COURT:

_____
RONALD L. BUCKWALTER, S.J.

---

[2] Counts VII, X, and XIII of the Amended Complaint were not the subject of either party's Motion for Summary Judgment.

6